## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>INTEGRATED HEALTH SERVICES, INC., et al.,<br><br><br>Debtors. | Chapter 11<br><br>Case No. 00-389 (MFW)<br><br>(Jointly Administered) |
| IHS LIQUIDATING LLC,<br>    Plaintiff,<br>  v.<br><br>ACE INDEMNITY INSURANCE COMPANY f/k/a<br>INDEMNITY INSURANCE COMPANY OF NORTH<br>AMERICA,<br>    Defendant. | Adv. No. 05-51318 (MFW) |

### RESPONSE OF PLAINTIFF IHS LIQUIDATING LLC
### IN OPPOSITION TO THE MOTION OF DEFENDANT FOR
### WITHDRAWAL OF REFERENCE UNDER 28 U.S.C. §157(d)

TO:    THE HONORABLE MARY F. WALRATH
       CHIEF UNITED STATES BANKRUPTCY JUDGE

Plaintiff IHS Liquidating LLC ("Plaintiff" or "Liquidating LLC"), by its attorneys,

hereby submits this response ("Response") in opposition to the *Motion of Defendant for Withdrawal*

*of Reference Pursuant to 28 U.S.C. § 157(d)* (the "Motion"), filed by defendant Ace Indemnity

Insurance Company, f/k/a Indemnity Insurance Company of North America ("Defendant" or

"IICNA").

## PRELIMINARY STATEMENT

1.    IICNA would have this Court withdraw the reference of this adversary proceeding (the "1999 Policy Proceeding") notwithstanding that (i) it is a core proceeding,[1] (ii) the insurance policy that forms the basis of this action is an integral part of IHS' plan of reorganization, (iii) the Bankruptcy Court has overseen the IHS bankruptcy and, in fact, has already adjudicated an adversary proceeding involving the very same issues as the instant case, and thus is intimately familiar with the underlying transactions and legal issues relevant to this dispute; and (iv) IICNA is engaging in blatant forum shopping by attempting to amend the complaint in a completely unrelated action pending in this Court, in order to add a claim that essentially mirrors this action, in a transparent attempt to avoid this Court's automatic reference of the matter to the Bankruptcy Court. In light of these facts, IICNA cannot meet its burden of demonstrating that sufficient cause exists to withdraw the reference. The Motion should be denied.

## RELEVANT BACKGROUND

### A.    The Debtors' Chapter 11 Cases

2.    On February 2, 2000 (the "Filing Date"), Integrated Health Services, Inc. ("IHS") and a number of its direct and indirect subsidiaries (collectively with IHS, the "Debtors"), filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

3.    The Debtors operated through three principal business segments, one of which was the operation of skilled nursing and subacute care facilities. Because of the nature of the long term care industry and the sheer magnitude of the Debtors' operations, the Debtors maintained

---

[1]    This issue is addressed more fully in the *Response of Plaintiff IHS Liquidating LLC In Opposition to Defendant's Motion Pursuant to Del. Bankr. L.R. 5011-1 For Determination Whether Matter Is Core*, which has been filed with the Bankruptcy Court and is annexed hereto as Exhibit "A".

certain programs and practices to manage their exposure to liability claims asserted against the Debtors in the operation of their businesses. The Debtors' practices included, *inter alia*, the procurement of insurance policies for professional and general liability claims ("PL/GL Claims").

**B.    The Plan, the SPA, the Liquidating LLC and the Treatment of PL/GL Claims**

4.    By order dated May 12, 2003 (the "Confirmation Order"), the Bankruptcy Court confirmed the *Amended Joint Plan of Reorganization of Integrated Health Services, Inc. and its Subsidiaries under Chapter 11 of the Bankruptcy Code*, dated March 13, 2003 (as amended, modified or supplemented, including by the Confirmation Order, the "Plan").[2] The Plan became effective on September 9, 2003 (the "Effective Date").

5.    The cornerstone of the Plan was the consummation of a stock purchase agreement (the "SPA") between IHS and Abe Briarwood Corp. ("Briarwood"). Both the SPA and the Plan contemplated the formation by IHS of two new wholly-owned subsidiaries named IHS Long Term Care, Inc. (the "LTC Subsidiary") and IHS Therapy Care, Inc. (the "Therapy Subsidiary" and, together with the LTC Subsidiary, the "Purchased Subsidiaries"). *See* Plan at §5.9(b); SPA at p.1. Section 5.9(b) of the Plan provided for the implementation of the SPA, including the provision that IHS will "contribute and assign" to either the LTC Subsidiary or the Therapy Subsidiary, as the case may be, all of IHS' assets and liabilities other than the Excluded Assets and the Excluded Liabilities. *Id.*

6.    Effective as of August 31, 2003, in accordance with the SPA, the Plan and the Confirmation Order, IHS contributed and assigned to the LTC Subsidiary all of its assets and liabilities that related to IHS' long-term care business, other than "Excluded Assets" and "Excluded Liabilities" (each as defined under the SPA) and contributed and assigned to the Therapy Subsidiary

---

2    A copy of the Plan is annexed hereto as Exhibit "B".

all of its assets and liabilities that related to IHS' contract rehabilitation therapy business, again other than Excluded Assets and Excluded Liabilities.

7.    At the closing under the SPA, Briarwood purchased from IHS all of the outstanding shares of the Purchased Subsidiaries. As a result, the LTC Subsidiary, owned by Briarwood post-closing, is liable for all liabilities of IHS in respect of PL/GL Claims arising from and after the Filing Date, and the Reorganized Debtors, indirectly owned by Briarwood through the LTC Subsidiary, remain liable for PL/GL Claims against them arising from and after the Filing Date.

8.    In addition to the implementation of the SPA, the Plan contemplated the formation of the Liquidating LLC, a Delaware limited liability company, for the purpose of implementing certain aspects of the Plan after the Effective Date. In accordance with section 5.9 of the Plan, upon the closing under the SPA, the then-remaining assets and liabilities of IHS, consisting of the net proceeds of the SPA, the Excluded Assets and the Excluded Liabilities, were transferred to the Liquidating LLC. As a result of the consummation of the transactions contemplated by the Plan, IHS was left without any assets or liabilities.

9.    Among other things, the Plan charges the Liquidating LLC with responsibility for the administration of disputed prepetition claims against the Debtors, including, without limitation, PL/GL Claims arising *prior* to the Filing Date.

10.    Under the Plan, a special and distinct class was established for PL/GL Claims arising during the calendar year 1999 ("1999 Insured Tort Claims"), because the Debtors' professional/general liability ("PL/GL") insurance coverage for claims arising in 1999 presented a number of unique and complex issues requiring an equitable resolution under the Plan, as discussed in greater detail below.

**C.**   **The Reliance Liquidation and Treatment of 1999 Insured Tort Claims Under the Plan**

11.   The Debtors' primary PL/GL insurance carrier for 1999 was Reliance Insurance Company ("Reliance"). The policy issued by Reliance (the "Reliance Policy") is a matching deductible insurance policy. In the view of IHS (and, since the Effective Date, the Liquidating LLC), the Reliance Policy provides coverage of $2,000,000 per incident for professional liability claims and $1,000,000 per incident for general liability claims, with an aggregate coverage limit of $9,000,000. Under the Reliance Policy, IHS is subject to deductibles in the same amounts as the coverage limits.

12.   On October 3, 2001, the Commonwealth Court of Pennsylvania declared Reliance insolvent and entered an Order of liquidation (the "Liquidation Order"). M. Diane Koken, Insurance Commissioner of the Commonwealth of Pennsylvania, was named as the Reliance Liquidator.

13.   On or about September 20, 2002, IHS filed an action against Reliance (the "Reliance Action") to resolve certain disputes between the Reliance Liquidator and the Debtors with respect to the Reliance Policy. In the Reliance Action, IHS seeks, among other things, a declaration that the Reliance Policy provides total coverage of $9,000,000. The Reliance Liquidator maintains that the aggregate policy limit is only $4,500,000. The Liquidating LLC (as successor to IHS in the litigation) and the Reliance Liquidator agree that the aggregate limits of the Reliance Policy have been exhausted, whether those limits are $4.5 million or $9 million, by judgments entered against the Debtors and settlements made by the Debtors totaling substantially in excess of $9 million.

14.   Since the Liquidation Order was entered, the Reliance Liquidator has not paid any claims or defense costs covered by the Reliance Policy. Once the litigation between IHS and Reliance is resolved, the Liquidating LLC will have a claim against the Reliance liquidation estate

for any part of the coverage that was not exhausted prior to the Reliance liquidation. The value of the claim cannot be determined until both the allowed amount of the claim and the likely percentage recovery of creditors are determined.

15. As a result of Reliance's liquidation proceeding, it became obvious that in the absence of a resolution among the holders of 1999 Insured Tort Claims, there was a risk that certain holders of 1999 Insured Tort Claims whose claims were liquidated within the Reliance coverage limits would be partially or completely deprived of access to insurance proceeds, while other holders would have access to the full benefit of coverage under the excess policies. In order to address this problem, the Debtors established a special class under the Plan for holders of 1999 Insured Tort Claims.

16. The Plan provides for each holder of an allowed 1999 Insured Tort Claim to receive its *pro rata* share of the aggregate sum of (i) the proceeds recovered at any given time under the Debtors' insurance policies, including excess insurance policies, in respect of allowed 1999 Insured Tort Claims, after payment of defense costs payable under the policies ("Available 1999 Insurance Proceeds"); and (ii) 3% of the difference between the Available 1999 Insurance Proceeds and the total amount of allowed 1999 Insured Tort Claims.

17. In order for the Liquidating LLC to implement distributions to the holders of allowed 1999 Insured Tort Claims, the Plan further provides for the formation of an escrow account (the "1999 Insured Tort Claims Escrow"), to be established on the Effective Date and administered by the Liquidating LLC. Pursuant to the Plan, as each 1999 Insured Tort Claim is resolved, the insurance proceeds that would otherwise be paid directly to the claimant must be paid to the Liquidating LLC for deposit into the 1999 Insured Tort Claims Escrow, so that the Liquidating LLC may make pro rata interim and final distributions as provided in the Plan.

**D.    The Debtors' Coverage Dispute With National Union for 1999 Insured Tort Claims**

18.    National Union Fire Insurance Company of Pittsburgh ("National Union")
issued an excess insurance policy providing both professional liability and general liability coverage
for IHS for the policy period January 1, 1999 through January 1, 2000 (the "National Union Policy").
The National Union Policy provides the first layer of $25 million per occurrence/aggregate in excess
in the Reliance Policy.

19.    The Debtors' Disclosure Statement relating to the Plan discussed at length the
mechanics of the Class 8 distribution scheme and the availability of coverage under the excess
policies, notwithstanding Reliance's insolvency. Shortly before the Plan was confirmed, National
Union took the position that the Debtors could not look to National Union for any professional
liability insurance coverage until the $9 million primary layer of coverage was exhausted by the
actual cash payment of $9 million in claims and expenses. Because both IHS and Reliance were in
insolvency proceedings, it was unlikely that IHS would ever actually pay the $9 million obligation
in full. The position taken by National Union therefore amounted to a complete denial of coverage,
and the holders of 1999 Insured Tort Claims were notified of National Union's position.

20.    On March 26, 2003, IHS filed an adversary proceeding in the Bankruptcy
Court styled *Integrated Health Services, Inc. v. National Union Fire Insurance Company of
Pittsburgh, PA*, Adv. Proc. No. 03-52081, in an effort to enforce coverage under the National Union
Policy (the "National Union Adversary Proceeding"). By order dated October 23, 2003 (the
"Summary Judgment Order"), the Bankruptcy Court entered partial summary judgment in favor of
IHS. The Summary Judgment Order held, *inter alia*, that coverage under the National Union Policy
was triggered upon IHS becoming liable for 1999 Insured Tort Claims and related defense costs in

excess of $9 million, whether by settlement or judgment, regardless of whether IHS or Reliance paid such claims and expenses in cash.

21.    The 1999 Insured Tort Claims that have to date been liquidated in amount by judgments or settlement agreements constituting binding legal obligations aggregate to an amount in excess of the limits of the Reliance Policy and the National Union Policy. In accordance with the Plan, National Union has made payments to the Liquidating LLC for 1999 Insured Tort Claims within National Union's layer of coverage.

E.    **The 1999 GenStar Policy**

22.    General Star Indemnity Company ("GenStar") issued an excess insurance policy providing both professional liability and general liability coverage for IHS for the policy period January 1, 1999 through January 1, 2000 (the "GenStar Policy"). The GenStar Policy provides the second layer of $25 million per occurrence/aggregate in excess of the Reliance Policy and National Union Policy.

23.    Once the National Union coverage limits were reached, GenStar, without any objection, acted in conformance with the Bankruptcy Court's directive in the National Union Adversary Proceeding and assumed the administration and defense of the remaining 1999 Insured Tort Claims. GenStar has reportedly entered into settlements on behalf of IHS and/or obligated itself to satisfy judgments against IHS that will soon exhaust the $25 million limit of the GenStar Policy. In accordance with the Plan, and consistent with the Bankruptcy Court's ruling in the National Union litigation, GenStar has made payments to the Liquidating LLC for 1999 Insured Tort Claims within GenStar's layer of coverage.

F.    **The IICNA 1999 Policy**

24.    The third layer of insurance coverage in excess of the Reliance Policy, the National Union Policy and the GenStar Policy consists of insurance issued by IICNA, pursuant to that certain Excess Liability Catastrophe Policy, No. XLX G19545507 (the "1999 IICNA Policy").[3] The 1999 IICNA Policy provides excess coverage for 1999 Insured Tort Claims of $50 million per occurrence and $50 million in the aggregate in excess of underlying insurance limits.

25.    Upon information and belief, the aggregate amount of Allowed 1999 Insured Tort Claims will exceed the limits under the GenStar policy, and as a result, some portion of the excess coverage provided by the 1999 IICNA Policy will be payable. As confirmed by the express language of Sections IV.C and IV.I(2) of the 1999 IICNA Policy, the insolvency and bankruptcy of IHS do not relieve IICNA of its obligations under the 1999 IICNA Policy.

26.    Section I of the 1999 IICNA Policy defines the coverage obligation of IICNA as follows:

A.    COVERAGE

WE will pay on YOUR behalf the ULTIMATE NET LOSS (1) in excess of all UNDERLYING INSURANCE, and (2) only after all UNDERLYING INSURANCE has been exhausted by the payment of the limits of such insurance for losses arising out of OCCURRENCES that take place during OUR policy period and are insured by all of the policies designated in the Declarations as UNDERLYING INSURANCE. If any UNDERLYING INSURANCE does not pay a loss for reasons other than the exhaustion of an aggregate limit of insurance, then WE shall not pay such loss.

---

[3]    A copy of the IICNA 1999 Policy is annexed hereto as Exhibit "C." The Motion to Amend (as herein defined) and the proposed amended complaint attached thereto refer to a different policy number, and the Liquidating LLC, which does not have a copy of the policy bearing the number referenced in the Motion to Amend, has not yet determined whether there are any differences between the two documents other than the policy number. Counsel for IICNA has informed the Liquidating LLC's counsel that the policy number was changed in 1999, for reasons IICNA has not yet determined.

27.    The 1999 IICNA Policy defines "Ultimate Net Loss" as "the amount paid or payable in cash in the settlement or satisfaction of claims for which the insured is liable, either by adjudication or compromise with OUR written consent, after making proper deduction for all recoveries and salvages." The 1999 IICNA Policy further provides that "[d]efense expense payments shall be included within the ULTIMATE NET LOSS, provided that such expenses are included within the terms, conditions, and limits of insurance of any UNDERLYING INSURANCE."

28.    Similar to the National Union policy, the 1999 IICNA Policy expressly provides that the bankruptcy or insolvency of IHS, or of IHS's underlying insurance carrier, will not relieve IICNA of any obligation to pay a covered claim. Section IV.C states, in relevant part, that "[b]ankruptcy and insolvency of YOU, or YOUR estate will not relieve US of OUR obligations under this policy." Additionally, Section IV.I(2) provides, in relevant part, that if any limits of liability of underlying insurance are "unavailable due to bankruptcy or insolvency of an underlying insurer . . . then the insurance afforded by this policy shall apply in the same manner as if such underlying insurance and limits of liability had been in effect, available, so maintained and unchanged."

## G.    The Briarwood Proceeding and the Motion to Amend

29.    Separate and apart from the 1999 IICNA Policy, IICNA also provided the Debtors with insurance coverage for claims arising during the year 2000. That insurance is provided pursuant to that certain Excess Liability Catastrophe Policy, No. XLXG20108034. (the "2000 IICNA Policy"). After confirmation of the Plan but prior to the consummation of the SPA, Briarwood filed a motion in the Bankruptcy Court requesting, *inter alia*, a declaration from the Bankruptcy Court that the 2000 IICNA Policy, which primarily covered PL/GL Claims arising after the Filing Date, would

be in full force and effect upon consummation of the SPA. Upon information and belief, Briarwood and IICNA subsequently agreed to litigate that issue in a separate adversary proceeding.

30.    Accordingly, on August 15, 2003, IICNA commenced an adversary proceeding (the "Briarwood Proceeding") in the Bankruptcy Court, naming Briarwood and IHS as defendants. The complaint (the "Briarwood Complaint") seeks a declaratory judgment that (i) Briarwood and the Purchased Subsidiaries are not insureds under the 2000 IICNA Policy, (ii) in the alternative, that Briarwood and the Purchased Subsidiaries are subject to the same obligations as the named insureds under the 2000 IICNA Policy, and (iii) that IICNA is entitled to defend and settle the PL/GL Claims covered by the 2000 IICNA Policy under a complete reservation of rights.

31.    At the time the Briarwood Complaint was filed, the Plan had not become effective, the SPA had not been consummated, and the Liquidating LLC had not yet come into existence. Less than one month later, as a result of the consummation of the Plan, IHS was divested of all of its assets and liabilities, and Briarwood assumed defense of the Briarwood Proceeding.

32.    On September 3, 2004, IICNA filed a motion pursuant to 28 U.S.C. §157(d) to withdraw the automatic reference of the Briarwood proceeding to the Bankruptcy Court. The motion was unopposed, and by Order dated December 2, 2004, this Court withdrew the reference.

33.    On April 18, 2005, IICNA filed a motion to amend the Briarwood Complaint (the "Motion to Amend"), seeking, among other things, to add a claim for declaratory relief relating to the 1999 IICNA Policy (the "Proposed 1999 Count"). Specifically, the Proposed 1999 Count would seek a declaration that unless and until the underlying limits of the Reliance Policy, the National Union Policy and the GenStar Policy have been exhausted by the actual *payment* of claims against IHS during the policy period, IICNA owes no duty under the 1999 IICNA Policy to indemnify and defend the Debtors' estates against 1999 Insured Tort Claims or any other claims

occurring within the policy period. In other words, notwithstanding the Plan's contemplation that the proceeds of the insurance policies covering 1999 Insured Tort Claims are to be paid to the Liquidating LLC for pro rata distribution to creditors, *and* notwithstanding the Bankruptcy Court's coverage determination in the National Union Adversary Proceeding, IICNA belatedly seeks a ruling -- not from the Bankruptcy Court, which is already familiar with the underlying issues, but from this Court -- that as a result of the bankruptcy of the Debtors and the liquidation of Reliance, IICNA will *never* have any obligation to defend the Debtors' estates against 1999 Insured Tort Claims and/or contribute funds to the 1999 Insured Tort Claims Escrow.

**H.    The 1999 Policy Proceeding and the Motion to Intervene**

34.    On May 6, 2005, the Liquidating LLC commenced the 1999 Policy Proceeding in the Bankruptcy Court, pursuant to which it seeks declaratory relief to enforce coverage under the 1999 IICNA Policy. In addition, on May 13, 2005, the Liquidating LLC filed a motion to intervene in the Briarwood Proceeding pending before this Court for the purposes of (i) objecting to the Motion to Amend and (ii) in the alternative, in the event that the Motion to Amend is granted, filing a subsequent motion requesting that the Proposed 1999 Count be severed and referred to the Bankruptcy Court for consolidation with the 1999 Policy Proceeding.

35.    On May 13, 2005, IICNA filed the instant Motion, by which it seeks to have the automatic reference of the 1999 Policy Proceeding withdrawn. By a separate motion, IICNA has requested a determination from the Bankruptcy Court that the 1999 Policy Proceeding is a non-core proceeding.

**APPLICABLE LEGAL STANDARD**

36.    IICNA seeks to withdraw the reference pursuant to section 157(d) of the United States Judicial Code, which provides in relevant part that "[t]he district court may withdraw,

in whole or in part, any case or proceeding referred under this section, on its own motion or on

timely motion of any party, for cause shown." 28 U.S.C. § 157(d).[4] The burden of establishing

sufficient "cause" rests squarely on the moving party to justify withdrawing the reference from the

Bankruptcy Court. *See Hatzel & Buehler, Inc. v. Central Hudson Gas and Elec. Corp.*, 106 B.R.

367, 370 (D. Del. 1989).

      37.    To avoid undue interference with the proper functioning of the bankruptcy

courts, courts in this and other districts have held that section 157(d) should be construed narrowly.

*See In re G-I Holdings, Inc.*, 295 B.R. 211, 221 (D.N.J. 2003); *Hatzel & Buehler*, 106 B.R. at 371;

*In re White Motor Corp.*, 42 B.R. 693, 703 (N.D. Ohio 1984). The legislative history of section

157(d) makes clear that Congress did not intend for that section to become "an escape hatch through

which most bankruptcy matters will be removed to the district court." *In re Onyx Motor Car Corp.*,

116 B.R. 89, 91 (S.D. Ohio 1990) (citing 130 Cong. Rec. H1850 (daily ed. March 21, 1984)).

Accordingly, courts have been cautious in applying section 157(d) so that the exception does not

swallow the rule. *See In re Pruitt*, 910 F.2d 1160, 1168 (3d Cir. 1990); *Holland Am. Ins. Co. v.*

*Succession of Roy*, 777 F.2d 992, 998 (5th Cir. 1985).

      38.    In determining whether cause is shown for purposes of section 157(d), courts

consider, among other factors, whether the matters to be withdrawn are "core" or "non-core" to the

bankruptcy case, judicial economy, prevention of forum shopping, uniformity in the administration

of the bankruptcy laws, and the presence of a jury demand. *See In re Pruitt*, 910 F.2d at 1165

(adopting *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992 at 999); *see also In re Winstar*

*Communications, Inc.*, 2004 WL 2713101 (D. Del. Nov. 16, 2004) (denying motion to withdraw

---

[4]    IICNA concedes that mandatory withdrawal under 28 U.S.C. §157(d) is not applicable to the 1999 Policy
Proceeding.

reference); *C-TC 9th Ave. P'ship. v. Norton Co., (In re C-TC 9th Ave. P'ship)*, 177 B.R. 760, 765

(N.D.N.Y. 1995); *In re Big V Holding Corp.*, 2002 WL 1482392 (D. Del. July 11, 2002); *NDEP*

*Corp. v. Handl-It, Inc. (In re NDEP Corp.)*, 203 B.R. 905, 908 (D. Del. 1996) (citing *Orion Pictures*

*Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1101 (2d Cir. 1993));

*In re Philadelphia Training Center Corp.*, 155 B.R. 109, 112 (E.D. Pa. 1993).

## ARGUMENT

### MOVANTS HAVE FAILED TO SATISFY
### THEIR BURDEN OF ESTABLISHING SUFFICIENT CAUSE
### TO WITHDRAW THE REFERENCE UNDER 28 USC §157(d)

39.    As shown in the *Response of Plaintiff IHS Liquidating LLC In Opposition to*

*Defendant's Motion Pursuant to Del. Bankr. L.R. 5011-1 For Determination Whether Matter Is Core*,

which is annexed hereto as Exhibit "A" and incorporated herein by reference, the 1999 Policy

Proceeding is a core proceeding which should be resolved by the Bankruptcy Court. The claims in

the 1999 Policy Proceeding affect the administration of the estate, the liquidation of assets of the

estate and the adjustment of the debtor-creditor relationship. The availability of coverage under the

1999 IICNA Policy was contemplated by the Plan and is a critical component of the distribution

scheme for 1999 Insured Tort Claimants.

40.    The Plan specifically provides that the insurance carriers are to pay all

insurance proceeds that become due and owing to the Liquidating LLC, which is to carry out the

distributions contemplated by the Plan. Creditors voted on the Plan and participated in this

distribution scheme on the basis of that assumption. IICNA knew this to be the case by at least

January 2005, well before the Plan was confirmed, yet waited until April 2005, long after the Plan

had become effective and distributions had commenced, to disclose its position that the 1999 IICNA

Policy proceeds should never become payable. The Liquidating LLC, as administrator of the Debtors'

estates, cannot carry out its obligations absent a ruling on the 1999 Policy Proceeding. The resolution

of the claims asserted in the 1999 Policy Proceeding therefore is crucial to the implementation of the

Plan and the administration of the Debtors' bankruptcy cases in accordance with the Plan. As such,

the 1999 Policy Proceeding is core pursuant to § 157(b)(2)(A) and (O). *See, e.g., United States Lines,*

*Inc. v. American Steamship (In re United States Lines, Inc.)*, 197 F.3d 631, 636 (2d Cir. 1999); *In*

*re Prudential Lines*, 170 B.R. 222, 229 (S.D.N.Y. 1994); *In re County Seat Stores, Inc.*, 2002 WL

141875, *3-4 (S.D.N.Y. Jan. 31, 2002); *Celotex Corp. v. AIU Ins. Co. (In re Celotex Corp.)*, 152 B.R.

667, 676 (Bankr. M.D. Fla. 1993).

      41.    The fact that the 1999 Policy Proceeding is core weighs heavily against

withdrawing the reference. *See In re Philadelphia Training Center Corp.*, 155 B.R. at 112 (noting

that threshold factor in determining permissive withdrawal is whether claim asserted is core); *In re*

*Enron Corp.*, 295 B.R. 21, 26 (S.D.N.Y. 2003) (noting that determination that claim asserted in

adversary proceeding is core strongly indicates that there is no cause to withdraw reference); *In re*

*County Seat Stores, Inc.*, 2002 WL 141875, *4 (S.D.N.Y. Jan. 31, 2002) (same).

      42.    However, even if this proceeding were not core, IICNA can not meet its burden

of showing that cause exists to withdraw the reference. It is well settled that the fact that a proceeding

is non-core is not dispositive of the question of whether the reference should be withdrawn. *See In*

*re Enron Corp.*, 295 B.R. at 26 (finding "core" nature of claims asserted in adversary proceeding is

not dispositive of whether there is "cause" for withdrawal of reference); *Mishkin v. Ageloff*, 220 B.R.

784, 800 (S.D.N.Y. 1998) (noting that fact that claims alleged in an adversary proceeding are core is

not dispositive of withdrawal analysis); *Hatzel & Buehler*, 106 B.R. at 371 ("Proceedings should not

be withdrawn for the sole reason that they are non-core."). Courts in this Circuit routinely deny

motions to withdraw the reference where, as here, the factors considered in determining whether

cause exists for permissive withdrawal militate against withdrawing the reference. *See, e.g., In re Big V Holding Corp.*, 2002 WL 1482392, *4 (D. Del. July 11, 2002); *Pension Benefit Guaranty Corp. v. Smith Corona Corp. (In re Smith Corona Corp.)*, 205 B.R. 712, 716 (D. Del. 1996); *Hatzel & Buehler*, 106 B.R. at 371.

43.     Withdrawing the reference would not promote uniformity in bankruptcy administration, foster the economical use of debtors' and creditors' resources or expedite the bankruptcy process.  To the contrary, judicial economy and uniformity would be served by leaving the case before Judge Walrath, who has presided over the Debtors' bankruptcy cases for more than five years, is intimately familiar with the case and the complex transactions and distribution procedures contemplated by the Plan and, in the context of the National Union Adversary Proceeding, considered and resolved the very same issues that are implicated by the 1999 Policy Proceeding.[5] *See, e.g., In re Big V Holding Corp.*, 2002 WL 1482392, at *4 (denying motion to withdraw reference because "[t]he Bankruptcy Court is intimately familiar with the numerous complex issues surrounding the [the action]."); *Northwestern Institute of Psychiatry, Inc. v. Travelers Indem. Co.*, 272 B.R. 104, 109 (E.D. Pa. 2001) (denying insurer's motion for withdrawal of core proceeding where "[t]he bankruptcy court is familiar with the parties, the factual background of the case and the legal issues involved. Therefore, this court finds no reason to disturb the present course and it declines to withdraw the reference as judicial economy will be served by allowing the adversary action to remain in bankruptcy court."); *General Electric Capital Corp. v. Teo*, 2001 U.S. Dist. LEXIS 22266, *16-17 (D. N.J. 2001) (dismissing defendant's motion to withdraw reference because of the bankruptcy

---

[5]     IICNA attempts in its amended complaint to characterize the Proposed 1999 Count as substantively dissimilar to the matter decided by the Bankruptcy Court in the National Union Adversary Proceeding.  However, the proposed amended complaint omits critical provisions in the 1999 IICNA Policy that are analogous to terms in the National Union Policy upon which the Bankruptcy Court based its summary judgment decision.

court's familiarity with nature of dispute and because there was substantial factual overlap between such dispute and other similar suits currently pending in the Bankruptcy Court). *See also Kaiser Aluminum & Chemical Corp. v. Monument Select Insurance Corp.*, 2004 U.S. Dist. LEXIS 19868 (D. Del. September 30, 2004) (granting motion for referral to the bankruptcy court because it had presided over a similar related aspect of the case and the outcome would affect the amount of money available in the debtor's estate). Withdrawing the reference of this proceeding would waste judicial resources and would create an unnecessary risk of inconsistent judgments. For this reason alone, the Motion should be denied.

44.     IICNA effort to characterize withdrawal as somehow promoting judicial economy is unavailing. IICNA's suggestion that this Court should withdraw the reference because, if this proceeding is non-core, this Court will have to review any findings of the Bankruptcy Court *de novo*, is nonsensical and should be rejected. *See* Motion at pp. 8-9. If that argument were accepted, it is difficult to imagine any circumstances under which the Bankruptcy Court could exercise its "related to" jurisdiction. The reference of all non-core proceedings would be withdrawn to avoid the "additional layer of judicial review." Motion at p. 9.

45.     IICNA'S assertion that withdrawing the reference would somehow avoid duplication of effort, (*see* Motion at pp. 9-11), ignores the fact that IICNA's Proposed 1999 Count is not yet before this Court and the fact that the Liquidating LLC has opposed IICNA's motion to amend the complaint in the Briarwood Action on the grounds that the Proposed 1999 Count should not be permitted, and that if it permitted, it should be consolidated with the 1999 Policy Proceeding and referred to the Bankruptcy Court. As shown in the Liquidating LLC's opposition to the Motion to Amend, the Proposed 1999 Count has nothing whatsoever to do with any of the legal or factual issues arising in the Briarwood Proceeding, in which IICNA seeks relief against an unrelated entity

with respect to a different insurance policy on completely different grounds-- and having no relevance to the Liquidating LLC's implementation of the Plan. IICNA's attempt to bootstrap the instant proceeding into this Court on the basis of a claim that is not even pending before this Court should be rejected.

46.    The best way to promote judicial efficiency and avoid duplication of effort is for this Court to deny both the Motion to Amend and the instant Motion, so that the 1999 Policy Proceeding and the Proposed 1999 Count can be tried together before Judge Walrath. Her Honor has extensive experience and knowledge with the Plan and has specifically addressed the majority of the legal and factual underpinnings of this dispute in the context of the National Union Policy Proceeding.

47.    In that regard, IICNA's argument that the reference should be withdrawn because the instant proceeding "is sufficiently different from the kinds of cases that typically arise in the course of bankruptcy administration" (*see* Motion at p. 10), is belied by the fact that the Bankruptcy Court has already adjudicated a virtually identical case (the National Union Adversary Proceeding). Furthermore, bankruptcy courts routinely resolve insurance coverage disputes where the availability of insurance proceeds forms an integral component of the debtor's plan of reorganization. *See, e.g., In re United States Lines, Inc.*, 197 F.3d at 636; *In re Prudential Lines*, 170 B.R. at 229; *In re County Seat Stores, Inc.*, 2002 WL 141875 at *3-4; *In re Celotex Corp.*, 152 B.R. at 676.

48.    Contrary to IICNA's assertion, Judge Walrath is well-suited to handle the 1999 Policy Proceeding. This dispute involves the interpretation of the Plan, the Disclosure Statement and the 1999 IICNA Policy, regarding issues that Judge Walrath has already adjudicated in the context of the National Union Adversary Proceeding--without the need for extensive discovery or expert testimony, as IICNA suggests could arise. Under these circumstances, it is difficult to imagine that

any court would be better equipped than the Bankruptcy Court to adjudicate the 1999 Policy Proceeding in an efficient manner.

49.     IICNA's argument that the Court should withdraw the reference here "for the same reasons the reference was withdrawn in the [Briarwood Proceeding]" misrepresents the record in that case and should be rejected. *See* Motion at p. 6. The Briarwood Proceeding was withdrawn from the Bankruptcy Court on a consensual basis, long before the Liquidating LLC, the 1999 Insured Tort Claims or the 1999 IICNA Policy were implicated in that action.[6] The Briarwood Proceeding seeks determinations relating exclusively to whether the rights and obligations of the 2000 IICNA Policy have been transferred to Briarwood and/or the LTC Subsidiary.    Unlike the holders of postpetition claims covered by the 2000 Policy, who have Administrative Expense Claims entitled to payment in full, the holders of 1999 Insured Tort Claims have no source of recovery other than the insurance proceeds that are ultimately paid into the 1999 Insured Tort Claims Escrow and distributed in accordance with the Plan. Hence, a decision as to the availability of insurance proceeds from the 1999 IICNA Policy is far more relevant to the administration of the bankruptcy cases than the Briarwood Proceeding, which, unlike the instant action, is essentially a two-party contract dispute.

50.     The remaining factors favor denying the motion.  Neither party has demanded a jury trial so IICNA does not, and cannot, argue that the reference should be withdrawn on this basis. Additionally, denying the Motion would put an end to IICNA's forum shopping.[7]  IICNA's motion

---

[6]     Although the Bankruptcy Court did enter an order stating that the 2000 Policy Proceeding was non-core, the court merely entered the order that IICNA submitted under Certificate of Counsel, indicating that no party objected to the relief sought in IICNA's motion. Since the Court had no countervailing argument before it, it is disingenuous for IICNA to attribute any particular reasoning to the Court's finding. Indeed, because the reference was withdrawn on a consensual basis, the Bankruptcy Court presumably did not engage in any analysis concerning whether the matter was core or non-core.

[7]     Ironically, IICNA claims that this factor is not applicable here. *See* Motion at p. 11.

to amend the complaint in the Briarwood Proceeding rather than filing a separate proceeding – which would have been automatically referred to the Bankruptcy Court – is a transparent attempt to avoid having its claim heard before the Bankruptcy Court, which has already considered and rejected its arguments in the National Union Adversary Proceeding. IICNA's blatant attempt to shop for a more favorable forum by moving to withdraw the reference should be rejected.

      51.    The instant proceeding is properly before the Bankruptcy Court and should remain before the Bankruptcy Court. IICNA has failed to meet its burden of establishing cause for withdrawal of the reference. The Motion should be denied.

WHEREFORE, for all of the foregoing reasons, the Liquidating LLC respectfully requests that the Court deny the Motion and grant the Liquidating LLC such other and further relief as the Court deems just and proper.

Dated: Wilmington, Delaware
June 1, 2005

YOUNG CONWAY STARGATT & TAYLOR, LLP

James L. Patton (No. 2202)
Robert S. Brady (No. 2847)
Edmon L. Morton (No. 3856)
Kenneth J. Enos (No. 4544)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE 19899-0391
(302) 571-6600
- and -

KAYE SCHOLER LLP
Arthur Steinberg
Marc D. Rosenberg
Hilary Lane
Ana M. Alfonso
425 Park Avenue
New York, NY 10022-3598
(212) 836-8000

Attorneys for IHS Liquidating LLC