# EXHIBIT A

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| INTEGRATED HEALTH SERVICES, INC., et al., | Case No. 00-389 (MFW) |
| | (Jointly Administered) |
| Debtors. | |
| IHS LIQUIDATING LLC,<br>            Plaintiff,<br>    v. | Adv. No. 05-51318 (MFW) |
| ACE INDEMNITY INSURANCE COMPANY f/k/a<br>INDEMNITY INSURANCE COMPANY OF NORTH<br>AMERICA,<br>            Defendant. | |

### RESPONSE OF PLAINTIFF IHS LIQUIDATING LLC IN OPPOSITION TO THE MOTION OF DEFENDANT PURSUANT TO DEL. BANKR. L.R. 5011-1 FOR DETERMINATION WHETHER PROCEEDING IS CORE

TO:    THE HONORABLE MARY F. WALRATH
       CHIEF UNITED STATES BANKRUPTCY JUDGE

Plaintiff IHS Liquidating LLC ("Plaintiff" or "Liquidating LLC"), by its attorneys, hereby submits this response ("Response") in opposition to the *Motion of Defendant Pursuant to Del. Bankr. L.R. 5011-1 for Determination Whether Proceeding is Core* (the "Motion"), filed by defendant Ace Indemnity Insurance Company, f/k/a Indemnity Insurance Company of North America ("Defendant" or "IICNA").

### PRELIMINARY STATEMENT

1.    Through the Motion, IICNA seeks a determination that this adversary proceeding (the "1999 Policy Proceeding") is not a core proceeding within the meaning of

310884453.WPD

6/1/05

13

section 157(b) of the United States Judicial Code. The Motion should be denied. The claims at issue here affect the administration of the estate, the liquidation of assets of the estate and the adjustment of the debtor-creditor relationship. As such, the proceeding is core pursuant to § 157(b)(2)(A) and (O). The instant proceeding is not, as IICNA would have this Court believe, simply a matter of contract interpretation. The resolution of the claims asserted herein is critical to the implementation of the Plan (as herein defined) and the administration of the Debtors' bankruptcy cases in accordance with the Plan. For these reasons, the Court should find that the 1999 Policy Proceeding is a core proceeding.

## RELEVANT BACKGROUND

### A.    The Debtors' Chapter 11 Cases

2.    On February 2, 2000 (the "Filing Date"), Integrated Health Services, Inc. ("IHS") and a number of its direct and indirect subsidiaries (collectively with IHS, the "Debtors"), filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.

3.    The Debtors operated through three principal business segments, one of which was the operation of skilled nursing and subacute care facilities. Because of the nature of the long term care industry and the sheer magnitude of the Debtors' operations, the Debtors maintained certain programs and practices to manage their exposure to liability claims asserted against the Debtors in the operation of their businesses. The Debtors' practices included, *inter alia*, the procurement of insurance policies for professional and general liability claims ("PL/GL Claims").

**B.    The Plan, the SPA, the Liquidating LLC and the Treatment of PL/GL Claims**

4.    By order dated May 12, 2003 (the "Confirmation Order"),[1] the Court confirmed the *Amended Joint Plan of Reorganization of Integrated Health Services, Inc. and its Subsidiaries under Chapter 11 of the Bankruptcy Code*, dated March 13, 2003 (as amended, modified or supplemented, including by the Confirmation Order, the "Plan").[2]  The Plan became effective on September 9, 2003 (the "Effective Date").

5.    The cornerstone of the Plan was the consummation of a stock purchase agreement (the "SPA") between IHS and Abe Briarwood Corp. ("Briarwood").  Both the SPA and the Plan contemplated the formation by IHS of two new wholly-owned subsidiaries named IHS Long Term Care, Inc. (the "LTC Subsidiary") and IHS Therapy Care, Inc. (the "Therapy Subsidiary" and, together with the LTC Subsidiary, the "Purchased Subsidiaries").  *See* Plan at § 5.9(b); SPA at p.1. Section 5.9(b) of the Plan provided for the implementation of the SPA, including the provision that IHS will "contribute and assign" to either the LTC Subsidiary or the Therapy Subsidiary, as the case may be, all of IHS' assets and liabilities other than the Excluded Assets and the Excluded Liabilities. *Id.*

6.    Effective as of August 31, 2003, in accordance with the SPA, the Plan and the Confirmation Order, IHS contributed and assigned to the LTC Subsidiary all of its assets and liabilities that related to IHS' long-term care business, other than "Excluded Assets" and "Excluded Liabilities" (each as defined under the SPA) and contributed and assigned to the Therapy Subsidiary

---

[1]    A copy of the Confirmation Order is annexed hereto as Exhibit "A".

[2]    A copy of the Plan is annexed hereto as Exhibit "B".

all of its assets and liabilities that related to IHS' contract rehabilitation therapy business, again other than Excluded Assets and Excluded Liabilities.

7.    At the closing under the SPA, Briarwood purchased from IHS all of the outstanding shares of the Purchased Subsidiaries. As a result, the LTC Subsidiary, owned by Briarwood post-closing, is liable for all liabilities of IHS in respect of PL/GL Claims arising from and after the Filing Date, and the Reorganized Debtors, indirectly owned by Briarwood through the LTC Subsidiary, remain liable for PL/GL Claims against them arising from and after the Filing Date.

8.    In addition to the implementation of the SPA, the Plan contemplated the formation of the Liquidating LLC, a Delaware limited liability company, for the purpose of implementing certain aspects of the Plan after the Effective Date. In accordance with section 5.9 of the Plan, upon the closing under the SPA, the then-remaining assets and liabilities of IHS, consisting of the net proceeds of the SPA, the Excluded Assets and the Excluded Liabilities, were transferred to the Liquidating LLC. As a result of the consummation of the transactions contemplated by the Plan, IHS was left without any assets or liabilities.

9.    Among other things, the Liquidating LLC is charged with responsibility for the administration of disputed prepetition claims against the Debtors, including, without limitation, PL/GL Claims arising *prior* to the Filing Date.

10.    Under the Plan, a special and distinct class was established for PL/GL Claims arising during the calendar year 1999 ("1999 Insured Tort Claims"), because the Debtors' professional/general liability ("PL/GL") insurance coverage for claims arising in 1999 presented a number of unique and complex issues requiring an equitable resolution under the Plan, as discussed in greater detail below.

**C.**    **The Reliance Liquidation and Treatment of 1999 Insured Tort Claims Under the Plan**

11.    The Debtors' primary PL/GL insurance carrier for 1999 was Reliance Insurance Company ("Reliance"). The policy issued by Reliance (the "Reliance Policy") is a matching deductible insurance policy. In the view of IHS (and, since the Effective Date, the Liquidating LLC), the Reliance Policy provides coverage of $2,000,000 per incident for professional liability claims and $1,000,000 per incident for general liability claims, with an aggregate coverage limit of $9,000,000. Under the Reliance Policy, IHS is subject to deductibles in the same amounts as the coverage limits.

12.    On October 3, 2001, the Commonwealth Court of Pennsylvania declared Reliance insolvent and entered an Order of liquidation (the "Liquidation Order"). M. Diane Koken, Insurance Commissioner of the Commonwealth of Pennsylvania, was named as the Reliance Liquidator.

13.    On or about September 20, 2002, IHS filed an action against Reliance (the "Reliance Action") to resolve certain disputes between the Reliance Liquidator and the Debtors with respect to the Reliance Policy. In the Reliance Action, IHS seeks, among other things, a declaration that the Reliance Policy provides total coverage of $9,000,000. The Reliance Liquidator maintains that the aggregate policy limit is only $4,500,000. The Liquidating LLC (as successor to IHS in the litigation) and the Reliance Liquidator agree that the aggregate limits of the Reliance Policy have been exhausted, whether those limits are $4.5 million or $9 million, by judgments entered against the Debtors and settlements made by the Debtors totaling substantially in excess of $9 million.

14.    Since the Liquidation Order was entered, the Reliance Liquidator has not paid any claims or defense costs covered by the Reliance Policy. Once the litigation between IHS and

Reliance is resolved, the Liquidating LLC will have a claim against the Reliance liquidation estate for any part of the coverage that was not exhausted prior to the Reliance liquidation. The value of the claim cannot be determined until both the allowed amount of the claim and the likely percentage recovery of creditors are determined.

15.     As a result of Reliance's liquidation proceeding, it became obvious that in the absence of a resolution among the holders of 1999 Insured Tort Claims, there was a risk that certain holders of 1999 Insured Tort Claims whose claims were liquidated within the Reliance coverage limits would be partially or completely deprived of access to insurance proceeds, while other holders would have access to the full benefit of coverage under the excess policies. In order to address this problem, the Debtors established a special class under the Plan for holders of 1999 Insured Tort Claims.

16.     The Plan provides for each holder of an allowed 1999 Insured Tort Claim to receive its *pro rata* share of the aggregate sum of (i) the proceeds recovered at any given time under the Debtors' insurance policies, including excess insurance policies, in respect of allowed 1999 Insured Tort Claims, after payment of defense costs payable under the policies ("Available 1999 Insurance Proceeds"); and (ii) 3% of the difference between the Available 1999 Insurance Proceeds and the total amount of allowed 1999 Insured Tort Claims.

17.     In order for the Liquidating LLC to implement distributions to the holders of allowed 1999 Insured Tort Claims, the Plan further provides for the formation of an escrow account (the "1999 Insured Tort Claims Escrow"), to be established on the Effective Date and administered by the Liquidating LLC. Pursuant to the Plan, as each 1999 Insured Tort Claim is resolved, the insurance proceeds that would otherwise be paid directly to the claimant must be paid to the

Liquidating LLC for deposit into the 1999 Insured Tort Claims Escrow, so that the Liquidating LLC may make pro rata interim and final distributions as provided in the Plan.

**D.**    **The Debtors' Coverage Dispute With National Union for 1999 Insured Tort Claims**

18.    National Union Fire Insurance Company of Pittsburgh ("National Union") issued an excess insurance policy providing both professional liability and general liability coverage for IHS for the policy period January 1, 1999 through January 1, 2000 (the "National Union Policy"). The National Union Policy provides the first layer of $25 million per occurrence/aggregate in excess in the Reliance Policy.

19.    The Debtors' Disclosure Statement relating to the Plan discussed at length the mechanics of the Class 8 distribution scheme and the availability of coverage under the excess policies, notwithstanding Reliance's insolvency. Shortly before the Plan was confirmed, National Union took the position that the Debtors could not look to National Union for any professional liability insurance coverage until the $9 million primary layer of coverage was exhausted by the actual cash payment of $9 million in claims and expenses. Because both IHS and Reliance were in insolvency proceedings, it was unlikely that IHS would ever actually pay the $9 million obligation in full. The position taken by National Union therefore amounted to a complete denial of coverage, and the holders of 1999 Insured Tort Claims were notified of National Union's position.

20.    On March 26, 2003, IHS filed an adversary proceeding styled *Integrated Health Services, Inc. v. National Union Fire Insurance Company of Pittsburgh, PA*, Adv. Proc. No. 03-52081, in an effort to enforce coverage under the National Union Policy (the "National Union Adversary Proceeding"). By order dated October 23, 2003 (the "Summary Judgment Order"), the Court entered partial summary judgment in favor of IHS. The Summary Judgment Order held, *inter*

*alia*, that coverage under the National Union Policy was triggered upon IHS becoming liable for 1999 Insured Tort Claims and related defense costs in excess of $9 million, whether by settlement or judgment, regardless of whether IHS or Reliance paid such claims and expenses in cash.

21.    The 1999 Insured Tort Claims that have to date been liquidated in amount by judgments or settlement agreements constituting binding legal obligations aggregate to an amount in excess of the limits of the Reliance Policy and the National Union Policy. In accordance with the Plan, National Union has made payments to the Liquidating LLC for 1999 Insured Tort Claims within National Union's layer of coverage.

E.    **The 1999 GenStar Policy**

22.    General Star Indemnity Company ("GenStar") issued an excess insurance policy providing both professional liability and general liability coverage for IHS for the policy period January 1, 1999 through January 1, 2000 (the "GenStar Policy"). The GenStar Policy provides the second layer of $25 million per occurrence/aggregate in excess of the Reliance Policy and National Union Policy.

23.    Once the National Union coverage limits were reached, GenStar, without any objection, acted in conformance with the Court's directive in the National Union Adversary Proceeding and assumed the administration and defense of the remaining 1999 Insured Tort Claims. GenStar has reportedly entered into settlements on behalf of IHS and/or obligated itself to satisfy judgments against IHS that will soon exhaust the $25 million limit of the GenStar Policy. In accordance with the Plan, and consistent with the Court's ruling in the National Union litigation, GenStar has made payments to the Liquidating LLC for 1999 Insured Tort Claims within GenStar's layer of coverage.

**F.**    **The IICNA 1999 Policy**

24.    The third layer of insurance coverage for holders of 1999 Insured Tort Claims (in excess of the Reliance Policy, the National Union Policy and the GenStar Policy) consists of insurance issued by IICNA, pursuant to that certain Excess Liability Catastrophe Policy, No. XLX G19545507 (the "1999 IICNA Policy").[3] The 1999 IICNA Policy provides excess coverage for 1999 Insured Tort Claims of $50 million per occurrence and $50 million in the aggregate in excess of underlying insurance limits.

25.    Upon information and belief, the aggregate amount of Allowed 1999 Insured Tort Claims will exceed the limits under the GenStar policy, and as a result, some portion of the excess coverage provided by the 1999 IICNA Policy will be payable. As confirmed by the express language of Sections IV.C and IV.I(2) of the 1999 IICNA Policy, the insolvency and bankruptcy of IHS do not relieve IICNA of its obligations under the 1999 IICNA Policy.

26.    Section I of the 1999 IICNA Policy defines the coverage obligation of IICNA as follows:

> A.    COVERAGE
>
> WE will pay on YOUR behalf the ULTIMATE NET LOSS (1) in excess of all UNDERLYING INSURANCE, and (2) only after all UNDERLYING INSURANCE has been exhausted by the payment of the limits of such insurance for losses arising out of OCCURRENCES that take place during OUR policy period and are insured by all of the policies designated in the Declarations as UNDERLYING INSURANCE.    If any UNDERLYING

---

[3]    A copy of the IICNA 1999 Policy is annexed hereto as Exhibit "C." The Motion to Amend (as herein defined) and the proposed amended complaint attached thereto refer to a different policy number, and the Liquidating LLC, which does not have a copy of the policy bearing the number referenced in the Motion to Amend, has not yet determined whether there are any differences between the two documents other than the policy number. Counsel for IICNA has informed the Liquidating LLC's counsel that the policy number was changed in 1999, for reasons IICNA has not yet determined.

INSURANCE does not pay a loss for reasons other than the exhaustion of an aggregate limit of insurance, then WE shall not pay such loss.

27.    The 1999 IICNA Policy defines "Ultimate Net Loss" as "the amount paid or payable in cash in the settlement or satisfaction of claims for which the insured is liable, either by adjudication or compromise with OUR written consent, after making proper deduction for all recoveries and salvages." The 1999 IICNA Policy further provides that "[d]efense expense payments shall be included within the ULTIMATE NET LOSS, provided that such expenses are included within the terms, conditions, and limits of insurance of any UNDERLYING INSURANCE."

28.    Similar to the National Union policy, the 1999 IICNA Policy expressly provides that the bankruptcy or insolvency of IHS, or of IHS's underlying insurance carrier, will not relieve IICNA of any obligation to pay a covered claim. Section IV.C states, in relevant part, that "[b]ankruptcy and insolvency of YOU, or YOUR estate will not relieve US of OUR obligations under this policy." Additionally, Section IV.I(2) provides, in relevant part, that if any limits of liability of underlying insurance are "unavailable due to bankruptcy or insolvency of an underlying insurer . . . then the insurance afforded by this policy shall apply in the same manner as if such underlying insurance and limits of liability had been in effect, available, so maintained and unchanged."

G.    **The Briarwood Proceeding and the Motion to Amend**

29.    Separate and apart from the 1999 IICNA Policy, IICNA also provided the Debtors with insurance coverage for claims arising during the year 2000. That insurance is provided pursuant to that certain Excess Liability Catastrophe Policy, No.XLXG20108034 (the "2000 IICNA Policy"). After confirmation but prior to the consummation of the SPA, Briarwood filed a motion

in the Court seeking certain relief against IHS, and requesting a declaration from the Court that the

2000 IICNA Policy, which primarily covered PL/GL Claims arising after the Filing Date, would be

in full force and effect upon consummation of the SPA. Upon information and belief, in the interest

of administrative convenience, Briarwood and IICNA subsequently agreed to litigate that issue in

a separate adversary proceeding.

        30.     Accordingly, on August 15, 2003, IICNA commenced an adversary

proceeding (the "Briarwood Proceeding"), naming Briarwood and IHS as defendants. The complaint

(the "Briarwood Complaint") seeks a declaratory judgment that (i) Briarwood and the Purchased

Subsidiaries are not insureds under the 2000 IICNA Policy, (ii) in the alternative, that Briarwood and

the Purchased Subsidiaries are subject to the same obligations as the named insureds under the 2000

IICNA Policy, and (iii) that IICNA is entitled to defend and settle the PL/GL Claims covered by the

2000 IICNA Policy under a complete reservation of rights.

        31.     At the time the Briarwood Complaint was filed, the Plan had not become

effective, the SPA had not been consummated, and the Liquidating LLC had not yet come into

existence. Less than one month later, as a result of the consummation of the Plan, IHS was divested

of all of its assets and liabilities, and Briarwood assumed defense of the Briarwood Proceeding.

        32.     On September 3, 2004, IICNA filed a motion in the United States District

Court for the District of Delaware ("District Court"), pursuant to 28 U.S.C. § 157(d) to withdraw the

automatic reference of the Briarwood proceeding to this Court. The motion was unopposed, and by

Order dated December 2, 2004, the District Court withdrew the reference.

        33.     On April 18, 2005, IICNA filed a motion to amend the Briarwood Complaint

(the "Motion to Amend"), seeking, among other things, to add a claim for declaratory relief relating

to the 1999 IICNA Policy (the "Proposed 1999 Count"). Specifically, the Proposed 1999 Count would seek a declaration that unless and until the underlying limits of the Reliance Policy, the National Union Policy and the GenStar Policy have been exhausted by the actual *payment* of claims against IHS during the policy period, IICNA owes no duty under the 1999 IICNA Policy to indemnify and defend the Debtors' estates against 1999 Insured Tort Claims or any other claims occurring within the policy period. In other words, notwithstanding the Plan's contemplation that the proceeds of the insurance policies covering 1999 Insured Tort Claims are to be paid to the Liquidating LLC for pro rata distribution to creditors, *and* notwithstanding the Court's coverage determination in the National Union Adversary Proceeding, IICNA belatedly seeks a ruling -- not from this Court, which is already familiar with the underlying issues, but from the District Court -- that as a result of the bankruptcy of the Debtors and the liquidation of Reliance, IICNA will *never* have any obligation to defend the Debtors' estates against 1999 Insured Tort Claims and/or contribute funds to the 1999 Insured Tort Claims Escrow.

**H.    The 1999 Policy Proceeding and the Motion to Intervene**

34.    On May 6, 2005, the Liquidating LLC commenced the instant 1999 Policy Proceeding, in the Bankruptcy Court, pursuant to which the Liquidating LLC seeks declaratory relief to enforce the 1999 IICNA Policy. In addition, on May 13, 2005, the Liquidating LLC filed a motion to intervene in the Briarwood Proceeding pending before this Court for the purposes of (i) objecting to the Motion to Amend and (ii) in the alternative, in the event that the Motion to Amend is granted, filing a subsequent motion requesting that the Proposed 1999 Count be severed and referred to this Court for consolidation with the 1999 Policy Proceeding.

35.     On May 13, 2005, IICNA filed a motion with the District Court seeking to withdraw the reference, and this Motion, by which it seeks a determination that the 1999 Policy Proceeding is non-core.

### APPLICABLE LEGAL STANDARD

36.     Section 157 of the United States Judicial Code provides bankruptcy courts "with two levels of judicial power, depending upon the type of proceeding before it." *Halper v. Halper*, 164 F.3d 830, 836 (3d Cir. 1999) (citing *In re Marcus Hook*, 943 F.2d 261, 266 (3d Cir. 1991)). The Third Circuit has established a two-step inquiry as to whether a bankruptcy proceeding is "core" or "non-core" under 28 U.S.C. § 157 (the "*Halper* Test"). *See Halper*, 164 F.3d at 836.

37.     First, the Court "must consult § 157(b). Although § 157(b) does not precisely define 'core' proceedings, it nonetheless provides an illustrative, non-exclusive list of types of proceedings that may be considered 'core.'" *Id.* (citing 28 U.S.C. § 157(b)(2)(A)-(O)). Section 157(b)(2) provides, in relevant part:

> Core proceedings include, but are not limited to
>
> (A)     matters concerning the administration of the estate . . . and
>
> (O)     other proceedings affecting the liquidation of assets of the estate or the adjustment of the debtor-creditor . . . relationship.

28 U.S.C. § 157(b)(2).

38.     Second, this Court must determine whether the proceeding (1) "invokes a substantive right provided by title 11" or (2) "is a proceeding, that by its nature, could arise only in the context of a bankruptcy case." *Halper*, 164 F.3d at 836 (citing *In re Guild & Gallery Plus, Inc.*,

72 F.3d 1171, 1178 (3d Cir. 1996)); *In re Marcus Hook Development Park, Inc.*, 943 F.2d 261, 267

(3d Cir. 1991); *In re Continental Airlines*, 125 F.3d 120, 131 (3d Cir. 1997).

## ARGUMENT

### THE 1999 POLICY PROCEEDING IS A CORE PROCEEDING

39.    The instant action plainly is a core proceeding within the meaning of

section 157(b).    The resolution of this matter goes to the heart of the distribution scheme

contemplated by the Plan to facilitate the equitable distribution of the 1999 IICNA Policy proceeds

and other Available 1999 Insurance Proceeds.

40.    Pursuant to the Plan, the Liquidating LLC is charged with responsibility for

procuring, maintaining and distributing insurance proceeds to the holders of Allowed 1999 Insured

Tort Claims on a pro rata basis.    The Plan specifically provides that the principal purpose of the

Liquidating LLC is to make distributions in accordance with the Plan, and that through the

Liquidating Manager, it is responsible for carrying out the implementation of the Plan, including

administering the 1999 Insured Tort Claims Escrow. *See* Plan at §5.9(d), (g). As noted above, the

Plan specifically contemplates the Liquidating LLC's receipt and distribution of proceeds from the

1999 IICNA Policy, and hence, the outcome of this proceeding plainly will have an impact on the

these matters. Thus, the proceeding is a core proceeding under § 157(b).

41.    Specifically, this proceeding, which  involves the distribution of proceeds

under the 1999 IICNA Policy pursuant to the Plan, concerns the administration of the Debtors'

estates and therefore is a core proceeding pursuant to § 157(b)(2)(A).  The proceeding also affects

the liquidation of assets of the estate *and* the adjustment of a debtor-creditor relationship, and thus

is a core proceeding pursuant to § 157(b)(2)(O).

42.    The matters at issue in the 1999 Policy Proceeding could arise only in the context of a bankruptcy case. The Disclosure Statement made clear that the total amount of Allowed 1999 Insured Tort Claims would be approximately $77 million, and that the total amount of "excess" insurance coverage available under the National Union Policy, the GenStar Policy and the IICNA Policy would aggregate $100 million. IICNA was well aware of these assumptions before the Plan was confirmed, but unlike National Union, which timely disclosed its contrary view of the National Union Policy before the Plan was confirmed (thereby enabling IHS to inform the holders of 1999 Insured Tort Claims and institute a declaratory action before making any potentially prejudicial distributions), IICNA did not disclose until April 2005, long after the Plan had become effective.[4]

43.    Indeed, the fact that the Liquidating LLC has already made distributions pursuant to the Plan's distribution scheme renders the 1999 Policy Proceeding inextricably intertwined with the administration of the Plan. Section 4.8 of the Plan provides for an initial pro rata distribution of 50% to be made to the holders of 1999 Insured Tort Claims well before all of the claims in that class have been fully adjudicated, and hence, well before all of the policy proceeds have become available for distribution. As additional 1999 Insured Tort Claims are liquidated and additional funds become available, the Liquidating LLC is authorized to make subsequent interim distributions prior to the date that all 1999 Insured Tort Claims have been liquidated. The Liquidating LLC was empowered under the Plan, and in fact has exercised the power, to make initial and interim distributions to the existing holders of Allowed 1999 Insured Tort Claims of approximately 70%.

---

[4]    IICNA filed objections to the disclosure statement and the Plan. However, it never raised the issue of whether the 1999 IICNA Policy would be effectively nullified as a result of Reliance's insolvency. If it had, the issue could have been resolved prior to the confirmation of the Plan.

44.    If IICNA succeeds on its claim that, in contrast to National Union and GenStar, it should not be required to make any payments under the 1999 IICNA Policy unless and until the Reliance coverage limits are exhausted through actual payment (which, as explained above and in the Disclosure Statement, is an impossibility), the total available proceeds will be less than the $77 million assumed under the Plan. As a result, the 70% distributions already made would exceed the maximum *pro rata* distributions to which any holder of a 1999 Insured Tort Claim would ultimately be entitled. Hence, those claimants who are still litigating their claims would stand to receive lower recoveries than those who settled their claims during the two year period from January 2003, when this distribution scheme was first made known to IICNA, until April 2005, when IICNA first made its position known to the Liquidating LLC.

45.    The resolution of this proceeding will impact the Liquidating LLC's ability to carry out the Class 8 distributions in an equitable manner. As a result of IICNA's delay in disclosing its argument that it should not be required to make any payment under the 1999 IICNA Policy, this proceeding will involve not only the resolution of the dispute relating to the 1999 IICNA Policy, but also a determination of whether IICNA should be barred by the doctrines of laches, waiver and estoppel from asserting that argument. This determination will require an evaluation of the consequences of IICNA's failure to raise the argument before the Plan was consummated and implemented in reliance upon IICNA's tacit acceptance of the Plan's distribution scheme, and thus could only arise in the context of a bankruptcy case.

46.    In the Motion, IICNA cites to a number of cases in which insurance contract disputes were found to constitute non-core proceedings. *See* Motion at pp. 7-10. However, IICNA does not point to any cases involving a plan of reorganization in which the availability of the

insurance proceeds formed an integral component of a plan of reorganization. Nor does it cite any cases where a party failed to raise issues that had far-reaching consequences for the administration of the Plan in a timely manner.

47.    Indeed, courts have found insurance coverage disputes to be "core" matters where the availability of insurance proceeds formed an integral component of the debtor's plan of reorganization. *See, e.g., United States Lines, Inc. v. American Steamship (In re United States Lines, Inc.)*, 197 F.3d 631, 636 (2d Cir. 1999) (holding claims for declaration of coverage under insurance contracts were core claims because insurance proceeds represented major source of recovery to group of creditors under reorganization plan and based on their corresponding significant impact on administration of estate); *In re Prudential Lines*, 170 B.R. 222, 229 (S.D.N.Y. 1994) (holding that declaratory judgment action on insurance coverage was core proceeding where determination of coverage under policies was "essential and inextricably tied to the administration of the estate" under confirmed chapter 11 plan); *Celotex Corp. v. AIU Ins. Co. (In re Celotex Corp.)*, 152 B.R. 667, 676 (Bankr. M.D. Fla. 1993) (holding adversary proceeding to determine scope of debtor's insurance coverage was core matter where insurance proceeds were essential to fund debtor's plan; noting adversary proceeding regarding coverage dispute was "a soritical inquiry where each determination of coverage expands or contracts not only the rights of the parties to the policies but the distribution of funds to all classes of claimants under the plan."); *cf. In re County Seat Stores, Inc.*, 2002 WL 141875, *3-4 (S.D.N.Y. Jan. 31, 2002) (determining that insurance dispute was core matter where the scope of insurance coverage would significantly impact the bankruptcy court's ability to distribute estate's assets in an equitable manner).

48.     Accordingly, since the claims asserted in the 1999 Policy Proceeding are integral to the administration of the Plan and could only arise in the context of a bankruptcy case, this Court should find that it is a core proceeding.

WHEREFORE, for all of the foregoing reasons, the Liquidating LLC respectfully requests that the Court find that the 1999 Policy Proceeding is a core proceeding, and grant the Liquidating LLC such other and further relief as the Court deems just and proper.

Dated:  Wilmington, Delaware
        June 1, 2005

YOUNG CONWAY STARGATT & TAYLOR, LLP

James L. Patton (No. 2202)
Robert S. Brady (No. 2847)
Edmon L. Morton (No. 3856)
Kenneth J. Enos (No. 4544)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE  19899-0391
(302) 571-6600

- and -

KAYE SCHOLER LLP
Arthur Steinberg
Marc D. Rosenberg
Hilary Lane
Ana M. Alfonso
425 Park Avenue
New York, NY  10022-3598
(212) 836-8000
*Attorneys for IHS Liquidating LLC*

31088445.WPD

```
MIME-Version:1.0
From:DEBdb_ECF_Reply@deb.uscourts.gov
To:dummail@deblecf.deb.circ3.dcn
Bcc: bankruptcy@ycst.com, casarinom@whiteandwilliams.com, debankruptcy@whiteandwilli
Message-Id:<3846068@deb.uscourts.gov>
Subject:05-51318-MFW
```

"Response (B)" Content-Type: text/html

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\*You may view the filed documents once without charge. To avoid later charges, download a copy of each document during this first viewing.**

### U.S. Bankruptcy Court

### District of Delaware

Notice of Electronic Filing

The following transaction was received from Enos, Kenneth J. entered on 6/1/2005 at 5:28 PM EDT and filed on 6/1/2005

**Case Name:**        IHS Liquidating LLC v. Ace Indemnity Insurance Company f/k/a Indemnity In

**Case Number:**      05-51318-MFW

**Document Number:** 13

**Docket Text:**
Response to *(in Opposition) the Motion of Defendant for Determination Whether Proceeding is Core* Filed by IHS Liquidating LLC (Attachments: # (1) Exhibit A# (2) Exhibit B, Part 1# (3) Exhibit B, Part 2# (4) Exhibit C) (Enos, Kenneth)

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**N:\Bankruptcy\IHS\To Be Filed\RESPONSE - in Opposition to Mot of Defendant to Determine if Proceeding is Core.pdf
**Electronic document Stamp:**
[STAMP bkecfStamp_ID=983460418 [Date=6/1/2005] [FileNumber=3846066-0]
[96a83fdf690ef863acdc31aa44a99a3261bdaa4c8992cb22b70514183c4876e4be853
6f5c17c960c0917483759042714efef586da03f7b1c4d6acfcd69e572a17]]
**Document description:**Exhibit A
**Original filename:**N:\Bankruptcy\IHS\To Be Filed\RESPONSE - in Opposition to Mot of Defendant to Determine if Proceeding is Core, Ex A.pdf
**Electronic document Stamp:**
[STAMP bkecfStamp_ID=983460418 [Date=6/1/2005] [FileNumber=3846066-1]
[68b883dcece6fcbb9e983fe7ec1aead27e2506893a72d059d372c93bdb22c4eb47f92
3a7ac4f14ddd64edd4e6336d2ffa1f7820f0b303f68f9228e88ff29d6f9]]
**Document description:**Exhibit B, Part 1
**Original filename:**N:\Bankruptcy\IHS\To Be Filed\RESPONSE - in Opposition to Mot of Defendant to Determine if Proceeding is Core, ExB1.pdf
**Electronic document Stamp:**
[STAMP bkecfStamp_ID=983460418 [Date=6/1/2005] [FileNumber=3846066-2]