# EXHIBIT B

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| INTEGRATED HEALTH SERVICES, INC., *et al.*, | ) | Case No. 00-389 (MFW) |
| | ) | |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | |

## AMENDED JOINT PLAN OF REORGANIZATION OF INTEGRATED HEALTH SERVICES, INC. AND ITS SUBSIDIARIES UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

KAYE SCHOLER LLP
425 Park Avenue
New York, New York 10022
Co-Attorneys for the Debtors
 and Debtors in Possession

JENKENS & GILCHRIST -
 PARKER CHAPIN LLP
The Chrysler Building
405 Lexington Avenue
New York, New York 10174
Co-Attorneys for the Debtors
 and Debtors in Possession

YOUNG, CONAWAY,
 STARGATT & TAYLOR LLP
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE 19899-0391
Co-Attorneys for the Debtors
 and Debtors in Possession

Docket No. _____

Date Filed ___4|4|03___

[THIS PAGE INTENTIONALLY LEFT BLANK]

TABLE OF CONTENTS

Page

SECTION 1.  DEFINITIONS AND INTERPRETATION ................................ 2
    A.  Definitions ........................................................ 2
    B.  Interpretation; Application of Definitions and Rules of Construction ............ 21

SECTION 2.  ADMINISTRATIVE EXPENSE CLAIMS, DIP CREDIT FACILITY
            CLAIMS AND PRIORITY TAX CLAIMS ........................... 21
    2.1  Administrative Expense Claims ...................................... 21
    2.2  Compensation and Reimbursement Claims .......................... 22
    2.3  DIP Credit Facility Claims ........................................ 23
    2.4  Priority Tax Claims .............................................. 23

SECTION 3.  CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS ............ 24

SECTION 4.  TREATMENT OF CLAIMS AND EQUITY INTERESTS ................. 26
    4.1  Other Priority Claims (Class 1) .................................... 26
    4.2  Secured Synthetic Lease Claims (Class 2) .......................... 26
    4.3  Other Secured Claims (Class 3) .................................... 28
    4.4  Senior Lender Claims (Class 4) .................................... 32
    4.5  United States Claims (Class 5) .................................... 34
    4.6  General Unsecured Claims (Class 6) ................................ 34
    4.7  Premiere Unsecured Claims (Class 7) .............................. 36
    4.8  1999 Insured Tort Claims (Class 8) ................................ 36
    4.9  Settled Senior Subordinated Debt Claims (Class 9) .................. 37
    4.10  Convertible Senior Subordinated Debenture Claims (Class 10) .......... 38
    4.11  Punitive Damage Claims (Class 11) ................................ 39
    4.12  Subsidiary Equity Interests (Class 12) .............................. 39
    4.13  IHS Equity Interests (Class 13) .................................... 39

SECTION 5.  MEANS FOR IMPLEMENTATION ................................ 39
    5.1  Substantive Consolidation of Debtors for Plan Purposes Only .......... 39
    5.2  Termination of Subordination Rights ................................ 40
    5.3  United States Settlement Agreement ................................ 40
    5.4  Release of Non-Debtor Affiliates .................................. 40
    5.5  Release of Representatives ........................................ 41
    5.6  Limitation on Releases, Indemnification and Exculpation of
         Directors. ...................................................... 41
    5.7  Cancellation of Existing Securities and Agreements .................. 41
    5.8  Merger and Liquidation of Subsidiaries ............................ 41
    5.9  The Sale Transactions ............................................ 42

i

Page

5.10   The Stand-Alone Transactions ............................... 46
5.11   Termination of Security Interests Granted Under DIP Credit
       Facility .................................................. 50

SECTION 6.  DISTRIBUTION PROCEDURES ............................... 50
6.1    General Provisions ........................................ 50
6.2    Distribution Procedures in the Event the Sale Transactions are
       Implemented .............................................. 50
6.3    Distribution Procedures for Classes 4 and 6 under the Stand-Alone
       Transactions ............................................. 61

SECTION 7.  PROCEDURES FOR DISPUTED CLAIMS ........................ 62
7.1    Objections to Claims ...................................... 62
7.2    Payments and Distributions with Respect to Disputed Claims ... 62
7.3    Distributions After Allowance ............................. 64
7.4    Estimations and Reserves for Contingent, Unliquidated and Disputed
       Claims ................................................... 64

SECTION 8.  EXECUTORY CONTRACTS AND UNEXPIRED LEASES .............. 64
8.1    Assumption of Executory Contracts and Unexpired Leases ..... 64
8.2    Rejection of Executory Contracts and Unexpired Leases ...... 65
8.3    Rejection Claims .......................................... 65
8.4    Survival of the Debtors' Corporate Indemnities ............ 66

SECTION 9.  CONDITIONS PRECEDENT TO CONFIRMATION AND THE
            EFFECTIVE DATE ....................................... 66
9.1    Conditions Precedent to Confirmation ...................... 66
9.2    Conditions Precedent to the Effective Date ................ 66
9.3    Effect of Failure of Conditions to Effective Date ......... 68
9.4    Waiver of Conditions ...................................... 68

SECTION 10. EFFECT OF CONFIRMATION ............................... 68
10.1   Vesting of Assets ......................................... 68
10.2   Discharge of Claims and Termination of Equity Interests ... 69
10.3   Discharge of Debtors ...................................... 69
10.4   Term of Injunctions or Stays .............................. 69
10.5   Injunction Against Interference With Plan ................. 70
10.6   Injunction Against Suits Against IHS Under the Sale Transactions .. 71
10.7   Exculpation ............................................... 71
10.8   Retention of Causes of Action/Reservation of Rights ....... 71
10.9   Dismissal of Premiere Committee Matters ................... 72

ii

                                                                        <u>Page</u>

SECTION 11. RETENTION OF JURISDICTION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72
      11.1    Exclusive Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72
      11.2    Jurisdiction Over Compensation Action  . . . . . . . . . . . . . . . . . . . . . . . . . . 74

SECTION 12. MISCELLANEOUS PROVISIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74
      12.1    Payment of Statutory Fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74
      12.2    Retiree Benefits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74
      12.3    Dissolution of Statutory Committees of Unsecured Creditors . . . . . . . . . . . 74
      12.4    Post-Confirmation Committee  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75
      12.5    Substantial Consummation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75
      12.6    Amendments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76
      12.7    Revocation or Withdrawal of the Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76
      12.8    Severability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76
      12.9    Governing Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76
      12.10   Time . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77
      12.11   Section Headings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77
      12.12   Exemption from Transfer Taxes  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77
      12.13   Effectuating Documents and Further Transactions  . . . . . . . . . . . . . . . . . . . 77
      12.14   Injunction Regarding Worthless Stock Deductions  . . . . . . . . . . . . . . . . . . . 77
      12.15   Exhibits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78
      12.16   Notices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

[THIS PAGE INTENTIONALLY LEFT BLANK]

ORIGINAL

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| INTEGRATED HEALTH SERVICES, INC., _et al._, | ) | Case No. 00-389 (MFW) |
| | ) | |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | |

**AMENDED JOINT PLAN OF REORGANIZATION OF
INTEGRATED HEALTH SERVICES, INC. AND ITS SUBSIDIARIES
UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

4|8|03
9270

Integrated Health Services, Inc. and the other Debtors (as defined below), as debtors and debtors in possession herein, propose the following joint Chapter 11 plan of reorganization for the Debtors, pursuant to section 1121(a) of title 11 of the United States Code:

## SECTION 1.  DEFINITIONS AND INTERPRETATION

### A.    *Definitions.*

The following terms used herein shall have the respective meanings defined below (such meanings to be equally applicable to both the singular and plural):

1.1    *5¾% Convertible Senior Subordinated Debentures* means the $143,750,000 original principal amount of IHS' 5¾% Convertible Senior Subordinated Debentures due 2004 issued pursuant to the Class 10 Indenture.

1.2    *9¼% Notes* means the $500,000,000 original principal amount of IHS' 9¼% Senior Subordinated Notes due 2008 issued pursuant to the 9¼% Indenture.

1.3    *9¼% Indenture* means the Indenture, dated as of September 11, 1997, as amended, between IHS, as issuer, and U.S. Bank National Association, as successor trustee for First Union National Bank of Virginia, with respect to the 9¼% Notes.

1.4    *9½% Notes* means the $450,000,000 original principal amount of IHS' 9½% Senior Subordinated Notes due 2007 issued pursuant to the 9½% Indenture.

1.5    *9½% Indenture* means the Indenture, dated as of May 30, 1997, as amended, between IHS, as issuer, and U.S. Bank National Association, as successor trustee for First Union National Bank of Virginia, with respect to the 9½% Notes.

1.6    *9⅝% Notes* means the $115,000,000 original principal amount of IHS' 9⅝% Senior Subordinated Notes due 2002, Series A, issued pursuant to the 9⅝% Indenture.

1.7    *9⅝% Indenture* means the Second Amended and Restated Supplemental Indenture, dated as of May 15, 1997, as amended, between IHS, as issuer, and The Bank of New York, as successor trustee, with respect to the 9⅝% Notes.

1.8    *10¼% Notes* means the $150,000,000 original principal amount of IHS' 10¼% Senior Subordinated Notes due 2006 issued pursuant to the 10¼% Indenture.

1.9    *10¼% Indenture* means the Indenture, dated as of May 15, 1996, as amended, between IHS, as issuer, and The Bank of New York, as successor trustee, with respect to the 10¼% Notes.

2

1.10    *10¾% Notes* means the $100,000,000 original principal amount of IHS' 10¾% Senior Subordinated Notes due 2004 issued pursuant to the 10¾% Indenture.

1.11    *10¾% Indenture* means the Amended and Restated Supplemental Indenture, dated as of May 15, 1997, as amended, between IHS, as issuer, and The Bank of New York, as successor trustee, with respect to the 10¾% Notes.

1.12    *1999 Insured Tort Claim* means a Tort Claim covered by the Debtors' insurance policies for PLGL Claims arising in 1999.

1.13    *1999 Insured Tort Claims Escrow* means the escrow account to be established on the Effective Date to provide for the payment of Allowed 1999 Insured Tort Claims in accordance with the Plan.

1.14    *1999 Unpaid Deductible Amount* means the approximately $7.6 million outstanding amount for which the Debtors have a matching-deductible insurance policy with Reliance Insurance Company for PLGL Claims arising in 1999, but only to the extent that such amount is unpaid.

1.15    *Administrative Expense Claim* means any right to payment constituting a cost or expense of administration of any of the IHS Reorganization Cases allowed under sections 503(b), 507(a)(1), and 1114(e) of the Bankruptcy Code, including, without limitation, any actual and necessary costs and expenses of preserving the Debtors' estates, any actual and necessary costs and expenses of operating the Debtors' businesses, any indebtedness or obligations incurred or assumed by the Debtors, as debtors in possession, during the IHS Reorganization Cases, including, without limitation, for the acquisition or lease of property or an interest in property or the rendition of services, Tort Claims arising after the Commencement Date, to the extent not an Insured Claim, any Allowed Claims that are entitled to be treated as Administrative Expense Claims pursuant to a Final Order of the Bankruptcy Court under section 546(c)(2)(A) of the Bankruptcy Code, any allowances of compensation and reimbursement of expenses to the extent allowed by Final Order under sections 330 or 503 of the Bankruptcy Code, and any fees or charges assessed against the estates of the Debtors under section 1930 of chapter 123 of title 28 of the United States Code.

1.16    *Allowed* means, with reference to any Claim, (a) any Claim against any Debtor which has been listed by such Debtor in the Schedules, as such Schedules may be amended by the Debtors from time to time in accordance with Bankruptcy Rule 1009, as liquidated in amount and not disputed or contingent and for which no contrary proof of claim has been filed, (b) any timely filed Claim as to which no objection to allowance has been interposed in accordance with Section 7.1 hereof or such other applicable period of limitation fixed by the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or as to which any objection has been determined by a Final Order to the extent such objection is determined in favor of the respective holder, or (c) any Claim expressly allowed by a Final Order or hereunder.

3

1.17    *Amended Bylaws* means the Bylaws of Reorganized IHS, as amended and restated, and which shall be substantially in the form set forth in the Plan Supplement.

1.18    *Amended Certificate of Incorporation* means the Certificate of Incorporation of Reorganized IHS, as amended and restated, and which shall be substantially in the form set forth in the Plan Supplement.

1.19    *Available 1999 Insurance Proceeds* means the amount of proceeds recovered at any given time under the Debtors' insurance policies, including excess insurance policies, in respect of Allowed 1999 Insured Tort Claims, after payment of defense costs payable under the policies.

1.20    *Avoidance Claims* means the Debtors' Causes of Action, including those actions, if any, commenced by the Creditors' Committee, arising under sections 502, 506, 510, 541, 542, 543, 544, 545, 547, 548, 549, 550, 551 and 553 of the Bankruptcy Code, or under related state or federal statutes and common law, including fraudulent transfer laws, whether or not litigation has been commenced to prosecute such Causes of Action as of the Effective Date.

1.21    *Ballot* means a ballot distributed with the Disclosure Statement and approved in form by the Bankruptcy Court for voting on the Plan, and includes any such ballot for any Class entitled to vote on the Plan.

1.22    *Bankruptcy Code* means title 11 of the United States Code, as amended from time to time, as applicable to the IHS Reorganization Cases.

1.23    *Bankruptcy Court* means the unit of the United States District Court for the District of Delaware having jurisdiction over the IHS Reorganization Cases under section 151 of title 28 of the United States Code.

1.24    *Bankruptcy Rules* means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as amended from time to time, applicable to the IHS Reorganization Cases, and any Local Rules of the Bankruptcy Court.

1.25    *Bar Date* means the August 29, 2000 deadline for filing of all proofs of claims against the Debtors established by the Bankruptcy Court, except (i) Claims of governmental units for which proofs of claim were filed in accordance with section 502(b)(9) of the Bankruptcy Code, or (ii) such other date as has been granted by order of the Bankruptcy Court with respect to one or more other holders of Claims.

1.26    *Business Day* means any day other than a Saturday, a Sunday, or any other day on which banking institutions in New York, New York are required or authorized to close by law or executive order.

4

1.27    *Cash* means legal tender of the United States of America.

1.28    *Catch-Up Distribution* means a distribution of Cash, a Class 4 Membership Interest, Class 6 Membership Interest, New Common Stock or New Subordinated Notes, as the case may be, to a holder of an Allowed Senior Lender Claim, Allowed General Unsecured Claim or Allowed 1999 Insured Tort Claim which was a Disputed Claim as of the date of the last initial or interim distribution made to holders of Allowed Claims in such Class, and on account of which the holder is entitled to a distribution as provided under the Plan.

1.29    *Cause of Action* means any and all actions, causes of actions, suits, accounts, controversies, agreements, promises, rights to legal remedies, rights to equitable remedies, rights to indemnification, rights to payment and claims, whether known, unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured and whether asserted or assertable directly or derivatively, in law, equity or otherwise.

1.30    *Claim* has the meaning set forth in section 101(5) of the Bankruptcy Code.

1.31    *Class* means any group of Claims or Equity Interests classified by the Plan pursuant to section 1122(a)(1) of the Bankruptcy Code.

1.32    *Class 2 A-Notes* means the Series A Trust Notes issued pursuant to the Participation Agreement.

1.33    *Class 2 B-Notes* means the Series B Trust Notes issued pursuant to the Participation Agreement.

1.34    *Class 2 Certificates* means the Series C Trust Certificates issued pursuant to the Participation Agreement.

1.35    *Class 4 Cash Fund* means the approximately $42.5 million in Cash being held in escrow for the benefit of the holders of Senior Lender Claims, plus all income earned thereon through the Effective Date.

1.36    *Class 4 Pro Rata Share* means, with respect to distributions contemplated under the Plan, the sum of (A) the ratio (expressed as a percentage) of the amount of an Allowed Senior Lender Claim in Class 4 to the aggregate amount of the sum of (i) Allowed General Unsecured Claims in Class 6 (less the aggregate amount of General Unsecured Claims in respect of which Class 6 Cash-Out Elections have been made, if made effective pursuant to Section 4.6(c) of the Plan), (ii) all Allowed Senior Lender Claims in Class 4 (less the amount of the Class 4 Cash Fund), and (iii) the aggregate amount of all Subordinated Debt Claims, and (B) the result obtained by multiplying the

5

amount of Subordinated Debt Percentage by an Allowed Senior Lender Claim's Pro Rata Share of Allowed Senior Lender Claims.

      1.37   *Class 4 Membership Interest* means an uncertificated interest in the Liquidating LLC, to be established in the event that the Sale Transactions are implemented, representing the right of the holder of an Allowed Senior Lender Claim to receive the Class 4 Pro Rata Share distributions contemplated by Sections 6.2(m), 6.2(n) and 6.2(p).

      1.38   *Class 4 Stand-Alone Membership Interest* means an uncertificated interest in the Stand-Alone LLC, to be established in the event that the Stand-Alone Transactions are implemented, representing the right of the holder of an Allowed Senior Lender Claim to receive the distributions contemplated by Section 4.4(c)(4)(C) of the Plan.

      1.39   *Class 6 Cash-Out Election* means the election, described in Section 4.6(c) of the Plan, which may be made by holders of General Unsecured Claims in Class 6.

      1.40   *Class 6 Membership Interest* means an uncertificated interest in the Liquidating LLC, to be established in the event that the Sale Transactions are implemented, representing the right of the holder of an Allowed General Unsecured Claim in Class 6 (other than a holder of a General Unsecured Claim in respect of which a Class 6 Cash-Out Election has been made) to receive the Class 6 Pro Rata distributions contemplated by Section 6.2(m), 6.2(n) and 6.2(p).

      1.41   *Class 6 Pro Rata Share* means, with respect to distributions contemplated under the Plan, the ratio (expressed as a percentage) of the amount of an Allowed General Unsecured Claim in Class 6 (other than a General Unsecured Claim in respect of which a Class 6 Cash-Out Election has been made, if made effective pursuant to Section 4.6(c) of the Plan) to the aggregate amount of the sum of (i) Allowed General Unsecured Claims in Class 6 (less the aggregate amount of General Unsecured Claims in respect of which Class 6 Cash-Out Elections have been made, if made effective pursuant to Section 4.6(c) of the Plan), (ii) all Allowed Senior Lender Claims in Class 4 (less the amount of the Class 4 Cash Fund) and (iii) the aggregate amount of all Subordinated Debt Claims.

      1.42   *Class 6 Stand-Alone Membership Interest* means an uncertificated interest in the Stand-Alone LLC, to be established in the event that the Stand-Alone Transactions are implemented, representing the right of the holder of an Allowed General Unsecured Claim (other than a General Unsecured Claim in respect of which a Class 6 Cash-Out Election has been made, if made effective pursuant to Section 4.6(c) of the Plan) to receive the distributions contemplated by Section 4.6(b)(3) of the Plan.

      1.43   *Class 9 Indenture Trustees* means U.S. Bank National Association (and its successors and assigns) and The Bank of New York (and its successors and assigns), in their respective capacities as indenture trustees for the holders of Settled Senior Subordinated Debt Claims.

1.44   *Class 9 Indentures* means, collectively, the (i) 9½% Indenture, (ii) 9¼% Indenture, (iii) 10¼% Indenture, (iv) 9⅝% Indenture and (v) 10¾% Indenture.

1.45   *Class 10 Indenture* means the Indenture, dated as of September 15, 1994, as amended, between IHS, as issuer, and HSBC Bank USA, as successor trustee, with respect to the 5¾% Convertible Senior Subordinated Debentures.

1.46   *Collateral* means any property or interest in property of the estate of any Debtor subject to a lien, charge, or other encumbrance to secure the payment or performance of a Claim, which lien, charge, or other encumbrance is not subject to avoidance under the Bankruptcy Code.

1.47   *Commencement Date* means February 2, 2000.

1.48   *Compensation Action* means that certain civil action currently pending in the Bankruptcy Court (Adv. Pro. No. 02-01830), or such other court as hereafter may be the court where the action is heard, that the Creditors' Committee, by Bankruptcy Court Order dated January 24, 2002, was authorized to commence on behalf of the Debtors' estates, against certain current and former members of the Board of Directors of IHS. The Compensation Action shall include any claims or Causes of Action that are or may be asserted in the Compensation Action, subject to, and in accordance with, the January 24, 2002 Order.

1.49   *Confirmation Date* means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order on its docket.

1.50   *Confirmation Hearing* means the hearing to be held by the Bankruptcy Court regarding confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

1.51   *Confirmation Order* means the order of the Bankruptcy Court confirming the Plan of Reorganization pursuant to section 1129 of the Bankruptcy Code.

1.52   *Convertible Senior Subordinated Debenture Claims* means all Claims arising under, in connection with, or related to, the Class 10 Indenture or the 5¾% Convertible Senior Subordinated Debentures.

1.53   *Credit Agreement* means that certain Revolving Credit and Term Loan Agreement, dated as of September 15, 1997, as amended, by and among IHS, as borrower, Citibank N.A., as administrative agent, The Toronto-Dominion Bank, as documentation agent, Citicorp Securities, Inc., as arranger, and the lenders party thereto, and any and all of the documents and instruments relating thereto.

7

1.54   *Creditors' Committee* means the Official Committee of Unsecured Creditors appointed in the IHS Reorganization Cases by the Office of the United States Trustee on February 15, 2000, as constituted from time to time.

1.55   *Debtors* means Integrated Health Services, Inc., and its direct and indirect subsidiaries, which are debtors and debtors in possession. Unless otherwise indicated, the term "Debtors" does not include the Rotech Debtors.

1.56   *Debtors' Claims* means all Causes of Action and Avoidance Claims that a Debtor or a Debtor's estate may have that arose prior to the Effective Date and that, as of the Effective Date, have not been waived, settled, released or denied by Final Order of the court having jurisdiction over a proceeding in which such Cause of Action or Avoidance Claim was asserted.

1.57   *Deficiency Claims* means the amount by which the total Claim of a holder of a Secured Claim exceeds the amount of such Secured Claim (as determined in accordance with the definition of such term herein).

1.58   *DIP Credit Facility* means the Secured Super-Priority Debtor-In-Possession Revolving Credit Agreement, dated as of March 21, 2002, as amended, among IHS, as borrower, The CIT Group/Business Credit, Inc., as Administrative Agent and Lender, CapitalSource Finance LLC, as Collateral Agent and Lender, and the lenders party thereto, together with any of the documents and instruments relating thereto, as approved by the orders of the Bankruptcy Court authorizing and governing such facility.

1.59   *DIP Credit Facility Claims* means all Claims arising under the DIP Credit Facility.

1.60   *DIP Credit Facility Letter of Credit* means any letter of credit issued under the DIP Credit Facility.

1.61   *Disbursing Agent* means any entity (including any applicable Debtor if it acts in such capacity) in its capacity as a disbursing agent under Section 6.1 hereof.

1.62   *Disclosure Statement* means the *Disclosure Statement for Amended Joint Plan of Reorganization of Integrated Health Services, Inc. and its Subsidiaries Under Chapter 11 of the Bankruptcy Code*, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

1.63   *Disputed* or *Disputed Claim* means any Claim which has not been Allowed pursuant to the Plan or a Final Order, and:  (i) a Claim that has been or hereafter is listed on the Schedules as disputed, contingent, or unliquidated; or (ii)

(a)      if no proof of claim has been filed by the applicable deadline, a Claim that has been or hereafter is listed on the Schedules as other than disputed, contingent or unliquidated, but as to which any of the Debtors or any other party in interest has interposed an objection or request for estimation which has not been withdrawn or determined by a Final Order; *or*

(b)      if a proof of claim or request for payment of an Administrative Expense Claim has been filed by the applicable deadline: (1) a Claim for which no corresponding Claim has been or hereafter is listed on the Schedules; (2) a Claim for which a corresponding Claim has been or hereafter is listed on the Schedules as other than disputed, contingent or unliquidated, but the nature or amount of the Claim as asserted in the proof of claim varies from the nature and amount of such Claim as listed on the Schedules; (3) a Claim for which a corresponding Claim has been or hereafter is listed on the Schedules as disputed, contingent or unliquidated; (4) a Claim for which a timely objection or request for estimation is interposed by any of the Debtors which has not been withdrawn or determined by a Final Order; or (5) any Tort Claim which has not previously been Allowed.

1.64    ***Disputed General Unsecured Claims Reserve*** means the reserve to be established by the Liquidating LLC if the Sale Transactions are implemented, or by the Reorganized Debtors or the Stand-Alone LLC, as applicable, if the Stand-Alone Transactions are implemented, to provide for the payment of (i) Disputed General Unsecured Claims in Class 6 that are ultimately Allowed by the Bankruptcy Court or otherwise payable after the Effective Date and (ii) any Disputed Claims referred to in Section 4.2(c) which become Allowed Senior Lender Claims.

1.65    ***Disputed Other Priority Claims Account*** means the account to be established on the books of the Liquidating LLC on the Effective Date if the Sale Transactions are implemented to provide for the payment of Disputed Other Priority Claims that are ultimately Allowed by the Bankruptcy Court or otherwise payable after the Effective Date.

1.66    ***Disputed Other Secured Claims Account*** means the account to be established on the books of the Liquidating LLC on the Effective Date if the Sale Transactions are implemented, to provide for the payment of Disputed Other Secured Claims that are ultimately Allowed by the Bankruptcy Court or otherwise payable after the Effective Date.

1.67    ***Disputed Premiere Unsecured Claims Account*** means the account to be established on the books of the Liquidating LLC on the Effective Date if the Sale Transactions are implemented, to provide for the payment of Disputed Premiere Unsecured Claims that are ultimately Allowed by the Bankruptcy Court or otherwise payable after the Effective Date.

1.68    ***Disputed Priority Tax Claims Account*** means the account to be established on the books of the Liquidating LLC on the Effective Date if the Sale Transactions are implemented, to provide for the payment of Disputed Priority Tax Claims that are ultimately Allowed by the Bankruptcy Court or otherwise payable after the Effective Date.

1.69    ***Distribution Record Date*** means the Confirmation Date.

1.70   ***Distribution Reserve Account*** means the account to be established by the Liquidating LLC as of the Effective Date, if the Sale Transactions are implemented, to hold Cash reserved for the purpose of making distributions in respect of Membership Interests (after funding of the Reserves) as provided in the Plan.

1.71   ***Effective Date*** means the first Business Day on or after the Confirmation Date specified by the Debtors on which (a) no stay of the Confirmation Order is in effect and (b) the conditions precedent to the effectiveness of the Plan of Reorganization specified in Section 9.2 hereof have been satisfied or waived.

1.72   ***Elkins Released Parties*** means Dr. Robert N. Elkins and the other parties identified in the Elkins Settlement Agreement as constituting Elkins Released Parties (as defined in the Elkins Settlement Agreement).

1.73   ***Elkins Settlement Agreement*** means the Agreement dated as of July 26, 2000, as amended and/or modified thereafter, between IHS and Dr. Robert N. Elkins, as approved by Order of the Bankruptcy Court dated January 5, 2001.

1.74   ***Equity Interest*** means any equity interest in any of the Debtors of any kind or nature, including, without limitation, any interest represented by any issued and outstanding shares of common or preferred stock or other instrument evidencing a present ownership interest in any of the Debtors, whether or not transferable, and any option, warrant, or right, contractual or otherwise, to acquire any such interest.

1.75   ***Excluded Administrative Expense Claims*** means the Administrative Expense Claims which constitute Excluded Liabilities.

1.76   ***Excluded Administrative Expense Claims Reserve*** means the reserve to be established on the Effective Date by the Liquidating LLC if the Sale Transactions are implemented, for payment of Disputed Excluded Administrative Expense Claims that may become Allowed Excluded Administrative Expense Claims after the Effective Date.

1.77   ***Excluded Assets*** means the assets identified in the Schedule of Excluded Assets attached to the Disclosure Statement as Exhibit F.

1.78   ***Excluded Liabilities*** means the liabilities identified in the Schedule of Excluded Liabilities attached to the Disclosure Statement as Exhibit G.

1.79   ***Exit Financing Facility*** means a senior secured credit facility to be established for the Reorganized Debtors in the event that the Stand-Alone Transactions are implemented. The material terms of the Exit Financing Facility are described in the Disclosure Statement.

1.80    *Expense Reserve Account* means the account to be established by the Liquidating LLC as of the Effective Date if the Sale Transactions are implemented, to hold Cash reserved for the payment of costs and expenses of the Liquidating LLC.

1.81    *Expense Reserve Account Residual* means all assets remaining in the Expense Reserve Account, as of the Final Liquidating LLC Distribution Date, after provision has been made for payment of all accrued expenses of the Liquidating LLC and the establishment of the Wind-Up Reserve.

1.82    *Final Class 8 Distribution Date* means the date that is twenty (20) Business Days after the date that all Disputed Claims in Class 8 have been resolved by Final Order and all Available 1999 Insurance Proceeds have been paid into the 1999 Insured Tort Claims Escrow Account.

1.83    *Final Liquidating LLC Distribution Date* means the date, to be determined pursuant to Section 6.2(o), on which the Liquidating Manager shall, among other things, make the final distributions on account of Class 4 Membership Interests and Class 6 Membership Interests.

1.84    *Final Order* means an order or judgment of the Bankruptcy Court entered by the Clerk of the Bankruptcy Court on the docket in the IHS Reorganization Cases, which has not been reversed, vacated, or stayed and as to which (i) the time to appeal, petition for *certiorari*, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for *certiorari*, or motion for new trial, reargument or rehearing shall then be pending or (ii) if an appeal, writ of *certiorari* new trial, reargument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court shall have been affirmed by the highest court to which such order was appealed, or *certiorari* shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for *certiorari* or move for a new trial, reargument, or rehearing shall have expired; provided, however, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order or judgment shall not cause such order to not be a Final Order.

1.85    *Final Stand-Alone Distribution Date* means twenty (20) Business Days after the first date on which all Senior Lender Claims, all General Unsecured Claims (other than General Unsecured Claims in respect of which a Class 6 Cash-Out Election has been made, if made effective pursuant to Section 4.6(c)(2) of the Plan) which were Disputed Claims and all deemed Disputed Claims referred to in Section 4.2(c) have been resolved by a Final Order, or as soon thereafter as is reasonably practicable.

1.86    *General Unsecured Claim* means any Claim against any of the Debtors that is not a DIP Credit Facility Claim, Administrative Expense Claim, Priority Tax Claim, Other Priority

11

Claim, Secured Synthetic Lease Claim, Other Secured Claim, Senior Lender Claim, United States Claim, Premiere Unsecured Claim, 1999 Insured Tort Claim, Settled Senior Subordinated Debt Claim, Convertible Subordinated Debenture Claim or Punitive Damage Claim.

1.87    *Headquarters Property* means the property described in Schedule A to the Deed of Trust, Fixture Filing, Assignment of Rents and Security Agreement, dated July 31, 1997, which secures certain of the Class 2 B-Notes and certain of the Class 2 Certificates.

1.88    *IHS* means Integrated Health Services, Inc., a Delaware corporation and debtor or debtor in possession (as the context requires) herein, and the ultimate parent company of the other Debtors, each of which is a direct or indirect subsidiary of IHS.

1.89    *IHS Equity Interest* means any Equity Interest in IHS.

1.90    *IHS Noteholder Escrow Account* means the escrow account established pursuant to the Escrow Agreement, dated as of March 26, 2002, among IHS, Rotech Medical Corporation and the IHS Noteholder Escrow Agent, for the benefit of the holders of Settled Subordinated Debt Claims, in accordance with the IHS Noteholder Settlement.

1.91    *IHS Noteholder Escrow Agent* means U.S. Bank National Association.

1.92    *IHS Noteholder Payment* means $27,700,000.

1.93    *IHS Noteholder Settlement* means the settlement between the holders of Senior Lender Claims and the Majority Noteholders, for the benefit of the holders of Settled Senior Subordinated Debt Claims, which is described in the Disclosure Statement, to be effectuated through the Plan.

1.94    *IHS Reorganization Cases* means the jointly administered cases under Chapter 11 of the Bankruptcy Code commenced by the Debtors on February 2, 2000, in the United States District Court for the District of Delaware, and jointly administered under the caption *In re Integrated Health Services, Inc., et al.*, 00-389 (MFW), other than the cases of the Rotech Debtors administered under Chapter 11 of the Bankruptcy Code.

1.95    *Impaired* means any Claim or Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

1.96    *Initial Class 8 Distribution* means the initial distribution of Cash to the holders of Allowed 1999 Insured Tort Claims pursuant to Section 4.8 of the Plan.

1.97    *Initial Class 8 Distribution Date* means the later of (i) the Effective Date and (ii) twenty (20) Business Days after the first date on which there exist funds in the 1999 Insured

Tort Claims Escrow in an aggregate amount sufficient to pay each holder of a then-existing Allowed 1999 Insured Tort Claim a distribution of 50% of the amount of each such Allowed Claim.

1.98    ***Initial Member Distribution Date*** means the later of (i) the Effective Date and (ii) twenty (20) Business Days after the first date on which all Senior Lender Claims and all General Unsecured Claims have been either Allowed, reserved for or estimated by the Bankruptcy Court and all of the Reserves provided for under the Plan to be established and maintained by the Liquidating LLC pursuant to Section 6.2 of the Plan (other than the Wind-Up Reserve) have been funded as required under the Plan, or as soon thereafter as is reasonably practicable.

1.99    ***Initial Stand-Alone Distribution Date*** means the later of (i) the Effective Date and (ii) twenty (20) Business Days after the first date on which all Senior Lender Claims and all General Unsecured Claims have been either Allowed, reserved for or estimated by the Bankruptcy Court, or as soon thereafter as is reasonably practicable.

1.100    ***Insured Claim*** means any Claim other than a 1999 Insured Tort Claim against any of the Debtors arising from an incident or occurrence, but only to the extent such Claim is covered by any of the Debtors' insurance policies.

1.101    ***ISDA Master Agreement*** means the ISDA Master Agreement, dated as of March 3, 1997, between Citibank, N.A. and IHS, and confirmations issued thereunder between Citibank, N.A. and IHS.

1.102    ***Liquidating LLC*** means a Delaware limited liability company, to be established in the event that the Sale Transactions are implemented, for the purpose of carrying out the implementation of the Plan as provided herein.

1.103    ***Liquidating LLC Agreement*** means the operating agreement, to become effective in the event that the Sale Transactions are implemented, of the Liquidating LLC, which shall be approved in the Confirmation Order and entered into by the Debtors, for the benefit of the holders of Class 4 Membership Interests and Class 6 Membership Interests, and the Liquidating Manager on the Effective Date pursuant to the terms of the Plan.

1.104    ***Liquidating Manager*** means an individual to be designated in the Confirmation Order, with the joint approval of the Debtors, the Creditors' Committee and the Unofficial Senior Lenders' Working Group, to serve, in the event that the Sale Transactions are implemented, as the manager of the Liquidating LLC, and any successor thereto.

1.105    ***Liquidating Manager Agreement*** means the agreement between the Liquidating LLC and the Liquidating Manager, dated as of the date of the Confirmation Order.

1.106    ***LTC Subsidiary*** means a new wholly-owned direct subsidiary of IHS, to be named IHS Long Term Care, Inc., a Delaware corporation, to be formed in connection with the Sale

13

Transactions, for the primary purpose of assigning to it all of the capital stock of certain of IHS' subsidiaries, pursuant to the terms of the Sale Agreement.

1.107  *Majority Noteholders* means Capital Research and Management Company and Credit Suisse First Boston (or their respective affiliates) in their respective capacities as holders of Settled Senior Subordinated Debt Claims, and their successors or assigns.

1.108  *Majority Noteholder Counsel* means Wachtell, Lipton, Rosen & Katz, as counsel to the Majority Noteholders in their respective capacities as holders of Settled Senior Subordinated Debt Claims.

1.109  *Membership Interests* means, collectively, the Class 4 Membership Interests and the Class 6 Membership Interests.

1.110  *New Common Stock* means the 2,500,000 shares of common stock of Reorganized IHS, par value $0.0001 per share, authorized under the Amended Certificate of Incorporation and to be issued hereunder on the Effective Date and any additional shares authorized for the purposes specified herein. The New Common Stock shall only be issued and become effective in the event that the Stand-Alone Transactions are implemented.

1.111  *New Mexico Properties* means, collectively, the Debtors' skilled nursing facilities located in Farmington, New Mexico, Hobbs, New Mexico and Gallup, New Mexico, each of which is described more fully in the Participation Agreement, and each of which secures certain of the Class 2 B-Notes and certain of the Class 2 Certificates.

1.112  *New Secured Note* means a note secured by the Collateral of a holder of an Allowed Other Secured Claim, providing for periodic Cash payments having a present value equal to the amount of the Allowed Other Secured Claim, to be distributed to such holder under the Plan.

1.113  *New Subordinated Notes* means the senior subordinated debt securities of Reorganized IHS, to be issued under the New Subordinated Notes Indenture if the Stand-Alone Transactions are implemented, the material terms of which are described in the Disclosure Statement.

1.114  *New Subordinated Notes Indenture* means the indenture between Reorganized IHS and the New Subordinated Notes Trustee, to be executed if the Stand-Alone Transactions are implemented.

1.115  *New Subordinated Notes Trustee* means the bank or trust company that will serve as trustee under the New Subordinated Notes Indenture, and its successors and assigns.

1.116  *Non-Debtor Affiliate* means a direct or indirect subsidiary of IHS that is not a Debtor.

14

1.117 *Omega Settlement Agreement* means the settlement and compromise between the Debtors and Omega Healthcare Investors, Inc., as approved by Order of the Bankruptcy Court dated December 18, 2002.

1.118 *Other Priority Claim* means any Claim against any of the Debtors entitled to priority in payment as specified in sections 507(a)(3), (4), (5), (6), (7) or (9) of the Bankruptcy Code.

1.119 *Other Secured Claim* means any Secured Claim against any of the Debtors other than a Secured Synthetic Lease Claim or Senior Lender Claim.

1.120 *Participation Agreement* means that certain Participation Agreement, dated July 31, 1997, as amended, among IHS, Integrated Health Services at Highland Park, Inc. and IHS Development – Highlands Park, Inc., as borrowers, State Street Bank and Trust Company of Connecticut, N.A., Eric J. Donaghey, Citicorp U.S.A., Inc., as the certificate holder, Citicorp U.S.A., Inc., as agent, and the lenders party thereto, and any and all of the documents and instruments relating thereto.

1.121 *Plan Documents* means the documents to be executed, delivered, assumed, and/or performed in conjunction with the consummation of the Plan of Reorganization on or about the Effective Date. If the Sale Transactions are implemented, the Plan Documents will include, without limitation, the (i) Sale Agreement; (ii) Liquidating LLC Agreement; (iii) Liquidating Manager Agreement; and (iv) United States Settlement Agreement. If the Stand-Alone Transactions are implemented, the Plan Documents will include, without limitation, the (a) Amended Certificate of Incorporation; (b) Amended Bylaws; (c) Exit Financing Facility; (d) New Subordinated Notes Indenture; (e) Registration Rights Agreement; (f) United States Settlement Agreement; and (g) the Stand-Alone LLC Agreement. Each of the Plan Documents shall be in form and substance reasonably satisfactory to the Debtors, the Creditors' Committee and the Unofficial Senior Lenders' Working Group.

1.122 *Plan of Reorganization* or *Plan* means this joint Chapter 11 plan of reorganization of the Debtors, including the exhibits hereto, as the same may be amended or modified from time to time in accordance with the provisions of the Bankruptcy Code and the terms hereof.

1.123 *Plan Securities* means, if the Sale Transactions are implemented, the Class 4 Membership Interests and the Class 6 Membership Interests; and if the Stand-Alone Transactions are implemented, the New Common Stock, the New Subordinated Notes, the Class 4 Stand-Alone Membership Interests and the Class 6 Stand-Alone Membership Interests, in either case, distributed or to be distributed to creditors of the Debtors pursuant to the Plan.

1.124 *Plan Supplement* means a separate appendix to the Plan incorporated herein by reference, containing certain documents (substantially in final form) relevant to the implementation of the Plan. The Plan Supplement will be filed with the Clerk of the Bankruptcy Court no later than five (5) days prior to the deadline for soliciting votes to accept or reject the Plan.

15

1.125  *PLGL Claims* means any and all claims relating to professional and general liability with respect to the operation of the Debtors' businesses.

1.126  *Post-Confirmation Committee* means a committee, consisting of up to three (3) individuals or entities, and any duly designated successors to such individuals or entities. The initial members of the Post-Confirmation Committee shall be designated by the Creditors' Committee and shall be appointed pursuant to the Confirmation Order.

1.127  *Premiere Group Creditors' Committee* means the Official Committee of Unsecured Creditors for the Premiere Debtors appointed in the IHS Reorganization Cases by the Office of the United States Trustee on January 4, 2002, as constituted from time to time.

1.128  *Premiere Debtors* means Premiere Associates, Inc. and its subsidiaries that constitute Debtors.

1.129  *Premiere Unsecured Claim* means any Claim against a Premiere Debtor that is not a DIP Credit Facility Claim, Administrative Expense Claim, Priority Tax Claim, Other Priority Claim, Secured Synthetic Lease Claim, Other Secured Claim, Senior Lender Claim, United States Claim, General Unsecured Claim, 1999 Insured Tort Claim, Settled Senior Subordinated Debt Claim, Convertible Senior Subordinated Debenture Claim, Punitive Damage Claim or an amount to be paid from the Expense Reserve Account.

1.130  *Priority Tax Claim* means any Claim of a governmental unit of the kind entitled to priority in payment under sections 502(i) and 507(a)(8) of the Bankruptcy Code.

1.131  *Professional* means a consultant, accountant, attorney or other professional service provider retained by the Debtors, the Liquidating Manager or any official committee pursuant to sections 327 and 1103 of the Bankruptcy Code or otherwise.

1.132  *Professional Claim* means a Claim of a Professional for compensation or reimbursement of costs and expenses relating to services incurred after the Commencement Date and prior to and including the Effective Date pursuant to sections 330, 331 and 503 of the Bankruptcy Code. Until a timely filed Professional Claim is Allowed or Disallowed, it shall be considered a Disputed Administrative Expense Claim for purposes of Section 2.1.

1.133  *Pro Rata Share* means the ratio (expressed as a percentage) of the amount of an Allowed Claim in a Class to the aggregate amount of all Allowed Claims in the same Class.

1.134  *Punitive Damage Claim* means any Claim against any of the Debtors, whether secured or unsecured, for any fine, penalty, forfeiture, attorney's fees, or for multiple, exemplary, or punitive damages, to the extent that such fine, penalty, forfeiture, attorney's fees, or damages is not compensation for actual pecuniary loss suffered by the holder of such Claim.

16

1.135 *Purchased Subsidiaries* means, collectively, the LTC Subsidiary and Therapy Subsidiary.

1.136 *Purchaser* means Abe Briarwood Corp., as the Purchaser under the Sale Agreement.

1.137 *Purchaser-Assumed Administrative Expense Claims* means all Administrative Expense Claims other than those constituting Excluded Liabilities.

1.138 *Registration Rights Agreement* means the Registration Rights Agreement to be entered into by Reorganized IHS as of the Effective Date if the Stand-Alone Transactions are implemented, which shall be substantially in the form of the registration rights agreement to be included in the Plan Supplement.

1.139 *Remaining Funds* means, with respect to the Excluded Administrative Claims Reserve, the Disputed General Unsecured Claims Reserve, Disputed Other Priority Claims Account, Disputed Other Secured Claims Account, Disputed Priority Tax Claims Account, Disputed Premiere Unsecured Claims Account or any of the Disputed Claims Accounts, Cash remaining in such reserve or account after all distributions that are to be made from such reserve or account have been made. Remaining Funds also shall include the Expense Reserve Account Residual.

1.140 *Reorganized Debtors* means Reorganized IHS and each of the other Debtors upon the Effective Date.

1.141 *Reorganized IHS* means IHS upon the Effective Date.

1.142 *Reserves* means (i) the Excluded Administrative Claims Reserve, (ii) the Disputed Other Priority Claims Account, (iii) the Disputed Other Secured Claims Account, (iv) the Disputed Priority Tax Claims Account, (v) the Disputed General Unsecured Claims Reserve, (vi) Disputed Premiere Unsecured Claims Account (vii) the Unclaimed Distributions Reserve, (viii) the Distribution Reserve Account, (ix) the Expense Reserve Account, and (x) the Wind-Up Reserve.

1.143 *Rotech* means Rotech Medical Corporation, formerly a wholly-owned subsidiary of IHS.

1.144 *Rotech Debtors* means Rotech Medical Corporation and its direct and indirect subsidiaries, which were formerly debtors and debtors in possession whose Chapter 11 cases were jointly administered with the IHS Reorganization Cases, and which emerged from their Chapter 11 cases on March 26, 2002, pursuant to the Rotech Plan.

1.145 *Rotech Plan* means the Second Amended Joint Plan of Reorganization of Rotech Medical Corporation and Its Subsidiaries, dated February 7, 2002.

1.146  **Sale Agreement** means the Stock Purchase Agreement, dated as of January 28, 2003, by and between IHS, as Seller, and Abe Briarwood Corp., as Purchaser.

1.147  **Sale Approval Order** means the order of the Bankruptcy Court approving the Sale Agreement and authorizing the Debtors to implement the transactions contemplated thereunder.

1.148  **Sale Transactions** means the transactions contemplated to occur substantially contemporaneous with the Effective Date in connection with the sale of the Shares and/or IHS Shares in accordance with the terms and conditions set forth in the Sale Agreement, and the transfer of the Excluded Assets, assumption of Excluded Liabilities and distribution of Cash and Plan Securities to creditors of the Debtors as provided in the Plan.

1.149  **Sale Transaction Documents** means the material agreements entered into or to be entered into on the Effective Date in connection with the implementation of the Sale Transactions, including, without limitation, the: (i) Sale Agreement; (ii) Liquidating LLC Agreement; (iii) Liquidating Manager Agreement; and (iv) United States Settlement Agreement.

1.150  **Schedules** means the schedules of assets and liabilities and the statement of financial affairs filed by the Debtors under section 521 of the Bankruptcy Code, Bankruptcy Rule 1007, and the Official Bankruptcy Forms of the Bankruptcy Rules as such schedules and statements have been or may be supplemented or amended through the Confirmation Date.

1.151  **Secured Claim** means a Claim to the extent (i) secured by Collateral the amount of which Claim is equal to or less than the value of such Collateral (a) as set forth in the Plan of Reorganization, (b) as agreed in writing by the holder of such Claim and the Debtors, or (c) as determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code, or (ii) secured by the amount of any rights of setoff of the holder thereof under section 553 of the Bankruptcy Code.

1.152  **Secured Synthetic Lease Claim** means a Claim arising under the Participation Agreement, but only to the extent such Claim is a Secured Claim as provided under Section 4.2 of the Plan.

1.153  **Senior Lender Agreements** means the Credit Agreement, the Participation Agreement and the ISDA Master Agreement.

1.154  **Senior Lender Claim** means any Claim against any of the Debtors arising under, in connection with, or related to the Senior Lender Agreements, other than Secured Synthetic Lease Claims.

1.155  **Settled Senior Subordinated Debt Claims** means all Claims arising under, in connection with or related to any of the Class 9 Indentures or the 10¼% Notes, the 9½% Notes, the 9¼% Notes, the 9% Notes, or the 10¾% Notes.

18

1.156  *Shares* means (i) an aggregate of 1,000 shares of common stock of the LTC Subsidiary, which will represent all of the issued and outstanding shares of capital stock of the LTC Subsidiary as of the Effective Date, and (ii) an aggregate of 1,000 shares of common stock of the Therapy Subsidiary, which will represent all of the issued and outstanding shares of capital stock of the Therapy Subsidiary as of the Effective Date.

1.157  *Stand-Alone LLC means* a Delaware limited liability company to be established in the event that the Stand-Alone Transactions are implemented for the purpose of prosecuting the Compensation Action.

1.158  *Stand-Alone LLC Agreement* means the operating agreement, to become effective in the event that the Stand-Alone Transactions are implemented, of the Stand-Alone LLC, which shall be approved in the Confirmation Order and entered into by the Debtors, for the benefit of the holders of Class 4 Stand-Alone Membership Interests and Class 6 Stand-Alone Membership Interests, on the Effective Date pursuant to the terms of the Plan.

1.159  *Stand-Alone LLC Manager* means an individual to be designated in the Confirmation Order, with the joint approval of the Debtors, the Creditors' Committee and the Unofficial Senior Lenders' Working Group, to serve, in the event that the Stand-Alone Transactions are implemented, as the manager of the Stand-Alone LLC, and any successor thereto.

1.160  *Stand-Alone Manager Agreement* means the agreement between the Stand-Alone LLC and the Stand-Alone LLC Manager, dated as of the date of the Confirmation Order.

1.161  *Stand-Alone Transactions* means the transactions contemplated to occur in connection with the stand-alone reorganization of the Debtors' businesses in the event the Sale Transactions do not occur, including without limitation, the issuance of the New Common Stock and New Subordinated Notes, all of which are to be implemented as provided in Section 5.10.

1.162  *Stand-Alone Transaction Documents* means the material agreements and other documents to be entered into and/or effectuated on the Effective Date in connection with the implementation of the Stand-Alone Transactions, including, without limitation:  the (i) Amended Certificate of Incorporation; (ii) Amended Bylaws; (iii) Exit Financing Facility; (iv) New Subordinated Notes Indenture; (v) Registration Rights Agreement; (vi) United States Settlement Agreement; (vii) the Stand-Alone LLC Agreement; and (viii) the Stand-Alone Manager Agreement.

1.163  *Subordinated Debt Claims* means, collectively, the Settled Senior Subordinated Debt Claims and the Convertible Senior Subordinated Debenture Claims.

1.164  *Subordinated Debt Percentage* means the ratio (expressed as a percentage) of the amount of the Subordinated Debt Claims to the aggregate amount of the sum of (i) Allowed General Unsecured Claims in Class 6 (less the aggregate amount of General Unsecured Claims in

respect of which Class 6 Cash-Out Elections have been made if made effective pursuant to Section 4.6(c) of the Plan), (ii) Allowed Senior Lender Claims in Class 4 (less the amount of the Class 4 Cash Fund), and (iii) the aggregate amount of all Subordinated Debt Claims.

1.165  *Subsidiary Equity Interest* means any Equity Interest in any Debtor other than IHS.

1.166  *Synthetic Lease Claim* means any Claim against any of the Debtors arising under the Participation Agreement.

1.167  *Therapy Subsidiary* means a new wholly-owned direct subsidiary of IHS, to be named IHS Therapy Care, Inc., a Delaware corporation, to be formed in connection with the Sale Transactions, for the primary purpose of assigning to it all of the capital stock of certain of IHS' subsidiaries, pursuant to the terms of the Sale Agreement.

1.168  *Tort Claims* means any Claims related to personal injury, property damage, products liability, wrongful death, employment litigation, or other similar Claims against any of the Debtors including, without limitation, any PLGL Claim.

1.169  *Unclaimed Distributions* means distributions to holders of Allowed Claims that are returned as undeliverable or not cashed.

1.170  *Unclaimed Distributions Reserve* means the reserve created with the Unclaimed Distributions, which may be claimed after the Effective Date.

1.171  *United States Claims* means all (i) civil or administrative monetary claims (e.g., claims seeking monetary remedies or payments) or civil or administrative monetary Causes of Action (including attorneys' fees, costs, and expenses of every kind) the United States of America, or its agencies, departments, officers, agents, employees and assigns, or third parties under 31 U.S.C. § 3730(b) or (d), has or may have against the Debtors under the False Claims Act, 31 U.S.C. §§ 3729-3733; the Civil Monetary Penalties Law, 42 U.S.C. § 1320a-7a; the Program Fraud Civil Remedies Act, 31 U.S.C. §§ 3801-3812; and/or common law doctrines of payment by mistake, unjust enrichment, breach of contract or fraud for the Covered Conduct (as defined in the United States Settlement Agreement); (ii) administrative overpayments, including claims or causes of action for services rendered or products supplied to beneficiaries, under the Medicare Program ("Medicare"), Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395-1395, under contracts with the Department of Veterans Affairs ("VA") and under the TRICARE Program (also known as the Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS")), 10 U.S.C. 1071-1106; (iii) civil monetary penalties imposed pursuant to 42 U.S.C. § 1395i-3(h)(2)(B)(ii) and 42 U.S.C. § 1396r(h)(2)(A)(ii); and (iv) actions for permissive exclusion from Medicare, the Medicaid program and other federal health programs (as defined in 42 U.S.C. 1320a-7b(f)) under 42 U.S.C. § 1320a-7(b) and 42 U.S.C. § 1320a-7a for the Covered Conduct. All other Claims of the United States of America are expressly excluded from this definition.

20

1.172  *United States Settlement Agreement* means the settlement agreement entered into between the Debtors and the United States, a copy of which will be included in the Plan Supplement.

1.173  *Unofficial Senior Lenders' Working Group* means the unofficial working group of the holders of the Senior Lender Claims, as constituted from time to time.

1.174  *Voting Agent* means Poorman-Douglas Corporation.

1.175  *Wind-Up Reserve* means a Cash reserve to be established by the Liquidating Manager at the time of making a final distribution to creditors of the Debtors under the Plan for purposes of paying the expenses of such final distribution and winding up the affairs of the Liquidating LLC after such final distribution, including the projected costs of dissolving the Liquidating LLC, preparing final tax returns, filing reports or other documents in the IHS Reorganization Cases or under applicable nonbankruptcy law, and storing or disposing of records and any other property of the Liquidating LLC.

B.    *Interpretation; Application of Definitions and Rules of Construction.*

Unless otherwise specified, all section or exhibit references in the Plan of Reorganization are to the respective section in, or exhibit to, the Plan of Reorganization, as the same may be amended, waived, or modified from time to time. The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan of Reorganization as a whole and not to any particular section, subsection, or clause contained therein. A term used herein that is not defined herein shall have the meaning assigned to that term in the Bankruptcy Code. The rules of construction contained in section 102 of the Bankruptcy Code shall apply to the Plan of Reorganization.

SECTION 2.  **ADMINISTRATIVE EXPENSE CLAIMS, DIP CREDIT FACILITY CLAIMS AND PRIORITY TAX CLAIMS**

2.1    *Administrative Expense Claims.*

(a)    *Treatment.* Each holder of an Allowed Administrative Expense Claim shall receive an amount in Cash equal to such Allowed Administrative Expense Claim on or as soon as is reasonably practicable after the later of (i) the Effective Date and (ii) the first Business Day that is thirty (30) calendar days after the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim; provided, however, that Allowed Administrative Expense Claims in respect of Tort Claims arising after the Commencement Date (to the extent not an Insured Claim), liabilities incurred in the ordinary course of business by the Debtors, as debtors in possession, and liabilities arising under loans or advances to or other obligations incurred by the Debtors, as debtors in possession, whether or not incurred in the ordinary course of business, shall be liquidated and paid in the ordinary course of business, consistent with past practice and in accordance with the terms and

21

subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to such transactions.

(b)     *Sale Transactions.*  If the Sale Transactions are implemented, all Allowed Purchaser-Assumed Administrative Expense Claims shall be paid by the Purchased Subsidiaries in accordance with subsection (a) above, and neither IHS nor the Liquidating LLC shall have any liability for Purchaser-Assumed Administrative Expense Claims.  All Allowed Excluded Administrative Expense Claims shall be paid by the Liquidating LLC from the Excluded Administrative Expense Claims Reserve (and, if and to the extent necessary, from the Distribution Reserve Account) in accordance with Section 6.2 of the Plan.

(c)     *Stand-Alone Transactions.*  If the Stand-Alone Transactions are implemented, all Administrative Expense Claims shall be paid by the Reorganized Debtors in accordance with subsection (a) above.

### 2.2     *Compensation and Reimbursement Claims.*

(a)     All entities seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code (a) shall file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred by the date that is forty-five (45) days after the Effective Date; and (b) shall be paid in full in such amounts as are allowed by the Bankruptcy Court (i) upon the later of (A) the Effective Date and (B) the date upon which the order relating to the allowance of any such Administrative Expense Claim is entered or (ii) upon such other terms as may be mutually agreed upon between the holder of such an Administrative Expense Claim and either the Liquidating LLC under the Sale Transactions or the Reorganized Debtors under the Stand-Alone Transactions, as applicable.  The Debtors are authorized to pay compensation for services rendered or reimbursement of expenses incurred after the Confirmation Date and until the Effective Date in the ordinary course and without the need for Bankruptcy Court approval.  After the Effective Date, the Liquidating LLC or the Reorganized Debtors, as applicable, are authorized to pay compensation for services rendered or reimbursement of expenses incurred after the Effective Date (including, without limitation, compensation for services rendered and reimbursement of the expenses incurred by professionals retained by the Liquidating LLC or the Reorganized Debtors, as applicable, the Post-Confirmation Committee, the Liquidating Manager, the Stand-Alone LLC and the Stand-Alone LLC Manager), in the ordinary course and without the need for Bankruptcy Court approval.

(b)     *Payment of Professional Claims Under the Sale Transactions.*  If the Sale Transactions are implemented, on the Effective Date, the Liquidating Manager shall deposit in the Excluded Administrative Claims Reserve sufficient Cash to pay all unpaid fees and expenses of Professionals incurred through the Effective Date.  The Professionals shall serve estimates of fees and expenses due for periods that have not been billed as of the Effective Date so as to be received by the counsel for the Debtors within twenty (20) days after the Confirmation Date, and the Liquidating

22

Manager shall include such estimated fees and expenses in calculating the amount of the Excluded Administrative Claims Reserve. The Allowed amounts of such Professional Claims shall be paid by the Liquidating LLC out of the Excluded Administrative Claims Reserve and, if and to the extent necessary, the Distribution Reserve Account.

      2.3    ***DIP Credit Facility Claims.***

      (a)    *Payment of Outstanding Obligations.* On the Effective Date, all DIP Credit Facility Claims under or evidenced by amounts outstanding under the DIP Credit Facility (other than DIP Credit Facility Letters of Credit) shall be paid in full in Cash by the Liquidating LLC or the Reorganized Debtors, as applicable.

      (b)    *DIP Credit Facility Letters of Credit.* On the Effective Date, all outstanding DIP Credit Facility Letters of Credit shall be treated as follows:

      (1)    *Treatment Under the Sale Transactions.* If the Sale Transactions are implemented, the Purchaser shall either replace or secure each DIP Credit Facility Letter of Credit in accordance with the provisions of the DIP Credit Facility.

      (2)    *Treatment Under the Stand-Alone Transactions.* If the Stand-Alone Transactions are implemented, all outstanding DIP Credit Facility Letters of Credit shall either be replaced or secured by letters of credit issued under the Exit Financing Facility in accordance with the provisions of the DIP Credit Facility.

      2.4    ***Priority Tax Claims.***

      Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a different treatment, Priority Tax Claims shall be treated as provided below.

      (a)    *Treatment Under the Sale Transactions.* If the Sale Transactions are implemented, each holder of an Allowed Priority Tax Claim shall receive from the Liquidating LLC Cash in an amount equal to such Allowed Priority Tax Claim, to be paid on or as soon as is reasonably practicable after the later of (i) the Effective Date and (ii) the first Business Day that is thirty (30) calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim.

      (b)    *Treatment Under the Stand-Alone Transactions.* If the Stand-Alone Transactions are implemented, each holder of an Allowed Priority Tax Claim shall receive, at the sole option of the Reorganized Debtors, either (i) Cash in an amount equal to such Allowed Priority Tax Claim, to be paid as soon as is reasonably practicable after the later of the Effective Date and the first Business Day that is thirty (30) calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, or (ii) equal annual Cash payments in an aggregate amount equal to such Allowed Priority Tax Claim, together with interest at a fixed annual rate equal to six percent (6%), over a period not exceeding six (6) years after the date of assessment of such Allowed Priority Tax Claim,

or upon such other terms determined by the Bankruptcy Court to provide the holder of such Allowed Priority Tax Claim deferred Cash payments having a value, as of the Effective Date, equal to such Allowed Priority Tax Claim. All Allowed Priority Tax Claims that are not due and payable on or before the Effective Date shall be paid in the ordinary course of business as such obligations become due.

### SECTION 3.   CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS

The following table designates the Classes of Claims against and Equity Interests in the Debtors and specifies which of those Classes are (i) impaired or unimpaired by the Plan, (ii) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code, and (iii) deemed to accept or reject the Plan. Each holder of a Claim in Classes 2, 3-E through 3-K, 4, 5, 6, 7 , 8 and 9 shall be entitled to vote separately to accept or reject the Plan. Classes 1, 3-A through 3-D and 12 are unimpaired and are deemed to accept the Plan. Because Classes 10, 11 and 13 are deemed to have rejected the Plan, the Debtors intend to request that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code with respect to Classes 10, 11 and 13. In the event that any impaired Class of Claims shall fail to accept the Plan, the Debtors reserve the right to request that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) with respect to any such non-accepting Class.

(1)   *Classes.*

| Class | Designation | Impairment | Entitled to Vote |
|-------|-------------|------------|------------------|
| 1 | Other Priority Claims | Unimpaired | No (deemed to accept) |
| 2 | Secured Synthetic Lease Claims | Impaired | Yes |
| 3-A through 3-D | Other Secured Claims | Unimpaired | No (deemed to accept) |
| 3-E through 3-K | Other Secured Claims | Impaired | Yes |
| 4 | Senior Lender Claims | Impaired | Yes |
| 5 | United States Claims | Impaired | Yes |
| 6 | General Unsecured Claims | Impaired | Yes |
| 7 | Premiere Unsecured Claims | Impaired | Yes |
| 8 | 1999 Insured Tort Claims | Impaired | Yes |
| 9 | Settled Senior Subordinated Debt Claims | Impaired | Yes |
| 10 | Convertible Senior Subordinated Debenture Claims | Impaired | No (deemed to reject) |

24

| Class | Designation | Impairment | Entitled to Vote |
|---|---|---|---|
| 11 | Punitive Damage Claims | Impaired | No (deemed to reject) |
| 12 | Subsidiary Equity Interests | Unimpaired | No (deemed to accept) |
| 13 | IHS Equity Interests | Impaired | No (deemed to reject) |

(2)     ***Subclasses for Class 3.***  For convenience of identification, the Plan classifies the Claims in Class 3 as a single Class.  This Class is, in fact, a group of subclasses, and depending on the underlying Collateral securing such Allowed Claims, each subclass is treated as a distinct Class for voting and distribution purposes.  The following table identifies the material subclasses for Class 3.

| Class | Creditor | Collateral | Impairment | Entitled to Vote |
|---|---|---|---|---|
| 3-A | Beal Bank SSB | Clarkston facility | Unimpaired | No |
| 3-B | SBA | IHS-Mt. Pleasant, Mt. Pleasant Assisted Living Facility | Unimpaired | No |
| 3-C | Todd Alexander | Central Accounting Office of Florida | Unimpaired | No |
| 3-D | Canada Life Assurance Company | IHS-Texoma at Sherman | Unimpaired | No |
| 3-E | Bank of America | South Carolina laundry and billing facility | Impaired | Yes |
| 3-F | Bank of America | Inman Healthcare and Golden Age-Inman facilities | Impaired | Yes |
| 3-G | Finova | Houston Hospital | Impaired | Yes |
| 3-H | Omega Healthcare Investors, Inc. | various facilities | Impaired | Yes |
| 3-I | Omega Healthcare Investors, Inc. | various facilities | Impaired | Yes |
| 3-J | Omega Healthcare Investors, Inc. | Crystal Springs Nursing and Rehabilitation Center (closed) | Impaired | Yes |
| 3-K | Beal Bank SSB | Treyburn Rehabilitation and Nursing Center | Impaired | Yes |

25

## SECTION 4. TREATMENT OF CLAIMS AND EQUITY INTERESTS

### 4.1    *Other Priority Claims (Class 1).*

Except to the extent that a holder of an Allowed Other Priority Claim against any of the Debtors has agreed to a different treatment, each such holder shall receive, in full satisfaction of such Allowed Other Priority Claim, Cash in an amount equal to such Allowed Other Priority Claim, to be paid by the Liquidating LLC or the Reorganized Debtors, as applicable, on or as soon as reasonably practicable after the later of (i) the Effective Date and (ii) the date such Claim becomes an Allowed Other Priority Claim.

### 4.2    *Secured Synthetic Lease Claims (Class 2).*

(a)    *Allowance and Subclassification of Synthetic Lease Claims.* On the Effective Date, the Synthetic Lease Claims shall be subclassified and treated as follows: (i) $26,823,980.54 shall be deemed Allowed Claims arising under the Class 2 A-Notes; (ii) $10,575,855.71 plus all accrued interest with respect to the Class 2 B-Notes arising from the Commencement Date through the Effective Date, at the non-default contract rate, shall be deemed Allowed Claims arising under Class 2 B-Notes; and (iii) $2,901,701.33, plus all accrued interest with respect to the Class 2 Certificates arising from the Commencement Date through the Effective Date, at the non-default contract rate, shall be deemed Allowed Claims arising under Class 2 Certificates.

(b)    *Designation of Secured and Unsecured Synthetic Lease Claims.*

(1)    *Class 2 A-Notes -- Unsecured.* On the Effective Date, the Allowed Synthetic Lease Claims arising under Class 2 A-Notes shall be deemed unsecured and shall be treated as Senior Lender Claims in Class 4.

(2)    *Class 2 B-Notes -- Secured.* The Claims arising under Class 2 B-Notes shall be deemed and treated as Allowed Secured Synthetic Lease Claims in the aggregate amount of (i) $1,467,080.02, plus all accrued interest arising from the Commencement Date through the Effective Date, at the non-default contract rate, with respect to the Class 2 B-Notes secured by the New Mexico Properties; and (ii) $9,108,775.69, plus all accrued interest arising from the Commencement Date through the Effective Date, at the non-default contract rate, with respect to the Class 2 B-Notes secured by the Headquarters Property.

(3)    *Class 2 Certificates -- Secured.* The Claims arising under the Class 2 Certificates shall be deemed and treated as Allowed Secured Synthetic Lease Claims in the aggregate amount of (i) $400,234.67, plus all accrued interest arising from the Commencement Date, through the Effective Date, at the non-default contract rate, with respect to the Class 2 Certificates secured by the New Mexico Properties; and (ii) $2,501,466.66, plus all accrued interest arising from the Commencement Date through the Effective Date, at the non-default contract rate, with respect to the Class 2 Certificates secured by the Headquarters Property.

26

(c)    *Claims Disputed Pending Sale of Collateral.* All Claims arising under the Class 2 B-Notes and the Class 2 Certificates secured by the Headquarters Property shall (notwithstanding Sections 4.2(b)(2)(ii) and 4.2(b)(3)(ii) above) be deemed to be Disputed until the Headquarters Property is sold as provided in Section (d) or (e) below, as applicable. If the proceeds from such sale actually paid to the holders of the Class 2 B-Notes and Class 2 Certificates secured by the Headquarters Property pursuant to Sections 4.2(d)(2) or 4.2(e)(2), as applicable, is less than the amount of $9,108,775.69 with respect to such Class 2 B-Notes and less than the amount of $2,501,466.66 with respect to such Class 2 Certificates, then the holders of the Class 2 B-Notes and Class 2 Certificates secured by the Headquarters Property shall have Allowed Senior Lender Claims in Class 4, respectively equal to the difference between the amounts set forth in this subsection (c) and the amounts actually paid to them.

(d)    *Treatment of Secured Synthetic Lease Claims Under Sale Transactions.* If the Sale Transactions are implemented, the holders of Secured Synthetic Lease Claims shall receive the treatment set forth in subsections (1) and (2) of this Section 4.2(d) in full satisfaction of all Allowed Secured Synthetic Lease Claims.

(1)    On the Effective Date, or as soon thereafter as is practicable, the Liquidating LLC shall pay to the Disbursing Agent a Cash distribution in an amount equal to the sum of the amounts set forth in Sections 4.2(b)(2)(i) and 4.2(b)(3)(i), and, upon receipt thereof, all liens on the New Mexico Properties arising out of the Participation Agreement shall be deemed to have been released.

(2)    On the Effective Date, the Debtors' interests in the Headquarters Property shall be transferred to the Liquidating LLC, and the Disbursing Agent shall receive a mortgage note from and executed by the Liquidating LLC in a principal amount equal to the sum of the amounts set forth in Sections 4.2(b)(2)(ii) and 4.2(b)(3)(ii) (the "Restructured Headquarters Note"), for the benefit of the holders of Class 2 B-Notes and the Class 2 Certificates that were secured by the Headquarters Property. The Restructured Headquarters Note will bear interest at 7% per year, will mature on the fifth anniversary of the Effective Date, and will be secured by the existing first mortgage lien on the Headquarters Property. The Liquidating LLC shall sell the Headquarters Property, and upon such sale, shall pay to the Disbursing Agent from the proceeds of such sale a Cash distribution (which shall then be distributed ratably to the holders of the Class 2 B-Notes and the Class 2 Certificates) in an amount equal to the lesser of (i) the total then outstanding obligations under the Restructured Headquarters Note; and (ii) the net proceeds of the sale of the Headquarters Property. Upon such payment to the Disbursing Agent, all liens on the Headquarters Property shall be deemed to have been released, and to the extent such payment is less than the amounts set forth in Section 4.2(c) hereof, the holders of the Class 2 B-Notes and Class 2 Certificates shall have and shall be deemed to have Allowed Senior Lender Claims in Class 4 in the respective amounts and as provided in Section 4.2(c) hereof.

(e)    *Treatment of Secured Synthetic Lease Claims Under the Stand-Alone Transactions.* If the Stand-Alone Transactions are implemented the holders of Allowed Secured Synthetic Lease Claims shall receive the treatment set forth in subsections (1) and (2) of this Section 4.2(d) in full satisfaction of all Allowed Secured Synthetic Lease Claims.

(1)    On the Effective Date or as soon thereafter as practicable, the Reorganized Debtors shall pay to the Disbursing Agent a Cash distribution in an amount equal to the sum of the amounts set forth in Sections 4.2(b)(2)(i) and 4.2(b)(3)(i), and, upon receipt thereof, all liens on the New Mexico Properties arising out of the Participation Agreement shall be deemed to have been released.

(2)    On the Effective Date, the Disbursing Agent shall receive a mortgage note from and executed by the Reorganized Debtors in a principal amount equal to the sum of the amounts set forth in Sections 4.2(b)(2)(ii) and 4.2(b)(3)(ii) (the "Restructured Headquarters Note"), for the benefit of the holders of Class 2 B-Notes and Class 2 Certificates which were secured by the Headquarters Property. The Restructured Headquarters Note will bear interest at 7% per year, will mature on the fifth anniversary of the Effective Date, and will be secured by the existing first mortgage lien on the Headquarters Property. The Reorganized Debtors shall sell the Headquarters Property, and upon such sale, shall pay to the Disbursing Agent from the proceeds of such sale a Cash distribution (which shall then be distributed ratably to the holders of the Class 2 B-Notes and Class 2 Certificates) in an amount equal to the lesser of (i) the total then outstanding obligations under the Restructured Headquarters Note; and (ii) the net proceeds of the sale of the Headquarters Property. Upon such payment to the Disbursing Agent, all liens on the Headquarters Property shall be deemed to have been released, and to the extent such payment is less than the amounts set forth in Section 4.2(c) hereof, the holders of the Class 2 B-Notes and Class 2 Certificates shall have and shall be deemed to have Allowed Senior Lender Claims in Class 4 in the respective amounts and as provided in Section 4.2(c) hereof.

(f)    *Distributions to Individual Holders; Disbursing Agent.* The aggregate distributions in respect of Secured Synthetic Lease Claims shall be made to Citicorp USA, Inc., as Disbursing Agent, which shall make distributions as provided herein to the individual holders of the Secured Synthetic Lease Claims as of the Distribution Record Date. The delivery of such aggregate distributions to Citicorp USA, Inc. shall be in full satisfaction, release and discharge of all Secured Synthetic Lease Claims against the Debtors. Citicorp USA, Inc. shall deduct from such distributions all costs and expenses (including all professional fees and disbursements) incurred by it and unpaid prior to making any distribution to the holders of Allowed Secured Synthetic Lease Claims.

## 4.3    *Other Secured Claims (Class 3).*

(a)    *General Treatment.* With respect to all Other Secured Claims not designated in one of Subclasses 3-A through 3-K (the treatment of which is set forth below):