IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>INTEGRATED HEALTH SERVICES, INC., *et al.*,<br><br>    Debtors. | Case No. 00-389 (MFW)<br>Jointly Administered |
| IHS LIQUIDATING LLC,<br><br>    Plaintiff,<br><br>    v.<br><br>ACE INDEMNITY INSURANCE COMPANY<br>f/k/a INDEMNITY INSURANCE COMPANY<br>OF NORTH AMERICA,<br><br>    Defendant. | Civil Action No. 05-376 (GMS) |

**RESPONSE OF DEFENDANT, INDEMNITY
INSURANCE COMPANY OF NORTH AMERICA IN
OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT ON COUNT I OF THEIR COMPLAINT**

Dated: March 22, 2006

Thomas G. Whalen, Jr. (No. 4034)
Stevens & Lee, P.C.
1105 North Market Street, 7th Floor
Wilmington, DE 19801
Telephone: (302) 425-3304
Telecopier: (610) 371-8512
E-mail: tgw@stevenslee.com

SL1 620915v1/020037.00001

and

Leonard P. Goldberger, Esquire
(Member of PA Bar)
Stevens & Lee, P.C.
1818 Market Street, 29th Floor
Philadelphia, PA  19103
Telephone:  (215) 864-7000
Telecopier:  (215) 864-7123
E-mail: lpg@stevenslee.com


and

Francis J. Deasey, Esquire
Gerald J. Valentini, Esquire
Ward A. Rivers, Esquire
(Members of PA Bar)
DEASEY, MAHONEY & BENDER, LTD.
1800 John F. Kennedy Boulevard
Suite 1300
Philadelphia, PA  19103
Telephone:  (215) 587-9400
Telecopier:  (215) 587-9456

*Attorneys for Defendant, Indemnity
Insurance Company of North America*

## TABLE OF CONTENTS

I. PRELIMINARY STATEMENT ...................................................................................1

II. STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING.................2

III. SUMMARY OF ARGUMENT .................................................................................4

IV. STATEMENT OF UNDISPUTED FACTS ................................................................6

    A.    History...........................................................................................................6

    B.    The Bankruptcy Proceedings...........................................................................8

    C.    Confirmation of the Plan................................................................................12

V. ARGUMENT............................................................................................................15

    A.    The Summary Judgment Standard ..................................................................15

    B.    Choice of Law ..............................................................................................15

    C.    Plaintiff's Motion For Partial Summary Judgment Must Be Denied Because
           Plaintiff Is Not Entitled To Judgment As A Matter Of Law ..............................18

           1.    Coverage Under The Underlying Policies Has Not Been Exhausted By
                   Payment....................................................................................................18

           2.    IICNA Has No Duty to Drop down in the Event of an Underlying Insurer's
                   Insolvency. ...............................................................................................23

           3.    The Insolvency Provision Of The IICNA Policy Does Not Abrogate The
                   Insured's Contractual Obligation To Satisfy Its Self-Insured Retention ...28

VI. CONCLUSION.........................................................................................................30

# TABLE OF AUTHORITIES

## CASES

### UNITED STATES COURT OF APPEALS

Bensalem Township v. International Surplus Lines Ins. Co.,
        38 F.3d 1303, 1311 (3d Cir. 1994)...................................................................16

Canada Life Assurance Co. v. Estate of Liebowitz,
        185 F.3d 231, 235 (4th Cir. 1999) ...................................................................18

Molina v. United States Fire Ins. Co.,
        574 F.2d 1176 (4th Cir. 1978) ........................................................................26

### UNITED STATES DISTRICT COURTS

In re Amatex Corporation,
        107 B.R. 856 (E.D. Pa. 1989) .........................................................................29

Associated Electric & Gas Ins. Serv., Ltd. v. Border Steel Rolling Mills,
        2005 U.S. Dist. LEXIS 32198 (W.D. Tx. 2005)............................................29

Home Ins. Co. v. The Law Offices of Jonathan D. Young,
        32 F. Supp. 2d 219 (E.D. Pa. 1998) ................................................................15

Independence Blue Cross v. Lexington Ins. Co.,
        1999 U.S. Dist. LEXIS 10812 (E.D. Pa. 1995)..............................................16

Kline v. The Kemper Group,
        826 F. Supp. 123, 127 (M.D. Pa. 1993)..........................................................16

McGirt v. Royal Ins. Co. of America,
        399 F. Supp. 2d 655 (D. MD. 2005) ...............................................................26

Pac-Mor Manufacturing Co. v. Royal Surplus Lines Ins. Co.,
        2005 U.S. Dist. LEXIS 34683 (W.D. Tx. 2005)............................................29

### UNITED STATES BANKRUPTCY COURTS

In re Apache Products Co.,
        311 B.R. 288 (Bkr. M.D. Fl. 2004).................................................................29

Columbia Casualty Co. v. Federal Insurance Company
    104 B.R. 56 (Bkr. M.D. Ind. 1989) ................................................................. 28

In re Keck Mahan & Kate,
    241 B.R. 583 596 (Bkr. E.D. Ill. 1999) ........................................................... 29

**DELAWARE**

Derrickson v. American Nat'l Fire Ins. Co.,
    538 A.2d 1113, 1988 Del. LEXIS 4 (Del. 1988) ............................................ 17

Graves v. CMC, Inc.,
    2005 Del. LEXIS 319 (Del. 2005) ................................................................... 17

Playtex FP v. Columbia Casualty Co.,
    622 A.2d 1074 (Del. Super. Ct. 1992) ........................................................ 24, 25

**MARYLAND**

Prince George's County v. Local Government Ins. Trust,
    388 Md. 162, 172, 879 A.2d 81, 88 (Md. 2005) ............................................ 18

**PENNSYLVANIA**

Consulting Engineers, Inc. v. Insurance Company of North America,
    710 A.2d 82, 85 (Pa. Super. 1980) .................................................................. 16

Donegal Mut. Ins. Co. v. Long,
    528 Pa. 295, 597 A.2d 1124 (Pa. 1991) .......................................................... 25

Jean & Harvey Builders v. Pennsylvania Manufacturers' Assoc. Ins. Co.,
    512 Pa. 420, 517 A.2d 910 (Pa. 1986) ........................................................... 16

J. Kinderman & Sons, Inc. v. United Nat'l Ins. Co.,
    406 Pa. Super. 37, 593 A.2d 635 (Pa. Super. 1991) .................................... 25, 26

Minnesota Fire & Cas. Co. v. Greenfield,
    579 Pa. 333, 855 A.2d 854 (Pa. 2003) ........................................................... 15

Standard Venetian Blinds Co. v. American Empire Ins. Co.,
    503 Pa. 300, 469 A.2d 563 (Pa. 1983) ........................................................... 16

Tonkovic v. State Farm Mut. Auto. Ins. Co.,
  513 Pa. 445, 521 A.2d 920, 925 (Pa. 1987) .................................................... 16, 17

Vickodile v. Pennsylvania Ins. Guar. Ass'n.,
  356 Pa. Super. 325, 541 A.2d 635 (Pa. Super. 1986) ..................................... 25

**OTHER JURISDICTIONS**

The Home Ins. Co. of Illinois v. Hooper,
  294 Ill. App. 3d 626; 691 N.E.2d 65 (Ill. 1998) ............................................. 29

**STATUTES**

Federal Rule of Civil Procedure 56(c) ....................................................................... 15

**OTHER AUTHORITY**

Barry R. Ostreger, et al., Handbook of Insurance Coverage Disputes,
  (12 Ed., Aspen L. & Bus. 2004 at 336) .......................................................... 21, 24

Defendant, Indemnity Insurance Company of North America (hereinafter "IICNA"), by and through its attorneys, files this Response to Plaintiff's Motion for Partial Summary Judgment.

## I. PRELIMINARY STATEMENT

Contrary to Plaintiff's allegations, IICNA has not precluded Plaintiff from making distributions from the 1999 insured trust claims escrow.  Rather, Plaintiff's problems in this regard arise from its improvident and ill-advised decision to make partial payments to some holders of 1999 insured tort claims prior to determining the pool of money available to pay such claims.  Plaintiff's problems are further compounded by its failure to read and understand the terms of the policies prior to making distributions, electing to make payments in amounts over and above those required by the plan, failing to hold non-debtor entities responsible for payment of their respective shares of the self-insured retention and allowing distribution to holders of 1999 insured tort claims asserted against non-debtor entities at the full settlement or judgment value of the claim.

More importantly, and contrary to Plaintiff's allegations, IICNA is defending all covered 1999 insured tort claims subject to a Reservation of Rights; has entered into settlement agreements with holders of 1999 insured tort claims subject to that same Reservation of Rights; and has attempted to make payments to the 1999 insured tort claims escrow for such claims for more than six months. IICNA has been unable to make payments because Plaintiff has, to date, failed to provide IICNA with a tax identification number for the 1999 insured tort claims escrow.

1

## II. **STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING**

Plaintiff, IHS Liquidating, LLC ("Plaintiff") commenced this adversary proceeding on or about May 6, 2005. A copy of Plaintiff's Complaint (the "Complaint") is attached hereto as Exhibit "A." The Complaint seeks, *inter alia*, a determination of whether coverage provided to the Plaintiff by IICNA under a certain excess catastrophe liability policy has been triggered and, thus, IICNA is required to defend and indemnify Plaintiff in connection with certain professional liability and general liability claims asserted against Plaintiff for the policy period 1999-2000.

On or about July 26, 2005, IICNA filed an Answer and Counterclaim to Plaintiff's Complaint. IICNA's Counterclaim asserts, in part, that coverage under the IICNA policy is not triggered until the underlying limits are properly exhausted by payment. Since none of the limits of the underlying policies have been properly exhausted by payments, IICNA asserts that coverage under its policy has not been triggered.

On August 18, 2005, Plaintiff filed a Reply to Counterclaim and a Third Party Complaint against National Union Fire Insurance Company of Pittsburgh, PA ("AIG") and General Star Indemnity Company ("GenStar") seeking a declaration of coverage under policies issued by AIG and GenStar. The Third Party Complaint also seeks injunctive relief against IICNA and reasserts Plaintiff's claims of breach of contract and bad faith.

On or about September 19, 2005, IICNA filed its Answer and Affirmative Defenses to Third Party Complaint. In response to the Third Party Complaint, GenStar filed a Motion for Stay and Abstention. To date, AIG has not filed an answer or motion in response to the Third Party Complaint.

On or about December 12, 2005, Plaintiff filed the subject Motion for Partial Summary Judgment seeking summary judgment as to Count I of its Complaint. That Count and the Motion

2

for Partial Summary Judgment both seek a declaration of coverage in contravention of the express terms of the IICNA policy.

On March 14, 2006, the United States District Court for the District of Delaware entered an Order granting the Withdrawal of the Reference.

This is IICNA's Response to Plaintiff's Motion for Partial Summary Judgment.

### III. **SUMMARY OF ARGUMENT**

Plaintiff's Motion for Partial Summary Judgment should be denied because Plaintiff is not entitled to judgment as a matter of law for the following reasons:

1. **The Coverages Underlying The IICNA Policy Have Not Been Exhausted Properly By Payment.** The clear and unambiguous provisions of the IICNA policy require the exhaustion of the underlying limits by "payment" as a condition precedent to the attachment of IICNA's policy. None of the underlying policies were, in fact, exhausted by payment. The limits of the Reliance policy have not been exhausted by payment. The limits of the AIG policy have been improperly exhausted by the inclusion of defense expenses within limits in contravention of the clear and unambiguous terms and conditions of the AIG policy. Further, the AIG policy limits have been improperly exhausted by the inclusion of indemnity payments and defense expenses for claims asserted against Integrated Health Services of Lester, Inc., an entity which has been expressly excluded by coverage under the AIG policy. AIG issued a separate, stand alone, policy to Integrated Health Services of Lester, Inc. which has not been exhausted. The GenStar policy is a follow form excess liability policy which incorporates all of the definitions, terms, conditions and exclusions contained in the AIG policy by reference, including the exclusion of coverage for Integrated Health Services of Lester, Inc. Likewise, the limits of the GenStar policy were improperly exhausted by the inclusion of indemnity payments and defense expenses for claims asserted against Integrated Health Services of Lester, Inc.

2. **IICNA Has No Duty To Drop Down In The Event Of An Underlying Insurer's Insolvency.** The IICNA policy contains a maintenance of underlying insurance provision which places the credit risk of any underlying insurer's insolvency on the insured. IICNA has no drop down provision in its policy. Under the case law of Delaware, Maryland and Pennsylvania,

IICNA has no duty to drop down and provide coverage in the event of an underlying carrier's insolvency in the absence of a drop down provision in its policy.

3. **The Insolvency Provision Of The IICNA Policy Does Not Abrogate The Insured's Contractual Obligation To Satisfy Its Self-Insured Retention.** An insolvent insured which has coverage subject to a self insured retention retains a contractual obligation to satisfy such self-insured retention prior to the attachment of the excess coverage.

SL1 620915v1/020037.00001

## IV. STATEMENT OF UNDISPUTED FACTS

### A. History

In order to understand the nature of this adversary proceeding, it is necessary to understand the various coverages provided to Plaintiff for the 1999 policy year. For the Court's ease of reference, the policies are identified herein.

Plaintiff's primary coverage was provided by Reliance National Indemnity Company ("Reliance") under policy number NGB0151564-00 (the "Reliance policy"). The Reliance policy is purported to be a "matching deductible" insurance policy "subjecting IHS (Plaintiff) to deductibles in the same amount as the coverage limits." Coverage limits are either $4,500,000 or $9,000,000 aggregate.

The next layer of coverage was provided by National Union Fire Insurance Company of Pittsburgh, PA ("AIG") under a commercial umbrella policy No. BE 357-43-43 (the "AIG policy"). Coverage limits are $25,000,000 per occurrence and aggregate in excess of the underlying. A copy of the AIG policy is attached hereto as Exhibit "B."

The third layer of coverage was provided by General Star Indemnity Company ("GenStar") under an excess liability policy No. IXG-347714B (the "GenStar policy"). Coverage limits under the GenStar policy are $25,000,000 occurrence and aggregate in excess of the underlying. A copy of the GenStar policy is attached hereto as Exhibit "C."

Finally, IICNA provided coverage under an excess catastrophe liability policy, No. XLXG19524139 (the "IICNA policy"). IICNA's coverage limits are $50,000,000 occurrence and aggregate in excess of the underlying. A copy of IICNA's policy is attached hereto as Exhibit "D." Coverage under the IICNA policy is afforded as follows:

**Section I.**

**Insuring Agreements**

**Coverage**

> WE will pay on YOUR behalf the ULTIMATE NET LOSS (1) in excess of all UNDERLYING INSURANCE (2) only after all UNDERLYING INSURANCE has been exhausted by the payment of the limits of such insurance for losses arising out of OCCURRENCES that take place during Our policy period and are insured by all of the policies designated in the declarations as UNDERLYING INSURANCE.   If   any   UNDERLYING INSURANCE does not pay a loss for reasons other than exhaustion of an aggregate limit of insurance then We shall not pay such loss.
>
> The definitions, terms, conditions, limitations and exclusions of the "first policy of UNDERLYING INSURANCE," in effect at the inception date of this policy, applied to this coverage unless they are inconsistent with provision of this policy . . .

The AIG policy contains the following endorsement which expressly excludes coverage for Integrated Health Services of Lester, Inc.:

**BROAD NAMED INSURED AMENDATORY**

> The definition of named insured (IV) E1(a) and (b) is amended to include any partnership, interest in a joint venture, subsidiary or controlled or proprietary company, corporation, firm, organization or other entity as now exists or may hereafter be constituted, form or acquired where the named insured has at least 50% ownership interest or management control.
>
> **However this policy shall exclude all coverage and limits for the exposure of Integrated Health Services of Lester, Inc.** and its interest in other entities.  (Emphasis added.)
>
> *See Joint Venture Endorsement for additional conditions.

Significantly, AIG issued a separate, stand-alone policy to Integrated Health Services of Lester, Inc. under policy No. BE 357-43-44 (the "AIG Lester policy").  The AIG Lester policy is attached hereto as Exhibit "E."

At all times relevant hereto, AIG and GenStar retained Hamlin & Burton Liability Management, Inc. ("Hamlin & Burton") as their claims administrator for the 1999 claims. Information provided by Hamlin & Burton discloses that AIG and GenStar improperly exhausted their respective policy limits by indemnity payments made in settlement of claims asserted against certain Integrated Health Services of Lester, Inc. facilities. A copy of Diane McCartney's Affidavit in support thereof is attached hereto as Exhibit "F."

Furthermore, the AIG policy provides that defense expenses are **in addition to**, rather than included in, the limits of the policy. See Exhibit "B," page 7, second non-designated paragraph after "F." Information provided by Hamlin & Burton establishes that AIG improperly exhausted the limits of its coverage by the inclusion of defense expenses.

## B.    The Bankruptcy Proceedings

On or about February 2, 2000 (the "Filing Date"), Integrated Health Services, Inc. and a number of its direct and indirect subsidiaries (collectively, "IHS") commenced voluntary cases under Chapter 11 of the Bankruptcy Code. As of the filing date, IHS was primarily engaged in the business of operating skilled nursing and subacute care facilities. As of the Filing Date, IHS operated approximately 377 facilities with approximately 42,000 beds. IHS' operations resulted in the filing of an unknown number of claims and/or lawsuits asserting various injuries resulting from acts and/or omissions and/or breaches of the standard of care occurring in whole or in part, during the 1999 calendar year ("tort lawsuits"). At the time of the purported exhaustion of the GenStar policy, some 62 tort lawsuits were remaining. Of that number, 11 tort lawsuits arose from allegations for breaches in the standard of care given to residents of Integrated Health Services of Lester, Inc. facilities.

**8**

During the relevant time period to Plaintiff's Motion for Partial Summary Judgment, Plaintiff's primary general liability and professional liability insurance was provided by Reliance. The Reliance policy is purported to be a "matching deductible" insurance policy, subjecting IHS to deductibles in the same amount as the coverage limits. See Plaintiff's Motion, ¶ 15. On or about May 29, 2001, Reliance consented to the entry of an Order of Rehabilitation by the Commonwealth Court of Pennsylvania. Subsequently, on or about October 3, 2001, the Commonwealth Court ordered Reliance into liquidation.

Despite IHS's insolvency and the Order for liquidation entered against Reliance, IHS continued to "settle" an unknown number of tort lawsuits in which IHS was named as a defendant. At some point, these "settlements" exceeded what IHS believed to be the aggregate limits of the Reliance policy and IHS sought coverage under the AIG policy.

The AIG policy provides, in part:

**Insuring Agreements**

**I.    Coverage**

> We will pay on behalf of the insured those sums in excess of the retained limit that the **Insured** becomes legally obligated to pay by reason of liability imposed by law or assumed by the **Insured** under an **Insured Contract** because of **Bodily Injury,** Property Damage, Personal Injury or **Advertising Injury** that takes place during the **Policy Period** and is caused by an **Occurrence** happening anywhere in the world. The amount we will pay for damages is limited as described in Insuring Agreement, III, Limits of Insurance.

Upon the purported "exhaustion" of the Reliance policy, IHS tendered both the total dollar value of its settlement of the tort lawsuits and all the remaining, unresolved, tort lawsuits still pending to AIG for defense and indemnification. IHS did not, at any time, tender any tort

lawsuits, settlements or pending tort lawsuits to AIG for coverage under a concurrent AIG Lester policy.

Upon receipt of IHS's tender of the dollar value of the settlements of the tort lawsuits and all of the tort lawsuits still pending, AIG declined coverage.  On or about March 26, 2003, IHS filed in the Bankruptcy Court a declaratory judgment action seeking coverage under the AIG policy **only**.  The declaratory judgment action was resolved by partial summary judgment in IHS's favor and against AIG **only** by order of the Bankruptcy Court.  Thereafter, AIG assumed the defense of the pending tort lawsuits as well as any new tort lawsuits filed against IHS.  The Order of the Bankruptcy Court granting partial summary judgment in favor of IHS and against AIG specifically held that the AIG policy was obligated to pay IHS for liabilities covered under the AIG policy when the "insured" or the "insured's underlying carrier" (as such terms are defined in the AIG policy, according to the Order) became "legally obligated" to pay sums in excess of the underlying limits.

Accordingly, AIG undertook to provide the defense of all currently pending lawsuits alleging residency or injury occurring during the AIG policy's coverage term in which IHS, its subsidiaries or affiliates were named as defendants.  AIG also provided for the defense of any additional lawsuits filed subsequent to AIG's acceptance of the defense, but which alleged residency or injury occurring during the AIG policy's coverage term.  The actual investigation in defense of such claims, and acceptance of coverage for new claims, was handled by AIG's claims administrator, Hamlin & Burton.  All payments made in satisfaction of settlement or judgment, as well as payments to defense counsel were made by AIG through Hamlin & Burton.  Hamlin & Burton was responsible for tracking the exhaustion of the AIG policy's aggregate limits.

At some point, the limits of the AIG policy were purportedly exhausted. Thereafter, the pending tort lawsuits were tendered to the next excess carrier, GenStar. GenStar accepted the tender of pending lawsuits against IHS which alleged residency or injury occurring during the GenStar policy's coverage term. GenStar also had retained Hamlin & Burton to act as its claims administrator for all lawsuits defended under the GenStar policy in which IHS, its subsidiaries or affiliates were named as defendants. GenStar also provided for the defense of any additional lawsuits filed subsequent to GenStar's acceptance of the defense, but which alleged residency or injury occurring during the GenStar policy's coverage term. As it had for AIG, Hamlin & Burton was responsible for tracking the exhaustion of GenStar's policy aggregate limits.

In or about February 2005, AIG provided IICNA with "certified" copies of its policies issued to Integrated Health Services, Inc. and, separately, to Integrated Health Services of Lester, Inc. Shortly thereafter, Hamlin & Burton provided spreadsheet information documenting the purported amount of erosion of the GenStar policy's aggregate limits. The spreadsheet information disclosed that GenStar's policy limits were improperly exhausted by payment of settlements and defense expenses for claims asserted against Integrated Health Services of Lester, Inc. See Exhibit "F." IICNA then requested and received information from Hamlin & Burton which disclosed that the limits of the AIG policy had likewise been eroded by the improper exhaustion of its policy limits by indemnity payments and defense expenses incurred in connection with claims asserted against Integrated Health Services of Lester, Inc. Hamlin & Burton also disclosed that the limits of the AIG policy had been improperly exhausted by inclusion of payment of defense expenses. See Exhibit "F."

11

C.    **Confirmation of the Plan**

On or about January 28, 2003, IHS entered into that certain Stock Purchase Agreement made by and between A. Briarwood Corp., a Nevada Corporation ("Briarwood") and IHS, Inc. (the "SPA"). On or about March 13, 2003, counsel for IHS filed an Amended Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code (the "Plan"). Pursuant to page 5 of the Disclosure Statement for the Amended Joint Plan of Reorganization of IHS, and its subsidiaries under Chapter 11 of the Bankruptcy Code ("Disclosure Statement"), "the sale agreement will serve as the cornerstone of the Plan." A copy of page 5 of the Disclosure Statement is attached as Exhibit "G."

IICNA filed timely objections to confirmation of the Plan because, *inter alia*, the Plan prejudiced IICNA's rights under IICNA's various insurance policies issued to IHS. IICNA's objections to the Plan are incorporated herein by reference. On May 12, 2003, the Plan was confirmed by the Bankruptcy Court, which issued an Order entitled Findings of Facts, Conclusions of Law and Order under 11 U.S.C. §1129(a) and (b) and Fed. R. Bank. P. 3020 Confirming Amended Joint Plan of Reorganization of Integrated Health Services, Inc. and its subsidiaries under Chapter 11 of the Bankruptcy Code (the "Confirmation Order").

IICNA's objections to the Plan were resolved by the inclusion in the Confirmation Order of the following reservation of IICNA's rights:

> (e)        With respect to the Objection filed by Pacific Employers Insurance Company, et al., the Debtors have agreed as follows: Notwithstanding any other term or provision in the Plan, this Order (i) is without prejudice to the rights, claims and/or defenses of Pacific Employers Insurance Company, Century Indemnity Company (a successor to CIGNA Specialty Insurance Company, formerly known as California Union Insurance Company), Indemnity Insurance Company of North America and ACE American Insurance Company (collectively "Insurers") under the

12

> Debtors' insurance policies with the Insurers (the "Policies")
> and/or the Reservation of Rights by Insurers as to any issues
> relating to the policies (as such issues are set forth in insurers'
> objections to confirmation [Doc. No. 9349]; provided, however,
> that the Insurers and Debtors agree that to the extent § 365 of the
> Bankruptcy Code is applicable, nothing in the Plan or this Order
> shall be deemed to constitute a rejection of the Policies under §
> 365 of the Bankruptcy Code; (ii) Confirms that all the terms,
> conditions, limitations and/or exclusions contained in the Policies
> shall remain in full force and effect; (iii) Confirms that the Debtors
> and the reorganized Debtors shall remain as the insureds under the
> policies, and the Debtors, the Reorganized Debtors and the Insurers
> shall remain bound by all the terms, conditions, limitations and/or
> exclusions contained in the Policies; (iv) Confirms that the
> Policies, to the extent they so provide, shall not be assigned by the
> Debtors or the Reorganized Debtors without Insurers' written
> consent; (v) Acknowledges that nothing in the Plan shall be
> deemed to create any insurance coverage that does not otherwise
> exist, if at all, under the terms of the policy; and (vi) **Is without
> prejudice to any of the Insurers' or the Debtors' (or the
> reorganized Debtors', if applicable) rights and/or defenses in
> any pending or subsequent litigation in which Insurers or the
> Reorganized Debtors may seek a declaration regarding the
> nature and/or extent of any coverage under the Policies.**

Confirmation Order § 35(e) (Emphasis added.)

Under the Plan, the professional and general liability claims against IHS alleging residency, injury or occurrence occurring during the 1999 calendar year comprise a separate class of claims (the "Class 8 claims"). Class 8 claims are addressed in two separate sections of the Plan, Section 4.8 and Section 6.2(k). Pursuant to Section 4.8, each holder of an allowed 1999 tort claim is entitled to receive its *pro rata* share of the aggregate sum of (i) the available 1999 insurance proceeds; and (ii) 3% of the difference between the available 1999 insurance proceeds and the total amount of allowed 1999 tort claims. The Plan defines the term "allowed" in part, as:

> Any claim, (a) any claim against any Debtor which has been listed
> by such Debtor in the schedules . . . (b) any timely filed claim as to
> which no objection to allowance has been interposed . . . (c) any
> claim expressly allowed by final order or hereunder.

The Plan defines a 1999 insured tort claim as a "tort claim **covered** by the Debtors'

insurance policies for PLGL claims arising in 1999." (Emphasis added.) Available 1999

insurance proceeds are defined as "the amount of proceeds recovered at any given time under the

Debtors' insurance policies, including excess insurance policies, in respect of allowed 1999

insured tort claims, after payment of defense costs payable under the policies." Under the Plan,

any potential right of coverage is predicated on coverage under the applicable policy. Further,

pursuant to the Confirmation Order, any and all defenses available to the insurers are preserved.

14

## V. **ARGUMENT**

### A.   **The Summary Judgment Standard**

Summary judgment may be granted only where "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and **that the moving party is entitled to judgment as a matter of law**." Fed. R. Civ. P. 56(c) (emphasis added).

### B.   **Choice of Law**

IHS was a Delaware corporation with its principal place of business located in Maryland. IICNA is a Pennsylvania corporation with offices in both Pennsylvania and Georgia. Plaintiff does not make an argument regarding the choice of law applicable to this coverage dispute. However, much of Plaintiff's argument is predicated upon its interpretation of Pennsylvania law. As both Delaware and Maryland law may be applicable in resolving this matter, and as Delaware and Maryland law are in accord with Pennsylvania law, no conflict of law exists; however, for the Court's reference, relevant case law from each jurisdiction is provided below.

In its Motion for Partial Summary Judgment, Plaintiff incorrectly states that under Pennsylvania case law an insurer's interpretation of its policy is enforceable if, and only if, the interpretation is the "only fair and reasonable one." Under Pennsylvania law it is the province of the Court to interpret contracts of insurance, <u>Home Ins. Co. v. The Law Offices of Jonathan D. Young</u>, 32 F. Supp. 2d 219, 233 (E.D. Pa. 1998). The task of interpreting an insurance contract regarding the existence or nonexistence of coverage is generally performed by a court. <u>Minnesota Fire & Cas. Co. v. Greenfield</u>, 579 Pa. 333, 344, 855 A.2d 854, 861 (Pa. 2003). The goal of the task is to ascertain the intent of the parties as manifested by the language of the

15

written instrument. Standard Venetian Blinds Co. v. American Empire Ins. Co., 503 Pa. 300, 304, 469 A.2d 563, 566 (Pa. 1983).

It is well established under Pennsylvania law that where the language of the insurance contract is clear and unambiguous, courts will give effect to that language. See generally, Standard Venetian Blind, 469 A.2d at 563; Jean & Harvey Builders v. Pennsylvania Manufacturers' Assoc. Ins. Co., 512 Pa. 420, 426, 517 A.2d 910, 913 (Pa. 1986). "When construing an insurance contract, it must be read in its entirety and the intent gathered from a consideration of the ordinary meaning of the words used in the instrument. Ambiguous terms should be construed against the insurer, but a court should not 'torture' the language to create an ambiguity where none exists. Only where reasonably intelligent men, considering the word in the context of the entire policy, could honestly differ as to its meaning, will an ambiguity be found." Consulting Engineers, Inc. v. Insurance Company of North America, 710 A.2d 82, 85 (Pa. Super. 1980) *quoting* Erie Insurance Exchange v. TransAmerica, Ins. Co., 352 Pa. Super. 78, 507 A.2d 389, 392 (Pa. Super. 1986) *reversed on other grounds*, 516 Pa. 574, 533 A.2d 1363 (Pa. 1987). "In deciding this question, the court should read the policy with an eye toward avoiding ambiguities and take care not to torture policy language to create uncertainties where none exists." Kline v. The Kemper Group, 826 F. Supp. 123, 127 (M.D. Pa. 1993).

Contrary to Plaintiff's assertion, Pennsylvania courts only apply the reasonable expectation theory to the insurance policy at issue where the insurer elects to issue a policy different from what the insured requested and paid for. Tonkovic v. State Farm Mut. Auto. Ins. Co., 513 Pa. 445, 521 A.2d 920, 925 (Pa. 1987). See also Bensalem Township v. International Surplus Lines Ins. Co., 38 F.3d 1303, 1311 (3d Cir. 1994) and Independence Blue Cross v. Lexington Ins. Co., 1999 U.S. Dist. LEXIS 10812 (E.D. Pa. 1995). The Court in Tonkovic held

16

that there is a "crucial distinction between cases where one applies for a specific coverage and the insurer unilaterally limits that coverage, resulting in a policy quite different from what the insured requested, and cases where the insured received precisely the coverage that he requested." Tonkovic, 513 Pa. at 454.

Despite its bold assertion, Plaintiff presents no evidence that the policy issued by IICNA differs from the policy which IHS applied for.  Rather, Plaintiff's argument, as stated in paragraphs 37 and 42 of its Motion, is that the "Debtors – and later the Liquidating LLC" "understood" that IICNA's policy would be available notwithstanding the bankruptcy of IHS or the insolvency of Reliance.  Under the relevant case law of Pennsylvania, the Liquidating LLC's "understanding or expectations" of coverage are legally irrelevant to application of the unambiguous terms and conditions of coverage under the IICNA policy.  Absent evidence showing that IICNA's policy differs from the policy which IHS applied for, the "reasonable expectations" theory under Tonkovic is inapplicable and the Standard Venetian Blind line of cases is controlling.

Likewise, Delaware law offers no support for Plaintiff's position since under Delaware law the parties to an insurance contract are bound by the plain meaning of the policy.  In Graves v. CMC, Inc., 2005 Del. LEXIS 319 (Del. 2005), the Supreme Court of Delaware held that if the policy language is unambiguous, the policies are bound by its plain meaning.  Absent such ambiguity, there is no need, or authority, for a court to apply rules of construction which require an insurance contract to be construed in favor of the insured, or attempt to discern the reasonable expectations of the purchaser.  Derrickson v. American Nat'l Fire Ins. Co., 538 A.2d 1113, 1988 Del. LEXIS 4 (Del. 1988).

17

Similarly, Plaintiff's argument is unsupported by Maryland law, because Maryland courts also apply the terms of the contracts as written. "In interpreting an insurance policy, as with any contract, the primary task of the Circuit Court is to apply the terms of the policy itself." See Prince George's County v. Local Government Ins. Trust, 388 Md. 162, 172, 879 A.2d 81, 88 (Md. 2005). The court must accord the terms their customary, ordinary and accepted meaning. Id. at 173, 188. The court must construe the instrument as a whole, in examining the character of the contract, its purpose and the facts and circumstances of the parties **at the time of execution.** Id. (Emphasis added.) Ambiguous terms are construed against the drafter in accordance with the reasonable expectations of the insured. Canada Life Assurance Co. v. Estate of Liebowitz, 185 F.3d 231, 235 (4th Cir. 1999).

## C.    Plaintiff's Motion For Partial Summary Judgment Must Be Denied Because Plaintiff Is Not Entitled To Judgment As A Matter Of Law

Pursuant to Rule 56(c), partial summary judgment is not appropriate because Plaintiff is not entitled to judgment as a matter of law for each of the following reasons.

### 1.    Coverage Under The Underlying Policies Has Not Been Exhausted By Payment.

The IICNA policy clearly and unambiguously requires the exhaustion of the underlying coverage by payment as a condition precedent to the attachment of coverage. The IICNA policy provides, in relevant part, as follows:

> WE will pay on YOUR behalf the ULTIMATE NET LOSS (1) in excess of all UNDERLYING INSURANCE and (2) only after **all UNDERLYING INSURANCE** has been **exhausted by the payments of the limits** of such insurance or losses arising out of Occurrences that take place during OUR policy period and are insured by all of the policies designated in the declarations as UNDERLYING INSURANCE.    If any UNDERLYING INSURANCE does not pay a loss for reasons other than the exhaustion of an aggregate limit of insurance then We shall not pay such loss. (Emphasis Added.)

18

Plaintiff does not dispute that the limits of the Reliance policy have not been paid. The Disclosure Statement confirms that less than $2,000,000 of the limits of the Reliance policy have been paid. The remaining amount of the limits is the subject matter of a lawsuit filed by the Plaintiff against Reliance. To the extent that the Plaintiff is successful in its lawsuit, additional insurance funds will become available to pay 1999 insured tort claims as that term is defined in the Plan. At this time, however, the limits of the Reliance policy have not been exhausted by "payment" as expressly required by the IICNA policy. Therefore, IICNA's coverage does not attach. Pursuant to the express terms of the IICNA policy, unless and until the Reliance policy limits are paid, IICNA has no obligation to defend or indemnify under the express terms of the IICNA policy.

As discussed above, the next layer of coverage was provided by the AIG policy. See Exhibit "B." This AIG policy was filed with the Bankruptcy Court in support of AIG's Response to Debtors' Motion for Summary Judgment, in Adversary No. 03-520881. This AIG policy discloses that defense expenses are in addition to, rather than included in, the limits of coverage under the policy. See Exhibit "B," page 7, second non-designated paragraph after "F." In direct contravention of the express terms and conditions of the AIG policy, defense expenses were paid out of the limits of the AIG policy thereby improperly exhausting the AIG policy's limits of coverage. See Exhibit "B."

Further, AIG's policy limits have been improperly exhausted by payment of claims asserted against Integrated Health Services of Lester, Inc., its subsidiary and affiliated companies, despite an express exclusion of coverage for Integrated Health Services of Lester, Inc., its subsidiaries and affiliated companies. See Exhibit "B," broad named-amendatory endorsement included with Exhibit "B" and attached separately as Exhibit "H".

19

Based on the foregoing, there are additional limits available to pay claims under the AIG policy, and the AIG policy has not been exhausted by "payments" as expressly required by the IICNA policy. Therefore, all other issues of coverage aside, coverage under IICNA's policy has not been triggered.

During the relevant coverage period, the GenStar policy provided limits of $25,000,000 in excess of the limits of the AIG policy. The GenStar policy incorporates by reference all of the terms, conditions, agreements, definitions, exclusions and limitations set forth in the AIG policy to the extent that such terms, conditions, agreements, definitions, exclusions and limitations are not inconsistent with the provisions of the GenStar policy. Nothing contained in the GenStar policy conflicts with the express exclusion of coverage for claims asserted against Integrated Health Services of Lester, Inc., its subsidiary and affiliated companies. As such, GenStar should have declined coverage for each and every lawsuit tendered in which Integrated Health Services of Lester, Inc., its subsidiaries and/or affiliated companies were identified as defendants.

In direct contravention of the express terms and conditions of the GenStar policy, GenStar has paid claims and defense expenses in connection with claims asserted against Integrated Health Services of Lester, Inc., its subsidiaries and affiliated companies. Therefore, the limits of coverage under the GenStar policy have been improperly eroded. Thus, the GenStar policy has not been exhausted by "payments" as expressly required by the IICNA policy. Because the GenStar policy has not been exhausted by "payments," all other issues of coverage aside, coverage under the IICNA policy has not been triggered.

In a futile attempt to obscure the undeniable fact that the policies underlying the IICNA policy have not been exhausted by payment, Plaintiff points to the fact that Zurich is identified as an underlying insurer in the schedule of underlying insurance form of the IICNA policy. By

20

virtue of this fact, Plaintiff tries to manufacture an ambiguity in the IICNA policy. Plaintiff's argument is wholly without merit. It is well established in the insurance industry that excess or secondary insurance is coverage that only attaches after a predetermined amount of primary coverage has been exhausted. See Barry R. Ostreger, et al., Handbook of Insurance Coverage Disputes (12th Ed., Aspen L. & Bus. 2004 at 335-336) (citations omitted). "Excess insurers frequently agree to provide coverage to an insured in excess of agreed types and amounts of underlying coverage, without having seen copies of the underlying policies or, in many cases, without even knowing the name of the company that is to provide the underlying insurance . . . where an insured purchases both primary and excess coverage . . . there are two (or more) separate policies of insurance, each separately negotiated." Id. at 867 (Emphasis added.)

Excess policies often contain follow form clauses which incorporate, by reference, the terms and conditions of the underlying policy. The obligations of following form excess insurers are defined by the language of the underlying policies, except to the extent that there is a conflict between the two policies, in which case the wording of the excess will control. Id. at 868 (citations omitted) (Emphasis added.)

The IICNA policy provides:

> The Definitions, Terms, Conditions, Limitations and Exclusions of the "first policy of UNDERLYING INSURANCE" in effect at the inception date of this policy, apply to this coverage unless they are inconsistent with the provisions of this policy . . .

21

As such, the IICNA policy incorporates, by reference, all the provisions of the "first policy of Underlying Insurance[1] which are consistent with the provisions of the IICNA policy. The coverage provisions of the AIG policy and the IICNA policy, however, are not consistent. The AIG policy provides (in part):

> We will pay on behalf of the insured those sums in excess of the retained limit that the **insured** becomes legally obligated to pay . . . (Emphasis original.)

Whereas, the IICNA policy provides (in part):

> We will pay on Your behalf the Ultimate Net Loss (1) in excess of all Underlying Insurance and (2) only after all Underlying Insurance has been exhausted by the **payment** of the limits . . . (Emphasis added.)

Because the coverage provisions set forth above are inconsistent, the Bankruptcy Court's holding in Adversary No. 03-52081, interpreting the AIG policy has absolutely no bearing on this Court's determination of IICNA's obligations under its policy. The language of the two policies is different and, as a result, the responsibilities of AIG and IICNA are different. As a condition precedent to the attachment of coverage under the AIG policy, the policy holder must *only* become "legally obligated to pay" settlements or judgments in excess of the underlying limits. In stark contrast, the IICNA policy requires, as a condition precedent to its attachment of coverage, the exhaustion of the underlying insurance by "payment." The policies underlying the IICNA

---

[1]Plaintiff asserts that because the IICNA policy's declaration page identifies the underlying insurance as being issued by Zurich, Plaintiff cannot determine which "underlying policy" is incorporated by reference. At the same time, however, Plaintiff asserts that the IICNA policy attaches upon the purported exhaustion of the AIG policy and the GenStar policy. Plaintiff clearly understands which policies are "underlying" IICNA's. Should Plaintiff wish to assert that some other policy(ies) is (are) "underlying" IICNA's, Plaintiff will also need to produce some evidence that the "underlying" insurance has been exhausted by payment. Plaintiff's assertion, which is clearly an attempt to aver an ambiguity where none exists, has no merit. No provision in the underlying policy can negate, eliminate or modify IICNA's requirement that all underlying coverage must be exhausted by **payment** before the IICNA policy attaches as any such provision would be inconsistent with the express terms of IICNA's policy. Moreover, the identification of Zurich as the underlying carrier is consistent with the placement of excess insurance as described in Ostreger, *supra*.

22

policy have not been exhausted by "payment." As such, coverage under the IICNA policy has not been triggered.

Plaintiff asserts contradictory arguments based on its refusal to acknowledge the unambiguous terms of the IICNA policy. In paragraph 59 of Plaintiff's Motion, Plaintiff acknowledges that IICNA has no duty to drop down to pay claims within "a lower level of coverage when an underlying insurer defaults on its obligation to provide coverage." At the same time, however, Plaintiff refuses to accept that actual payment of all underlying limits is an express condition precedent to the attachment of coverage under the IICNA policy. Instead, Plaintiff asserts that the Bankruptcy Court's decision with respect to the attachment of coverage under the AIG policy is applicable to the IICNA policy even though (i) IICNA was not a party to that litigation and (ii) that proceeding interpreted the language of the AIG policy only. Plaintiff's argument ignores the fact that these two policies contained vastly different coverage provisions.

As set forth more fully above, none of the underlying policies have been exhausted by payment of covered claims. Because an express condition precedent to the attachment of IICNA's coverage has not been met, IICNA has no present duty to defend or indemnify Plaintiff.

For the reasons set forth above, this Honorable Court should deny Plaintiff's Motion for Partial Summary Judgment.

### 2.    IICNA Has No Duty to Drop down in the Event of an Underlying Insurer's Insolvency.

Contrary to Plaintiff's argument, IICNA's policy is not required to drop down and provide coverage in the event of the insolvency of an underlying insurer. The maintenance of underlying insurer's provision in the IICNA policy places the credit risk of any underlying insurer's insolvency on the insured. Under the case law of Delaware, Maryland and Pennsylvania, an

23

excess carrier has no duty to drop down and provide coverage in the event of an underlying carrier's insolvency in the absence of a drop down provision in the policy.

Excess insurance policies usually contain a provision requiring the insured to maintain specified levels of underlying insurance. Ostreger, Handbook of Insurance Coverage Disputes, 873 (12th Ed. Aspen L. & Bus. 2004) (citations omitted). The excess coverage typically does not attach until the underlying coverage is exhausted. Id.

It is the majority rule in the United States that absent a "drop down" provision, an excess insurer is not required to "drop down" to assume the primary insurer's coverage obligation when the primary carrier becomes insolvent. In fact, in paragraph 59 of Plaintiff's Motion, Plaintiff acknowledges that IICNA has no duty to drop down. At the same time, however, Plaintiff avers that the maintenance of the underlying insurance provision, as contained in the IICNA policy, requires that IICNA take on the defense and indemnification of impending lawsuits even though the underlying policies are not exhausted. Plaintiff's argument misrepresents the purpose and effect of the maintenance of underlying insurance provision.

The maintenance of underlying insurance provisions serves to shift the credit risk of the underlying carrier's insolvency to the insured. In Playtex FP v. Columbia Casualty Co., 622 A.2d 1074, 1077-78 (Del. Super. Ct. 1992), the Court held:

> The practice employed by the insurance industry in the placement of large umbrella liability programs such as this one is consistent with the conclusion that umbrella liability policies were not intended to provide for insolvency drop down. Underwriters evaluate risks in determining the premium to be charged to an insured . . . as is common practice in the excess insurance industry, once Esmark had a commitment from a lead umbrella insurer, in this case Mission, Esmark began to fill the layers of excess coverage above Mission. Excess underwriters often rely on the lead umbrella insurer's evaluation of the risk and sign on for layers of excess coverage based on the lead umbrella premium and the

24

> attachment point of a particular layer of coverage, sometimes without seeing the lead umbrella policy form or knowing what insurers occupy the underlying layers. The premiums of excess insurance policies are generally much less expensive the more distant the layer of coverage is from the risk. Even if the excess insurers were provided with the information to evaluate the financial risk of their under layers, the ordinary underwriter cannot measure that risk. (Emphasis added.)

The Playtex FP court went on to hold:

> The purpose of a liability insurance program is to protect the insured against third party liability claims, not to insure the solvency of underlying insurers. (Emphasis added.)

Id.

Pennsylvania courts have similarly determined that an excess insurer has no duty to drop down. See Donegal Mut. Ins. Co. v. Long, 528 Pa. 295, 597 A.2d 1124 (Pa. 1991); J. Kinderman & Sons, Inc. v. United Nat'l Ins. Co., 406 Pa. Super. 37, 593 A.2d 635 (Pa. Super. 1991); Vickodile v. Pennsylvania Ins. Guar. Ass'n., 356 Pa. Super. 325, 541 A.2d 635 (Pa. Super. 1986), appeal denied, 514 Pa. 639, 523 A.2d 346 (1987).

In Kinderman, the court was asked to determine the application of a maintenance of underlying insurance provisions similar to that contained in the IICNA policy. The maintenance of underlying insurance provision contained in the policy at issue in Kinderman stated (in part):

> The insurance afforded by this policy shall apply in the same manner it would have applied had such policies been so maintained enforce. Kinderman, 406 Pa. Super. at 41.

In reliance on the foregoing language, the court in Kinderman held:

> The intent of the parties is clear from the insurance contract; United did not intend to provide coverage until after the underlying insurance carrier's amount was fulfilled. The policy provides that in the case the insurance is not maintained, the insured's coverage would be the same as if the insured maintained underlying insurance.

25

> Id. at 41-42 (Emphasis added.); See also McGirt v. Royal Ins. Co.
> of America, 399 F. Supp. 2d 655 (D. MD. 2005); Molina v. United
> States Fire Ins. Co., 574 F.2d 1176 (4th Cir. 1978).

As demonstrated above, the maintenance of underlying insurance provision as contained in the IICNA policy serves to shift the credit risk of the underlying carrier's insolvency to the insured. Since Plaintiff has admitted that IICNA has no duty to drop down, Plaintiff has acknowledged this very risk.

In a vain attempt to support its argument, Plaintiff tries to absolve itself of any responsibility for the gap in coverage left by the Reliance insolvency. Plaintiff argues that the primary layer of coverage was provided by Reliance; that the policy was issued on a "matching deductible" basis; that the total limits of the Reliance policy are either $4,500,000 or $9,000,000 and that Reliance has not paid any defense or indemnity since being placed in litigation. See Plaintiff's Motion, ¶¶ 15-18. Plaintiff therefore asserts that Reliance's insolvency created a risk that certain holders of 1999 insured tort claims would be partially or completely deprived of access to insurance proceeds while others would have the full benefit of coverage under the excess policies. See Plaintiff's Motion, ¶ 19. In order to address this potential, IHS established a special class under the Plan. Id.

However, a detailed description of the treatment of Class 8 claims is found in the Disclosure Statement and does not support Plaintiff's contention (the relevant pages are attached hereto as Exhibit "I"). Pursuant to the Disclosure Statement, only approximately $1,400,000 of the deductible was paid prior to IHS' insolvency. Depending upon the final determination of the aggregate limit, IHS owes between $3,100,000 and $7,600,000 in additional deductible payments. However, nothing in the Plan or the Disclosure Statement makes IHS responsible for these payments. Rather, the Plan shifts the entire burden onto IHS' insurers, including Reliance.

26

Specifically, the Disclosure Statement provides that should any part of the unpaid deductible amount be recovered from Reliance and the Reliance Liquidator, that amount "will be deposited by the Liquidating LLC into the 1999 insured tort claims escrow. If Debtors recover less than the full amount of the 1999 unpaid deductible amount, holders of allowed Class 8 claims will not recover 100% of the allowed amount of their claims." See Exhibit "I," p. 33. The Disclosure Statement goes on to state "holders of allowed 1999 insured tort claims will share in any available coverage under the Reliance policy only pursuant to the treatment provided in the Plan." Id. Moreover, the Disclosure Statement shifts the burden of non-debtor entities to the insurance companies. While acknowledging that non-debtor entities, such as Lyric Health Care, LLC and related companies are "insureds" under the Reliance policy, nothing in the Plan requires Lyric Health Care, LLC to pay any portion of the matching deductible. The Disclosure Statement provides that with respect to any claims against the non-debtor entities "Debtors anticipate that such claims would be pursued and resolved in the ordinary course, outside the context of the Plan. To the extent that such claims against non-debtor insureds result in payment of proceeds of the Reliance policy or proceeds of the Debtors' 1999 excess insurance policies, such payments would reduce the coverage available under such policies to holders of allowed 1999 insured tort claims under this Plan." See Exhibit "I," p. 34.

As demonstrated by the Disclosure Statement, IHS never had any intention of satisfying the self-insured retention. IHS' position is clear: if Reliance pays then the "entire class of 1999 insured tort claimants" benefits; if Reliance does not pay, then the entire class of 1999 insured tort claimants" is harmed to the extent that there is a shortfall in available insurance proceeds. At the same time, IHS allows for erosion of coverage limits through the use of insurance proceeds to pay claims asserted against non-debtor entities without requiring the payment of any portion of

27

the "matching deductible" from the non-debtor entities. The Disclosure Statement clearly shows that it is Reliance's insolvency that is at issue, not IHS' ability to pay the self-insured retention.

For the reasons set forth above, this Honorable Court should deny Plaintiff's Motion for Partial Summary Judgment.

### 3. The Insolvency Provision Of The IICNA Policy Does Not Abrogate The Insured's Contractual Obligation To Satisfy Its Self-Insured Retention

In a final, yet desperate, attempt to support its Motion, Plaintiff argues that the insolvency provision of the IICNA policy conflicts with the maintenance underlying insurance provision thereby rendering the IICNA policy ambiguous. Plaintiff urges this Court to effectively disregard both provisions within the IICNA policy in order to find that coverage under the IICNA policy has been triggered. Plaintiff's claim is wholly without merit for several reasons.

First, IICNA does not oppose Plaintiff's Motion for Partial Summary Judgment based on the insolvency of its insured, Integrated Health Services, Inc.

Second, the maintenance of underlying insurance provision serves to shift the credit risk of the underlying carrier's insolvency to the insured. Excess carriers do not assume the credit risk of the underlying coverage. As such, the fact that the IICNA policy contains both a maintenance of underlying insurance provision and a statutorily required insolvency provision does not create an ambiguity in the policy.

In support of its specious argument, Plaintiff cites to only one case, <u>Columbia Casualty Co. v. Federal Insurance Company (In re Federal Press)</u>, 104 B.R. 56 (Bkr. M.D. Ind. 1989). Plaintiff's reliance on <u>Federal Press</u> is misplaced and, in fact, Plaintiff has mis-cited the holding

in the <u>Federal Press</u> case.[2]  The majority of courts considering this issue have concluded that an

excess insurer has no duty to defend or indemnify an insolvent insured who is unable to pay its

self-insured retention.  <u>The Home Ins. Co. of Illinois v. Hooper</u>, 294 Ill. App. 3d 626, 691 N.E.2d

65 (Ill. 1998); <u>In re Keck Mahan & Kate,</u> 241 B.R. 583, 596 (Bkr. E.D. Ill. 1999); <u>In re Apache</u>

<u>Products Co.</u>, 311 B.R. 288 (Bkr. M.D. Fl. 2004); <u>In re Amatex Corporation,</u> 107 B.R. 856 (E.D.

Pa. 1989); <u>Associated Electric & Gas Ins. Serv., Ltd. v. Border Steel Rolling Mills</u>, 2005 U.S.

Dist. LEXIS 32198 (W.D. Tx. 2005); <u>Pac-Mor Manufacturing Co. v. Royal Surplus Lines Ins.</u>

<u>Co.</u>, 2005 U.S. Dist. LEXIS 34683 (W.D. Tx. 2005).

    For the reasons set forth above, this Honorable Court should deny Plaintiff's Motion for

Partial Summary Judgment.

---

[2]In <u>Federal Press</u> the insured was a manufacturer of press machines and was subject to numerous tort claims for injuries resulting from the use of the machines.  Federal Press declared bankruptcy.  During the relevant period Federal Press had a $300,000 self-insured retention.  Columbia Casualty's coverage was in excess of the self-insured limit.  Columbia Casualty's policy attached when the insured became "legally liable" in excess of the self-insured retention, similar to the attachment of the AIG policy.  <u>Federal Press</u>, at 60.  The Court found that Columbia was obligated for "damages in excess of the retained limit."  <u>Id</u>.  The Court held that the "excess insurance carrier was not required to extend coverage to an amount for which its insured bargained to become a self insurer."  <u>Id</u>. at 61.  The Court also held that "the policies place no obligations upon Columbia to pay damages falling within the amounts of the retained limit which Federal Press has a duty to pay.  <u>Id</u>., *citing* <u>Ryder Truck Lines, Inc. v. Carolina Casualty Ins. Co.</u>, 270 Ind. 315, 385 N.E.2d 449, 452 (1979).  Ultimately, the Court concluded the neither Federal Press nor Columbia is relieved of their obligations under the Columbia policies.  <u>Federal Press</u>, at 64.  Thus, the Court held that Federal Press was required to continue defending cases within the $300,000 retained limit, to the extent such limit was not exhausted and that Columbia was required to reimburse Federal for amounts in excess of that amount.  <u>Id</u>.

## VI.  **CONCLUSION**

For the reasons set forth more fully above, IICNA respectfully requests this Honorable Court to Deny Plaintiff's Motion for Partial Summary Judgment because IICNA has no present obligation to assume the defense of and/or pay for claims that have been liquidated by judgment or settlement in connection with 1999 claims asserted against Plaintiff as the limits of coverage underlying the IICNA policy have not been exhausted by payment of covered claims.

Dated: March 22, 2006

Respectfully submitted,

/s/ Thomas G. Whalen, Jr.
Thomas G. Whalen, Jr. (No. 4034)
Stevens & Lee, P.C.
1105 North Market Street, 7th Floor
Wilmington, DE 19801
Telephone: (302) 425-3304
Telecopier: (610) 371-8512
E-mail: tgw@stevenslee.com

and

Leonard P. Goldberger, Esquire
(Member of PA Bar)
Stevens & Lee, P.C.
1818 Market Street, 29th Floor
Philadelphia, PA  19103
Telephone:  (215) 864-7000
Telecopier:  (215) 864-7123
E-mail: lpg@stevenslee.com

30

and

Francis J. Deasey, Esquire
Gerald J. Valentini, Esquire
Ward A. Rivers, Esquire
(Members of PA Bar)
DEASEY, MAHONEY & BENDER, LTD.
1800 John F. Kennedy Boulevard
Suite 1300
Philadelphia, PA  19103
Telephone:  (215) 587-9400
Telecopier:  (215) 587-9456

*Attorneys for Defendant, Indemnity Insurance
Company of North America*

31