# EXHIBIT A

MAY 9 2005

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>Integrated Health Services, Inc., *et al.*,<br><br>Debtors. | Case No. 00-389 (MFW)<br>Jointly Administered<br><br>Chapter 11 |
| IHS LIQUIDATING LLC,<br><br>Plaintiff,<br><br>v.<br><br>ACE INDEMNITY INSURANCE COMPANY f/k/a INDEMNITY INSURANCE COMPANY OF NORTH AMERICA,<br><br>Defendant. | Adv. Pro. No. 05-51318 (MFW) |

## COMPLAINT

IHS Liquidating LLC (the "Liquidating LLC" or "Plaintiff"), by its undersigned counsel, for its complaint against defendant, alleges that:

## THE PARTIES

1. The Liquidating LLC is a Delaware limited liability company, with its principal place of business located at 21 East 40th Street, Suite 1300, New York, New York 10016.

2. Defendant Ace Indemnity Insurance f/k/a Indemnity Insurance Company of North America ("IICNA") is an insurance company organized and existing under the laws of the State of Connecticut, with its principal place of business located at 1601 Chestnut Street, Philadelphia, Pennsylvania 19103, and with offices located at 500 Colonial Center Parkway, Suite 200, Roswell, Georgia 30076.

## JURISDICTION AND VENUE

3. This Court has jurisdiction over the instant action pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (C). This action is authorized to be brought as an adversary proceeding by Bankruptcy Rule 7001(2) and (9). Venue is proper under 28 U.S.C. § 1409(a).

## THE CHAPTER 11 CASES

4. On February 2, 2000 (the "Petition Date"), debtor, Integrated Health Services Inc. ("IHS") and a number of its direct and indirect subsidiaries (collectively, the "Debtors"), filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.

5. By order dated May 12, 2003 (the "Confirmation Order"), this Court confirmed the *Amended Joint Plan of Reorganization of Integrated Health Services, Inc. and its Subsidiaries under Chapter 11 of the Bankruptcy Code*, dated March 13, 2003 (as amended, modified or supplemented, including by the Confirmation Order, the "Plan").

6. The Liquidating LLC was formed pursuant to the Plan for the purpose of implementing certain aspects of the Plan.

7. Pursuant to the Plan, the Liquidating LLC is charged with responsibility for the administration of disputed prepetition claims against the Debtors, including, without limitation, claims relating to professional and general liability with respect to the operation of the Debtors' business ("PL/GL Claims") covered by the Debtors' insurance policies for PL/GL Claims arising in 1999 ("1999 Insured Tort Claims").

8. The Plan provides that each holder of an allowed 1999 Insured Tort Claim shall be entitled to receive its *pro rata* share of the aggregate sum of (i) the proceeds recovered at any given time under the Debtors' insurance policies, including excess insurance policies, in respect of allowed 1999 Insured Tort Claims, after payment of defense costs payable under the policies

("Available 1999 Insurance Proceeds"); and (ii) 3% of the difference between the Available 1999 Insurance Proceeds and the total amount of allowed 1999 Insured Tort Claims.

9. In order for the Liquidating LLC to implement distributions to the holders of allowed 1999 Insured Tort Claims, the Plan further provides for the formation of an escrow account (the "1999 Insured Tort Claims Escrow"), to be established on the Effective Date and administered by the Liquidating LLC. Pursuant to the Plan, as each 1999 Insured Tort Claim is resolved, the insurance proceeds that would otherwise be paid directly to the claimant must be paid to the Liquidating LLC for deposit into the 1999 Insured Tort Claims Escrow so that the Liquidating LLC may make pro rata interim and final distributions as provided in the Plan.

## GENERAL ALLEGATIONS

### The Policy

10. Heretofore, IICNA, for consideration, issued to IHS an Excess Liability Catastrophe Policy, No. XLX G19545507 (the "Policy"). The Policy provides general liability and medical professional liability ("PL/GL") excess coverage for the policy period January 1, 1999 through January 1, 2000. The Policy provides PL/GL excess coverage of $50 million per occurrence and $50 million in the aggregate in excess of underlying insurance limits. A true and correct copy of the Policy is attached hereto as Exhibit A and incorporated herein by reference.

11. Section I of the Policy defines the coverage obligation of IICNA as follows:

> A. COVERAGE
> WE will pay on YOUR behalf the ULTIMATE NET LOSS (1) in excess of all UNDERLYING INSURANCE, and (2) only after all UNDERLYING INSURANCE has been exhausted by the payment of the limits of such insurance for losses arising out of OCCURRENCES that take place during OUR policy period and are insured by all of the policies designated in the Declarations as UNDERLYING INSURANCE. If any UNDERLYING INSURANCE does not pay a loss for reasons other than the exhaustion of an aggregate limit of insurance, then WE shall not pay such loss.

12. The Policy defines "Ultimate Net Loss" as "the amount paid or payable in cash in the settlement or satisfaction of claims for which the insured is liable, either by adjudication or compromise with OUR written consent, after making proper deduction for all recoveries and salvages." The Policy further provides that "[d]efense expense payments shall be included within the ULTIMATE NET LOSS, provided that such expenses are included within the terms, conditions, and limits of insurance of any UNDERLYING INSURANCE."

13. The Policy expressly provides that the bankruptcy or insolvency of IHS, or of IHS's underlying insurance carrier, will not relieve IICNA of any obligation to pay a covered claim. Section IV.C states, in relevant part, that "[b]ankruptcy and insolvency of YOU, or YOUR estate will not relieve US of OUR obligations under this policy." Additionally, Section IV.I(2) provides, in relevant part, that if any limits of liability of underlying insurance are "unavailable due to bankruptcy or insolvency of an underlying insurer . . . then the insurance afforded by this policy shall apply in the same manner as if such underlying insurance and limits of liability had been in effect, available, so maintained and unchanged."

**The Underlying Insurance**

14. The underlying insurance is comprised of a primary matching deductible insurance policy (the "Reliance Policy") issued by Reliance Insurance Company ("Reliance"). In the view of IHS (and, since the Effective Date, the Liquidating LLC), the Reliance Policy provides coverage of $2,000,000 per incident for professional liability claims and $1,000,000 per incident for general liability claims, with an aggregate coverage limit of $9,000,000. Under the Reliance Policy, IHS is subject to deductibles in the same amounts as the coverage limits.

15. On October 3, 2001 the Commonwealth Court of Pennsylvania declared Reliance insolvent and entered an Order of liquidation (the "Liquidation Order"). M. Diane Koken,

Insurance Commissioner of the Commonwealth of Pennsylvania, was named as the Reliance Liquidator.

16. On or about September 20, 2002, IHS filed a litigation against Reliance (the "Reliance Action") to resolve certain disputes between the Reliance Liquidator and the Debtors with respect to the Reliance Policy. In the Reliance Action, IHS seeks, among other things, a declaration that the Reliance Policy provides total coverage of $9,000,000. The Reliance Liquidator maintains that the aggregate policy limit is only $4,500,000. The Liquidating LLC (as successor to IHS in the litigation) and the Reliance Liquidator agree that the aggregate limits of the Reliance Policy have been exhausted, whether those limits are $4.5 million or $9 million, by judgments entered against the Debtors and settlements made by the Debtors totaling substantially in excess of $9 million.

17. Since the Liquidation Order was entered, the Reliance Liquidator has not paid any claims or defense costs covered by the Reliance Policy. Once the litigation between IHS and Reliance is resolved, the Liquidating LLC will have a claim against the Reliance liquidation estate for any part of the coverage that was not exhausted prior to the Reliance liquidation. The value of the claim cannot be determined until both the allowed amount of the claim and the likely percentage recovery of creditors is determined.

18. National Union Fire Insurance Company of Pittsburgh ("National Union") issued an excess insurance policy providing both professional liability and general liability coverage for IHS for the policy period January 1, 1999 through January 1, 2000 (the "National Union Policy"). The National Union Policy provides the first layer of $25 million per occurrence/aggregate in excess in the Reliance Policy.

19. Shortly before the Plan was confirmed, National Union took the position that the Debtors could not look to National Union for any professional liability insurance coverage until the $9 million primary layer of coverage was exhausted by the actual cash payment of $9 million in claims and expenses. Because both IHS and Reliance were in insolvency proceedings, it was unlikely that IHS would ever actually pay the $9 million obligation in full. The position taken by National Union therefore amounted to a complete denial of coverage.

20. On March 26, 2003, IHS filed an adversary proceeding in the Bankruptcy Court styled *Integrated Health Services, Inc. v. National Union Fire Insurance Company of Pittsburgh, PA*, adv. proc. no. 03-52081, in an effort to enforce coverage under the National Union Policy (the "National Union Adversary Proceeding"). By order dated October 23, 2003 (the "Summary Judgment Order"), the Bankruptcy Court entered partial summary judgment in favor of IHS. The Summary Judgment Order held, *inter alia*, that coverage under the National Union Policy was triggered upon IHS becoming liable for 1999 Insured Tort Claims and related defense costs in excess of $9 million, whether by settlement or judgment, regardless of whether IHS or Reliance paid such claims and expenses in cash.

21. General Star Indemnity Company ("GenStar") issued an excess insurance policy providing both professional liability and general liability coverage for IHS for the policy period January 1, 1999 through January 1, 2000 (the "GenStar Policy"). The GenStar Policy provides the second layer of $25 million per occurrence/aggregate in excess of the Reliance Policy and National Union Policy.

22. The 1999 IICNA Policy is the third layer of coverage in excess of the Reliance Policy, the National Union Policy and the GenStar Policy. The 1999 Insured Tort Claims have been liquidated in amount by judgments or settlement agreements constituting binding legal

obligations in excess of the limits of the Reliance Policy and the National Union Policy. In accordance with the Plan, National Union has made payments to the Liquidating LLC for 1999 Insured Tort Claims within National Union's layer of coverage.

23. GenStar has now assumed the administration and defense of the remaining 1999 Insured Tort Claims and has entered into settlements on behalf of IHS and/or obligated itself to satisfy judgments against IHS that will soon exhaust the $25 million limit of the GenStar Policy. In accordance with the Plan, GenStar has made payments to the Liquidating LLC for 1999 Insured Tort Claims within GenStar's layer of coverage.

24. Upon information and belief, the aggregate amount of Allowed 1999 Insured Tort Claims will exceed the limits under the GenStar policy, and as a result, some portion of the excess coverage provided by the Policy will be payable. As confirmed by the express language of Sections IV.C and IV.I(2) of the Policy, the insolvency and bankruptcy of IHS do not relieve IICNA of its obligations under the Policy.

**The Proposed Amendments**

25. IICNA is currently prosecuting an adversary proceeding against IHS and Abe Briarwood Corp. ("Briarwood") arising out of a policy issued by IICNA to IHS for the policy period January 1, 2000 to January 1, 2001 (the "Briarwood Action"). Pursuant to a Sale Agreement dated as of January 28, 2003, Briarwood purchased IHS's long-term care and contract rehabilitation therapy business (the "Purchase"). In connection with the Purchase, IHS assigned to IHS Long Term Care, Inc., among other things, IHS' liabilities relating to any and all past, current and future PL/GL Claims arising after February 2, 2000.

26. In the Briarwood Action, IICNA seeks a declaration that there is no coverage for Briarwood under the 2000 Policy because Briarwood is not an insured under that Policy, and

because Briarwood has violated the terms and conditions of the 2000 Policy by allegedly failing and/or refusing to cooperate with IICNA in connection with IICNA's request for financial information. IHS is a nominal defendant in the Briarwood Action. The Liquidating LLC is not a party to that action.

27. On or about April 18, 2005, IICNA filed a motion to amend the Complaint in the Briarwood Action to add a claim for a declaration that:

> [u]nless and until the limits of the underlying Reliance Policy, as well as the limits of all other underlying insurance, have been exhausted by the actual payment of Claims against IHS during the relevant policy period, IICNA owes no duty under its 1999 IICNA Policy to indemnify and defend IHS for the 1999 Claims or any other claims otherwise occurring in the relevant policy period.

Thus, IICNA has taken the position that IICNA will not provide any coverage under the Policy unless and until IHS or its primary carrier makes actual cash payments totaling in excess of the $9 million Retained Limits under the Reliance Policy.

28. Because neither IHS nor Reliance, IHS's primary carrier, is expected to make actual claim payments totaling in excess of the $9 million retained limits under the Reliance Policy, IICNA has, in effect, disclaimed all coverage under the Policy. As previously indicated, it is likely that some portion of the $50 million of excess coverage provided by the Policy will be payable. IICNA's refusal to provide coverage in accordance with the Policy therefore deprives IHS and the holders of Allowed 1999 Insured Tort Claims of coverage.

29. The Plan and the related Disclosure Statement that was approved by the Court and served upon IICNA reflected IHS's belief that it has excess coverage under the Policy, which will be available, with other insurance funds, for distribution *pro rata* to holders of allowed 1999 Insured Tort Claims.

30. Notwithstanding the fact that IICNA has at all times been aware of the Plan treatment of 1999 Insured Tort Claims and the Debtors' expectation that the Policy proceeds would be available for distribution in accordance with the Plan, IICNA did not advise IHS or the Liquidating LLC of its plan to disavow coverage until April 14, 2005, nearly two years after the Plan had been confirmed.

31. IICNA's interpretation of the Policy and its refusal to honor its obligations under the Policy are contrary to the express and unambiguous provisions of the Policy as set forth above and are without a reasonable basis.

32. IICNA's bad-faith disclaimer of coverage under the Policy has implications not only with respect to the Debtors' estates and the holders of 1999 Insured Tort Claims, who are deprived of coverage, but also to other insureds of IICNA who have sought protection, or may seek protection, under the Bankruptcy Code. The Policy is a standard policy document under which IICNA and its related entities have no doubt provided excess insurance to hundreds of companies. The position taken in the Proposed Amendments by IICNA, would effectively eliminate coverage under all IICNA policies for all insolvent insureds and their personal injury claimants.

## FIRST CLAIM FOR RELIEF

### (Declaratory Judgment)

33. Plaintiff repeats and realleges the allegations of paragraphs 1 through 32 of this Complaint as if fully set forth herein.

34. An actual controversy exists between the parties as to whether IICNA is obligated to provide coverage under the Policy. This controversy has a substantial and present adverse impact upon Liquidating LLC's administration of: (a) 1999 Insured Tort Claims; and (b) the Plan and the proceedings related thereto.

35. Plaintiff is entitled to a declaration that the Policy obligates IICNA to pay covered professional liability claims which have been liquidated in amount by judgment or settlement to the extent that such liquidated claims are in excess of $50 million per occurrence or $50 million in the aggregate, whether or not the applicable per occurrence or aggregate limit of the Debtors' primary insurance coverage has been paid.

36. Plaintiff has no adequate remedy at law.

## SECOND CLAIM FOR RELIEF

### (Breach of Contract; Compensatory Damages)

37. Plaintiff repeats and realleges the allegations of paragraphs 1 through 36 of this Complaint as if fully set forth herein.

38. Plaintiff's disclaimer of coverage under the Policy constitutes a breach of the Policy for which Plaintiff is entitled to recover its damages from IICNA. Plaintiff has incurred additional administrative costs and will incur additional costs by reason of IICNA's eleventh-hour disclaimer. Plaintiff is entitled to judgment against IICNA for all such costs, in such amounts as may be demonstrated at trial.

## THIRD CLAIM FOR RELIEF

### (Bad Faith; Punitive Damages)

39. Plaintiff repeats and realleges the allegations of paragraphs 1 through 38 of this Complaint as if fully set forth herein.

40. IICNA's disclaimer of all coverage under the Policy was made without reasonable basis and in bad faith.

41. Under the common law of the State of Delaware, and under statutory law of the State of Pennsylvania, Plaintiff is entitled to an award of punitive damages against IICNA in an amount to be determined by the Court.

**WHEREFORE**, Plaintiff demands judgment:

(A)  On the First Claim for Relief, declaring that the Policy obligates IICNA to pay covered professional liability claims which have been liquidated in amount by judgment or settlement to the extent that such liquidated claims are in excess of $50 million per occurrence or $50 million in the aggregate, whether or not the applicable per occurrence or aggregate limit of the Debtors' primary insurance coverage has been paid;

(B)  On the Second Claim for Relief, compensatory damages in an amount to be determined at trial, together with appropriate interest thereon;

(C)  On the Third Claim for Relief, punitive damages in an amount to be determined by the Court;

WP3:1110046.2                                                                                                                          56309.1001

(D) For the costs and disbursements of the action; and

(E) For such other and further relief as the Court shall deem proper.

Dated: May 6, 2005
Wilmington, Delaware

YOUNG CONAWAY STARGATT &
TAYLOR, LLP

Robert S. Brady (No. 2847)
Edmon L. Morton (No. 3856)
Joseph M. Barry (No. 4221)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302) 571-6600

-and-

KAYE SCHOLER LLP
Arthur Steinberg
Marc D. Rosenberg
Ana Alfonso
425 Park Avenue
New York, NY 10022-3598
(212) 836-8000

-and-

TROUTMAN SANDERS LLP
Lee W. Stremba
The Chrysler Building
405 Lexington Avenue
New York, NY 10174
(212) 704-6393

*Attorneys for Plaintiff IHS Liquidating LLC*