# TAB 1

2005 U.S. Dist. LEXIS 32198, *

8 of 38 DOCUMENTS

**ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED, Plaintiff, v. BORDER STEEL ROLLING MILLS, INC. and MANUEL ROMERO, Defendants.**

EP-04-CV-00389-KC

**UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF TEXAS, EL PASO DIVISION**

*2005 U.S. Dist. LEXIS 32198*

**September 27, 2005, Decided**

**PRIOR HISTORY:** *Romero v. Border Steel Rolling, 54 Fed. Appx. 591, 2002 U.S. App. LEXIS 26692 (2002)*

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff insurer moved for summary judgment in its action seeking a declaration that it was not obligated to pay any excess judgment on a personal injury action between defendant insured and defendant individual.

**OVERVIEW:** The **insurance** policy at issue was an excess **insurance** policy. At issue was whether indemnity provisions would be triggered in the event the individual obtained a judgment against the insured, thus requiring the insurer to pay the judgment. The court concluded that the plain meaning of the policy at issue required the insurer to "reimburse" the insured for any sums that it became legally obligated to pay, such as damages either by adjudication or compromise. No where in the policy did it indicate that the insurer would hold the insured "harmless" or provide for its defense. Rather, the only promise the insurer made was to reimburse the insured for ultimate net loss. Therefore, the plain meaning of the policy provision required strict indemnity. The insurer was only required to reimburse the insured for any judgment that might be rendered against it, so long as it fell within the relevant policy provisions. The insured had become insolvent and would be unable to satisfy its underlying **self-insured retention.** Therefore, the excess **insurance** policy would not be triggered and the insurer would not be required to pay any excess judgment.

**OUTCOME:** The court granted the insurer's motion for summary judgment.

**CORE TERMS:** insured, indemnity, insurer, excess insurance, indemnify, plain meaning, legally obligated to pay, underlying insurance, indemnity provision, ultimate net loss, insolvency, indemnitee, exhausted, insolvent, carrier, bodily injury, insurance contract, duty to defend, harmless, insurance policy, summary judgment, reimburse, nonmovant, declaration, collectible, triggered, lawsuit, policy provided, property damage, broad language

**LexisNexis(R) Headnotes**

*Civil Procedure > Summary Judgment > Burdens of Production & Proof*
*Civil Procedure > Summary Judgment > Summary Judgment Standard*
*Civil Procedure > Summary Judgment > Supporting Papers & Affidavits*
[HN1] A summary judgment movant must show by affidavit or other evidence that there is no genuine issue regarding any material fact. To establish that there is no genuine issue as to any material fact, the movant must either submit evidence that negates the existence of some material element of the nonmoving party's claim or defense, or, if the crucial issue is one for which the nonmoving party will bear the burden of proof at

Case 1:05-cv-00376-GMS    Document 7-13    Filed 03/22/2006    Page 3 of 12

Page 2
2005 U.S. Dist. LEXIS 32198, *

trial, merely point out that the evidence in the record is insufficient to support an essential element of the nonmovant's claim or defense. Once the movant carries the initial burden, the burden shifts to the nonmovant to show that summary judgment is inappropriate.

**Civil Procedure > Summary Judgment > Summary Judgment Standard**
[HN2] Summary judgment is required if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *Fed. R. Civ. P. 56(c)*. In order for a court to conclude that there are no genuine issues of material fact, the court must be satisfied that no reasonable trier of fact could have found for the nonmovant, or, in other words, that the evidence favoring the nonmovant is insufficient to enable a reasonable jury to return a verdict for the nonmovant.

**Contracts Law > Contract Interpretation > Interpretation Generally**
**Insurance Law > Claims & Contracts > Policy Interpretation > Contract Interpretation Rules**
[HN3] Under Texas law, courts interpret insurance contracts under the same rules that govern general contracts.

**Insurance Law > Claims & Contracts > Policy Interpretation > Contract Interpretation Rules**
**Insurance Law > Claims & Contracts > Policy Interpretation > Plain Language**
[HN4] When interpreting an insurance contract, the court's primary concern is to effectuate the intent of the parties as expressed in the instrument. In making this interpretation, the court considers the policy as a whole. Furthermore, when interpreting an insurance contract, the court gives policy terms their plain meaning.

**Contracts Law > Contract Interpretation > Ambiguities & Contra Proferentem**
[HN5] A court will find a contract ambiguous only if it is reasonably susceptible to more than one meaning. A mere disagreement over contract interpretation does not create an ambiguity.

**Contracts Law > Contract Interpretation > Ambiguities & Contra Proferentem**
**Insurance Law > Claims & Contracts > Policy Interpretation > Ambiguous Terms**
**Insurance Law > Claims & Contracts > Policy Interpretation > Plain Language**
[HN6] Courts will not strain to find ambiguities where none exist, especially if such a construction would defeat the probable intentions of the parties. However, in the event that the court determines a contract term is ambiguous, such ambiguity will be strictly construed against the insurer. On the other hand, when the plain meaning of a contract is definite, and thus not ambiguous, the court will interpret the contract as a matter of law.

**Contracts Law > Contract Conditions & Provisions > Indemnity**
**Insurance Law > General Liability Insurance > Obligations Generally**
[HN7] Courts recognize a distinction between two types of indemnity provisions in insurance contracts: (1) indemnity against liability (liability provisions) and (2) indemnity against damages and/or loss (indemnity provisions). Liability provisions require that the insurer protect the indemnitee against rendition of a judgment or the accrual of liability. Under such provisions, the indemnitee may recover from the insurer when liability becomes fixed, such as by the rendition of a judgment, whether or not the indemnitee has paid that judgment. Indemnity provisions require that the insurer protect the indemnitee against the consequences of a judgment. Under such provisions, the indemnitee may not recover from the insured until the indemnitee actually suffers a loss, such as by payment of that judgment.

**Contracts Law > Contract Conditions & Provisions > Indemnity**
**Insurance Law > General Liability Insurance > Obligations Generally**
[HN8] The Texas Supreme Court has stated that broad language, which holds the indemnitee harmless against all liability evidences an agreement to indemnify the indemnitee against liability.

Case 1:05-cv-00376-GMS   Document 7-13   Filed 03/22/2006   Page 4 of 12

Page 3
2005 U.S. Dist. LEXIS 32198, *

*Contracts Law > Contract Conditions & Provisions > Indemnity*
*Insurance Law > General Liability Insurance > Obligations Generally*
[HN9] Language used to create indemnity provisions is less broad than that used to create liability provisions.

**COUNSEL:** [*1] For ASSOCIATED ELECTRIC & GAS, INSURANCE SERVICES LIMITED, plaintiff: Susan Abbott Schwartz, Henslee, Fowler, Hepworth, et, al, Dallas, TX.

For MANUEL ROMERO, defendant: Jeffrey B. Pownell, Sam J. Legate, Scherr, Legate & Ehrlich, PLLC, El Paso, TX; James F. Scherr, El Paso, TX.

For MANUEL ROMERO, counter-plaintiff: James F. Scherr, El Paso, TX.

For ASSOCIATED ELECTRIC & GAS, INSURANCE SERVICES LIMITED, counter-defendant: Susan Abbott Schwartz, Henslee, Fowler, Hepworth, et, al, Dallas, TX.

For MANUEL ROMERO, Counter-plaintiff: Jeffrey B. Pownell, Sam J. Legate, Scherr, Legate & Ehrlich, PLLC, El Paso, TX; James F. Scherr, El Paso, TX.

For ASSOCIATED ELECTRIC & GAS, INSURANCE SERVICES LIMITED, counter-defendant: Susan Abbott Schwartz, Henslee, Fowler, Hepworth, et, al, Dallas, TX.

**JUDGES:** KATHLEEN CARDONE, UNITED STATES DISTRICT JUDGE.

**OPINIONBY:** KATHLEEN CARDONE

**OPINION:**

### ORDER

On this day, this Court considered plaintiff's Motion for Summary Judgment (the "Motion"). Plaintiff moves for summary judgment, asking this Court to declare that it is not obligated to pay any excess judgement in a personal injury action between one of its insured, defendant Border Steel [*2] Rolling Mills Inc. ("Border Steel"), and defendant Manuel Romero ("Romero"). Having reviewed the record, this Court is of the opinion that plaintiff's motion for summary judgment should be **GRANTED.**

### I. BACKGROUND

Defendant Border Steel and defendant Manuel Romero are parties to a personal injury lawsuit styled *Manuel Romero v. Border Steel Rolling Mills, Inc.*, Cause No. 90-4928 in the 34th Judicial District Court of El Paso County, Texas ("Underlying Suit"). While this suit was pending, Border Steel filed a voluntary petition in bankruptcy under Chapter 11 of the United States Bankruptcy Code. Initially, Romero did not file proof of a claim in Border Steel's bankruptcy proceedings, such that when the bankruptcy court approved the Chapter 11 Plan, Romero was not listed among the creditors.

The Bankruptcy Court denied Romero's request to modify the Chapter 11 Plan and continue the Underlying Suit against Border Steel. Ultimately, the Fifth Circuit Court of Appeals directed the Bankruptcy Court to enter an order allowing the Underlying Lawsuit to continue. As of this date, Romero has not obtained a judgment against Border Steel. Furthermore, Border Steel has been [*3] liquidated and is without assets.

On or about June 1, 1989, plaintiff Associated Electric & Gas Insurance Services Limited ("AEGIS") issued Excess Liability Insurance Policy No. X0407A1A89 ("Policy") to First Named Insured El Paso Electric Company, under which defendant Border Steel was an insured. Under the Policy, AEGIS agreed to indemnify Border Steel "for any and all sums which [Border Steel] shall become legally obligated to pay as ULTIMATE NET LOSS by reason of liability imposed upon [Border Steel] by law . . . including . . . for damages because of BODILY INJURY." App. to Manuel Romero's Resp. in Opp'n to AEGIS's Mot. for Summ. J. Ex. 1. The Policy, however, limits this liability to the "ULTIMATE NET LOSS in excess of the UNDERLYING LIMITS as stated in Item 6A or 6B of the Declarations, whichever is applicable." *Id.* Declaration 6B describes the "UNDERLYING LIMITS" for a personal injury action as $ 500,000. *Id.* In other words, the Policy requires Border Steel to maintain a self-insured retention ("SIR") of $ 500,000.

Case 1:05-cv-00376-GMS    Document 7-13    Filed 03/22/2006    Page 5 of 12

Page 4
2005 U.S. Dist. LEXIS 32198, *

At issue in this case is whether these indemnity provisions will be triggered in the event Romero obtains a judgement against Border Steel, thus requiring [*4] AEGIS to pay the judgement. For the reasons discussed below, this Court answers in the negative.

## II. DISCUSSION

### A. Summary Judgment Standard

[HN1] A summary judgment movant must show by affidavit or other evidence that there is no genuine issue regarding any material fact. *Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*. To establish that there is no genuine issue as to any material fact, the movant must either submit evidence that negates the existence of some material element of the nonmoving party's claim or defense, or, if the crucial issue is one for which the nonmoving party will bear the burden of proof at trial, merely point out that the evidence in the record is insufficient to support an essential element of the nonmovant's claim or defense. *Lavespere v. Niagra Machine & Tool Works, Inc., 910 F.2d 167, 178 (5th Cir. 1990)*. Once the movant carries the initial burden, the burden shifts to the nonmovant to show that summary judgment is inappropriate. *See Fields v. City of South Houston, 922 F.2d 1183, 1187 (5th Cir. 1991)*.

[HN2] Summary judgment is required if the pleadings, depositions, answers to interrogatories, [*5] and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *FED. R. CIV. P. 56 (c); Celotex Corp., 477 U.S. at 322*. In order for a court to conclude that there are no genuine issues of material fact, the court must be satisfied that no reasonable trier of fact could have found for the nonmovant, or, in other words, that the evidence favoring the nonmovant is insufficient to enable a reasonable jury to return a verdict for the nonmovant. *See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 n.4, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*.

### B. Insurance Contracts

[HN3] Under Texas law, courts interpret insurance contracts under the same rules that govern general contracts. *Schneider Nat'l Transp. v. Ford Motor Co., 280 F.3d 532, 537 (5th Cir. 2002); Matador Petroleum Corp. v. St. Paul Surplus Lines Co., 174 F.3d 653, 656 (5th Cir. 1999) (citing Nat'l Union Fire Ins. Co. v. CBI Indus., Inc., 907 S.W.2d 517, 520 (Tex. 1995))*. [HN4] When interpreting an insurance contract, [*6] the court's primary concern is to effectuate the intent of the parties as expressed in the instrument. *Coker v. Coker, 650 S.W.2d 391, 393, 26 Tex. Sup. Ct. J. 368 (Tex. 1983); R&P Enter. v. LaGuarta, Gavrel & Kirk, Inc., 596 S.W.2d 517, 518, 23 Tex. Sup. Ct. J. 280 (Tex. 1980)*. In making this interpretation, the court considers the policy as a whole. *Schneider Nat'l Transport, 280 F.3d at 537; Matador Petroleum, 174 F.3d at 656; Forbau v. Aetna Life Ins. Co., 876 S.W. 2d 132, 133, 37 Tex. Sup. Ct. J. 345 (Tex. 1994)*. Furthermore, when interpreting an insurance contract, the court gives policy terms their plain meaning. *Schneider Nat'l Transport, 280 F.3d at 537*.

[HN5] A court will find a contract ambiguous only if "it is reasonably susceptible to more than one meaning." *Matador Petroleum, 174 F.3d at 657 (citing Coker, 650 S.W.2d at 393)*. A mere disagreement over contract interpretation does not create an ambiguity. *Matador Petroleum, 174 F.3d at 657; Forbau, 876 S.W.2d at 134*. Moreover, [HN6] courts will not strain to find ambiguities where none exist, especially if such a construction would defeat [*7] the probable intentions of the parties. *Matador Petroleum, 174 F.3d at 657; Sharp v. Federal Sav. & Loan Ins. Corp., 858 F.2d 1042, 1045 (5th Cir. 1988)*. However, in the event that the court determines a contract term is ambiguous, such ambiguity will be strictly construed against the insurer. *Providence Washington Ins. Co. v. Proffitt, 150 Tex. 207, 211, 239 S.W.2d 379 (Tex. 1951); Life Ins. Co. v. Spradlin, 526 S.W.2d 625, 627 (Tex. App. 1975)*. On the other hand, when the plain meaning of a contract is definite, and thus not ambiguous, the Court will interpret the contract as a matter of law. *Texas Farmers Ins. Co. v. Gerdes by & Through Chiropractic Clinic, 880 S.W.2d 215, 218 (Tex. App. 1994), GT & MC, Inc. v. Texas City Refining, Inc., 822 S.W.2d 252, 255-56 (Tex. App. 1991)*.

#### 1. Type of Indemnity Contract

[HN7] Courts recognize a distinction between two types of indemnity provisions in insurance contracts: (1) indemnity against liability ("liability provisions") and (2) indemnity against damages and/or loss ("indemnity provisions"). *Ingersoll-Rand Co. v. Valero Energy Corp., 997 S.W.2d 203, 207, 42 Tex. Sup. Ct. J. 818 (Tex. 1999)*. [*8] Liability provisions require that the insurer protect the indemnitee against *rendition* of a judgement or the accrual of liability. *Russell v. Lemons, 205 S.W.2d 629, 631 (Tex. App. 1947)*. Under such provisions,

the indemnitee may recover from the insurer when liability becomes fixed, such as by the rendition of a judgment, whether or not the indemnitee has paid that judgment. *Ingersoll-Rand, 997 S.W.2d at 207.* Indemnity provisions require that the insurer protect the indemnitee against the *consequences* of a judgment. *Russell, 205 S.W.2d at 629.* Under such provisions, the indemnitee may not recover from the insured until the indemnitee actually suffers a loss, such as by payment of that judgment. *See id. at 631.* In the present case, AEGIS contends that the indemnity provision at issue merely requires AEGIS to reimburse Border Steel in the event a court renders a judgment against it, rather than pay the judgment for Border Steel.

The issue of whether the provision in this case is a liability or an indemnity provision requires this Court to examine the specific language of the policy. [HN8] The Texas Supreme Court [*9] has stated that broad language, which holds the indemnitee harmless against all liability evidences an agreement to indemnify the indemnitee against liability. *Ingersoll-Rand, 997 S.W.2d at 207.* For example, in *Ingersoll-Rand*, the Court construed the following broad language as a liability provision:

> OWNER [Valero] shall *release, defend, indemnify and hold harmless* CONTRACTOR [Kellogg], its subcontractors [Ingersoll-Rand] and affiliates and their employees performing services under this Agreement against all claims, liability, loss or expense, including legal fees and court costs in connection therewith, arising out of or in connection with this Agreement or the Work to be performed hereunder, including losses attributable to the CONTRACTOR's negligence, to the extent CONTRACTOR is not compensated by insurance carried under this ARTICLE. . .

*Id. at 206* (emphasis added).

Similarly, the court *In re FFP Operating, L.P., 2004 Bankr. LEXIS 896 (Bankr. D. Tex. 2004)* construed the following language as a liability provision:

> Debtor agreed to *'indemnify and hold Lessor harmless from and against any* [*10] *and all claims by or on behalf of any person . . . arising from the occupation, use, possession, conduct or management of. . . the Leased Premises . . .* In addition, the Debtor agreed to indemnify and save Lessor harmless from and against any and all claims arising from any condition of the Leased Premises or the Improvements. . .'

*In re FFP Operating, L.P., 2004 Bankr. LEXIS 896 at * 3* (emphasis added).

The bankruptcy court noted that the debtor agreed to hold the lessor harmless against *all* claims and indemnify him against *all* costs and expenses, including attorney's fees. *2004 Bankr. LEXIS 896 at * 9.* Relying on *Ingersoll-Rand*, the Court held that this broad language constituted a liability provision. *Id.* Consequently, because the liability of the lessor in this case had not yet been fixed (i.e., by rendition of a judgment), the debtor's indemnity obligations had not yet been triggered. *2004 Bankr. LEXIS 896 at * 10.*

By contrast, [HN9] language used to create indemnity provisions is less broad than that used to create liability provisions. For example, in *Universal Automobile Ins. Co. v. Culberson, 126 Tex. 282, 86 S.W.2d 727 (1935), overruled on other grounds in Hernandez v. Great Am. Ins. Co. of New York, 464 S.W.2d 91, 93, 14 Tex. Sup. Ct. J. 255 (Tex. 1971)* [*11] (overruling the holding *of Culberson* with respect to the prepayment rule), Universal Automobile Insurance issued an automobile policy to Culberson, the terms of which were as follows:

> The Company does hereby agree to insure the Assured named and described in the Schedule of Statements' herein, for the term therein specified against *direct loss by reason of liability imposed by law* . . . In the event a final judgment is rendered against the Assured, to pay the same to an amount not exceeding the limits specified herein [$ 5,000]. . . It is understood and agreed that the Insolvency or Bankruptcy of the Assured or other persons entitled to benefit

Case 1:05-cv-00376-GMS   Document 7-13   Filed 03/22/2006   Page 7 of 12

Page 6
2005 U.S. Dist. LEXIS 32198, *

> hereunder shall not release the Company from the payment of damages for injuries or loss occasioned during the life of the policy.

*126 Tex. at 285-87* (emphasis added).

Culberson's daughter was subsequently involved in an accident, and the court rendered a judgment against her in the amount of $ 10,536.88. *126 Tex. at 284-85.* Culberson brought suit against Universal to recover (1) the amount of the judgment in excess of the policy limits and (2) his defense costs. *Id.* The Texas Court of Appeals construed the above-mentioned [*12] language as an indemnity provision, rather than as a liability provision, placing emphasis on the fact that the primary insuring clause protected against "direct loss." *126 Tex. at 287.* Thus, Culberson could not recover from Universal because he had not suffered a direct loss, such as by payment of that judgment. *Id.*

In another case, the Texas Court of Appeals also construed the following language as an indemnity provision: "I here and now guarantee to hold M. W. Lemons harmless and to protect him against whatever judgment, if any, may be entered against the said M.W. Lemons in said cause number 370." *Russell, 205 S.W.2d at 630.* In *Russell*, Russell and Lemons signed personal guarantees to ensure the payment of loans for certain pieces of real property procured by the Lemons-Thompson Company. *205 S.W.2d at 630.* At some point, Russell purchased Lemons' interest in the Lemons-Thompson Company and as part of the transaction Russell executed the above-mentioned indemnity agreement with respect to the personal guarantees. *Id. at 630.* The court found that both Russell and Lemons knew that the Lemons-Thompson Company would default on the [*13] loans and a lawsuit would follow. *Id. at 631.* With this consideration in mind, the court held that the indemnity provision was of strict indemnity, rather than liability. *Id. at 631-32.* It found that the obligation was not designed to protect Lemons against the rendition of a judgment, which both parties knew would be entered, but rather it was designed to protect Lemons against the discharge of such a judgment. *Id. at 632.*

While these examples begin to provide a distinction between liability and indemnity provisions, none of them address the exact language at issue in the AEGIS Policy. Texas courts have dealt with the exact language at issue here, albeit in different contexts. For example, in *Embrey v. Royal Ins. Co. of Am. and Royal Indem. Co., 22 S.W.3d 414, 43 Tex. Sup. Ct. J. 652 (Tex. 2000)*, James Embrey sued Royal Insurance to recover prejudgment interest on a judgment rendered in his favor. *Id. at 414.* Royal Insurance argued that it was not obligated to pay prejudgment interest because to do so would exceed its stated policy limits. *Id. at 416.* The policy at issue provided that: "The company [Royal [*14] Indemnity] will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of. . . bodily injury." *Id.* Although the Texas Supreme Court did not categorize the policy as a liability or a indemnity provision, the Court's discussion of the policy is nonetheless instructive. In construing the purpose of the policy, the court held that the plain meaning of the contract provided that Royal Indemnity was obligated to "indemnify the insured for liability assessed against the insured" to the extent of the policy limits. *Id.* Later in its opinion, the Court reiterated that the insurance contract required Royal Indemnity "to pay, on the insured's behalf, only those sums that the insured became legally obligated to pay." *Id. at 417.* This illustrates that the Court treated the policy as one for payment and reimbursement -- in other words an indemnity provision.

As with the Texas Supreme Court in *Embrey*, Texas Courts of Appeals have come across identical language in different contexts. For example, in *Clemons v. State Farm and Cas. Co., 879 S.W.2d 385 (Tex. App. 1994)*, the Texas Court of Appeals [*15] was faced with the issue of whether or not State Farm had a duty to defend and indemnify homeowners in a lawsuit for violation of certain deed restrictions. *Id. at 391.* The relevant language in the policy provided insurance coverage for "all sums which the Insured shall become legally obligated to pay as damages because of bodily injury or property damage. . ." *Id. at 388.* The court held that this policy was unambiguous and that its plain meaning was clear -- State Farm promised to pay for losses that the Clemons' became legally obligated to pay due to bodily injury or property damage. *Id. at 391.* In essence, the Court interpreted the clause as an indemnity provision.

Another example from the Texas Court of Appeals is *Houston Gen. Ins. Co. v. Owens, 653 S.W.2d 93 (Tex. App. 1983).* In *Owens*, the court faced the task of determining whether or not an insurance policy naming Ralph Owens also covered his trucking company, the Ralph Owens Trucking Company ("Company). *653 S.W.2d at 97.* A truck owned by the Company struck a woman and she later settled a lawsuit against the company for $ 269,800. *Id. at 95.* [*16] The company's primary insurer paid its $ 100,000 limit, the company's secondary insurer paid its $ 150,000 limit, and the trucking company paid $ 19,800. Later, the

Case 1:05-cv-00376-GMS    Document 7-13    Filed 03/22/2006    Page 8 of 12

Page 7
2005 U.S. Dist. LEXIS 32198, *

company sought reimbursement from Houston General Insurance Company for the $ 19,800 it expended on the settlement. *Id. at 96*. Houston General had agreed to "indemnify the insured for all sums which the insured shall become legally obligated to pay as damages and expenses. . ." *Id. at 97*. The Court ultimately decided that the Ralph Owens Trucking Company was covered under the plain terms of the policy, but that the issue of Houston General's liability had been improperly submitted to the jury in earlier proceedings. *Id. at 98-99*. While describing what Ralph Owens would need to prove in order to establish Houston General's liability under the policy, the Court distinguished "coverage" from "liability" under the policy. It described liability as "the dollar amounts of indemnity provided for the risks." *Id. at 99*. In so doing, the Court treated contract language, that is nearly identical to the contract language used by AEGIS, to require reimbursement for [*17] losses suffered as a consequence of an adverse judgment. *See id. at 99*.

With these examples in mind, this Court can now turn to the specific facts of this case. As stated above, the policy at issue provides:

> The COMPANY shall indemnify the INSURED for *any and all sums* which the INSURED *shall become legally obligated to pay as ULTIMATE NET LOSS* by reason of liability imposed upon the INSURED by law or liability assumed by the INSURED under CONTRACT, including the INSURED's proportionate share of any liability arising in any manner whatsoever out of the operations or existence of any JOINT VENTURE in which the INSURED has an interest, *for damages because of BODILY INJURY*, PERSONAL INJURY or PROPERTY DAMAGE which is caused by an OCCURRENCE and either: (1) for which a CLAIM is first made against the INSURED during the POLICY PERIOD or during any DISCOVERY PERIOD; or (2) about which a NOTICE OF CIRCUMSTANCES was given to the COMPANY during the POLICY PERIOD or during any DISCOVERY PERIOD; whichever is earlier.

App. to Manuel Romero's Resp. in Opp'n to AEGIS's Mot. for Summ. J. Ex. 1. (emphasis added).

Moreover, the policy defines "ULTIMATE [*18] NET LOSS" as:

> The total of the following sums: (1) all sums which the INSURED *shall become legally obligated to pay as damages either by adjudication or compromise* with the consent of the COMPANY, after making proper deductions for all recoveries and salvages collectible and for other insurance as provided for in CONDITION (H) hereof; and (2) all expenses incurred by the INSURED in the investigation, negotiation, settlement and defense of any CLAIM or in the investigation of any OCCURRENCE or circumstances of which NOTICE OF CIRCUMSTANCES has been given, excluding all salaries, wages and benefit expenses of employees and office expenses of the INSURED; however, the COMPANY shall not be liable for expenses as aforesaid when such expenses are included in other valid and collectible insurance, except where that insurance is subject to at least 100 percent reimbursement by the INSURED.

App. to Manuel Romero's Resp. in Opp'n to AEGIS's Mot. for Summ. J. Ex. 1. (emphasis added).

The word "indemnify" means "to reimburse (another) for a loss suffered because of a third party's or one's own act or default." BLACK'S LAW DICTIONARY *available at* http://www.westlaw.com [*19] (8th ed. 2004). Based on this dictionary definition, and the definition of "ultimate net loss" within the contract itself, the plain meaning of the policy at issue requires AEGIS to "reimburse" Border Steel for any sums that it becomes legally obligated to pay, such as "damages either by adjudication or compromise." No where in the policy does it indicate that AEGIS will hold Border Steel "harmless" or provide for its defense. *Compare Ingersoll-Rand, 997 S.W.2d at 206; In re FFP Operating L.P., 2004 Bankr. LEXIS 896 at * 3*. Rather, the language in AEGIS' policy is more analogous to the limited language found in *Culberson, Russell, Embrey, Clemons*, and *Owens* because the only promise it makes is to reimburse Border Steel for ultimate net loss. Therefore, the plain meaning of this policy provision requires strict indemnity.

Although the cases cited above tend to show that the language at issue in this case refers to strict indemnity, it is important to note one case with similar language in which the Texas Court of Appeals held the

Case 1:05-cv-00376-GMS   Document 7-13   Filed 03/22/2006   Page 9 of 12

Page 8
2005 U.S. Dist. LEXIS 32198, *

policy to be one of general liability, rather than indemnity. In *City of Beaumont v. Ranger Ins. Co., 505 S.W.2d 934 (Tex. App. 1974)* [*20] the Court was asked to determine whether Ranger Insurance Company was obligated to defend the City of Beaumont. *506 S.W.2d at 934*. In *Ranger*, the relevant insurance policy provided: "The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of . . . bodily injury. . . and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent. . ." *Id. at 935*. In a summary conclusion, the Court held that the policy was one of general liability rather than mere indemnity. *Id.*

At first blush, the language in *Ranger* closely resembles the language at issue in the current case. Upon closer inspection, however, a key distinction emerges. The policy at issue in the current case merely provides that AEGIS shall indemnify the insured for sums the insured shall become legally obligated to pay. In contrast, the *Ranger* policy provided not only that Ranger had an obligation to indemnify the insured, but also that Ranger had the [*21] right and duty to defend the insured against any suit. *Ranger, 505 S.W.2d at 935*. Unlike this case and the strict indemnity cases cited above, the broad language in *Ranger* is indicative of the language used in *Ingersoll-Rand* to create a general liability provision. Thus, *Ranger* is distinguishable from the instant case. Interpreting the AEGIS contract as one of strict indemnity is consistent with *Ranger* and similar case-law.

Nevertheless, Romero relies upon the case of *Houston v. Edgeworth, 993 F.2d 51 (5th Cir. 1993)* for the proposition that federal courts have allowed plaintiffs such as Romero to recover against insurance companies like AEGIS when the underlying insurer becomes insolvent. In *Edgeworth*, a doctor filed for bankruptcy under Chapter 7 of the United States Bankruptcy Code and received a discharge. *Id. at 53*. The bankruptcy court subsequently allowed an injured party -- Houston -- to file a medical malpractice claim against the doctor in state court. *Id.* At issue in that case was whether Houston could pursue that lawsuit in order to collect a judgment from the doctor's malpractice liability policy. [*22] *Id. at 53*. The court held that Houston could pursue such a cause of action under *11 U.S.C. § 524(e)* because to hold otherwise would allow an insurance company to escape its obligations because of the financial condition of its insured. *Id. at 54*; see also *Chapman v. Bituminous Ins. Co., 345 F.3d 338, 343 (5th Cir, 2003)* (allowing similar case to proceed).

Romero improperly relies upon *Edgeworth* for the proposition advanced. In an earlier proceeding, the Fifth Circuit relied upon *Edgeworth* in allowing Romero to proceed with his suit after he initially failed to file as a creditor. See *Romero v. Border Steel, 54 Fed. Appx. 591 (2002)*; Manuel Romero's Resp. in Opp. to AEGIS' Mot. for Summ. J. Ex. B. At issue in the instant case is not whether Romero *can proceed with* his suit, but rather AEGIS' *liability* under the contract now that Romero has been allowed to proceed with his suit. As a result, *Edgeworth* cannot support Romero's argument that the AEGIS' Policy requires it to pay any judgment Romero might receive. Accordingly, this Court holds that the policy is one of strict indemnity [*23] and AEGIS is only required to reimburse Border Steel for any judgment that might be rendered against it, so long as it falls within the policy provisions discussed below.

### 2. Triggering the Excess Policy

AEGIS next argues that because the insurance contract at issue is an indemnity policy, it obligates AEGIS to indemnify Border Steel against actual loss. Since Border Steel has suffered bankruptcy, it will never be able to pay any judgment and suffer actual loss. Therefore, AEGIS asks this Court to declare that it will not have to pay any part of a judgment that Romero might obtain against Border Steel.

While there are no cases directly on point from the Fifth Circuit or the Texas state courts, the facts of *Schneider Nat'l Transp. v. Ford Motor Co., 280 F.3d 532 (5th Cir, 2002)* make it useful for comparison. *Schneider* involved the interpretation of an insurance contract under Texas law. See *id. at 535*. In *Schneider*, a large trucking company called Builder's Transport, Inc. maintained a three-tiered insurance structure to guard against liability. *Id. at 534*. First, Builders Trucking maintained a SIR of $ 1,000,000. [*24] *Id.* Second, Builder's purchased coverage from Planet Insurance Co. to cover losses between $ 1,000,000 and $ 2,000,000 in the event liability exceeded Builders' SIR. *Id.* Finally, Builders purchased an excess, or "umbrella," policy from Insurance Company of Pennsylvania for losses exceeding $ 2,000,000. *Id.* Planet's policy provided for a pro rata sharing of defense costs among all contributors to a settlement, whereas Insurance Company of Pennsylvania's policy stated that "should applicable underlying insurance(s) become exhausted by payment of covered claims, this insurance will continue in force as underlying insurance and shall defend any suit arising out of a covered occurrence. . ." *Id. at 535-36*.

Case 1:05-cv-00376-GMS    Document 7-13    Filed 03/22/2006    Page 10 of 12

Page 9
2005 U.S. Dist. LEXIS 32198, *

At some point, Builders incurred more than $ 2,000,000 in settlement and defense costs. *Id. at 535*. Planet argued that all three insurance providers should contribute to the defense pro rata, while Penn contended that it had no obligation to pay until the underlying limits were exhausted. *Id. at 536-37*. The Fifth Circuit held that the plain and ordinary meaning of Insurance Company of Pennsylvania's policy meant that the it [*25] was not obligated to pay any costs until the underlying insurance was exhausted. *Id. at 538*. The court wrote that "the excess carrier's duty to defend does not arise until the underlying insurance has been exhausted, i.e. when that insurance coverage has been paid out. This interpretation is supported by Texas law and the holding in the majority of other jurisdictions." *Id. at 538*. In reaching this decision, the Fifth Circuit noted that there were two "underlying" insurance policies that must be exhausted before Insurance Company of Pennsylvania would have to make any payments on the judgment -- the SIR and the Planet insurance. *See id. at 539 n.7*; *see also Keck v. Nat'l Union Fire Ins. Co., 20 S.W.3d 692, 700-01, 43 Tex. Sup. Ct. J. 775 (Tex. 2000)* ("The majority rule is that where the insured maintains both primary and excess policies, . . . the excess liability insurer is not obligated to participate in the defense until the primary policy limits are exhausted. . . . The majority rule is supported by the reasonable expectations of the insured and its insurance carriers. Excess insurers are able to provide relatively inexpensive insurance [*26] with high policy limits because they require the insured to contract for underlying primary insurance with another carrier. The primary carrier generally provides a much lower amount of coverage, but must insure against what is likely to be a greater number of claims and must provide a defense. (citations omitted) The premiums charged are thus a reflection of the risks undertaken. Because the primary insurer's duty to defend extends to covered claims without regard to their amount, an excess insurer's duty to defend is not typically invoked merely because a claim has been asserted against the insured in excess of primary limits.")

Although the policy terms in *Schneider* are not identical to the ones at issue in this case, the principles relating to SIRs and excess insurance are nonetheless instructive. As in *Schneider*, the insurance policy at issue in the instant case is an excess insurance policy. The title of the AEGIS policy is "Excess Liability Insurance Policy" and Declaration 6B makes clear that AEGIS agreed to indemnify Border Steel for any excess judgment awarded over the $ 500,000 SIR. Under *Schneider*, it follows that AEGIS is not required to indemnify Border Steel [*27] until the underlying limits of the SIR have been exhausted. In the present case, there has been no judgment rendered against Border Steel. Therefore, AEGIS' obligation to indemnify Border Steel has not arisen. Furthermore, in the event that a judgment *is* rendered against Border Steel, it has been declared an insolvent corporation and would therefore be unable to satisfy the underlying limits as described in Declaration 6B. Hence, in the event a judgment is awarded against Border Steel, AEGIS' excess insurance policy will not be triggered under the plain meaning of the policy terms.

This interpretation is supported by a recent district court opinion from the Fifth Circuit. In *In re RIC United Corp. v. Litzler, 2005 U.S. Dist. LEXIS 15536 (N.D. Tex. 2005)* a trucking business called TIC was self-insured under an SIR for up to $ 1,000,000 and carried an excess insurance policy for liability exceeding $ 1,000,000. *2005 U.S. Dist. LEXIS 15536 at * 7*. At some point, TIC filed for bankruptcy but continued to operate its business. *2005 U.S. Dist. LEXIS 15536 at * 1*. During the bankruptcy proceedings, the bankruptcy court ordered that all known holders of damage claims against TIC must submit to ADR. *2005 U.S. Dist. LEXIS 15536* [*28] *at * 2-4*. Litzler did not receive notice of this claim, failed to submit to ADR by the appointed deadline, and was thus denied the opportunity to present his claim for resolution. *See id*. One issue on appeal to the district court was whether or not any excess insurance proceeds would belong to the bankruptcy estate or instead belong to a claim holder. *See 2005 U.S. Dist. LEXIS 15336 at * 5*. In resolving this issue, the district court announced that excess insurance policies are structured such that if the insured owes a tort damage payment, then the insured, rather than the insurer, is responsible for payment of the SIR. *2005 U.S. Dist. LEXIS 15536 at * 7*.

*Litzler* addressed the obligations of an insured subject to a SIR and made clear that, regardless of the fact that TIC was bankrupt, it would nonetheless be responsible for its SIR amount before the excess insurance provider would be required to make payments. *See id*. As in *Litzler*, at issue in this case is AEGIS' responsibility for any judgment that might be rendered in Romero's favor, in light of the fact that Border Steel is bankrupt. A straightforward application of the above-mentioned principles in *Litzler* support the conclusion that AEGIS is [*29] not obligated to pay any judgment Romero might receive against Border Steel, until and unless Border Steel pays its SIR.

Moreover, several courts outside the Fifth Circuit have analyzed similar cases and reached similar conclusions. For example, the leading case on the issue presented is styled *Molina v. United States Fire Ins. Co., 574 F.2d 1176 (4th Cir. 1977)*. In *Molina*, the United States Fire Insurance Company issued Dr. Molina

2005 U.S. Dist. LEXIS 32198, *

an insurance policy designed to provide supplemental protection for Dr. Molina in the event he incurred liability for damages exceeding the coverage provided by his primary insurer. *Id. at 1177*. Under the terms of this policy, Dr. Molina was required to maintain primary insurance of at least $ 100,000 per claim, which he did through a company titled Professional Insurance Company of New York. *Id.* Professional later became insolvent. *Id.* When Dr. Molina became the subject of two malpractice suits, he unsuccessfully requested that U.S. Fire defend him. *Id.* He later filed a motion for a declaration of his rights under the insurance contract. *Id.*

The district court held that U.S. Fire had no obligation [*30] to provide Molina with a defense or pay any sums recovered against him that were not in excess of the underlying $ 100,000 limit. *Id. at 1178*. In affirming this decision, the Fourth Circuit held that the district court's interpretation was mandated by the plain meaning of the insurance policies. *Id.* The policy required Molina to maintain underlying insurance of $ 100,000 per claim and U.S. Fire's only obligation was to pay the ultimate net loss in excess of those limits. *Id.* The court rejected Molina's argument that the primary insurer's insolvency required U.S. Fire to "drop down" and assume any losses, because such an interpretation would ignore the policy language requiring primary insurance to be "in force and collectible.'" *Id.* Finally, the Fourth Circuit rejected the argument that Professional's insolvency constituted an "exhaustion" of the underlying insurance, requiring U.S. Fire to indemnify him for any losses. *Id.*

The facts of *Molina* are nearly identical to the facts at issue in this case. In both cases, an injured party sought recoupment from an excess insurance carrier after an insured tortfeasor experienced bankruptcy. The Fourth [*31] Circuit denied recovery based on the plain meaning of an insurance policy similar to the one at issue. Thus, even though the Fourth Circuit is not controlling in this jurisdiction, *Molina* provides persuasive guidance as to the correct interpretation of the Policy.

In addition to the Fourth Circuit, the Seventh Circuit also analyzed a similar policy in *Premcor USA, Inc. v. Am. Home Assurance Co., 400 F.3d 523 (7th Cir. 2005)*. Premcor USA subscribed to several insurance policies. *Id. at 525*. At the first level, Premcor had a general liability policy from Reliance National Indemnity Company for $ 2,000,000. *Id.* At the second level, it had an "umbrella insurance policy" with American Home Assurance Company (AHA) for liability in excess of $ 2,000,000. *Id.* In 1995, two Premcor employees were killed while working at a Premcor facility. *Id.* Premcor initially filed a claim with its primary insurer -- Reliance -- for defense costs which amounted to over $ 2,000,000. *Id.* However, Reliance subsequently became insolvent, and Premcor sought a declaratory judgement requiring AHA to "drop down" and pay defense costs that Reliance was no longer [*32] capable of paying. *Id.* In declaring that AHA had no obligation to pay defense costs because of Reliance's insolvency, the Seventh Circuit analyzed the precise language of the AHA policy. Under this policy, AHA agreed "to pay on behalf of [Premcor] that portion of the ultimate net loss in excess of the retained limit as hereinafter defined. . . ." *Id. at 526*. Furthermore, in the definition of "ultimate net loss" AHA stated that it would "not be liable for expenses. . . when such are covered by underlying policies of insurance whether collectible or not." Finally, the policy provided that "the liability of [AHA] shall not be increased by the refusal or inability of [Premcor] to pay its Self-Insured Retention (or retained limit) or by the refusal or inability of any underlying insurer to pay, whether by Reasons of Insolvency, Bankruptcy, or otherwise." *Id.*

As in the Fourth Circuit, the Seventh Circuit had to determine whether or not an excess insurance carrier has an obligation to drop down and cover the obligations of an underlying insurer when that insurer becomes insolvent. Consistent with the Fourth Circuit, the Seventh Circuit held that an excess insurance [*33] carrier has no such obligation under the plain meaning of an excess insurance policy. Hence, both the Fourth Circuit's and the Seventh Circuit's treatment of cases similar to the one at issue support holding that AEGIS has no obligation to pay any judgment that might be rendered in favor of Romero since Border Steel will never be able to pay its SIR.

Regardless of the cases cited above, Romero makes much of the provision in the Policy providing that "bankruptcy or insolvency of the INSURED shall not relieve the COMPANY of any of its obligations hereunder." *See* App. to Manuel Romero's Resp. in Opp'n to AEGIS's Mot. for Summ. J. Ex. 1. Romero argues that to interpret the Policy as a strict indemnity provision that cannot be triggered because of Border Steel's insolvency would render this quoted language meaningless. However, Romero fails to address the following language from the Policy:

> Notwithstanding any of the terms of this POLICY that might be construed otherwise, the excess insurance provided by this POLICY *shall be excess over the stated maximum monetary limits of*

*any underlying insurance listed* on the Underlying Limits Schedule *whether collectible or not collectible* [*34] *for any reason including, but not limited to, uncollectibility (in whole or in part) because of the financial impairment or insolvency of an underlying insurer.* The risk of uncollectibility (in whole or in part) of such underlying insurance whether because of financial impairment or insolvency of an underlying insurer or for any other reason, is expressly retained by the INSURED and is not in any way or under any circumstances insured or assumed by the COMPANY.

App. to Manuel Romero's Resp. in Opp'n to AEGIS's Mot. for Summ. J. Ex. 1. (emphasis added).

The plain meaning of this provision embodies the principles set forth in *Schneider, Molina*, and *Premcor*. That is, an excess insurance policy provider is not obligated to provide indemnity when an underlying insurance carrier becomes insolvent. As applied to the case at issue, Border Steel has become insolvent and will be unable to satisfy its underlying SIR. Therefore, the excess insurance policy will not be triggered and AEGIS will not be required to pay any excess judgment rendered against Romero.

### III. CONCLUSION

Plaintiff's Motion for Summary Judgment (Doc. No. 25) is **GRANTED.**

**SO ORDERED.** [*35]

**SIGNED** on this 27 day of September 2005.

KATHLEEN CARDONE

UNITED STATES DISTRICT JUDGE