# TAB 4

7 of 38 DOCUMENTS

## PAK-MOR MANUFACTURING CO., Plaintiff v. ROYAL SURPLUS LINES INSURANCE CO. et al., Defendants

### SA-05-CA-135-RF

### UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF TEXAS, SAN ANTONIO DIVISION

*2005 U.S. Dist. LEXIS 34683*

**November 3, 2005, Decided**
**November 3, 2005, Filed**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendant insurer, a bankruptcy debtor, appealed an order of the United States Bankruptcy Court for the Western District of Texas, San Antonio Division, which denied summary judgment on the insurer's claim that, under the insurance policy at issue, the insurer's obligations did not arise until plaintiff insured satisfied the self-insured retention.

**OVERVIEW:** The appeal involved the question of whether the obligations of the insurer under its **insurance** contract with the insured were triggered even though the insured failed to satisfy the **self-insured retention** provision of that contract. The instant court answered in the negative. There was only one reasonable way to interpret the policy, and the interpretation said that the insurer did not have to pay anything until the insured first paid the retained limit. The equities in this case supported that conclusion. However, the insured was free to pay the retained limit in whatever form it liked. If the insured issued a promissory note to its judgment creditor in the sum of $ 100,000, which note was not dischargeable in bankruptcy and which was shown to be a credible obligation of the insured and its estate and its principals, then the bankruptcy court would be within its power to find the self-insured retention requirement to be satisfied, triggering the insurer's obligation under its policy. The insurer was only responsible for amounts beyond the $ 100,000 retained limit, up to the policy limit. The plain meaning of the policy and the equities of the situation compelled this finding.

**OUTCOME:** The bankruptcy court's order was reversed, and summary judgment was granted in favor of the insurer.

**CORE TERMS:** insured, insurer, self-insured, retention, insolvency, summary judgment, plain meaning, insurance policy, relieve, ambiguous, claimant, condition precedent, endorsement, insurance policies, obligation to pay, unambiguous, coverage, paying, duty, liability insurance, contract interpretation, written instrument, conclusions of law, public policy, de novo, equitable, triggered, obligated, injustice, bankrupt

### LexisNexis(R) Headnotes

***Bankruptcy Law > Practice & Proceedings > Appeals***
[HN1] The district court reviews the bankruptcy court's findings of fact for clear error and its conclusions of law de novo.

***Civil Procedure > State & Federal Interrelationships***
***Contracts Law > Contract Interpretation > Interpretation Generally***
[HN2] In a case where the question is one of contract interpretation, state law controls.

***Contracts Law > Contract Interpretation > Interpretation Generally***
[HN3] Under Texas law, a court seeking to determine the meaning of a contract must follow the plain meaning of the text when it can be ascertained — that is, when the text can reasonably be interpreted in only one way.

***Bankruptcy Law > Practice & Proceedings***

Case 1:05-cv-00376-GMS   Document 7-16   Filed 03/22/2006   Page 3 of 12

Page 2
2005 U.S. Dist. LEXIS 34683, *

*Contracts Law > Contract Interpretation >*
[HN4] Equitable arguments generally do not carry predominant weight with the United States District Court for the Western District of Texas, San Antonio Division, in cases where the law clearly declares the legal primacy of a contract's plain meaning and the decision therefore invariably turns on a close reading of the specific text at issue. Nevertheless, the United States Court of Appeals for the Fifth Circuit has held that the bankruptcy court is a court of equity and it must undertake an analysis of equitable considerations.

*Contracts Law > Contract Interpretation > Parol Evidence Rule*
[HN5] Texas law agrees with the notion that parties' intentions are important-indeed, of paramount importance. But it does not ordinarily permit courts to discover these intentions by looking to the parties' testimony. Instead, courts are to look exclusively to the written instrument and indeed to reject extrinsic evidence until it becomes clear that the written instrument produces inconclusive findings.

*Contracts Law > Contract Interpretation > Interpretation Generally*
*Insurance Law > Claims & Contracts > Policy Interpretation > Contract Interpretation Rules*
[HN6] It is the settled law in Texas that contracts of insurance in their construction are governed by the same rules as other contracts, and that terms used in them are to be given their plain, ordinary and generally accepted meaning unless the instrument itself shows them to have been used in a technical or different sense.

*Contracts Law > Contract Interpretation > Interpretation Generally*
[HN7] The court has to assume that what parties agree to in plain English is their actual agreement. When the policy's words have a clear meaning and the writing nowhere indicates the parties' intentions to convey something else, the court must honor the plain meaning of the words.

*Insurance Law > General Liability Insurance > Coverage Generally*
[HN8] Under Texas law, insurers are free to issue policies that relieve them of liability in the bankruptcy context. The court is thus not constrained by statutory law in interpreting particular policies that claim to so relieve insurers.

*Interpretation Generally*
COUNSEL: [*1] For ROYAL SURPLUS LINES INSURANCE COMPANY, appellant: J. Scott Rose, Toni Price, Jenkins & Gilchrist P C, San Antonio, TX; L. D. Simmons, II, Brian A. Kahn, Helms Mulliss & Wicker, PLLC, Charlotte, NC.

For PAK-MOR MANUFACTURING COMPANY, appellee: Claiborne B. Gregory, Jr., Justin Rice, Jackson Walker, LLP, San Antonio, TX.

For MID-ATLANTIC TRUCK CENTER, INC., INTERNATIONAL TRUCKS OF CENTRAL NEW JERSEY, DBA AIR BRAKE AND EQUIPMENT, amicus: Jerry A. Gibson, Plunkett & Gibson, Inc., San Antonio, TX.

JUDGES: ROYAL FURGESON, UNITED STATES DISTRICT JUDGE.

OPINIONBY: ROYAL FURGESON

OPINION:

### ORDER REVERSING BANKRUPTCY COURT'S DENIAL OF ROYAL'S MOTION FOR SUMMARY JUDGMENT

This appeal from the Bankruptcy Court involves the question of whether the obligations of Royal Surplus Lines Insurance Co. ("Royal") under its insurance contract with Pak-Mor Manufacturing Co. ("Pak-Mor") are triggered even though Pak-Mor failed to satisfy the self-insured retention provision of that contract. This Court answers in the negative.

Before the Court are (1) *Brief of Appellant Royal Surplus Lines Insurance Company ("Royal's Brief")* (Docket No. 4); (2) *Brief of Amicus Curiae Mid-Atlantic Truck Center,* [*2] *Inc. and International Trucks of Central New Jersey dba Air Brakes and Equipment* (Docket No. 25); (3) *Amicus Curiae Brief of Lorenza Lockhart* (Docket No. 26); (4) *Royal Surplus Lines Insurance Company's Reply to Mid-Atlantic Truck Center, Inc. and International Trucks of Central New Jersey's Amicus Brief* (Docket No. 29); and the summary judgment briefs, evidentiary submissions from the proceedings below; and the Bankruptcy Court's ruling. The Court now REVERSES the Bankruptcy Court's ruling in its entirety and GRANTS Royal's motion for summary judgment.

### INTRODUCTION

On September 1, 2001, Royal commenced insurance coverage of Pak-Mor under a commercial general liability insurance policy. A year later-around November 12, 2002-Lorenza Lockhart, a garbage collector in Tyler, Texas, slipped off the back step of his garbage truck, fell to the ground, and suffered

2005 U.S. Dist. LEXIS 34683, *

horrific injury when the wheels of the truck rolled over his legs and crushed them. n1 Lockhart blamed Pak-Mor for his injuries, taking the view that Pak-Mor had improperly designed the step from which he had slipped, and that this had caused him to fall. n2

> n1 This is according to *Lorenza Lockhart's Motion for Leave to File Amicus Brief and Motion for Leave to File Out of Time 2 ("Lockhart's Motion")* (Docket No. 7).

> n2 *Lockhart's Motion* at 2.

> n3 Lockhart's suit was styled *Lorenza Lockhart v. Pak-Mor Manufacturing Company and Bond Equipment Company, Inc.*, Cause No. 48, 161-A, County Court at Law, Smith County, Texas.

Very shortly after Lockhart filed suit-on June 2, 2003-Pak-Mor filed for bankruptcy. This immediately sparked a tussle between Royal and Pak-Mor as to Royal's obligations under their **insurance** policy. Royal's view was that Pak-Mor's bankruptcy and consequent inability to satisfy the **self-insured retention** provision of the policy relieved Royal of any liability to Pak-Mor under the policy. Pak-Mor took the opposite view, that Royal's obligations under the policy persisted whether or not Pak-Mor satisfied the policy's self-insured retention provision.

Eventually, on August 28, 2003, Pak-Mor initiated this declaratory **[*4]** judgment action in the Bankruptcy Court. Pak-Mor sought "[a] declaration and determination that, despite the failure, inability, or liability of Pak-Mor to satisfy the Retained Limit in the Royal Policy, Royal is obligated to indemnify and provide coverage to Pak-Mor under the Royal Policy. . . ." n4 Royal responded with a motion for summary judgment, contending that "Royal has no obligation to defend or indemnify Pak-Mor because Pak-Mor has not satisfied its self insured retention." n5 After considering both parties' arguments, the Bankruptcy Court denied Royal's motion and in fact awarded partial summary judgment in favor of Pak-Mor. Royal appealed.

> n4 *Amended Complaint for Declaratory Relief to Determine the Rights and Liabilities of the Parties with Respect to the Debtor's Liability Insurance Policies ("Pak-Mor's Complaint")* 14 (Feb. 9, 2004).

> n5 *Royal Surplus Lines Insurance Company's Motion for Summary Judgment and Memorandum in Support ("Royal's Motion")* 1 (Aug. 31, 2004).

Accordingly, on May 22, 2003, Lockhart filed suit against **[*3]** Pak-Mor. n3

The question presented **[*5]** on appeal is whether the Bankruptcy Court erred when it denied summary judgment on Royal's claim that, under the policy, Royal's obligations do not arise until Pak-Mor satisfies the self-insured retention.

At the outset, it should be observed that the Western District of Texas is privileged to have a Bankruptcy Court of the highest order. Judge Lief Clark, one of the members of the Court, is a first-rate judge -- one whose opinions are invariably well-reasoned and well-written. It is thus unusual for one of his opinions to get appealed to this Court, and it is even more unusual for this Court to reach a conclusion different from his. This is one of those rare cases, however.

The general question as to the propriety of self-insured retention requirements in the bankruptcy context is one subject to reasonable dispute. Yet, having studied all the briefs, and having given careful thought to the precise question presented in this case, this Court is of the view that the Bankruptcy Court erred. Royal is correct; under the policy it need not pay anything under its policy unless Pak-Mor first satisfies the self-insured retention. Accordingly, this Court reverses the Bankruptcy Court and **[*6]** grants summary judgment for Royal. n6

> n6 This Court has jurisdiction over this appeal under *28 U.S.C. § 158 (2005)* ("The district courts of the United States shall have jurisdiction to hear appeals . . . from . . . orders . . . of bankruptcy judges entered in cases and proceedings referred to the bankruptcy judges under *section 157* of this title.").

**STANDARD OF REVIEW**

The first thing to note is the standard of review. [HN1] This Court reviews the Bankruptcy Court's findings of fact for clear error and its conclusions of law *de novo*. n7 The Bankruptcy Court made just one finding of fact: the policy is embodied in the documents purporting to be the policy. n8 This fact is beyond reasonable dispute, and no party has disputed it. Accordingly, this Court finds no clear error in the Bankruptcy Court's factual ruling. Turning to the Bankruptcy Court's legal conclusion -- that under the policy "Royal must satisfy its policy obligations once a tort claimant proves his claim is greater than **[*7]** the SIR amount" -- this Court takes a *de novo* approach.

2005 U.S. Dist. LEXIS 34683, *

n9 Thus, this Court adjudicates that issue from scratch.

n7 *See In re Chestnut, 422 F.3d 298, 301 (5th Cir. 2005)* ("We review a decision of a district court, which sat as an appellate court in review of the bankruptcy court, by applying the same standards of review to the bankruptcy court's findings of fact and conclusions of law as applied by the district court. Findings of fact are reviewed for clear error and the conclusions of law are reviewed de novo." (internal quotation marks and citations omitted)).

n8 The Bankruptcy Court found this implicitly. It did not mention the existence of any genuine issue of material fact, as it would have had it doubted what the literal terms of the policy were. Further, it proceeded directly to the legal analysis and applied the law to the purported policy documents as though they in factconstituted the policy. And it granted partial summary judgment for Pak-Mor, which presupposes that no facts were at issue. Incidentally, the documents constituting the policy were submitted to the Court as Exhibit B attached to *Pak-Mor's Complaint.*

[*8]

n9 *Memorandum Decision on Royal Surplus Lines Insurance Company, Lexington Insurance Company, and Westchester Fire Insurance Company's Motions for Summary Judgment* 18 (Bankr. W.D. Tex. Dec. 13, 2004); *see Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Kasler Corp., 906 F.2d 196, 198 (5th Cir. 1990)* ("The interpretation of an insurance contract, including the question of whether the contract is ambiguous, is a legal determination meriting de novo review.").

**REASONING**

**1. The Plain Meaning of the Policy's Text Compels the Conclusion that Royal Has No Obligation Until Pak-Mor Pays the Retained Limit.**

The unambiguous text of the insurance policy compels the conclusion that Pak-Mor must pay the self-insured part of the policy before Royal has any obligation to pay any excess. Section 3.11 of the policy's Self-Insured Retention Endorsement says:

Notwithstanding any provisions of the policy or any endorsements to the

contrary, it is a condition precedent to the company's liability under this policy that the insured, and no other person, insurer or organization [*9] for or on behalf of the insured, makes actual payment of the Retained Limit'. Any of our obligations under the policy shall not attach or arise unless or until the insured alone, and no other person, insurer or organization for or on behalf of the insured, pays the amount of the Retained Limit'. . . . n10

n10 *Self Insured Retention Endorsement ("SIRE")* § 3.11 (Exhibit A attached to *Royal's Motion*). Incidentally, this Court rejects Pak-Mor's claim that the *SIRE* is not part of the policy. *See Pak-Mor's Complaint* at 13 ("Pak-Mor alternatively asserts that the Self Insured Retention Endorsement in the Royal Policy does not, by its express and unambiguous terms, apply to Pak-Mor because the Royal Policy is Pak-Mor's primary' insurance policy. . . ."). Pak-Mor's reasoning is as follows: "The Introductory Paragraph to the SIR Endorsement itself clearly states that IT DOES NOT APPLY ON A PRIMARY BASIS.'" *Plaintiff's Response in Opposition to Defendant Royal Surplus Lines Insurance Company's Motion for Summary Judgment ("Pak-Mor's Response")* 13 (Sep. 20, 2004). The policy here is a primary one. *See Pak-Mor's Response* at 11 ("The text . . . does not contain any form of clear and conspicuous language that would indicate that the Royal Policy was excess, secondary, or umbrella coverage."). Ergo, the *SIRE* does not apply to the policy. This argument fails because Pak-Mor misreads the very quote it cites. When the *SIRE* states that "it does not apply on a primary basis," it does not mean that it fails to apply to primary policies. Instead, it means that it will make the policy into a secondary policy. After all, the *SIRE's* introductory paragraph also states, "THIS ENDORSEMENT CHANGES THE COVERAGE PROVIDED BY THE POLICY." *SIRE.* Besides this, the Schedule of Forms and Endorsements for the Policy clearly lists the *SIRE* as one of the policy's endorsements. *See* Exhibit B attached to *Royal Surplus Lines Insurance Company's Reply to Plaintiff's Response in Opposition to Royal's Motion for Summary Judgment* (October 1, 2004). The *SIRE* is a part of the policy.

[*10]

This language is clear as daylight. It practically states Royal's claim word for word: None "of [Royal's] obligations under the policy shall [] attach or arise unless or until [Pak-Mor] . . . pays the amount of the Retained Limit.'" Indeed, even if any doubt remained as to the matter, the following words would dispel it:

n11 *SIRE* § 1.20 (italics supplied).

n12 The Court thus flatly rejects Pak-Mor's claims that "Royal's position, to the effect that its obligations with respect to the Lawsuit do not arise until Pak-Mor has satisfied the Retained Limit, is inconsistent with the plain meaning of the terms and conditions of the Royal Policy" and that "alternatively . . . the Royal Policy contains ambiguities, which thus present genuine issues of material fact with respect to Royal's duties and obligations under the Royal Policy. . . . thereby precluding Royal from summary judgment as a matter of law." *Pak-Mor's Response* at 7.

[*11]

It follows that the Court must so find as well. [HN2] In a case like this, where the question is one of contract interpretation, state law controls. n13 And [HN3] under Texas law, a court seeking to determine the meaning of a contract must follow the plain meaning of the text when it can be ascertained -- that is, when the text can reasonably be interpreted in only one way. n14 Since the plain meaning of the policy's text is evident here, the Court must follow what it says: Royal is not obligated to pay anything until Pak-Mor first pays the retained limit.

n13 *F.D.I.C. v. Firemen's Ins. Co. of Newark, N.J., 109 F.3d 1084, 1087 (5th Cir. 1997)* ("We look to state law for rules governing contract interpretation.").

n14 *Guaranty Nat'l Ins. Co. v. Azrock Industries Inc., 211 F.3d 239, 243 (5th Cir. 2000)* ("If the policy terms are susceptible of only one reasonable construction, they will be enforced as written."); *Federal Ins. Co. v. Srivastava, 2 F.3d 98, 101 (5th Cir. 1993)* ("When policy terms are not ambiguous, they are given their plain, ordinary and generally accepted meaning unless the instrument itself shows that the terms have been used in a technical or different sense.'" (quoting *Ramsay v. Maryland Am. Gen. Ins. Co., 533 S.W.2d*

"'Retained Limit' means the amount shown below *which must be paid . . . before we are obligated to make any payments*." n11 The policy is thus totally unambiguous. There is only one reasonable way to interpret the policy, and this interpretation says that Royal does not have to pay anything until Pak-Mor first pays the retained limit. n12

*344, 346, 19 Tex. Sup. Ct. J. 164 (Tex. 1976)))*.

[*12]

## 2. Equity Considerations Also Support This Conclusion.

The equities also support this finding. [HN4] Equitable arguments generally do not carry predominant weight with this Court in cases where, as here, the law clearly declares the legal primacy of a contract's plain meaning and the decision therefore invariably turns on a close reading of the specific text at issue. Nevertheless, this Court takes them seriously here, because this case comes out of the Western District's Bankruptcy Court, and the Fifth Circuit has held that "the bankruptcy court is a court of equity and it must undertake an analysis of equitable considerations." n15 Looking at the equities in this case, this Court concludes that they support the conclusion reached above: Royal need not pay anything until Pak-Mor satisfies the self-insured retention.

n15 *TNB Financial, Inc. v. James F. Parker Interests, 243 F.3d 228, 234 (5th Cir. 2001)*.

The reasoning must start with the candid acknowledgment that there is an equitable [*13] problem here that cries out for a solution. As Pak-Mor notes, relieving insurers of liability in the bankruptcy context leaves "third party plaintiffs . . . no means of recovery in the event that they are successful despite the fact that the insured [defendants] took the precaution of obtaining insurance to cover such losses such as those the claimants have suffered." n16 And this is a tragic position for plaintiffs to be in. Having endured suffering and having finally won a favorable judgment from the courts, it is unfair for them to get nothing because culpable defendants throw up their arms in insolvency and insurers quietly exit through the back door. This is an injustice, and something ought to be done about it.

2005 U.S. Dist. LEXIS 34683, *

n16 *Pak-Mor's Response* at 16 (internal quotation marks and modification omitted).

The solution, however, does not lie in judicially compelling an insurer to pay plaintiffs the amount they are due, contrary to contractual obligations. After all, the injustice does not lie at the insurer's doorstep. **[\*14]** Indeed, an insurer should not be put on the hook in this kind of situation because it writes liability insurance generally. Insurers, like anyone else, make a living by promising to do particular things in exchange for the payment of premiums. They are

While this Court believes plaintiffs should get the compensation they deserve, equity prevents it from forcing Royal to pay Pak-Mor in this instance. Accordingly, this Court holds that Royal cannot be forced to pay anything until Pak-Mor first satisfies the self-insured retention.

### 3. Pak-Mor's Intention Argument Fails.

Pak-Mor also contends (and brings evidence to show) that it "obtained the Royal Policy **[\*15]** with the intention of securing primary insurance coverage to provide for incidents of commercial liability. . . . Pak-Mor did not intend for payments by Pak-Mor of amounts up to the Retained Limit to serve as a threshold requirement for Royal's obligations under the Royal Policy." n17

n17 *Pak-Mor's Response* at 11.

At first glance, this point appears facially persuasive. At its essence, after all, a contract is an agreement between two minds on a certain set of terms; it is not really the typed-up document that follows the agreement (i.e., the mere after-the-fact memorialization). In seeking to discover a contract's terms, therefore, one would expect that a court would welcome parties' testimony as to their intentions at the time of the agreement. This evidence carries no force under Texas law, however, and rightly so. To be sure, [HN5] Texas law agrees with the notion that parties' intentions are important-indeed, of paramount importance. n18 But it does not ordinarily permit courts to discover these intentions **[\*16]** by looking to the parties' testimony. n19 Instead, courts are to look exclusively to the written instrument and indeed to reject extrinsic evidence until it becomes clear that the written instrument produces inconclusive findings. n20 Because the written instrument here is unambiguous (as already discussed), Pak-Mor's intention argument cannot persuade the Court.

bound to keep the promises they make, but they cannot be held to promises they never made and never received payment for. Here, if the insured had wanted this insurer to assume liabilities in the bankruptcy context, then the insured could have paid the insurer to do it. But where the insured has asked the insurer to assume liability in a situation such as this, and where no payment was made to do so, this Court cannot simply order the insurer now to do it for free. That would only replace one injustice with another one.

n18 *Kelley-Coppedge, Inc. v. Highlands Ins. Co., 980 S.W.2d 462, 464, 42 Tex. Sup. Ct. J. 130 (Tex. 1998)* ("The primary concern of a court in construing a written contract is to ascertain the true intent of the parties as expressed in the instrument. If a written contract is so worded that it can be given a definite or certain legal meaning, then it is not ambiguous. Parol evidence is not admissible for the purpose of creating an ambiguity. If, however, the language of a policy or contract is subject to two or more reasonable interpretations, it is ambiguous. Whether a contract is ambiguous is a question of law for the court to decide by looking at the contract as a whole in light of the circumstances present when the contract was entered. Only where a contract is first determined to be ambiguous may the courts consider the parties' interpretation, and admit extraneous evidence to determine the true meaning of the instrument.").

**[\*17]**

n19 *Kelley-Coppedge, 980 S.W.2d at 464.*

n20 *Kelley-Coppedge, 980 S.W.2d at 464.*

### 4. Pak-Mor's Bankruptcy Clause Argument Fails.

Similarly, a plausible argument can be made that the policy's bankruptcy clause negates the retained limit requirement in the bankruptcy context and thereby establishes Royal's liability here. The bankruptcy clause states, "Bankruptcy, insolvency or any other inability of the insured or of the insured's estate or any other insured to pay the Retained Limit' will not increase or otherwise change our obligations under this Coverage Part and our obligations shall

2005 U.S. Dist. LEXIS 34683, *

continue to apply only in excess of the Retained Limit'." n21

n21 SIRE § 5.

But, as this argument goes, this "plain meaning" reading of the clause does not get it right. Instead, Pak-Mor asserts, one must conduct a historical reading of the clause to properly understand it. In the past, retained limit requirements yielded unhappy results in the bankruptcy context. It was precisely when the insured went bankrupt that his creditors most needed the insurance funds, since the insured was not in a position to pay them. Yet it was precisely at that moment that the insurer was relieved of liability, since the insured could not pay the retained limit. n22 Several legislatures did not like that creditors thus got nothing, while the insurers paid nothing, so they mandated that insurers insert "bankruptcy clauses" into their policies. n23 These clauses were to *negate* the retained limit requirements in the bankruptcy context and thereby keep insurers *on the hook* when the insureds went bankrupt. n24 Many insurers (both in states with such statutes and in other states) inserted bankruptcy clauses into their [*19] policies pursuant to these laws. n25 And Royal's should be understood as one such, according to Pak-Mor. It looks unmistakably like traditional bankruptcy clauses, and it was included in policies issued after the state statutes were in place. n26 Because such clauses were never intended to *relieve* insurers of liability in the bankruptcy context, but indeed precisely the opposite, is it not now totally disingenuous for Royal to turn the clause on its head through artfully drafted language?

n22 Patricia A. Bronte, "'Pay First' Provisions and the Insolvent Policyholder," *The Insurance Coverage Law Bulletin* (June 2004) ("For many debtors in bankruptcy, liability insurance coverage is the most likely source of distributions to unsecured creditors. But if the insolvent policyholder is required to pay deductibles, SIRs or the entire claim before accessing policy proceeds, then its insolvency would automatically relieve the insurer of its coverage obligations.").

n23 *Id.* ("As a result a number of states . . . have enacted legislation requiring insurance policies to contain a provision stating that a policyholder's bankruptcy or insolvency will not relieve the insurer of its obligations under the insurance policy. Consequently, many

At first blush, of course, this clause appears to *confirm* the retained limit requirement's applicability in the bankruptcy context. After all, that requirement appears to apply upon reading the rest of the [*18] policy, and the clause explicitly states that it "will not increase or otherwise change [Royal's] obligations" when the context is shifted to bankruptcy.

insurance policies now contain this bankruptcy' provision."); Keeton, *Insurance Law* § 4.8(b) (1988) ("The obvious inequity of such situations led to legislation in some states requiring that liability insurance contracts include a provision to the effect that the insolvency or bankruptcy of an insured shall not release an insurer from liability. In time, similar legislation almost certainly would have been adopted in every state had not insurers revised the standard policy forms used for liability insurance to provide coverage without regard to an insured's insolvency.").

[*20]

n24 *Id.*

n25 *Id.*

n26 For example, the bankruptcy clause in *Columbia Cas. Co. v. Federal Press Co.* states, "Bankruptcy or insolvency of the Insured shall not relieve the Company of any of its obligations hereunder." *Columbia Cas. Co. v. Federal Press Co., 104 B.R. 56, 57-58 (Bankr. N.D. Ind. 1989).* And the bankruptcy clause here states, "Bankruptcy, insolvency or any other inability of the insured or of the insured's estate or any other insured to pay the Retained Limit' will not increase or otherwise change our obligations under this Coverage Part and our obligations shall continue to apply only in excess of the Retained Limit'." *SIRE* § 5.

This argument has a certain appeal. Indeed, what does not make immediate sense is why Royal would insert the bankruptcy clause into its policy if that clause actually does nothing. n27 Parties seeking to accomplish nothing usually do nothing, and parties who insert clauses into contracts are usually instead trying to accomplish something. Nevertheless, this Court cannot accept the historical reading argument. For [*21] one thing, it only properly offers a historical account of bankruptcy clauses in general. Pak-Mor has offered no evidence to indicate that Royal *specifically* intended its bankruptcy clause to negate the retained limit requirement in the bankruptcy context. Furthermore (and more importantly), Texas

law says: [HN6] "It is the settled law in this state that contracts of insurance in their construction are governed by the same rules as other contracts, and that terms used in them are to be given their plain, ordinary and generally accepted meaning unless *the instrument itself* shows them to have been used in a technical or different sense." n28 And here, there is nothing in the written policy to indicate that the bankruptcy clause was intended to mean anything other than what its plain meaning says. [HN7] This Court has to assume that what parties agree to in plain English is their actual agreement. When the policy's words have a clear meaning and the writing nowhere indicates the parties' intentions to convey something else, this Court must honor the plain meaning of the words. The argument therefore fails.

n27 *Royal's Brief* at 13 ("The bankruptcy of any insured does not change the obligations of Royal, nor does it change the obligations of

**5. Pak-Mor's Precedential Argument Fails.**

Finally, Pak-Mor seeks to bring the weight of precedent in support of its position. The first case it cites is *Columbia Casualty Co. v. Federal Press Co.* n29 In that case, the policy stated,

No action shall lie against the Company with respect to any one occurrence unless, as a condition precedent thereto, the Insured shall have fully complied with all the terms of this policy, nor until the amount of the Insured's obligation to pay an amount of ultimate net loss in excess of the retained limit shall have been finally determined either by judgment against the Insured after actual trial or by written agreement of the Insured, the claimant and the Company. . . . Bankruptcy or insolvency of the Insured shall not relieve the Company of any of its obligations hereunder. n30

n29 *Columbia Casualty Co. v. Federal Press Co., 104 B.R. 56 (Bankr. N.D. Ind. 1989).*

[*23]

Pak-Mor."). To be fair, it is very possible that Royal inserted this clause for defensive purposes. Perhaps Royal was worried that the Court would strike down the retained limit requirements in the bankruptcy context on public policy grounds. Therefore, it is possible that Royal inserted this clause to show the Court that both parties agreed in black and white that the retained limit requirement would be preserved even in the bankruptcy context. Royal does not make this argument, of course, but it is plausible.

[*22]

n28 *Western Reserve Life Ins. Co. v. Meadows, 261 S.W.2d 554, 564 (Tex. 1953)* (italics supplied).

n30 *Columbia Casualty, 104 B.R. at 57-58.*

In other words, the policy was similar to the policy here. And the court concluded "that Federal Press' possible inability to satisfy its retained limit of $ 300,000 due to its bankruptcy or insolvency does not relieve Columbia of its obligation to indemnify Federal Press." n31

n31 *Columbia Casualty, 104 B.R. at 62.*

Pak-Mor also cites *Home Ins. Co. of Illinois v. Hooper.* n32 That case also contained a retained limit requirement like the one here. The court stated, "The unambiguous language of the self-insured provision contained in the instant policy would release Home from the obligation of payment under the policy due to Lester's bankruptcy. Lester's pending bankruptcy petition will almost certainly make it impossible for Lester to pay the initial $ 250,000 of any judgment." n33 The court held that the **insurance** company would be liable [*24] even in the event that the insured was unable to satisfy the **self-insured retention.** n34

n32 *Home Ins. Co. of Illinois v. Hooper, 294 Ill. App. 3d 626, 691 N.E.2d 65, 229 Ill. Dec. 129 (Ill. App. 1998).*

n33 *Home Ins., 691 N.E.2d at 70.*

2005 U.S. Dist. LEXIS 34683, *

n34 *Home Ins., 691 N.E.2d at 70.*

As a final example, Pak-Mor cites *Albany Ins. Co. v. Bengal Marine, Inc.* n35 Once again, the court there faced a policy similar to the one here, and once again, the court held that the insurer would be liable even if the insured failed to pay the retained limit n36

n35 *Albany Ins. Co. v. Bengal Marine, Inc., 857 F.2d 250 (5th Cir. 1988).*

n36 *Albany Ins., 857 F.2d at 255.*

None of these cases affects the outcome here. As an initial matter, two of them were decided by courts with no controlling authority over this **[*25]** Court. *Columbia Casualty* was decided by the United States Bankruptcy Court of the Northern District of Indiana,

n37 *See Columbia Casualty, 104 B.R. at 62-63* ("*Ind.Code § 27-1-13-7* requires insurance policies issued in Indiana to contain a provision preventing the insolvency or bankruptcy of the insured from releasing the insurance carrier from liability under the policy. . . . The court thus concludes that *Ind.Code § 27-1-13-7* embodies the public policy of permitting an injured victim to recover under a valid insurance policy from the insurer itself in the event the insured is unable to pay due to its insolvency or bankruptcy. In this case the parties satisfied the requirements of *Ind.Code § 27-1-13-7* by including such a provision in the Columbia policies. They thus contemplated that Columbia would not be able to avoid its obligations under the policies solely due to Federal Press' insolvency or bankruptcy."); *Home Ins., 691 N.E.2d at 69-70* ("*Section 388* of the Illinois Insurance Code requires all liability policies to contain a provision which guarantees that the insolvency or bankruptcy of the insured will not release the insurer from payment of damages from injuries or loss occurring during the term of the policy. . . . The operative effect of the language of the self-insured provision is directly contrary to the public policy as declared by the legislative enactment of *section 388.*" (internal citations omitted)); *Albany Ins., 857 F.2d at 255* ("Our analysis begins by recognizing that the insurance policy between Bengal Marine and Angelina Casualty, although characterized as an indemnity policy by Angelina, is governed by Louisiana's Direct Action Statute, *La.Rev.Stat.Ann. § 22:655.* . . . This statute provides that the insolvency or bankruptcy of

and *Home Ins.* was decided by the Appellate Court of Illinois. But beyond this (and more importantly), the reasoning in those cases does not apply to this case. In all those cases, the courts' decisions were virtually compelled by applicable statutes in those states that required insurers to assume liability in the bankruptcy context just as they would outside the bankruptcy context, regardless of what the policies themselves said. n37 Texas law provides no such restriction, however. [HN8] Under Texas law, insurers are free to issue policies that relieve them of liability in the bankruptcy context. This Court is thus not constrained by statutory law in interpreting particular policies that claim to so relieve insurers. Since the policy here plainly says that the retained limit requirement applies in the bankruptcy context, that is what this Court holds as well. n38

the insured shall not release the insurer from the payment of damages for injuries sustained or loss occasioned during the existence of the policy. . . . Thus, through the direct action statute, Louisiana has afforded claimants a direct cause of action against insurers precisely so that claimants can collect despite the insolvency of the insured. If claimants had to wait for the insured to pay its deductible or pay the claim before the insurer would satisfy their claim, they would effectively be barred from ever collecting from insurers of bankrupts.").

**[*26]**

n38 *Home Ins.* fails to apply for a further reason. In that case, the Court found that "the equities of the case support this finding." *Home Ins., 691 N.E.2d at 63.* Here, as noted, that is not so.

Indeed, this Court believes that the best approach in these matters is a case-by-case approach. One interesting case this Court reviewed in its research was *Fidelity and Guaranty Ins. Co. v. Employers Ins. of Wausau.* n39 That case, in setting forth its reasoning, reviewed several cases confronting the issue here: "whether or not the SIR must be exhausted in order for the [insurer's] duty to arise." n40 The review revealed that, in case after case, every court ultimately reached its decision by closely examining the precise text of the policy before it. n41 Indeed, that is what the *Fidelity and Guaranty* court itself did. n42 Thus, this Court emphasizes the necessity in deciding these cases of applying the specific law of contract interpretation in the jurisdiction

2005 U.S. Dist. LEXIS 34683, *

to the specific text of the policy at issue. Even though persuasive precedents often concern insurance policies [*27] that look very similar and legal questions that look nearly identical to those in a particular case, even minor differences in law and fact require this practice. Pak-Mor's precedential argument fails.

n39 *Fidelity and Guaranty Ins. Co. v. Employers Ins. of Wausau, 311 B.R. 288 (Bankr. M.D. Fla. 2004)*.

n40 *Fidelity and Guaranty, 311 B.R. at 295*.

n41 *Fidelity and Guaranty, 311 B.R. at 296-97* ("In *General Star*, the California appellate court citing to the exact language involved in that case, noted that the SIR endorsement eliminated the duty to defend and replaced it with a contingent duty, per the specific language in that policy. Thus, the appellate court determined that the policy had to be enforced according to its plain terms, which in General Star, required the insured as a condition precedent to coverage to exhaust the SIR. . . . In *Wheelwright*, under the facts presented to the Alabama Supreme Court, the court determined that payment of a SIR would not be viewed as a condition precedent to the insurers' obligation under the policy, and would act as a setoff when the insured was in bankruptcy, since the policy contained an exception when the insured was in bankruptcy. . . . In the case of *Beloit Liquidating Trust v. Century Indemnity Company*, Beloit sued Century. . . . After reviewing the exact language of the policy, the court agreed with Century that the plain language of the SIR dictated that Beloit pay the SIR amount for claims before Century's liability under the policy is triggered. . . ." (internal citations omitted)).

[*28]

n42 *Fidelity and Guaranty, 311 B.R. at 297* ("Based upon the foregoing authority, this Court turns to the precise language in the Lexington policy in order to determine whether or not the SIR must be exhausted to trigger Lexington's duty to defend and indemnify. . . .").

n44 Pak-Mor argues that Royal is Pak-Mor's primary insurer. *Pak-Mor's Complaint* at 13 ("The Royal Policy is Pak-Mor's primary insurance policy. . . ."). This implies that Royal is obligated to assume all of Pak-Mor's liability, not only the amount beyond the retained limit. Royal flatly disagrees: "Royal has no obligation to pay any portion of a settlement or judgment within the $ 100,000 self-insured retention." *Royal's Motion* at 21.

**6. Pak-Mor Can Pay the Retained Limit in Any Form.**

Thus, Royal has no obligation under the policy to pay anything until Pak-Mor satisfies the self-insured retention. This leaves two remaining points of dispute: (1) In what form can Pak-Mor pay its $ 100,000 retained limit?; n43 and (2) If Pak-Mor satisfies its self-insured retention, then what does Royal have to pay? n44

n43 Royal's position is that "the Royal policy requires that Pak-Mor pay the full amount of the self-insured retention *from its own assets before Royal has any contractual obligation to Pak-Mor*." *Royal's Motion* at 13 (italics in original). Pak-Mor's position, in contrast, is that "exhaustion of a self-insured retention can occur under a Chapter 11 claim by the grant to creditor-plaintiffs of an unsecured claim for the self-insured retention portion of their claim and their acceptance of the Chapter 11 plan." *Pak-Mor's Response* at 18.

[*29]

To answer the first question, Pak-Mor can pay the retained limit in any form. Again, the plain meaning of the policy compels this conclusion. The policy consistently describes Pak-Mor's duty as being to "pay" the retained limit. n45 Yet the plain meaning of "pay" does not indicate a required *method* of payment. To the contrary, the standard dictionary definition leaves it open: "to discharge indebtedness for." n46 Common usage does as well; people often speak of paying by check or money order, paying in cash, and paying by credit card. Even Black's Law Dictionary fails to confuse the matter: "performance of an obligation by the delivery of money [*30] *or some other valuable thing* accepted in partial or full discharge of the obligation." n47 Indeed, there is case law to support this conclusion: "An obligation to pay is satisfied when *something of value* is given and accepted in full discharge of that obligation." n48

2005 U.S. Dist. LEXIS 34683, *

Thus, this Court finds that Pak-Mor may satisfy the self-insured retention by making its payment in whatever form it wants. n49

n45 *See SIRE* § 1.20 ("'Retained Limit' means the amount shown below which must be *paid* solely by an insured. . . ." (italics supplied)); *SIRE* § 3.11 ("It is a condition precedent . . . that the insured . . . makes actual *payment* of the Retained Limit'." (italics supplied)); *SIRE* § 5 ("Bankruptcy . . . or any other inability of the insured . . . to pay the Retained Limit' will not increase or otherwise change our obligations. . . ." (italics supplied)).

n46 *Merriam-Webster Online Dictionary*, available at http://www.m-w.com.

n47 *Black's Law Dictionary*, 8th ed. (2004) (italics supplied).

n48 *In re Keck, Mahin & Cate, 241 B.R. 583, 596 (Bankr. N.D. Ill. 1999)* (italics supplied).

[*31]

Therefore, under the circumstances, while Royal's summary judgment [*32] must be granted at this point in the proceedings, facts can change to change the result. If Pak-Mor issues a promissory note to its judgment creditor in the sum of $ 100,000, which note is not dischargeable in bankruptcy and which note is shown to be a credible obligation of Pak-Mor and its estate and its principals, then the Bankruptcy Court would be within its power to find Pak-Mor's self-insured retention requirement to be satisfied, triggering Royal's obligation under its policy.

### 7. Royal Need Only Pay the Amount Beyond the $ 100,000 Retained Limit.

The final disputed question is what Royal has to pay once Pak-Mor satisfies the self-insured retention. The answer is that Royal is only responsible for amounts beyond the $ 100,000 retained limit, up to the policy limit. This follows from the reasoning above. Royal's obligations under the policy are not even triggered until Pak-Mor satisfies the self-insured retention by paying the $ 100,000. Thus, once Royal enters the picture, the first $ 100,000 is already paid and done with, and there is obviously no need for Royal to pay that sum again. Further, the plain meaning of the policy n50 and the equities of the situation [*33] compel this finding. n51

n49 Of course, if Pak-Mor seeks to pay using a non-traditional method of payment, it might have to obtain the payee's consent. Pak-Mor does have to give $ 100,000 in value, and where the value of its proposed payment is subject to dispute, it is important that the payee and Pak-Mor agree that the payment is worth the full amount.

This conclusion is bolstered by the equities of the situation. Royal understandably cares whether Pak-Mor pays or fails to pay the $ 100,000 retained limit. Until that happens, Royal need not pay anything, and after that happens, Royal is assured that it will not have to pay that sum. But there is no reason why Royal should care what form that payment takes. Indeed, whether the payee and Pak-Mor agree on a $ 100,000 payment in the form of cash, a promissory note, or anything else, it fulfills its same function as far as everyone is concerned; it fulfills Pak-Mor's $ 100,000 obligation and provides Royal its $ 100,000 protection. Thus, Pak-Mor is free to pay the retained limit in whatever form it likes.

n50 *See SIRE* § 2.1 ("Our obligations . . . apply in excess of . . . the Retained Limit', and subject to the limits of liability. . . .").

n51 Simply put, this Court cannot impose obligations on Royal that it never signed up for.

### CONCLUSION

In conclusion, this Court finds that, as the facts presently stand, Royal has no obligations under the policy until Pak-Mor satisfies the self-insured retention. Pak-Mor can pay the retained limit in any form it desires, so long as the Bankruptcy Court confirms that the payment is performed in a credible and reliable manner. And upon satisfaction of the self-insured retention, Royal is obligated only to pay amounts beyond the $ 100,000 self-insured retention, up to the limits of the policy.

The Bankruptcy Court's order is REVERSED, and summary judgment for Royal is GRANTED. This matter is REMANDED to the Bankruptcy Court for further action, consistent with this Order.

Signed this day of 3rd November, 2005.

ROYAL FURGESON

UNITED [*34] STATES DISTRICT JUDGE