UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>INTEGRATED HEALTH SERVICES, INC., *et al.*,<br><br>　　　　　　　　　　　　Debtors. | Chapter 11<br><br>Case No. 00-389 (MFW)<br><br>(Jointly Administered) |
| IHS LIQUIDATING LLC,<br><br>　　　　　　　　　　　　Plaintiff,<br><br>　　　　　　　v.<br><br>ACE INDEMNITY INSURANCE COMPANY<br>f/k/a INDEMNITY INSURANCE COMPANY<br>OF NORTH AMERICA,<br><br>　　　　　　　　　　　　Defendant. | Adv. Pro. No. 05-51318(MFW) |
| IHS LIQUIDATING LLC,<br><br>　　　　　　　　　　Third-Party Plaintiff,<br><br>　　　　　　　v.<br><br>NATIONAL UNION FIRE INSURANCE<br>COMPANY OF PITTSBURGH, PA.,<br>GENERAL STAR INDEMNITY COMPANY,<br>and ACE INDEMNITY INSURANCE COMPANY f/k/a<br>INDEMNITY INSURANCE COMPANY<br>OF NORTH AMERICA,<br><br>　　　　　　　　　　Third-Party Defendants. | |

## MOTION OF IHS LIQUIDATING LLC FOR PARTIAL SUMMARY JUDGMENT

Plaintiff IHS Liquidating LLC (the "Liquidating LLC") moves this Court  for an order

pursuant to Federal Rule of Bankruptcy Procedure 7056: (i) severing and awarding the

Liquidating LLC summary judgment on the First Claim for Relief in its adversary proceeding

complaint (the "Complaint"), declaring that the Excess Liability Catastrophe Policy XLX

G19545507 (the "IICNA Policy") issued by defendant Indemnity Insurance Company of North

America now known as Ace Indemnity Insurance Company ("IICNA") obligates IICNA to pay

covered professional liability and general liability claims that have been liquidated in amount, by

judgment or settlement, to the extent that such liquidated claims are in excess of the applicable

per occurrence or aggregate limits of the Debtors' underlying primary and excess insurance

coverage, whether or not the liquidated claims within those underlying limits have been paid in

cash; and (ii) dismissing IICNA's counterclaim (the "Counterclaim") as moot.[1]

    In support of this motion for partial summary judgment (the "Motion"), the Liquidating

LLC respectfully represents as follows.

## PRELIMINARY STATEMENT

    1.    IICNA has denied coverage of personal injury claims against the Debtors under

IICNA's $50 million excess liability policy covering personal injury claims for the year 1999

due to the bankruptcy and insolvency of the Debtors and their primary insurer.  Until this Court

adjudicates the First Claim for Relief, which seeks a declaration that this denial of coverage is

contrary to the terms of the IICNA Policy, there can be no further distributions to the holders of

1999 personal injury claims, many of whom settled their claims in reliance on the recovery

provided for in the IHS Plan of Reorganization and all of whom have been waiting years for

payment of their claims as provided for in the Plan.

## THE UNDISPUTED FACTS

**A.**    **Administration Of The 1999 Insured Tort Claims**

    2.    *The Amended Joint Plan of Reorganization of Integrated Health Services, Inc.*

*and its Subsidiaries under Chapter 11 of the Bankruptcy Code*, dated March 13, 2003 (as

---

[1]    For the Court's convenience, the pleadings filed to date are annexed as exhibits to this Motion.  The Liquidating LLC's Complaint is annexed as Exhibit 1; IICNA's Answer and Counterclaim is annexed as Exhibit 2; the Liquidating LLC's Reply to the Counterclaim and Third-Party Complaint is annexed as Exhibit 3; and IICNA's Answer to the Third-Party Complaint is annexed as Exhibit 4.

2

amended, modified or supplemented, inter alia, by the Confirmation Order, the "Plan"), which became effective on September 9, 2003 (the "Effective Date"), provided for the formation of the Liquidating LLC, a Delaware limited liability company, to implement certain of the Plan's provisions.

3.    The Liquidating LLC is responsible for the administration of disputed claims against the Debtors and accordingly administers the separate class of approximately 325 prepetition unsecured professional and general liability claims that arose during the year 1999 (the "1999 Insured Tort Claims"). As provided in the Plan, all holders of allowed 1999 Insured Tort Claims are entitled to share pro rata in the total insurance proceeds available under the Debtors' primary and excess liability insurance policies for 1999.[2] As of the Effective Date, most of the 1999 Insured Tort Claims were unliquidated. To administer this class of Claims, the Liquidating LLC must collect all insurance proceeds that become payable upon the settlement or adjudication of each such Claim, and make appropriate distributions to the holders of allowed Claims from the pool of insurance proceeds collected in this manner.

4.    Administration of the 1999 Insured Tort Claims initially stalled when the aggregate total of allowed 1999 Insured Tort Claims and related expenses approached the $9 million limits of the Debtors' primary layer of insurance with Reliance, and Integrated Health Services, Inc. ("IHS") tendered the unliquidated 1999 claim files to National Union Fire Insurance Company of Pittsburgh, PA ("National Union"), the issuer of the Debtors' first layer of excess liability coverage for 1999. Although it was clear to National Union that the Debtors'

---

[2]    As discussed in detail below, the treatment of 1999 Insured Tort Claims was structured to account for the insolvency and liquidation of the Debtors' primary insurance carrier, Reliance Insurance Company ("Reliance"), which created a substantial gap in the Debtors' liability insurance for 1999. The Plan creates a pool of excess insurance proceeds in which all holders of allowed 1999 Insured Tort Claims are to share *pro rata*. In this manner, the insurance gap left by the Reliance liquidation is shared by all members of the class rather than borne solely by those claimants who settled or otherwise liquidated their claims before the $9 million Reliance layer was exhausted.

liabilities for 1999 Insured Tort Claims exceeded $9 million, and indeed that the liabilities would exceed the National Union excess layer of $25 million, National Union refused to assume the defense of or pay any 1999 claims. National Union asserted that no part of its $25 million excess policy was payable until the entire $9 million primary policy issued by Reliance was paid out *in cash.* Since Reliance and IHS were both insolvent and neither one was able to pay out $9 million in cash, National Union's disclaimer was a repudiation of its entire policy.

5.    To get past this initial road-block, IHS commenced a declaratory judgment adversary proceeding against National Union in this Court. A copy of the National Union Adversary Complaint is annexed as Exhibit 5. After the Effective Date of the Plan, the Liquidating LLC assumed prosecution of the adversary proceeding in furtherance of implementing the Plan. In October, 2003, this Court awarded summary judgment in favor of IHS against National Union, confirming National Union's obligation to provide coverage for the Debtors' liabilities in excess of $9 million, whether or not the first $9 million of insured liabilities is ever paid in cash. A copy of the Court's Order so providing is annexed as Exhibit 6.[3]

6.    Thereafter, in accordance with the Court's ruling, National Union assumed the defense of open 1999 Insured Tort Claims. As such Claims were liquidated, the Liquidating LLC collected the insurance proceeds and deposited them into the 1999 Tort Claims Escrow. Once the National Union policy limits were exhausted, General Star Indemnity Company ("GenStar"), which had issued a second excess layer policy providing $25 million in coverage, assumed the defense of open 1999 Insured Tort Claims.

---

[3]    In addition to the policy that was the subject of the adversary proceeding, National Union issued a second underlying excess policy covering claims against IHS of Lestor. See Paragraph 23 below.

4

7.     By September 2004, the Liquidating LLC had collected sufficient insurance proceeds to make an initial 70% distribution to the holders of approximately eighty-eight 1999 Insured Tort Claims that had by that time been fixed in amount. Thereafter, as additional 1999 Insured Tort Claims were liquidated and the applicable insurance proceeds collected, the Liquidating LLC made 70% distributions to such claimants.  By April 2005, the Liquidating LLC had made an initial 70% distribution to approximately 126 of the 1999 Insured Tort Claimants.

8.     In or about May, 2005, as the GenStar layer of coverage was nearing exhaustion and GenStar was preparing to turn over the open claim files to IICNA, the issuer of the Debtors' third and final layer of 1999 excess coverage, IICNA disclaimed coverage based upon the same argument made unsuccessfully by National Union two years earlier.[4]  Specifically, IICNA disclaimed all coverage under the IICNA Policy unless and until all underlying policy limits were paid out *in cash*, even though this Court rejected this position when National Union asserted it in 2003.  IICNA's disclaimer, like the disclaimer made by National Union two years ago, is a complete repudiation of IICNA's coverage obligations under its Policy.  If IICNA's position is sustained, the Debtors will be deprived of $50 million in insurance coverage that IHS purchased and paid for prepetition.

9.     IICNA has issued additional disclaimers under other theories.  Its resurrection of the discredited National Union argument is IICNA's most troublesome disclaimer, however, because it is the only disclaimer that puts at issue the entirety of the IICNA Policy.  There remain at least one-hundred-fifty-eight 1999 Insured Tort Claims that have not yet been liquidated and

---

[4]     IICNA has taken over the defense of certain 1999 Insured Tort Claims, but in each such instance has done so under a reservation any rights it may have to seek contribution or reimbursement of its expenditures from the Liquidating LLC or the other excess insurance carriers.

for which no distributions have been made. The Liquidating LLC estimates that these claims, when liquidated, will total several million dollars. In addition, there are forty-one 1999 Insured Tort Claims that have recently been liquidated in amount by settlements, totaling $8,642,750, for which the Liquidating LLC has collected insurance proceeds but has not made a distribution to the holders of the claim due to the IICNA disclaimer.

10.    Given IICNA's position on coverage, the Liquidating LLC can no longer assume that future claim settlements or judgments will result in collection of the corresponding insurance proceeds. As a result, until the First Claim for Relief is finally adjudicated, the Liquidating LLC is unable to determine what, if any, distribution can properly be made to claimants who have recently settled or may hereafter settle their claims, consistent with the Plan's requirement that all 1999 Insured Tort Claimants share *pro rata* in available insurance proceeds. The Liquidating LLC has therefore suspended all distributions to holders of allowed 1999 Insured Tort Claims.

11.    The Liquidating LLC is mindful that this moratorium may cause great hardship to claimants who have already been waiting years for a recovery on their claims and may be in dire need of funds. Unfortunately, the IICNA disclaimer requires that, to protect the interests of the entire class of 1999 Insured Tort Claims under the Plan, no further distributions be made until this Court grants declaratory relief.

**B.    The Debtors' Chapter 11 Cases**

12.    On February 2, 2000 (the "Filing Date"), Integrated Health Services, Inc. ("IHS") and a number of its direct and indirect subsidiaries (collectively with IHS, the "Debtors") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

13.    The Debtors had three principal business segments, one of which operated skilled nursing and subacute care facilities. As of the Filing Date, the Debtors operated 377 such

6

facilities, with a total of about 42,000 licensed beds and provided a wide range of basic medical and subacute care services for the patients in their care.

14.    Given the nature of the long term care industry and the magnitude of the Debtors' operations, IHS maintained insurance programs to manage its exposure to personal injury claims arising from the Debtors' businesses. This adversary proceeding concerns the Debtors' primary and excess insurance policies covering professional and general liability claims ("PL/GL Claims") for the 1999 policy year.

**C.    The Reliance Liquidation And Treatment Of 1999 Insured Tort Claims Under The Plan**

15.    IHS procured primary PL/GL insurance coverage for 1999 from Reliance. The policy issued by Reliance (the "Reliance Policy") is a matching deductible insurance policy subjecting IHS to deductibles in the same amount as the coverage limits. In the view of IHS (and, since the Effective Date, the Liquidating LLC), the Reliance Policy provides coverage of $2,000,000 per occurrence for professional liability claims and $1,000,000 per occurrence for general liability claims, with an aggregate coverage limit of $9,000,000.

16.    On October 3, 2001, the Commonwealth Court of Pennsylvania declared Reliance insolvent and issued an Order of liquidation (the "Liquidation Order"). M. Diane Koken, Insurance Commissioner of the Commonwealth of Pennsylvania, was named as the Reliance Liquidator.

17.    On or about September 20, 2002, IHS filed a lawsuit against Reliance (the "Reliance Action") to resolve certain disputes between the Reliance Liquidator and the Debtors with respect to the Reliance Policy. In the Reliance Action, IHS sought, among other things, a declaration that the Reliance Policy provides total coverage of $9,000,000. The Reliance Liquidator maintains that the aggregate policy limit is $4,500,000. The Liquidating LLC (as

7

successor to IHS in the litigation) and the Reliance Liquidator agree that the aggregate limits of the Reliance Policy have been exhausted, whether those limits are $4.5 million or $9 million, by judgments entered against the Debtors and settlements made by the Debtors totaling substantially in excess of $9 million.

18.    Since entry of the Liquidation Order, the Reliance Liquidator has not paid any claims or defense costs covered by the Reliance Policy. Once the litigation between IHS and Reliance is resolved, the Liquidating LLC will have a claim against the Reliance estate for that part of the coverage not exhausted prior to the Reliance liquidation. The value of the claim will not be known until its allowed amount and the percentage recovery are determined.

19.    Reliance's insolvency created a risk that certain holders of 1999 Insured Tort Claims whose claims were liquidated within the Reliance coverage limits would be partially or completely deprived of access to insurance proceeds, while other holders would have access to the full benefit of coverage under the excess policies. To avoid this potential inequity, the Debtors established a special class under the Plan for holders of 1999 Insured Tort Claims.

20.    The Plan provides that each holder of an allowed 1999 Insured Tort Claim will be entitled to receive its *pro rata* share of the aggregate sum of: (i) the proceeds recovered under the Debtors' insurance policies, including excess insurance policies, in respect of allowed 1999 Insured Tort Claims, after payment of defense costs payable under the policies ("Available 1999 Insurance Proceeds"); and (ii) three percent of the difference between the Available 1999 Insurance Proceeds and the total amount of the allowed 1999 Insured Tort Claims.

21.    For the Liquidating LLC to make distributions to the holders of allowed 1999 Insured Tort Claims, the Plan further provides for the formation of a segregated account (the "1999 Insured Tort Claims Escrow"), established on the Effective Date and administered by the

8

Liquidating LLC.  Pursuant to the Plan, as each 1999 Insured Tort Claim is resolved, the insurance proceeds that would otherwise be paid directly to the claimant must be paid to the Liquidating LLC for deposit into the 1999 Insured Tort Claims Escrow, so that the Liquidating LLC can make *pro rata* interim and final distributions as provided in the Plan.

### D.    The National Union Policies

22.    National Union issued an excess insurance policy providing IHS with both professional liability and general liability coverage for the 1999 policy period (the "National Union Policy").  The National Union Policy (Exhibit A to the Liquidating LLC's Third-Party Complaint annexed hereto as Exhibit 3) provides the first layer of $25 million coverage in excess of the Reliance Policy.

23.    A Landlord of IHS of Lester, Inc. (the "Lester Landlord" and "IHS of Lester") one of IHS's operating subsidiaries, demanded that IHS of Lester obtain separate excess coverage for 1999.  Accordingly, claims against IHS of Lester were excluded from coverage under the National Union Policy, and IHS obtained a second National Union Commercial Umbrella Policy, BE 357-43-44, (the "National Union Lester Policy," together with the National Union Policy, the "National Union Policies").  The National Union Lester Policy (Exhibit B to the Third-Party Complaint) provides IHS of Lester with a separate first layer of excess coverage.

### E.    The Debtors' Coverage Dispute With National Union Concerning The 1999 Insured Tort Claims

24.    Shortly before the Plan was confirmed, National Union took the position that the Debtors could not look to National Union for any insurance coverage until the $9 million primary layer of coverage was exhausted *by the actual cash payment of $9 million in claims and expenses.*  IHS and Reliance were in insolvency proceedings, so it was obvious that this $9

9

million obligation would never be paid in full. The position taken by National Union therefore was a complete denial of coverage under its excess Policy.

25.     On March 26, 2003, IHS filed an adversary proceeding in the Bankruptcy Court, entitled *Integrated Health Services, Inc. v. National Union Fire Insurance Company of Pittsburgh, PA*, Adversary. Proceeding No. 03-52081, to enforce coverage under the National Union Policy (the "National Union Adversary Proceeding"). By order dated October 23, 2003 (the "Summary Judgment Order"), annexed as Exhibit 6, the Bankruptcy Court awarded partial summary judgment in favor of IHS. The Summary Judgment Order declares that coverage under the National Union Policy was triggered upon IHS becoming liable for 1999 Insured Tort Claims and related defense costs in excess of $9 million, whether by settlement or judgment, *regardless of whether IHS or Reliance first paid such claims and expenses in cash.* [5]

26.     In accordance with the Plan and the Summary Judgment Order, National Union thereafter made payments to the Liquidating LLC for 1999 Insured Tort Claims within National Union's $25 million layer of coverage. [6]

F.     **The 1999 GenStar Policy**

27.     In addition to the Reliance Policy and the National Union Policy, IHS procured from GenStar a second layer excess policy providing for $25 million in excess professional

---

[5]     The National Union Adversary Proceeding Complaint is annexed as Exhibit 5; and the Order awarding summary judgment is annexed as Exhibit 6.

[6]     IICNA has taken the position that the $25 million limits of the National Union Policy have been improperly eroded in that: (a) National Union improperly applied its defense costs against the National Union Policy limits; and (b) National Union applied claim payments and related defense costs against the National Union Policy limits in certain instances in which the claims arose at IHS of Lester and therefore should have been charged against the policy limits of the separate National Union Lester Policy. IICNA claims, therefore, that National Union is obligated to provide additional coverage before the IICNA layer is reached. These issues are addressed in the Liquidating LLC's Counterclaim and Third-Party Complaint and will be resolved in further proceedings. The issue before the Court on the present Motion is distinct from those additional issues and may be resolved separately. Moreover, it is critical that the Motion be heard without delay since the issue addressed herein, unlike those additional issues, concerns the totality of coverage available under the IICNA Policy and therefore has prevented the Liquidating LLC from proceeding with interim distributions under the Plan.

10

liability and general liability coverage for the 1999 policy period (the "GenStar Policy"). A copy

of the GenStar Certificate of Insurance is annexed as Exhibit C to the Third-Party Complaint.

28.    In accordance with its obligations under the GenStar Policy, GenStar, without

objection, assumed the administration and defense of the 1999 Insured Tort Claims after the

National Union Policy was exhausted. In accordance with the Plan, and consistent with the

Bankruptcy Court's declaration in the National Union Adversary Proceeding, GenStar made

payments to the Liquidating LLC for 1999 Insured Tort Claims within GenStar's $25 million

layer of coverage.

29.    GenStar entered into settlements on behalf of IHS and obligated itself to satisfy

judgments against IHS in amounts that exhausted the $25 million per occurrence and aggregate

limits of the GenStar Policy.[7]

## G.    The IICNA Policy

30.    The third and final layer of excess insurance coverage for the 1999 policy period

is provided by IICNA. The IICNA Policy (Exhibit I to the Third-Party Complaint) provides

excess coverage for 1999 Insured Tort Claims of $50 million in excess of the underlying

insurance limits.

31.    Since the aggregate amount of the Allowed 1999 Insured Tort Claims exceeds the

limits of the GenStar Policy, some portion of the excess coverage provided by the IICNA Policy

will be payable.

32.    Section I(A) of the 1999 IICNA Policy captioned "Coverage" provides:

---

[7]    ICNA has asserted that the GenStar Policy, like the National Union Policy has been improperly eroded and that GenStar, like National Union, is obligated to provide additional coverage before the IICNA layer is reached. These additional issues raised by IICNA are distinct from the issue addressed by the present Motion. See footnote 6 above.

11

WE will pay on YOUR behalf the ULTIMATE NET LOSS (1) in excess of all UNDERLYING INSURANCE, and (2) only after all UNDERLYING INSURANCE has been exhausted by the payment of the limits of such insurance for losses arising out of OCCURRENCES that take place during OUR policy period and are insured by all of the policies designated in the Declarations as UNDERLYING INSURANCE. If any UNDERLYING INSURANCE does not pay a loss for reasons other than the exhaustion of an aggregate limit of insurance, then WE shall not pay such loss.

33.    Like the National Union Policy, the IICNA Policy further provides that the bankruptcy or insolvency of IHS, or of IHS's underlying insurance carrier, does *not* relieve IICNA of its obligation to pay covered claims. This is confirmed by the express language of Sections IV(C) and IV(I)(2) of the IICNA Policy.

34.    Section IV(C) of the IICNA Policy, captioned "Bankruptcy and Insolvency," provides:

> Bankruptcy and insolvency of YOU, or YOUR estate will not relieve US of OUR obligations under this policy.

35.    Section IV(I) of the IICNA Policy, captioned "Maintenance of Underlying Insurance," provides:

> if any limits of liability of UNDERLYING INSURANCE . . . are unavailable due to bankruptcy or insolvency of an underlying insurer . . . then the insurance afforded by this policy shall apply in the same manner as if such underlying insurance and limits of liability had been in effect, available, so maintained and unchanged.

36.    The Schedule of Underlying Insurance contained in the Declarations of the IICNA policy provides that the "First Policy of Underlying Insurance" is an unspecified policy issued by Zurich Insurance Company with $50,000,000 limits of coverage. However, it is uncontroverted that Zurich issued no underlying liability policy to IHS for the 1999 policy year. The Schedule of Underlying Insurance makes no mention of the actual underlying insurance

12

policies for 1999 (*i.e.*, the primary Reliance Policy, the excess National Union Policy, the excess National Union Lester Policy or the excess GenStar Policy). Thus, the IICNA Policy fails to identify the policies that constitute "Underlying Insurance" as the term is used in the IICNA Policy.

37.    Based upon these IICNA Policy provisions, the Debtors--and later the Liquidating LLC--understood that the IICNA Policy proceeds would become payable upon the liquidation of claims within the underlying layers of coverage, notwithstanding the bankruptcy of IHS or the insolvency of Reliance, which together rendered full cash payment of the underlying limits impossible.

38.    At no point prior to April 2005 did IICNA disclose to the Debtors or the Liquidating LLC its position that the IICNA Policy would never become payable.

**H.    The IICNA District Court Action And The IICNA Motion To Amend**

39.    Separate and apart from the IICNA Policy, IICNA also provides the Debtors with insurance coverage for claims arising during the year 2000 (the "2000 Policy"). On August 15, 2003, IICNA commenced an adversary proceeding in the Bankruptcy Court, which was consensually withdrawn to the District Court (the "2000 Policy Action"). The 2000 Policy Action seeks declaratory relief against Abe Briarwood Corp. ("Briarwood") relating to the 2000 Policy. The Liquidating LLC is not a party to that action, and the declaratory relief IICNA seeks is unrelated to the IICNA Policy that is the subject of this adversary proceeding. However, on April 18, 2005, IICNA filed a motion seeking authority to add a claim for declaratory relief relating to the IICNA Policy (the "Proposed 1999 Count"), which is substantially the same as declaratory relief IICNA seeks in its Counterclaim in the present Adversary Proceeding. The Liquidating LLC filed a motion to intervene in the 2000 Policy Action to oppose the motion to

13

amend. The motion to amend and the motion to intervene have been fully briefed and have not been decided by the District Court.[8]

40.     The Proposed 1999 Count was the first indication that IICNA intended to assert the same position taken unsuccessfully two years earlier by National Union, *i.e.* that the bankruptcy and insolvency of IHS and Reliance excuse IICNA's performance under its Policy due to the resulting failure of Reliance and IHS to exhaust the $9 million primary layer of coverage with actual cash payments.

## I.     The Present Adversary Proceeding

41.     On May 6, 2005, the Liquidating LLC commenced the present adversary proceeding in the Bankruptcy Court. The First Claim for Relief in the Liquidating LLC's Complaint seeks a declaration that the IICNA Policy obligates IICNA to pay covered claims in excess of underlying policy limits notwithstanding that the full limits of the underlying primary Reliance Policy have not been paid in cash due to the bankruptcy and insolvency of IHS and Reliance. The Second and Third Claims for Relief seek compensatory and punitive damages. Only the declaratory relief sought in the First Claim is at issue in this Motion.

42.     As previously described, IICNA's disclaimer, parroting a disclaimer made unsuccessfully by National Union more than two years ago, has put at issue the entirety of the coverage that the Liquidating LLC has always understood to be available under the IICNA Policy. For this reason, the Liquidating LLC has been forced to suspend distributions to holders

---

[8]     Specifically, the Liquidating LLC opposes amendment on the grounds that the Proposed 1999 Count: (i) has nothing at all to do with the pending dispute between IICNA and Briarwood, which concerns only the 2000 Policy; (ii) seeks relief as to which neither Briarwood nor IHS is a real party in interest; (iii) involves the very same issues as the present adversary proceeding pending before the Bankruptcy Court; (iv) concerns facts and legal issues substantially similar to issues that the Bankruptcy Court already ruled upon in the National Union Adversary Proceeding; (v) arises out of and is related to the Debtors' chapter 11 cases; and (vi) is a transparent attempted end-run around the Standing Order, which would have automatically referred the Proposed 1999 Count to the Bankruptcy Court had it been filed as a separate action. A copy of the District Court docket sheet for the 2000 Policy Action case is attached as Exhibit 7.

of allowed 1999 Insured Tort Claims, including a number of claimants whose claims have recently been settled and as to which applicable insurance proceeds have been collected by the Liquidating LLC from GenStar.  To resume distributions, the Liquidating LLC must obtain the declaration sought in this Motion for summary judgment.

43.    On May 13, 2005, IICNA moved for a determination that the present adversary proceeding is not a core proceeding and further moved for withdrawal of the reference.  The Liquidating LLC opposed both motions and the latter motion has been transferred to the District Court.  Neither motion has been determined.

44.    On July 26, 2005, IICNA filed its Answer to the Complaint and a Counterclaim (Exhibit 2) seeking a declaration that:

> Unless and until the limits of the underlying Reliance Policy, as well as the limits of all other underlying insurance, have been exhausted by the actual payment of covered claims against IHS during the relevant policy period, IICNA owes no duty under its 1999 IICNA Policy to indemnify and/or defend IHS for the 1999 Insured Tort Claims or any other claims otherwise occurring within the relevant policy period.

Counterclaim at page16. In addition, the Counterclaim, at Paragraphs 48 and 49, alleges: (i) that the National Union Policy and the GenStar Policy are "improperly exhausted" because these insurers made improper charges--for defense costs and for coverage of claims arising at IHS of Lester--against their Policies; (ii) that National Union and GenStar are therefore further liable to plaintiff under their insurance policies; and (iii) that IICNA is therefore excused from performing under the IICNA Policy until and unless the alleged liability of National Union and GenStar under their insurance policies is satisfied.

45.    Upon information and belief, the position of both National Union and GenStar is that their insurance policies are exhausted, that no improper charges have been made against

those Policies, and that neither National Union nor GenStar has any remaining liability to their insureds or to the Liquidating LLC thereunder.

46.    The 1999 insurance policies issued to IHS by National Union, GenStar and IICNA were intended to and do provide IHS with a seamless web of excess insurance coverage of at least $100,000,000 over and above IHS's $9,000,000 primary insurance with Reliance. The Liquidating LLC expects that the aggregate coverage provided by Reliance, exhausted long ago, together with the excess insurance policies, will substantially exceed the aggregate amount of all covered 1999 Insured Tort Claims, together with defense costs. Accordingly, irrespective of whether the National Union and GenStar policies have been exhausted, as those insurers claim, or have not been exhausted, as IICNA claims, IHS is fully insured for all claim payments and defense costs that may arise in the future with respect to any and all 1999 Insured Tort Claims that have not as yet been resolved.

47.    In response to the Counterclaim, the Liquidating LLC has asserted a Third-Party Claim (Exhibit 3) against all three excess carriers, joining National Union and GenStar, to permit a determination binding on all. The issues addressed in the Liquidating LLC's third-party claim are distinct from the issue raised in the Liquidating LLC's Complaint and addressed in the present Motion for summary judgment. Those issues principally relate to a dispute among the excess carriers and can be addressed at a later point in these proceedings.

## RELIEF REQUESTED

48.    The First Claim for Relief in the Liquidating LLC's Complaint seeks a declaration that the IICNA Policy obligates IICNA to pay covered claims that have been liquidated in amount by judgment or settlement to the extent that such liquidated claims exceed the limits of the underlying policies notwithstanding that the full limits of the underlying primary Reliance

16

Policy have not been paid out in cash due to the bankruptcy and insolvency of IHS and Reliance. By this Motion, the Liquidating LLC seeks an order granting this declaratory relief.

## ARGUMENT

### THE COURT SHOULD AWARD PARTIAL SUMMARY JUDGMENT GRANTING THE DECLARATORY RELIEF REQUESTED IN THE FIRST CLAIM FOR RELIEF IN THE LIQUIDATING LLC's COMPLAINT AND DISMISSING IICNA's COUNTERCLAIM.

49.     The First Claim for Relief seeks a declaration that the IICNA Policy obligates IICNA to pay covered claims that have been liquidated in amount by judgment or settlement to the extent that such liquidated claims exceed the limits of the underlying coverage, whether or not the Reliance Policy has been exhausted *by cash payments*.  Absent this declaratory relief, IICNA, by virtue of the insolvency of others, will receive a windfall of millions of dollars, avoiding entirely a risk IICNA was paid to assume.

**A.**     **Summary Judgment Is Appropriate.**

50.     Summary judgment is appropriate when the moving party has established that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Rule 7056 of the Federal Rules of Bankruptcy Procedure; Rule 56(c) of the Federal Rules of Civil Procedure.

51.     "Generally, the proper construction of a policy of insurance is a matter of law which may properly be resolved by a court pursuant to a motion for summary judgment." *Frain v. Keystone Ins. Co.*, 433 Pa. Super. 462, 466, 640 A.2d 1352, 1354 (1994); *Seaway Port Authority of Duluth v. Midland Insurance Company*, 430 N.W.2d 242, 247 (Minn. Ct. App. 1988) ("The interpretation and construction of an insurance policy is a matter of law which the trial court could properly determine on summary judgment.").

52.     The issue before this Court on the present motion is a simple matter of contract construction. This issue can be resolved by the Court as a matter of law, and summary judgment is therefore appropriate.

**B.**     **Any Ambiguities In The Policy Must Be Resolved In Favor Of Coverage.**

53.     As demonstrated below, the provisions of the IICNA Policy require that IICNA provide coverage when the Debtor insureds become liable for amounts in excess of the Retained Limit, not when the insureds or their insurance carriers have actually paid out these amounts in cash. However, in the event that this Court should find that the language of the Policy is amenable to more than one interpretation or construction, certain well-accepted axioms of insurance law would mandate a finding in favor of coverage.[9]

54.     Under Pennsylvania law, the court determines the intent of the parties to an insurance contract from the plain meaning of the language, giving terms their ordinary meanings, and where issues of coverage arise, any ambiguity in the language of the policy is construed in favor of coverage in full recognition of the underlying objective to provide coverage, not exclude it. It follows that to prevail in a coverage dispute, an insurer must demonstrate not only that its interpretation is a reasonable one, but that it is the *only* fair and reasonable one. A construction favoring the insurer will be sustained only where it is the sole construction that can fairly be placed on the policy language. *See Gilderman v. State Farm Insurance Co.*, 437 Pa. Super. 217, 224, 649 A.2d 941, 944 (1994) ("In construing a policy, coverage provisions are interpreted to afford the greatest possible protection to the insured, and the insured's expectations are our focus.") *Alexander & Alexander, Inc. v. Rose*, 671 F.2d 771, 777 (3rd Cir. 1982) ("A long and

---

[9]     The IICNA Policy contains no choice of law provision. Because IICNA maintains its principal place of business in Philadelphia, the laws of Pennsylvania might well apply, and therefore we cite cases from this jurisdiction and from the forum State. However, the principles of law relevant to this Motion are generally accepted from state to state and, accordingly no conflict of laws is apparent.

unbroken line of Pennsylvania precedents holds that ambiguous language in a contract of insurance must be construed strictly against the insurer who is responsible for the language chosen in order to give the insured the benefit of the indemnity for which he has bargained, and this rule has been applied to transactions involving sophisticated commercial contractors as well as to consumer transactions resembling contracts of adhesion.")

55.     The result would be no different under Delaware law. See *Alstrin v. St. Paul Mercury Ins. Co.*, 179 F. Supp. 2d 376, 390 (D. Del. 2002) ("Delaware courts . . . consistently construe ambiguities [within insurance policies] in favor of the insured as a matter of law," and "Convoluted or confusing terms are the problem of the insurer...not the insured...")(internal quotation marks omitted).

56.     As demonstrated below, the IICNA Policy is amenable to only one fair and reasonable interpretation with respect to the coverage issue raised in the Liquidating LLC's First Claim for Relief. However, even assuming that IICNA could point to an ambiguity in the 1999 IICNA Policy -- and it cannot -- the foregoing rules of construction would nevertheless mandate summary judgment in favor of the Liquidating LLC.

## C.     The Liquidating LLC Is Entitled To A Declaration In Its Favor As A Matter Of Law.

57.     The Liquidating LLC seeks a declaration that the IICNA Policy obligates IICNA to defend and pay 1999 Insured Tort Claims that are within IICNA's $50 million layer of excess coverage, whether or not the underlying primary layer of coverage with Reliance has been exhausted by cash payments. IICNA's contrary interpretation of its Policy is incorrect as a matter of law.

58.     The relevant provisions of the Policy begin with Section I(A), which provides:

WE will pay on YOUR behalf the ULTIMATE NET LOSS (1) in
excess of all UNDERLYING INSURANCE, and (2) only after all

19

> UNDERLYING INSURANCE has been exhausted by the payment of the limits of such insurance for losses arising out of OCCURRENCES that take place during OUR policy period and are insured by all of the policies designated in the Declarations as UNDERLYING INSURANCE. *If any UNDERLYING INSURANCE does not pay a loss for reasons other than the exhaustion of an aggregate limit of insurance, then WE shall not pay such loss.* [emphasis added]

59.     The last sentence of the foregoing provision is significant in the context of this Motion. It is clear from that sentence that if a claim within the Debtors' primary layer of insurance with Reliance has not been paid, in this case because Reliance is in liquidation, IINCA is not obligated to pay that claim. In common insurance terminology, the last sentence of Section I(A) makes explicit that IICNA is not obligated to "drop down" to cover claims within a lower level of coverage when an underlying insurer defaults in its obligation to provide coverage. On the other hand, the last sentence of Section I(A) very clearly *does not say* that IICNA is relieved of the obligation to defend and pay claims *within IICNA's own layer of coverage* in the event that an underlying insurer defaults. Had the parties actually agreed to such a harsh result, IICNA could easily have so stated in the last sentence of Section I(A) with the change of a single word, as follows: "If any UNDERLYING INSURANCE does not pay a loss for reasons other than the exhaustion of an aggregate limit of insurance, then WE shall not pay any loss," rather than "… WE shall not pay such loss." (emphasis added) Obviously, the parties did not agree to such a forfeiture, and neither Section I(A) nor any other provision in the IICNA Policy so provides.

60.     Indeed, the position taken by IICNA is directly contrary to two other provisions of the 1999 IICNA Policy. Section IV(C) of the IICNA Policy, captioned "Bankruptcy and Insolvency," provides:

> Bankruptcy and insolvency of YOU, or YOUR estate will not relieve US of OUR obligations under this policy.

20

In addition, Section IV(I) of the IICNA Policy, captioned "Maintenance of Underlying Insurance," provides:

> if any limits of liability of UNDERLYING INSURANCE . . . are unavailable due to bankruptcy or insolvency of an underlying insurer . . . then the insurance afforded by this policy shall apply in the same manner as if such underlying insurance and limits of liability had been in effect, available, so maintained and unchanged.

61.    Sections IV (C) and IV (I) confirm that IICNA's obligation to provide coverage *within its own layer* will not be diminished in the event of the insolvency or bankruptcy of an insured or underlying insurer.[10] These IICNA Policy bankruptcy provisions, like the similar provisions in the National Union Policy, were not included voluntarily by the insurer, but rather are statutorily required to be included in all personal injury insurance policies issued in Pennsylvania. See 40 P.S. § 117, captioned "Indemnity insurance; statement as to insolvency or bankruptcy of insured," and providing:

> No policy of insurance against loss or damage resulting from accident to or injury suffered by an employee or other person and for which the person insured is liable, ... shall hereafter be issued or delivered in this State by any corporation, or other insurer, authorized to do business in this State, unless there shall be contained within such policy a provision that the insolvency or bankruptcy of the person insured shall not release the insurance carrier from the payment of damages for injury sustained or loss occasioned during the life of such policy ...[11]

62.    To give any credence to IICNA's self-serving construction of language IICNA itself drafted, one would have to write Sections IV (C) and IV (I) completely out of the IICNA Policy. The courts will not construe terms of an insurance contract in a manner that would

---

[10] Sections IV (C) and IV (I) also confirm that IICNA will not have an obligation to "drop down" in place of a lower layer of coverage in the event of the insolvency or bankruptcy of an insurer or underlying insurer.

[11]    The law of the State of Maryland, where the Debtor maintained its principal place of business similarly provides that liability policies issued in the State "shall provide" that "the bankruptcy or insolvency of the insured does not release the insurer from liability." MD Code, Insurance § 19-102.

21

render other terms meaningless. *Alstrin v. St. Paul Mercury Ins. Co.,* 179 F. Supp. 2d 376, 388 (D. Del. 2002) ("All provisions should be given meaning and the policy should not be interpreted to render any part superfluous."). *A fortiori,* where, as here, the provisions that IICNA would read out of its Policy are mandated by law, IICNA's argument should be rejected. Surely IICNA cannot comply with 40 P.S. § 117 by writing in a bankruptcy provision with one hand and then writing out with the other.

63.    The IICNA Policy's bankruptcy and insolvency provisions, Sections IV(C) and IV (I)(2), expressly address the circumstances in which the parties now find themselves, with the insured (IHS) in bankruptcy and an underlying insurer (Reliance) in liquidation proceedings. These Policy provisions, Sections IV (C) and IV (I) unequivocally provide that this situation "will not relieve US [IICNA] from OUR obligations under the policy."

64.    The Liquidating LLC's research has failed to uncover even a single reported case holding that the bankruptcy or insolvency of the insured or the insured's primary carrier relieves the excess carrier of the obligation to pay claims within the excess policy layer.[12]  This argument was unsuccessful in the National Union Adversary Proceeding, and the Bankruptcy Court in *Columbia Casualty Co. v. Federal Press Co. (In re Federal Press Co.)*, 104 B.R. 56 (Bkr. N.D. Ind. 1989), reached the same result, holding that excess insurance policy language requiring exhaustion of the underlying layer of self-insurance by payment of claims did *not* relieve the insurer of its obligation to indemnify where the insured was a debtor in bankruptcy and could not satisfy its retained limit.

---

[12]    Indeed, an A.L.R. annotation entitled "Primary Insurer's Insolvency as Affecting Excess Insurer's Liability," 85 A.L.R. 4th 729 (1991), is more than fifty pages long and cites not a single case where an insurer even argued that the bankruptcy or insolvency of the insured or the insured's primary carrier relieves the excess carrier of the obligation to pay claims within its excess policy layer.

65.     In *Federal Press Co.*, the insurer argued that it should be excused from paying claims under its policy because its insured, a chapter 11 debtor, was unable due to its insolvency to exhaust the policy's $300,000 retained limit by actual payment. Like the present case, the carrier claimed that under the express terms of its policy, actual payment was a prerequisite to coverage. Also like the present case, the excess policy provided, as required by applicable State law, that the bankruptcy or insolvency of the insured would not relieve the insurer of its obligations. The court concluded that the bankruptcy provision in the policy necessarily limited the other provision to the extent it required exhaustion by actual payment of the retained limit. *Id.* 104 B.R. at 63. *See Home Ins. Co. of Illinois v. Hooper*, 294 Ill. App. 3d 626 (Ill. App. Ct.), *appeal denied*, 179 Ill. 2d 576 (1998) (excess carrier obligated to indemnify chapter 7 debtor for that portion of judgment or settlement that exceeds the self-insured retention even though the policy expressly required "actual payment" as a prerequisite to coverage and the debtor was unable to pay the retention amount.). This Court, like the courts in *Federal Press Co.* and *Home Ins. Co. of Illinois*, should reject the insurer's position that would write the statutorily mandated bankruptcy provisions out of its Policy.

66.     IICNA's position in this litigation--that it can deny coverage of all claims under its $50 million excess liability Policy due to the bankruptcy and insolvency of its insured and the primary insurer--conflict with the bankruptcy provisions of IICNA's own Policy, which provisions are mandated by applicable State law. Under these circumstances, IINCA's disclaimer of coverage is so lacking in reason that it could not have been made rationally and in good faith.

**D.    The Declaration Sought By IICNA In Its Counterclaim Should Be Denied.**

67.    Insofar as the relief requested in IICNA's Counterclaim is the negative of the relief requested in IHS's claim for declaratory relief, the declaratory relief IICNA requests should be denied.

## CONCLUSION

68.    The Court should grant partial summary judgment in favor of the Liquidating LLC and against IICNA: (i) severing the First Claim for Relief; (ii) awarding a declaratory judgment declaring that the IICNA Policy obligates IICNA to pay claims that have been liquidated in amount by judgment or settlement to the extent that such claims exceed the per occurrence and aggregate limits of liability set forth in the Reliance Policy, the National Union Policies and the GenStar Policy, whether or not the Debtors' primary layer of coverage has been exhausted by actual cash  payments of claims and defense costs; and (iii) denying the relief requested in the IICNA Counterclaim.

Dated:  Wilmington, Delaware
         December ____, 2005

BIFFERATO, GENTILOTTI, BIDEN & BALICK

_____
Ian Connor Bifferato (#3273)
Garvan F. McDaniel (#4167)
Buckner Building
1308 Delaware Avenue
Wilmington, Delaware 19899
(302) 429-1900

-and-

KAYE SCHOLER LLP
Arthur Steinberg
Marc D. Rosenberg
Ana Alfronso
425 Park Avenue
New York, New York  10022-3598
(212) 836-8000

24

-and-

TROUTMAN SANDERS LLP
Lee W. Stremba
Clement H. Berne
Michelle L. Abruzzo
The Chrysler Building
405 Lexington Avenue
New York, New York  10174
(212) 704-6000

Attorneys for IHS Liquidating LLC

NEWYORK01 1086682v1 359273-000100