# EXHIBIT 1

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>Integrated Health Services, Inc., *et al.*,<br><br>        Debtors.<br><br>IHS LIQUIDATING LLC,<br><br><br>        Plaintiff,<br><br><br>    v.<br><br><br>ACE INDEMNITY INSURANCE COMPANY<br>f/k/a INDEMNITY INSURANCE COMPANY OF<br>NORTH AMERICA,<br><br>        Defendant. | Case No. 00-389 (MFW)<br>Jointly Administered<br><br>Chapter 11<br><br><br><br>Adv. Pro. No. |

## COMPLAINT

IHS Liquidating LLC (the "Liquidating LLC" or "Plaintiff"), by its undersigned counsel, for its complaint against defendant, alleges that:

### THE PARTIES

1.    The Liquidating LLC is a Delaware limited liability company, with its principal place of business located at 21 East 40th Street, Suite 1300, New York, New York 10016.

2.    Defendant Ace Indemnity Insurance f/k/a Indemnity Insurance Company of North America ("IICNA") is an insurance company organized and existing under the laws of the State of Connecticut, with its principal place of business located at 1601 Chestnut Street, Philadelphia, Pennsylvania 19103, and with offices located at 500 Colonial Center Parkway, Suite 200, Roswell, Georgia 30076.

## JURISDICTION AND VENUE

3.     This Court has jurisdiction over the instant action pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (C). This action is authorized to be brought as an adversary proceeding by Bankruptcy Rule 7001(2) and (9). Venue is proper under 28 U.S.C. § 1409(a).

## THE CHAPTER 11 CASES

4.     On February 2, 2000 (the "Petition Date"), debtor, Integrated Health Services Inc. ("IHS") and a number of its direct and indirect subsidiaries (collectively, the "Debtors"), filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.

5.     By order dated May 12, 2003 (the "Confirmation Order"), this Court confirmed the *Amended Joint Plan of Reorganization of Integrated Health Services, Inc. and its Subsidiaries under Chapter 11 of the Bankruptcy Code*, dated March 13, 2003 (as amended, modified or supplemented, including by the Confirmation Order, the "Plan").

6.     The Liquidating LLC was formed pursuant to the Plan for the purpose of implementing certain aspects of the Plan.

7.     Pursuant to the Plan, the Liquidating LLC is charged with responsibility for the administration of disputed prepetition claims against the Debtors, including, without limitation, claims relating to professional and general liability with respect to the operation of the Debtors' business ("PL/GL Claims") covered by the Debtors' insurance policies for PL/GL Claims arising in 1999 ("1999 Insured Tort Claims").

8.     The Plan provides that each holder of an allowed 1999 Insured Tort Claim shall be entitled to receive its *pro rata* share of the aggregate sum of (i) the proceeds recovered at any given time under the Debtors' insurance policies, including excess insurance policies, in respect of allowed 1999 Insured Tort Claims, after payment of defense costs payable under the policies

("Available 1999 Insurance Proceeds"); and (ii) 3% of the difference between the Available

1999 Insurance Proceeds and the total amount of allowed 1999 Insured Tort Claims.

9.      In order for the Liquidating LLC to implement distributions to the holders of

allowed 1999 Insured Tort Claims, the Plan further provides for the formation of an escrow

account (the "1999 Insured Tort Claims Escrow"), to be established on the Effective Date and

administered by the Liquidating LLC.  Pursuant to the Plan, as each 1999 Insured Tort Claim is

resolved, the insurance proceeds that would otherwise be paid directly to the claimant must be

paid to the Liquidating LLC for deposit into the 1999 Insured Tort Claims Escrow so that the

Liquidating LLC may make pro rata interim and final distributions as provided in the Plan.

## GENERAL ALLEGATIONS

### The Policy

10.      Heretofore, IICNA, for consideration, issued to IHS an Excess Liability

Catastrophe Policy, No. XLX G19545507 (the "Policy").  The Policy provides general liability

and medical professional liability ("PL/GL") excess coverage for the policy period January 1,

1999 through January 1, 2000.  The Policy provides PL/GL excess coverage of $50 million per

occurrence and $50 million in the aggregate in excess of underlying insurance limits.  A true and

correct copy of the Policy is attached hereto as Exhibit A and incorporated herein by reference.

11.      Section I of the Policy defines the coverage obligation of IICNA as follows:

> A.      COVERAGE
> WE will pay on YOUR behalf the ULTIMATE NET LOSS (1) in
> excess of all UNDERLYING INSURANCE, and (2) only after all
> UNDERLYING INSURANCE has been exhausted by the payment
> of the limits of such insurance for losses arising out of
> OCCURRENCES that take place during OUR policy period and
> are insured by all of the policies designated in the Declarations as
> UNDERLYING INSURANCE.      If any UNDERLYING
> INSURANCE does not pay a loss for reasons other than the
> exhaustion of an aggregate limit of insurance, then WE shall not
> pay such loss.

12.    The Policy defines "Ultimate Net Loss" as "the amount paid or payable in cash in the settlement or satisfaction of claims for which the insured is liable, either by adjudication or compromise with OUR written consent, after making proper deduction for all recoveries and salvages." The Policy further provides that "[d]efense expense payments shall be included within the ULTIMATE NET LOSS, provided that such expenses are included within the terms, conditions, and limits of insurance of any UNDERLYING INSURANCE."

13.    The Policy expressly provides that the bankruptcy or insolvency of IHS, or of IHS's underlying insurance carrier, will not relieve IICNA of any obligation to pay a covered claim. Section IV.C states, in relevant part, that "[b]ankruptcy and insolvency of YOU, or YOUR estate will not relieve US of OUR obligations under this policy." Additionally, Section IV.I(2) provides, in relevant part, that if any limits of liability of underlying insurance are "unavailable due to bankruptcy or insolvency of an underlying insurer . . . then the insurance afforded by this policy shall apply in the same manner as if such underlying insurance and limits of liability had been in effect, available, so maintained and unchanged."

**The Underlying Insurance**

14.    The underlying insurance is comprised of a primary matching deductible insurance policy (the "Reliance Policy") issued by Reliance Insurance Company ("Reliance"). In the view of IHS (and, since the Effective Date, the Liquidating LLC), the Reliance Policy provides coverage of $2,000,000 per incident for professional liability claims and $1,000,000 per incident for general liability claims, with an aggregate coverage limit of $9,000,000. Under the Reliance Policy, IHS is subject to deductibles in the same amounts as the coverage limits.

15.    On October 3, 2001 the Commonwealth Court of Pennsylvania declared Reliance insolvent and entered an Order of liquidation (the "Liquidation Order"). M. Diane Koken,

Insurance Commissioner of the Commonwealth of Pennsylvania, was named as the Reliance Liquidator.

16.     On or about September 20, 2002, IHS filed a litigation against Reliance (the "Reliance Action") to resolve certain disputes between the Reliance Liquidator and the Debtors with respect to the Reliance Policy. In the Reliance Action, IHS seeks, among other things, a declaration that the Reliance Policy provides total coverage of $9,000,000. The Reliance Liquidator maintains that the aggregate policy limit is only $4,500,000. The Liquidating LLC (as successor to IHS in the litigation) and the Reliance Liquidator agree that the aggregate limits of the Reliance Policy have been exhausted, whether those limits are $4.5 million or $9 million, by judgments entered against the Debtors and settlements made by the Debtors totaling substantially in excess of $9 million.

17.     Since the Liquidation Order was entered, the Reliance Liquidator has not paid any claims or defense costs covered by the Reliance Policy. Once the litigation between IHS and Reliance is resolved, the Liquidating LLC will have a claim against the Reliance liquidation estate for any part of the coverage that was not exhausted prior to the Reliance liquidation. The value of the claim cannot be determined until both the allowed amount of the claim and the likely percentage recovery of creditors is determined.

18.     National Union Fire Insurance Company of Pittsburgh ("National Union") issued an excess insurance policy providing both professional liability and general liability coverage for IHS for the policy period January 1, 1999 through January 1, 2000 (the "National Union Policy"). The National Union Policy provides the first layer of $25 million per occurrence/aggregate in excess in the Reliance Policy.

19.    Shortly before the Plan was confirmed, National Union took the position that the Debtors could not look to National Union for any professional liability insurance coverage until the $9 million primary layer of coverage was exhausted by the actual cash payment of $9 million in claims and expenses. Because both IHS and Reliance were in insolvency proceedings, it was unlikely that IHS would ever actually pay the $9 million obligation in full. The position taken by National Union therefore amounted to a complete denial of coverage.

20.    On March 26, 2003, IHS filed an adversary proceeding in the Bankruptcy Court styled *Integrated Health Services, Inc. v. National Union Fire Insurance Company of Pittsburgh, PA*, adv. proc. no. 03-52081, in an effort to enforce coverage under the National Union Policy (the "National Union Adversary Proceeding"). By order dated October 23, 2003 (the "Summary Judgment Order"), the Bankruptcy Court entered partial summary judgment in favor of IHS. The Summary Judgment Order held, *inter alia*, that coverage under the National Union Policy was triggered upon IHS becoming liable for 1999 Insured Tort Claims and related defense costs in excess of $9 million, whether by settlement or judgment, regardless of whether IHS or Reliance paid such claims and expenses in cash.

21.    General Star Indemnity Company ("GenStar") issued an excess insurance policy providing both professional liability and general liability coverage for IHS for the policy period January 1, 1999 through January 1, 2000 (the "GenStar Policy"). The GenStar Policy provides the second layer of $25 million per occurrence/aggregate in excess of the Reliance Policy and National Union Policy.

22.    The 1999 IICNA Policy is the third layer of coverage in excess of the Reliance Policy, the National Union Policy and the GenStar Policy. The 1999 Insured Tort Claims have been liquidated in amount by judgments or settlement agreements constituting binding legal

obligations in excess of the limits of the Reliance Policy and the National Union Policy. In accordance with the Plan, National Union has made payments to the Liquidating LLC for 1999 Insured Tort Claims within National Union's layer of coverage.

23.    GenStar has now assumed the administration and defense of the remaining 1999 Insured Tort Claims and has entered into settlements on behalf of IHS and/or obligated itself to satisfy judgments against IHS that will soon exhaust the $25 million limit of the GenStar Policy. In accordance with the Plan, GenStar has made payments to the Liquidating LLC for 1999 Insured Tort Claims within GenStar's layer of coverage.

24.    Upon information and belief, the aggregate amount of Allowed 1999 Insured Tort Claims will exceed the limits under the GenStar policy, and as a result, some portion of the excess coverage provided by the Policy will be payable. As confirmed by the express language of Sections IV.C and IV.I(2) of the Policy, the insolvency and bankruptcy of IHS do not relieve IICNA of its obligations under the Policy.

**The Proposed Amendments**

25.    IICNA is currently prosecuting an adversary proceeding against IHS and Abe Briarwood Corp. ("Briarwood") arising out of a policy issued by IICNA to IHS for the policy period January 1, 2000 to January 1, 2001 (the "Briarwood Action"). Pursuant to a Sale Agreement dated as of January 28, 2003, Briarwood purchased IHS's long-term care and contract rehabilitation therapy business (the "Purchase"). In connection with the Purchase, IHS assigned to IHS Long Term Care, Inc., among other things, IHS' liabilities relating to any and all past, current and future PL/GL Claims arising after February 2, 2000.

26.    In the Briarwood Action, IICNA seeks a declaration that there is no coverage for Briarwood under the 2000 Policy because Briarwood is not an insured under that Policy, and

because Briarwood has violated the terms and conditions of the 2000 Policy by allegedly failing

and/or refusing to cooperate with IICNA in connection with IICNA's request for financial

information. IHS is a nominal defendant in the Briarwood Action. The Liquidating LLC is not a

party to that action.

27.    On or about April 18, 2005, IICNA filed a motion to amend the Complaint in the

Briarwood Action to add a claim for a declaration that:

> [u]nless and until the limits of the underlying Reliance Policy, as
> well as the limits of all other underlying insurance, have been
> exhausted by the actual payment of Claims against IHS during the
> relevant policy period, IICNA owes no duty under its 1999 IICNA
> Policy to indemnify and defend IHS for the 1999 Claims or any
> other claims otherwise occurring in the relevant policy period.

Thus, IICNA has taken the position that IICNA will not provide any coverage under the Policy

unless and until IHS or its primary carrier makes actual cash payments totaling in excess of the

$9 million Retained Limits under the Reliance Policy.

28.    Because neither IHS nor Reliance, IHS's primary carrier, is expected to make

actual claim payments totaling in excess of the $9 million retained limits under the Reliance

Policy, IICNA has, in effect, disclaimed all coverage under the Policy. As previously indicated,

it is likely that some portion of the $50 million of excess coverage provided by the Policy will be

payable. IICNA's refusal to provide coverage in accordance with the Policy therefore deprives

IHS and the holders of Allowed 1999 Insured Tort Claims of coverage.

29.    The Plan and the related Disclosure Statement that was approved by the Court and

served upon IICNA reflected IHS's belief that it has excess coverage under the Policy, which

will be available, with other insurance funds, for distribution *pro rata* to holders of allowed 1999

Insured Tort Claims.

30.    Notwithstanding the fact that IICNA has at all times been aware of the Plan treatment of 1999 Insured Tort Claims and the Debtors' expectation that the Policy proceeds would be available for distribution in accordance with the Plan, IICNA did not advise IHS or the Liquidating LLC of its plan to disavow coverage until April 14, 2005, nearly two years after the Plan had been confirmed.

31.    IICNA's interpretation of the Policy and its refusal to honor its obligations under the Policy are contrary to the express and unambiguous provisions of the Policy as set forth above and are without a reasonable basis.

32.    IICNA's bad-faith disclaimer of coverage under the Policy has implications not only with respect to the Debtors' estates and the holders of 1999 Insured Tort Claims, who are deprived of coverage, but also to other insureds of IICNA who have sought protection, or may seek protection, under the Bankruptcy Code.  The Policy is a standard policy document under which IICNA and its related entities have no doubt provided excess insurance to hundreds of companies.  The position taken in the Proposed Amendments by IICNA, would effectively eliminate coverage under all IICNA policies for all insolvent insureds and their personal injury claimants.

## FIRST CLAIM FOR RELIEF

### (Declaratory Judgment)

33.    Plaintiff repeats and realleges the allegations of paragraphs 1 through 32 of this Complaint as if fully set forth herein.

34.    An actual controversy exists between the parties as to whether IICNA is obligated to provide coverage under the Policy.  This controversy has a substantial and present adverse impact upon Liquidating LLC's administration of:  (a) 1999 Insured Tort Claims; and (b) the Plan and the proceedings related thereto.

35.    Plaintiff is entitled to a declaration that the Policy obligates IICNA to pay covered professional liability claims which have been liquidated in amount by judgment or settlement to the extent that such liquidated claims are in excess of $50 million per occurrence or $50 million in the aggregate, whether or not the applicable per occurrence or aggregate limit of the Debtors' primary insurance coverage has been paid.

36.    Plaintiff has no adequate remedy at law.

## SECOND CLAIM FOR RELIEF

### (Breach of Contract; Compensatory Damages)

37.    Plaintiff repeats and realleges the allegations of paragraphs 1 through 36 of this Complaint as if fully set forth herein.

38.    Plaintiff's disclaimer of coverage under the Policy constitutes a breach of the Policy for which Plaintiff is entitled to recover its damages from IICNA. Plaintiff has incurred additional administrative costs and will incur additional costs by reason of IICNA's eleventh-hour disclaimer. Plaintiff is entitled to judgment against IICNA for all such costs, in such amounts as may be demonstrated at trial.

## THIRD CLAIM FOR RELIEF

### (Bad Faith; Punitive Damages)

39.    Plaintiff repeats and realleges the allegations of paragraphs 1 through 38 of this Complaint as if fully set forth herein.

40.    IICNA's disclaimer of all coverage under the Policy was made without reasonable basis and in bad faith.

41.    Under the common law of the State of Delaware, and under statutory law of the State of Pennsylvania, Plaintiff is entitled to an award of punitive damages against IICNA in an amount to be determined by the Court.

**WHEREFORE**, Plaintiff demands judgment:

(A)    On the First Claim for Relief, declaring that the Policy obligates IICNA to pay covered professional liability claims which have been liquidated in amount by judgment or settlement to the extent that such liquidated claims are in excess of $50 million per occurrence or $50 million in the aggregate, whether or not the applicable per occurrence or aggregate limit of the Debtors' primary insurance coverage has been paid;

(B)    On the Second Claim for Relief, compensatory damages in an amount to be determined at trial, together with appropriate interest thereon;

(C)    On the Third Claim for Relief, punitive damages in an amount to be determined by the Court;

(D)    For the costs and disbursements of the action; and

(E)    For such other and further relief as the Court shall deem proper.

Dated: May 6, 2005
Wilmington, Delaware

YOUNG CONAWAY STARGATT &
TAYLOR, LLP

Robert S. Brady (No. 2847)
Edmon L. Morton (No. 3856)
Joseph M. Barry (No. 4221)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE  19801
(302) 571-6600

-and-

KAYE SCHOLER LLP
Arthur Steinberg
Marc D. Rosenberg
Ana Alfonso
425 Park Avenue
New York, NY 10022-3598
(212) 836-8000

-and-

TROUTMAN SANDERS LLP
Lee W. Stremba
The Chrysler Building
405 Lexington Avenue
New York, NY  10174
(212) 704-6393

*Attorneys for Plaintiff IHS Liquidating LLC*

# EXHIBIT A

# TO EXHIBIT 1

*Declarations*
*Excess Liability Catastrophe Policy*

CIGNA Property & Casualty



CIGNA

| PRODUCER CODE 228384 | OFFICE New York | PREVIOUS POLICY NUMBER XLX G19524139 | |
|---|---|---|---|
| AUDIT FREQUENCY None | PRODUCER TRI CITY INSURANCE BROKERS INC | | |
| NAMED INSURED IS: Corporation | BUSINESS OF INSURED On File With Company | | PIIC 8093 |

Policy Number: XLX G19545507

Policy Period:   From 01/01/1999 to 01/01/2000
12:01 A.M. Standard Time at the Address of the Named Insured as stated herein

| NAMED INSURED AND ADDRESS | COVERAGE IS PROVIDED IN THE COMPANY DESIGNATED BELOW |
|---|---|
| INTEGRATED HEALTH SERVICES, INC.<br>10065 RED RUN BOULEVARD<br>OWINGS MILLS, MD 21117 | Indemnity Insurance Company of North America |

### Limits of Insurance

| $ 50,000,000   Each Occurrence | $ 50,000,000   Aggregate |
|---|---|

### Underlying Insurance Limits

| $ 50,000,000   Each Occurrence | $ 50,000,000   Aggregate |
|---|---|

### Premium

Basis of Premium:   Flat Charge.

| $ 45,000   Advance Premium | $ 45,000   Annual Minimum Premium |
|---|---|

### Schedule of Underlying Insurance
First Policy of Underlying Insurance

Company Zurich Insurance Company
Policy Number  On file with Co.
Expiration Date  01/01/2000

Limits of Insurance
$   50,000,000   Each Occurrence
$   50,000,000   Aggregate

### Endorsements Attached to and forming a part of this Policy at inception:

CC-1K11A   Signature Endorsement
XS-1V24   Maryland Changes - Cancellation Non-Renewal & State Required Conditions

| DATE OF ISSUE 05/18/1999 | SIGNATURE OF AUTHORIZED AGENT |
|---|---|

XS-9U59 (12/94)

## SIGNATURES

| Named Insured | | | Endorsement Number |
|---|---|---|---|
| Policy Symbol | Policy Number | Policy Period | Effective Date of Endorsement |
| Issued By (Name of Insurance Company) | | | |

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

THE ONLY SIGNATURES APPLICABLE TO THIS POLICY ARE THOSE REPRESENTING THE COMPANY NAMED ON THE FIRST PAGE OF THE DECLARATIONS.

**By signing and delivering the policy to you, we state that it is a valid contract.**

**INDEMNITY INSURANCE COMPANY OF NORTH AMERICA**
1601 Chestnut Street, Philadelphia, Pennsylvania 19192

*George D. Mulligan*
GEORGE D. MULLIGAN, Secretary

*Dennis Kane*
DENNIS KANE, President

---

**BANKERS STANDARD FIRE AND MARINE COMPANY**
1601 Chestnut Street, Philadelphia, Pennsylvania 19192

**BANKERS STANDARD INSURANCE COMPANY**
1601 Chestnut Street, Philadelphia, Pennsylvania 19192

**CIGNA INDEMNITY INSURANCE COMPANY**
1601 Chestnut Street, Philadelphia, Pennsylvania 19192

**CIGNA INSURANCE COMPANY**
1601 Chestnut Street, Philadelphia, Pennsylvania 19192

**CIGNA PROPERTY AND CASUALTY INSURANCE COMPANY**
900 Cottage Grove Road, Bloomfield, Connecticut 06002

**INSURANCE COMPANY OF NORTH AMERICA**
1601 Chestnut Street, Philadelphia, Pennsylvania 19192

**PACIFIC EMPLOYERS INSURANCE COMPANY**
1601 Chestnut Street, Philadelphia, Pennsylvania 19192

**CIGNA FIRE UNDERWRITERS INSURANCE COMPANY**
1601 Chestnut Street, Philadelphia, Pennsylvania 19192

*George D. Mulligan*
GEORGE D. MULLIGAN, Secretary

*Richard C. Franklin*
RICHARD C. FRANKLIN, President

Authorized Agent

CC-1K11a (5/96) Ptd. in U.S.A.

**MARYL  )  CHANGES — CANCELLATION,   ONRENEWAL AND STATE REQUIRED CONDITIONS**

| Name Insured | | | | Endorsement Number |
| --- | --- | --- | --- | --- |
| Policy Symbol | Policy Number | Policy Period | TO | Effective Date of Endorsement |
| Issued By (Name of Insurance Company) | | | | |

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### This endorsement modifes insurance provided under the following:

**COMMERCIAL UMBRELLA LIABILITY POLICY
EXCESS LIABILITY POLICY
EXCESS LIABILITY CATASTROPHE POLICY**

I.  The following is added to **SECTION IV** - CONDITIONS:

NONRENEWAL

If we decide not to renew this Policy we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 45 days before the expiration date. Even if we do not comply with these terms, this Policy will terminate:

(1)  On the expiration date, if:

    (a)  You fail to perform any of your obligations in connection with the payment of premium for the Policy or the renewal of the Policy or any installment payment, whether payable directly to us or our agents or indirectly under any premium finance plan or extension of credit;

    (b)  We have indicated our willingness to renew this Policy to you or your representative;

    (c)  You have notified us or our agent that you do not want to renew this Policy; or

(2)  On the effective date of any other insurance policy issued as a replacement for any insurance afforded by this policy, with respect to insurance to which both policies apply.

Authorized Agent

XS-1V24 (1/95) Printed in U.S.A.

# Excess Liability C.. ..astrophe Policy

**CIGNA Property & Casualty**



**CIGNA**

WE, the Company named in the Declarations, relying upon the statements shown on the Declarations page and in the Schedule of UNDERLYING INSURANCE attached to this policy, and in return for the payment of the premium and subject to the terms, conditions, exclusions, and limits of insurance of this policy, agree with YOU as follows:

## SECTION I
## INSURING AGREEMENTS

### A. COVERAGE

WE will pay on YOUR behalf the ULTIMATE NET LOSS (1) in excess of all UNDERLYING INSURANCE, and (2) only after all UNDERLYING INSURANCE has been exhausted by the payment of the limits of such insurance for losses arising out of OCCURRENCES that take place during OUR policy period and are insured by all of the policies designated in the Declarations as UNDERLYING INSURANCE. If any UNDERLYING INSURANCE does not pay a loss for reasons other than the exhaustion of an aggregate limit of insurance, then WE shall not pay such loss.

The Definitions, Terms, Conditions, Limitations, and Exclusions of the "first policy of UNDERLYING INSURANCE", in effect at the inception date of this policy, apply to this coverage unless they are inconsistent with provisions of this policy, or relate to premium, subrogation, any obligation to defend, the payment of expenses, limits of insurance, cancellation or any renewal agreement.

### B. LIMITS OF INSURANCE

The Limit of Insurance stated in the Declarations as applicable to "each OCCURRENCE" shall be the total limit of OUR liability for all covered damages sustained as the result of any one OCCURRENCE.

The Limit of Insurance stated in the Declarations as "aggregate" shall be the total limit of OUR liability for all covered damages sustained during each annual period of this policy; and for which any UNDERLYING INSURANCE provides coverage that is subject to an aggregate limit. If the UNDERLYING INSURANCE limit has been reduced or exhausted solely by reason of losses paid thereunder arising out of OCCURRENCES which take place during OUR policy period, then this policy shall:

1. in the event of reduction, pay the excess of the reduced underlying limit;

2. in the event of exhaustion continue in force as UNDERLYING INSURANCE.

The aggregate limit in this policy shall apply separately for each coverage as to which all underlying policies provide an aggregate limit.

### C. DEFENSE PROVISIONS AND SUPPLEMENTAL PAYMENTS

1. DEFENSE PROVISIONS

When insurance is available to YOU in any UNDERLYING INSURANCE, WE shall not be called upon to assume charge of the investigation, settlement or defense of any SUIT brought against YOU, but WE shall have the right and be given the opportunity to be associated in the defense and trial of any SUITS relative to any occurrence which, in OUR opinion, may create liability on the part of US under the terms of this policy.

We will assume charge of the settlement or defense of any SUIT brought against YOU to which this policy applies and to which no UNDERLYING INSURANCE applies because of the exhaustion of aggregate limits of insurance.

If WE assume any right, opportunity or obligation, WE shall not be obligated to defend any SUIT after the applicable limits of this policy have been exhausted.

2. SUPPLEMENTAL PAYMENTS

The only Supplemental Payments and expenses that WE shall pay under this policy are as follows:

a. All expenses incurred by US;

b. All interest on that part of any judgement which accrues after entry of the judgement and before WE have paid, offered to pay, or deposited in court that part of the judgement which does not exceed the limit of liability, and to which this policy applies;

c. If all UNDERLYING INSURANCE pays pre-judgement interest, then WE will pay related pre-judgement interest awarded against YOU on that part of the judgement WE pay. If WE make an offer to pay the applicable limit of insurance, WE will not pay any pre-judgement interest based on that period of time after the offer.

3. Subject to all of the foregoing:

a. If Defense and/or Supplemental payment expenses are included within the limit of insurance of any UNDERLYING INSURANCE, then any such expense payment WE make shall reduce the limit of insurance of this policy.

b. If none of the policies of UNDERLYING INSURANCE include Defense and/or Supplemental payment expenses within the limit of insurance, then any such expense payment WE make shall not reduce the limit of insurance of this policy.

## SECTION II (EXCLUSIONS)
## WHAT IS NOT COVERED BY THIS POLICY

This insurance does not apply:

A. To any injury, damage, expense, cost, loss, liability, or legal obligation arising out of or in any way related to asbestos or asbestos-containing materials.

B. To any injury, damage, expense, cost, loss, liability or legal obligation arising out of or in any way related to pollution, however caused.

Pollution includes the actual, alleged or potential presence in or introduction into the environment of any substance, if such substance has or is alleged to have the effect of making the environment impure, harmful, or dangerous. Environment includes any air, land, structure or the air therein, watercourse or water, including underground water.

If such insurance is available to YOU in the UNDERLYING INSURANCE and for the full limits of liability shown therein, this exclusion does not apply to liability caused by heat, smoke or fumes from a hostile fire. As used in the exclusion, a hostile fire means one which becomes uncontrollable or breaks out from where it was intended to be.

C. To any injury, damage, expense, cost, loss, liability or legal obligation arising out of or in any way related to the toxic properties of lead or lead-containing products, materials or substances. This exclusion applies to all forms of lead, including but not limited to solid, liquid, vapor and fumes.

D. To any claim or claims arising out of the Employee Retirement Income Security Act (ERISA) of 1974, Public Law 93-406, commonly referred to as the Pension Reform Act of 1974, including any amendments or revisions thereto.

E. To any liability for injury or damages due to war, whether or not declared, or any act or condition incident to war. War includes civil war, acts of terrorism, insurrection, rebellion or revolution.

F. To any liability:

1. With respect to which the insured under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, or Nuclear Insurance Association of Canada, or would be an insured under any such policy but for its termination upon exhaustion of its limits of liability; or

2. Resulting from the hazardous properties of nuclear material and with respect to which (a) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (b) the insured is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization; or

3. Resulting from the hazardous properties of nuclear material, if:

a. The nuclear material (a) is at any nuclear facility owned by, or operated by or on behalf of the insured or (b) has been discharged or dispersed therefrom;

b. The nuclear material is contained in spent fuel or waste at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of the insured; or

c. The injury or damage arises out of the furnishing by the insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility, but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (3) applies only to property damage to any property at the nuclear facility.

As used in this exclusion:

a. Hazardous properties include radioactive, toxic, or explosive properties;

b. Nuclear material means source material, special nuclear material, or byproduct material;

c. Source material, special nuclear material, and byproduct material have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof;

d. Spent fuel means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a nuclear reactor;

e. Waste means any waste material (1) containing byproduct material other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its source material content, and (2) resulting from the operation by any person or organization of any nuclear facility included under the first two paragraphs of the definition of nuclear facility;

XS-4U19 (5/94)

f. Nuclear facility means:

1. Any nuclear reactor;

2. Any equipment or device designed or used for (a) separating the isotopes of uranium or plutonium, (b) processing or utilizing spent fuel, or (c) handling, processing or packaging waste;

3. Any equipment or device used for the processing, fabricating or alloying of special nuclear material if at any time the total amount of such material in the custody of the insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

4. Any structure, basin, excavation, premises, or place prepared or used for the storage or disposal of waste; and

5. The site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

g. Nuclear reactor means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material;

h. Property damage includes all forms of radioactive contamination of property.

We shall have no duty or obligation to provide or pay for the investigation or defense of any suit excluded in this section, and in connection therewith Defense Provisions and Supplemental Payments shall not apply.

## SECTION III
## DEFINITIONS

A. OCCURRENCE means an accident including continuous or repeated exposure to substantially the same general harmful conditions.

B. OTHER INSURANCE means insurance, other than UNDERLYING INSURANCE, which has been provided to YOU and affords coverage with respect to injury or damage to which this policy also applies.

C. ULTIMATE NET LOSS means the amount paid or payable in cash in the settlement or satisfaction of claims for which the insured is liable, either by adjudication or compromise with OUR written consent, after making proper deduction for all recoveries and salvages.

Defense expense payments shall be included within the ULTIMATE NET LOSS, provided that such expenses are included within the terms, conditions, and limits of insurance of any UNDERLYING INSURANCE.

D. UNDERLYING INSURANCE means the policy or policies of insurance as described in the Declarations and Schedule of Underlying Insurance forming a part of this policy.

E. WE, US and OUR means the company shown in the Declarations as providing this insurance.

F. YOU and YOUR means a person or organization who qualifies as an insured in all of the underlying policies.

## SECTION IV
## CONDITIONS

A. APPEALS

If YOU or any of the underlying insurers elect not to appeal a judgement in excess of the limits of liability afforded by the UNDERLYING INSURANCE, or any OTHER INSURANCE available to YOU, WE may elect to appeal. OUR limit of liability shall not be increased because of the appeal, except that WE will make the appeal at OUR cost and expense.

B. ASSIGNMENT

Interest in this policy may not be transferred to another, except by an endorsement issued by US which gives OUR consent. If YOU are bankrupt or insolvent or if YOU die, this policy shall cover YOUR legal representative(s), but only while acting within the scope of their duties as such.

C. BANKRUPTCY AND INSOLVENCY

Bankruptcy and insolvency of YOU, or YOUR estate will not relieve US of OUR obligations under this policy.

D. CANCELLATION

This policy may be cancelled by the first Named Insured by mailing to US written notice stating when such cancellation shall be effective.

This policy may be cancelled by US by mailing to the first Named Insured at YOUR last known address, written notice stating when, not less than sixty (60) days thereafter, fifteen (15) days if cancellation is for non-payment of any unpaid portion of the premium, such cancellation shall be effective. The mailing of notice shall be sufficient proof of notice. The effective date and hour of cancellation stated in the notice shall be the end of the policy period.

If YOU cancel, earned premium shall be computed in accordance with the applicable short rate table or procedure. If WE cancel, earned premium shall be computed pro-rata. Premium adjustment may be made at the time cancellation becomes effective. OUR check or the check of OUR representative mailed to YOU shall be sufficient proof of any refund or premium due YOU.

E. CHANGES

This policy may be changed only by an endorsement issued by US to form a part of the policy.

F. DUTIES IN THE EVENT OF OCCURRENCE, OFFENSE, CLAIM OR SUIT

1. YOU must see to it that WE receive prompt written notice of an OCCURRENCE or an offense which may result in a claim. Notice should include:

   a. How, when and where the OCCURRENCE or offense took place;

   b. The names and addresses of any injured persons and witnesses.

2. If a claim is made or suit brought against YOU, YOU must see to it that WE receive written notice of the claim or suit as soon as practicable.

3. YOU and any other involved insured must:

   a. Immediately send US copies of any demands, notices, summons or legal papers received in connection with the claim or suit.

   b. Authorize US to obtain records and other information;

   c. Cooperate with US in the investigation, settlement or defense of the claim or suit;

   d. Assist US, upon OUR request, in the enforcement of any right against any person or organization which may be liable to YOU because of injury or damage to which this policy may also apply.

4. YOU shall not make or authorize an admission of liability or attempt to settle or otherwise dispose of any claim or suit without OUR written consent.

G. INSPECTION AND AUDIT

WE shall be permitted but not obligated to inspect YOUR property and operations. Neither OUR right to make inspections nor the making thereof nor any report thereon shall constitute an undertaking, on behalf of or for the benefit of YOU or others, to determine or warrant that such property or operations are safe.

WE may examine and audit YOUR books and records during this policy period and extensions thereof and within three (3) years after the final termination of this policy.

H. LEGAL ACTION AGAINST US

No person or organization has a right under this policy to:

1. Join US as a party or otherwise bring US into a SUIT asking for damages from YOU;

2. Sue US, unless all of the terms of this policy have been fully complied with.

A person or organization may sue US to recover on an agreed settlement or on a final judgement against YOU obtained after trial. WE will not be liable for damages that are not payable under the terms of this policy or that are in excess of the applicable limit of this policy. An agreed settlement means a settlement and release of liability signed by US, YOU, and the claimant or the claimant's legal representative.

I. MAINTENANCE OF UNDERLYING INSURANCE

The policy or policies referred to in the Declarations and schedule of UNDERLYING INSURANCE or renewals or replacements thereof not more restrictive in coverage shall be maintained in full effect during this policy period, except for any reduction in the aggregate limits solely by payment of covered claims and/or claims expense.

If such UNDERLYING INSURANCE is not maintained in full effect, or if any limits of liability of UNDERLYING INSURANCE are:

1. less than as stated in the schedule of UNDERLYING INSURANCE; or

2. unavailable due to bankruptcy or insolvency of an underlying insurer; or

3. if there is any material change in the coverage of any UNDERLYING INSURANCE;

then the insurance afforded by this policy shall apply in the same manner as if such UNDERLYING INSURANCE and limits of liability had been in effect, available, so maintained and unchanged.

J. OTHER INSURANCE

If OTHER INSURANCE, whether collectible or not, is available to YOU covering a loss also covered by this policy, other than a policy that is specifically written to apply in excess of this policy, the insurance afforded by this policy shall apply in excess of and shall not contribute with such OTHER INSURANCE.

K. PREMIUM

Unless otherwise provided, the premium for this policy is a flat premium and is not subject to adjustment except as provided herein or amended by endorsement.

L. YOUR REPRESENTATIONS

By accepting this policy, YOU agree that:

1. The statements in the Declarations, Schedule of UNDERLYING INSURANCE, and Application for this policy are accurate and complete;

2. Those statements are based upon representations YOU made to US;

3. This policy has been issued in reliance upon YOUR representations.

M. SEPARATION OF INSUREDS

Except with respect to the Limits of Insurance, this policy applies:

1. As if each insured were the only insured;

2. Separately to each insured against whom claim is made or suit brought.

N. SUBROGATION

In the event of any payment under this policy by US, WE shall be subrogated to all of YOUR rights of recovery against any person or organization, and YOU shall execute and deliver instruments and papers and do whatever else is necessary to secure such rights. YOU shall do nothing after loss to prejudice such rights.

The amount recovered through subrogation shall be apportioned in the inverse order of payment of the ULTIMATE NET LOSS to the extent of the actual payment. The expenses of all recovery proceedings shall be apportioned in the ratio of respective recoveries.

WE have no duty to provide coverage under this policy unless YOU and any other involved insureds have fully complied with the conditions of this policy.

IN WITNESS WHEREOF, the company has caused this policy to be executed and attested, but this policy shall not be valid unless countersigned by a duly authorized representative of the Company.

XS-4U19 (5/94)