**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re:<br><br>INTEGRATED HEALTH SERVICES, INC., *et al.*,<br><br><div align="center">Debtors.</div> | | Chapter 11<br><br>Case No. 00-389 (MFW)<br><br>(Jointly Administered) |
| IHS LIQUIDATING LLC,<br><br><div align="center">Plaintiff,</div><br><div align="center">v.</div><br><br>ACE INDEMNITY INSURANCE COMPANY<br>f/k/a INDEMNITY INSURANCE COMPANY<br>OF NORTH AMERICA,<br><br><div align="center">Defendant</div> | | Civil Action No. 05-376 (GMS) |
| IHS LIQUIDATING LLC,<br><br><div align="center">Third-Party Plaintiff</div><br><div align="center">v.</div><br><br>NATIONAL UNION FIRE INSURANCE<br>COMPANY OF PITTSBURGH, PA,<br>GENERAL STAR INDEMNITY COMPANY,<br>and ACE INDEMNITY INSURANCE COMPANY<br>f/k/a INDEMNITY INSURANCE COMPANY OF<br>NORTH AMERICA<br><br><div align="center">Third-Party Defendants</div> | | |

**THIRD-PARTY DEFENDANT AND FOURTH PARTY PLAINTIFF,**
**INDEMNITY INSURANCE COMPANY OF NORTH AMERICA'S**
**MOTION FOR SUMMARY JUDGMENT**

## PRELIMINARY STATEMENT

Defendant, Third-Party Defendant and Fourth-Party Plaintiff, Indemnity Insurance Company of North America (hereinafter "IICNA"), by and through its attorneys, moves this Honorable Court as follows:

## BACKGROUND

**A.     Procedural History**

1.      IICNA instituted an adversarial proceeding against Integrated Health Services, Inc. (hereinafter "IHS") and ABE Briarwood Corp. (hereinafter "Briarwood") by filing a Complaint in the United States Bankruptcy Court for the District of Delaware (hereinafter "Bankruptcy Court") on August 15, 2003.  (Bankruptcy Adversary Docket No. 1).  This adversarial proceeding sought a declaration of IICNA's rights and obligations under IICNA's Excess Catastrophe Liability policy No. XLX G20108034, effective January 1, 2000 (hereinafter the "2000 policy") only.

2.      On November 11, 2003, defendants IHS and Briarwood filed an Answer to the Complaint (Bankruptcy Adversary Docket No. 6).

3.      By Order dated December 2, 2004, this Honorable Court granted IICNA's Motion for Withdrawal of the Reference and withdrew the reference of IICNA's adversary proceeding from the Bankruptcy Court.  (Civil Action No. 04-1262 (GMS), District Court Docket No. 7).

4.      No scheduling order has been entered in this adversary proceeding.

5.      In early 2005, IICNA was informed that the aggregate limits to the policy directly underlying IICNA's Excess Catastrophe Liability policy No. XLX G1952413, effective January 1, 1999, were nearing exhaustion.

6.      IICNA investigated the status of the underlying aggregate erosion and informed counsel for IHS Liquidating LLC that IICNA's coverage may not have been triggered and that it intended to file a Declaratory Judgment action to have IICNA's rights and obligations under its Excess Catastrophe Liability policy No. XLX G1952413, effective January 1, 1999 (hereinafter the "1999 Policy") judicially determined.

6.      IICNA investigated the status of the underlying aggregate erosion and informed counsel for IHS Liquidating LLC that IICNA's coverage may not have been triggered and that it intended to file a Declaratory Judgment action to have IICNA's rights and obligations under its Excess Catastrophe Liability policy No. XLX G1952413, effective January 1, 1999 (hereinafter the "1999 Policy") judicially determined.

7.      Pursuant to this Honorable Court's local rules, on April 13, 2005, IICNA provided counsel for IHS Liquidating LLC (hereinafter the "Liquidating LLC") with a copy of a proposed Amended Complaint for Declaratory Judgment for review and approval.  The proposed Amended Complaint retained all of IICNA's prior averments related to its 2000 Policy and added certain averments related to its 1999 Policy.

8.      Counsel for the Liquidating LLC refused to give its consent, therefore IICNA filed its Motion to Amend with a copy of the Amended Complaint on May 6, 2005.

9.      On or about that same date, the Liquidating LLC filed a Complaint in the Bankruptcy Court seeking a declaration of IICNA's rights and obligations under its 1999 Policy.

10.      IICNA responded by filing a Motion to Withdraw the Reference and a Motion For Determination Pursuant to Del.Bankr.L.R. 5011-1 For Determination

Whether Proceeding Is Core. Separately, IICNA filed an Answer to the Liquidating LLC's Complaint and Counter-Claim.

11.     The Liquidating LLC Answered IICNA's Counter-Claim and filed a Third-Party Complaint against IICNA, National Union Fire Insurance Company of Pittsburgh, PA (hereinafter "National Union") and General Star Indemnity Company (hereinafter "GenStar").

12.     IICNA, National Union and GenStar filed Answers to the Liquidating LLC's Third-Party Complaint.

13.     Shortly thereafter, the Liquidating LLC filed a Motion for Partial Summary Judgment, to which IICNA responded. The Liquidating LLC then filed a Reply Brief and Request for Oral Argument.

14.     On March 16, 2006 this Honorable Court granted IICNA's Motion to Withdraw the Reference.

15.     On August 31, 2006, a Scheduling Order was issued which set October 31, 2006 as the deadline for filing Amended Pleadings. In Compliance with this Honorable Court's Order, IICNA filed a timely Motion to Amend to assert certain claims for relief directly against the underlying carriers. On February 20, 2007, this Honorable Court granted IICNA's Motion to Amend which enabled the parties to engage in discovery with regard to the terms and conditions of the underlying policies.

   **B.     <u>Relationship of Parties</u>**

16.     The parties are insurance carriers each of which issued policies to Integrated Health Services, Inc. for two consecutive coverage periods the first of which was January 1, 1999 to January 1, 2000 and the second was January 1, 2000 to January 1,

2001.  Each carrier's policy is unique, with different coverage, limits, terms, definitions, exclusions and endorsements.

C.     **Insurance Coverage**

*1.     1999 Coverage*

17.     Integrated Health Services, Inc. (hereinafter "IHS") was a health care corporation organized under the laws of Delaware and having its principle place of business is Maryland.  At the times relevant hereto, coverage was provided to IHS on a calendar year basis.

18.     From January 1, 1999 through January 1, 2000, IHS was insured at the primary level by Reliance National Insurance Company under a matching deductible Health Care Medical Professional Liability and General Liability policy No. NGB 0151564-00 (the "Reliance Policy").

19.     National Union issued two separate Commercial Umbrella policies providing coverage during the period January 1, 1999 to January 1. 2000.  Both policies provide professional liability and general liability coverage in excess of the Reliance Policy.

20.     National Union's Commercial Umbrella Policy No. BE 357-43-43 (hereinafter the "1999 Main Policy") was issued to Integrated Health Services, Inc. (hereinafter "IHS") which provided limits of coverage of $25,000,000.00 per occurrence/aggregate in excess of the Reliance Policy.  On information and belief, IHS paid $725,000.00 for this coverage.[1]

---

[1] At various times throughout this litigation and an earlier action between IHS and National Union, National Union has produced numerous "versions" of the 1999 Main Policy, each of which has differing terms and conditions.  At no time, however, has any version contained a "Non-Pyramiding of Limits"

21.     National Union also issued Commercial Umbrella Policy No. BE 357-43-44 (hereinafter the "1999 Lester Policy") to Integrated Health Services of Lester, Inc. (hereinafter "IHS of Lester") which provided limits of coverage of $2,000,000.00 per occurrence/aggregate in excess of the Reliance Policy.  On information and belief, IHS of Lester paid $16,000.00 for this coverage.  A copy of the 1999 Lester Policy is attached hereto as Exhibit "A".[2]

22.     The next $25,000,000.00 per occurrence/aggregate layer of coverage was provided by GenStar.  This layer is in excess of the National Union's policies, which are further in excess of the Reliance Policy.

23.     The last known layer of insurance is a Catastrophe Excess Liability Policy No. XLXG1 9524139, with limits of $50,000,000.00 each occurrence/aggregate (the "1999 IICNA Policy") issued by IICNA.  The 1999 IICNA Policy is triggered only upon the exhaustion of the underlying coverage by *payment.*  A copy of the 1999 IICNA Policy is attached hereto as Exhibit "B".

**Pertinent Policy Provisions:**

24.     As originally issued, the 1999 Main Policy contained a Broad Named Insured Amendatory endorsement which provided:

**<u>BROAD NAMED INSURED-AMENDATORY</u>**

> The definition of Named Insured (IV E1 a and b) is amended to include any partnership, interest in a joint venture[*], subsidiary controlled or proprietary company, corporations, firm, organization or other entity as now exists or may hereafter be constituted, formed or acquired

---

endorsement.  As IICNA is not certain which version of the 1999 Main Policy is the "final" version, no copy is attached to this pleading.
    [2] IICNA has requested and received only one version of the 1999 Lester Policy.  Note that it does not contain a "Non-Pyramiding of Limits" endorsement.

where the Named Insured has at least 50% ownership
interest or management control.

However, this policy shall exclude all coverage and limits
for the exposure of **Integrated Health Services of Lester,
Inc.** and its interests in other entities.

\* See Joint Venture Endorsement for additional conditions.

**ALL OTHER TERMS AND CONDITIONS REMAIN
UNCHANGED.**

(Emphasis in original).

25.     The 1999 Lester Policy Contained an endorsement which provides:

## <u>AMENDATORY ENDORSEMENT</u>

It is hereby understood and agreed that this policy shall not
respond to any insureds, named insureds or additional
insureds covered under policy BE 357-43-43 for Integrated
Health Services, Inc.

ALL OTHER TERMS AND CONDITIONS REMAIN
UNCHANGED.

26.     Pursuant to the foregoing endorsements, the 1999 IHS Main Policy and

the 1999 Lester Policy provide mutually exclusive coverage.

27.     Shortly after National Union issued the 1999 IHS Main Policy and the

1999 Lester Policy the broker, Lockton Insurance Services (hereinafter "Lockton") sent a

"fax memo" to National Union documenting the numerous errors Lockton had discovered

in the policies as issued.  The "fax memo" dated May 28, 1999, states that Integrated

Health Services of Lester, Inc. (hereinafter "IHS of Lester") should not be excluded from

coverage under the 1999 IHS Main Policy.  Further, the "fax memo" states that the 1999

IHS of Lester Policy should be included on the Schedule of Underlying Insurance as an

underlying to the 1999 IHS Main Policy.  A true and correct copy of the May 28, 1999

"fax memo" is attached hereto as Exhibit "C" and incorporated herein by reference.  The

May 28, 1999 "fax memo" attached hereto was made available to IICNA through

discovery requests served on National Union.

     28.     The 1999 IICNA Policy provides, in part, as follows:

> **SECTION I**
> **INSURING AGREEMENTS**
>
> A.     COVERAGE
>
> WE will pay on YOUR behalf the ULTIMATE NET LOSS
> (1) in excess of all UNDERLYING INSURANCE and (2)
> ***only after all UNDERLYING INSURANCE has been***
> ***exhausted by the payment of the limits of such insurance***
> for losses arising out of OCCURRENCES that take place
> during OUR policy period and are insured by all of the
> policies designated in the Declarations as UNDERLYING
> INSURANCE.  If any UNDERLYING INSURANCE does
> not pay a loss for reasons other than the exhaustion of an
> aggregate limit of insurance then WE shall not pay such
> loss.  (Emphasis added).
>
> The Definitions, Terms, Conditions, Limitations and Exclusions of
> the "first policy of UNDERLYING INSURANCE", in effect at the
> inception date of this policy, apply to this coverage unless they are
> inconsistent with provisions of this policy, or relate to premium,
> subrogation, any obligation to defend, the payment of expenses,
> limits of insurance, cancellation or any renewal agreement.
>
> **SECTION III**
> **DEFINITIONS**
>
> ULTIMATE NET LOSS means the amount paid or payable in cash
> in the settlement or satisfaction of claims for which the insured is
> liable, either by adjudication or compromise with OUR written
> consent, after making proper deduction for all recoveries and
> salvages.

     29.     The "first policy of UNDERLYING INSURANCE" to the 1999 IICNA

Policy was the 1999 Main Policy.

     ***2.     2000 Coverage***

30.     National Union issued Commercial Umbrella Policy No. BE 357-43-84 for the policy period January 1, 2000 to January 1, 2002 (hereinafter the "2000 Main Policy"). The "*insured*" identified in the Declarations is Integrated Health Services, Inc. Only the coverage available during the January 1, 2000 to January 1, 2001 period are at issue in this litigation.

31.     The 2000 Main Policy provides limits of coverage of $25,000,000.00 per occurrence/aggregate in excess of a self-insured retention with limits of $1,000,000.00 per occurrence/$5,000,000.00 general liability aggregate and $2,000,000.00 each medical incident/$14,000,000.00 professional liability aggregate. On information and belief, the "*insured*" paid $1,900,000.00 for the 2000 Main Policy. A copy of the 2000 Mail Policy is attached hereto as Exhibit "D".[3]

32.     National Union also issued Commercial Umbrella Policy No. BE 357-43-86 for the period January 1, 2000 to January 1, 2001 (hereinafter the "2000 Lester Policy"). The Declarations to the 2000 Lester Policy identifies the "*insured*" as "Integrated Health Services of Lester". Pursuant to Endorsement #3, the applicable limits are $2,000,000 each occurrence/$2,000,000 aggregate in excess of the underlying self-insured retention. On information and belief, the "*insured*" paid $19,000.00 for this coverage. A copy of the 2000 Lester Policy as provided by National Union to IICNA is attached hereto as Exhibit "E".[4]

---

[3] As with the 1999 Main Policy, throughout the course of this litigation, IICNA has been presented with numerous versions of the 2000 Main Policy. As such, IICNA does not know which version is the "final" version or if, in fact, a "final" version has yet been issued. The copy attached was provided to IICNA by National Union's third-party claims administrator and agent, Hamlin & Burton Liability Management, Inc. upon the purported exhaustion of the underlying coverage and the tender of IHS professional liability claims to IICNA in or about February 2003.

[4] As with the 1999 Lester Policy, National Union has only provided IICNA with one version of the 2000 Lester Policy.

33.    GenStar issued Excess Liability Policy IXG-347714C to Integrated Health Services, Inc. for the period January 1, 2000 to January 1, 2001 (hereinafter the "2000 GenStar Policy").  The 2000 GenStar Policy provides limits of $25,000,0000 each occurrence Bodily Injury and/or Property Damage liability combined/$25,000,000 aggregate (where applicable) in excess of underlying limits.

34.    IICNA issued Excess Catastrophe Liability Policy No. XLXG20108034 to IHS for the period January 1, 2000 to January 1, 2001 (hereinafter the "2000 IICNA Policy").  The 2000 IICNA Policy provides limits of $50,000,000 each occurrence/$50,000,000 aggregate in excess of underlying coverage.  The 2000 IICNA Policy is attached hereto as Exhibit "F".

<div align="center">

**Pertinent Policy Provisions:**

</div>

35.    At issuance, the 2000 Main Policy contained endorsement No. 5, which provides as follows:

<div align="center">

**<u>BROAD NAMED INSURED-AMENDATORY</u>**

</div>

The definition of Named Insured (IV E1 a and b) is amended to include any partnership, interest in a joint venture[*], subsidiary controlled or proprietary company, corporations, firm, organization or other entity as now exists or may hereafter be constituted, formed or acquired where the Named Insured has at least 50% ownership interest or management control.

However, this policy shall exclude all coverage and limits for the exposure of **Integrated Health Services of Lester, Inc.** and its interests in other entities.

* See Joint Venture Endorsement for additional conditions.

**ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.**

(Emphasis in original).

37.     At issuance, the 2000 Lester Policy contained the exact same endorsement as included above.

38.     At issuance, the 2000 Main Policy contained endorsement No. 4, which provides as follows:

Non-Pyramiding of Limits

If damages covered by this policy are also covered in whole or part by Policy Numbers 357-43-86 and 357-43-88. our total Limits of Insurance under all policies combined shall be:

| | |
|---|---|
| $25,000,000 | Each Occurrence Limit |
| $25,000,000 | Each Medical Incident Limit |
| $25,000,000 | Products Completed Operations Aggregate Limit |
| $25,000,000 | Medical Professional Aggregate Limit |
| $25,000,000 | General Aggregate Limit |

39.     At issuance, the 2000 Lester Policy contains a similar endorsement, however, Policy Number 357-43-84 is substituted for policy number 357-43-86.  The endorsement in the 2000 Lester Policy is also identified as Endorsement No. 4.

40.     The 2000 IICNA Policy contains the same relevant provisions as did the 1999 IICNA Policy:

**SECTION I
INSURING AGREEMENTS**

A.     COVERAGE

WE will pay on YOUR behalf the ULTIMATE NET LOSS (1) in excess of all UNDERLYING INSURANCE and (2) ***only after all UNDERLYING INSURANCE has been exhausted by the payment of the limits of such insurance*** for losses arising out of OCCURRENCES that take place during OUR policy period and are insured by all of the policies designated in the Declarations as UNDERLYING INSURANCE.  If any UNDERLYING INSURANCE does not pay a loss for reasons other than the exhaustion of an

aggregate limit of insurance then WE shall not pay such loss. (Emphasis added).

The Definitions, Terms, Conditions, Limitations and Exclusions of the "first policy of UNDERLYING INSURANCE", in effect at the inception date of this policy, apply to this coverage unless they are inconsistent with provisions of this policy, or relate to premium, subrogation, any obligation to defend, the payment of expenses, limits of insurance, cancellation or any renewal agreement.

**SECTION III**
**DEFINITIONS**

ULTIMATE NET LOSS means the amount paid or payable in cash in the settlement or satisfaction of claims for which the insured is liable, either by adjudication or compromise with OUR written consent, after making proper deduction for all recoveries and salvages.

40.    The "first policy of the UNDERLYING INSURANCE" to the 2000 IICNA Policy was the 2000 Main Policy.

41.    Shortly after the issuance of the 2000 Main Policy and the 2000 Lester Policy, National Union received a "fax memo" from the broker, Lockton. The "fax memo", dated April 12, 2000 documented the numerous differences between the policies as bound and the policies as issued. A copy of the April 12, 2000 "fax memo" is attached hereto as Exhibit "G".

42.    Notably, the April 12, 2000 "fax memo" specifically informed National Union that the "Non-Pyramiding of Limits" endorsement, Endorsement No. 4, should be removed from both the 2000 Main Policy and the 2000 Lester Policy.

43.    In addition, the April 12, 2000 "fax memo" informed National Union that the exclusion for IHS of Lester, as contained in the 2000 Main Policy, should be removed as IHS of Lester as included in the coverage. The 2000 Lester Policy was to be a scheduled underlying policy as it was supposed to be in 1999.

44.     Moreover, the April 12, 2000 "fax memo" informed National Union that the exclusion for IHS of Lester, as contained in the 2000 Lester Policy, should be removed.

**D.     <u>Claim History</u>**

*1999 Claims*

45.     On March 26, 2003, IHS filed an adversary proceeding in the Bankruptcy Court styled *Integrated Health Services, Inc. v. National Union Fire Insurance Company of Pittsburgh, PA*, adv. proc. no. 03-52081, in an effort to enforce coverage under the National Union Commercial Umbrella policy (the "National Union Adversary"). Through this action, IHS sought to compel National Union to assume administration and defense of any remaining open professional liability claims alleging residency or injury occurring during the 1999 calendar year ("1999 Claims").  IHS further alleged in the National Union Adversary that the settlement value of the open 1999 Claims was in excess of the limits of the National Union Policy and would reach, at a minimum, the next layer of coverage which is provided by GenStar.

46.     The Bankruptcy Court entered partial summary judgment in favor of IHS by Order Granting Debtors' Motion for Partial Summary Judgment dated October 23, 2003 (the "Summary Judgment Order").  The Summary Judgment Order held, *inter alia*, that National Union's Commercial Umbrella policy was triggered because IHS had entered into settlement agreements resolving numerous 1999 Claims for amounts in excess of the Reliance Policy limits.  The Court held that such settlements constituted a "legal obligation to pay", which satisfied the conditions precedent to coverage under the

National Union policy regardless of whether underlying insurance or IHS's own funds were actually paid for such claims.

47.     National Union did not appeal from the Summary Judgment Order. On information and belief, after the issuance of the Summary Judgment Order, National Union assumed the administration and defense of the 1999 Claims.

48.     At some point, National Union tendered the administration and defense of the 1999 Claims to GenStar. GenStar assumed the administration and defense of the 1999 Claims.

49.     In or about May 2005, GenStar tendered the administration and defense of the 1999 Claims to IICNA.

50.     Coverage under IICNA's Excess Catastrophe Liability policy differs significantly from that provided by National Union under its Commercial Umbrella policy in that coverage under the IICNA's Excess Catastrophe Liability policy is triggered *only by actual payment* of underlying insurance coverage and not simply upon the insured becoming "legally obligated to pay" a liability. Since the Reliance Policy was not exhausted by actual payment of policy proceeds, the 1999 IICNA Policy is not triggered.

51.     IICNA notified the Liquidating LLC that its coverage was not triggered due to the failure to exhaust the underlying limits. IICNA has, however, provided for the defense of all 1999 Claims alleging residency or injury in an IHS facility under a full and complete Reservation of Rights.

52.     IICNA has declined to defend, even under an Reservation of Rights, any 1999 Claim alleging residency or injury in an IHS of Lester facility, and has transferred all such 1999 Claims to National Union for defense under the 1999 Lester Policy.

53.     On October 31, 2006, IICNA filed Motion to Amend its pleading to assert cross-claims for improper exhaustion of the underlying limits and to, *inter alia*, seek a declaration from this Court that the 1999 IICNA Policy was not triggered due to the improper exhaustion of the underlying insurance 1999 coverage.  This Honorable Court's Order, issued February 20, 2007, granted IICNA's Motion to Amend has enabled the parties to engage in discovery related to the coverage available to IHS.

54.     This Honorable Court's February 20, 2007 Order permitted IICNA to assert similar claims with regard to the 2000 coverage.

55.     In its Fourth-Party Complaint, IICNA alleged that the limits of coverage available under the 1999 Lester Policy had not been paid, therefore, IICNA's policy was not triggered.

56.     IICNA further demanded that the limits of the 1999 Lester Policy be used for purposes of replenishing the underlying limits of the 1999 Main Policy.

57.     In its Fourth-Party Complaint, IICNA alleged that the limits of coverage available under the 2000 Lester Policy had not been paid.

58.     Rather than seeking a declaration that the 2000 IICNA Policy was not triggered, since IICNA had been defending IHS for the better part of three years under its 2000 IICNA Policy, IICNA demanded replenishment of the limits of coverage by payment of the limits of the 2000 Lester Policy.

59.    Practically speaking, this meant payment of the limits of the 2000 Lester Policy to IICNA for its use in defending the IHS and its subsidiary and affiliated entities.

60.    Shortly after the filing of IICNA's Fourth-Party Complaint, National Union agreed to provide for the defense of certain open 1999 Claims wherein there was an allegation of injury or residency at an IHS of Lester facility during the 1999 Lester Policy's coverage period.

61.    By and through its agreement to provide for the defense of 1999 claims alleging residence or injury at an IHS of Lester facility, National Union acknowledged that the limits of the 1999 Lester Policy have not been exhausted.

62.    By and through its agreement to provide for the defense of 1999 claims alleging residence or injury at an IHS of Lester facility, National Union further acknowledged that the 1999 Main Policy and the 1999 Lester Policy are not subject to a "Non-Pyramiding of Limits" endorsement.

63.    National Union has not made a similar acknowledgement with regard to the coverage available under its 2000 Main Policy and its 2000 Lester Policy.

64.    Rather, National Union continues to deny that it has any obligation to provide coverage under its 2000 Lester Policy.

### *Application And Binder*

65.    On or about, December 14, 1999 Lockton submitted a request for quotation for coverage for IHS of Lester during the 2000 coverage period.  Coverage was bound as expiring.  A copy of Lockton's request and the National Union binder are attached hereto as Exhibit "H".

66.    On or about December 14, 1999, National Union provided IHS with a quotation for coverage for Integrated Health Services, Inc. only.  The quote expressly states that it is a "renewal of" policy "357-43-43".  A copy of National Union's December 14, 1999 quote is attached hereto as Exhibit "I".

67.    The quote expressly states "[f]orm, terms and conditions to be adapted from expiring."  See pg. 2, Bates number NU-U/W 01151.[5]

68.    On or about December 27, 1999, broker Risk Strategies requested that National Union bind coverage for Integrated Health Services, Inc.  The fax transmittal identifies limits and premium for the proposed two year policy.  A copy of Risk Strategies December 27, 1999 fax is attached hereto as Exhibit "J".

69.    On or about December 27, 1999, National Union issued a binder to Integrated Health Services, Inc. for the proposed two year policy.  The binder indicates that it is a "renewal of" policy "357-43-43" and that "[f]orm, terms and conditions are to be adapted from expiring.  At no time does the binder indicate that National Union has unilaterally decided to include a "Non-Pyramiding of Limits" endorsement into the policy to be issued.  A copy of National Union's binder is attached hereto as Exhibit "K".

70.    As stated in Lockton's April 12, 2000 "fax memo", the policies as issued do not match the binder.  Many of the changes requested in the April 12, 2000 "fax memo" are attempts to correct errors carried over from National Union's 1999 coverage and more fully described in the May 28, 1999 "fax memo".  Only the removal of the Non-Pyramiding of Limits endorsement and the Retained Limits endorsement apply to the 2000 coverage.

---

[5] Previously marked as Exhibit NU ?? and identified in the deposition of National Union's 30 (b)(6) underwriting corporate designee.

71.    National Union was slow to respond and failed to timely make the corrections requested.  On January 17, 2002, Risk Strategies sent another letter requesting corrections to National Union's policies.  The January 17, 2002 letter states that "[t]he primary issue involves the discrepancies between the policy contract and the original proposal from AIG."  See January 17, 2002 letter attached hereto as Exhibit "L".

72.    The January 17, 2002 letter states that the changes requested in the April 12, 2000 "fax memo" are "self-explanatory."  However, the letter notes "none of the changes have been made."  See January 17, 2002 letter.

73.    The letter goes on to state (in its pertinent parts):

> This policy was clearly quoted, bound and issued on an occurrence basis.  I have also included Jeff Meserve's quote letter for the 1/1/200-2002 policy.  The letter states that the policy is a renewal of the 1999 policy with forms, terms and conditions as expiring . . . I understand the sensitivities regarding this policy, however, the original proposal is clear in its intent . . . This situation has lingered for far too long.

74.    During the course of discovery, IICNA was made aware of a meeting held between representatives of National Union, Integrated Health Services, Inc., and the broker involved in placing IHS's coverage.  That meeting is purported to have occurred on July 2, 2002.

75.    An agenda for that meeting was included in National Union's responses to IICNA's discovery requests and was identified as an exhibit at the deposition of National Union's 30 (b)(6) claims representative, Ms. Donna DiTuri.

76.    Ms. DiTuri's deposition was conducted in two parts, the first being taken on April 11, 2007 and the second part being taken on June 8, 2007.

77.    During the first part of Ms. DiTuri's deposition, IICNA was informed of the July 2, 2002 meeting and informed that issues related to IHS's coverage were discussed.  At that time, IICNA had not received National Union's discovery materials, therefore, IICNA reserved its right to recall Ms. DiTuri for further deposition related to National Union's discovery materials.

78.    On June 8, 2007, IICNA questioned Ms. DiTuri about the July 2, 2002 meeting.  A copy of the Agenda from that meeting is attached hereto as Exhibit "M".

79.    Ms. DiTuri testified (in part) as follows:

Q.    Okay.  Under the list of attendees for AIG, specifically, can you tell me who amongst those attendees was in the underwriting department at the time of this meeting?

A.    No one.

DiTuri, 6/8/07, p.34; 17-22

Q.    And we get to the second page, we have – there's -- correct me if I'm wrong, there's only one note that relates to the 2000 coverage; is that correct?

A.    Yes.

Q.    Now, I know that in your previous deposition, we had talked about the fact that certain coverage issues had been raised at this meeting; is that correct?

A.    Yes.

Q.    And that Mike Christian had requested certain changes to the policy, is that correct, to the best of your recollection?

A.    Yes.

Q.    Is there anything in these notes that memorializes Mr. Christian's request?

A.    Not specifically, but I noted that Mike C. will contact underwriting.

> **Q.**    Okay.
>
> **A.**    And that's what that was referring to, that he was supposed to follow up with underwriting.
>
> **Q.**    Okay.  That note, though, is under the heading 2001; is that correct?
>
> **A.**    Yes.
>
> **Q.**    Was that note intended to apply only to the 2001 policy year?
>
> **A.**    I'm not sure.
>
> DiTuri, 6/8/07, pp 36-37; 15-25, 1-20.

80.    On further examination Ms. DiTuri testified:

> **Q.**    With respect to the corrections that were made within the next month, do you know -- were you involved in making those corrections?
>
> **A.**    No.
>
> **Q.**    Do you know, as you sit here today, whether those corrections were made as a result of the meeting?
>
> **A.**    I think so.
>
> DiTuri, 6/8/07, pp. 39-40; 24-25, 1-8.

81.    National Union's file material contains a page of handwritten notes dated July 12, 2002 and Bates numbered NU-U/W 01210, a copy of which is attached hereto as Exhibit "N".

82.    According to the July 12, 2002 notes, National Union wrote the "'99-00" policy over "Reliance" and that the policy was "renewed again to 2002 (same as expiring".

83.    National Union has not produced any documentation rejecting the brokers request to have the Non-Pyramiding of Limits endorsement removed from the 2000 Main Policy and the 2000 Lester Policy.

84.    Rather, National Union has been silent.

### 2000 Claims

85.    In or about November 2002, IICNA received notice from National Union's agent and third-party claims administrator, Hamlin & Burton, that the limits underlying IICNA's coverage were expected to exhaust in the near future.

86.    IICNA reviewed the underlying claims and coverage material provided by Hamlin & Burton and began working on a "Non-Waiver Agreement" with IHS.

87.    Upon completion of the "Non-Waiver Agreement" and the purported exhaustion of the underlying limits, IICNA began to provide for the defense of IHS pursuant to the terms of its 2000 IICNA Policy and the "Non-Waiver Agreement".

88.    IICNA also provided for the defense of IHS of Lester and has incurred significant costs in the defense and settlement of professional liability claims asserted against IHS of Lester.

89.    IICNA provided for the defense of IHS of Lester despite the fact that, had National Union provided the coverage it had contracted to provide, IICNA was not contractually obligated to do so until the limits of all of the underlying coverage was paid.

90.    IICNA seeks equitable subrogation and payment of the limits of the 2000 Lester Policy.

## DECLARATORY JUDGMENT REQUESTED

91.     IICNA hereby requests that this Honorable Court declare that;

    I.     The Non-Pyramiding of Limits endorsements as contained in National Union's 2000 Main Policy and 2000 Lester Policy are not applicable as the "Non-Pyramiding of Limits" endorsements constitute a unilateral change in coverage issued by National Union after the issuance of its binder are not part of the policies; and,

    II.     That National Union's 2000 Lester Policy limits have not been paid and that IICNA is entitled to be reimbursed for amounts it ha spent in the defense and settlement of IHS of Lester claims up to the limits of the 2000 Lester Policy.

## MOTION FOR SUMMARY JUDGMENT

**I.     Non-Pyramiding of Limits endorsements as contained in National Union's 2000 Main Policy and 2000 Lester Policy are not applicable as the "Non-Pyramiding of Limits" endorsements constitute a unilateral change in coverage issued by National Union after the issuance of its binder are not part of the policies.**

92.     The "Non-Pyramiding of Limits" endorsement was not part of National Union's binder, therefore it is not properly included in the 2000 Main Policy.

93     The 2000 Lester Policy and the 2000 Main Policy were written on "forms, terms and conditions" as expiring.

94.     The "Non-Pyramiding of Limits" endorsements as containing in National Union's 2000 Main Policy and 2000 Lester Policy are not applicable as it constitutes a unilateral change in coverage not agreed to by IHS.

95.    The 2000 Main Policy was quoted and bound with the understanding that the 2000 Main Policy would be on "forms, terms and conditions" as the expiring 1999 Main Policy.

96.    The 1999 Main Policy does not contain a "Non-Pyramiding of Limits" endorsement.

97.    The 1999 Lester Policy does not contain a "Non-Pyramiding of Limits" endorsement.

98.    National Union has taken over the defense of 1999 claims alleging residence or injury occurring at an IHS of Lester facility.

99.    National Union has acknowledged that the limits of its 1999 Lester Policy have not been exhausted.

100.   In doing so, National Union has acknowledged that the 1999 policies it issued to IHS and IHS of Lester do not  contain a "Non-Pyramiding of Limits" endorsement.

101.   On December 14, 1999, National Union issued a quote for the renewal of the 1999 Main Policy on the same "forms, terms and conditions" as the expiring policy.

102.   At no time did National Union indicate that it would include a "Non-Pyramiding of Limits" endorsement in the renewal policy.

103.   Again, in the December 27, 1999 binder, National Union indicates that the renewal will be on the same "forms, terms and conditions" as expiring.

104.   Nothing in the December 27, 1999 binder indicates that a 'Non-Pyramiding of Limits" endorsement would be made part of the 2000 Main Policy.

105.    As early as April 12, 2000, National Union was informed that the "Non-Pyramiding of Limits" endorsement was not in keeping with National Union's quote and binder.

106.    Again, on January 17, 2002, the broker inform National Union that its 2000 policies are not as quoted or bound.

107.    National Union is also informed that the errors the broker identified have not been resolved for more than two years.

108.    National Union has absolutely no evidence that IHS ever approved of a "Non-Pyramiding of Limits" endorsement.

109.    As the "Non-Pyramiding of Limits" endorsement was not part of the National Union quote or binder, it is not part of the 2000 Main Policy and should not be given force or effect.

**II.    National Union's 2000 Lester Policy limits have not been paid and that IICNA is entitled to be reimbursed for amounts it ha spent in the defense and settlement of IHS of Lester claims up to the limits of the 2000 Lester Policy. National Union's 2000 Lester Policy limits have not been paid and that IICNA is entitled to be reimbursed for amounts it ha spent in the defense and settlement of IHS of Lester claims up to the limits of the 2000 Lester Policy.**

110.    Pursuant to Lockton's April 12, 2000 "fax memo", the coverage written for IHS of Lester should not include a "Non-Pyramiding of Limits" endorsement.

111.    Nothing in Lockton's request for quotation for IHS of Lester includes a "Non-Pyramiding of Limits" endorsement.

112.    In 1999, National Union provided IHS and IHS of Lester with combined limits of coverage of $27,000,000.00; the majority of which was in the 1999 Main Policy.

113.    To secure this coverage, IHS paid a combined total of approximately $750,000.00 in premium, of which $16,000.00 was paid for the 1999 Lester Policy.

114.    In 2000, IHS paid a substantially higher premium.

115.    Coverage under the two year 2000 Main Policy was purchased for $1,900,000.00.

116.    Coverage under the 2000 Lester Policy was purchased for $19,000.00; $3,000.00 more than in 1999.

117.    The 1999 Lester Policy does not include a "Non-Pyramiding of Limits" endorsement; something that National Union has acknowledged by providing for the defense of the 1999 claims alleging residency or injury in an IHS of Lester facility.

118.    Should this Honorable Court give effect to the "Non-Pyramiding of Limits" endorsement, it will facilitate National Union's unilateral change in coverage after the issuance of National Union's coverage binder.

119.    Moreover, giving effect to the "Non-Pyramiding of Limits" endorsement renders the coverage provided by the 2000 Lester Policy illusory.

120.    IHS of Lester will, if the "Non-Pyramiding of Limits" endorsement is upheld, have paid $19,000.00 in premium for $0.00 in coverage.  In 1999, IHS of Lester paid $16,000.00 for $2,000,000.00 in coverage.

121.    In 2002, National Union exhausted the limits of the 2000 Main Policy.

122.    At no time did National Union pay any portion of the limits of the 2000 Lester Policy.

123.    National Union tendered the open 2000 claims to the next layer carrier, GenStar.

124.    Upon the exhaustion of GenStar's limits, GenStar tendered the open 2000 claims to IICNA.

125.    IICNA has paid a significant amount for the defense and settlement of IHS of Lester claims under its 2000 IICNA Policy despite the fact that National Union hs not exhausted the limits of the 2000 Lester Policy.

126.    IICNA is entitled to be reimbursed the amount it has spent in the defense and settlement of IHS of Lester claims despite the fact that there was other  coverage available to IHS of Lester.

**WHEREFORE,** this Honorable Court should grant IICNA's Motion for Summary Judgment and hold:

(i)    the "Non-Pyramiding of Limits" endorsements, as contained in National Union's 2000 Main Policy and the 2000 Lester Policy are not applicable as they are not part of the policies; and,

(ii)    IICNA is entitled to the limits of the 2000 Lester Policy.

Respectfully Submitted,

WETZEL & ASSOCIATES, P.A.

/s/Benjamin C. Wetzel, III
BENJAMIN C. WETZEL, III (ID No. 985)
NATALIE M. IPPOLITO (ID No. 3845)
1100 North Grant Avenue, Suite 201
Wilmington, DE  19805
(302) 652-1200
*Attorney for Ace Indemnity Insurance
Company f/k/a Indemnity Insurance
Company of North America*

Of Counsel:
Ward A. Rivers, Esquire
Deasey, Mahoney & Bender, Ltd.
1800 John F. Kennedy Blvd., Suite 1300
Philadelphia, PA  19103-2978

Date:  June 25, 2007

**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re:<br><br>INTEGRATED HEALTH SERVICES, INC., *et al.*,<br><br>　　　　　　　　　　　　Debtors. | | Chapter 11<br><br>Case No. 00-389 (MFW)<br><br>(Jointly Administered) |
| IHS LIQUIDATING LLC,<br><br>　　　　　　　Plaintiff,<br><br>　　　　　　　v.<br><br>ACE INDEMNITY INSURANCE COMPANY<br>f/k/a INDEMNITY INSURANCE COMPANY<br>OF NORTH AMERICA,<br><br>　　　　　　　Defendant | | Civil Action No. 05-376 (GMS) |
| IHS LIQUIDATING LLC,<br><br>　　　　　　　Third-Party Plaintiff<br><br>　　　　　　　v.<br><br>NATIONAL UNION FIRE INSURANCE<br>COMPANY OF PITTSBURGH, PA,<br>GENERAL STAR INDEMNITY COMPANY,<br>and ACE INDEMNITY INSURANCE COMPANY<br>f/k/a INDEMNITY INSURANCE COMPANY OF<br>NORTH AMERICA<br><br>　　　　　　　Third-Party Defendants | | |

**ORDER**

AND NOW, having duly considered Indemnity Insurance Company of North

America's Motion For Summary Judgment;

IT IS ORDERED, that Indemnity Insurance Company of North America's Motion For Summary Judgment is GRANTED and National Union Fire Insurance Company of Pittsburgh, PA is hereby ORDERED to pay to Indemnity Insurance Company of North America the limits of its Policy BE 357-43-86.


_____
Hon. Gregory M. Sleet
United States District Court Judge

## CERTIFICATE OF SERVICE

I certify that on June 25, 2007, I electronically filed the within Motion For

Summary Judgment, Brief in support thereof and Exhibits with the Clerk of the Court

using CM/ECF which will send notification of such filing to the following:

> George G. Campion, Esquire
> Weiner Lesniak, LLP
> 629 Parsippany Road
> P.O. Box 438
> Parsippany, NJ  07054
>
> Garvan F. McDaniel, Esquire
> Bifferato, Gentilotti, Biden & Balick
> 1308 Delaware Avenue
> PO Box 2165
> Wilmington, DE 19899
>
> Christopher Page Simon
> Cross & Simon, LLC
> 913 Market Square, Ste. 1001
> Wilmington, DE 19801

> WETZEL & ASSOCIATES, P.A.
>
> /s/Benjamin C. Wetzel, III
> BENJAMIN C. WETZEL, III (ID No. 985)
> NATALIE M. IPPOLITO (ID No. 3845)
> 1100 North Grant Avenue, Suite 201
> Wilmington, DE  19805
> (302) 652-1200
> *Attorney for Ace Indemnity Insurance*
> *Company f/k/a Indemnity Insurance*
> *Company of North America*

Of Counsel:
Ward A. Rivers, Esquire
Deasey, Mahoney & Bender, Ltd.
1800 John F. Kennedy Blvd., Suite 1300
Philadelphia, PA  19103-2978

Date:  June 25, 2007