# Unreported Cases

Westlaw.

Slip Copy                                                                                    Page 1
Slip Copy, 2006 WL 3751395 (D.N.J.)
**(Cite as: Slip Copy)**

Marjac, LLC v. Trenk
D.N.J.,2006.
Only the Westlaw citation is currently available.NOT
FOR PUBLICATION
United States District Court,D. New Jersey.
MARJAC, LLC, a New Jersey Limited Liability
Company, DJF Realty, Inc., a New Jersey
Corporation, Mario Levecchia, and Jack Fiorenza, Jr.,
Plaintiffs,
v.
Richard TRENK-Township Attorney, Booker,
Rabinowitz, Trenk, Lubetkin, Tully, Dipasquale &
Webster, P.C., Planning Board for the Township of
West Orange, Mayor and Council for the Township
of West Orange, John Mckeon-Mayor, Susan Borg-
Planning Board Director West Orange Building
Dept., Russell Desantis-Building Sub-Code Official,
West Orange Health Dept., James Montgomery-
Health Inspector, and John Does A-Z, Defendants.
**Civil Action No. 06-1440 (JAG).**

Dec. 19, 2006.

Michael S. Kasanoff, Red Bank, NJ, for Plaintiffs.
William Northgrave, Kevin P. McManimon,
McManimon & Scotland, Newark, NJ, for
Defendants.

**OPINION**
GREENAWAY, JR., U.S.D.J.
**\*1** This matter comes before this Court on
Defendants' motion to dismiss Plaintiffs' Complaint
for failure to state a claim upon which relief can be
granted, pursuant to Fed.R.Civ.P. 12(b)(6). In the
alternative, Defendants move for a more definite
statement, pursuant to Fed.R.Civ.P. 12(e). For the
reasons stated below, Defendants' motion to dismiss
will be granted in part and denied in part, and
Defendants' motion for a more definite statement will
be denied.

**I. INTRODUCTION**

On March 27, 2006, Plaintiffs Marjac, LLC, DJF
Realty, Inc., Mario Lavecchia, and Jack Fiorenza
(collectively, "Plaintiffs") filed the instant action
against Defendants Richard Trenk,[FN1] the Planning
Board for the Township of West Orange ("West

Orange"), West Orange Mayor John McKeon, West
Orange Building Department Planning Board
Director Susan Borg, Building Sub-Code Official
Russell Desantis, the West Orange Health
Department, Health Inspector James Montgomery,
and various John Doe defendants (collectively,
"Defendants"). Plaintiffs' Complaint alleges the
following causes of action against Defendants: (1)
tortious interference with prospective economic
advantage; (2) tortious interference with contractual
relations; (3) violation of 42 U.S.C. § 1983 pursuant
to the Fifth and Fourteenth Amendments; (4)
violation of the New Jersey Civil Rights Act, N.J.
Stat. Ann.. § 10:6-2(c); (5) breach of fiduciary duty;
(6) legal malpractice; (7) civil conspiracy; (8)
intentional infliction of emotional distress; (9)
estoppel; and (10) racketeering under N.J. Stat. Ann..
§ 2C:41-2. Defendants now move to dismiss all
causes of action asserted in Plaintiffs' Complaint on
the ground that each fails to assert a claim upon
which relief may be granted. In the event that this
Court finds that any of Plaintiffs' claims are viable,
Defendants move for a more definite statement of
Plaintiffs' claims.

FN1. Richard Trenk serves as counsel for
the Township of West Orange.

**II. *FACTUAL BACKGROUND***

Plaintiffs contend that in September 2002, they spent
$1,350,000 purchasing a liquor license and property
at 466 Prospect Avenue in West Orange, New Jersey
(the "Property"), with the goal of establishing a
landmark destination featuring Essex County's
trendiest new restaurant, one of New Jersey's largest
and most upscale nightclubs, and a first-class catering
business. (Complaint ("Compl."), ¶ 1.) The Property
is located directly across from the Essex Green
Shopping Plaza and a TGI Friday's restaurant. (*Id.,* ¶
2.) To finance their business endeavor, Plaintiffs took
out two small business loans totaling $2 million with
Commerce Bank, a $508,000 equipment loan with
Northfield Bank, and several personal loans. (*Id.,* ¶
3.) Plaintiffs contend that they have poured more than
$4 million into their business, and that they have
staked their livelihoods on its success. (*Id.*)

In November 2002, the West Orange Planning Board
(the "Planning Board") approved Plaintiffs'

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 3751395 (D.N.J.)
(Cite as: Slip Copy)

Page 2

preliminary plans, and the West Orange Building Department (the "Building Department") later approved Plaintiffs' completed plans. (*Id.,* ¶ 4.) Plaintiffs allege that they completed 90% of the construction of their business under the direct and ongoing supervision of the Building Department. (*Id.*)

**\*2** On June 16, 2004, Defendant Desantis, a Building Sub-Code Official, issued a Stop Work Order allegedly with the assistance of Defendants Planning Board Director Borg, and Township Attorney Trenk. (*Id.,* ¶ 5.) Desantis purportedly claimed that Plaintiffs' construction failed to comport with the approved architectural plans, and that he did not have a copy of the plans. (*Id.*) Plaintiffs contend that Desantis actually had a signed-off copy of the plans in his car. (*Id.*)

When the Stop Work Order was issued, Trenk allegedly ordered everyone on the property to stop work, requested their names, and then proceeded to dictate to those persons what he perceived as various code violations by Plaintiffs. (*Id.,* ¶ 6.)

Two weeks later, the Stop Work Order was lifted by an unspecified court on the condition that Plaintiffs obtain a bond for their construction work. (*Id.,* ¶ 7.) Plaintiffs allege that they complied with the court's bond order, but were nonetheless confronted by Trenk, who claimed that the bond that had been posted was insufficient, and otherwise harassed Plaintiffs by stopping by the Property and directing West Orange personnel to photograph the Property repeatedly. (*Id.*)

Plaintiffs contend that around the time that the Stop Work Order was lifted, Trenk began to slander their Italian heritage. Plaintiffs allege that Trenk ordered municipal employees not to conduct any inspections of the property because Plaintiffs are "Wiseguys" with a "lot of money" behind them. (*Id.,* ¶ 8.) Trenk also allegedly stated, "We don't want these 'Wiseguys' in our town." (*Id.*) When Trenk saw Plaintiff Mario LaVecchia wearing a *Sopranos* t-shirt, he allegedly commented, "Keep doing what you are doing, it's going to get you far." (*Id.*) He also purportedly told a West Orange detective that Plaintiffs "were not investigated properly" because "there is 'Mafia Money' behind them. (*Id.*) Plaintiffs also allege that at a West Orange Department Heads meeting one or more of those present stated that Plaintiffs "will use the place to launder money," when discussing Plaintiffs' development of the Property. (*Id.*)

Plaintiffs contend that Trenk solicited the State Department of Community Affairs ("DCA") to take over supervision of Plaintiffs' business project, despite the fact that the DCA usually assumes jurisdiction over public projects subject to competitive bidding, as opposed to private projects. (*Id.,* ¶ 9.) Plaintiffs contend that their project was indefinitely delayed as a result of the DCA's involvement because DCA approval requires substantially more detail than local planning boards and building departments. (*Id.*)

In July 2004, the DCA issued a Stop Work Order that sent Plaintiffs back to the drawing board to create updated plans for the development of the Property. (*Id.,* ¶ 10.) The day after the Stop Work Order was issued, Trenk allegedly came to the Property with a camera, and began threatening tradespeople working at the site; Plaintiffs contend that Trenk yelled, "You have to stop work and I am calling the Police," and told the tradespeople they would not be paid. (*Id.*)

**\*3** Plaintiffs further allege that Defendants attempted to revoke their approvals in August 2004, despite retired West Orange Construction Code Official Thomas Biondi's testimony that Plaintiffs had complied with all Code requirements throughout the course of construction. (*Id.,* ¶ 11.) Also, in August 2004, West Orange Police Lieutenant Lang allegedly commented to one of Plaintiffs' attorneys, "Why don't you do like the other guys, pay $50,000 and it will go away." (*Id.,* ¶ 19.)

In September 2004, Trenk allegedly came to the Property, yelled at workers to stop construction, and called the police. Plaintiffs contend that after learning of Trenk's actions, the DCA lifted the Stop Work Order it had issued. (*Id.,* ¶ 12.) Despite the lifting of the Stop Work Order, a West Orange Police officer, on the orders of his sergeant, allegedly came to the Property a few days after the Order had been lifted, and advised Plaintiffs that no work could continue. (*Id.*)

Plaintiffs allege that in October 2004, West Orange improperly adopted an ordinance amending its zoning provisions to grant the Planning Board the authority to revoke previously-granted approvals. Plaintiffs contend that this ordinance violates municipal land use law. (*Id.,* ¶ 13.) Pursuant to this ordinance, on February 2, 2005, the Planning Board adopted a resolution revoking and deeming null and void the approvals previously granted to Plaintiffs.[FN2] (*Id.*)

Slip Copy                                                                                                                Page 3
Slip Copy, 2006 WL 3751395 (D.N.J.)
**(Cite as: Slip Copy)**

FN2. The legality of the Planning Board's resolution is currently being litigated in state court, in actions entitled *Throne v. DJF Realty, Inc.,* Docket No.: ESX-L-6519-05, and *MARJAC, L.L. C. et al. v. Planning Board of West Orange, et al.,* Docket No.: ESX-L-8573-05. (*Id.,* ¶ 13.)

On December 3, 2004, Borg allegedly sent a fax to the DCA indicating that Plaintiffs had no approvals, when in fact the Planning Board did not actually adopt its resolution lifting Plaintiffs' approvals until February 2005. In response to Borg's alleged miscommunication, the DCA instituted another Stop Work Order on December 9, 2004. (*Id.,* ¶ 14.)

Plaintiffs assert that Defendants also launched an "all-out assault" on their liquor license. Plaintiffs contend that Trenk placed irrational and arbitrary restrictions on the renewal of Plaintiffs' liquor license such as: (1) limiting Plaintiffs' occupancy to 250 people, when they were originally approved to host 520 people; and (2) demanding that Plaintiffs restrict their hours to a midnight closing, while every other similarly situated business in town is permitted to serve liquor until 2:00 a.m. (*Id.,* ¶ 15.) Plaintiffs allege that these restrictions would sabotage their business. (*Id.*) Plaintiffs further maintain that Trenk personally solicited Eagle Ridge Condominium Association residents to request that obscenity restrictions be placed on Plaintiffs' license, although there had been no objections to Plaintiffs' license in 2004. (*Id.,* ¶ 16.)

Plaintiffs contend that because of Trenk's actions and involvement in sabotaging their liquor license, he was required to recuse himself from Plaintiffs' Alcoholic Beverage Control ("ABC") hearing. Trenk failed to do so, however, allegedly in violation of West Orange Township Code, Article IV, § 2-6.2(a), which provides that the Clerk-not the township attorney-"shall keep and record the minutes of each Council meeting and of each committee meeting." (*Id.,* ¶ 17.) After the hearing, Plaintiffs allegedly were unable to obtain a copy of the minutes because the recording unit meant to memorialize the hearing had malfunctioned. (*Id.*)

**\*4** Plaintiffs assert that Trenk's conduct was motivated by the desire to (1) generate substantial legal fees; and (2) aid his partners' business venture, 22 West Restaurant Group, which was threatened by Plaintiffs' competitive business plan. (*Id.,* ¶¶ 20, 21.)

Plaintiffs also contend that all of the conduct alleged in the Complaint occurred under the watch of Mayor John McKeon, who was duty-bound to "supervise all of the departments of the Township government." (*Id.,* ¶ 22.)

### III. *DISCUSSION*

#### A. *Legal Standard Governing Motions To Dismiss Under Rule 12(b)(6)*

On a motion to dismiss for failure to state a claim, pursuant to Fed.R.Civ.P. 12(b)(6), the court must accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the non-moving party. *See Oshiver v. Levin, Fishbein, Sedran & Berman,* 38 F.3d 1380, 1384-85 (3d Cir.1994). A complaint should be dismissed only if the alleged facts, taken as true, fail to state a claim. *See In re Warfarin Sodium,* 214 F.3d 395, 397-98 (3d Cir.2000). The question is whether the claimant can prove any set of facts consistent with his or her allegations that will entitle him or her to relief, not whether that person will ultimately prevail. *See Hishon v. King & Spalding,* 467 U.S. 69, 73 (1984). "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957).

While a court will accept well-pled allegations as true for the purposes of the motion, it will not accept unsupported conclusions, unwarranted inferences, or sweeping legal conclusions cast in the form of factual allegations. *See Morse v. Lower Merion School District,* 132 F.3d 902, 906 n. 8 (3d Cir.1997). All reasonable inferences, however, must be drawn in the plaintiff's favor. *See Sturm v. Clark,* 835 F.2d 1009, 1011 (3d Cir.1987). Moreover, the claimant must set forth sufficient information to outline the elements of his or her claims or to permit inferences to be drawn that the elements exist. *See* Fed.R.Civ.P. 8(a)(2); *Conley,* 355 U.S. at 45-46. "The defendant bears the burden of showing that no claim has been presented." *Hedges v. United States,* 404 F.3d 744, 750 (3d Cir.2005).

The Supreme Court has characterized dismissal with prejudice as a "harsh remedy." *New York v. Hill,* 528 U.S. 110, 118 (2000). Dismissal of a count in a

complaint with prejudice is appropriate if amendment would be inequitable or futile. "When a plaintiff does not seek leave to amend a deficient complaint after a defendant moves to dismiss it, the court must inform the plaintiff that he has leave to amend within a set period of time, unless amendment would be inequitable or futile." *Grayson v. Mayview State Hosp.,* 293 F.3d 103, 108 (3d Cir.2002).

**B.** *Plaintiffs' 42 U.S.C. § 1983 Claims* **(Count Three)**

**\*5** Plaintiffs' third cause of action contends that Defendants, acting "under the color of authority of the statutes of the State of New Jersey," acted arbitrarily, capriciously, and unreasonably in violation of (1) Plaintiffs' Fifth Amendment property rights, "by enacting an illegal and improper taking of Plaintiffs' premises without due process of law;"(2) Plaintiffs' Fourteenth Amendment right to Equal Protection of the law; (3) Plaintiffs' rights under the Commerce Clause, by destroying their business; and (4) Plaintiffs' Fourteenth Amendment Substantive Due Process rights, by "hampering Plaintiffs' proposed development in order to profit personally" and "exhibiting deliberate bias against Plaintiffs and sabotaging the project due to a perceived stereotype relating to their Italian heritage" in a "manner that shocks the conscience." (Compl., Third Count, ¶ ¶ 2-9.)

"Section 1983 imposes civil liability upon any person who, acting under the color of state law, deprives another individual of any rights, privileges, or immunities secured by the Constitution or laws of the United States." *Hill v. Borough of Kutztown,* 455 F .3d 225, 233 n. 8 (3d Cir.2006); (quoting *Shuman ex rel. Shertzer v.. Penn Manor Sch. Dist.,* 422 F.3d 141, 146 (3d Cir.2005)); *see* 42 U.S.C. § 1983. "In order to state a claim under § 1983, a plaintiff must allege that his constitutional rights were violated by someone acting under color of state law." *Jerrytone v. Musto,* 167 Fed. Appx. 295, 300 (3d Cir.2006) (citing *West v. Atkins,* 487 U.S. 42, 48 (1988)). "Accordingly, '[t]he first step in evaluating a *section 1983* claim is to 'identify the exact contours of the underlying right said to have been violated' and to determine 'whether the plaintiff has alleged a deprivation of a constitutional right at all.' " *Kaucher v. County of Bucks,* 455 F.3d 418, 423 (3d Cir.2006) (quoting *Nicini v. Morra,* 212 F.3d 798, 806 (3d Cir.2000) (quoting *County of Sacramento v. Lewis,* 523 U.S. 833, 841 n. 5 (1998))).

Defendants argue that Plaintiffs' cause of action under § 1983 should be dismissed because Plaintiffs' complaint fails to allege that they have been deprived of any constitutional right. Defendants specifically argue that Plaintiffs' constitutional claims are unripe; Defendants contend that because the Planning Board has yet to make a final determination on Plaintiffs' amended site plan application, Plaintiffs have failed to allege the deprivation of a right. In their opposition in response to Defendants' motion, Plaintiffs only argue that they have sufficiently alleged a § 1983 claim for violation of their substantive due process rights, and their rights under the Commerce Clause.[FN3]

> FN3. Plaintiffs do not address their § 1983 claims pursuant to the Fifth Amendment, or the Fourteenth Amendment's Equal Protection clause, and has thus abandoned them. *See Testa v. Town of Madison,* No. Civ. 04-185-B-W, 2005 WL 2365319, at \* 12 (D.Me. Sept. 26, 2005) ("The Town argues that the existing record cannot support Testa's defamation claim. Testa fails to oppose this aspect of the motion in her opposition memorandum. Accordingly, Testa has abandoned her defamation claim and judgment should enter in favor of the Town on count II"); *Bayne v. Provost,* No. 1:04 CV 44, 2005 WL 1871182, at \* 4 (N.D.N.Y. Aug. 4, 2005) ("The failure to oppose a motion for summary judgment on a certain claim is deemed abandonment of the claim"); *Mack v. St. Mobile Aerospace Engineering, Inc.,* No. Civ.A.04-0307-BH-B, 2005 WL 1768646, at \* 29 (S.D.Ala. July 26, 2005) ("Wayne apparently does not oppose MAE's summary judgment regarding his claim of demotion from 'Acting' Lead, or has abandoned the claim, inasmuch as he has failed to respond in opposition to same"); *Akins Foods, Inc. v. American and Foreign Ins. Co.,* No. C04-2195JLR, 2005 WL 2090678, at \*4 n. 8 (W.D.Wash. Aug. 30, 2005) ("a party opposing summary judgment cannot simply rest on its allegations without any significant probative evidence supporting its claims.... By not bringing forward sufficient evidence or authority to oppose Defendant's motion for summary judgment, Akins has abandoned its claims") (internal citations omitted); *Moss v. Technicolor, Inc.,* No. CV-99-05601-WJR (Mcx), 2001 WL 1472673, at \* 16 (C.D.Cal.

May 4, 2001) ("This Court concludes that this claim should be dismissed because Plaintiffs have abandoned it. Plaintiffs failed to oppose Defendants' various attacks on these claims. As such, Plaintiffs failed to meet their burden ... In other words, Plaintiffs have conceded this issue"). This Court shall only address whether Plaintiffs have stated a cause of action under § 1983, pursuant to the Fourteenth Amendment's substantive due process provisions, and/or the Commerce Clause.

### 1. *Legal Standard Governing The Ripeness Doctrine*

Defendants' challenge to Plaintiffs' § 1983 claims centers on the ripeness doctrine. "The ripeness doctrine serves 'to determine whether a party has brought an action prematurely and counsels abstention until such time as a dispute is sufficiently concrete to satisfy the constitutional and prudential requirements of the doctrine.' " *Khodara Envtl., Inc. v. Blakey,* 376 F.3d 187, 196 (3d Cir.2004) (quoting *Peachlum v. City of York,* 333 F.3d 429, 433 (3d Cir.2003)). In *Williamson County Regional Planning Com. v. Hamilton Bank,* 473 U.S. 172, 186, 194-95 (1985), the Supreme Court held that an as-applied Fifth Amendment Just Compensation Takings claim against a municipality's enforcement of a zoning ordinance is not ripe until (1) "the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue" (the "finality rule"), and (2) the plaintiff has unsuccessfully exhausted the state's procedures for seeking "just compensation," so long as the procedures provided by the state were adequate.

*\*6* The "*Williamson* [ ] finality rule bars not only as-applied Just Compensation Takings claims, but also as-applied Substantive Due Process and Equal Protection claims by property owners or tenants who have challenged the denial of a permit by an initial decision-maker but failed to take advantage of available, subsequent procedures.' " *County Concrete Corp. v. Town of Roxbury,* 442 F .3d 159, 164 (3d Cir.2006) (quoting *Lauderbaugh v. Hopewell Twp.,* 319 F.3d 568, 574 (3d Cir.2003)) (citing *Taylor Inv., Ltd. v. Upper Darby Twp.,* 983 F.2d 1285, 1292, 1295 (3d Cir.1993)). "Only once a decision maker has arrived at a definitive position on the issue" has a property owner been inflicted with "an actual, concrete injury.' " *County Concrete,* 319 F.3d at 574 (quoting *Williamson,* 473 U.S. at 192).

The absence of "just compensation" is not part of a due process or Equal Protection injury, however. *County Concrete,* 442 F.3d at 169 (citing *Williamson,* 473 U.S. at 197). Thus, if a Substantive Due Process or Equal Protection claim satisfies the finality rule, it is ripe for adjudication. *Id.*

### 2. Plaintiffs' Substantive Due Process Claim Is Ripe For Adjudication

The Fourteenth Amendment provides that no State shall "deprive any person of life, liberty, or property without due process of law." U.S. Const. Amend. XIV. "To prevail on a substantive due process claim, a plaintiff must demonstrate that an arbitrary and capricious act deprived them of a protected property interest." *County Concrete,* 319 F.3d at 575 (quoting *Taylor Inv.,* 983 F.2d at 1292). Plaintiffs' complaint effectively argues that Defendants abused the zoning process in West Orange to deprive them of the lawful use of the Property because of impermissible personal and political animus.

In *Blanche Road Corp. v. Bensalem Twp.,* 57 F.3d 253 (3d Cir.1995), the Third Circuit held that a plaintiff landowner need not comply with the finality rule where, instead of "appealing from an adverse decision on a permit application," the plaintiff claims that the defendant Township officers "deliberately and improperly interfered with the process by which the Township issued permits, in order to block or to delay the issuance of plaintiff's permits, and that defendants did so for reasons unrelated to the merits to the application for the permits." *Id.,* 57 F.3d at 267-68. It was asserted by the plaintiff in *Blanche Road* that the Township "engaged in a campaign of harassment designed to force [it] to abandon its development of [an] industrial park." *Id.* at 258. The *Blanche Road* court explained that the type of Substantive Due Process claim at issue there was "substantively different" from "that presented in the ripeness cases" and that "[s]uch actions, if proven, are sufficient to establish a [Substantive Due Process] violation, actionable under § 1983, even if the ultimate outcome of plaintiff's permit applications was favorable." *Id.* at 268. Thus, no further appeals were necessary in order to have a ripe, final determination for a federal court to review.

*\*7* Plaintiffs allege that Defendants violated the Substantive Due Process Clause by "hampering Plaintiffs' proposed development in order to profit personally" and "exhibiting deliberate bias against

Slip Copy                                                                                                        Page 6
Slip Copy, 2006 WL 3751395 (D.N.J.)
**(Cite as: Slip Copy)**

Plaintiffs and sabotaging the project due to a perceived stereotype relating to their Italian heritage" in a "manner that shocks the conscience." (Compl., Third Count, ¶¶ 2-9.) The Complaint alleges that the alleged campaign to prevent Plaintiffs from developing the Property was spearheaded by Trenk, who, along with others, engaged in a campaign of harassment that has forestalled the construction of Plaintiffs' business. (See Compl., ¶¶ 7, 8, 10, 15.)

These allegations parallel those asserted by the plaintiff in *Blanche Road.* This Court finds that such claims are therefore sufficient to establish a ripe Substantive Due Process claim, regardless of the outcome of subsequent appeals for relief to municipal zoning boards. Thus, Plaintiffs' claim under § 1983 and the Substantive Due Process clause is ripe for adjudication, and Defendants' motion to dismiss Plaintiffs' Substantive Due Process claim sub judice is denied.

### 3. *Plaintiffs Have Failed To State A Claim Under The Commerce Clause*

Defendants also appear to extend their ripeness challenge to Plaintiffs' § 1983 claim pursuant to the Commerce Clause. Plaintiffs counter that they have stated adequately a claim for relief under the Commerce Clause by alleging that their business involves interstate commerce, and that Defendants, motivated by "protectionist sentiment," destroyed and sabotaged their business. (See Compl., Third Court, ¶ 7.) This Court cannot determine whether Plaintiff's Commerce Clause claim is ripe because Plaintiffs have failed to state a claim that could possibly fall within the ambit of the Commerce Clause.

To state a § 1983 claim for violation of the Commerce Clause, Plaintiffs must allege that a challenged law or regulation imposes a burden on interstate commerce that is excessive and not incidental to the local benefits of the law or regulation. *See Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142 (1970). FN4 Plaintiffs' Complaint, which tersely alleges that Defendants violated the Commerce Clause by destroying their business, cannot be construed as a challenge to a governmental law or regulation, which burdens interstate commerce. Plaintiffs have failed to state a claim upon which relief can be granted, and their Commerce Clause under § 1983 must be dismissed pursuant to Fed.R.Civ.P. 12(b)(6).

FN4. In *Dennis v. Higgins,* 498 U.S. 439 (1991), the Supreme Court upheld a cause of action under § 1983 based on the Commerce Clause, rejecting the argument that the Commerce Clause could not be the basis of a § 1983 cause of action because it "merely allocates power between the Federal and State Governments and does not confer 'rights.' " *Id.* at 447. The Court instead held that the Commerce Clause both was a "power allocating" provision and constituted a "substantive restriction on permissible state regulation of interstate commerce." *Id.* (internal quotation marks and citation omitted).

### C. *Plaintiffs' New Jersey Civil Rights Act, N.J. Stat. Ann .. § 10:6-2(C)* Claim **(Count Four)**

Plaintiffs' fourth cause of action asserts a claim under the New Jersey Civil Rights Act, N.J. Stat. Ann.. § 10:6-2(C). Defendants contend that Plaintiffs have failed to state a cause of action under this statute because they have not alleged sufficiently that Defendants engaged in discrimination against a protected class. Even if this were true, Defendants' argument is unavailing.

**\*8** N.J. STAT. ANN. § 10:6-2(C) provides:

Any person who has been deprived of any substantive due process or equal protection rights, privileges or immunities secured by the Constitution or laws of the United States, or any substantive rights, privileges or immunities secured by the Constitution or laws of this State, or whose exercise or enjoyment of those substantive rights, privileges or immunities has been interfered with or attempted to be interfered with, by threats, intimidation or coercion by a person acting under color of law, may bring a civil action for damages and for injunctive or other appropriate relief.

Plaintiffs' complaint alleges that "by causing Plaintiffs to be deprived of his [sic] constitutionally guaranteed rights of liberty and property secured and guaranteed under the Commerce Clause, and the Fifth and Fourteenth Amendments of the Constitution of the United States, and corresponding rights guaranteed by the New Jersey State Constitution ... Defendants have violated the New Jersey Civil Rights Act ..." (Compl., Fourth Count, ¶ 2.)

Because Plaintiffs have successfully stated a claim

for the deprivation of their Substantive Due Process rights, which are secured by the Constitution of the United States, Plaintiffs have also successfully stated a claim for relief, pursuant to N.J. Stat. AnnN § 10:6-2(c). This Court denies Defendants' motion to dismiss Plaintiffs' N.J. Stat. AnnN § 10:6-2(c) claim.

D. *Plaintiffs' State Law Rackeering Claim* (Count Ten)

Plaintiffs' tenth cause of action purports to state a claim under the New Jersey Racketeer Influenced Corrupt Organizations Act ("RICO"), N.J. Stat. Ann.. 2C:41-4(c) ("state RICO statute").[FN5] The state RICO statute provides that "[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in or activities of which affect trade or commerce to conduct or participate, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity." N.J. Stat. Ann.. 2C:41-2(c). Under N.J. Stat. Ann.. § 2C:41-4(c), "[a]ny person damaged in his business or property by reason of a violation of N.J. Stat. Ann.. § 2C:41-2 may sue" the violating party.

> FN5. Contrary to Defendants' contention, Plaintiff does not assert a claim against Defendants for violations of the Federal Racketeer Influenced Corrupt Organizations Act ("RICO").

Defendants argue that Plaintiffs have failed to state a claim under the state RICO statute because: (1) they have failed to allege that Defendants participated in a "pattern of racketeering activity"; (2) they have failed to meet the "continuity" requirement necessary to establish a pattern of racketeering activity; (3) they have failed to allege that Defendants are the "proximate cause" of Plaintiff's injuries; and (4) they have failed to meet the heightened pleading requirements of FED. R. CIV. P. 9(b), which requires that allegations involving fraud "be stated with particularity."[FN6] This Court will address each of these challenges to Plaintiffs' complaint in turn.

> FN6. Defendants do not contest that Plaintiffs have alleged the existence of an enterprise. West Orange constitutes an enterprise within the meaning of N.J. Stat. Ann.. § 2C:41-1(2)(c).
> *See Genty v. RTC*, 937 F.2d 899, 906-07 (3d Cir.1991).

**1. *Pattern Of Rackeering Activity***

**\*9** To claim a "pattern of racketeering activity" properly, Plaintiffs must allege that (1) Defendants engaged in "at least two incidents of racketeering conduct one of which shall have occurred after the effective date of th[e][A]ct and the last of which shall have occurred within 10 years ... after a prior incident of racketeering activity"; and (2) "the incidents of racketeering activity embrace criminal conduct that has either the same or similar purposes, results, participants or victims or methods of commission or are otherwise interrelated by distinguishing characteristics and are not isolated incidents." N.J. Stat. Ann.. § 2C:41-1(d).

Plaintiffs' Complaint alleges that the individual Defendants, under the umbrella of West Orange, devised a scheme in the Summer of 2004 to deprive Plaintiffs of their money and property through extortion, fraudulent practices, wire fraud, violation of the Hobbs Act, 18 U.S.C. § 1951, and interference with Plaintiffs' Small Business Association loan in violation of 18 U.S.C. § 245(b)(1)(B). (Compl., ¶ ¶ 2-17.) Each of these alleged offenses occurred after the effective date of the statute, within ten years of one another, and constitutes a predicate act of racketeering, as that term is defined in the state RICO statute. *See* N.J. Stat. Ann .. § 2C:41-1 (indicating that "[r]acketeering activity" includes extortion; and forgery and fraudulent practices and all crimes defined in chapter 21 of Title 2C of the New Jersey Statutes). Therefore, this Court finds that Plaintiffs have alleged a pattern of racketeering activity. To the extent Defendants' motion to dismiss Plaintiffs' state RICO claim is grounded in their contention that Plaintiffs have failed to allege a pattern of racketeering activity, it is denied.[FN7]

> FN7. As explained *infra*, Plaintiffs have met the Rule 8 and 9(b) pleading standard regarding at least two of the predicate acts of fraud pled in their Complaint.

**2. *Continuity***

Contrary to Defendants' arguments, New Jersey's RICO statute does not require that continuity be alleged, or even established. *See Maxim Sewerage Corp. v. Monmouth Ridings*, 640 A.2d 1216, 1222-1223 (N.J.Super. Ct. Law Div.1993) ("New Jersey's statute does not require a showing of continuity ... Federal RICO, however, is more restrictive"); *State v.*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                      Page 8
Slip Copy, 2006 WL 3751395 (D.N.J.)
**(Cite as: Slip Copy)**

*Ball, 632 A.2d 1222, 1259 (N.J.Super.Ct.App.Div.1993)* ("since the New Jersey statute explicitly requires only a showing of relatedness among predicate acts, there is no reason why the additional element of continuity, which is associated with Federal RICO, should be grafted onto New Jersey's statutory definition"). Thus, even assuming Plaintiffs' complaint fails to allege continuity, such an omission does not necessitate dismissal of Plaintiffs' state RICO claims. This Court must deny Defendants' motion on this basis.

### 3. Proximate Cause

Defendants also argue that Plaintiffs' state RICO claims must be dismissed because the complaint fails to meet the "proximate cause" requirement regarding damages. Defendants base their argument on their contention that "Plaintiffs are the sole cause of any alleged damages as they have failed to return to the Planning Board for final resolution of all issues concerning the subject property." (Def.'s Br. at 17.)

**\*10** This Court cannot agree that Defendants' argument warrants dismissal. In deciding a motion to dismiss, pursuant to Fed.R.Civ.P. 12(b)(6), this Court is limited to a consideration of the contents of the Complaint. *See, e.g., County Concrete, 442 F.3d at 172 n. 2 (3d Cir.2006)* ("the District Court here dismissed Counts One through Four on a Rule 12(b)(6) motion to dismiss, and, thus, our review is limited to the factual allegations in the complaint"). Here, the Complaint clearly alleges that "Defendants' pattern of racketeering activity directly damages Plaintiffs in that Defendants' conduct was the cause-in-fact of Plaintiffs' damages, as well as the legal and proximate cause." (Compl., Count Ten, ¶ 22.) [FN8] This Court shall deny Defendants' motion to dismiss Plaintiffs' RICO claims for failure to allege adequately that Defendants proximately caused Plaintiffs' damages.

> FN8. This Court notes that whether Defendants actually did cause Plaintiffs' damages through their conduct is a question of fact, not properly addressed in a 12(b)(6) motion. The causation question is properly addressed at a later stage in these proceedings, i.e., at the summary judgment phase of this case or at trial.

### 4. Rule 9's Pleading Requirements

As explained, Plaintiffs' complaint purports to assert a state RICO claim predicated on Defendants' alleged extortion, fraudulent practices, wire fraud, the Hobbs Act, and interference with Plaintiffs' small business loan in violation of 18 U.S.C. § 245(b)(1)(B). (Compl., Count Ten, ¶ 14.) Defendants argue that Plaintiffs' allegations are insufficient under Rule 9(b)'s pleading requirements. Plaintiffs counter that they have pled predicate acts sufficiently to meet the specificity required under Rule 9(b).

### a. Fraud And Wire Fraud [FN9]

> FN9. Contrary to Defendants' contentions, Plaintiffs do not base their state RICO claim on a predicate act of mail fraud. *(See* Compl., Tenth Count, ¶¶ 12-15.)

To the extent Plaintiffs' state RICO action is predicated on fraudulent practices and wire fraud, it must be pled with specificity, pursuant to Fed.R.Civ.P. 9(b). *See Lum v. Bank of America, 361 F.3d 217, 223 (3d Cir.2004); Fed. R. Civ. P. 9(b)* ("In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity").[FN10]

> FN10. The federal wire fraud statute prohibits the use of interstate wires for purposes of carrying out any scheme or artifice to defraud. *See* 18 U.S.C. § 1343. " 'A scheme or artifice to defraud need not be fraudulent on its face, but must involve some sort of fraudulent misrepresentation or omission reasonably calculated to deceive persons of ordinary prudence and comprehension.' " *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc., 140 F.3d 494, 528 (3d Cir.1998)* (quoting *Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1415 (3d Cir.1991)*).

"In order to satisfy Rule 9(b), [P]laintiffs must plead with particularity 'the circumstances of the alleged fraud in order to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior.' " *Lum, 361 F.3d at 223-24* (quoting *Seville Indus. Mach. Corp. v. Southmost Mach. Corp., 742 F.2d 786, 791 (3d Cir.1984)*). "Plaintiffs may satisfy this requirement by pleading the 'date, place or time' of the fraud, or

Slip Copy                                                                                                    Page 9
Slip Copy, 2006 WL 3751395 (D.N.J.)
(Cite as: Slip Copy)

through 'alternative means of injecting precision and some measure of substantiation into their allegations of fraud.' " *Id* . (holding that a plaintiff satisfied Rule 9(b) by pleading which machines were the subject of alleged fraudulent transactions and the nature and subject of the alleged misrepresentations). "Plaintiffs also must allege who made a misrepresentation to whom and the general content of the misrepresentation." *Id.* at 224 (citing *Saporito v. Combustion Eng'g, Inc.,* 843 F.2d 666, 675 (3d Cir.1988),* vacated on other grounds, 489 U.S. 1049 (1989); *Rolo v. City Investing Co. Liquidating Trust,* 155 F.3d 644, 658-59 (3d Cir .1998); *Klein v. General Nutrition Co., Inc.,* 186 F.3d 338, 345 (3d Cir.1999)).

### (i) *Fraudulent Practices*

**\*11** Plaintiffs' state RICO claim alleges that "Defendants' conduct in the affairs of the enterprise[, i.e., West Orange,] as documented in Paragraphs 1 through 23 constitutes fraudulent practices thereby falling within the definition of racketeering set forth in N.J.S.A. 2C:41-1(a)(1)(o)." (Compl., ¶ 13.) This statement is the only specific allegation going to the nature of the predicate act of "fraudulent practices." Defendants do not specify the "date, place or time" of the fraudulent practice or "who made a misrepresentation to whom and the general content of the misrepresentation." *Lum,* 361 F.3d at 223-24. This lack of specificity requires this Court to find that Plaintiff has failed to allege the predicate act of fraudulent practices adequately, in accordance with Rule 9(b)'s pleading requirements. Thus, to the extent Plaintiffs' state RICO claims relies upon fraudulent practices as a predicate act, they cannot survive.

### (ii) *Wire Fraud*

Plaintiff's state RICO claim also alleges that Defendants committed acts of wire fraud in violation of 18 U.S.C. § 1343. Plaintiffs specifically allege: Defendants willfully and knowingly devised a scheme or artifice to injure Plaintiffs by means of false pretenses, representations, and/or promises, and caused to be transmitted by means of wire and interstate commerce, writings, signs, signals, pictures, and/or sounds for the purpose of executing the scheme to defraud, in particular the following:
a. communicating with Plaintiffs on numerous occasions via telephone;
b. upon information and belief, utilizing the telephone and/or other forms of wire communications

to communicate among themselves and with third parties; and
c. fraudulent fax dated December 3, 2004 from Susan Borg to the State DCA

(Compl., Count Ten, ¶ 15.) Earlier in the Complaint, Plaintiffs allege that Borg sent a fax to the DCA indicating that Plaintiffs had no approvals, when in fact the Planning Board did not actually adopt its resolution lifting Plaintiffs' approvals until February 2005. In response to Borg's alleged miscommunication, the DCA instituted another Stop Work Order on December 9, 2004. (*Id.,* ¶ 14.) Plaintiffs further allege that the activities chronicled throughout the complaint could only have been carried out through wire communications. (Compl., Count Ten, ¶ 16.) Plaintiffs also assert that the Defendants who did not carry out the alleged acts of racketeering aided and abetted those acts. (*Id.,* ¶ 18.)

This Court finds that with the exception of Plaintiffs' allegation that Borg transmitted a fraudulent fax to the DCA in an effort to shut down Plaintiffs' construction efforts, Plaintiffs have failed to aver wire fraud adequately as a predicate act to their state RICO claims. With the exception of the Borg fax transmission, Plaintiffs have failed to specify the "date, place or time" of the fraudulent practice or "who made a misrepresentation to whom and the general content of the misrepresentation." *Lum,* 361 F.3d at 223-24. On the other hand, the allegations regarding the Borg transmission have met the Rule 9(b) pleading standard. Plaintiffs have alleged that on December 3, 2004, Borg transmitted a fax to DCA misrepresenting Plaintiffs' approvals (Compl., ¶ 14; Compl., Count Ten, ¶ 15.) This Court finds that to the extent it relies on the predicate act of wire fraud, Plaintiffs' state RICO claim can only be based on the wire fraud allegedly committed by Borg in transmitting the fax to DCA.

### b. Extortion, Hobbs Act, and 18 U.S.C. § 245(b)(1)(B)

**\*12** To the extent Plaintiffs' state RICO action is predicated on extortion, the Hobbs Act,[FN11] and 18 U.S.C. § 245(b)(1)(B),[FN12] their allegations need only satisfy Rule 8's general notice-pleading standard. *See Rose v. Bartle,* 871 F.2d 331, 362 n. 53 (3d Cir.1989) (Rule 9(b) inapplicable because plaintiffs' claims of bribery and extortion do not allege fraud on part of defendants); *Chiropractic Alliance of New Jersey v. Parisi,* 854 F.Supp. 299,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 10
Slip Copy, 2006 WL 3751395 (D.N.J.)
**(Cite as: Slip Copy)**

308 (D.N.J.1994) ("the allegations of theft by extortion, for example, are properly governed by the more lenient pleading requirement of Fed.R.Civ.P. 8"). Plaintiffs have put Defendants on notice of these claims and the conduct underlying them. Defendants' motion to dismiss Plaintiffs' RICO claim, to the extent it is predicated on Defendants' alleged extortion, violation of the Hobbs Act, and violation of 18 U.S.C. § 245(b)(1)(B), is denied.

> FN11. An individual commits a crime under the Hobbs Act, 18 U.S.C. § 1951, if he "in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section." 18 U.S.C. § 1951(a).

> FN12. A person is in violation of 18 U.S.C. § 245(b)(1)(B) when "whether or not acting under color of law, by force or threat of force willfully injures, intimidates or interferes with, or attempts to injure, intimidate or interfere with any person because he is or has been, or in order to intimidate such person or any other person or any class of persons from participating in or enjoying any benefit, service, privilege, program, facility, or activity provided or administered by the United States."

Because Plaintiffs have alleged the predicate act of wire fraud regarding Borg's conduct with sufficient specificity, as well as the predicate acts of extortion, violation of the Hobbs Act, and violation of 18 U.S.C. § 245(b)(1)(B), more generally, Defendants' motion to dismiss Plaintiffs' state RICO claims for failure to state a claim upon which relief can be granted is denied.

**E.** *Plaintiffs' Remaining State Law Tort Claims*

**1.** *Plaintiffs' Allegedly Deficient Tort Claims Notice Does Not Warrant Dismissal Of Plaintiffs' Claims Pursuant To Rule 12(b)(6)*

Pursuant to the New Jersey Tort Claims Act ("NJTCA"), "[t]o bring an action in tort against a

'public entity or public employee' in New Jersey, the claimant must file a notice of claim with the entity within ninety days of the accrual of the claim or else be 'forever barred' from asserting that cause of action." *County Concrete*, 442 F.3d at 174 (citing N.J. Stat. Ann., § 59:8-3 and -8; *Moon v. Warren Haven Nursing Home*, 867 A.2d 1174, 1176 (N.J.Sup.Ct.2005)). The NJTCA requires that a notice of claim include the "date, place and other circumstances of the occurrence or transaction which gave rise to the claim asserted;" a "general description of the injury, damage or loss incurred;" the "name or names of the public entity, employee or employees causing the injury;" and the amount of damages claimed. N.J. Stat. Ann., § 59:8-4.

While Defendants' allegations that Plaintiffs' notice is deficient under the NJTCA may ultimately warrant dismissal of Plaintiffs' tort claims, this Court cannot make such a finding at this time. In considering a motion to dismiss for failure to state a claim, pursuant to Rule 12(b)(6), this Court is limited to a consideration of the contents of the Complaint. *See Yarris v. County of Delaware*, 465 F.3d 129, 134 (3d Cir.2006) (at the motion-to-dismiss stage, the district court's "review is limited to the contents of the complaint and any attached exhibits").[FN13] This Court cannot determine whether Plaintiffs' NJTCA notice is sufficient without looking beyond the four corners of the Complaint. Thus, Defendants' motion to dismiss Plaintiffs' tort claims under Rule 12(b)(6), based on the alleged deficiencies in Plaintiffs' NJTCA notice, is denied.[FN14]

> FN13. The Third Circuit, however, has held that a "court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss," without converting the motion into a motion for summary judgment, "if the plaintiff's claims are based on the document." *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir.1993), cert. denied, 510 U.S. 1042 (1994). This case, however, presents this Court with no such circumstance. Unlike a contract, which forms the basis for a breach of contract claim, here Plaintiffs' NJTCA notice does not in any way form the *basis* for Plaintiffs' various state law causes of action. To the extent that Defendants have proffered evidence related to the form of Plaintiffs' notice, this Court may not consider it at this juncture, on a Rule 12(b)(6) motion.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN14. This Court notes that it will entertain Defendants' arguments under the NJTCA if they are raised at the appropriate time, e.g., in a motion for summary judgment.

### 2. Plaintiffs' State Law Claims Are Ripe For Adjudication

**\*13** Defendants argue that all of Plaintiffs' claims are unripe because (1) Plaintiffs have failed to exhaust their administrative remedies "in failing to return to the Planning Board with a completed amended site plan application"; and (2) "Plaintiffs' own actions have caused the necessary changes in how they must now proceed with respect to site plan approvals."

This Court finds that Plaintiffs' claims are ripe for adjudication. "The ripeness doctrine serves 'to determine whether a party has brought an action prematurely and counsels abstention until such time as a dispute is sufficiently concrete to satisfy the constitutional and prudential requirements of the doctrine.' " *Khodara Envtl., Inc. v. Blakey,* 376 F.3d 187, 196 (3d Cir.2004) (quoting *Peachlum v. City of York,* 333 F.3d 429, 433 (3d Cir.2003)). As this Court has explained in its discussion of the ripeness of Plaintiffs' constitutional claims, in *Blanche Road Corp. v. Bensalem Twp.,* 57 F.3d 253 (3d Cir.1995), the Third Circuit held that a plaintiff landowner need not comply with the finality rule where, instead of "appealing from an adverse decision on a permit application," the plaintiff claims that the defendant Township officers "deliberately and improperly interfered with the process by which the Township issued permits, in order to block or to delay the issuance of plaintiff's permits, and that defendants did so for reasons unrelated to the merits of the application for the permits." *Id.,* 57 F.3d at 267-68. It was asserted by the plaintiff in *Blanche Road* that the Township "engaged in a campaign of harassment designed to force [it] to abandon its development of [an] industrial park." *Id.* at 258. The *Blanche Road* court explained that the claim at issue there was "substantially different" from "that presented in the ripeness cases" and that "[s]uch actions, if proven, are sufficient to establish" an actual claim, even if the ultimate outcome of plaintiff's permit applications was favorable." *Id.* at 268. Thus, no further appeals were necessary in order to have a ripe, final determination for a federal court to review.

Looking to this precedent, this Court finds that Plaintiffs' claims are ripe despite Defendants' contentions that Plaintiffs have failed to seek a final

administrative determination of Defendants' revocation of their permits. Like the plaintiff in *Blanche,* Plaintiffs claim that West Orange and its officers and agents deliberately and improperly interfered with the process through which West Orange issues permits, and controls development once permits are issued. This Court denies Defendants' motion to dismiss Plaintiffs' claims on the ground that they are unripe.

### 3. Tortious Interference With Economic Advantage / Contractual Relations (Counts One And Two)

Plaintiffs' first and second causes of action assert claims for tortious interference with prospective economic advantage, and tortious interference with contractual relations, generally. To state a claim for tortious interference with contract or prospective business advantage, Plaintiffs must allege that: (1) they had "some protectable right," or "reasonable expectation of economic advantage;" (2) "the interference was done intentionally ... without justification or excuse;" (3) "the interference caused the loss of the prospective gain;" and (4) "the injury caused the damage." *Printing Mart-Morristown v. Sharp Electronics Corp.,* 116 N.J. 739, 751 (1989). The Complaint must include allegations giving rise to some "reasonable expectation of economic advantage." *Id.*

**\*14** Defendants argue that Plaintiffs' tortious interference claims should be dismissed, pursuant to Rule 12(b)(6), because Plaintiffs cannot establish the "malice" requirement essential to their claims. This Court rejects Defendants' argument. While it may be true that Plaintiffs will not ultimately be able to establish the so-called "malice" element of their tortious interference claims, such an inquiry is beyond this Court's purview in determining whether Plaintiffs have sufficiently *alleged* their claims. As has been explained *supra*, in considering a motion to dismiss for failure to state a claim, pursuant to Rule 12(b)(6), this Court is limited to a consideration of the contents of the Complaint. *See, e.g., County Concrete Corp.,* 442 F.3d at 172 n. 2 ("the District Court here dismissed Counts One through Four on a Rule 12(b)(6) motion to dismiss, and, thus, our review is limited to the factual allegations in the complaint").

Here, Plaintiffs have alleged that "Defendants have intentionally interfered with Plaintiffs' prospective economic advantage *without justification, thereby establishing malice* ...," and that "Defendants have

Slip Copy                                                                                                    Page 12
Slip Copy, 2006 WL 3751395 (D.N.J.)
**(Cite as: Slip Copy)**

intentionally interfered with Plaintiffs' contractual relations *without justification, thereby establishing malice ...*" (Compl., First Count, ¶ 3 (emphasis added); Compl., Second Count, ¶ 3 (emphasis added).)

This Court finds that these allegations are sufficient under the notice-pleading standard to state the intent element of tortious interference. Defendants' motion to dismiss Plaintiffs' tortious interference claims for failure to state a claim upon which relief can be granted is denied.

### 4. Breach Of Fiduciary Duty (Count Five)

Plaintiffs' fifth cause of action asserts a claim for breach of fiduciary duty against Defendants. "The essence of a fiduciary relationship is that one party places trust and confidence in another who is in a dominant or superior position." *McKelvey v. Pierce,* 173 N.J. 26, 57 (2002) (citation omitted). "The fiduciary's obligations to the dependent party include a duty of loyalty and a duty to exercise reasonable skill and care." *Id.* (citing Restatement (Second) of Trusts § § 170, 174 (1959). "[T]he fiduciary is liable for harm resulting from a breach of the duties imposed by the existence of such a relationship." *Id.* (citing Restatement (Second) of Torts § 874 (1979)).

"Public officers hold positions of public trust, and stand in a fiduciary relationship to the people whom they have been appointed to serve." *State v. Markt,* 384 A.2d 162, 166 (N.J.Super.Ct.App .Div.1978) (citing *Driscoll v. Burlington-Bristol Bridge Co.,* 8 N .J. 433, 474 (1952)). "They must serve the public with the highest fidelity." *Id.* "The citizen is not at the mercy of his servants holding positions of public trust nor is he helpless to secure relief from their machinations except through the medium of the ballot, the pressure of public opinion or criminal prosecution." *Driscoll,* 8 N.J. at 476. "Whenever the acts of public officers fail to conform to the standard imposed by the fiduciary relationship in which they stand to the public, relief will be available in the civil courts." *Id.*

**\*15** Here, Plaintiffs allege that "Defendants, as public entities, elected officials, and political appointees stand in fiduciary relationship with their constituents." (Compl., Fifth Count, ¶ 2 .) "As fiduciaries ... Defendants are under an inescapable obligation to serve the public, including taxpayers such as Plaintiffs, with the highest fidelity, intelligence, skill, diligence, conscientiousness,

reasonableness, good faith, honesty, and integrity." (*Id.,* ¶ 3.) Plaintiffs contend that by engaging in the conduct set forth in the Complaint, i.e., by engaging in and promoting a campaign of harassment designed to halt the construction of Plaintiffs' business, "Defendants breached their fiduciary duties to Plaintiffs, and said breach proximately caused Plaintiffs' damages." (*Id.,* ¶ ¶ 6-7.) The Complaint thereby alleges a fiduciary relationship, a duty of "highest fidelity," a breach of that duty, and damages.[FN15] These allegations suffice to state a claim for breach of fiduciary duty. Defendants' motion to dismiss Plaintiffs' breach of fiduciary claim, pursuant to Rule 12(b)(6), is denied.

> FN15. Defendants argue that they acted in accordance with their fiduciary duty in halting construction on Plaintiffs' property because Plaintiffs' failed to abide by the site plan approval procedures set forth by state statute. This contention, like many of Defendants arguments, focuses on what the evidence will ultimately show, i.e., that Defendants were acting in accordance with their fiduciary duties, rather than what is alleged in the Complaint. Even if the evidence ultimately produced does not support Plaintiffs' breach of fiduciary duty claim, because Plaintiffs have alleged a claim upon which relief can be granted, this Court cannot dismiss Plaintiffs' fifth cause of action, pursuant to Rule 12(b)(6). *See County Concrete Corp.,* 442 F.3d at 172 n. 2; *Yarris,* 465 F.3d at 134.

### 5. Legal Malpractice (Count Six)

Plaintiffs' sixth cause of action asserts a claim for legal malpractice against Trenk and his law firm. To state a claim for legal malpractice, Plaintiffs must allege: (1) the existence of an attorney-client relationship creating a duty of care by the defendant attorney, (2) the breach of that duty by the defendant, and (3) proximate causation of the damages claimed by the plaintiff." *McGrogan v. Till,* 167 N.J. 414, 425 (2001) (citing *Conklin v. Hannoch Weisman,* 145 N.J. 395, 416 (1996)). "At the most fundamental level, the legal-malpractice action provides a remedy for negligent professional performance." *Id.* (citation omitted).

Defendants argue that Plaintiffs have failed to allege the existence of an attorney-client relationship creating a duty of care by the defendant attorney.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                                      Page 13
Slip Copy, 2006 WL 3751395 (D.N.J.)
**(Cite as: Slip Copy)**

This Court agrees. Trenk is alleged to be West Orange's attorney. (Compl. at 2.) Nowhere in the Complaint do Plaintiffs allege that they retained Trenk as their counsel. Plaintiffs' conclusory allegation that an attorney-client relationship existed between Plaintiffs and Trenk does not suffice to meet the first element of a claim for legal malpractice. While a court will accept well-pled allegations as true for the purposes of the motion, it will not accept unsupported conclusions, unwarranted inferences, or sweeping legal conclusions cast in the form of factual allegations. *See Morse, 132 F.3d at 906 n. 8.* Contrary to Plaintiffs' contentions, no fiduciary duty exists between Trenk, as the Township's counsel, and Plaintiffs, which gives rise to a legal malpractice claim. This Court shall grant Defendants' motion to dismiss Plaintiffs' claim for legal malpractice, pursuant to Fed.R.Civ.P. 12(b)(6).

**6. *Civil Conspiracy (Count Seven)***

Plaintiffs' seventh cause of action alleges a claim for "civil conspiracy." Defendants have moved to dismiss this cause of action on the grounds that (1) under New Jersey law, there is no independent cause of action for "civil conspiracy"; and (2) it is impossible for a corporation and its agents to conspire with themselves.

**\*16** In order to state a claim for "civil conspiracy," plaintiff must allege "a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damage." *State, Dept. of Treasury, Div. of Inv. ex rel. McCormac v. Qwest Communications Intern., Inc.,* 904 A.2d 775, 785 (N.J.Super.Ct.App.Div.2006) (citing *Morgan v. Union Cty. Bd. of Chosen Freeholders,* 268 N.J.Super. 337, 364 (App.Div.1993)).

"Most importantly, the 'gist of the claim is not the unlawful agreement, 'but the underlying wrong which, absent the conspiracy, would give a right of action.' " " *Id.* (quoting *Morgan,* 268 N.J.Super. at 364 (quoting *Bd. of Educ. v. Hoek,* 38 N.J. 213, 238 (1962))). "[A] cause of action for civil conspiracy is not an independent cause of action; rather, it depends on the existence of an underlying tort." *In re Lead Paint Litigation,* No. A-1946-02T3, 2005 WL 1994172, at \*20 (N.J.Super.Ct.App.Div. Aug. 17, 2005); *see also Farris v. County of Camden,* 61

F.Supp.2d 307, 326 (D.N.J.1999) (under New Jersey law, civil conspiracy is not an independent cause of action; it is a mechanism for expanding liability in the event that the plaintiff can prove the underlying tort); *Board of Educ., Asbury Park v. Hoek,* 38 N.J. 213, 238 (1962) ("The gravamen of an action in civil conspiracy is not the conspiracy itself but the underlying wrong which, absent the conspiracy, would give a right of action").

**a. Plaintiffs Successfully Allege An Underlying Tort**

While Defendants are correct that a claim for civil conspiracy cannot exist absent an underlying tort, here, Plaintiffs' claim does not suffer from such a deficit. As this Court has found, Plaintiffs have successfully alleged state tort claims (tortious interference, breach of fiduciary duty). To the extent Defendants move to dismiss Plaintiffs' civil conspiracy claim for failure to allege an underlying wrong, Defendants' motion is denied.

**a. Plaintiffs Have Failed To Allege That Two Or More Persons Engaged In The Alleged Conspiracy**

Defendants also argue that Plaintiffs' civil conspiracy claim fails because all Defendants engaged in the alleged conspiratorial conduct in their roles as West Orange officials. Defendants are correct that officials and/or employees of the same entity cannot conspire among themselves for purposes of establishing civil conspiracy. "A corporation cannot conspire with itself, just as an individual cannot conspire with himself." *Selman v American Sports Underwriters Inc.,* 697 F.Supp. 225, 238 (W.D.Va.1988). Since a corporation can only act through its agents, officers, and employees, it is legally impossible for a corporation to conspire with these persons, as long as they are acting exclusively within the scope of their employment. *See Tynan v. General Motors Corp.,* 591 A.2d 1024, 1032 (N.J.Super.Ct.App.Div.1991), *rev'd in part on other grounds,* 127 N.J. 269 (1992) (citing *Exxon Corporation v. Wagner,* 154 N.J.Super. 538, 545 (App.Div.1977)); *Cromley v. Board of Education of Lockport Township High School Dist. No.* 205, 699 F.Supp. 1283, 1291-92 (N.D.Ill.1988); *Wolf v.. City of Chicago Heights,* 828 F.Supp. 520, 524 (N.D.Ill.1993); *Selman,* 697 F.Supp. at 238; *Hebron Public School District v. U.S. Gypsum,* 690 F.Supp. 866 (D.N.D.1988), *aff'd,* 953 F.2d 398 (8th Cir.1992). Nor can individual agents, officers, or employees of a corporation, acting in their

Slip Copy
Slip Copy, 2006 WL 3751395 (D.N.J.)
(Cite as: Slip Copy)

representative capacities, conspire among themselves. *Rutherfoord v Presbyterian-University Hospital,* 417 Pa.Super. 316 (1992). This Court notes, however, that a conspiracy is possible between a corporation and its agents, officers, or employees where they were acting as *individuals,* rather than representatives of the corporation. *See Selman,* 697 F.Supp. at 239.

**\*17** Here, Plaintiffs allege that the individual Defendants conspired among themselves, acting as "principals, agents, officers, management, control persons, and/or other employees." (Compl., Seventh Count, ¶ 2.) Plaintiffs have failed to allege that any of the Defendants were acting outside of their official capacity when they engaged in the alleged conduct. Defendants, acting as agents and employees of West Orange, cannot conspire among themselves. *Tynan,* 591 A.2d at 1032. Consequently, Plaintiffs have failed to allege that two or more "persons" acted in concert to commit an unlawful act. Accordingly, Defendants' motion to dismiss Plaintiffs' civil conspiracy claim is granted.

### 7. *Estoppel (Count Nine)*

"Although the doctrine of equitable estoppel is rarely invoked against a governmental entity, this Court has long held that the prevention of manifest injustice provides an exception to the general rule." *Casamasino v. City of Jersey City,* 158 N.J. 333, 354 (1999) (citing *County of Morris v. Fauver,* 153 N.J. 80, 104 (1998); *Vogt v. Borough of Belmar,* 14 N.J. 195, 205 (1954)). Assuming that Plaintiffs can demonstrate a "manifest injustice," in order to assert a claim for equitable estoppel, Plaintiffs must allege that Defendants "engaged in conduct, either intentionally or under circumstances that induced reliance, and that [Plaintiffs] acted or changed [their] position to [their] detriment." *Aqua Beach Condominium Ass'n v. Department of Community Affairs, Bureau of Homeowner Protection, New Home Warranty Program,* 186 N.J. 5, 20 (2006) (quoting *Knorr v. Smeal,* 178 N.J. 169, 178 (2003) (citing *Miller v. Miller,* 97 N.J. 154, 163 (1984))).

Defendants move to dismiss Plaintiffs' cause of action for equitable estoppel on the grounds that Plaintiffs (1) have no legal right or entitlement to proceed with construction that fails to comply with the plans presented to, and approved by, the Planning Board; and (2) "any permits obtained by Plaintiffs were null and void, and neither issued or relied on in good faith." (Defs.' Br. at 35.) This court finds

Defendants' arguments unavailing. Defendants argue about what the proofs ultimately produced will show, rather than focusing on any deficiencies in Plaintiffs' allegations.

Plaintiffs allege that their "plans were approved and permits were issued in good faith by public entities/officials acting within the ambit of their duty," and that they "relied upon said approvals and permits in good faith" to their detriment in continuing to develop and put money into the Property. (Compl., Ninth Count, ¶¶ 2-3.) These allegations suffice to state a claim for equitable estoppel. *See Aqua Beach,* 186 N.J. at 20. This Court denies Defendants' motion to dismiss Plaintiffs' equitable estoppel claim, pursuant to Rule 12(b)(6).[FN16]

> FN16. Count Eight of Plaintiffs' complaint asserts a cause of action for intentional infliction of emotional distress. Defendants have made no general arguments warranting dismissal of this cause of action, and have failed to identify any specific deficiencies in Plaintiffs' complaint regarding this cause of action. Defendants have not met their burden, and this Court will not dismiss Plaintiffs' emotional distress claim. *See Hedges v. United States,* 404 F.3d 744, 750 (3d Cir.2005) ("The defendant bears the burden of showing that no claim has been presented").

### F. *Defendants' Motion For A More Definite Statement Under* Rule 12(e)

Under Rule 12(e), a defendant may move for a more definite statement "[i]f a pleading ... is so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading." Fed.R.Civ.P. 12(e). The Rule 12(e) "motion shall point out the defects complained of and the details desired." *Id.* "When a complaint fashioned under a notice pleading standard does not disclose the facts underlying a plaintiff's claim for relief, the defendant cannot reasonably be expected to frame a proper, fact-specific ... defense; [t]he Rule 12(e) motion for a more definite statement is perhaps the best procedural tool available to the defendant to obtain the factual basis underlying a plaintiff's claim for relief." *Thomas v. Independence Tp.,* 463 F.3d 285, 301 (3d Cir.2006).

**\*18** A defendant who makes a motion for a more definite statement under Rule 12(e) may join that motion with a Rule 12(b) motion to dismiss. FED. R.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

CIV. P. 12(g) ("A party who makes a motion under this rule may join with it any other motions herein provided for and then available to the party"). "When presented with an appropriate Rule 12(e) motion for a more definite statement, the district court shall grant the motion and demand more specific factual allegations from the plaintiff concerning the conduct underlying the claims for relief." *Thomas,* 463 F.3d at 301.

Defendants argue that in the event that this Court determines that any of the counts set forth in the Complaint should not be dismissed for failure to state a claim upon which relief may be granted, this Court should order Plaintiffs to proffer more specific factual allegations because the Complaint is "both vague and ambiguous." Defendants specifically contend that Plaintiffs have failed to define the individual parties and their respective interests in the litigation, or allege specific factual support for a single claim in their ten-count Complaint. Defendants also contend that Plaintiffs set forth numerous irrelevant inflammatory comments about Defendant Trenk.[FN17]

> **FN17.** Although Defendants complain that irrelevant inflammatory comments were directed toward Defendant Trenk, they have not made a motion to strike the allegedly inflammatory language. Therefore, there is no need for this Court to address whether such language should be stricken.

This Court finds that the claims which have not been dismissed, pursuant to Rule 12(b)(6), are sufficiently alleged such that Defendants can reasonably frame a responsive pleading. As Defendants' motion itself demonstrates, Defendants clearly understand the factual allegations underlying Plaintiffs' claims, and have alleged factual reasons why they should not be held liable for each count. Defendants, as the movants, carry the burden of pointing out the "specific defects complained of and the details desired." Fed.R.Civ.P. 12(e). Through their general admonition that the Complaint is vague and ambiguous in failing to allege specific factual support for a single claim" (Defs.' Br. at 38-39), Defendants fail to meet their burden.

This Court also notes that there is no authority supporting the proposition that the inclusion of allegedly inflammatory remarks in a Complaint justifies an order for a more definite statement, pursuant to Rule 12(e). For these reasons, this Court

denies Defendants' motion for a more definite statement.

## IV. *CONCLUSION*

For the reasons stated above, this Court grants in part and denies in part Defendants' motion to dismiss Plaintiffs' Complaint, and denies Defendants' motion for a more definite statement.

D.N.J.,2006.
Marjac, LLC v. Trenk
Slip Copy, 2006 WL 3751395 (D.N.J.)

END OF DOCUMENT

Not Reported in F.Supp.2d                                                                                    Page 1
Not Reported in F.Supp.2d, 2004 WL 603482 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

Minuteman Intern., Inc. v. Great American Ins. Co.
N.D.Ill.,2004.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois, Eastern
Division.
MINUTEMAN INTERNATIONAL, INC., Plaintiff,
v.
GREAT AMERICAN INSURANCE COMPANY,
Defendant.
**No. 03 C 6067.**

March 22, 2004.

S. Joseph Formusa, Rabens, Formusa & Glassman,
Ltd., Chicago, IL, for Plaintiff.
Paul Francis Matousek, Joseph J. Borders, David L.
Koury, Lord, Bissell & Brook LLP, Chicago, IL, for
Defendant.

*MEMORANDUM OPINION AND ORDER*
HART, J.
**\*1** This case involves a dispute over insurance
coverage for expenses related to a Securities and
Exchange Commission ("SEC") investigation which
concluded with the entry of an agreed cease-and-
desist order with affirmative action provisions.
Plaintiff Minuteman International, Inc. was
investigated by the SEC and subsequently entered
into an agreement with the SEC to undertake certain
corrective action. Defendant Great American
Insurance Company declined to pay any "Costs of
Defense" or possible "Loss" on the ground that the
SEC investigation was not a "Claim" as that term is
used in the parties' insurance policy. Presently
pending is Great American's motion to dismiss.

On a Rule 12(b)(6) motion to dismiss, plaintiff's well-
pleaded allegations of fact are taken as true and all
reasonable inferences are drawn in plaintiff's favor.
*Leatherman v. Tarrant County Narcotics Intelligence
& Coordination Unit, 507 U.S. 163, 164, 113 S.Ct.
1160, 122 L.Ed.2d 517 (1993); Dixon v. Page, 291
F.3d 485, 486 (7th Cir.2002); Stachon v. United
Consumers Club, Inc., 229 F.3d 673, 675 (7th
Cir.2000).* A complaint need not set forth all relevant
facts or recite the law; all that is required is a short
and plain statement showing that the party is entitled
to relief. *Fed.R.Civ.P. 8(a)(2); Boim v. Quranic
Literacy Institute, 291 F.3d 1000, 1008 (7th*

*Cir.2002); Anderson v. Simon, 217 F.3d 472, 474 (7th
Cir.2000), cert. denied, 531 U.S. 1073, 121 S.Ct.
765, 148 L.Ed.2d 666 (2001); Scott v. City of
Chicago, 195 F.3d 950, 951 (7th Cir.1999).* Plaintiffs
in a suit in federal court need not plead facts;
conclusions may be pleaded as long as the defendant
has at least minimal notice of the claim. *Fed.R.Civ.P.
8(a)(2); Swierkiewicz v. Sorema N.A., 534 U.S. 506,
512, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002); Higgs v.
Carver, 286 F.3d 437, 439 (7th Cir.2002); Scott, 195
F.3d at 951; Albiero v. City of Kankakee, 122 F.3d
417, 419 (7th Cir.1997); Jackson v. Marion County,
66 F.3d 151, 153-54 (7th Cir.1995).* In the complaint
itself, it is unnecessary to specifically identify the
legal basis for a claim as long as the facts alleged
would support relief. *Forseth v. Village of Sussex,
199 F.3d 363, 368 (7th Cir.2000); Scott, 195 F.3d at
951; Albiero, 122 F.3d at 419; Bartholet v. Reishauer
A.G. (Zurich), 953 F.2d 1073, 1078 (7th Cir.1992).*
However, in response to a motion to dismiss that
raises the issue, the plaintiff must identify the legal
basis for a claim and make adequate legal arguments
in support of it. *Kirksey v. R.J. Reynolds Tobacco
Co., 168 F.3d 1039, 1041-42 (7th Cir.1999); Stransky
v. Cummins Engine Co., 51 F.3d 1329, 1335 (7th
Cir.1995); Levin v. Childers, 101 F.3d 44, 46 (6th
Cir.1996); Carpenter v. City of Northlake, 948
F.Supp. 759, 765 (N.D.Ill.1996).* As long as they are
consistent with the allegations of the complaint, a
plaintiff may assert additional facts in his or her
response to a motion to dismiss. *Brokaw v. Mercer
County, 235 F.3d 1000, 1006 (7th Cir.2000); Forseth,
199 F.3d at 368; Albiero, 122 F.3d at 419; Gutierrez
v. Peters, 111 F.3d 1364, 1367 n. 2 (7th Cir.1997).*
Also, documents that are referred to in the complaint
and that are central to a claim that is made may be
considered even if not attached to the complaint.
*Duferco Steel Inc. v. M/V Kalisti, 121 F.3d 321, 324
n. 3 (7th Cir.1997); Venture Associates Corp. v.
Zenith Data Systems Corp., 987 F.2d 429, 431 (7th
Cir.1993); Hebein ex rel. Berman v. Young, 37
F.Supp.2d 1035, 1038-39 (N.D.Ill.1998).* This may
include the full text of an SEC filing or document
that is integral to the complaint. *See Bovee v.
Coopers & Lybrand C.P.A., 272 F.3d 356, 360-61
(6th Cir.2001); Ehlert v. Singer, 245 F.3d 1313, 1316
n. 4 (11th Cir.2001); San Leandro Emergency
Medical Group Profit Sharing Plan v. Philip Morris
Cos., 75 F.3d 801, 808-09 (2d Cir.1996); Abrams v.
Van Kampen Funds, Inc., 2002 WL 1160171 \*2
(N.D.Ill. May 30, 2002); In re Newell Rubbermaid*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                                  Page 2
Not Reported in F.Supp.2d, 2004 WL 603482 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

*Inc. Securities Litigation*, 2000 WL 1705279 *3 n. 2 (N.D.Ill. Nov.14, 2000).

**\*2** The following facts are taken to be true for purposes of ruling on defendant's motion to dismiss. For the pertinent time period, plaintiff had a "claims made" directors and officers liability policy with defendant (the "Policy"). On November 13, 2001, the SEC issued an order entitled "Order Directing a Private Investigation and Designating Officers to Take Testimony" (the "2001 Order"). The 2001 Order stated that SEC staff had reported information indicating that, in connection with securities transactions, Minuteman officers and others may have made false or misleading statements, failed to keep accurate records and accounts, and failed to implement and maintain a system of internal accounting controls. The 2001 Order directs that a private investigation be undertaken as to these matters and the Order empowers specified individuals to administer oaths and affirmations, subpoena witnesses, etc., in order to conduct this investigation.

A subpoena dated November 21, 2001 was served on plaintiff and certain of its officers and employees requiring appearances for depositions and the production of specified categories of documents. On January 22, 2002, written notice of the investigation and subpoena was provided to defendant. Plaintiff expended in excess of $57,000 complying with the document production aspect of the subpoena. Additional subpoenas requiring more depositions and document production were also issued. Deponents retained counsel and defendant reimbursed the deponents for their legal fees, which was an amount in excess of $418,000. Plaintiff contends these two expenses qualify as "Costs of Defense" under the Policy.

On May 31, 2003, the SEC entered a cease-and-desist order making findings and imposing "undertakings" under the Securities and Exchange Act of 1934. This order was based on the acceptance of plaintiff's offer to settle the matter without admitting or denying the findings contained in the cease-and-desist order. The findings included that certain earnings were misstated. Plaintiff and certain officers were ordered to cease and desist from engaging in securities law violations. Plaintiff was also required to: (1) employ, for five years, a Chief Accounting Officer who would be responsible for reviewing filings with the SEC and be responsible for all financial reporting; (2) implement written internal procedures to ensure quarterly sales were recorded in accordance with

generally accepted accounting principles; and (3) retain an additional auditing firm to conduct quarterly audits and review internal controls. It is alleged that the Chief Accounting Officer and additional auditor will cost an estimated $420,000 or more. Plaintiff contends this expense is a "Loss" from a "Settlement" under the terms of the Policy.

In response to plaintiff's January 22, 2002 notice, defendant stated that it was proceeding under a reservation of rights. Plaintiff continued to keep defendant advised of the SEC proceedings and continued to maintain that the proceedings constituted a Claim under the Policy. Defendant took the position that it was not a Claim and eventually denied plaintiff's request for reimbursement.

**\*3** In its motion to dismiss, defendant contends no aspect of the SEC proceedings constitutes a "Claim" as that term is used in the Policy. Even if the Claim requirement is satisfied, defendant contends neither the cost of the Chief Accounting Officer nor the cost of the additional auditor qualifies as a "Loss" as that term is used in the Policy. Defendant does not presently dispute that the other expenses would qualify as Costs of Defense if the SEC proceedings constitute a Claim.

Section III of the Policy is entitled "Definitions." [FN1] It includes the following two definitions:

> FN1. All bold-face terms appear as such in the Policy and are terms defined in the definitional section of the Policy.

A. "Claim" shall mean:
(1) a written demand for monetary or nonmonetary relief made against any Insured ...; or
(2) a civil, criminal, administrative or arbitration proceeding made against any Insured seeking monetary or non-monetary relief and commenced by the service of a complaint or similar pleading, the return of an indictment, or the receipt or filing of notice of charges or similar document, including any proceeding initiated against any Insured before the Equal Employment Opportunity Commission or any similar governmental body.

P. "Securities Claim" shall mean any Claim (including a civil lawsuit or criminal proceeding brought by the Securities and Exchange Commission) made against an Insured alleging a violation of any

Not Reported in F.Supp.2d                                                                                    Page 3
Not Reported in F.Supp.2d, 2004 WL 603482 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

law, regulation or rule, whether statutory or common law, which is:
(1) brought by any person or entity alleging, arising out of, based upon or attributed to, in part or in whole, the: (a) purchase or sale, or (b) offer or solicitation of an offer to purchase or sell, any securities of the Company, or....

A definition for "Loss" is set forth in § III.L. of the Policy, but the definition in the body of the Policy is superseded by one or more definitions contained in two endorsements. The "Illinois Amendatory Endorsement," which is labeled "Endorsement 1," provides in part:
In compliance with the insurance regulations of the state of Illinois, the following provisions are hereby added to the Policy. In the event that a similar provision is already contained in the Policy, the provisions of this endorsement shall take precedence over such similar provision.

8. It is understood and agreed that Section III.L. of the Policy is hereby deleted and replaced with the following:
Section III.L. "Loss" shall mean compensatory damages, punitive or exemplary damages, the multiple portion of any multiplied damage award (in Illinois only vicariously assessed punitive damages are insurable), settlements and Costs of Defense, provided, however, Loss shall not include criminal or civil fines or penalties imposed by law, taxes, or any matter which may be deemed uninsurable under the law pursuant to which this Policy shall be construed. It is understood and agreed that the enforceability of the foregoing coverage shall be governed by such applicable law which most favors coverage for punitive or exemplary damages or the multiple portion of any multiplied damage award. Loss shall also not include any portion of damages, judgments or settlements arising out of any Claim alleging that the Company paid an inadequate price or consideration for the purchase of the Company's securities.

**\*4** The only language difference between the definition of Loss contained in the endorsement and the definition contained in the body of the Policy is the addition of the parenthetical language regarding vicariously assessed punitive damages.

There is another endorsement entitled "Insured Entity Coverage." This endorsement is labeled as

"Endorsement 2" and states in part:
2. Section III.L. of the Policy is amended by the addition of the following:
Loss, other than Costs of Defense, shall also not include:
(1) any obligation of the Insured Entity pursuant to any federal, state or local statutory law governing employment or benefits including but not limited to ...;
(2) any obligation of the Insured Entity as a result of a Claim seeking relief or redress in any form other than money damages, including but not limited to any obligation of the Insured Entity to modify any building or property; or
(3) any obligation of the Insured Entity to pay salary, wages or other employment-related benefits to any employee under an express or implied contract;

The parties dispute the meaning of the term "Claim," as used in the Policy. More specifically, the central aspect of the parties' dispute is the meaning of the phrase "non-monetary relief."

Although not in any way inconsistent, the definition of the term "Securities Claim," need not be construed in order to resolve the pending motion. The definition of "Securities Claim" fully incorporates the definition of Claim, "a 'Securities Claim' shall mean any Claim." A Securities Claim is simply a particular type of Claim. Other provisions of the Policy provide for special rules applicable to Securities Claims, but not applicable to all other types of Claims. Defendant does not presently rely on any of those provisions. As long as the SEC proceedings constitute a Claim, there is coverage regardless of whether the Claim also falls into the subcategory of being a Securities Claim.

Defendant does not dispute that the SEC proceeding met the requirement of being a "written demand" (§ III.A.(1)) and/or an "administrative ... proceeding" (§ III.A.(2)). The word "relief" is not further defined in the Policy.

The parties agree that Illinois law applies to their dispute. In construing terms of an insurance policy, the terms must be considered in the context of the entire policy and the parties' intentions. If language is unambiguous, it should be given its plain, ordinary, and popular meaning; language should not be distorted to create an ambiguity or support a desired result. *Travelers Insurance Co. v. Eljer Manufacturing, Inc.,* 197 Ill.2d 278, 258 Ill.Dec. 792, 757 N.E.2d 481, 491 (2001); *Wallis v. Country Mutual Insurance Co.,* 309 Ill.App.3d 566, 243

Not Reported in F.Supp.2d                                                              Page 4
Not Reported in F.Supp.2d, 2004 WL 603482 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

Ill.Dec. 344, 723 N.E.2d 376, 381 (2d Dist.), *appeal denied,* 189 Ill.2d 682, 246 Ill.Dec. 923, 731 N.E.2d 772 (2000); *Tribune Co. v. Allstate Insurance Co.,* 306 Ill.App.3d 779, 239 Ill.Dec. 818, 715 N.E.2d 263, 268 (1st Dist.), *appeal denied,* 186 Ill.2d 590, 243 Ill.Dec. 569, 723 N.E.2d 1170 (1999). However, if there is an ambiguity, it must be strictly construed against the insurer and in favor of coverage. *Eljer,* 258 Ill.Dec. 792, 757 N.E.2d at 491.

**\*5** Defendant contends an SEC investigation is not a proceeding in which relief is sought. Defendant draws a dichotomy between seeking relief in the form of monetary damages, injunctive-type sanctions, or criminal charges and performing the investigation that leads up to a request for that type of relief. Plaintiff has a broader view of relief. Plaintiff contends that the relief sought by the 2001 Order and subsequent subpoenas was the subjects' responses, that is a subject of a subpoena appearing to provide testimony or a subject responding by providing documents. Furthermore, it is asserted that the cease-and-desist order does impose the type of sanctions that defendant considers to be relief.

No case has been cited or found which involves an insurance policy with the exact same definition of "claim" and the question of whether an agency's investigative proceedings constitute a claim. Defendant relies on *Foster v. Summit Medical Systems, Inc.,* 610 N.W.2d 350 (Minn.Ct.App.2000) (*"Foster"* ). [FN2] In that case, the policy defined a Securities Action Claim as including an administrative proceeding relating to the sale of securities "in which [the insureds] may be subjected to a binding adjudication of liability for damages or other relief." *Id.* at 354. The Policy presently before the court does not define Claim as requiring that a "binding adjudication of liability" be sought. The Policy only requires a "demand for ... non-monetary relief" or an "administrative proceeding ... seeking ... non-monetary relief." Policy § III.A.(1), (2).

FN2. Defendant also cites an unpublished decision of a California Court of Appeal. Unpublished decisions of other courts are not to be considered to the extent the rules of the issuing court prohibit consideration of the unpublished decision. *Aetna Casualty & Surety Co. of Hartford, Conn. v. Kerr-McGee Chemical Corp.,* 875 F.2d 1252, 1255 n. 2 (7th Cir.1989); *Kingvision Pay Per View, Ltd. v. Boom Town Saloon, Inc.,* 98 F.Supp.2d 958, 959 n. 1 (N.D.Ill.2000).

*See also Doty v. Doyle,* 182 F.Supp.2d 750, 752 n. 3 (E.D.Wis.2002). California rules do not permit unpublished appellate court decisions to be considered, even for their persuasive value. Cal. Ct. R. 977; *People v. Russo,* 25 Cal.4th 1124, 108 Cal.Rptr.2d 436, 25 P.3d 641, 646 n. 1 (2001); *In re Antablian,* 140 B.R. 534, 536-37 (Bankr.C.D.Cal.1992). The unpublished California Court of Appeal case that is cited by defendant will not be considered.

The *Foster* decision focused on the use of "relief" in defining claim, but considered it as part of a phrase that included "binding adjudication." *See Foster,* 610 N.W.2d at 354 ("The parties agree that the SEC investigation is an administrative proceeding but dispute whether it is a proceeding in which respondents 'may be subjected to a binding adjudication for * * * relief.' "). The *Foster* court took a narrow view of "relief," construing it in the context of an adjudication, which was appropriate given the language of the policy there under consideration.

Respondents argue that the investigation satisfies this requirement because the SEC issued a subpoena duces tecum. But the ordinary understanding of the term "relief" is assistance or something that lessens pain or discomfort. *See* American Heritage Dictionary 1044 (2d ed.1976). In a legal context, the term "relief" refers to redress or benefit, especially equitable redress such as an injunction or specific performance. *See* Black's Law Dictionary 1293 (7th ed.1999). Issuing a subpoena does not fit within either meaning of the term "relief." *See City of Thief River Falls v. United Fire & Cas. Co.,* 336 N.W.2d 274, 276 (Minn.1983) (holding that petition for mandamus to compel city to initiate condemnation proceedings was not a "suit * * * seeking damages" within the plain meaning of the insurance policy because its essence was to secure performance of a legally required act rather than provide damages).

**\*6** *Foster,* 610 N.W.2d at 354.

Defendant also cites *Center for Blood Research, Inc. v. Coregis Insurance Co.,* 305 F.3d 38 (1st Cir.2002). In that case, the United States Attorney served an investigative subpoena on the insured under authority of the Health Insurance Portability and Accountability Act of 1996, 18 U.S.C. § 3486. The insured was not a target of the investigation and was not charged civilly or criminally, though one of its employees did subsequently plead guilty to taking kickbacks. The definition of "claim" in the policy

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 603482 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

included "any judicial or administrative proceeding in which any INSURED(S) may be subjected to a binding adjudication of liability for damages or other relief." *See id.* at 40-41. In holding that there was no claim, the First Circuit focused on the lack of an adjudication for liability, *see id.* at 42-43, which is not part of the definition of Claim in the Policy pertinent to the pending case. *Coregis* is readily distinguishable from the present case.

Plaintiff cites to *Richardson Electronics, Ltd. v. Federal Insurance Co.,* 120 F.Supp.2d 698 (N.D.Ill.2000). That case involved a Justice Department investigation of possible criminal antitrust violations, including service of a civil investigative demand with various interrogatories and subpoenas requiring the production of documents and testimony. *See id.* at 700. It was held that the investigation itself constituted a claim under the claims-made policy at issue. *Id.* at 701. The policy did not define "claim," so the court followed Illinois law which construes "claim" in a claims-made insurance policy as being an actual demand for something due. *Id.* (quoting *Central Illinois Public Service Co. v. American Empire Surplus Lines Insurance Co.,* 267 Ill.App.3d 1043, 204 Ill.Dec. 822, 642 N.E.2d 723, 725-26 (1st Dist.1994), *appeal denied,* 161 Ill.2d 524, 208 Ill.Dec. 358, 649 N.E.2d 414 (1995)). There was no requirement that the demand be for money. Being required to comply with demands for testimony and production of documents was a demand for something due that constituted a claim. *Richardson,* 120 F.Supp.2d at 701. Defendant attempts to distinguish *Richardson* on the ground that claim was not defined in the policy at issue, but the common law definition applied (an actual demand for something due) is very close to the Policy's "demand for ... relief."

In *Polychron v. Crum & Forster Insurance Co.,* 916 F.2d 461 (8th Cir.1990), the issue was whether a grand jury investigation constituted a "claim" under a claims-made policy. A grand jury subpoena was served on a bank. The subpoena sought documents related to the time period when Polychron was the bank's president and Polychron was subsequently questioned by a prosecutor and Internal Revenue Service officers. Polychron was eventually indicted, but was acquitted. As an insured under the policy at issue, Polychron sought reimbursement for his legal expenses during the investigation phase. The policy did not define "claim," but the court indicated it meant "[t]o demand as one's own or as one's right; to assert; to urge; to insist," not just "cause of action." *Id.* at 463 (quoting Black's Law Dictionary (5th

ed.1979)). Referring to the district court's use of "cause of action" as the definition, the Eighth Circuit held:

**7** the term "claim" has a broader definition. We believe that definition encompasses the first grand-jury investigation of Mr. Polychron. The function of a subpoena is to command a party to produce certain documents and therefore constitutes a "claim" against a party. The subpoena, it is true, was directed to the bank, but the documents demanded (not merely requested, as defendants would have it) related to the plaintiff's conduct as a bank official. Further, the grand jury's investigation and the questioning by the Assistant United States Attorney amounted, as a practical matter, to an allegation of wrongdoing against Mr. Polychron, for which he prudently hired an attorney. The defendants' characterization of the grand-jury investigation as mere requests for information and an explanation underestimates the seriousness of such a probe. As later events proved, the plaintiff was the target of the investigation.

*Polychron,* 916 F.2d at 463.

The *St. Paul Mercury Insurance Co. v. Foster,* 268 F.Supp.2d 1035, 1046-48 (C.D.Ill.2003) ("*St.Paul*"), case involves a factual setting distinguishable from the present case, but policy language close to that in the Policy. The policy in the *St. Paul* case defined "claim" as including a "written demand against any insured for monetary damages or other relief." *See id.* at 1046. In *St. Paul,* an attorney representing employees in an employee stock ownership plan ("ESOP") wrote a letter to ESOP officials requesting plan documents. The letter also refers to a drop in share values and a need for facts and documentation material to protecting the interests of the attorney's clients. *See id.* at 1047. The court held that such a request for information, even with allusions to a potential basis for a lawsuit, did not constitute a claim under the policy's definition. *Id.* at 1047-48. *St. Paul* distinguished the situation in *Richardson* on grounds that would also distinguish *St. Paul* from the present case. "[T]he third-party demanding documents in [*Richardson*] was the Department of Justice serving a Civil Investigative Demand and subpoena, and the seriousness of such an investigation was clearly material to the district court's determination.... The fact that th[e] particular inquiry [in *St. Paul*] purports to request information pursuant to ERISA does not transform an otherwise ordinary request for information into the substantive equivalent of a Department of Justice subpoena or Civil Investigative Demand." *St. Paul,* 268 F.Supp.2d at 1047, 1048. Also, unlike the present case and the

Not Reported in F.Supp.2d                                                    Page 6
Not Reported in F.Supp.2d, 2004 WL 603482 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

other cases that have been cited, in *St. Paul,* finding that there was not a claim favored the insured, not the insurer. Thus, unlike the present case, any doubts should have been resolved in favor of finding no claim.

The present case involves SEC orders and SEC subpoenas. If plaintiff or any of its employees had failed to comply with the subpoenas, the SEC could have brought suit in court to require compliance with the subpoena. *See* 15 U.S.C. § § 78v(b), 78u(c). The "relief" that could have been granted in such a proceeding would have been requiring plaintiff and/or its employees to produce documents and/or appear for a deposition. *See Penfield Co. of Cal. v. SEC,* 330 U.S. 585, 590, 67 S.Ct. 918, 91 L.Ed. 1117 (1947). *See also* Commodities Futures Trading Commission v. Collins, 997 F.2d 1231, 1232 (7th Cir.1993) (enforcement of CFTC subpoena). The Policy's definition of Claim is not limited to a lawsuit. Claim also includes a "written demand." Just as being required to produce documents or provide testimony would be relief in a court proceeding seeking enforcement of an SEC subpoena, the relief sought by the subpoena itself is the production of documents or testimony. Consistent with *Richardson* and *Polychron,* the 2001 Order and subsequent subpoenas served on plaintiff were demands for relief in that they were demands for something due. A demand for "relief" is a broad enough term to include a demand for something due, including a demand to produce documents or appear to testify. Moreover, as indicated in *St. Paul,* an SEC subpoena is not a mere request for information, but a substantial demand for compliance by a federal agency with the ability to enforce its demand. The investigative proceedings at issue in the present case constituted a Claim as that term is used in the Policy. The Costs of Defense claims will not be dismissed.

**\*8** Still to be considered is defendant's argument that the expenses of the Chief Accounting Officer and additional auditor required by the cease-and-desist order do not constitute a "Loss" as that term is used in the Policy. This dispute boils down to the question of whether the Loss definition provisions contained in the Insured Entity Coverage endorsement (Endorsement 2) is part of the Policy. If it is part of the Policy, plaintiff raises no argument that those expenses would not qualify as a Loss because the expenses are an obligation of plaintiff as a result of a Claim seeking relief or redress in a form other than money damages. Plaintiff contends the Loss provision of the Insured Entity Coverage endorsement is not part of the Policy because the

Illinois Amendatory Endorsement (Endorsement 1) overwrote any similar provisions, including the Loss definition in the Insured Entity Coverage endorsement. Defendant contends the Illinois Amendatory Endorsement simply replaced the Loss definition in the body of the Policy by adding one phrase and did not affect the additions to the Loss definition contained in the Insured Entity Coverage.

A policy and its endorsements are to be construed together in determining the meaning and effect of the insurance contract. *Rockford Mutual Insurance Company v. Economy Fire & Casualty Co.,* 217 Ill.App.3d 181, 160 Ill.Dec. 187, 576 N.E.2d 1141, 1144 (5th Dist.1991). If possible, effect is to be given to all parts of a policy, including endorsements. *Central Illinois Public Service Co. v. Allianz Underwriters Insurance Co.,* 240 Ill.App.3d 598, 181 Ill.Dec. 82, 608 N.E.2d 155, 158 (1st Dist.1992). Where a conflict exists between the body of the policy and the provisions of an attached endorsement, the endorsement will control. *Tribune,* 239 Ill.Dec. 818, 715 N.E.2d at 268; *Central Illinois,* 181 Ill.Dec. 82, 608 N.E.2d at 159; *Rockford Mutual,* 160 Ill.Dec. 187, 576 N.E.2d at 1144-45. Similarly, if there are two inconsistent endorsements and one endorsement is subsequent to the other endorsement, the later endorsement generally will control. *INA of Texas v. Leonard,* 714 S.W.2d 414, 416-17 (Tex.Ct.App.1986); *John Beaudette, Inc. v. Sentry Insurance,* 94 F.Supp.2d 77, 142 n. 90 (D.Mass.1999); *Couch on Insurance* § 21:21 (2003); John Alan Appleman & Jean Appleman, *Insurance Law & Practice,* § 7538 at 165 (1976). However, if no basis exists for favoring one endorsement over the other and the two endorsements are irreconcilably inconsistent, the general rule would be followed of resolving the ambiguity in favor of the insured. *See Reisman v. Coleman,* 193 A.D.2d 659, 598 N.Y.S.2d 12 (1993); *INA,* 714 S.W.2d at 417; *Rusthoven v. Commercial Standard Insurance Co.,* 387 N.W.2d 642, 644-45 (Minn.1986).

The Illinois Amendatory Endorsement (Endorsement 1) is the first endorsement added to the body of the Policy. As is stated at the beginning of this endorsement, the nine provisions contained therein take precedence over similar provisions "already contained in the Policy." This beginning paragraph also states that the provisions contained therein are being added in compliance with Illinois insurance regulations. As indicated by this beginning paragraph, the intent of this endorsement is to conform defendant's standard policy form with the requirements of Illinois law. Thus, § 8 of this

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 603482 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

endorsement adds language to the definition of Loss that conforms to Illinois case law that limits coverage for punitive damages to those that are assessed vicariously. *See International Surplus Lines Insurance Co. v. Pioneer Life Insurance Co. of Ill., 209 Ill.App.3d 144, 154 Ill.Dec. 9, 568 N.E.2d 9, 17 (1st Dist.1990), appeal denied, 141 Ill.2d 542, 162 Ill.Dec. 490, 580 N.E.2d 116 (1991); Warren v. Lemay, 144 Ill.App.3d 107, 98 Ill.Dec. 279, 494 N.E.2d 206, 212 (5th Dist.1986); United States Fidelity & Guaranty Co. v. Open Sesame Child Care Center, 819 F.Supp. 756, 761 (N.D.Ill.1993); GTE North Inc. v. First State Insurance Co., 1990 WL 186470 *3 (N.D.Ill. Oct.25, 1990).*

*9 Endorsement 1 takes precedence over the Loss definition "already contained in the Policy," that is, the definition contained in the body of the Policy. This endorsement does not state that it takes precedence over subsequent provisions, that is, the provisions contained in Endorsement 2 (Insured Entity Coverage) which followed. Further, there is no contention that the language added to the Loss definition by Endorsement 2 [FN3] is inconsistent with Illinois law and thus inconsistent with the purpose of Endorsement 1. Moreover, it would be unreasonable to read the beginning paragraph of Endorsement 1 as absolutely preventing any possible amendment or further endorsement regarding any of the subject matter covered by the nine provisions in Endorsement 1. Construing the Policy, together with its endorsements, the definition of Loss consists of the language contained in § 8 of Endorsement 1 and the additional language contained in § 2 of Endorsement 2. In accordance with the added language of subsection (2), the expenses for the Chief Accounting Officer and additional auditor are not a Loss for which plaintiff could be entitled to reimbursement. Plaintiff's claims will be dismissed to the extent they seek such reimbursement.

FN3. Endorsement 2 adds language to the definition of Loss, but it does not add coverage. Instead, the additional language contains exclusions from the definition of Loss.

Defendant also moves to dismiss Count III of the Complaint, which, pursuant to 215 ILCS 5/155, seeks attorney fees and a penalty for unreasonable and vexatious delay in paying insurance proceeds. Taking an unsuccessful position is not enough to impose a penalty under this provision; the insurer's behavior must be willful and without reasonable cause.

Citizens First National Bank of Princeton v. Cincinnati Insurance Co., 200 F.3d 1102, 1110 (7th Cir.2000). "[A]n insurer's conduct is not vexatious and unreasonable if: (1) there is a bona fide dispute concerning the scope and application of insurance coverage; (2) the insurer asserts a legitimate policy defense; (3) the claim presents a genuine legal or factual issue; or (4) the insurer takes a reasonable legal position on an unsettled issue of law." Id. (citations omitted; emphasis added).

On the facts alleged in the complaint, defendant's argument that the SEC investigation was not a Claim has been rejected. However, it was not unreasonable for defendant to argue otherwise. There is no case on point which decides whether an SEC investigation constitutes a Claim under the particular language of the Policy. There are cases, involving other policy language, that hold an SEC investigation or other similar agency investigation does not qualify as a claim and those cases contain some reasoning that supports defendant's position. Although those cases were distinguished and defendant's arguments were rejected, reasonable litigants could differ. On the facts alleged, it could not be found that defendant took an unreasonable and vexatious position. Count III will be dismissed.

This does not appear to be a case that requires much, if any, discovery. In the event some is necessary, however, a short period for discovery will be permitted. It may very well be, though, that this case is susceptible to settlement. Within 14 days from the date of today's order, counsel for both sides (or the parties themselves) shall discuss the possibility of settlement. If settlement does not appear likely, the parties must promptly complete discover in accordance with the date set herein.

*10 IT IS THEREFORE ORDERED that defendant's motion to dismiss [5-1] is granted in part and denied in part. Counts I and II of the Complaint are dismissed in part to the extent they seek damages for expenses related to plaintiff retaining a Chief Accounting Officer and additional auditor. Count III of the Complaint is dismissed in its entirety. Within 20 days, defendant shall answer the remaining allegations of the Complaint. All discovery is to be completed by April 27, 2004. A status hearing will be held on April 28, 2004 at 11:00 a.m.

N.D.Ill.,2004.
Minuteman Intern., Inc. v. Great American Ins. Co.
Not Reported in F.Supp.2d, 2004 WL 603482 (N.D.Ill.)

Not Reported in F.Supp.2d                                                                 Page 8
Not Reported in F.Supp.2d, 2004 WL 603482 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**


END OF DOCUMENT

©  2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.