# UNREPORTED CASES

Westlaw.

Slip Copy                                                                                                              Page 1
Slip Copy, 2007 WL 1115929 (C.A.3 (Pa.))
**(Cite as: Slip Copy)**

H

Carr v. Gillis Associated Industries, Inc.
C.A.3 (Pa.),2007.
Only the Westlaw citation is currently available.This case was not selected for publication in the Federal Reporter.NOT PRECEDENTIAL Please use FIND to look at the applicable circuit court rule before citing this opinion. Third Circuit Local Appellate Rule 28.3(a) and Internal Operating Procedure 5.3. (FIND CTA3 Rule 28.0 and CTA3 IOP APP I 5.3.)
United States Court of Appeals,Third Circuit.
Brian CARR; Marilyn Carr, Appellants
v.
GILLIS ASSOCIATED INDUSTRIES, INC., A Division of Leggett & Platt, Inc.; Jarke Corporation.
No. 06-2489.

Submitted Under Third Circuit LAR 34.1(a) March 26, 2007.
Filed April 16, 2007.

On Appeal from the United States District Court for the Eastern District of Pennsylvania (D.C. No. 04-cv-05345), District Judge: Honorable Thomas N. O'Neill, Jr.

Mark B. Segal, Segal Law Offices, West Chester, PA, Mark B. Segal, Jonathan Dryer, Wilson, Elser, Moskowitz, Edelman & Dicker, Philadelphia, PA, for Appellants.

Before FISHER, JORDAN and ROTH, Circuit Judges.

OPINION OF THE COURT
FISHER, Circuit Judge.
**\*1** In this personal injury action, plaintiff Brian Carr appeals from a grant of summary judgment in favor of defendant Gillis Associated Industries, Inc. ("Gillis"). Because there is no genuine issue of material fact in this case and Gillis is entitled to judgment as a matter of law, we will affirm.

I.

We write only for the parties and our recitation of the facts will therefore be brief. Brian **Carr** was injured on January 16, 2003, at his place of employment while using a rolling steel ladder designed,

manufactured and sold by Gillis. At the time of his injury, **Carr** had parked the ladder in front of a shelf in order to retrieve stock. When parked, the ladder rests on two back wheels and two stationary supporting front legs. **Carr** was standing on the ladder reaching toward the shelf for a part when the ladder began to roll away, causing **Carr** to fall and allegedly injure his back and right knee. An investigation conducted by **Carr's** employer, Welex, Inc., concluded that the accident was the result of poor maintenance of the ladder. Specifically, the rubber crutch tips of the two stationary supporting legs of the ladder had worn down so that they no longer provided the traction necessary to hold the ladder in place when parked.

Carr's original expert report alleged that the ladder was defective because its design allowed the metal of the tubular support legs to cut through the rubber crutch tips attached to the ends of the legs. It stated that if metal discs had been welded to the bottom of the metal feet, or if the rubber crutch tips had been reinforced with steel, wearing down of the rubber would have been prevented. The report also alleged that the warning label attached to the ladder was defective in that it inadequately warned the user to inspect the condition of the crutch tips and failed to specify replacement of the rubber tips when they were worn down. The report proposed that the label should instruct the user to turn the ladder on its side every week to inspect the rubber feet for wear.

In response, Gillis's expert produced a report indicating that the ladder, as originally manufactured and sold, did in fact include metal washer inserts designed to protect the rubber tips. According to the report, the rubber tips on the ladder at the time of the accident were replacement parts of unknown origin that were not authorized for use by the manufacturer. In addition, the expert report took issue with Carr's expert's proposed warning label, stating that the original warnings on the ladder were concise, easy to understand, and in full compliance with applicable safety standards. Gillis therefore moved for summary judgment on the basis that the subject ladder was, as a matter of law, not defective at the time of sale.

In his papers opposing the motion for summary judgment, Carr attached an "addendum" report in which his expert stated that the opinions contained in his original report remained the same. That

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

addendum, however, also responded to the undisputed fact that the rubber tips on the ladder were replacement parts. It asserted that Gillis did not provide adequate warnings regarding the necessity to use steel reinforced crutch tips as replacement parts. The District Court found that the change in theory was untimely, made two months after **Carr's** original expert report was due, and that **Carr's** expert should have known that the rubber tips on the ladder were replacements at the time of his original report. It therefore disregarded the addendum and only considered the original expert report in its summary judgment analysis.

**\*2** As neither party disputed that the accident was caused by the worn down rubber crutch tips or that these tips were unauthorized replacements parts, the District Court found that there were no genuine issues as to any material fact. In addition, the District Court found that the ladder was sold with the type of rubber tips conceded by Carr's original expert report to be proper. Applying Pennsylvania law, it concluded therefore that Gillis was entitled to summary judgment under Rule 56 of the Federal Rules of Civil Procedure. This timely appeal followed.

## II.

The District Court had diversity jurisdiction under 28 U.S.C. § 1332. A grant of summary judgment is a final order for purposes of appeal and we therefore have jurisdiction under 28 U.S.C. § 1291. *Selkridge v. United of Omaha Life Ins. Co.,* 360 F.3d 155, 160 (3d Cir.2004). Our review of an order granting summary judgment is plenary, *Moore v. City of Philadelphia,* 461 F.3d 331, 340 (3d Cir.2006), applying the same test employed by the District Court under Federal Rule of Civil Procedure 56(c). Summary judgment is appropriate when, after considering the record as a whole, it appears that "there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In examining the record, we draw all reasonable inferences in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986). We review decisions of the district courts pertaining to the admission of expert testimony for abuse of discretion. *Knight v. Otis Elevator Co.,* 596 F.2d 84, 87 (3d Cir.1979).

## III.

Under Pennsylvania law, to maintain a claim for product liability under a theory of negligence or strict liability, a plaintiff must show, inter alia, that the product at issue was defective and that the defect was the proximate cause of the injuries complained of. *See Wilson v. Vermont Castings, Inc.,* 170 F.3d 391, 396 (3d Cir .1999); *Spino v. John S. Tilley Ladder Co.,* 696 A.2d 1169 (Pa.1997). A product is defective if it lacks any element necessary to make it safe for its intended use or has any feature which renders it unsafe for the intended use when it leaves the control of the manufacturer or seller. *See Azzarello v. Black Bros. Co.,* 391 A.2d 1020, 1027 (Pa.1978). The word "defective" is a term of art and "[i]t is a judicial function to decide whether, under the plaintiff's averment of the facts, recovery would be justified...." *Id.* at 1026. In other words, should the court determine that a defect does not exist or "that the defect was not a legal cause of the injury, then the defendant is entitled to judgment as a matter of law. *Surace v. Caterpillar, Inc.,* 111 F.3d 1039, 1053 (1997).

In this case, the District Court correctly concluded that **Carr** had not demonstrated that Gillis was liable for any alleged design defect in the ladder. **Carr's** own expert opined that the accident occurred because the metal feet of the ladder had cut into and worn through the rubber crutch tips of the ladder, resulting in a loss of the traction required to prevent the ladder from slipping. He further opined that a metal disc the diameter of the metal feet, either welded to the bottom of the legs or inserted into the rubber tips, would have prevented the wearing down of the rubber. Apparently unbeknownst to Carr's expert, this was precisely the design of the original rubber crutch tips of the ladder. In other words, the proposed "alternative" remedial design was the very same design utilized by Gillis. In addition, it is undisputed that the defectively designed replacement tips were not provided or authorized by Gillis. This fact is fatal to Carr's claim for defective design. A plaintiff bringing a strict liability claim for such a defect must show not only that the alleged defect was the cause of his injury but that the defect existed in the product at the time it left the defendant's control. *See Berkebile v. Brantly Helicopter Corp.,* 337 A.2d 893, 898 (Pa.1975). A failure to establish either element bars recovery as a matter of law. *Phillips v. A-Best Prods. Co.,* 665 A.2d 1167, 1171 (Pa.1995). Carr did not demonstrate that the ladder left Gillis's control with defectively designed rubber crutch tips. To the contrary, testimony of his own expert established that the ladder left Gillis's control with properly designed

rubber crutch tips. Consequently, Gillis is entitled to judgment as a matter of law on **Carr's** defective design claim.

**\*3** The District Court also correctly concluded that Gillis was entitled to summary judgment on **Carr's** claim for defective warning. "In strict liability, an inadequate warning is a species of product defect, and hence is properly decided initially by the court as a matter of law." *Metzgar v. Playskool Inc.,* 30 F.3d 459, 465 (3d Cir.1994) (citing *Mackowick v. Westinghouse Electric Corp.,* 575 A.2d 100, 102 (1990)). In this case, Carr put forward two distinct theories of failure to warn liability, one before Gillis submitted his expert report and one after. The first theory, asserting that the warning label should have directed the user to inspect the rubber crutch tips weekly for wear, was correctly dismissed. Since the design of the original rubber crutch tips provided by Gillis made them resistant to wear, as indicated by Carr's own expert, there was no need to warn an ordinary user to check the rubber tips weekly for wear. The label actually provided, warning the user to "make sure the rubber tips are on legs and that tips rest on floor when you are on the ladder," was therefore adequate.

Carr's second theory of failure to warn liability, put forward in his addendum after discovering that the ladder had replacement rubber crutch tips on it at the time of the accident, was that Gillis should have but did not provide adequate warnings regarding the use of steel reinforced crutch tips as replacement parts. The District Court rejected the addendum and its new theory as untimely, and rightfully so. District Courts have broad discretion to disallow the addition of new theories of liability at the eleventh hour. *See, e.g., Speziale v. Bethlehem Area Sch. Dist.,* 266 F.Supp.2d 366, 371 n. 3 (E.D.Pa.2003) ("Plaintiff's counsel cannot reasonably expect to amend the complaint after the close of discovery merely by raising new arguments in the responsive papers" to a motion for summary judgment.); *Ota P'ship v. Forcenergy, Inc.,* 237 F.Supp.2d 558, 561 n. 3 (E.D.Pa.2002) (holding that a new claim that was first raised in opposition to a motion for summary judgment was "too late"). We agree with the District Court that Carr's expert was or should have been aware of the undisputed fact that the rubber tips on the ladder at the time of the accident were not the original tips at the time of manufacture. As such, it was not an abuse of discretion for the District Court to reject the addendum report as untimely filed.[FN1]

FN1. The District Court suggested that **Carr's** expert had lost "much, if not all, of his credibility," (App.4), by putting forward a new theory of liability after the original one had been debunked. Although we agree with **Carr** that the issue of credibility is an issue for the jury to consider, the District Court's conclusion as to the expert's lack of credibility was not the basis for its decision to disregard the addendum. The record clearly indicates that the District Court rejected the addendum as untimely.

IV.

There are no genuine issues of material fact left to be resolved in this case and the undisputed facts make clear that the ladder at issue was not defective at the time it was manufactured and sold by the defendant Gillis. Accordingly, Gillis is entitled to judgment as a matter of law and we will affirm the judgment of the District Court.

C.A.3 (Pa.),2007.
Carr v. Gillis Associated Industries, Inc.
Slip Copy, 2007 WL 1115929 (C.A.3 (Pa.))

END OF DOCUMENT





169 DLR A-11, 2006                                                    Page 1

                        Daily Labor Report
                             News
                   Thursday, August 31, 2006

    SAFETY & HEALTH: CURRENT LEGAL REGIME MAY HAVE 'ADVANTAGES' FOR WORKERS EXPOSED
                        TO ASBESTOS, CRS SAYS

    Although some observers have said the "explosion" of asbestos lawsuits over
the past decade is reaching "crisis" proportions, the current legal regime may
be fairest in terms of compensating workers exposed to asbestos, according to
the Congressional Research Service.

    "[I]t could be argued that the current legal system has distinct advantages
and should be allowed to proceed as it is, or with minor improvements," the
Aug. 23 report said. "The current system is providing substantial assistance to
large numbers of victims, most of whom do not have to pay lawyers' fees unless
and until compensation is received."

    CRS acknowledged, however, that "a substantial portion" of the money that
could pay those exposed to asbestos "is used to run the system rather than
directly benefit claimants." The current legal system "is also disorganized,
with no oversight to assure that compensation is allocated primarily to those
with the most compelling cases."

    CRS suggested that the current legal system may punish those most at fault
for exposing workers to asbestos. "From a public policy perspective, the fact
that defendant companies are the ones financing the benefits may be considered
broadly beneficial. That is, companies in all industries are being put on
notice that allowing harm to occur to employees and the public can be fatal to
their financial well-being."


Report Discusses Trust Fund, Other Proposals.


    The report, Asbestos Litigation: Prospects for Legislative Resolution,
outlines various legislative proposals that address the glut of asbestos-
related lawsuits. The bill that has received the most attention is a Senate
bill (S. 3274) that would remove asbestos lawsuits from the court system and
create a $140 billion trust fund to compensate workers with asbestos-related
diseases.

    The trust fund concept has been embraced by the Senate for nearly half a
decade. S. 3274 represents the most recent iteration of the Senate legislation,
incorporating amendments that were accepted to an earlier version of the bill
before it was pulled from the Senate floor in February (103 DLR A-7,
5/30/06 ;31 DLR A-9, 2/15/06).

    The Senate bill would set compensation levels for victims according to
medical criteria that describe nine levels of impairment. The highest award
under the bill, set at $1.1 million, would be given to workers with
mesothelioma, a lethal form of lung cancer linked directly to asbestos
exposure. Manufacturers that could be liable for asbestos lawsuits and the
insurers that cover them would pay into the fund for up to 30 years.

    According to CRS, the debate on the Senate bill has turned on the "financial
question" of whether the $140 billion generated by the bill would be adequate
to pay all asbestos claimants. "A number of unknowns mean the bill's stated
funding capacity of $140 billion, a substantial sum by any measure, may not yet
suffice to pay all scheduled benefits," the report said.

              COPR. ©  2007 The Bureau of National Affairs, Inc.

CRS also gave a brief overview of "medical criteria" legislation (H.R. 1957) that would waive statutes of limitations and other time limits on claims of asbestos exposure until physical impairments develop and can be diagnosed. Under the bill, when plaintiffs are allowed to proceed with their claims, their cases would be considered based on detailed medical criteria that take into account their employment and smoking history, x-ray evidence of lung abnormalities, and other medical data.

"This means, above all, that awards be made if and when actual impairment occurs, on the basis of reliable, relevant evidence," CRS said. "Given these conditions, it is held that there would be no need for new governmental agencies and levies."

CRS also discussed legislation (H.R. 1114) that would establish "administrative systems" to settle asbestos claims. The bill also would create a new agency within the Justice Department to handle the claims that would assess medical evidence of claimants and act as an intermediary between claimants and defendants when they negotiate settlements. If claimants did not accept settlement offers, they could then pursue regular lawsuits through the courts.

The report did not go into further detail on this type of proposal, although a future CRS report will discuss "extensively" proposals to create similar administrative systems in "new versions" of S. 2290, an asbestos measure introduced in 2004 by Senate Majority Leader Bill Frist (R-Tenn.).

169 DLR A-11, 2006

END OF DOCUMENT

COPR. © 2007 The Bureau of National Affairs, Inc.

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 1568674 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Iko Monroe, Inc. v. Royal & Sun Alliance Ins. Co. of Canada, Inc.
D.Del.,2001.
Only the Westlaw citation is currently available.
United States District Court, D. Delaware.
IKO MONROE, INC. Plaintiff,
v.
ROYAL & SUN ALLIANCE INSURANCE COMPANY OF CANADA, INC., Hartford Insurance Company of Canada, Inc., HIH Cotesworth Canada Limited, Defendants.
No. CIV.A. 00-834 GMS.

Dec. 7, 2001.

MEMORANDUM AND ORDER

SLEET, District J.

I. INTRODUCTION

*1 In September 2000, IKO Monroe ("IKO") filed a declaratory judgment action against Royal & Sun Alliance Insurance Company of Canada, Inc. ("Royal Sun"), Hartford Insurance Company of Canada, Inc. ("Hartford"), and HIH Cotesworth Canada Limited ("HIH"). IKO seeks a declaratory judgment stating that the defendants had a duty to defend IKO Monroe against certain lawsuits pending in Michigan. After IKO amended its complaint, each of the defendants submitted a revised answer. In its amended answer, Hartford added a counterclaim for reformation of its insurance contract with IKO.

Presently before the court are two motions-IKO's motion for a more definite statement from Hartford on its counterclaim and Royal Sun's motion for summary judgment against IKO.[FN1] After reviewing the briefs and hearing oral argument, the court will deny IKO's motion for a more definite statement and grant Royal Sun's motion for summary judgment.

FN1. By order of the court, HIH's motion for summary judgment was stricken and HIH was instructed to join in Royal Sun's motion. (D.I.59.) The parties agree that the Royal Sun-IKO and HIH-IKO contracts contain very similar language. For simplicity, the court will refer only to Royal

Sun. However, the same reasoning that applies to Royal Sun applies to HIH. By contrast, the language in the Hartford-IKO contract differs from the others, and therefore Hartford is not a party to this summary judgment motion.

II. BACKGROUND

A. Factual Background

IKO Monroe, a subsidiary of IKO Industries Ltd., is a Delaware corporation with its principal place of business in Monroe, Michigan. IKO manufactures paper for use in roofing products. Asphalt is used in the manufacturing process. Both the asphalt and the paper production process cause IKO's plants emit disagreeable odors.

IKO entered into insurance contracts with Canadian based insurance providers Royal Sun, HIH, and Hartford. In the IKO-Royal Sun insurance contract, Royal Sun agreed to defend IKO against claims for "bodily injury, personal injury, [or] property damage." (D.I. 46 at 5.) The policy also limited the duty to defend in significant ways. Most important for the present discussion, the policy contained an "absolute pollution exclusion" clause. The absolute pollution exclusion clause stated that the policy's coverage did not extend to "claims arising out of the actual, alleged, potential or threatened spill, discharge, emission, dispersal, seepage, leakage, migration, release or escape of pollutants." (D.I. 46 at 5.) The contract defines the term pollutant as "any solid, liquid, gaseous, or thermal irritant or contaminant, including smoke, *odour*, vapour, soot, fumes, acids, chemicals, and waste." (D.I. 46 at 5) (emphasis added).

In July 2000, the *Compora v. IKO Monroe* case was filed in Michigan state court. The *Compora* plaintiffs alleged that IKO's plant had caused "noxious odors ... accumulated and controlled by Defendant [IKO], to physically invade Plaintiff's person and property, [thereby] substantially and unreasonably interfer[ing] with Plaintiffs use and enjoyment of their property." (D.I. 46 at 7 .) In October 2000, the city of Monroe, Michigan also filed suit against IKO in Michigan state court. In the *City of Monroe v. IKO Monroe* complaint, the City of Monroe charged that IKO "had

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 1568674 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

been for some months prior to the date of this Complaint emitting or causing foul, offensive, noxious, and/or disagreeable odors or stenches which are extremely repulsive to the physical senses of persons in the general vicinity of the Defendant's premises." (D.I. 46 at 8.)

**\*2** Following the filing of these lawsuits, IKO asked Royal Sun to defend it against the claims. After reviewing the *Compora* and *City of Monroe* complaints, Royal Sun determined that both plaintiffs sought damages based on IKO's emission of "noxious odors ." Royal Sun then notified IKO that under the terms of the absolute pollution exclusion, it had no duty to defend either lawsuit.

### B. IKO's Motion for a More Definite Statement

After Royal Sun refused to defend IKO, IKO filed suit in this court asking the court to declare that the defendants had a duty to defend the Michigan lawsuits. After each of the defendants answered, IKO requested and was given permission to amend its complaint. Subsequently, each of the defendants submitted a revised answer. In its second answer, Hartford included a counterclaim against IKO for reformation of contract. In particular, paragraph 13 of the answer and counterclaim asserts that:
To the extent the definition of personal injury in the Hartford Canada policy is interpreted to encompass claims arising out of or related to pollution, the definitional language permitting such interpretation was excluded solely because of mutual mistake on the part of both IKO and Hartford Canada ...

(D.I. 44, Exh. 1 at 16.)

In response to the counterclaim, IKO filed a motion for more definite statement pursuant to Rule 12(e). In the motion, IKO asserts that Hartford failed to plead its allegations of mutual mistake with sufficient particularity as required by Rule 9(b). Hartford responds by asserting that it should be permitted to clarify its pleadings through discovery. Furthermore, Hartford argues that it cannot plead with more particularity because the relevant facts are solely in IKO's possession. Hartford states:
The facts within the possession of Hartford-Canada are that the parties to this insurance policy agreed to a contract that excluded coverage for pollution related claims and that, despite that intent and understanding, the written instrument as drafted by IKO or its insurance broker included language that IKO Monroe now alleges provides such coverage.

(D.I. 50 at 7.) In its reply, IKO cites several cases for the proposition that Hartford must plead with more specificity. Although IKO acknowledges that it is possible to clarify pleadings through subsequent pleadings or discovery, it denies that Hartford's pleadings sufficiently elucidate its claim.

### C. Royal Sun's Motion for Summary Judgment

On the same day that IKO filed its motion for a more definite statement, Royal Sun filed a motion for summary judgment asserting that it had no duty to defend the *Compora* or *City of Monroe* actions. Royal Sun argues that since the definition of "pollution" in the policy includes "odours," there is no duty to defend against lawsuits based on noxious odors. Based on this interpretation of the clause and the fact that both of the underlying Michigan lawsuits seek damages for IKO's emission of noxious odors, Royal Sun maintains that it has no duty to defend either lawsuit.

**\*3** IKO makes four basic arguments in its response brief. First, IKO asserts that the term "odours" was intended to mean only toxic odors. Second, IKO claims that the term "pollution" was intended to mean only "true pollution." Third, IKO alleges that it had a "reasonable expectation" of coverage because both IKO and Royal Sun knew or should have known that IKO's plants would produce some disagreeable odors in the normal course of business. Finally, IKO claims that it needs discovery from Royal Sun before it can demonstrate that the term "odour" is ambiguous.

In rebuttal, Royal Sun states that the absolute pollution exclusion does not limit the definition of odors to "toxic" odors. Royal Sun further contends that the clause is not limited to "true pollution." Royal Sun also states that IKO is not entitled to the benefit of the reasonable expectations doctrine because, under Michigan law, the reasonable expectations doctrine does not apply where the contract language is unambiguous. Finally, at oral argument, Royal Sun insisted that further discovery was unnecessary in this case because the contract language is unambiguous, and therefore extrinsic evidence is impermissible.

### III. DISCUSSION

Since the summary judgment motion and the motion

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 1568674 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

for a more definite statement require separate standards of review, the court will address each motion in turn. First, however, the court will address the choice of law issues involved in this case.

### A. Choice of Law

The court accepts the view of both parties that Michigan law applies to this dispute. A federal district court sitting in diversity must apply the choice of law rules of the state in which it sits to determine which state's law governs the controversy before it. *Hionis Int'l Enterprises, Inc. v. Tandy Corp.,* 867 F.Supp. 268, 271 (D.Del.1994) (citing *Day & Zimmermann, Inc. v. Challoner,* 423 U.S. 3, 4 (1975); *Klaxon Co. v. Stentor Mfg. Co.,* 313 U.S. 487, 496 (1941)). Therefore, the court will apply Delaware's choice of law rules.

In Delaware, "the subject matter of the contract is a factor to be considered as 'the state where the thing or risk is located will have a natural interest in the transactions affecting it.' " *See Liggett Group, Inc. v. Affiliated FM Ins. Co.,* No.CIV.A.00C-01-207, 2001 WL 589041, at *6 (Del.Super.Ct. May 15, 2001) (citations omitted). Delaware courts have held that in environmental insurance coverage cases, "the location of the subject matter is the location of the sites where the environmental damage or injury occurred." *See id.* In this case, Michigan is the site of the alleged environmental injury. Therefore, the court concludes that Michigan law will govern its analysis of the contract language at issue.

### B. Royal Sun's Motion for Summary Judgment

#### 1. The Summary Judgment Standard

Summary judgment is appropriate only if the record shows that there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). *See also 2-J Corp. v. Tice,* 126 F.3d 539, 540 (3d Cir.1997). The moving party bears the burden of proving that there are no genuine issues of material fact in dispute. *See Carter v. Exxon Co .,* 177 F.3d 197, 202 (3d Cir.1999); *Ideal Dairy Farms, Inc. v. John Labatt, Ltd.,* 90 F.3d 737, 743 (3d Cir.1996). In deciding a motion for summary judgment, all inferences should be drawn in the light most favorable to the moving party. *See Carter v. Exxon Co.,* 177 F.3d at 202. In determining if summary judgment is appropriate, the court's

"function is not to weigh the evidence and determine the truth of the matter," but to determine whether there are genuine issues of material fact in dispute. *Id.* (citation omitted). "Facts that could alter the outcome are 'material', and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Ideal Dairy Farms,* 90 F.3d at 743 (citation omitted).

**\*4** In particular, in a breach of contract action, the court can grant summary judgment only when "the contract is unambiguous and the moving party is entitled to judgment as a matter of law." *Newport Assocs. Indem. Co. v. Traveler's Indemnity Co.,* 162 F.3d 789, 791 (3d Cir.1999) (citing *Tamarind Resort Assocs. v. Government of Virgin Islands,* 138 F.3d 107, 111 (3d Cir.1998)).

#### 2. The Contract Language Is Unambiguous

The court finds that the contract is unambiguous and that Royal Sun is entitled to judgment as a matter of law based on the four corners of the contract. The court will now explain why IKO's arguments to the contrary are unavailing.

##### a. The term "odour"

IKO maintains that the term "odour" was intended to apply to "toxic odours" only. Under Michigan law, contract terms are given their plain meaning. *See Datron, Inc. v. CRA Holdings, Inc.,* 42 F.Supp.2d 736, 742 (W.D.Mich.1999) ( "The court should accord the words and phrases of the contract their plain meaning..."); *McKusick v. Travelers Indemn. Co.,* No.CIV.A.221171, 2001 WL 637676, at *4 (Mich.App. June 8, 2001) ("This court must enforce the insurance policy in accordance with its terms that are interpreted in light of their commonly used, ordinary, and plain meanings."). A contract term is ambiguous where it is susceptible to more than one valid interpretation. *See Society of St. Vincent DePaul in Archdiocese of Detroit v. Mt. Hawley Ins. Co.,* 49 F.Supp.2d 1011, 1016 (E.D.Mich.1999); *Cole v. Ladbroke Racing Michigan, Inc.,* 614 N.W.2d 169, 176 (Mich.App.2000). If the court finds that the term is ambiguous, extrinsic evidence may be admitted to explain the ambiguity. *See New Amsterdam Cas. Co. v. Sokolowski,* 132 N.W.2d 66, 68 (Mich.1965) ("[If a contract] is ambiguous, testimony may be taken to explain the ambiguity."). If, however, the court finds that the term is unambiguous, no extrinsic evidence

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 1568674 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

will be allowed to interpret the term. *See City of Kalamazoo v. Michigan Disposal Service Corp., 125 F.Supp.2d 219, 243 (W.D.Mich.2000)* ("When words of written contract are clear and unambiguous ... the court has no right to look to extrinsic evidence to determine their intent."); *Commercial Union Ins. Co. v. Cannelton Industries, 938 F.Supp. 458, 461 (W.D.Mich.1996)* ("Under Michigan law, when insurance policy is clear and unambiguous, there is no need for the court to resort to extrinsic evidence.").

The term "odour" as used in the contract at issue is not ambiguous. Its meaning is plain. Webster's Third New International Dictionary defines an "odour" as "a quality of something that affects the sense of smell ... a scent, fragrance, or aroma." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1565 (1993). In other words, colloquially speaking, an odor is a smell. Although an odor can be disagreeable, *see id.,* the court has found no evidence-and IKO has presented none-that an odor must be toxic or that the term as normally understood encompasses toxic materials at all. The plain meaning of the word "odour," therefore, does not lend itself to the interpretation suggested by IKO.

**\*5** IKO further suggests that plain meaning notwithstanding, the parties to the contract understood "odours" to mean only "toxic odours." However the record does not support this contention. It is clear that the insurance clause does not include any reference to "toxic odours" or "noxious odours" or "polluting odours"only "odours." The term is left unmodified. The parties here appear to be very sophisticated, of equal bargaining strength, and to have negotiated this contract at arm's length. Since "odours" as normally understood does not by definition include "toxic odors," if IKO intended only toxic odors to be exempted from coverage, it could have and should have negotiated to have this included in the contract. The court will not re-write the contract now to produce the result that IKO seeks.

### b. The term "pollution"

IKO also contends that the entire pollution exclusion clause, not just the language dealing with odors, is directed only at "true environmental pollution" that is, the release of hazardous substances into the environment. In support of this contention, IKO cites numerous cases from various jurisdictions wherein courts held that insurance clauses such as the one here are only applicable to cases involving major

environmental harm. This court, however, is applying Michigan law. In *McKusick v. Travelers Indemn. Co.,* the Michigan Court of Appeals expressly rejected IKO's argument, stating that where the pollution exclusion clause at issue does not specifically require that the insured cause traditional environmental pollution before triggering the exclusion, the court will not judicially engraft such a limitation. *See McKusick,* 2001 WL 637676, at *4. The plain language of the pollution exclusion clause at issue does not specifically state that the insured must cause "traditional" or "true" environmental pollution. Therefore, under Michigan law, this court cannot interpret the clause as requiring traditional environmental pollution, and will not do so.

### c. Reasonable expectation of coverage

IKO's third argument is that it had a reasonable expectation of coverage based on the parties' understanding that IKO's plants would normally generate disagreeable smells. IKO cites various cases from other jurisdictions in support of this position. However, as Royal Sun has pointed out, no *Michigan* court has held that the "reasonable expectations" doctrine applies where the contract language is unambiguous. Michigan courts have consistently stated, and recently reaffirmed, that the "reasonable expectations" doctrine applies only where the contract language at issue is ambiguous.[FN2] As explained earlier, the contract provisions at issue here are unambiguous regarding the scope of coverage. Therefore, under Michigan law, IKO is not entitled to the benefit of the reasonable expectations doctrine, and the court will not apply that doctrine in this case.

FN2. *See Farm Bureau Mut. Ins. Co. of Mich. v. Nikkel, 596 N.W.2d 915, 921 (Mich.1999)* ("[T]he rule of reasonable expectations has no applicability here because no ambiguity exists in the [insurance] clause and the insured could have discovered the clause on examination of the contract.") citing *Vanguard Ins. Co. v. Clarke,* 475 N.W.2d 48, 52 n. 7 (Mich.1991) ("Factors to consider in determining the legitimate existence of reasonable consumer expectation include 'whether an insurance policy includes a provision that unambiguously limits or excludes coverage and whether a policyholder could have ... discover[ed] a relevant clause that limits coverage.' "); *McKusick,* 2001 WL 637676,

Not Reported in F.Supp.2d                                                                                    Page 5
Not Reported in F.Supp.2d, 2001 WL 1568674 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

at *4 (holding reasonable expectations doctrine did not apply because "the pollution exclusion clause was "clear[ ] and unambiguous[ ]").

### d. Discovery

Finally, since the court finds that the contract is unambiguous, it will reject IKO's final argument that it should be allowed discovery on this issue. Under Michigan law, extrinsic evidence is admissible to interpret a contract only where the terms are ambiguous. *See New Amsterdam,* 132 N.W.2d at 68, *Commercial Union,* 938 F.Supp. at 461. (W.D.Mich.1996). Since the court finds that the terms are unambiguous, however, there is no need for discovery.

**\*6** IKO further argues that discovery should be permitted because the ambiguity is latent. Although Michigan courts permit extrinsic evidence to resolve latent ambiguities, *see McCarty v. Mercury Metalcraft Co.,* 127 N.W.2d 340, 344 (Mich.1964), IKO has not sufficiently demonstrated the presence of a latent ambiguity. A latent ambiguity arises "where the language employed is clear and intelligible and suggests but a single meaning, but some extrinsic fact or extraneous evidence creates a necessity for interpretation..." *See id.* As indicated at oral argument, the typical latent ambiguity situation involves two items, only one of which is named in the contract. *See e.g., Raffles v. Wichelhaus,* 159 Eng. Rep. 375 (Ex. 1864) (two ships named 'Peerless').

IKO's discovery request is not directed at the facts surrounding contract formation, but rather at information regarding Royal Sun's interpretation of the contract terms. However, a party's interpretation of contract terms is not actually a fact because one party's understanding of the contract terms is not binding on the other party. *See Turner Holdings, Inc. v. Howard Miller Clock Co.,* 657 F.Supp. 1370, 1380 (W.D.Mich.1987). Thus, even if IKO could prove that Royal Sun had another understanding of the contract terms, this different understanding or interpretation is not sufficient to create a latent ambiguity. *See id.* (refusing to find latent ambiguity based on defendant's "uncommunicated belief" about the meaning of contract terms). Therefore, the court is not compelled to find a latent ambiguity here.

### e. Judgment as a matter of law

Having found that the pollution exclusion clause is

unambiguous, the court further finds that Royal Sun is entitled to judgment as a matter of law based on the unambiguous wording of the contract. Absent fraud, duress, unconscionability, or other such factors, a court is bound to give full effect to a valid contract between two parties. *See Mellon Bank, N.A. v. Aetna Business Credit, Inc.,* 619 F.2d 1001, 1009 (3d Cir.1980). First, the court finds that there was a valid contract here-the parties do not dispute this fact. Second, the court does not find any impediment to the enforcability of this contract. There are no indicia of fraud, duress, or the like. Since there was a valid and unambiguous contract with no impediments to enforcability, the court must give full effect to the words of that contract. Under that contract, Royal Sun is not required to defend actions arising from the "discharge, emission, dispersal, seepage, leakage, migration, release, or escape" of pollutants. Pollutants includes "odours." "Odour" is not limited to toxic odors. Since the underlying lawsuits both involve claims against IKO for the discharge of odors, and the discharge of odor is explicitly exempted from coverage by the policy in question, Royal Sun has no contractual duty to defend either lawsuit. Given the court's ruling, it will not reach the arguments regarding the timing of the Michigan lawsuits or the distinction between damages and injunctive relief.

### C. IKO's Motion for More Definite Statement

**\*7** A motion for a more definite statement should be granted only where the pleading is so "vague or ambiguous" that the opponent cannot draft a responsive pleading. *See* FED. R. CIV. P. 12(e). *See also Schaedler v. Reading Eagle Publication,* 370 F.2d 795, 798 (3d Cir.1967) (same). Courts have interpreted this language to mean that the motion should only be granted where the pleading is unintelligible, *see CFMT, Inc. v. Yieldup International Corp.,* No.CIV.A.95-549, 1996 WL 33140642, at *1 (D.Del.Apr.5, 1996); *United States v. Board of Harbor Commissioners,* 73 F.R.D. 460, 462 (D.Del.1977), or the issues cannot be determined. *See Fischer & Porter Co. v. Sheffield Corp.,* 31 F.R.D. 534, 536 (D.Del.1962); *Container Co. v. Carpenter Container Corp.,* 8 F.R.D. 208, 210 (D.Del.1948).

IKO's motion for a more definite statement under Rule 12(e) must be denied. First, after reviewing the pleadings, the court finds that Hartford's pleading is far from unintelligible. It is clear on the face of the complaint that Hartford is alleging "mutual mistake

." Furthermore, nothing in the briefs or at argument indicates that IKO was or is unable to determine that mutual mistake is the issue. Since IKO is able to discern the issues, it is also able to respond to them.

Second, to the extent that IKO's motion rests on the contention that Hartford has not pleaded mistake with sufficient particularity under Rule 9(b), this argument must also fail. While Rule 9(b) requires that fraud and mistake be pleaded with particularity, *see* FED. R. CIV. P. 9(b), this rule must be read in conjunction with Rule 8 which outlines the liberal standard of pleading favored by the Federal Rules of Civil Procedure. *See* 5 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1298 ("Rule 9(b) ... does not render the general principles set forth in Rule 8 entirely inapplicable to pleadings alleging fraud; rather the two rules must be read in conjunction with each other."). The federal rules contemplate notice rather than fact pleading. This standard applies to Rule 9(b) as well. *See id.* ("[N]either Rule 8 nor Rule 9(b) requires fact pleading."). Thus, even under Rule 9(b), the circumstances, rather than the specific facts of the claim, are essential. *See id.* ("Although circumstances may consist of facts, the obligation to plead circumstances need not be treated as requiring allegations of facts in the pleading."). By notifying IKO that mutual mistake is the issue, Hartford has provided IKO with the general circumstances involving its claim.

Further, where an issue is not pleaded with particularity, a party can clarify its claims through its subsequent pleadings and briefs. *See Union Carbide v. Shell Oil Co., No.99-CV-274, 2000 WL 1481015, at *2 (D.Del. Sept. 29, 2000)* ("Here the defendant's pleadings appear to be 'bare-boned' on their face. However, its brief submitted in opposition to the present motion sufficiently clarified its pleadings to overcome Rule 9(b)'s requirements."); *Scripps Clinic and Research Foundation v. Baxter Travenol Laboratories, Civ.A.No. 87-140, 1988 WL 22602, at *3 (D.Del. Mar. 9, 1988)* (noting that defendant clarified its pleading in response to plaintiff's interrogatories). In its Opposition to IKO Monroe's Motion for a More Definite Statement, Hartford stated:

**\*8** The facts within the possession of Hartford-Canada are that the parties to this insurance policy agreed to a contract that excluded coverage for pollution related claims and that, despite that intent and understanding, the written instrument as drafted by IKO or its insurance broker included language that IKO Monroe now alleges provides such coverage.

Through this paragraph, Hartford has managed to add more detail to what it meant by "mutual mistake." These details appear to focus on the intent and understanding of the parties at the time of drafting. Hartford can either admit that the inclusion of the clause was the intent of the parties, deny that it was the intent of the parties, or state that it lacks sufficient information at this time to admit or deny that it was the intent of the parties. Therefore, the court finds that there is sufficient particularity.[FN3] Consequently, a more definite statement of the claim is unnecessary.[FN4]

> FN3. Although IKO offers several cases supporting its argument that Rule 9(b) requires Hartford to be more specific, *see Christidis v. First Pennsylvania Mortgage Trust, 717 F.2d 96 (3d Cir.1983)*; *SEC v. Saltzman, 127 F.Supp.2d 660 (E.D. Pa 2001)*; *United States v. Kensington Hospital, 760 F.Supp.1120 (E.D.Pa.1991)*, all of the cited cases involve fraud. The same considerations that make it necessary to plead fraud with specificity-namely damage to reputation-do not arise in the mistake context. *See Bankers Trust Co. v. Old Republic Ins. Co., 959 F.2d 677, 683 (7th Cir.1992)* ("Accusations of fraud do serious damage to the goodwill of a business firm or professional person .... Why, if this is the true rationale of Rule 9(b), allegations of mere mistake should have to be particularized is a mystery.").

> FN4. The court finds that the "motion to strike" issue is rendered moot by the court's ruling on IKO's motion for a more definite statement.

## IV. CONCLUSION

For the foregoing reasons, the court concludes that Royal Sun has no duty to defend the Michigan lawsuits. Therefore, the court grants Royal Sun's motion for summary judgment. The court further concludes that IKO is able to form a responsive pleading. Therefore, IKO's motion for a more definite statement is denied.

For these reasons, IT IS HEREBY ORDERED that:
1. Royal & Sun Alliance Insurance Company of Canada, Inc.'s Motion for Summary Judgment

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2001 WL 1568674 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**


(D.I.45) is GRANTED.

2. Summary Judgment be and hereby is ENTERED in favor of Royal & Sun Alliance Insurance Company of Canada, Inc. and HIH Cotesworth Canada Limited and against IKO, Monroe on all claims in the complaint.

3. IKO Monroe's Motion for a More Definite Statement (D.I.44) is DENIED.


D.Del.,2001.

Iko Monroe, Inc. v. Royal & Sun Alliance Ins. Co. of Canada, Inc.

Not Reported in F.Supp.2d, 2001 WL 1568674 (D.Del.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Marjac, LLC v. Trenk
D.N.J.,2006.
Only the Westlaw citation is currently available.NOT
FOR PUBLICATION
United States District Court,D. New Jersey.
MARJAC, LLC, a New Jersey Limited Liability
Company, DJF Realty, Inc., a New Jersey
Corporation, Mario Levecchia, and Jack Fiorenza, Jr.,
Plaintiffs,
v.
Richard TRENK-Township Attorney, Booker,
Rabinowitz, Trenk, Lubetkin, Tully, Dipasquale &
Webster, P.C., Planning Board for the Township of
West Orange, Mayor and Council for the Township
of West Orange, John Mckeon-Mayor, Susan Borg-
Planning Board Director West Orange Building
Dept., Russell Desantis-Building Sub-Code Official,
West Orange Health Dept., James Montgomery-
Health Inspector, and John Does A-Z, Defendants.
**Civil Action No. 06-1440 (JAG).**

Dec. 19, 2006.

Michael S. Kasanoff, Red Bank, NJ, for Plaintiffs.
William Northgrave, Kevin P. McManimon,
McManimon & Scotland, Newark, NJ, for
Defendants.

**OPINION**
GREENAWAY, JR., U.S.D.J.
**\*1** This matter comes before this Court on
Defendants' motion to dismiss Plaintiffs' Complaint
for failure to state a claim upon which relief can be
granted, pursuant to Fed.R.Civ.P. 12(b)(6). In the
alternative, Defendants move for a more definite
statement, pursuant to Fed.R.Civ.P. 12(e). For the
reasons stated below, Defendants' motion to dismiss
will be granted in part and denied in part, and
Defendants' motion for a more definite statement will
be denied.

**I. *INTRODUCTION***

On March 27, 2006, Plaintiffs Marjac, LLC, DJF
Realty, Inc., Mario Lavecchia, and Jack Fiorenza
(collectively, "Plaintiffs") filed the instant action
against Defendants Richard Trenk,[FN1] the Planning
Board for the Township of West Orange ("West

Orange"), West Orange Mayor John McKeon, West
Orange Building Department Planning Board
Director Susan Borg, Building Sub-Code Official
Russell Desantis, the West Orange Health
Department, Health Inspector James Montgomery,
and various John Doe defendants (collectively,
"Defendants"). Plaintiffs' Complaint alleges the
following causes of action against Defendants: (1)
tortious interference with prospective economic
advantage; (2) tortious interference with contractual
relations; (3) violation of 42 U.S.C. § 1983 pursuant
to the Fifth and Fourteenth Amendments; (4)
violation of the New Jersey Civil Rights Act, N.J.
Stat. Ann.. § 10:6-2(c); (5) breach of fiduciary duty;
(6) legal malpractice; (7) civil conspiracy; (8)
intentional infliction of emotional distress; (9)
estoppel; and (10) racketeering under N.J. Stat. Ann..
§ 2C:41-2. Defendants now move to dismiss all
causes of action asserted in Plaintiffs' Complaint on
the ground that each fails to assert a claim upon
which relief may be granted. In the event that this
Court finds that any of Plaintiffs' claims are viable,
Defendants move for a more definite statement of
Plaintiffs' claims.

FN1. Richard Trenk serves as counsel for
the Township of West Orange.

**II. *FACTUAL BACKGROUND***

Plaintiffs contend that in September 2002, they spent
$1,350,000 purchasing a liquor license and property
at 466 Prospect Avenue in West Orange, New Jersey
(the "Property"), with the goal of establishing a
landmark destination featuring Essex County's
trendiest new restaurant, one of New Jersey's largest
and most upscale nightclubs, and a first-class catering
business. (Complaint ("Compl."), ¶ 1.) The Property
is located directly across from the Essex Green
Shopping Plaza and a TGI Friday's restaurant. (*Id* ., ¶
2.) To finance their business endeavor, Plaintiffs took
out two small business loans totaling $2 million with
Commerce Bank, a $508,000 equipment loan with
Northfield Bank, and several personal loans. (*Id.,* ¶
3.) Plaintiffs contend that they have poured more than
$4 million into their business, and that they have
staked their livelihoods on its success. (*Id.*)

In November 2002, the West Orange Planning Board
(the "Planning Board") approved Plaintiffs'

Slip Copy, 2006 WL 3751395 (D.N.J.)
(Cite as: Slip Copy)

preliminary plans, and the West Orange Building Department (the "Building Department") later approved Plaintiffs' completed plans. (*Id.,* ¶ 4.) Plaintiffs allege that they completed 90% of the construction of their business under the direct and ongoing supervision of the Building Department. (*Id.*)

**\*2** On June 16, 2004, Defendant Desantis, a Building Sub-Code Official, issued a Stop Work Order allegedly with the assistance of Defendants Planning Board Director Borg, and Township Attorney Trenk. (*Id.,* ¶ 5.) Desantis purportedly claimed that Plaintiffs' construction failed to comport with the approved architectural plans, and that he did not have a copy of the plans. (*Id.*) Plaintiffs contend that Desantis actually had a signed-off copy of the plans in his car. (*Id.*)

When the Stop Work Order was issued, Trenk allegedly ordered everyone on the property to stop work, requested their names, and then proceeded to dictate to those persons what he perceived as various code violations by Plaintiffs. (*Id.,* ¶ 6.)

Two weeks later, the Stop Work Order was lifted by an unspecified court on the condition that Plaintiffs obtain a bond for their construction work. (*Id.,* ¶ 7.) Plaintiffs allege that they complied with the court's bond order, but were nonetheless confronted by Trenk, who claimed that the bond that had been posted was insufficient, and otherwise harassed Plaintiffs by stopping by the Property and directing West Orange personnel to photograph the Property repeatedly. (*Id.*)

Plaintiffs contend that around the time that the Stop Work Order was lifted, Trenk began to slander their Italian heritage. Plaintiffs allege that Trenk ordered municipal employees not to conduct any inspections of the property because Plaintiffs are "Wiseguys" with a "lot of money" behind them. (*Id.,* ¶ 8.) Trenk also allegedly stated, "We don't want these 'Wiseguys' in our town." (*Id.*) When Trenk saw Plaintiff Mario LaVecchia wearing a *Sopranos* t-shirt, he allegedly commented, "Keep doing what you are doing, it's going to get you far." (*Id.*) He also purportedly told a West Orange detective that Plaintiffs "were not investigated properly" because "there is 'Mafia Money' " behind them. (*Id.*) Plaintiffs also allege that at a West Orange Department Heads meeting one or more of those present stated that Plaintiffs "will use the place to launder money," when discussing Plaintiffs' development of the Property. (*Id.*)

Plaintiffs contend that Trenk solicited the State Department of Community Affairs ("DCA") to take over supervision of Plaintiffs' business project, despite the fact that the DCA usually assumes jurisdiction over public projects subject to competitive bidding, as opposed to private projects. (*Id.,* ¶ 9.) Plaintiffs contend that their project was indefinitely delayed as a result of the DCA's involvement because DCA approval requires substantially more detail than local planning boards and building departments. (*Id.*)

In July 2004, the DCA issued a Stop Work Order that sent Plaintiffs back to the drawing board to create updated plans for the development of the Property. (*Id.,* ¶ 10.) The day after the Stop Work Order was issued, Trenk allegedly came to the Property with a camera, and began threatening tradespeople working at the site; Plaintiffs contend that Trenk yelled, "You have to stop work and I am calling the Police," and told the tradespeople they would not be paid. (*Id.*)

**\*3** Plaintiffs further allege that Defendants attempted to revoke their approvals in August 2004, despite retired West Orange Construction Code Official Thomas Biondi's testimony that Plaintiffs had complied with all Code requirements throughout the course of construction. (*Id.,* ¶ 11.) Also, in August 2004, West Orange Police Lieutenant Lang allegedly commented to one of Plaintiffs' attorneys, "Why don't you do like the other guys, pay $50,000 and it will go away." (*Id.,* ¶ 19.)

In September 2004, Trenk allegedly came to the Property, yelled at workers to stop construction, and called the police. Plaintiffs contend that after learning of Trenk's actions, the DCA lifted the Stop Work Order it had issued. (*Id.,* ¶ 12.) Despite the lifting of the Stop Work Order, a West Orange Police officer, on the orders of his sergeant, allegedly came to the Property a few days after the Order had been lifted, and advised Plaintiffs that no work could continue. (*Id.*)

Plaintiffs allege that in October 2004, West Orange improperly adopted an ordinance amending its zoning provisions to grant the Planning Board the authority to revoke previously-granted approvals. Plaintiffs contend that this ordinance violates municipal land use law. (*Id.,* ¶ 13.) Pursuant to this ordinance, on February 2, 2005, the Planning Board adopted a resolution revoking and deeming null and void the approvals previously granted to Plaintiffs.[FN2] (*Id.*)

Slip Copy                                                                                     Page 3
Slip Copy, 2006 WL 3751395 (D.N.J.)
(Cite as: Slip Copy)

FN2. The legality of the Planning Board's resolution is currently being litigated in state court, in actions entitled *Throne v. DJF Realty, Inc., Docket No.: ESX-L-6519-05,* and *MARJAC, L.L. C. et al. v. Planning Board of West Orange, et al., Docket No.: ESX-L-8573-05. (Id.,* ¶ 13.)

On December 3, 2004, Borg allegedly sent a fax to the DCA indicating that Plaintiffs had no approvals, when in fact the Planning Board did not actually adopt its resolution lifting Plaintiffs' approvals until February 2005. In response to Borg's alleged miscommunication, the DCA instituted another Stop Work Order on December 9, 2004. (*Id.,* ¶ 14.)

Plaintiffs assert that Defendants also launched an "all-out assault" on their liquor license. Plaintiffs contend that Trenk placed irrational and arbitrary restrictions on the renewal of Plaintiffs' liquor license such as: (1) limiting Plaintiffs' occupancy to 250 people, when they were originally approved to host 520 people; and (2) demanding that Plaintiffs restrict their hours to a midnight closing, while every other similarly situated business in town is permitted to serve liquor until 2:00 a.m. (*Id.,* ¶ 15.) Plaintiffs allege that these restrictions would sabotage their business. (*Id.*) Plaintiffs further maintain that Trenk personally solicited Eagle Ridge Condominium Association residents to request that obscenity restrictions be placed on Plaintiffs' license, although there had been no objections to Plaintiffs' license in 2004. (*Id.,* ¶ 16.)

Plaintiffs contend that because of Trenk's actions and involvement in sabotaging their liquor license, he was required to recuse himself from Plaintiffs' Alcoholic Beverage Control ("ABC") hearing. Trenk failed to do so, however, allegedly in violation of West Orange Township Code, Article IV, § 2-6.2(a), which provides that the Clerk-not the township attorney-"shall keep and record the minutes of each Council meeting and of each committee meeting." (*Id.,* ¶ 17.) After the hearing, Plaintiffs allegedly were unable to obtain a copy of the minutes because the recording unit meant to memorialize the hearing had malfunctioned. (*Id.*)

**\*4** Plaintiffs assert that Trenk's conduct was motivated by the desire to (1) generate substantial legal fees; and (2) aid his partners' business venture, 22 West Restaurant Group, which was threatened by Plaintiffs' competitive business plan. (*Id.,* ¶¶ 20, 21.)

Plaintiffs also contend that all of the conduct alleged in the Complaint occurred under the watch of Mayor John McKeon, who was duty-bound to "supervise all of the departments of the Township government." (*Id.,* ¶ 22.)

## III. *DISCUSSION*

### A. *Legal Standard Governing Motions To Dismiss Under Rule 12(b)(6)*

On a motion to dismiss for failure to state a claim, pursuant to Fed.R.Civ.P. 12(b)(6), the court must accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the non-moving party. *See Oshiver v. Levin, Fishbein, Sedran & Berman,* 38 F.3d 1380, 1384-85 (3d Cir.1994). A complaint should be dismissed only if the alleged facts, taken as true, fail to state a claim. *See In re Warfarin Sodium,* 214 F.3d 395, 397-98 (3d Cir.2000). The question is whether the claimant can prove any set of facts consistent with his or her allegations that will entitle him or her to relief, not whether that person will ultimately prevail. *See Hishon v. King & Spalding,* 467 U.S. 69, 73 (1984). "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957).

While a court will accept well-pled allegations as true for the purposes of the motion, it will not accept unsupported conclusions, unwarranted inferences, or sweeping legal conclusions cast in the form of factual allegations. *See Morse v. Lower Merion School District,* 132 F.3d 902, 906 n. 8 (3d Cir.1997). All reasonable inferences, however, must be drawn in the plaintiff's favor. *See Sturm v. Clark,* 835 F.2d 1009, 1011 (3d Cir.1987). Moreover, the claimant must set forth sufficient information to outline the elements of his or her claims or to permit inferences to be drawn that the elements exist. *See* Fed.R.Civ.P. 8(a)(2); *Conley,* 355 U.S. at 45-46. "The defendant bears the burden of showing that no claim has been presented." *Hedges v. United States,* 404 F.3d 744, 750 (3d Cir.2005).

The Supreme Court has characterized dismissal with prejudice as a "harsh remedy." *New York v. Hill,* 528 U.S. 110, 118 (2000). Dismissal of a count in a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 3751395 (D.N.J.)
**(Cite as: Slip Copy)**

complaint with prejudice is appropriate if amendment would be inequitable or futile. "When a plaintiff does not seek leave to amend a deficient complaint after a defendant moves to dismiss it, the court must inform the plaintiff that he has leave to amend within a set period of time, unless amendment would be inequitable or futile." *Grayson v. Mayview State Hosp.,* 293 F.3d 103, 108 (3d Cir.2002).

**B.** *Plaintiffs'* 42 U.S.C. § 1983 *Claims* (**Count Three**)

**\*5** Plaintiffs' third cause of action contends that Defendants, acting "under the color of authority of the statutes of the State of New Jersey," acted arbitrarily, capriciously, and unreasonably in violation of (1) Plaintiffs' Fifth Amendment property rights, "by enacting an illegal and improper taking of Plaintiffs' premises without due process of law;"(2) Plaintiffs' Fourteenth Amendment right to Equal Protection of the law; (3) Plaintiffs' rights under the Commerce Clause, by destroying their business; and (4) Plaintiffs' Fourteenth Amendment Substantive Due Process rights, by "hampering Plaintiffs' proposed development in order to profit personally" and "exhibiting deliberate bias against Plaintiffs and sabotaging the project due to a perceived stereotype relating to their Italian heritage" in a "manner that shocks the conscience." (Compl., Third Count, ¶ ¶ 2-9.)

"Section 1983 imposes civil liability upon any person who, acting under the color of state law, deprives another individual of any rights, privileges, or immunities secured by the Constitution or laws of the United States." *Hill v. Borough of Kutztown,* 455 F .3d 225, 233 n. 8 (3d Cir.2006); (quoting *Shuman ex rel. Shertzer v.. Penn Manor Sch. Dist.,* 422 F.3d 141, 146 (3d Cir.2005)); *see* 42 U.S.C. § 1983. "In order to state a claim under § 1983, a plaintiff must allege that his constitutional rights were violated by someone acting under color of state law." *Jerrytone v. Musto,* 167 Fed. Appx. 295, 300 (3d Cir.2006) (citing *West v. Atkins,* 487 U.S. 42, 48 (1988)). "Accordingly, '[t]he first step in evaluating a section 1983 claim is to 'identify the exact contours of the underlying right said to have been violated' and to determine 'whether the plaintiff has alleged a deprivation of a constitutional right at all.' " *Kaucher v. County of Bucks,* 455 F.3d 418, 423 (3d Cir.2006) (quoting *Nicini v. Morra,* 212 F.3d 798, 806 (3d Cir.2000) (quoting *County of Sacramento v. Lewis,* 523 U.S. 833, 841 n. 5 (1998))).

Defendants argue that Plaintiffs' cause of action under § 1983 should be dismissed because Plaintiffs' complaint fails to allege that they have been deprived of any constitutional right. Defendants specifically argue that Plaintiffs' constitutional claims are unripe; Defendants contend that the Planning Board has yet to make a final determination on Plaintiffs' amended site plan application, Plaintiffs have failed to allege the deprivation of a right. In their opposition in response to Defendants' motion, Plaintiffs only argue that they have sufficiently alleged a § 1983 claim for violation of their substantive due process rights, and their rights under the Commerce Clause.[FN3]

FN3. Plaintiffs do not address their § 1983 claims pursuant to the Fifth Amendment, or the Fourteenth Amendment's Equal Protection clause, and has thus abandoned them. *See* *Testa v. Town of Madison,* No. Civ. 04-185-B-W, 2005 WL 2365319, at * 12 (D.Me. Sept. 26, 2005) ("The Town argues that the existing record cannot support Testa's defamation claim. Testa fails to oppose this aspect of the motion in her opposition memorandum. Accordingly, Testa has abandoned her defamation claim and judgment should enter in favor of the Town on count II"); *Bayne v. Provost,* No. 1:04 CV 44, 2005 WL 1871182, at * 4 (N.D.N.Y. Aug. 4, 2005) ("The failure to oppose a motion for summary judgment on a certain claim is deemed abandonment of the claim"); *Mack v. St. Mobile Aerospace Engineering, Inc.,* No. Civ.A.04-0307-BH-B, 2005 WL 1768646, at * 29 (S.D.Ala. July 26, 2005) ("Wayne apparently does not oppose MAE's summary judgment regarding his claim of demotion from 'Acting' Lead, or has abandoned the claim, inasmuch as he has failed to respond in opposition to same"); *Akins Foods, Inc. v. American and Foreign Ins. Co.,* No. C04-2195JLR, 2005 WL 2090678, at *4 n. 8 (W.D.Wash. Aug. 30, 2005) ("a party opposing summary judgment cannot simply rest on its allegations without any significant probative evidence supporting its claims.... By not bringing forward sufficient evidence or authority to oppose Defendant's motion for summary judgment, Akins has abandoned its claims") (internal citations omitted); *Moss v. Technicolor, Inc.,* No. CV-99-05601-WJR (Mcx), 2001 WL 1472673, at * 16 (C.D.Cal.

May 4, 2001) ("This Court concludes that this claim should be dismissed because Plaintiffs have abandoned it. Plaintiffs failed to oppose Defendants' various attacks on these claims. As such, Plaintiffs failed to meet their burden ... In other words, Plaintiffs have conceded this issue"). This Court shall only address whether Plaintiffs have stated a cause of action under § 1983, pursuant to the Fourteenth Amendment's substantive due process provisions, and/or the Commerce Clause.

### 1. *Legal Standard Governing The Ripeness Doctrine*

Defendants' challenge to Plaintiffs' § 1983 claims centers on the ripeness doctrine. "The ripeness doctrine serves 'to determine whether a party has brought an action prematurely and counsels abstention until such time as a dispute is sufficiently concrete to satisfy the constitutional and prudential requirements of the doctrine.' " Khodara Envtl., Inc. v. Blakey, 376 F.3d 187, 196 (3d Cir.2004) (quoting Peachlum v. City of York, 333 F.3d 429, 433 (3d Cir.2003)). In Williamson County Regional Planning Com. v. Hamilton Bank, 473 U.S. 172, 186, 194-95 (1985), the Supreme Court held that an as-applied Fifth Amendment Just Compensation Takings claim against a municipality's enforcement of a zoning ordinance is not ripe until (1) "the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue" (the "finality rule"), and (2) the plaintiff has unsuccessfully exhausted the state's procedures for seeking "just compensation," so long as the procedures provided by the state were adequate.

\*6 The "*Williamson* [ ] finality rule bars not only as-applied Just Compensation Takings claims, but also as-applied Substantive Due Process and Equal Protection claims by property owners or tenants who have challenged the denial of a permit by an initial decision-maker but failed to take advantage of available, subsequent procedures.' " County Concrete Corp. v. Town of Roxbury, 442 F .3d 159, 164 (3d Cir.2006) (quoting Lauderbaugh v. Hopewell Twp., 319 F.3d 568, 574 (3d Cir.2003)) (citing Taylor Inv., Ltd. v. Upper Darby Twp., 983 F.2d 1285, 1292, 1295 (3d Cir.1993)). "Only once a decision maker has arrived at a definitive position on the issue" has a property owner been inflicted with "an actual, concrete injury.' " County Concrete, 319 F.3d at 574 (quoting Williamson, 473 U.S. at 192).

The absence of "just compensation" is not part of a due process or Equal Protection injury, however. County Concrete, 442 F.3d at 169 (citing Williamson, 473 U.S. at 197). Thus, if a Substantive Due Process or Equal Protection claim satisfies the finality rule, it is ripe for adjudication. Id.

### 2. **Plaintiffs' Substantive Due Process Claim Is Ripe For Adjudication**

The Fourteenth Amendment provides that no State shall "deprive any person of life, liberty, or property without due process of law." U.S. Const. Amend. XIV. "To prevail on a substantive due process claim, a plaintiff must demonstrate that an arbitrary and capricious act deprived them of a protected property interest." County Concrete, 319 F.3d at 575 (quoting Taylor Inv., 983 F.2d at 1292). Plaintiffs' complaint effectively argues that Defendants abused the zoning process in West Orange to deprive them of the lawful use of the Property because of impermissible personal and political animus.

In Blanche Road Corp. v. Bensalem Twp., 57 F.3d 253 (3d Cir.1995), the Third Circuit held that a plaintiff landowner need not comply with the finality rule where, instead of "appealing from an adverse decision on a permit application," the plaintiff claims that the defendant Township officers "deliberately and improperly interfered with the process by which the Township issued permits, in order to block or to delay the issuance of plaintiff's permits, and that defendants did so for reasons unrelated to the merits to the application for the permits." Id., 57 F.3d at 267-68. It was asserted by the plaintiff in *Blanche Road* that the Township "engaged in a campaign of harassment designed to force [it] to abandon its development of [an] industrial park." Id. at 258. The *Blanche Road* court explained that the type of Substantive Due Process claim at issue there was "substantively different" from "that presented in the ripeness cases" and that "[s]uch actions, if proven, are sufficient to establish a [Substantive Due Process] violation, actionable under § 1983, even if the ultimate outcome of plaintiff's permit applications was favorable." Id. at 268. Thus, no further appeals were necessary in order to have a ripe, final determination for a federal court to review.

\*7 Plaintiffs allege that Defendants violated the Substantive Due Process Clause by "hampering Plaintiffs' proposed development in order to profit personally" and "exhibiting deliberate bias against

Slip Copy, 2006 WL 3751395 (D.N.J.)
**(Cite as: Slip Copy)**

Plaintiffs and sabotaging the project due to a perceived stereotype relating to their Italian heritage" in a "manner that shocks the conscience." (Compl., Third Count, ¶ ¶ 2-9.) The Complaint alleges that the alleged campaign to prevent Plaintiffs from developing the Property was spearheaded by Trenk, who, along with others, engaged in a campaign of harassment that has forestalled the construction of Plaintiffs' business. (See Compl., ¶ ¶ 7, 8, 10, 15.)

These allegations parallel those asserted by the plaintiff in *Blanche Road*. This Court finds that such claims are therefore sufficient to establish a ripe Substantive Due Process claim, regardless of the outcome of subsequent appeals for relief to municipal zoning boards. Thus, Plaintiffs' claim under § 1983 and the Substantive Due Process clause is ripe for adjudication, and Defendants' motion to dismiss Plaintiffs' Substantive Due Process claim sub judice is denied.

### 3. *Plaintiffs Have Failed To State A Claim Under The Commerce Clause*

Defendants also appear to extend their ripeness challenge to Plaintiffs' § 1983 claim pursuant to the Commerce Clause. Plaintiffs counter that they have stated adequately a claim for relief under the Commerce Clause by alleging that their business involves interstate commerce, and that Defendants, motivated by "protectionist sentiment," destroyed and sabotaged their business. (See Compl., Third Court, ¶ 7.) This Court cannot determine whether Plaintiff's Commerce Clause claim is ripe because Plaintiffs have failed to state a claim that could possibly fall within the ambit of the Commerce Clause.

To state a § 1983 claim for violation of the Commerce Clause, Plaintiffs must allege that a challenged law or regulation imposes a burden on interstate commerce that is excessive and not incidental to the local benefits of the law or regulation. *See Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142 (1970).[FN4] Plaintiffs' Complaint, which tersely alleges that Defendants violated the Commerce Clause by destroying their business, cannot be construed as a challenge to a governmental law or regulation, which burdens interstate commerce. Plaintiffs have failed to state a claim upon which relief can be granted, and their Commerce Clause under § 1983 must be dismissed pursuant to Fed.R.Civ.P. 12(b)(6).

FN4. In *Dennis v. Higgins,* 498 U.S. 439 (1991), the Supreme Court upheld a cause of action under § 1983 based on the Commerce Clause, rejecting the argument that the Commerce Clause could not be the basis of a § 1983 cause of action because it "merely allocates power between the Federal and State Governments and does not confer 'rights.' " *Id.* at 447. The Court instead held that the Commerce Clause both was a "power allocating" provision and constituted a "substantive restriction on permissible state regulation of interstate commerce." *Id.* (internal quotation marks and citation omitted).

### C. *Plaintiffs' New Jersey Civil Rights Act, N.J. Stat. Ann .. § 10:6-2(C)* Claim **(Count Four)**

Plaintiffs' fourth cause of action asserts a claim under the New Jersey Civil Rights Act, N.J. Stat. Ann.. § 10:6-2(C). Defendants contend that Plaintiffs have failed to state a cause of action under this statute because they have not alleged sufficiently that Defendants engaged in discrimination against a protected class. Even if this were true, Defendants' argument is unavailing.

**\*8** N.J. STAT. ANN. § 10:6-2(C) provides:
Any person who has been deprived of any substantive due process or equal protection rights, privileges or immunities secured by the Constitution or laws of the United States, or any substantive rights, privileges or immunities secured by the Constitution or laws of this State, or whose exercise or enjoyment of those substantive rights, privileges or immunities has been interfered with or attempted to be interfered with, by threats, intimidation or coercion by a person acting under color of law, may bring a civil action for damages and for injunctive or other appropriate relief.

Plaintiffs' complaint alleges that "by causing Plaintiffs to be deprived of his [sic] constitutionally guaranteed rights of liberty and property secured and guaranteed under the Commerce Clause, and the Fifth and Fourteenth Amendments of the Constitution of the United States, and corresponding rights guaranteed by the New Jersey State Constitution ... Defendants have violated the New Jersey Civil Rights Act ..." (Compl., Fourth Count, ¶ 2.)

Because Plaintiffs have successfully stated a claim

Slip Copy                                                                                                    Page 7
Slip Copy, 2006 WL 3751395 (D.N.J.)
(Cite as: Slip Copy)

for the deprivation of their Substantive Due Process rights, which are secured by the Constitution of the United States, Plaintiffs have also successfully stated a claim for relief, pursuant to N.J. Stat. AnnN § 10:6-2(c). This Court denies Defendants' motion to dismiss Plaintiffs' N.J. Stat. AnnN § 10:6-2(c) claim.

### D. *Plaintiffs' State Law Racketeering Claim* (Count Ten)

Plaintiffs' tenth cause of action purports to state a claim under the New Jersey Racketeer Influenced Corrupt Organizations Act ("RICO"), N.J. Stat. Ann.. 2C:41-4(c) ("state RICO statute").[FN5] The state RICO statute provides that "[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in or activities of which affect trade or commerce to conduct or participate, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity." N.J. Stat. Ann.. 2C:41-2(c). Under N.J. Stat. Ann.. § 2C:41-4(c), "[a]ny person damaged in his business or property by reason of a violation of N.J. Stat. Ann.. § 2C:41-2 may sue" the violating party.

> FN5. Contrary to Defendants' contention, Plaintiff does not assert a claim against Defendants for violations of the Federal Racketeer Influenced Corrupt Organizations Act ("RICO").

Defendants argue that Plaintiffs have failed to state a claim under the state RICO statute because: (1) they have failed to allege that Defendants participated in a "pattern of racketeering activity"; (2) they have failed to meet the "continuity" requirement necessary to establish a pattern of racketeering activity; (3) they have failed to allege that Defendants are the "proximate cause" of Plaintiff's injuries; and (4) they have failed to meet the heightened pleading requirements of FED. R. CIV. P. 9(b), which requires that allegations involving fraud "be stated with particularity."[FN6] This Court will address each of these challenges to Plaintiffs' complaint in turn.

> FN6. Defendants do not contest that Plaintiffs have alleged the existence of an enterprise. West Orange constitutes an enterprise within the meaning of N.J. Stat. Ann.. § 2C:41-1(2)(c).
> *See Genty v. RTC*, 937 F.2d 899, 906-07 (3d Cir.1991).

### 1. *Pattern Of Rackeering Activity*

**\*9** To claim a "pattern of racketeering activity" properly, Plaintiffs must allege that (1) Defendants engaged in "at least two incidents of racketeering conduct one of which shall have occurred after the effective date of th[e][A]ct and the last of which shall have occurred within 10 years ... after a prior incident of racketeering activity"; and (2) "the incidents of racketeering activity embrace criminal conduct that has either the same or similar purposes, results, participants or victims or methods of commission or are otherwise interrelated by distinguishing characteristics and are not isolated incidents." N.J. Stat. Ann.. § 2C:41-1(d).

Plaintiffs' Complaint alleges that the individual Defendants, under the umbrella of West Orange, devised a scheme in the Summer of 2004 to deprive Plaintiffs of their money and property through extortion, fraudulent practices, wire fraud, violation of the Hobbs Act, 18 U.S.C. § 1951, and interference with Plaintiffs' Small Business Association loan in violation of 18 U.S.C. § 245(b)(1)(B). (Compl., ¶ ¶ 2-17.) Each of these alleged offenses occurred after the effective date of the statute, within ten years of one another, and constitutes a predicate act of racketeering, as that term is defined in the state RICO statute. *See* N.J. Stat. Ann .. § 2C:41-1 (indicating that "[r]acketeering activity" includes extortion; and forgery and fraudulent practices and all crimes defined in chapter 21 of Title 2C of the New Jersey Statutes). Therefore, this Court finds that Plaintiffs have alleged a pattern of racketeering activity. To the extent Defendants' motion to dismiss Plaintiffs' state RICO claim is grounded in their contention that Plaintiffs have failed to allege a pattern of racketeering activity, it is denied.[FN7]

> FN7. As explained *infra*, Plaintiffs have met the Rule 8 and 9(b) pleading standard regarding at least two of the predicate acts of fraud pled in their Complaint.

### 2. *Continuity*

Contrary to Defendants' arguments, New Jersey's RICO statute does not require that continuity be alleged, or even established. *See Maxim Sewerage Corp. v. Monmouth Ridings*, 640 A.2d 1216, 1222-1223 (N.J.Super. Ct. Law Div.1993) ("New Jersey's statute does not require a showing of continuity ... Federal RICO, however, is more restrictive"); *State v.*

*Ball, 632 A.2d 1222, 1259 (N.J.Super.Ct.App.Div.1993)* ("since the New Jersey statute explicitly requires only a showing of relatedness among predicate acts, there is no reason why the additional element of continuity, which is associated with Federal RICO, should be grafted onto New Jersey's statutory definition"). Thus, even assuming Plaintiffs' complaint fails to allege continuity, such an omission does not necessitate dismissal of Plaintiffs' state RICO claims. This Court must deny Defendants' motion on this basis.

### 3. Proximate Cause

Defendants also argue that Plaintiffs' state RICO claims must be dismissed because the complaint fails to meet the "proximate cause" requirement regarding damages. Defendants base their argument on their contention that "Plaintiffs are the sole cause of any alleged damages as they have failed to return to the Planning Board for final resolution of all issues concerning the subject property." (Def.'s Br. at 17.)

**\*10** This Court cannot agree that Defendants' argument warrants dismissal. In deciding a motion to dismiss, pursuant to Fed.R.Civ.P. 12(b)(6), this Court is limited to a consideration of the contents of the Complaint. *See, e.g., County Concrete, 442 F.3d at 172 n. 2 (3d Cir.2006)* ("the District Court here dismissed Counts One through Four on a Rule 12(b)(6) motion to dismiss, and, thus, our review is limited to the factual allegations in the complaint"). Here, the Complaint clearly alleges that "Defendants' pattern of racketeering activity directly damages Plaintiffs in that Defendants' conduct was the cause-in-fact of Plaintiffs' damages, as well as the legal and proximate cause." (Compl., Count Ten, ¶ 22.) [FN8] This Court shall deny Defendants' motion to dismiss Plaintiffs' RICO claims for failure to allege adequately that Defendants proximately caused Plaintiffs' damages.

> FN8. This Court notes that whether Defendants actually did cause Plaintiffs' damages through their conduct is a question of fact, not properly addressed in a 12(b)(6) motion. The causation question is properly addressed at a later stage in these proceedings, i.e., at the summary judgment phase of this case or at trial.

### 4. Rule 9's Pleading Requirements

As explained, Plaintiffs' complaint purports to assert a state RICO claim predicated on Defendants' alleged extortion, fraudulent practices, wire fraud, the Hobbs Act, and interference with Plaintiffs' small business loan in violation of 18 U.S.C. § 245(b)(1)(B). (Compl., Count Ten, ¶ 14.) Defendants argue that Plaintiffs' allegations are insufficient under Rule 9(b)'s pleading requirements. Plaintiffs counter that they have pled predicate acts sufficiently to meet the specificity required under Rule 9(b).

### a. Fraud And Wire Fraud [FN9]

> FN9. Contrary to Defendants' contentions, Plaintiffs do not base their state RICO claim on a predicate act of mail fraud. *(See* Compl., Tenth Count, ¶¶ 12-15.)

To the extent Plaintiffs' state RICO action is predicated on fraudulent practices and wire fraud, it must be pled with specificity, pursuant to Fed.R.Civ.P. 9(b). *See Lum v. Bank of America, 361 F.3d 217, 223 (3d Cir.2004);* Fed. R. Civ. P . 9(b) ("In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity").[FN10]

> FN10. The federal wire fraud statute prohibits the use of interstate wires for purposes of carrying out any scheme or artifice to defraud. *See* 18 U.S.C. § 1343. " 'A scheme or artifice to defraud need not be fraudulent on its face, but must involve some sort of fraudulent misrepresentation or omission reasonably calculated to deceive persons of ordinary prudence and comprehension.' " *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc., 140 F.3d 494, 528 (3d Cir.1998)* (quoting *Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1415 (3d Cir.1991)*).

"In order to satisfy Rule 9(b), [P]laintiffs must plead with particularity 'the circumstances of the alleged fraud in order to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior.' " *Lum, 361 F.3d at 223-24* (quoting *Seville Indus. Mach. Corp. v. Southmost Mach. Corp., 742 F.2d 786, 791 (3d Cir.1984)*). "Plaintiffs may satisfy this requirement by pleading the 'date, place or time' of the fraud, or

through 'alternative means of injecting precision and some measure of substantiation into their allegations of fraud.' " *Id* . (holding that a plaintiff satisfied Rule 9(b) by pleading which machines were the subject of alleged fraudulent transactions and the nature and subject of the alleged misrepresentations). "Plaintiffs also must allege who made a misrepresentation to whom and the general content of the misrepresentation." *Id.* at 224 (citing *Saporito v. Combustion Eng'g, Inc.,* 843 F.2d 666, 675 (3d Cir.1988),* vacated on other grounds, 489 U.S. 1049 (1989); *Rolo v. City Investing Co. Liquidating Trust,* 155 F.3d 644, 658-59 (3d Cir .1998); *Klein v. General Nutrition Co., Inc.,* 186 F.3d 338, 345 (3d Cir.1999)).

### (i) *Fraudulent Practices*

**\*11** Plaintiffs' state RICO claim alleges that "Defendants' conduct in the affairs of the enterprise[, i.e., West Orange,] as documented in Paragraphs 1 through 23 constitutes fraudulent practices thereby falling within the definition of racketeering set forth in N.J.S.A. 2C:41-1(a)(1)(o)." (Compl., ¶ 13.) This statement is the only specific allegation going to the nature of the predicate act of "fraudulent practices." Defendants do not specify the "date, place or time" of the fraudulent practice or "who made a misrepresentation to whom and the general content of the misrepresentation." *Lum,* 361 F.3d at 223-24. This lack of specificity requires this Court to find that Plaintiff has failed to allege the predicate act of fraudulent practices adequately, in accordance with Rule 9(b)'s pleading requirements. Thus, to the extent Plaintiffs' state RICO claims relies upon fraudulent practices as a predicate act, they cannot survive.

### (ii) *Wire Fraud*

Plaintiff's state RICO claim also alleges that Defendants committed acts of wire fraud in violation of 18 U.S.C. § 1343. Plaintiffs specifically allege: Defendants willfully and knowingly devised a scheme or artifice to injure Plaintiffs by means of false pretenses, representations, and/or promises, and caused to be transmitted by means of wire and interstate commerce, writings, signs, signals, pictures, and/or sounds for the purpose of executing the scheme to defraud, in particular the following:
a. communicating with Plaintiffs on numerous occasions via telephone;
b. upon information and belief, utilizing the telephone and/or other forms of wire communications

to communicate among themselves and with third parties; and
c. fraudulent fax dated December 3, 2004 from Susan Borg to the State DCA

(Compl., Count Ten, ¶ 15.) Earlier in the Complaint, Plaintiffs allege that Borg sent a fax to the DCA indicating that Plaintiffs had no approvals, when in fact the Planning Board did not actually adopt its resolution lifting Plaintiffs' approvals until February 2005. In response to Borg's alleged miscommunication, the DCA instituted another Stop Work Order on December 9, 2004. (*Id.,* ¶ 14.) Plaintiffs further allege that the activities chronicled throughout the complaint could only have been carried out through wire communications. (Compl., Count Ten, ¶ 16.) Plaintiffs also assert that the Defendants who did not carry out the alleged acts of racketeering aided and abetted those acts. (*Id.,* ¶ 18.)

This Court finds that with the exception of Plaintiffs' allegation that Borg transmitted a fraudulent fax to the DCA in an effort to shut down Plaintiffs' construction efforts, Plaintiffs have failed to aver wire fraud adequately as a predicate act to their state RICO claims. With the exception of the Borg fax transmission, Plaintiffs have failed to specify the "date, place or time" of the fraudulent practice or "who made a misrepresentation to whom and the general content of the misrepresentation." *Lum,* 361 F.3d at 223-24. On the other hand, the allegations regarding the Borg transmission have met the Rule 9(b) pleading standard. Plaintiffs have alleged that on December 3, 2004, Borg transmitted a fax to DCA misrepresenting Plaintiffs' approvals (Compl., ¶ 14; Compl., Count Ten, ¶ 15.) This Court finds that to the extent it relies on the predicate act of wire fraud, Plaintiffs' state RICO claim can only be based on the wire fraud allegedly committed by Borg in transmitting the fax to DCA.

### b. Extortion, Hobbs Act, and 18 U.S.C. § 245(b)(1)(B)

**\*12** To the extent Plaintiffs' state RICO action is predicated on extortion, the Hobbs Act,[FN11] and 18 U.S.C. § 245(b)(1)(B),[FN12] their allegations need only satisfy Rule 8's general notice-pleading standard. *See Rose v. Bartle,* 871 F.2d 331, 362 n. 53 (3d Cir.1989) (Rule 9(b) inapplicable because plaintiffs' claims of bribery and extortion do not allege fraud on part of defendants); *Chiropractic Alliance of New Jersey v. Parisi,* 854 F.Supp. 299,

308 (D.N.J.1994) ("the allegations of theft by extortion, for example, are properly governed by the more lenient pleading requirement of Fed.R.Civ.P. 8"). Plaintiffs have put Defendants on notice of these claims and the conduct underlying them. Defendants' motion to dismiss Plaintiffs' RICO claim, to the extent it is predicated on Defendants' alleged extortion, violation of the Hobbs Act, and violation of 18 U.S.C. § 245(b)(1)(B), is denied.

> FN11. An individual commits a crime under the Hobbs Act, 18 U.S.C. § 1951, if he "in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section." 18 U.S.C. § 1951(a).

> FN12. A person is in violation of 18 U.S.C. § 245(b)(1)(B) when "whether or not acting under color of law, by force or threat of force willfully injures, intimidates or interferes with, or attempts to injure, intimidate or interfere with any person because he is or has been, or in order to intimidate such person or any other person or any class of persons from participating in or enjoying any benefit, service, privilege, program, facility, or activity provided or administered by the United States."

Because Plaintiffs have alleged the predicate act of wire fraud regarding Borg's conduct with sufficient specificity, as well as the predicate acts of extortion, violation of the Hobbs Act, and violation of 18 U.S.C. § 245(b)(1)(B), more generally, Defendants' motion to dismiss Plaintiffs' state RICO claims for failure to state a claim upon which relief can be granted is denied.

### E. *Plaintiffs' Remaining State Law Tort Claims*

#### 1. *Plaintiffs' Allegedly Deficient Tort Claims Notice Does Not Warrant Dismissal Of Plaintiffs' Claims Pursuant To Rule 12(b)(6)*

Pursuant to the New Jersey Tort Claims Act ("NJTCA"), "[t]o bring an action in tort against a 'public entity or public employee' in New Jersey, the claimant must file a notice of claim with the entity within ninety days of the accrual of the claim or else be 'forever barred' from asserting that cause of action." *County Concrete*, 442 F.3d at 174 (citing N.J. Stat. Ann., § 59:8-3 and -8; *Moon v. Warren Haven Nursing Home*, 867 A.2d 1174, 1176 (N.J.Sup.Ct.2005)). The NJTCA requires that a notice of claim include the "date, place and other circumstances of the occurrence or transaction which gave rise to the claim asserted;" a "general description of the injury, damage or loss incurred;" the "name or names of the public entity, employee or employees causing the injury;" and the amount of damages claimed. N.J. Stat. Ann., § 59:8-4.

While Defendants' allegations that Plaintiffs' notice is deficient under the NJTCA may ultimately warrant dismissal of Plaintiffs' tort claims, this Court cannot make such a finding at this time. In considering a motion to dismiss for failure to state a claim, pursuant to Rule 12(b)(6), this Court is limited to a consideration of the contents of the Complaint. *See Yarris v. County of Delaware*, 465 F.3d 129, 134 (3d Cir.2006) (at the motion-to-dismiss stage, the district court's "review is limited to the contents of the complaint and any attached exhibits").[FN13] This Court cannot determine whether Plaintiffs' NJTCA notice is sufficient without looking beyond the four corners of the Complaint. Thus, Defendants' motion to dismiss Plaintiffs' tort claims under Rule 12(b)(6), based on the alleged deficiencies in Plaintiffs' NJTCA notice, is denied.[FN14]

> FN13. The Third Circuit, however, has held that a "court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss," without converting the motion into a motion for summary judgment, "if the plaintiff's claims are based on the document." *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir.1993), cert. denied, 510 U.S. 1042 (1994). This case, however, presents this Court with no such circumstance. Unlike a contract, which forms the basis for a breach of contract claim, here Plaintiffs' NJTCA notice does not in any way form the *basis* for Plaintiffs' various state law causes of action. To the extent that Defendants have proffered evidence related to the form of Plaintiffs' notice, this Court may not consider it at this juncture, on a Rule 12(b)(6) motion.

FN14. This Court notes that it will entertain Defendants' arguments under the NJTCA if they are raised at the appropriate time, e.g., in a motion for summary judgment.

### 2. Plaintiffs' State Law Claims Are Ripe For Adjudication

*13 Defendants argue that all of Plaintiffs' claims are unripe because (1) Plaintiffs have failed to exhaust their administrative remedies "in failing to return to the Planning Board with a completed amended site plan application"; and (2) "Plaintiffs' own actions have caused the necessary changes in how they must now proceed with respect to site plan approvals."

This Court finds that Plaintiffs' claims are ripe for adjudication. "The ripeness doctrine serves 'to determine whether a party has brought an action prematurely and counsels abstention until such time as a dispute is sufficiently concrete to satisfy the constitutional and prudential requirements of the doctrine.' " *Khodara Envtl., Inc. v. Blakey,* 376 F.3d 187, 196 (3d Cir.2004) (quoting *Peachlum v. City of York,* 333 F.3d 429, 433 (3d Cir.2003)). As this Court has explained in its discussion of the ripeness of Plaintiffs' constitutional claims, in *Blanche Road Corp. v. Bensalem Twp.,* 57 F.3d 253 (3d Cir.1995), the Third Circuit held that a plaintiff landowner need not comply with the finality rule where, instead of "appealing from an adverse decision on a permit application," the plaintiff claims that the defendant Township officers "deliberately and improperly interfered with the process by which the Township issued permits, in order to block or to delay the issuance of plaintiff's permits, and that defendants did so for reasons unrelated to the merits of the application for the permits." *Id.,* 57 F.3d at 267-68. It was asserted by the plaintiff in *Blanche Road* that the Township "engaged in a campaign of harassment designed to force [it] to abandon its development of [an] industrial park." *Id.* at 258. The *Blanche Road* court explained that the claim at issue there was "substantially different" from "that presented in the ripeness cases" and that "[s]uch actions, if proven, are sufficient to establish" an actual claim, even if the ultimate outcome of plaintiff's permit applications was favorable." *Id.* at 268. Thus, no further appeals were necessary in order to have a ripe, final determination for a federal court to review.

Looking to this precedent, this Court finds that Plaintiffs' claims are ripe despite Defendants' contentions that Plaintiffs have failed to seek a final administrative determination of Defendants' revocation of their permits. Like the plaintiff in *Blanche,* Plaintiffs claim that West Orange and its officers and agents deliberately and improperly interfered with the process through which West Orange issues permits, and controls development once permits are issued. This Court denies Defendants' motion to dismiss Plaintiffs' claims on the ground that they are unripe.

### 3. Tortious Interference With Economic Advantage / Contractual Relations (Counts One And Two)

Plaintiffs' first and second causes of action assert claims for tortious interference with prospective economic advantage, and tortious interference with contractual relations, generally. To state a claim for tortious interference with contract or prospective business advantage, Plaintiffs must allege that: (1) they had "some protectable right," or "reasonable expectation of economic advantage;" (2) "the interference was done intentionally ... without justification or excuse;" (3) "the interference caused the loss of the prospective gain;" and (4) "the injury caused the damage." *Printing Mart-Morristown v. Sharp Electronics Corp.,* 116 N.J. 739, 751 (1989). The Complaint must include allegations giving rise to some "reasonable expectation of economic advantage." *Id.*

*14 Defendants argue that Plaintiffs' tortious interference claims should be dismissed, pursuant to Rule 12(b)(6), because Plaintiffs cannot establish the "malice" requirement essential to their claims. This Court rejects Defendants' argument. While it may be true that Plaintiffs will not ultimately be able to establish the so-called "malice" element of their tortious interference claims, such an inquiry is beyond this Court's purview in determining whether Plaintiffs have sufficiently *alleged* their claims. As has been explained *supra,* in considering a motion to dismiss for failure to state a claim, pursuant to Rule 12(b)(6), this Court is limited to a consideration of the contents of the Complaint. *See, e.g., County Concrete Corp.,* 442 F.3d at 172 n. 2 ("the District Court here dismissed Counts One through Four on a Rule 12(b)(6) motion to dismiss, and, thus, our review is limited to the factual allegations in the complaint").

Here, Plaintiffs have alleged that "Defendants have intentionally interfered with Plaintiffs' prospective economic advantage *without justification, thereby establishing malice ...,*" and that "Defendants have

intentionally interfered with Plaintiffs' contractual relations *without justification, thereby establishing malice ...*" (Compl., First Count, ¶ 3 (emphasis added); Compl., Second Count, ¶ 3 (emphasis added).)

This Court finds that these allegations are sufficient under the notice-pleading standard to state the intent element of tortious interference. Defendants' motion to dismiss Plaintiffs' tortious interference claims for failure to state a claim upon which relief can be granted is denied.

### 4. *Breach Of Fiduciary Duty (Count Five)*

Plaintiffs' fifth cause of action asserts a claim for breach of fiduciary duty against Defendants. "The essence of a fiduciary relationship is that one party places trust and confidence in another who is in a dominant or superior position." *McKelvey v. Pierce,* 173 N.J. 26, 57 (2002) (citation omitted). "The fiduciary's obligations to the dependent party include a duty of loyalty and a duty to exercise reasonable skill and care." *Id.* (citing *Restatement (Second) of Trusts § § 170,* 174 (1959). "[T]he fiduciary is liable for harm resulting from a breach of the duties imposed by the existence of such a relationship." *Id.* (citing *Restatement (Second) of Torts § 874 (1979)*).

"Public officers hold positions of public trust, and stand in a fiduciary relationship to the people whom they have been appointed to serve." *State v. Markt,* 384 A.2d 162, 166 (N.J.Super.Ct.App .Div.1978) (citing *Driscoll v. Burlington-Bristol Bridge Co.,* 8 N .J. 433, 474 (1952)). "They must serve the public with the highest fidelity." *Id.* "The citizen is not at the mercy of his servants holding positions of public trust nor is he helpless to secure relief from their machinations except through the medium of the ballot, the pressure of public opinion or criminal prosecution." *Driscoll, 8 N.J. at 476.* "Whenever the acts of public officers fail to conform to the standard imposed by the fiduciary relationship in which they stand to the public, relief will be available in the civil courts." *Id.*

***15** Here, Plaintiffs allege that "Defendants, as public entities, elected officials, and political appointees stand in fiduciary relationship with their constituents." (Compl., Fifth Count, ¶ 2 .) "As fiduciaries ... Defendants are under an inescapable obligation to serve the public, including taxpayers such as Plaintiffs, with the highest fidelity, intelligence, skill, diligence, conscientiousness,

reasonableness, good faith, honesty, and integrity." (*Id.,* ¶ 3.) Plaintiffs contend that by engaging in the conduct set forth in the Complaint, i.e., by engaging in and promoting a campaign of harassment designed to halt the construction of Plaintiffs' business, "Defendants breached their fiduciary duties to Plaintiffs, and said breach proximately caused Plaintiffs' damages." (*Id.,* ¶ ¶ 6-7.) The Complaint thereby alleges a fiduciary relationship, a duty of "highest fidelity," a breach of that duty, and damages.[FN15] These allegations suffice to state a claim for breach of fiduciary duty. Defendants' motion to dismiss Plaintiffs' breach of fiduciary claim, pursuant to Rule 12(b)(6), is denied.

> FN15. Defendants argue that they acted in accordance with their fiduciary duty in halting construction on Plaintiffs' property because Plaintiffs' failed to abide by the site plan approval procedures set forth by state statute. This contention, like many of Defendants arguments, focuses on what the evidence will ultimately show, i.e., that Defendants were acting in accordance with their fiduciary duties, rather than what is alleged in the Complaint. Even if the evidence ultimately produced does not support Plaintiffs' breach of fiduciary duty claim, because Plaintiffs have alleged a claim upon which relief can be granted, this Court cannot dismiss Plaintiffs' fifth cause of action, pursuant to Rule 12(b)(6). *See County Concrete Corp.,* 442 F.3d at 172 n. 2; *Yarris,* 465 F.3d at 134.

### 5. *Legal Malpractice (Count Six)*

Plaintiffs' sixth cause of action asserts a claim for legal malpractice against Trenk and his law firm. To state a claim for legal malpractice, Plaintiffs must allege: (1) the existence of an attorney-client relationship creating a duty of care by the defendant attorney, (2) the breach of that duty by the defendant, and (3) proximate causation of the damages claimed by the plaintiff." *McGrogan v. Till,* 167 N.J. 414, 425 (2001) (citing *Conklin v. Hannoch Weisman,* 145 N.J. 395, 416 (1996)). "At the most fundamental level, the legal-malpractice action provides a remedy for negligent professional performance." *Id.* (citation omitted).

Defendants argue that Plaintiffs have failed to allege the existence of an attorney-client relationship creating a duty of care by the defendant attorney.

Slip Copy                                                                                                          Page 13
Slip Copy, 2006 WL 3751395 (D.N.J.)
(Cite as: Slip Copy)

This Court agrees. Trenk is alleged to be West Orange's attorney. (Compl. at 2.) Nowhere in the Complaint do Plaintiffs allege that they retained Trenk as their counsel. Plaintiffs' conclusory allegation that an attorney-client relationship existed between Plaintiffs and Trenk does not suffice to meet the first element of a claim for legal malpractice. While a court will accept well-pled allegations as true for the purposes of the motion, it will not accept unsupported conclusions, unwarranted inferences, or sweeping legal conclusions cast in the form of factual allegations. *See Morse, 132 F.3d at 906 n. 8.* Contrary to Plaintiffs' contentions, no fiduciary duty exists between Trenk, as the Township's counsel, and Plaintiffs, which gives rise to a legal malpractice claim. This Court shall grant Defendants' motion to dismiss Plaintiffs' claim for legal malpractice, pursuant to Fed.R.Civ.P. 12(b)(6).

### 6. Civil Conspiracy (Count Seven)

Plaintiffs' seventh cause of action alleges a claim for "civil conspiracy." Defendants have moved to dismiss this cause of action on the grounds that (1) under New Jersey law, there is no independent cause of action for "civil conspiracy"; and (2) it is impossible for a corporation and its agents to conspire with themselves.

**\*16** In order to state a claim for "civil conspiracy," plaintiff must allege "a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damage." *State, Dept. of Treasury, Div. of Inv. ex rel. McCormac v. Qwest Communications Intern., Inc., 904 A.2d 775, 785 (N.J.Super.Ct.App.Div.2006)* (citing *Morgan v. Union Cty. Bd. of Chosen Freeholders, 268 N.J.Super. 337, 364 (App.Div.1993)*).

"Most importantly, the 'gist of the claim is not the unlawful agreement, 'but the underlying wrong which, absent the conspiracy, would give a right of action.' " " *Id.* (quoting *Morgan, 268 N.J.Super. at 364* (quoting *Bd. of Educ. v. Hoek, 38 N.J. 213, 238 (1962)*)). "[A] cause of action for civil conspiracy is not an independent cause of action; rather, it depends on the existence of an underlying tort." *In re Lead Paint Litigation, No. A-1946-02T3, 2005 WL 1994172, at \*20 (N.J.Super.Ct.App.Div. Aug. 17, 2005); see also Farris v. County of Camden, 61*

F.Supp.2d 307, 326 (D.N.J.1999) (under New Jersey law, civil conspiracy is not an independent cause of action; it is a mechanism for expanding liability in the event that the plaintiff can prove the underlying tort); *Board of Educ., Asbury Park v. Hoek, 38 N.J. 213, 238 (1962)* ("The gravamen of an action in civil conspiracy is not the conspiracy itself but the underlying wrong which, absent the conspiracy, would give a right of action").

#### a. Plaintiffs Successfully Allege An Underlying Tort

While Defendants are correct that a claim for civil conspiracy cannot exist absent an underlying tort, here, Plaintiffs' claim does not suffer from such a deficit. As this Court has found, Plaintiffs have successfully alleged state tort claims (tortious interference, breach of fiduciary duty). To the extent Defendants move to dismiss Plaintiffs' civil conspiracy claim for failure to allege an underlying wrong, Defendants' motion is denied.

#### a. Plaintiffs Have Failed To Allege That Two Or More Persons Engaged In The Alleged Conspiracy

Defendants also argue that Plaintiffs' civil conspiracy claim fails because all Defendants engaged in the alleged conspiratorial conduct in their roles as West Orange officials. Defendants are correct that officials and/or employees of the same entity cannot conspire among themselves for purposes of establishing civil conspiracy. "A corporation cannot conspire with itself, just as an individual cannot conspire with himself." *Selman v American Sports Underwriters Inc., 697 F.Supp. 225, 238 (W.D.Va.1988)*. Since a corporation can only act through its agents, officers, and employees, it is legally impossible for a corporation to conspire with these persons, as long as they are acting exclusively within the scope of their employment. *See Tynan v. General Motors Corp., 591 A.2d 1024, 1032 (N.J.Super.Ct.App.Div.1991), rev'd in part on other grounds, 127 N.J. 269 (1992)* (citing *Exxon Corporation v. Wagner, 154 N.J.Super. 538, 545 (App.Div.1977)); Cromley v. Board of Education of Lockport Township High School Dist. No. 205, 699 F.Supp. 1283, 1291-92 (N.D.Ill.1988); Wolf v. City of Chicago Heights, 828 F.Supp. 520, 524 (N.D.Ill.1993); Selman, 697 F.Supp. at 238; Hebron Public School District v. U.S. Gypsum, 690 F.Supp. 866 (D.N.D.1988), aff'd, 953 F.2d 398 (8th Cir.1992)*. Nor can individual agents, officers, or employees of a corporation, acting in their

Slip Copy                                                                                                            Page 14
Slip Copy, 2006 WL 3751395 (D.N.J.)
**(Cite as: Slip Copy)**

representative capacities, conspire among themselves. *Rutherfoord v Presbyterian-University Hospital,* 417 Pa.Super. 316 (1992). This Court notes, however, that a conspiracy is possible between a corporation and its agents, officers, or employees where they were acting as *individuals,* rather than representatives of the corporation. *See Selman,* 697 F.Supp. at 239.

**\*17** Here, Plaintiffs allege that the individual Defendants conspired among themselves, acting as "principals, agents, officers, management, control persons, and/or other employees." (Compl., Seventh Count, ¶ 2.) Plaintiffs have failed to allege that any of the Defendants were acting outside of their official capacity when they engaged in the alleged conduct. Defendants, acting as agents and employees of West Orange, cannot conspire among themselves. *Tynan,* 591 A.2d at 1032. Consequently, Plaintiffs have failed to allege that two or more "persons" acted in concert to commit an unlawful act. Accordingly, Defendants' motion to dismiss Plaintiffs' civil conspiracy claim is granted.

### 7. Estoppel (Count Nine)

"Although the doctrine of equitable estoppel is rarely invoked against a governmental entity, this Court has long held that the prevention of manifest injustice provides an exception to the general rule." *Casamasino v. City of Jersey City,* 158 N.J. 333, 354 (1999) (citing *County of Morris v. Fauver,* 153 N.J. 80, 104 (1998); *Vogt v. Borough of Belmar,* 14 N.J. 195, 205 (1954)). Assuming that Plaintiffs can demonstrate a "manifest injustice," in order to assert a claim for equitable estoppel, Plaintiffs must allege that Defendants "engaged in conduct, either intentionally or under circumstances that induced reliance, and that [Plaintiffs] acted or changed [their] position to [their] detriment." *Aqua Beach Condominium Ass'n v. Department of Community Affairs, Bureau of Homeowner Protection, New Home Warranty Program,* 186 N.J. 5, 20 (2006) (quoting *Knorr v. Smeal,* 178 N.J. 169, 178 (2003) (citing *Miller v. Miller,* 97 N.J. 154, 163 (1984))).

Defendants move to dismiss Plaintiffs' cause of action for equitable estoppel on the grounds that Plaintiffs (1) have no legal right or entitlement to proceed with construction that fails to comply with the plans presented to, and approved by, the Planning Board; and (2) "any permits obtained by Plaintiffs were null and void, and neither issued or relied on in good faith." (Defs.' Br. at 35.) This court finds

Defendants' arguments unavailing. Defendants argue about what the proofs ultimately produced will show, rather than focusing on any deficiencies in Plaintiffs' allegations.

Plaintiffs allege that their "plans were approved and permits were issued in good faith by public entities/officials acting within the ambit of their duty," and that they "relied upon said approvals and permits in good faith" to their detriment in continuing to develop and put money into the Property. (Compl., Ninth Count, ¶ ¶ 2-3.) These allegations suffice to state a claim for equitable estoppel. *See Aqua Beach,* 186 N.J. at 20. This Court denies Defendants' motion to dismiss Plaintiffs' equitable estoppel claim, pursuant to Rule 12(b)(6).[FN16]

> FN16. Count Eight of Plaintiffs' complaint asserts a cause of action for intentional infliction of emotional distress. Defendants have made no general arguments warranting dismissal of this cause of action, and have failed to identify any specific deficiencies in Plaintiffs' complaint regarding this cause of action. Defendants have not met their burden, and this Court will not dismiss Plaintiffs' emotional distress claim. *See Hedges v. United States,* 404 F.3d 744, 750 (3d Cir.2005) ("The defendant bears the burden of showing that no claim has been presented").

### F. Defendants' Motion For A More Definite Statement Under Rule 12(e)

Under Rule 12(e), a defendant may move for a more definite statement "[i]f a pleading ... is so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading." Fed.R.Civ.P. 12(e). The Rule 12(e) "motion shall point out the defects complained of and the details desired." *Id.* "When a complaint fashioned under a notice pleading standard does not disclose the facts underlying a plaintiff's claim for relief, the defendant cannot reasonably be expected to frame a proper, fact-specific ... defense; [t]he Rule 12(e) motion for a more definite statement is perhaps the best procedural tool available to the defendant to obtain the factual basis underlying a plaintiff's claim for relief." *Thomas v. Independence Tp.,* 463 F.3d 285, 301 (3d Cir.2006).

**\*18** A defendant who makes a motion for a more definite statement under Rule 12(e) may join that motion with a Rule 12(b) motion to dismiss. FED. R.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                          Page 15
Slip Copy, 2006 WL 3751395 (D.N.J.)
**(Cite as: Slip Copy)**

CIV. P. 12(g) ("A party who makes a motion under this rule may join with it any other motions herein provided for and then available to the party"). "When presented with an appropriate Rule 12(e) motion for a more definite statement, the district court shall grant the motion and demand more specific factual allegations from the plaintiff concerning the conduct underlying the claims for relief." *Thomas,* 463 F.3d at 301.

Defendants argue that in the event that this Court determines that any of the counts set forth in the Complaint should not be dismissed for failure to state a claim upon which relief may be granted, this Court should order Plaintiffs to proffer more specific factual allegations because the Complaint is "both vague and ambiguous." Defendants specifically contend that Plaintiffs have failed to define the individual parties and their respective interests in the litigation, or allege specific factual support for a single claim in their ten-count Complaint. Defendants also contend that Plaintiffs set forth numerous irrelevant inflammatory comments about Defendant Trenk.[FN17]

> FN17. Although Defendants complain that irrelevant inflammatory comments were directed toward Defendant Trenk, they have not made a motion to strike the allegedly inflammatory language. Therefore, there is no need for this Court to address whether such language should be stricken.

This Court finds that the claims which have not been dismissed, pursuant to Rule 12(b)(6), are sufficiently alleged such that Defendants can reasonably frame a responsive pleading. As Defendants' motion itself demonstrates, Defendants clearly understand the factual allegations underlying Plaintiffs' claims, and have alleged factual reasons why they should not be held liable for each count. Defendants, as the movants, carry the burden of pointing out the "specific defects complained of and the details desired." Fed.R.Civ.P. 12(e). Through their general admonition that the Complaint is vague and ambiguous in failing to allege specific factual support for a single claim" (Defs.' Br. at 38-39), Defendants fail to meet their burden.

This Court also notes that there is no authority supporting the proposition that the inclusion of allegedly inflammatory remarks in a Complaint justifies an order for a more definite statement, pursuant to Rule 12(e). For these reasons, this Court

denies Defendants' motion for a more definite statement.

### IV. *CONCLUSION*

For the reasons stated above, this Court grants in part and denies in part Defendants' motion to dismiss Plaintiffs' Complaint, and denies Defendants' motion for a more definite statement.

D.N.J.,2006.
Marjac, LLC v. Trenk
Slip Copy, 2006 WL 3751395 (D.N.J.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.