# UPREPORTED CASES

122NSS

**Time of Request:** Thursday, July 05, 2007   10:51:57 EST
**Client ID/Project Name:** 500.21931
**Number of Lines:** 349
**Job Number:**      1821:36145367

Research Information

**Service:**   LEXSEE(R) Feature
**Print Request:** Current Document: 1
**Source:** Get by LEXSEE(R)
**Search Terms:** 2000 U.S. Dist. LEXIS 6924

**Note:** Delaware case distinguishes earlier Delaware case

**Send to:**  RIVERS, WARD
        DEASEY MAHONEY BENDER
        1880 JOHN F KENNEDY BLVD FL 13
        PHILADELPHIA, PA 19103-7422

LEXSEE

**CENTERFORCE TECHNOLOGIES, INC., Plaintiff, v. AUSTIN LOGIS-
TICS INC., Defendant.**

**Civil Action No. 99-243 MMS**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELA-
WARE**

*2000 U.S. Dist. LEXIS 6924; 55 U.S.P.Q.2D (BNA) 1124*

**February 2, 2000, Argued
March 10, 2000, Decided**

**DISPOSITION:**    [*1]  CenterForce's motion to
amend granted.

**COUNSEL:** Patricia Smink Rogowski, Esquires,
and Francis DiGiovanni, Esquire, Connolly, Bove,
Lodge & Hutz LLP, Wilmington, Delaware, for
Plaintiff.

William E. Wallace III, Esquire, Gregory S. Lewis,
Esquire, Tyler R. Goodwyn, IV, Esquire, Margaret
S. Izzo, Esquire, and Melvin L. Barnes, Jr., Esquire,
Of Counsel, Morgan, Lewis & Bockius LLP, Wash-
ington, D.C., for Plaintiff.

Richard D. Kirk, Esquire, and Gretchen A. Bender,
Esquire, Of Counsel, Morris, James, Hitchens &
Williams LLP, Wilmington, Delaware, for Defen-
dant.

Robert Neuner, Esquire, Of Counsel, Baker &
Botts, L.L.P., New York, New York, for Defendant.

Patrick O. Keel, Esquire, and Robert W. Holland,
Esquire, Baker & Botts, L.L.P., Austin, Texas, for
Defendant.

**JUDGES:** Murray M. Schwartz, Senior District
Judge.

**OPINION BY:** Murray M. Schwartz

**OPINION**

**MEMORANDUM OPINION**

Argued: February 2, 2000

Dated: March 10, 2000

Murray M. Schwartz

**Senior District Judge**

**I. Introduction**

CenterForce Technologies, Inc. ("CenterForce")
is the owner by assignment of three patents relating
to methods for optimizing telephone campaigns. Its
U. [*2] S. *Patent No. 5,436,965 (the '965 patent)*,
filed on November 16, 1993 and entitled "Method
and System for Optimization of Telephone Contact
Campaigns," issued on July 25, 1995. CenterForce
filed a continuation-in-part application of the *'965
patent* application on June 7, 1995, which resulted
in the second patent, *U.S. Patent No. 5,621,790
(the '790 patent)*, issued on April 15, 1997. On
April 14, 1997, CenterForce filed a continuation of
the *'790 patent* application, which resulted in the
issuance of the third patent, *U.S. Patent No.
5,889,799 (the '799 patent)*, on March 30, 1999.

CenterForce filed a complaint against Austin
Logistics Inc. ("ALI") on April 13, 1999, alleging
that ALI had infringed the *'799 patent*, that ALI
engaged in false patent marking, and that ALI made
false and misleading representations in violation of
the Lanham Act, *15 U.S.C. § 1051, et seq.* Docket
Item ("D.I.") 1. ALI filed an answer and counter-

Case 1:05-cv-00376-GMS    Document 105-2    Filed 07/13/2007    Page 4 of 31

Page 2

2000 U.S. Dist. LEXIS 6924, *; 55 U.S.P.Q.2D (BNA) 1124

claim on May 24, denying CenterForce's allegations and seeking a declaratory judgment that the *'799 patent* is invalid, unenforceable, and not infringed. D.I. 14. ALI subsequently amended its counter-claim to assert a Lanham Act claim against **[*3]** CenterForce. D.I. 46.

On October 26, 1999, CenterForce moved for leave to file an amended complaint. D.I. 80. In the amended complaint, CenterForce seeks to allege infringement of the *'965 patent*, and to add a claim for willful infringement of both the *'799* and *'965 patents*. CenterForce also seeks recovery of treble damages. ALI opposes CenterForce's motion to amend. For the reasons set forth below, the Court will grant CenterForce's motion to amend the complaint.

## II. Factual Background

The three CenterForce patents describe methods and systems for enhancing telephone contact campaigns by scheduling calls based on probabilities of right party contact with the targeted individual in order to enhance the rate of correct party contact and operator productivity. CenterForce markets and sells its telephone scheduling systems under the name "Optimizer," to, for example, debt collection and telemarketing firms.

ALI is also in the business of selling call optimization systems. ALI markets its "CallTech" system, previously known as "Stalker," in competition with CenterForce's Optimizer system.

CenterForce's president and chief operating officer, Robert F. Kelly, learned of the Stalker **[*4]** system as early as November 1994 when he was employed by EIS International. Kelly had received two documents, a facsimile of a brochure cover or data sheet describing Stalker and a two-page general product overview. D.I. 91, at B-9-11. Early in 1995, Kelly met with representatives of ALI to discuss ALI's product development generally, but "no technical specifics" were discussed. *Id.* at B-15.

In July 1995, representatives of CenterForce, then known as Automated Systems and Programming, Inc. ("ASPI"), obtained a copy of a Stalker brochure at a trade show. *Id.* at B-23. By a letter dated July 28, 1995, CenterForce's attorney wrote to ALI stating that the Stalker system as described in the brochure was "very similar to ASPI's [Center-

Force's] Campaign Optimizer product." *Id.* at B-25. The letter went on to assert that "important aspects of the Campaign Optimizer are protected by the [*'965 patent*]" and that CenterForce had another patent application pending. *Id.* The letter closed with a warning that "ASPI [CenterForce] intends to enforce its patent rights vigorously and will not license potential competitors such as ALI. ALI should ensure that its products do not incorporate **[*5]** ASPI's [CenterForce's] patented technology." *Id.*

ALI's attorney responded in a letter dated October 12, 1995 asserting that "the ALI system cannot be considered as conflicting with [the] *965 Patent*." *Id.* at B-34. The letter stated in pertinent part:

> Although ALI's scheduling system is proprietary and I can, therefore, not disclose to you specifically what ALI's system does, I can set forth for you generally what the ALI system does not do relative to your client's *965 Patent*. First, the ALI process does not prioritize accounts into relative priorities according to contact priority. The ALI system also does not allocate accounts in descending order of contact probability. Also, the ALI system does not create demographic profiles representative of contact probability.

*Id.* Enclosed with the letter were several pages of additional descriptive information including flow charts. *Id.* at B-36-43.

On January 30, 1996, CenterForce's attorney responded to the October 12, 1995 letter, acknowledging receipt of the materials describing Stalker and stating:

> These materials, like the publicly-available information about the Stalker product that we reviewed **[*6]** earlier, suggest that the Stalker infringes claims of ASPI's [Center-Force's] *U.S. Patent No. 5,436,965*. However, you decline to provide further detail on the operation of the

2000 U.S. Dist. LEXIS 6924, *; 55 U.S.P.Q.2D (BNA) 1124

product on the grounds that the infor-
mation is proprietary, and we lack suf-
ficient independent information about
the product to form a definitive in-
fringement conclusion. We must
therefore rely on the representations in
your October 12 letter that the product
does not meet the claim limitations
that you identified.

*Id.* at B-44. The letter concluded by stating that
CenterForce would "let this matter rest" until its
next patent issued or "until [CenterForce] received
additional information indicating that the *'965 pat-
ent* is infringed." *Id.*

On June 4, 1996, ALI's attorney wrote to Cen-
terForce's attorney, expressing concern that certain
CenterForce representatives had been representing
in the marketplace that ALI's CallTech product in-
fringed a CenterForce patent and demanding that
such representations cease. CenterForce responded
by letter dated June 25, 1996, stating that "in light
of ALI's published material and your May 10 letter,
and since ALI has refused to provide sufficient in-
formation [*7] to permit us to perform a definitive
infringement analysis, [CenterForce] remains con-
cerned that ALI is infringing one or more claims of
[the '965] patent. Accordingly, [CenterForce] has
expressed its concerns to others." *Id.* at B-45.

By letter dated July 7, 1997, CenterForce's at-
torney informed ALI that the *'790 patent* recently
had issued. *Id.* at B-59. The letter asserted, "many
of the claims of the *'790 patent* are directed to fea-
tures of CenterForce's software that were not spe-
cifically claimed in the *'965 patent* and which may
be used in ALI's product. Other claims are directed
to the same features as were claimed in the *'965
patent* and which CenterForce remains unsatisfied
are not infringed by ALI's product." *Id.* In conclu-
sion, CenterForce renewed its "demand that ALI
explain why its CallTech product does not infringe
CenterForce's patent rights." *Id.*

At least one of CenterForce's salesmen contin-
ued during 1998 to make representations to custom-
ers that CenterForce had "three broad based pat-
ents" covering the Optimizer and, therefore, it was
"virtually impossible for ALI to be selling the same
type of product." *Id.* at B-47, 50, 57.

On September 1, 1998, ALI [*8] received a
patent for its CallTech system, *U.S. Patent No.
5,802,161 (the '161 patent)*. The patent specifica-
tion references the use of "scorecards" and "charac-
teristics" in the specification and description of the
preferred embodiment. *Id.* at B-68.

On April 15, 1999, CenterForce's president
wrote ALI's president, announcing the issuance of
the *'799 patent* on March 30, 1999, and advising
ALI that CenterForce had filed this suit for alleged
infringement of the *'799 patent. Id.* at B-82. In Au-
gust 1999 the parties exchanged responses to
document requests and interrogatories, and in Sep-
tember and October 1999 the parties engaged in
depositions.

On December 14-15, 1999, the court held a
*Markman* [1] hearing regarding construction of dis-
puted claim terms of the *'799 patent.*

> 1    *Markman v. Westview Instruments, Inc.,
> 517 U.S. 370, 134 L. Ed. 2d 577, 116 S. Ct.
> 1384 (1996).*

## III. Legal Standard

*Rule 15(a) of the Federal Rules of Civil Proce-
dure* provides that a party may amend its pleadings
[*9] by "leave of the court" and that leave to
amend "shall be freely given when justice so re-
quires." *Fed. R. Civ. P. 15(a)*; *Foman v. Davis, 371
U.S. 178, 182, 9 L. Ed. 2d 222, 83 S. Ct. 227
(1962)*; *In re Burlington Coat Factory Sec. Litig.,
114 F.3d 1410, 1434 (3d Cir. 1997)* (citing *Glass-
man v. Computervision Corp., 90 F.3d 617, 622
(1st Cir. 1996))*. This Rule "embodies a liberal
pleading policy of the federal rules." *Barkauskie v.
Indian River School Dist., 951 F. Supp. 519, 527
(D. Del. 1996)*. A policy of favoring decisions on
the merits, rather than on the technicalities, under-
lies this Rule. *Foman, 371 U.S. at 181-82*. While a
trial court has the discretion to grant or deny leave
to amend, leave to amend should be freely granted,
as the Rule requires, unless there is sufficient rea-
son to deny leave. *See id. at 182; Burlington Coat
Factory, 114 F.3d at 1434*. Sufficient reasons in-
clude undue delay, bad faith or dilatory motive on
the part of the movant, undue prejudice to the op-
posing party, failure to cure deficiencies in former
amendments, and futility of amendment. [*10] *See
Foman, 371 U.S. at 182; Burlington Coat Factory,*

2000 U.S. Dist. LEXIS 6924, *; 55 U.S.P.Q.2D (BNA) 1124

*114 F.3d at 1434.* The Third Circuit Court of Appeals has further elaborated on the exceptions to the policy of liberally granting leave to amend, stating that "the passage of time, without more, does not require that a motion to amend a complaint be denied; however, at some point, the delay will become 'undue,' placing an unwarranted burden on the court, or will become 'prejudicial,' placing an unfair burden on the opposing party." *Adams v. Gould, Inc., 739 F.2d 858, 868 (3d Cir. 1984), cert. denied, 469 U.S. 1122, 83 L. Ed. 2d 799, 105 S. Ct. 806 (1985); see also Procter & Gamble Co. v. Nabisco Brands, Inc., 125 F.R.D. 405, 409 (D. Del. 1987)* ("a showing of undue prejudice or unfair disadvantage to the nonmovant is required before delay provides an adequate basis for denial" (citations omitted)). Thus, "'prejudice to the non-moving party is the touchstone for the denial of an amendment.'" *Lorenz v. CSX Corp., 1 F.3d 1406, 1414 (3d Cir. 1993)* (quoting *Cornell & Co. v. Occupational Safety & Health Review Comm'n, 573 F.2d 820, 823 (3d Cir. 1978)).* [*11]

## IV. Discussion

The Court now turns to consideration of the factors relevant [2] to determining whether to grant the motion to amend. [3]

> 2   There is no indication, and ALI has made no argument, that CenterForce's proposed amendments would be futile or that, by this amendment, CenterForce seeks to cure deficiencies it failed to make in former amendments. Therefore, the Court will not further consider these factors.

> 3   As an initial matter, ALI urges that CenterForce's motion should be denied because it is not supported by any evidence, particularly affidavits of a CenterForce witness to support the assertions in the motion to amend about what CenterForce knew and when it knew it. In *Barkauskie, 951 F. Supp. at 527-28,* this Court found a letter from the plaintiff's treating psychiatrist supported her motion to amend her complaint. However, the Court knows of no authority that would require the filing of an affidavit to support a motion to amend. Moreover, as CenterForce points out, because the depositions which gave CenterForce comfort in filing the motion to amend were designated by ALI as "Attorneys Eyes Only," CenterForce's counsel could not show or discuss the contents of these depositions with CenterForce executives.

### [*12] A. Undue Delay

Delay in of itself will not serve as a basis for denying a motion to amend unless the defendant is prejudiced. *See Proctor & Gamble Co., 125 F.R.D. at 409; Jenn-Air Products Co., Inc. v. Penn Ventilator, Inc., 283 F. Supp. 591, 594 (E.D. Pa. 1968).* However, "because . . . a showing of long delay may ameliorate the degree of prejudice which a nonmovant must establish in order to defeat the proposed amendment," the Court will address the parties contentions regarding when CenterForce was in possession of sufficient information upon which to base a claim of infringement of the *'965 patent. Proctor & Gamble Co., 125 F.R.D. at 410.*

CenterForce asserts that it did not unduly delay amending the complaint to include infringement of the *'965 patent,* but rather quickly sought to amend when it received sufficient evidence of infringement through discovery in this case. CenterForce contends that it had concerns as early as 1995 that ALI's Stalker system, the predecessor to CallTech, infringed CenterForce's *'965 patent* and conveyed those concerns to ALI. D.I. 91, at B-44 & -45. However, CenterForce asserts it did not [*13] file and could not have filed a claim against ALI for infringement of the *'965 patent* earlier because, based on publicly available information about the Stalker product, ALI's refusal to provide additional product information on the ground such information was proprietary, and ALI's representations regarding the differences between the two products, *id.* at B-34, CenterForce could not form a definitive conclusion as to whether the product infringed the *'965 patent. Id.* at B-44 & 45. CenterForce maintains that it obtained sufficient information to form a good faith belief that ALI's products infringed the *'965 patent* through discovery in this case relating to the '799 infringement claim. In particular, CenterForce contends that, among the 30,000 pages of documents produced by ALI in August 1999, four technical documents relating to CallTech evidenced a possibility that ALI's CallTech infringed the *'965*

Case 1:05-cv-00376-GMS    Document 105-2    Filed 07/13/2007    Page 7 of 31

Page 5

2000 U.S. Dist. LEXIS 6924, *; 55 U.S.P.Q.2D (BNA) 1124

*patent.* CenterForce asserts it was not until October 4-8, 1999, however, during the depositions of ALI's President, Alexander N. Svoronos, and Vice-President, Daniel N. Duncan, that it received sufficient information regarding the functionality of the CallTech product, which furthered [*14] its understanding of the documents produced in August, to enable it to determine that CallTech infringed the *'965 patent.* In particular, CenterForce contends that CallTech infringes independent claim 4 and dependent claims 5 and 7 of the *'965 patent,* which involve the creation and use of a "demographic profile" representative of right party contact. Also after these depositions, CenterForce updated its claim chart regarding the *'799 patent* to assert that claim 9, which also references "demographic profile," is also infringed.

ALI counters that CenterForce unduly delayed in bringing its claim for infringement of the *'965 patent* because it had the necessary information to make the infringement determination prior to filing the original complaint. In particular, ALI contends that the information CenterForce claims to have learned in discovery was already known to CenterForce through the following materials: (1) brochures on the Stalker system given to Robert Kelly in 1994; (2) a brochure on CallTech obtained by CenterForce at a trade show in 1995; (3) the October 12, 1995 letter from ALI's counsel accompanied by a product description and flow charts; and (4) ALI's *'161 patent.* ALI maintains [*15] these materials indicated that its system used "scorecards" and "characteristics" to determine right party contact probabilities and that CenterForce should have been well aware that the scorecards could be determined based on characteristics that included demographic data representative of right party contact.

"The issue of undue delay is inherently ambiguous. Any consideration of it frequently necessitates an inquiry into the applicability of *Rule 11* [of the Federal Rules of Civil Procedure] and the incidental issues of dilatory motive, unfair surprise or bad faith. It is difficult, even through the gift of hindsight, for the Court to determine precisely when counsel possessed sufficient information upon which to base an amendment." *Proctor & Gamble Co., 125 F.R.D. at 411.* *Rule 11* mandates that upon signing a pleading, an attorney is "certifying that to the best of the person's knowledge, information, and

belief formed after an inquiry reasonable under the circumstances," the claims and allegations therein are well grounded in fact and warranted by law. *Fed. R. Civ. P. 11(b).* CenterForce contends that it was following the requirements of *Rule 11* on advice of counsel [*16] by waiting for the discovery process to reveal whether or not there was sufficient basis to assert a claim that CallTech infringed the *'965 patent.*

In light of *Rule 11's* mandate, the Court cannot conclude that CenterForce unduly delayed asserting a claim for infringement of the *'965 patent.* Here, correspondence between attorneys for ALI and CenterForce, beginning as early as 1995, indicates a consistent position by CenterForce that it was concerned that ALI's product infringed the *'965 patent,* but that it did not have sufficient information to make a definitive infringement interpretation. ALI refused CenterForce's requests for additional information on its product, citing its proprietary nature. ALI also asserted that its product did not infringe the *'965 patent,* citing differences, including a representation in the October 12, 1995 letter that "the ALI system does not create demographic profiles representative of contact probability." B-34. Moreover, as far as the Court can determine, the brochures and other information available to CenterForce, including ALI's *'161 patent,* while indicating that the Stalker and CallTech systems used "scorecards" and "characteristics," do not explicitly [*17] reference use of demographic information in calculating contact probabilities. ALI argues that anyone with any sort of expertise in the credit collection business would understand that a credit scoring system, like ALI's product, necessary used demographic data. D.I. 134, Transcript 2/2/00, at 27-29. However, in light of the fact that ALI was clearly on notice of CenterForce's position that it did not have sufficient information to make a definitive infringement analysis, ALI's refusal to provide additional information, and ALI's explicit representation that its product did not create demographic profiles, the Court concludes CenterForce did not unduly delay in asserting the claim for infringement of the *'965 patent.* [4]

> 4 ALI cites *DRR, L.L.C. v. Sears, Roebuck & Co., 171 F.R.D. 162 (D. Del. 1997)* to support its argument that CenterForce unduly delayed in asserting a claim for infringement

Case 1:05-cv-00376-GMS    Document 105-2    Filed 07/13/2007    Page 8 of 31

Page 6

2000 U.S. Dist. LEXIS 6924, *; 55 U.S.P.Q.2D (BNA) 1124

of the *'965 patent*. The Court finds *DRR* to be distinguishable from the present case. In *DRR*, of primary importance to the court's finding of undue delay and undue prejudice was the fact that the plaintiff sought leave to amend the complaint to add a new legal theory after summary judgment had been granted, more than two and one-half years after the original complaint was filed. *Id. at 167-68*. In the present case, by contrast, fact discovery has yet to close and there have been no determinations on the merits. Moreover, in *DRR*, unlike the present case, the plaintiff offered no explanation for its failure to assert the new legal theory before summary judgment was entered against it. *Id. at 167*.

[*18] **B. Undue Prejudice**

CenterForce contends the proposed amendment would not be prejudicial to ALI because the *'965 patent* is the grandparent of the *'799 patent* and the claims of the two patents are substantially similar. CenterForce asserts the addition of the *'965 patent* would not introduce any new claim terms, that extensive discovery has been taken already on the *'965 patent*, and, therefore, that little additional discovery will be required. Finally, CenterForce maintains it would be preferable for all concerned to dispose of the *'965 patent* infringement claims in one proceeding, rather than forcing CenterForce to file a separate lawsuit, given the substantial similarity between the patents, the claims involve the same infringing product, and the substantial overlap in discovery.

ALI maintains that permitting amendment of the complaint would unduly prejudice ALI because the additional claims and the additional defenses to such claims would necessitate additional discovery regarding the *'965 patent* and claim terms. ALI further asserts that it would have excellent grounds for defending the new claim on the basis of laches and equitable estoppel. Although ALI may have affirmative [*19] defenses to the '965 infringement claim based upon the doctrine of estoppel and laches, this can only be determined after adjudication on the merits including the required factual findings regarding the elements of these defenses. *See Jenn-Air Products Co., Inc., 283 F. Supp. at 594*. In addi-

tion, ALI may need to conduct additional discovery related to these defenses, as well as the defense of advice of counsel to the willful infringement claim that CenterForce seeks to add.

"'Prejudice' for the purpose of *Rule 15(a)* does not concern potential prejudice resulting from the nature of the claims sought to be added; it concerns only the prejudice resulting from the fact of adding new claims at a late date." *Barkauskie, 951 F. Supp. at 528*. While the Court agrees with ALI that some additional discovery will be needed, the Court does not believe this need for additional discovery creates "undue prejudice" within the meaning of *Foman, 371 U.S. at 182. See id.* As was the case in *Barkauskie*, a trial date has not been set in this case, and defendants will be able to conduct discovery with respect to the additional claims and defenses. [*20] *See id.* Moreover, prejudice to ALI is diminished because the claims relate to the same product, the patents are substantially similar, and significant discovery regarding the *'965 patent* has been conducted already in this litigation.

ALI also maintains that any delay of the case by extending scheduling order deadlines would unduly prejudice ALI because it would extend CenterForce's ability to use this litigation "as a club against ALI in the marketplace." D.I. 90, at 14. This argument is not persuasive. Were this Court to deny CenterForce's motion to amend the complaint, CenterForce would be entitled to file a separate suit for infringement of the *'965 patent* (and would then, presumably, have a very good argument for consolidation of that action with this one). It would seem that, were the Court to deny the motion to amend and CenterForce were to file a separate suit, as it asserts it would, it would extend even longer CenterForce's ability to use infringement litigation "as a club in the marketplace against ALI." ALI counters that resolution of the '799 claim will essentially end the litigation for all practical purposes. [5] At this point, however, the Court has no way of knowing [*21] whether this is correct. Therefore, because discovery has not yet closed, the *'965 patent* is closely related to the *'799 patent*, both claims involve the same product, the trial of this case has not been set, and, if CenterForce's instant motion is denied, CenterForce could, and represents it would, institute a separate action against ALI, the Court

Case 1:05-cv-00376-GMS    Document 105-2    Filed 07/13/2007    Page 9 of 31

Page 7

2000 U.S. Dist. LEXIS 6924, *; 55 U.S.P.Q.2D (BNA) 1124

concludes ALI will not be unduly prejudiced by allowing the motion to amend.

> 5   At the hearing on the motion to amend, ALI also put forth the following argument: ALI asserts that the claims of the '799 patent are drawn more broadly than those of the '965 patent and, therefore, if CenterForce were to prevail on its claim for infringement of the '799 patent, it would get the same relief as it would under the '965 patent because CenterForce is claiming the benefit of the earlier filing date. D.I. 134, at 41. However, if CenterForce were to prevail on a claim for infringement of the '965 patent, which issued in 1995, it would appear to be eligible for four additional years of damages than it would be were it to prevail only on the '799 patent, which issued in 1999. See generally 5 DONALD S. CHISUM, CHISUM ON PATENTS § 16.04[2]-[3] (1999) (liability and remedy for infringing acts only during term of patent, which begins when patent issues) and cases cited therein.

### [*22] C. Bad Faith or Dilatory Motive

Finally, ALI makes two arguments that CenterForce has brought this motion in bad faith. First, ALI contends that CenterForce's conduct in the marketplace, in particular assertions by sales representatives that ALI's CallTech system infringes the '965 and '799 patents, demonstrates CenterForce's bad faith. Second, ALI asserts CenterForce is adding the claim for infringement of the '965 patent because it has come to realize that its case regarding the '799 patent is weak.

Regarding the representations of the CenterForce sales representative that ALI's system may infringe CenterForce's patents, the Court finds it hard to relate this action to any bad faith in bringing the motion to amend. ALI is essentially arguing their Lanham Act claim against CenterForce as their argument for bad faith, and the ultimate success of the parties' claims on the merits is not properly before the Court at this procedural juncture. See Proctor & Gamble Co., 125 F.R.D. at 412. Moreover, in most instances, infringement litigation is a stronger "club" in the marketplace than a salesman's assertions that a competitor's products

"may" violate CenterForce's [*23] patent rights. It follows it would make sense for CenterForce to assert its patent infringement claims as soon as possible, rather than delay.

Second, ALI argues that CenterForce is now seeking to assert a claim for infringement of the grandparent '965 patent because it made some bad decisions during the course of the current lawsuit and that during the course of discovery, CenterForce has been educated as to the weakness of its case regarding the '799 patent. D.I. 90, at 15; D.I. 134, at 39, 43-44. The success or failure of CenterForce's original claims is an issue for trial and cannot be decided on a motion to amend. See Proctor & Gamble Co., 125 F.R.D. at 412. Other than ALI's bald assertions, the Court has no indication at this stage of the proceedings that the original claims are unsupported. See id.

Finally, there is no evidence to indicate that motion to amend is simply a delaying tactic by CenterForce. CenterForce has argued that there is no need to change the current schedule, that very little, if any additional discovery would be necessitated by the additional claims. In sum, the Court cannot conclude there was bad faith or dilatory motive on the part [*24] of CenterForce.

### V. Conclusion

The Court concludes that CenterForce did not unduly delay in asserting a claim for infringement of the '965 patent, nor was the motion to amend brought in bad faith. In view of the fact that discovery has not yet closed, the '965 patent is closely related to the '799 patent, both claims involve the same product, and the trial of this case has not been set and ALI will have time to prepare its defenses to these new claims before the case is scheduled for trial, ALI will not be unduly prejudiced by granting the motion to amend. "Moreover, if plaintiff's motion were denied[,] . . . a separate action against the defendant could be instituted[,] and, in the absence of creating undue complications at trial, it is clearly preferable to dispose of all the contentions between these parties in one proceeding." Jenn-Air Products Co., 283 F. Supp. at 594. Therefore, an order will be issued granting CenterForce's motion to amend and addressing case management concerns.

122NSS

**Time of Request:** Tuesday, July 10, 2007  12:36:49 EST
**Client ID/Project Name:** 500.21931
**Number of Lines:** 651
**Job Number:**      2822:36875439

Research Information

**Service:**    Terms and Connectors Search
**Print Request:** Current Document: 1
**Source:** DE State Cases, Combined
**Search Terms:** "equitable subrogation"

**Note:** Recent DE case decided on California law

**Send to:**   RIVERS, WARD
           DEASEY MAHONEY BENDER
           1880 JOHN F KENNEDY BLVD FL 13
           PHILADELPHIA, PA 19103-7422

1 of 10 DOCUMENTS

**AT&T CORP., Plaintiff Below, Appellant, v. CLARENDON AMERICAN INSURANCE COMPANY, GENESIS INSURANCE COMPANY, CERTAIN UNDERWRITERS AT LLOYD'S LONDON AND CERTAIN LONDON MARKET INSURANCE COMPANIES, NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURG PA., NORTH AMERICAN SPECIALTY INSURANCE COMPANY, and XL SPECIALTY INSURANCE CO., Defendants Below, Appellees.**

**No. 567, 2006**

**SUPREME COURT OF DELAWARE**

*2007 Del. LEXIS 294*

**March 14, 2007, Submitted**
**July 2, 2007, Decided**

**NOTICE:**

THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION IN THE PERMANENT LAW REPORTS. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL.

**PRIOR HISTORY:** [*1]
Court Below: Superior Court of the State of Delaware in and for New Castle County. C. A. No. 04C-11-167.

**DISPOSITION:** REVERSED and REMANDED.

**COUNSEL:** John E. James and Sarah E. DiLuzio, Esquires, of Potter Anderson & Corroon LLP, Wilmington, Delaware; Of Counsel: David M. Halbreich and Michel Y. Horton, Esquires, of Morgan, Lewis & Bockius LLP, Los Angeles, California; John Edward Failla (argued) and Christopher C. Loeber, Esquires, of Morgan, Lewis & Bockius LLP, New York, New York; Paul A. Zevnik, Esquire of Morgan, Lewis & Bockius LLP, Washington, DC; Cynthia Mahowald and Emily Barbour, Esquires, of AT&T, Washington, DC; for Appellant.

John C. Phillips, Jr. and Brian Farnan, Esquires, of Phillips Goldman & Spence, P.A., Wilmington, Delaware; Of Counsel: Douglas Mangel, Esquire, of Drinker Biddle & Reath, Washington, DC; for Appellee Clarendon American Insurance Company.

Kevin F. Brady, Esquire, of Connolly Bove Lodge & Hutz LLP, Wilmington, Delaware; Of Counsel: William E. Smith and Cara Tseng Duffield, Esquires, of Wiley Rein LLP, Washington, DC; for Appellee Genesis Insurance Company.

David A. Denham, Esquire, of Bifferato & Gentilotti, LLC, Wilmington, Delaware; Of Counsel: Martin J. Flannery, Jr. and [*2] David A. Richman, Esquires, of Pattison & Flannery, New York, New York; for Appellees Farady Capital Limited, Individually and as Representative of those Underwriters at Lloyd's and those other Companies Subscribing to Directors and Officers and Company Reimbursement Policy No. 509/QB405901.

Edward M. McNally and Mary B. Matterer, Esquires, of Morris James LLP, Wilmington, Delaware; Of Counsel: Jeffrey G. Weil (argued) and Jared S. Hosid, Esquires, of Dechert LLP, Philadelphia, Pennsylvania; Michael Manire and William P. Larsen, III, Esquires, of D'Amato & Lynch, New York, New York; for Appellees National Union Insurance Company of Pittsburgh PA. and North American Specialty Insurance Company.

Francis J. Murphy and Jonathan L. Parshall, Esquires, of Murphy Spadaro & Landon, Wilmington, Delaware; for Appellee XL Specialty Insurance Co.

**JUDGES:** Before STEELE, Chief Justice, HOLLAND, BERGER, JACOBS and RIDGELY, Justices, constituting the Court en Banc.

**OPINION BY:** JACOBS

**OPINION**

   **JACOBS,** Justice:

   AT&T Corp. ("AT&T") appeals from a judgment of the Superior Court dismissing this action brought by AT&T against several insurance carriers (the "D&O insurers"). [1] Those carriers issued Director and Officer ("D&O") policies insuring [*3] At Home Corporation ("At Home") and At Home's directors and officers. AT&T, as At Home's largest shareholder, designated ten of its employees to serve as At Home directors. [2] At Home later declared bankruptcy, and thereafter, AT&T and the At Home Directors were sued jointly and severally for billions of dollars in damages. Being insolvent, At Home could not indemnify the At Home Directors for any liability and litigation costs resulting from those lawsuits (the "Underlying Litigation"). Accordingly, the At Home Directors requested the D&O insurers to advance their defense costs. The D&O insurers refused, taking the position that the At Home Directors had not incurred a covered "Loss" under the D&O policies. The At Home Directors then turned to AT&T for assistance in paying defense costs, settlements and judgments in the Underlying Litigation. AT&T agreed to do so, in exchange for which the At Home Directors assigned to AT&T their breach of contract claims against the D&O insurers.

   1    The D&O insurers are Genesis Insurance Company, Clarendon America Insurance Company, North American Specialty Insurance Company, Faraday Capital Limited, individually and as representative of certain underwriters [*4] at Lloyd's London, and XL Specialty Insurance Company.

   2    The AT&T employees who served as directors of At Home at AT&T's request are referred to in this Opinion as the "At Home Directors."

   AT&T then sued the D&O insurers in the Superior Court, both as assignee of its At Home director-employees, and as subrogee to those directors' coverage claims against the D&O insurers for defense costs and indemnification relating to the Underlying Actions. [3] The D&O insurers moved to dismiss AT&T's amended complaint on the grounds (*inter alia*) that: (1) the At Home Directors had suffered no "Loss" needed to trigger the D&O coverage, and (2) AT&T could not prevail on its **equitable subrogation** claim, because when it indemnified the At Home Directors, AT&T acted as a "volunteer." Applying California law, the Superior Court upheld both of the D&O insurers' contentions and dismissed the complaint. [4] This appeal followed.

   3    The Underlying Actions are *Williamson v. AT&T Corp., et al.,* No. CV 812506 (Cal. Super. Ct., Santa Clara Cty.) (*"Williamson"*) and *Leykin v. AT&T Corp. et al., 423 F. Supp. 2d 229 (S.D.N.Y.)* (*"Leykin"*).

   4    *AT&T Corp. v. Clarendon America Insurance, et al., 2006 Del. Super. LEXIS 359, 2006 WL 2685061 (Del. Super. Sept. 18, 2006)* [*5] ("Opinion").

   Having analyzed the relevant California authorities and applied them to the facts pled in the complaint, we arrive at a result contrary to that reached by the Superior Court. Accordingly, we reverse.

**FACTS**

   The facts, which are summarized in the Opinion of the trial court, are drawn from AT&T's amended complaint, as is required on a motion to dismiss under Superior Court Rule 12(b)(6).

   ***Background: At Home and AT&T***

   At Home was formed in 1995 to provide internet access to subscribers of CATV companies. At Home's largest shareholder was Tele-Communications, Inc. ("TCI"), which by 1997 controlled 70 percent of the voting power of At Home stock. By 1999, TCI had been acquired by AT&T,

which became At Home's new controlling stock-holder.

At the time AT&T acquired TCI, At Home was experiencing financial difficulties. Although At Home's network performance was enhanced in 2001, by the spring of that year, At Home's revenue had sharply declined. AT&T stepped in and (among other things) infused $ 85 million in cash into At Home, but that company's financial situation continued to worsen. On September 28, 2001, At Home filed for federal bankruptcy protection.

### *The Underlying Litigation*

The **[\*6]** Williamson Action

The Underlying Litigation was filed in 2002. In May 2002, the Bankruptcy Court created the At Home Bondholders' Liquidating Trust ("BHLT"). In November 2002, the trustee of the BHLT brought a damages action ("the *Williamson* action") against the At Home directors and officers, alleging various breaches of fiduciary duty. Those claimed breaches of duty (AT&T avers) constituted "Wrongful Acts" that fell within the scope of the D&O policies. In defending *Williamson*, the At Home directors retained legal counsel and incurred defense costs. In May, 2005, the BHLT trustee settled *Williamson* for approximately $ 400 million. AT&T contributed to that settlement on behalf of the At Home directors, who, because of AT&T's intervention and payment, did not have to contribute to the *Williamson* settlement amount.

The Leykin Action

In March 2002, At Home shareholders filed three securities class actions against At Home directors and officers. Those lawsuits were consolidated into the *Leykin* action. The consolidated *Leykin* complaint alleged claims for securities violations, fraud and breach of fiduciary duty. In defending *Leykin*, the At Home directors retained counsel and incurred defense **[\*7]** costs. In March 2006, the *Leykin* action was dismissed in its entirety. *Leykin* is currently on appeal.

### *The D&O Insurers Deny Any Coverage And AT&T Agrees To Indemnify The At Home Directors*

Although AT&T alleges that the claims against the At Home Directors in the Underlying Actions were covered by the D&O insurance policies, the D&O insurers denied coverage and declined to advance defense costs to the At Home directors. [5] Being bankrupt, At Home was unable to indemnify its directors and officers. In these circumstances, AT&T--whose employees had been serving as At Home Directors at AT&T's request--advanced the At Home Directors' defense costs and agreed to pay on their behalf any judgments or settlements in the Underlying Actions. In consideration for AT&T's indemnification agreement, the At Home Directors assigned to AT&T their rights to coverage under the D&O policies.

> 5  The D&O insurers have no duty to defend under the D&O policies.

Because AT&T had agreed to indemnify them, the At Home Directors were never required to, nor did they, pay any defense costs or contribute to the *Williamson* settlement. Nor will those Directors be required to pay any defense costs, settlements or judgments **[\*8]** in any future proceedings in *Leykin*. AT&T concedes that it:

> . . . has paid all defense fees and costs and settlements, incurred in connection with the Leykin, James and Williamson Fiduciary Actions on behalf of the At Home Directors and Officers, and will pay any future defense fees and costs, settlements, or Judgments on behalf of the At Home Directors and officers, in connection with Leykin. [6]

> 6  *Opinion, 2006 Del. Super. LEXIS 359, [WL] at \*4* (quoting P 41 of the First Amended Complaint).

That conceded fact raises the question we are called upon to decide: whether AT&T's payment of defense and settlement costs in *Williamson*, and its agreement to pay any such costs and liabilities in *Leykin*, forecloses coverage under the D&O poli-

cies. That issue is governed by the terms of the D&O policies, which are next discussed.

### The D&O Policies

At issue is coverage under policies issued by the D&O insurers for the policy period July 8, 2001 through July 8, 2002. The primary insurer is Genesis Insurance Company ("Genesis"), and the four excess insurers are Clarendon America Insurance Company; North American Specialty Insurance Company; XL Specialty Insurance Company; and Faraday Capital Limited, individually and as **[\*9]** representative of certain underwriters at Lloyd's and other companies. The policies issued by those four excess insurers followed form to (that is, they tracked) the terms and conditions of the primary Genesis policy issued to At Home. The excess policies provided various layers of coverage above the $ 10 million of Genesis primary coverage.

National Union Fire Insurance Company of Pittsburgh ("National Union") also sold primary coverage to At Home. The National Union policy provided $ 10 million in coverage for the policy period July 8, 1999 to July 8, 2000, and $ 15 million for the policy period July 8, 2000 to July 8,

2001. Those National Union policies were the subject of the At Home insurers' motion to dismiss, a motion in which National Union joined.

The National Union and the Genesis policies are structured and worded similarly. Coverage for At Home's directors and officers is triggered by a "Loss," which the policies define as an amount that the directors and officers are either "financially liable" or "legally obligated" to pay. The act or event that triggers coverage must arise from an actual or alleged "Wrongful Act," for example, a "breach of duty." Coverage is excluded if **[\*10]** At Home indemnifies its directors and officers, but coverage is not excluded merely because a third party (such as AT&T) indemnifies At Home's directors and officers.

The critical terms of the respective National Union and the Genesis D&O policies are set forth in their insuring agreements and their definitions of "Loss." Those terms are excerpted (on a side by side basis for ease of reference) in the chart below.

The insuring agreement language of each policy is as follows:

|  | National Union | Genesis |
| --- | --- | --- |
| Insuring | The policy shall pay | The insurer will pay, |
| Agreement | the Loss of each | on behalf of the |
|  | and every Natural | Directors and Officers, |
|  | Person Insured(s) | Loss arising from Claims |
|  | arising from a Claim | first made . . . |
|  | . . . for any actual | against the Directors or |
|  | or alleged Wrongful | Officers, individually |
|  | Act in their | or collectively, |
|  | respective capacities | for a Wrongful Act, |
|  | as Natural Person | except for such Loss |
|  | Insured(s), except | which the Company |
|  | when and to the | [At Home] pays to or |
|  | extent that the | on behalf of the |
|  | Company [At Home] | Directors and Officers.... |
|  | has indemnified the |  |
|  | Natural Person |  |
|  | Insured(s). |  |

And the policies define "Loss" as follows:

|  | National Union | Genesis |
|---|---|---|
| Definition of "Loss" | "Loss" means damages, judgments (including any award of prejudgment and post-judgment interest), settlement . . . however, Loss shall not include . . . any amount for which the Insured are not financially liable or which are without legal recourse to the Insureds. . . . | "Loss" shall mean any amounts which the Directors or Officers are legally obligated to pay . . . for Claims made against the Directors or Officer . . . including damages, Judgments, orders, Settlements and Defense Costs.... |

### The [*11] Superior Court Decision

In the Superior Court proceedings, the defendant D&O insurers moved to dismiss AT&T's first amended complaint under Superior Court Rule 12(b)(6). The pivotal question was "whether the ten AT&T employees who serve as Directors and Officers of At Home suffered a 'loss' within the meaning of the relevant policies." [7] The D&O insurers argued--and the Superior Court held--that under California law, which governs this dispute, the At Home Directors suffered no "Loss" because they never paid, and never did or will incur any obligation or liability to pay, their defense costs or any judgment or settlement in the Underlying Litigation. Because the At Home Directors had no claim against the D&O insurers for coverage, AT&T, as their assignee, had no greater rights than the At Home Director-assignors. Nor, the Superior Court held, did AT&T have a legally cognizable claim for **equitable subrogation,** because under California law, the subrogee (AT&T) must not have acted as a volunteer, but in indemnifying the At Home directors AT&T had acted as a volunteer.

> 7    Opinion, 2006 Del. Super. LEXIS 359, [WL] at *4.

### THE CONTENTIONS AND THE ISSUES PRESENTED

On this appeal, AT&T claims that the Superior Court [*12] erred as a matter of law in holding that the complaint failed to allege a cognizable claim that: (1) the At Home Directors had suffered a "Loss" that was covered under the D&O policies, and (2) AT&T was equitably subrogated to the claims of the At Home Directors. Those claims generate the two issues presented on this appeal. Because the dispute involves the Superior Court's grant of a motion to dismiss and its interpretation of insurance policy language, our review is de novo; [8] requiring us to determine whether the trial court erred "in formulating or applying legal precepts." [9]

> 8    AeroGlobal Capital Mgmt., LLC. v. Cirrus Indus., Inc., 871 A.2d 428, 444 (Del. 2005); Phillips Home Builders, Inc. v. Travelers Ins. Co., 700 A.2d 127, 129 (Del. 1997).

> 9    Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P., 624 A.2d 1199, 1204 (Del. 1993).

Our analysis begins with the question of whether the At Home Directors suffered a "Loss" that triggered coverage under the D&O policies. We conclude that the Directors did suffer a covered "Loss," and that AT&T, as those Directors' assignee, was entitled to enforce the Directors' contract claims against the D&O insurers. We then consider [*13] the second issue--whether AT&T was equitably subrogated to the claims of the At Home Directors--and conclude that AT&T was eq-

uitably subrogated. All parties agree that these issues are governed by California law.

## ANALYSIS

### I. Whether The At Home Directors Suffered A "Loss" That Triggered Coverage Under The D&O Policies

It is undisputed that the At Home Directors never paid any litigation defense costs in the Underlying Litigation or contributed to the *Williamson* settlement. Nor will those directors be required to pay any future defense or settlement costs or any judgment in *Leykin*. For the At Home Directors to have suffered a "Loss" covered by the D&O policies, therefore, it must be inferable from the complaint's allegations that those directors became "legally obligated" or "financially liable" to pay any defense costs they incurred and any judgment or settlement in the Underlying Actions.

The Superior Court held that no such inference could be drawn from the complaint, because AT&T had undertaken, on behalf of the At Home Directors, to pay all defense costs, judgments and settlement obligations attributable to those directors in the Underlying Litigation. [10] As the trial court stated [*14] in its Opinion:

> Simply stated, the At Home Directors are not, and have never been, "legally obligated to pay" or "financially liable." Nowhere in the record is there a "document or reference . . . which specifically and clearly establishes an obligation personal to "the . . . At Home Directors" which obligated or required the directors to pay a portion of the *Williamson Fiduciary* settlement or the costs of defending the Underlying Litigation. . . . In fact, in this case, the Assignments . . . establish that these At Home Directors have paid nothing and will never be obligated to pay anything. This case is controlled by California law, and *Pan Pacific* [11] and *PLM* [12] make clear that unless the At Home Directors made payments or incurred an obligation to pay, there is no "loss" under the Policies. [13]

10    The Superior Court relied on the language of the Assignments and the *Williamson* settlement agreement. The Assignments pertinently declare that AT&T: (1) has paid for all of the Assignors' "defense costs and fees," (2) will indemnify the Assignors for "liability that results from any settlement or judgment," and (3) will "assume responsibilities for the fees and expenses incurred by the Assignors [*15] in any continued litigation in conjunction with any claim filed against any Assignor." The *Williamson* settlement agreement pertinently provides that "[o]n or before May 24, 2005. . . . AT&T shall pay on behalf of itself and the Individual Defendants the sum of $ 340,000,000 to Williamson by wire transfer to the escrow agent selected and paid for by Williamson and reasonably acceptable to AT&T. . . ." (*Opinion, 2006 Del. Super. LEXIS 359, [WL] at * 12, note 79*).

11    *Pan Pacific Retail Properties, Inc. v. Gulf Ins. Co., 2004 U.S. Dist. LEXIS 28534, 2004 WL 2958479 (S.D. Cal.), aff'd in part, rev'd in part, and remanded, 466 F.3d 867 (9th Cir. 2006).*

12    *PLM, Inc. v. National Union Fire Ins. Co. of Pittsburgh, PA, 1986 U.S. Dist. LEXIS 17014, 1986 WL 74358 (N.D. Cal.), aff'd, 848 F.2d 1243 (9th Cir. 1988).*

13    *Opinion, 2006 Del. Super. LEXIS 359, [WL] at *12.*

The question is whether, as a matter of California law, AT&T's agreement to indemnify the At Home Directors precludes any inference that those Directors became "legally obligated" to pay those defense costs or to pay or contribute towards any judgment or settlement. We conclude that the Superior Court, by answering that question in the negative, erred as a matter of law for two separate reasons. First, the language of the D&O policies [*16] supports a contrary conclusion. Second, the California cases do not affirmatively require, in order to

establish a "Loss," that the directors who are in-sured under a D&O policy must actually suffer the entry of a judgment, or otherwise contractually promise to pay any judgment and/or costs of de-fense.

### A. The Policy Language

If the D&O insurers wanted their policies un-ambiguously to preclude coverage of losses in-curred by the named insureds who are indemnified by a third party (here, AT&T), the insurers knew how to achieve that result. Both the National Union and the Genesis policies insure against a "Loss" of the Directors and Officers resulting from any "Wrongful Act" committed in those capacities--except where *the Company* (here, At Home) has indemnified them. [14] No similar exception is created for "Losses" that are indemnified by a party *other than The Company.* The D&O insurers could easily have added a second exception from coverage to capture losses indemnified by third parties, but they did not. Nor is it a satisfactory answer for the D&O insurers to argue--as they do here--that adding such a second coverage exception was unnecessary, be-cause that same result is achieved under the [*17] policies' definition of "Loss." If that is so, then un-der the policies' definition of "Loss," losses indem-nified by *the Company* should not be covered ei-ther, yet the D&O insurers carved out from cover-age only Losses indemnified by the Company. The unavoidable inference is that (i) such an express "carve out" was needed, because otherwise losses indemnified by the Company would be covered by the D&O policies; and (ii) the absence of a parallel carve out for a "Loss" indemnified by third parties indicates that such indemnified "Loss[es]" were intended to be covered. At a minimum this incon-gruity significantly undercuts the D&O insurers' position and to that contrary inference the D&O insurers offer no satisfactory response. By failing to credit that inference in its analysis, the Superior Court erred as a matter of law in dismissing the complaint for failure to state a claim.

14   The National Union policy expressly ex-cepts from its Insuring Agreement, Losses "when and to the extent that the Company [i.e., At Home] has indemnified the Natural Person Insured(s) [i.e., the Directors and Of-ficers]." The Genesis policy excepts out

"such Loss which the Company pays to or on behalf of the Directors [*18] and Officers. . . ."

### B. The California Case Law

The trial court also read the California case law to require dismissal of the D&O coverage claim. We do not interpret the California law to mandate that result. The Superior Court's apparent reading of California law is that a liability to pay defense costs and any judgment or settlement that would be a covered "Loss" under the D&O policies, is extin-guished where a third party promises to indemnify the directors against that "Loss." That reading fails to take into account that, if AT&T had not inter-vened, the At Home Directors would have been at all times personally liable to their attorneys for the cost of their defense and would also have been re-quired to contribute out of their own pockets their allocated portion of the *Williamson* settlement.

Under California law, an insured becomes le-gally obligated to pay legal expenses as soon as the legal services are rendered. [15] For that reason, le-gally it does not matter (in the Superior Court's words) that "the record contains no 'document or reference . . . which specifically and clearly estab-lishes an obligation personal to the . . . At Home Directors which obligated or required the directors [*19] to pay . . . the costs of defending the Underly-ing Litigation.'" [16] Under California law, the At Home Directors' liability to pay their defense costs arose once their lawyers began performing services on their behalf. And even though AT&T agreed to pay those defense costs, the At Home Director cli-ents would remain liable to their attorneys if, for whatever reason, AT&T reneged on its agreement. [17] Only if the At Home Directors' defense counsel had contractually agreed to look solely to AT&T for payment of their fees would the At Home Directors be relieved from liability. The amended complaint alleges no such agreement by defense counsel.

15   *Gon v. First State Ins. Co., 871 F.2d 863, 864 (9th Cir. 1989)* (citing California cases and holding that a D&O insurer "must pay legal expenses as they are incurred, be-cause an insured becomes legally obligated to pay legal expenses as soon as the services are rendered.").

16    *Opinion, 2006 Del. Super. LEXIS 359, [WL] at *12.*

17    *See, Baer v. Assoc. Life Ins. Co., 202 Cal. App. 3d 117, 123, 248 Cal. Rptr. 236 (1988)* ("[T]he assignor of the contract cannot be released from his/her burden of obligation to the other contracting party absent a novation."); *accord, RESTATEMENT (SECOND) OF CONTRACTS § 318 (3)* **[*20]** (1981) ("Unless the obligee agrees otherwise, neither delegation of performance nor a contract to assume the duty made with the obligor by a person delegated discharges any duty or liability of the delegating obligor.").

That reasoning applies equally to the *Williamson* settlement costs, which AT&T undertook to (and did) pay on behalf of the At Home Directors. Again, the trial court's Opinion fails to take into account that, had AT&T reneged on its indemnification undertaking and refused to pay the *Williamson* settlement, the At Home Directors would have been subject to personal liability for any judgment subsequently entered against them in the *Williamson* action.

In concluding otherwise, the Superior Court reasoned that the "settlement agreement in the *Williamson* Fiduciary Action expressly provides that *only* AT&T is promising to pay the settlement amount," and that "[t]he plaintiffs in *Williamson* have no recourse against the At Home Directors if AT&T fails to make that payment." [18] That is accurate, but materially incomplete. The *Williamson* settlement agreement goes on to provide that if the agreement is not approved by the At Home Bankruptcy Court, or if any approval is stayed or reversed **[*21]** on appeal, "the settlement shall . . . become null and void and the parties shall return to their respective positions *ex ante,* as though this settlement had never occurred, and the . . . Action will be returned to the trial calendar for trial setting and trial." [19] Thus, had AT&T reneged on the settlement agreement, the settlement would never have been presented to, let alone approved by, the Bankruptcy Court. As a result, the At Home directors would be required to defend themselves at a trial and be subject to an *in personam* judgment against them in the event they did not prevail.

18    *Id.* at *13.

19    *Williamson* Settlement Agreement, P 1 (A 2727); P 2.4 (A 2728).

Had AT&T never undertaken to indemnify the At Home Directors, or had AT&T breached that undertaking, the D&O insurers would never have been in a position to argue that the At Home Directors incurred no "Loss" that triggers D&O coverage. The D&O insurers are able make this argument only because AT&T made and honored its commitment--a fact that elevates irony to new heights. The question is whether under California law, AT&T's commitment--without which the At Home Directors would have been entitled to coverage of their defense and settlement **[*22]** costs under the D&O policies--divested those Directors of that entitlement. No California case cited to us mandates that result.

The Superior Court read the cited California cases discussed in its Opinion to require that for the At Home Directors to have incurred a covered "Loss," they must have either have suffered the entry of a judgment against them or promised to pay any defense costs and judgments, including a judgment entered as part of a settlement. With respect to the defense costs, that conclusion is incorrect because, as previously discussed, the directors incurred liability to pay defense costs as soon as their counsel performed services on their behalf. As for the At Home Directors' liability for the *Williamson* settlement, the California case law is less clear.

In its Opinion, the Superior Court held that the cases cited by AT&T did not support AT&T's position, because the settlements in those cases involved either the entry of a judgment against the settling directors or an obligation on their part to pay a certain amount "equivalent to a judgment debt." [20] For example, in *Xebec Dev. Partners, Ltd. v. National Union Fire Ins. Co.,* [21] the parties reached a settlement that **[*23]** was reduced to a joint and several consent judgment against the company and its officers and directors. The directors and officers then assigned their coverage rights under their D&O insurance policy to the plaintiff in exchange for the plaintiff's promise not to execute on the judgment. In a subsequent insurance coverage litigation, the California court rejected the argument of the insurer (National Union) that the individuals had suffered

no covered "loss" in light of the covenant not to execute, because the directors were liable under the consent judgment. Similarly, in *Smith v. Parks Manor*, [22] a personal injury case, a liability insurer, acting on behalf of the defendant insureds, reached a settlement with the injured plaintiffs under which the insureds were obligated "to pay a certain sum or, stated otherwise, created a settlement debt equivalent to a judgment debt." The court held that "[a]t that point [the defendants] had suffered a loss which [the insurer] was obligated by contract to indemnify. . . ." [23]

> 20    *Opinion, 2006 Del. Super. LEXIS 359, [WL] at *12.*

> 21    *12 Cal. App. 4th 501, 15 Cal. Rptr. 2d 726 (Cal. Ct. App. 1993)* ("*Xebec*").

> 22    *197 Cal. App. 3d 872, 243 Cal. Rptr. 256 (Cal. Ct. App. 1987).*

> 23    *Id. at 259.*

The California cases upon which **[*24]** the Superior Court relied can fairly be read to hold that a settlement that involves a consent judgment being entered against the insured is *sufficient* to constitute a covered "Loss" under the D&O policies at issue. But, those cases cannot be read definitively to hold that under California law such a judgment against the insured directors is *essential* to trigger coverage. [24] Indeed, no authoritative California decision cited to us definitively so holds.

> 24    The Superior Court also relied on *Pan Pacific Retail Properties, Inc. v. Gulf Ins. Co., 2004 U.S. Dist. LEXIS 28534, 2004 WL 2958479 (S.D. Cal. July 14, 2004), aff'd in part, rev'd in part, and remanded, 466 F.3d 867 (9th Cir. 2006)* but that case is distinguishable. There, Pan Pacific and Western, who were parties to a merger, sued their respective insurers, Gulf and Twin City, alleging that the insurers had wrongfully refused to indemnify them against liability for claims, expenses and damages arising out of a class action suit attacking the merger. Twin City, which had issued a D&O policy insuring Western and its directors and officers, moved for summary judgment. Twin City claimed that Western suffered no "Loss" within the meaning of the D&O policy because **[*25]** Pan Pacific, and not Western, paid the defense costs and settlement in that class action suit. The Court granted Twin City's motion, holding that (1) because Western had paid no portion of the settlement, Western suffered no covered "Loss;" and (2) any payment by Twin City would constitute an impermissible windfall for (the former) Western and its directors and officers. Insofar as the *Pan Pacific* ruling is driven by the fact that D&O coverage of the settlement would result in a double recovery to the insured (see *466 F.3d at 878*), it is inapposite here. Any recovery of the *Williamson* settlement against the D&O insurers would not constitute a windfall to, or double recovery by, AT&T, because AT&T has yet to receive a single recovery. Any recovery by AT&T would merely reimburse AT&T for what it paid on behalf of the At Home Directors.

The only case that arguably could be read to require a judgment or other legally binding obligation to pay a settlement as a condition for coverage, is a federal court opinion, *PLM, Inc. v. National Union Fire Insurance Company of Pittsburgh, PA.* [25] ("*PLM*"). In that case, PLM settled a breach of contract and fraud action brought by Pillsbury against PLM **[*26]** and certain PLM directors and officers. PLM sought reimbursement of a portion of the settlement payment from National Union, which had issued certain D&O policies covering PLM's directors and officers. National Union denied coverage. In a subsequent lawsuit by PLM against National Union, the federal court ruled that PLM's directors had suffered no covered "loss," because they paid no claim and were not legally obligated to pay, even though the PLM directors had individually guaranteed some of the promised settlement payment. Affirming a District Court judgment in favor of National Union, the Ninth Circuit stated:

> We think it clear that in this case execution of the guarantees created only a contingent obligation to pay on the part of the directors and officers. It was not an obligation to pay and it never became an obligation to pay.

Hence, there was no loss as defined by the D&O provision. . . . PLM claims that the words "legally obligated to pay" include situations in which a payment is made by third persons on behalf of a director or officer. Since the payments made by [PLM] eliminated potential liability of all defendants in the Pillsbury lawsuit, a portion of the payments arguably [*27] was made on behalf of the directors and officers. Nonetheless, PLM's argument fails because potential liability is not equivalent to a legal obligation to pay. The directors and officers were not legally obligated to make payments to Pillsbury and therefore the payments made on their behalf were not recoverable under the D&O provision. [26]

25  *848 F.2d 1243, 1988 WL 58031 (9th Cir. 1988)* (Table).

26  *848 F.2d 1243, [WL] at *1-2.*

*PLM* is an unpublished ruling by a federal court attempting to apply California law. Because *PLM* is not an opinion by a California state court, it is not an authoritative pronouncement of California law on the issue before us. [27] Moreover, under Ninth Circuit Local Rules *PLM*, as an unpublished opinion, cannot be cited as precedent in that Circuit or in any courts thereof, except in limited circumstances not applicable here. [28] And, lastly, the *PLM* opinion cites no California case to support its conclusions, or otherwise attempts to explain why the California courts would adopt the *PLM* Court's rationale. Accordingly, we do not regard *PLM* as persuasive evidence of California law or consider ourselves obligated to follow that decision or accord it significant weight. [29] In [*28] discharging our independent obligation to ascertain how the California state courts would rule on the precise issue presented to us, we must, therefore, look to other sources.

27  *Fidelity Union Trust Co. v. Field, 311 U.S. 169, 178, 61 S. Ct. 176, 85 L. Ed. 109 (1940)* ("The highest state court is the final authority on state law, . . . but it is still the duty of the federal courts, where the state law supplies the rule of decision, to ascertain and apply that law even though it has not been expounded by the highest court of the State. . . . An intermediate state court in declaring and applying the state law is acting as an organ of the State and its determination, in the absence of more convincing evidence of what the state law is, should be followed by a federal court in deciding a state question.") (internal citations omitted).

28  *Ninth Circuit Rule 36-3* provides that unpublished dispositions or orders of that Court "are not precedent, except where relevant under the doctrine of law of the case or rules of claim preclusion or issue preclusion." *Rule 36-3 (a).* Moreover, because *PLM* was decided before January 1, 2007, it may not be cited to courts of the Ninth Circuit, except where relevant for the foregoing purposes, [*29] or for factual purposes, or for purposes of a request to publish the disposition, or a request for rehearing, or to demonstrate the existence of a conflict among opinions, dispositions, or orders. *Rule 36-3 (c).*

29  *See Raymond Townes v. Sunbeam Oster Co., 50 S.W.3d 446, 452 (Tenn. App. 2001)* ("When a federal court undertakes to decide a state law question in the absence of authoritative state precedent, the state courts are not bound to follow the federal court's decision.")

We begin with the proposition, which the insurers themselves concede, that the *Williamson* settlement payment would be a covered "Loss" if the *Williamson* settlement, like that in *Xebec*, had been structured so that a consent judgment was first entered against the At Home Directors, and then paid by AT&T. In terms of economic substance, a settlement so structured would be identical to the different settlement form actually employed in *Williamson*. That being the case, the D&O insurers' position necessarily reduces to the proposition that

coverage under their policies turns entirely upon the matter of settlement structure. The question is whether the California courts would hold such adherence to form is *essential* for [*30] D&O coverage to attach. We find no indication that the California courts would so hold. Indeed, what indications are available to us point in the opposite direction.

Those indications are found in *Xebec*. There (to reiterate), the settlement of the underlying litigation against the defendants (Xebec and its directors)--all of whom were insured by National Union--took the form of a transaction where: (i) Xebec and its directors stipulated to a judgment in favor of the plaintiff (XDP), in consideration for (ii) which XDP agreed not to execute on its judgment, and (iii) Xebec assigned to the plaintiff its rights to coverage from the D&O insurer. National Union denied coverage, resulting in the plaintiff suing the insurer to recover under the D&O policies. National Union argued (*inter alia*) that because of the plaintiff's covenant not to execute on its judgment against Xebec and the two directors, those policyholders would never be required to pay the plaintiff's claim and, therefore, had no "loss" that triggered coverage. The insureds having no valid claim for coverage, XDP could not recover as their assignee.

Reversing a California Superior Court judgment in favor of National Union, the [*31] California Court of Appeals held that the policyholders had suffered a "loss" covered by the D&O policy, for which the plaintiff XDP, as the policyholders' assignee, was entitled to recover from National Union. Ruling, in effect, that the existence of a covered "loss" should depend on economic substance and not transactional form, the California Court of Appeals stated:

> Assuming, for purposes of analysis, that the settlement accurately reflected, and that the arbitration award and judgment sufficiently implemented, a legally enforceable obligation upon [the policyholders] to fund an actual cash payment to XDP, it would be an idle exercise to require [the policyholders] to fund an actual cash payment to XDP and then to pursue their own right of indemnity

against National Union. Given these admittedly hypothetical assumptions, the result would be essentially the same in either case: National Union would pay the sum, XDP would receive the sum, and [the policyholders] would neither be wealthier nor poorer for the experience. In a sense [the policyholders] may be regarded as middlemen, and the assignment and covenant not to execute may be regarded as mechanisms by which the transaction can [*32] be simplified by permitting the middlemen to withdraw in order to allow XDP to proceed directly against National Union. There is no apparent just purpose to be served, in these circumstances, on a hypertechnically literal payment from [the policyholders] to XDP. [30]

[30]  *Xebec Del. Partners, Ltd.,* 15 Cal. Rptr. 2d at 744.

In this case the Superior Court found *Xebec* to be factually distinguishable, because in *Xebec* a consent judgment was entered against the insured defendants as part of the settlement structure, whereas in *Williamson* no judgment was entered against the At Home Director defendants. Because of the consent judgment, the insured director-defendants in *Xebec* had an "obligation to pay." In reality, however, that "obligation" was formalistic, because the plaintiff (XDP) had agreed not to execute on the judgment, but instead to look to the D&O insurer for its recovery. The *Williamson* settlement in this case differs from *Xebec* only in that here the settling parties by-passed the "idle exercise" intermediate step of requiring the At Home Directors to consent to a judgment that they would never have to pay. Stated differently, although *Xebec* and this case differ in that single respect, [*33] in terms of economic substance the settlements in both cases were identical, making the *Xebec* court's rationale equally applicable to the form of settlement structure employed in *Williamson*.

Here, as in *Xebec,* the insured At Home Directors may be regarded "as middlemen, and the assignment and [the *Williamson* Settlement Agreement] may be regarded as mechanisms by which the transaction can be simplified by permitting the middlemen to withdraw in order to allow [AT&T] to proceed directly against [the D&O insurers]." Just as in *Xebec* there was "no apparent just purpose to be served by insisting . . . on a hypertechnically literal payment from [the policyholders] to XDP[,]" no just purpose would be served in this case by requiring a hypertechnical entry of judgment that the settling parties knew from the outset that the At Home Directors would never be required to pay. Thus, although *Xebec* involved a settlement one ingredient of which was a consent judgment, nothing in *Xebec* suggests that the judgment was *essential* to the result, such that if the California court had confronted the facts in this case, the outcome would be any different.

Nor does any other authoritative California decision [*34] cited to us require us to reach the result argued for by the D&O insurers here. We therefore conclude that under California law the At Home Directors suffered a covered "Loss" under the D&O policies. Accordingly, those Directors had a cognizable legal claim against the D&O insurers, which AT&T, as their assignee, became entitled to enforce. In concluding otherwise, the Superior Court legally erred.

## II. Whether AT&T Has Standing To Sue As the Directors' Equitable Subrogee

We turn next to the second issue raised on this appeal: whether AT&T is entitled to sue the D&O insurers on a theory of **equitable subrogation**. [31] We conclude that it is, and that the Superior Court erred in holding otherwise.

> 31   Because we hold that AT&T is the assignee of valid claims against the D&O insurers, as a technical matter we need not reach the subrogation issue. We do so, however, to avoid any potential controversy over AT&T's standing to sue in the proceedings on remand to the trial court.

As the Superior Court correctly found, to be equitably subrogated under California law, a party paying the debt of another must satisfy the follow-

ing prerequisites: "(1) Payment must have been made by the subrogee to protect [*35] its own interest. (2) The subrogee must not have acted as a volunteer. (3) The debt paid must be one for which the subrogee was not primarily liable. (4) Subrogation must not work any injustice to the rights of others." [32] The sole issue relating to subrogation, as the trial court properly noted, is whether AT&T acted as a volunteer when it made the payments on behalf of the At Home Directors. The Superior Court held that AT&T acted as a volunteer, because the complaint does not allege that AT&T was legally obligated to indemnify those Directors. [33]

> 32   *Opinion, 2006 Del. Super. LEXIS 359, [WL] at *11* (quoting *Caito v. United California Bank, 20 Cal. 3d 694, 144 Cal. Rptr. 751, 576 P.2d 466, 471 (Cal. 1978)* (internal citations omitted)).

> 33   As the trial court noted (quoting from a statement by AT&T's counsel at oral argument), ". . . AT&T was not obligated to indemnify those directors and officers, it was permissive indemnification." *Opinion, 2006 Del. Super. LEXIS 359, [WL] at * 13.*

In concluding that AT&T must have been legally obligated to indemnify the At Home Directors in order not to be deemed a volunteer for subrogation purposes, the Superior Court misread California law. AT&T claims that it indemnified the At Home Directors not because it was legally [*36] obligated to do so, but because it was protecting its own interests. The narrow issue is whether the complaint states a cognizable claim that AT&T indemnified those Directors "to protect its own interest." Under California law, a subrogee need not have a legal obligation to indemnify a subrogor in order to have an interest worthy of protection for subrogation purposes. The California courts:

> . . . have given a very liberal interpretation of the "interest" required to distinguish a person from being a volunteer. "It would seem that one acting in good faith in making his payment, and under a reasonable belief that it is necessary to his protection, is entitled to subrogation, even though it turns

out that he had no interest to protect."
[34]

34  *Employers Mut. Liab. Ins. Co. of Wis. v. Pac. Indem. Co., 167 Cal. App. 2d 369, 379, 334 P.2d 658 (Cal. Ct. App. 1959)* (citations omitted).

Under California law, a "volunteer" has been defined as a "stranger or intermeddler who has *no interest to protect* and is under no legal or moral obligation to pay under the circumstances." [35] Although AT&T was not legally obligated to indemnify the At Home Directors, the complaint alleges ample facts that, if taken as true, **[*37]** would establish an interest that AT&T, as a reasonable member of the business community, was entitled to protect. AT&T was the majority stockholder of At Home and, as such, was entitled to select the persons it would designate to the subsidiary's board. But for AT&T having requested them to do so, the At Home Directors would not have served as directors of At Home, and would not have been sued in the Underlying Litigation. The complaint specifically alleges that the At Home Directors were sued for actions they took as directors and officers of At Home, an AT&T subsidiary. Because AT&T had other subsidiaries and would likely acquire subsidiaries in the future, it is inferable that AT&T knew it would likely ask other AT&T employees to serve as those subsidiaries' officers and directors. To persuade its employees to do that, AT&T must be able credibly to assure those employees that they would be protected from financial ruin while serving as a director or officer of an AT&T subsidiary. In these circumstances, AT&T had a legally cognizable interest that it was entitled to protect by paying indemnification that AT&T was not legally obligated to provide.

35  *Id. at 380-81* (emphasis added).

The **[*38]** Superior Court interpreted California law to require that AT&T must have been legally (even though not primarily) obligated to indemnify the At Home Directors in order to have a protectible "interest" for subrogation purposes. In so doing, the trial court erred.

## CONCLUSION

For the foregoing reasons, the judgment of the Superior Court dismissing the complaint is reversed, and the case is remanded for proceedings consistent with this Opinion.

Salesperson: AT                    Invoice number: 4179683        Date: 12JUL2007
 For: VALENTINI/GERALD             Record locator: IJTPDL         Customer number: 0000020136

Notes: US AIRWAYS RECORD LOCATOR IS GMJZYG
*****************************************
SABRE VIRTUALLY THERE RESERVATION CODE DCHBEM
************************************************
***********CRITICAL INFORMATION************
UPON RECEIPT CHECK ITINERARY DETAIL FOR
ACCURACY AND REPORT ANY DISCREPANCY WITHIN
24 HOURS OR WE WILL ASSUME NO LIABILITY.
************************************************
VALID GOVERNMENT ISSUED PHOTO ID IS REQUIRED
FOR ALL FLIGHTS.
DOMESTIC FLIGHT CHECK-IN 2 HOURS PRIOR
INTERNATIONAL FLIGHT CHECK-IN 3 HOURS PRIOR
************************************************
.......ADDITIONAL IMPORTANT INFORMATION.......
....REGARDING YOUR TRAVEL IS LISTED AT THE....
...........BOTTOM OF YOUR ITINERARY...........
************************************************

**Wed, Sep 5**

| Air | US AIRWAYS | Flight # : 309 | Economy | Food for Purchase |
|-----|------------|----------------|---------|-------------------|
|     | From : PHILADELPHIA, PA | | 0830A | |
|     | Departure Terminal : B | | | 5Hr 17Min |
|     | To : PHOENIX, AZ | | 1047A | Non Stop |
|     | Arrival Terminal : 4 | | | |
|     | Equipment : AIRBUS INDUSTRIE A320 JET | | | |
|     | VALENTINI/GERALD | Seat(s) - 13D | US - XXXXXXX92 | |

**Fri, Sep 7**

| Air | US AIRWAYS | Flight # : 1194 | Economy | Food for Purchase |
|-----|------------|-----------------|---------|-------------------|
|     | From : PHOENIX, AZ | | 0250P | |
|     | Departure Terminal : 4 | | | 4Hr 30Min |
|     | To : PHILADELPHIA, PA | | 1020P | Non Stop |
|     | Arrival Terminal : B | | | |
|     | Equipment : AIRBUS INDUSTRIE A321 JET | | | |
|     | VALENTINI/GERALD | Seat(s) - 07C | US - XXXXXXX92 | |

| Ticket number | US7059993877 | VALENTINI GERALD | |
|---------------|--------------|-------------------|---|
|               |              | Billed to  AX  XXXXXXXXXX 1012 | *457.80 |
| Service Fee | XD8154318926 | | |
|               |              | Billed to  AX  XXXXXXXXXX 1012 | *30.00 |

----------

| | |
|---|---|
| Subtotal | 487.80 |
| Net credit card billing | *487.80 |
| | ---------- |
| Total amount due | 0.00 |

TRAVEL ARRANGEMENTS MADE BY SELMA SPIVACK
YOUR SERVICE FEE INCLUDES A 2.00 PER PERSON
 AIRLINE DISTRIBUTION FEE
 PHOTO ID REQUIRED FOR ALL FLIGHTS
THIS TICKET IS NON REFUNDABLE/SUBJECT TO CHANGE FEE
 YOUR VIT CODE IS S2J50
 ALL FLIGHTS MUST BE RECONFIRMED******
OUR AGENCY IS NOT ALWAYS NOTIFIED OF SCHEDULE CHANGES
PLEASE ARRIVE AT THE AIRPORT FOR CHECK IN
 AT LEAST 1 HOUR 1/2 MINIMUM

Your travel arranger provides the information contained in this document to you. *Sabre*®
*Virtually There*® is not responsible for the content of this document. Please contact your
travel arranger should you have any questions.

Copyright and Trademark Notices



 <u>Print this page</u>

# Itinerary
GERALD VALENTINI
Reservation code: IJTPDL

---

**Travel Arranger Priority Comments:**

US AIRWAYS RECORD LOCATOR IS GMJZYG
***************************************
SABRE VIRTUALLY THERE RESERVATION CODE DCHBEM
***************************************
***********CRITICAL INFORMATION************
UPON RECEIPT CHECK ITINERARY DETAIL FOR
ACCURACY AND REPORT ANY DISCREPANCY WITHIN
24 HOURS OR WE WILL ASSUME NO LIABILITY.
***********************************************
VALID GOVERNMENT ISSUED PHOTO ID IS REQUIRED
FOR ALL FLIGHTS.
DOMESTIC FLIGHT CHECK-IN 2 HOURS PRIOR
INTERNATIONAL FLIGHT CHECK-IN 3 HOURS PRIOR
***********************************************
......ADDITIONAL IMPORTANT INFORMATION.......
....REGARDING YOUR TRAVEL IS LISTED AT THE....
..........BOTTOM OF YOUR ITINERARY..........
***********************************************

---

## Wed, Sep 5

**Flights: US AIRWAYS, US  0309**
**Operated by AMERICA WEST DBA US AIRWAYS**

|  |  |  |  |
|---|---|---|---|
| **From:** | PHILADELPHIA, PA (PHL) | **Departs:** | 8:30am |
| **To:** | PHOENIX, AZ (PHX) | **Arrives:** | 10:47am |
| **Departure Terminal:** | TERMINAL B | **Duration:** | 5 hour(s) and 17 minute(s) |
| **Arrival Terminal:** | TERMINAL 4 | **Class:** | Economy |
| **Seat(s):** | 13D | **Status:** | Confirmed |
| **Notes:** |  |  |  |
| **Gate:** |  |  |  |
| **Aircraft:** | AIRBUS INDUSTRIE A320 JET | **Airline Confirmation:** | GMVFYV |
| **Meal:** | Food for Purchase | **Mileage:** | 2072 |
| **Smoking:** | No | **Frequent Flyer:** | US AIRWAYS FFE32U892 |

**Please verify flight times prior to departure**

## Fri, Sep 7

**Flights: US AIRWAYS, US  1194**

|  |  |  |  |
|---|---|---|---|
| **From:** | PHOENIX, AZ (PHX) | **Departs:** | 2:50pm |
| **To:** | PHILADELPHIA, PA (PHL) | **Arrives:** | 10:20pm |
| **Departure Terminal:** | TERMINAL 4 | **Duration:** | 4 hour(s) and 30 minute(s) |
| **Arrival Terminal:** | TERMINAL B | **Class:** | Economy |
| **Seat(s):** | 07C | **Status:** | Confirmed |
| **Notes:** |  |  |  |
| **Gate:** |  |  |  |
| **Aircraft:** | AIRBUS INDUSTRIE A321 JET | **Airline Confirmation:** | GMVFYV |
| **Meal:** | Food for Purchase | **Mileage:** | 2072 |
| **Smoking:** | No | **Frequent Flyer:** | US AIRWAYS FFE32U892 |

**Please verify flight times prior to departure**

## Tue, Feb 5

Other:

**City:** PHILADELPHIA, PA (PHL)
**Status:** Confirmed
**Information:** HAVE A GOOD TRIP

---

**Notes:**

---

TRAVEL ARRANGEMENTS MADE BY SELMA SPIVACK
YOUR SERVICE FEE INCLUDES A 2.00 PER PERSON
AIRLINE DISTRIBUTION FEE
*****************************************
PHOTO ID REQUIRED FOR ALL FLIGHTS
THIS TICKET IS NON REFUNDABLE/SUBJECT TO CHANGE FEE
YOUR VIT CODE IS S2J50
ALL FLIGHTS MUST BE RECONFIRMED******
OUR AGENCY IS NOT ALWAYS NOTIFIED OF SCHEDULE CHANGES
PLEASE ARRIVE AT THE AIRPORT FOR CHECK IN
AT LEAST 1 HOUR 1/2 MINIMUM



**Gerald Valentini**

| | |
|---|---|
| **From:** | Marianne Murphy |
| **Sent:** | Thursday, July 12, 2007 10:22 AM |
| **To:** | Everyone |
| **Subject:** | FW: LitigationAdvisor - header line #30 - Suit Type |
| **Attachments:** | PCP Suit Types May 2007.doc |

FYI REGARDING NEW SCOTTSDALE FILES

---

**From:** ANDRYB@nationwide.com [mailto:ANDRYB@nationwide.com]
**Sent:** Thursday, July 12, 2007 10:19 AM
**To:** ANDRYB@nationwide.com
**Subject:** LitigationAdvisor - header line #30 - Suit Type

**July 2007**
When you receive a new file assignment from Nationwide Companies, please confirm with the assigning file handler the need for identifying the Suit Type on Line 30 of the LitigationAdvisor Header. If a Suit Type is needed, please see below attachment for the code which would be used within LitigationAdvisor to identify the appropriate Suit Type.

Please note: this needs to be completed on the initial invoice submission for the matter.

If you have any questions regarding the Suit Type codes or the 30 Line Header, please contact Bret Andry, 614-249-8783 or andryb@nationwide.com.

Thank you,
Nationwide Companies Legal Initiatives

# Suit Types

1.  ADV - Advertising Injury – allegations of an injury arising out of an offense committed in the course of the insured's advertising activities, if such injury rises out of libel, slander, defamation, violation of right of privacy, piracy, unfair competition or infringement of copyright, title or slogan.

2. ARC - Architects & Engineers – allegations of errors or omissions arising out of the activity of an architect or engineer.

3. ARS - Arson – an alleged actual or attempted malicious and deliberate burning of a physical asset owned by another party.

4. ATL - Auto Liability – allegations of damage or injury to a third-party arising out of the operation or ownership of an automobile.

5. BDF - Bad Faith – allegations of damages arising out of an alleged failure to comply with Fair Claims Practices Acts.

6. BND - Bond – any type of performance bond, fidelity bond, or surety bond.

7. CLA - Class Action – a law suit by one or more plaintiffs on behalf of a group who have a common interest, and which has applied for, or been certified as a class, pursuant to FRCP 23 or an equivalent state rule.

8. CGL - Commercial General Liability – allegations of damage or injury to a third party arising out of the ownership of property, manufacturing operations, contracting operations, sale or distribution of products and the operating of machines as well as professional services. Based on premises & operations liability.

9. CSD - Construction Defect – allegations of damage or destruction of structures in the course of construction.

10. COV - Coverage – coverage opinion or civil action to determine the rights and interests of any party to a contract of insurance.

11. CRI - Crime – perils of burglary, theft, and robbery.

12. DIR - Directors, Officers & Managers – allegations of errors or omissions arising out of the activity or duties of a director, officer or manager.

13. E&O - E & O – allegations resulting from errors or omissions in the performance of professional duties.

May 2007

14. EMP - Employment Practices Liability – allegations resulting from charges of harassment, discrimination, wrongful termination of employment, defamation, and invasion of privacy.

15. EXT - Extra Contractual – defense of extra contractual allegations in a civil action.

16. GOV - Government Liability – allegations arising out of the activities of a public or governmental entity.

17. HEA - Heavy Equipment – allegations arising out of the operation of equipment insured as "heavy equipment".

18. HOM - Homeowners Liability – allegations of damage or injury to a third party.

19. INM - Inland Marine /Commercial – allegations of damage or destruction of cargo.

20. IP - Intellectual Property – allegations of infringement of any form of intellectual property, including infringement of copyright, trademark, trade name or patent.

21. LEG - Legal Malpractice – allegations resulting from errors or omissions in the performance of professional duties as an attorney.

22. LIQ - Liquor Liability – allegations arising out of an establishment or individual providing liquor which is alleged to be responsible for injuries caused by its customers to third parties.

23. MAR - Maritime Liability – allegations arising out of the ownership or operation of a boat or vessel on a navigable waterway.

24. MED - Medical Malpractice – allegations resulting from errors or omissions in the performance of professional duties as a medical professional.

25. NUR - Nursing Home Liability – allegations resulting from alleged errors or omissions in the performance of duties arising out of the operation of a nursing home.

26. PER - Personal Injury – allegations of false arrest, detention, or imprisonment, malicious prosecution, libel, slander, defamation, violation of right of privacy, wrongful entry, eviction, or other invasion of right of private occupancy.

27. PIP - PIP – claims involving no fault automobile insurance.

28. POL - Pollution – including lead paint/toxic tort/ mass tort: any allegation involving the presence of solid, liquid, gaseous, or thermal contaminants, irritants, or other pollutants.

29. PRD - Products Liability – allegations of bodily injury or property damage as a consequence of some defect in the product sold or manufactured or the exposure to liability by a contractor after an insured has completed a job as a result of improperly performed work.

30. PFC - Professional Coverage – allegations resulting from errors or omissions in the performance of professional duties other than medical or legal professions.

31. PAN - Propane Liability – allegations arising out of the sale or distribution of propane.

32. PRO - Property (1st Party) –allegations arising out of a dispute under 1st party property coverage for the insured's personal or real property.

33. SUB - Subrogation – litigation commenced by an insurance company to recover the amount of a claim paid on behalf of an insured where the loss was caused by a third party.

34. UMU - UM/UIM – (uninsured or underinsured) allegations of damage or injury by the insured where the third-party tortfeasor is uninsured or has inadequate insurance to compensate the insured for the loss.

35. WC - Worker's Compensation / Employers Liability – claims for employee job-related injuries or diseases paid without regard to fault.