# UNREPORTED CASES



Not Reported in F.Supp.2d                                                                                                    Page 1
Not Reported in F.Supp.2d, 2002 WL 2018824 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)



Fatir v. Dowdy
D.Del.,2002.
Only the Westlaw citation is currently available.
United States District Court, D. Delaware.
Amir FATIR, Plaintiff,
v.
David DOWDY, Patrick Ryan, Barry Hawlk,
Lawrence McGuigan, Robert Snyder, Carl Danberg,
Stanley Taylor, and Colleen T. Schotzberger,
Defendants.
**No. Civ.A. 95-677-GMS.**

Sept. 4, 2002.

*MEMORANDUM AND ORDER*
SLEET, J.

### I. INTRODUCTION

**\*1** On April 6, 1995, Amir Fatir, a prisoner, filed a complaint against the defendants pursuant to 42 U.S.C. § 1983. His allegations stem from various actions taken by the defendants, all employees of the Delaware Correctional Center ("DCC") in Smyrna, Delaware. At the time he filed his complaint, Fatir was proceeding *pro se.* Among other things, Fatir's original complaint ("the 1995 complaint") alleged that certain of the defendants had tampered with his mail and had taken property belonging to him from his work area.

In May 1996, Fatir wrote the court expressing his concern that the defendants had begun to retaliate against him for filing this lawsuit. This letter added further facts supporting the claims previously filed in the original complaint. Although Fatir stated that the letter was a motion for a preliminary injunction and did not attach an amended complaint, The Honorable Roderick R. McKelvie *sua sponte* decided to treat the letter as a motion to amend. Judge McKelvie granted the motion.

In the summer of 1996, Fatir was transferred to an Arizona prison. In January 1997, he sought to amend his complaint to add claims of retaliatory transfer and retaliation for speech protected under the First Amendment. Apparently, Fatir did not file any grievances with prison authorities regarding these claims prior to amending his complaint.

The case was eventually reassigned to this court. After the case was reassigned, Fatir filed a second motion for appointment of counsel. Although Fatir demonstrated that he was quite capable of prosecuting his lawsuit *pro se,* given the problems he encountered during the discovery period and the practical difficulties presented by his transfer to Arizona, the court appointed counsel on June 20, 2000 (D.I.57). In November 2000, Fatir, by and through his counsel, filed a motion to amend his complaint. On January 29, 2001, the court granted this motion with the provision that the defendants would be permitted to retain any and all applicable defenses. After the third motion to amend was granted, the court entered a scheduling order which set the dispositive motion deadline at November 16, 2001.

Presently before the court are two motions. The first is the defendants' motion for summary judgment filed on November 16, 2001. In this motion, the defendants raise several defenses to the plaintiff's claims, including the plaintiff's failure to exhaust administrative remedies as required by the Prison Litigation Reform Act of 1996 ("PLRA"), 42 U.S.C. § 1997e. In the plaintiff's response to that motion, filed on February 15, 2002, he asserts that since his complaint was filed after the PLRA was enacted, his claims are not subject to any exhaustion requirements. The defendants respond that although this is true for the claims contained in the 1995 complaint, the new claims presented in Fatir's first, second, and third amended complaints were filed after the PLRA's enactment and are therefore subject to its exhaustion requirements.

**\*2** The second motion before the court is the plaintiff's motion for leave to file a fourth amended complaint. This motion was filed on February 19, 2002, four days after the plaintiff's response to the defendants' motion for summary judgment. The proposed fourth amended complaint will amend Count Eight of the third amended complaint-which currently states a claim for deprivation of property-to state a claim for conversion. The defendants allege that this motion is the product of undue delay and will result in prejudice to their ability to defend this case. Additionally, the defendants allege that the proposed conversion claim is futile. The plaintiff responds that the amendment is not futile, and that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                    Page 2
Not Reported in F.Supp.2d, 2002 WL 2018824 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

the motion is not the result of undue delay.

Upon review of the lengthy record, the submissions of the parties, and the applicable law, the court reaches the following conclusions. First, the motion to amend will be denied. The court finds the fact that the motion was filed four days after the plaintiff's response to the motion for summary judgment supports a finding that the motion is the product of undue delay. For this reason, the court also finds that granting the motion will unreasonably prejudice the defendants and the court. Second, with regard to summary judgment, the court finds that certain of the plaintiff's claims either did not require exhaustion or were properly exhausted. The court finds, however, that there is scant evidence of exhaustion of the claims in Counts Four and Eight. Therefore, the court will order that those particular claims must be dismissed without prejudice until such time as the plaintiff has exhausted his administrative remedies regarding these claims. While the plaintiff is exhausting his remedies pertaining to these claims, this case will be stayed with respect to all other claims. Since the court is staying the case, the court will not decide the other legal issues in this case until the plaintiff has exhausted his remedies. The court will now more fully explain the reasons for is ruling.

II. FACTS [FN1]

> FN1. As indicated above, the court will not address the legal merits of the plaintiff's claims at this time. Thus, the court will only provide those facts that are pertinent to the motion to amend and the exhaustion issue raised in the motion for summary judgment.

In 1975, Amir Fatir was arrested and charged with crimes stemming from an armed robbery and murder which occurred earlier that year. In March 1976, the plaintiff was found guilty of the charges and was sentenced to life in prison. [FN2] Fatir was classified to serve his imprisonment at the Delaware Correctional Center ("DCC") in Smyrna, Delaware. Although the plaintiff presented a serious disciplinary problem at the beginning of his incarceration, by 1987, he had become a model prisoner. He became an active participant in positive aspects of prison life. He even began new programs designed to help prisoners cope with life behind bars. Fatir also became an author and sought after lecturer on prison life. Most important for the purposes of the present motion, after his initial infractions, Fatir was deemed to be a low security

risk and was permitted to work in the prison's Central Supply as a clerk and computer programmer. [FN3]

> FN2. The plaintiff was originally sentenced to death, but due to the constitutional infirmity of the Delaware death penalty statute, this sentence was later reduced to life without parole.

> FN3. The Central Supply was technically on the prison grounds, but it was beyond the secure area of the prison fences. Thus, only inmates who presented low security risks were permitted to work in this area.

*3 On April 6, 1995, Fatir filed a complaint against the defendants. [FN4] The complaint asserted several causes of action. First, Fatir claimed, "Defendants violated plaintiff's constitutional protection against unreasonable searches and seizures and free speech by searching his computer and copying files without his permission." (D.I. 2 at 7.) Fatir also alleged, "For the past year, Plaintiff's mail has been tampered with by mailroom officers.... Plaintiff has had incoming mail returned to sender without explanation and in violation of institutional mail regulations which require the mailroom officers to notify the inmates of any mail that they intend to send back to sender." (Id. at 10.)

> FN4. The defendants Danberg, Taylor, and Schotzberger were not added until 1997. Additionally, Fatir has voluntarily withdrawn certain claims. Therefore, the defendants Boyle, Hosterman, Cunningham, and Gullege are no longer defendants in this action.

On May 16, 1996, Fatir wrote a letter to the court. (D.I.19.) In the letter, Fatir alleged that "On May 14, 1996, Major Barry Halwk and Lawrence McGwiggen [sic] seized my personal computer, my file on this case, books I own including "The Prisoner's Self-Help Litigation Manual" and computer disks." (Id.) Fatir also asserted that "Defendant Dowdy has repeatedly mishandled legal mail coming into the institution for me. He has also stopped mail leaving the institution from directly going to the persons to whom the mail is addressed." (Id.) Fatir further stated, "I would request that the court please treat this letter as a Motion for a Preliminary Injunction." (Id.) At no point did Fatir refer to his letter as a motion to amend.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 2018824 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

On May 23, 1996, Judge McKelvie issued an order addressing Fatir's letter-motion. The order stated as follows:

On May 20, 1996, plaintiff sent a letter to the court stating that ... Major Barry Hawk and McGwiggen [sic], had seized his personal computer, his file for this litigation, certain books, including plaintiff's "The Prisoner's Self-Help Litigation Manual," and computer disks. In addition, the plaintiff asserts *as he did in his original complaint* that defendant Dowdy is interfering with his personal and legal mail. Plaintiff seeks a temporary restraining order and preliminary injunction to order the return of his property and to prevent DCC officials from tampering with his mail. The court will construe plaintiff's letter as a proposed amendment to his original complaint and as a motion for injunctive relief.

Plaintiff's proposed amendment to his complaint appears to claim that Hawk and McGwiggen's [sic] seizure of his personal property violates his Fourteenth Amendment right to due process. In addition, he appears to claim that their seizure of his legal materials and Dowdy's *continued* interference with legal mail violates his First Amendment right of access to the courts. As plaintiff still lacks the funds to maintain this action, and as these claims do not appear frivolous, the court will allow plaintiff to proceed *in forma pauperis* on these claims in addition to those identified by the court's October 31, 1995 Order granting plaintiff [sic] to proceed *in forma pauperis* against defendants Dowdy and Ryan.

*4 (D.I. 20 at 1)(emphasis added).

On June 22, 1996, approximately three months after Judge McKelvie granted the "motion to amend," Fatir gave a speech which criticized the policies of the warden, the defendant Robert Snyder, as racist. One week later, on June 29, 1996, Fatir was informed that he would be transferred to an Arizona prison pursuant to the Interstate Corrections Compact. Fatir arrived at Santa Rita prison in Arizona on July 5, 1996. On January 10, 1997, Fatir filed a motion to amend with a new complaint attached. (D.I.30.) In that complaint he alleged retaliatory transfer, retaliation for First Amendment violations, and deprivation of due process resulting from the seizure of certain of his personal effects lost during his transfer, including books, a television, a radio, legal materials, a computer, cosmetics, and other assorted items. (*Id.* at 5.) In their response to the motion, the defendants asserted that the retaliation claims should be considered separate causes of action under section 1983. (D.I.41.) Without addressing the defendants'

contention, Judge McKelvie granted Fatir's motion to amend. (D.I. 44 .)

In April 1998, Fatir filed a second motion for appointment of counsel. [FN5] In September 1998, the case was reassigned to this court. The court granted the motion for appointment of counsel on June 20, 2000. Upon securing new counsel, the plaintiff was permitted to file an amended complaint over the objection of the defendants. The amended complaint ("the 2001 complaint") was deemed filed on January 29, 2001. The 2001 Complaint asserted nine causes of action, seven of which remain in this litigation.[FN6] The 2001 complaint did not present new causes of action. Rather, it contained reformulations of Fatir's prior allegations. Count One alleged that the defendants had tampered with Fatir's "personal correspondence and legal mail." (D.I. 80 at 19.) Count Two alleged interference with Fatir's legal mail, specifically. (*Id.* at 20.) Count Four asserted that Hawlk and McGuigan had violated Fatir's Fourth Amendment rights against unreasonable searches and seizures and his Fourteenth Amendment right to due process by seizing his litigation materials and the other items listed in the May 1996 letter. (*Id.* at 21.) Count Five asserts that Fatir was retaliated against for engaging in speech protected by the First Amendment. Count Six contends that the plaintiff was transferred in retaliation for filing this lawsuit. Count Eight asserts that the defendants violated the plaintiff's right to due process and deprived him of his property when they removed certain property, including books, a radio, a television, legal material, a computer, cosmetics, stamps, shoes, clothing, and two photo albums. (*Id.* at 24.) Count Nine alleges that the defendants' interference with his legal mail violated his right to have access to the courts. (*Id.* at 25.)

> FN5. Fatir filed his first motion for appointment of counsel in August 1997. This motion was denied by Judge McKelvie in November 1997. (D.I.44.)

> FN6. The plaintiff has voluntarily withdrawn Count Three, an equal protection claim, and Count Seven, a due process claim based upon the plaintiff's reclassification upon arrival in Arizona. Since these claims are no longer being litigated, the court will not address them.

The court issued a scheduling order in this case on May 10, 2001. That order set the dispositive motion

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 2018824 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

deadline at September 28, 2001. However, by agreement of the parties and the court, the deadline was later changed to November 16, 2001. Thus, dispositive motions were to be filed on November 16, 2001, the answering briefs were due on January 25, 2002, and the reply briefs were due on February 1, 2002.

**\*5** The defendants filed their summary judgment motion on November 16, 2001, as scheduled. The motion argues, *inter alia,* that summary judgment should be granted in the defendants' favor because Fatir had failed to exhaust his administrative remedies before filing his complaint as required by the PLRA. The record indicates that the DCC had a formal grievance procedure for certain claims. The defendants have submitted an inmate grievance handbook and other materials establishing the existence of this grievance procedure. Also, Fatir testified at his deposition that there was a grievance procedure at the DCC. (D.I. 130 at A073.) When asked about his attempts at exhaustion during his deposition, Fatir testified as follows:

Q: Did you ever file a grievance?

A: Yes.

Q: More than one?

A: I can only recall one ...

Q: [T]here's a form they use, correct?

A: There ... was, I think, a letter you had to write to begin the grievance process.

Q: It was a form you had to fill in wasn't it?

A: Maybe. I don't know. I don't recall.

Q: And when you filled in this form, where would it go?

A: When the grievance procedure was functioning as ordered by the court, it would go to the grievance coordinator.

Q: And then from where? Would there be a hearing scheduled for it?

A: There would be a hearing for it.

Q: And after that there would be a decision made?

A: Yes.

Q: And after that you could appeal the decision?

A: Yes.

Q: To who [sic]?

A: To the warden.

....

A: The person who would be the statewide grievance coordinator [left], and the grievance procedure pretty much collapsed.

Q: There are still people that file grievances aren't there?

A: I would imagine so.

...

Q: In any event, in none of the instances that you

complained about in the second amended complaint did you in any way file a grievance form and turn it in, correct?

A: After having been told that my issues were nongrievable ...

Q: My question was did you actually file a written grievance and the answer is no?

A: No, I did not.

Q: Now, what things were you told were not grievable?

A: I was told that the mail tampering was not grievable. I was told that my job issues were not grievable because they were classification, and I was told that classification matters are not grievable. I was told that all the seizure of my materials, my computer itself, was not grievable, and--

Q: Just so we're clear--

A: the grievance board is not going to handle anything else from here.

Q: But you never filed a grievance and had the grievance board say that?

A: Well, the grievance coordinator said--

Q: My question is still the same. You never actually filed a grievance and had them say, "This is not grievable"?

A: That's a two part question ...

Q: Did you ever file a grievance form?

A: No.

Q: Since you never filed a grievance, you never heard back from the grievance board?

**\*6** A: I heard back. They don't have them.

In his answer to the defendant's motion, filed on February 15, 2002, the plaintiff responded that the PLRA was enacted on April 26, 1996. Fatir thus argued that since his original complaint was filed in 1995, and the PLRA was not retroactive, his case was exempt from the exhaustion requirements of the PLRA. He also argued that with regard to the 1997 claims surrounding his transfer to Arizona, there was no available "formal" grievance procedure. The defendants assert that upon his transfer, Fatir was instructed to "contact the Interstate Compact Administrator for any legal issues." (D.I. 143 at 21-22.) The defendants, however, cite no record evidence in support of this claim. A review of the depositions given by those responsible for the transfer (namely the defendants Shotzberger, Ryan, Danberg, Taylor, as well as Mr. Stanley Turner) fails to clearly identify exactly how Fatir could have or would have been able to file a grievance regarding his transfer claims. When asked how an inmate who disagreed with a transfer might challenge this decision, the defendant Taylor testified that "They

write letters all the time. They write grievances all the time." (D.I. 130 at 157 .) However, Taylor offered no testimony as to the exact operation or regulations of the purported grievance system, or to whom the grievance would be sent. Colleen Shotzberger, the Interstate Compact Administrator, testified that she gave Fatir a memo concerning the transfer of his legal materials, but did not testify that this memo or any other document notified Fatir of the appropriate grievance procedure for his transfer. (*Id.* at 299.) The prison hearing officer, Scott Turner, testified that if Fatir had indicated that he had a problem with the transfer, Turner might have been able to intervene. Additionally, Turner stated that there was no appeal from the decision to transfer. However, when Turner gave these responses, he was not specifically being asked about grievance procedures. (*Id.* at 120.) The record thus fails to clearly demonstrate how, or to whom, Fatir might appeal the transfer decision.

In their response to the plaintiff's motion, the defendants replied that although the PLRA might not be retroactive, thus saving the claims in the 1995 complaint, it did not save any claim asserted in an amended complaint after the PLRA was filed.

On February 19, 2002, a mere four days after answering the defendants' motion for summary judgment, the plaintiff filed a motion for leave to amend Count Eight of the 2001 Complaint. At present, Count Eight alleges that the defendants deprived Fatir of certain personal property, thus violating his due process rights. Fatir seeks to amend this count to instead assert a state law claim of conversion. The defendants oppose the amendment on two grounds. First, they assert that the plaintiff's motion is untimely, as it comes after the close of discovery and summary judgment. The defendants argue that this delay will prejudice their ability to defend this action. Second, the defendants assert that the plaintiff's conversion claim is futile under current law. The plaintiff responds that the motion is timely made and will not prejudice the defendants since the facts relating to the due process and conversion claims are nearly identical.

## III. DISCUSSION

**\*7** Since the motions to amend and for summary judgment are subject to different legal standards, the court will address each motion in turn. The court will first discuss its reasons for denying the motion to amend. The court will then discuss the exhaustion

issues raised in the defendants' motion for summary judgment.

### A. Motion to Amend

#### 1. Legal Standard

Permission to amend a pleading "shall be freely given whenever justice so requires." Fed. R. Civ. P. 15(a). *See also Foman v.. Davis,* 371 U.S. 178, 182 (1962) (same). Nevertheless, a court can deny a motion to amend if the motion is motivated by bad faith or if granting the motion will result in undue delay or prejudice to the opposing party. See *Cureton v. National Collegiate Athletic Ass'n,* 252 F.3d 267, 273 (3d Cir.2001) (citations omitted). Furthermore, the doctrine of futility allows the court to refuse any amendment that fails to state a cause of action. *See id.*

#### 2. The Plaintiff Unduly Delayed in Bringing this Motion to Amend

As noted above, a court may deny a motion to amend where the movant has unduly delayed in bringing the motion. *See id.* However, the Third Circuit has cautioned that delay alone is usually "an insufficient ground to deny leave to amend." *Id.* Nevertheless, "at some point, the delay will become 'undue,' placing an unwarranted burden on the court, or will become 'prejudicial,' placing an unfair burden on the opposing party." *Id.* Although the original complaint was filed in 1995, over seven years ago, the court will not consider the time during which the plaintiff represented himself *pro se.* The court will only consider the time from June 20, 2000-when counsel was appointed-to the present. Counsel first amended the complaint on January 29, 2001. The motion to amend presently before the court was filed on February 19, 2002, more than one year after the first amendment by counsel. This one year delay was both undue and prejudicial for the following reasons.

The plaintiff's delay may become undue after a motion for summary judgment is filed where the movant has had previous opportunities to amend a complaint, but chose not to do so. *See Bethany Pharmacal Co., Inc. v. QVC, Inc.,* 241 F.3d 854, 861-62 (7th Cir.2001) (denying leave to amend where the plaintiff "offered no explanation for waiting until it was faced with a summary judgment motion before attempting to add its promissory estoppel claim"

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 2018824 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

although claim was previously available). In particular, if the requested amendment is based upon facts known to the plaintiff at the time the previous complaint was amended, the amendment is disfavored. *See M/V American Queen v. San Diego Marine Construction Corp., 708 F.2d 1483, 1492 (9th Cir.1983)* (denying leave to amend where summary judgment was pending and amendment was not the product of newly discovery facts, but facts known at the time of the previous complaint). Similarly, if the newly presented claim and the previous claim are similar or identical, giving the plaintiff the ability to assert the new cause earlier, leave to amend is not granted. *See Coleman v. Ramada Hotel Operating Company, 933 F.2d 470, 473 (7th Cir.1991)* (denying leave to amend after filing of summary judgment motion where the new claims "merely reiterate[d]" the claims of the original complaint).

**\*8** In the present case, by the plaintiff's own admission, the earlier alleged deprivation of property claim and newly sought conversion claims are very similar. The plaintiff admits that the new claim stems from the exact same set of factual circumstances as its predecessor.[FN7] Although the plaintiff acknowledges that the new claim is factually similar, implicitly conceding that it could have been asserted previously, he offers no excuse for his failure to raise this claim earlier in this litigation. Since the new conversion claim is so similar to the prior property claim and there was no reason not to present the claim in the prior amended complaint, this delay weighs against granting the plaintiff's request for leave to amend. Moreover, this matter has been in litigation for nearly seven years. Given these facts, the court can not countenance the additional delay that would result were the plaintiff permitted the sought after amendment.

FN7. The plaintiff stated, "The underlying facts supporting the proposed claim for conversion are exactly the same as those supporting the claim for due process/deprivation of property." (D.I. 146 at 4.-Pls.' Reply Br.)

Additionally, the timing of this motion is prejudicial to the defendants and the court. The court notes that the motion to amend was filed on February 19, 2002, just four days after the plaintiff filed his response to the defendants' motion for summary judgment. Motions to amend which are filed after summary judgment motions have been filed or granted are

highly disfavored. *See Cureton, 252 F.3d at 273* ("When a party delays making a motion to amend until after summary judgment has been granted to the adverse party, other courts have recognized that the interests of judicial economy and finality of litigation may become particularly compelling."); *Eisenmann v. Gould-National Batteries, Inc., 169 F.Supp. 862, 864 (E.D.Pa.1958)* (denying leave to amend where "the plaintiffs waited nearly two years to move to amend the complaint and then made the motion only after a motion for summary judgment had been filed and argued"). These belated attempts at amendment are disfavored with good reason. If parties were allowed to repeatedly amend their complaints, even after summary judgment motions had been filed, not only the opponent, but the courts, would be prejudiced by the never-ending litigation.

The plaintiff notes that since discovery has been conducted regarding the deprivation of property issue, the defendants will be able to use that discovery in their defense of the conversion claim, and therefore will not be prejudiced. The court agrees, but further notes that this is not the only source of prejudice. As previously noted, motions to amend which follow the filing of a motions for summary judgment are heavily disfavored. In the present case, the timing of the motion to amend in response to the defendant's motion raises an inference that the plaintiff is attempting to bolster his legal position-and therefore avoid summary judgment-by amending the complaint. This is an unacceptable reason to amend. *See Kennedy v. Josephthal & Co., 814 F.2d 798, 806 (1st Cir.1987)* (affirming district court's denial of leave to amend where the attempt to amend the complaint appeared to be "an attempt to avoid an adverse ruling on summary judgment"); *Local 472 of the United Association of Journeymen and Apprentices v. Georgia Power Co., 684 F.2d 721, 724-25 (11th Cir.1982)* (same). Permitting such an amendment at this stage would change the focus of that portion of the litigation, thereby prejudicing the defendants. *See Torres-Rios v. LPS Laboratories, Inc., 152 F.3d 11, 16 (1st Cir.1998)* (noting that permitting amendment after discovery had closed and summary judgment motion had been filed would prejudice defendant).

**\*9** For all of the above reasons, the court concludes that the plaintiff's undue and prejudicial delay requires the court to deny the plaintiff's motion to amend.

B. The Exhaustion Issue

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 2018824 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

The court must address two questions. The first question is which claims, if any, must Fatir exhaust before proceeding. Second, the court must address whether any of these remedies were properly exhausted. The court will address the questions in turn. But first, the court will outline the applicable summary judgment standard.

### 1. The Summary Judgment Standard

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to a judgment as a matter of law. *See* Fed. R. Civ. P 56(c). A fact is material if it might affect the outcome of the case, and an issue is genuine if the evidence is such that a reasonable factfinder could return a verdict in favor of the nonmovant. *See In re Headquarters Dodge, Inc.,* 13 F.3d 674, 679 (3d Cir.1993) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). When deciding a motion for summary judgment, the court must evaluate the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *See Pacitti v. Macy's,* 193 F.3d 766, 772 (3d Cir.1999). The nonmoving party, however, must demonstrate the existence of a material fact supplying sufficient evidence-not mere allegations-for a reasonable jury to find for the nonmovant. *See Olson v. General Elec. Aerospace,* 101 F.3d 947, 951 (3d Cir.1996) (citation omitted). To raise a genuine issue of material fact, the nonmovant "need not match, item for item, each piece of evidence proffered by the movant but simply must exceed the 'mere scintilla' [of evidence] standard." *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.,* 998 F .2d 1224, 1230 (3d Cir.1993) (citations omitted). The nonmovant's evidence, however, must be sufficient for a reasonable jury to find in favor of the party, given the applicable burden of proof. *See Anderson,* 477 U.S. at 249-50.

### 2. Whether Exhaustion was Required

The first question is whether exhaustion is required, and if so, for which claims. The PLRA mandates that: no action shall be brought with respect to prison conditions under section 1983 of this title or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997(e)(a)(1996).

The latest version of the PLRA was enacted on April 26, 1996. *See* Pub. Law No. 104-134, 110 Stat. 1321. Congress did not state whether the law should have a retroactive effect. Nevertheless, the Third Circuit has made it clear that it believes the PLRA was not intended to be retroactive. *See Ghana v. Holland,* 226 F.3d 175, 182-83 (3d Cir.2000). Therefore, while the PLRA would apply to claims brought into this case after April 26, 1996, it would not apply to claims asserted prior to that time. Therefore, any claim that was clearly or conceivably asserted in Fatir's 1995 complaint is exempt from any exhaustion requirement.[FN8] However, as the defendants correctly point out, any claims that were asserted through amendment in 1996 or 1997 may need to be exhausted. The court will now consider each of the claims presented in Fatir's 2001 complaint and determine when they were first asserted in this litigation-whether explicitly or through relation back-and whether the PLRA is applicable to them.

> [FN8]. Although there were methods of determining exhaustion in existence prior to the enactment of the PLRA, the defendants do not assert that Fatir failed to exhaust his remedies under pre-PLRA law. They merely argue that he did not exhaust as required by the PLRA. Since the defendants did not brief the issue of pre-PLRA exhaustion, the court will consider it waived.

#### a. Count One

**\*10** Count One of the complaint states a claim for interference with mail. In Fatir's 1995 complaint, he clearly states that his "mail had been tampered with by mailroom officers." (D.I. 2 at 10.) Thus, the claims in Count One were clearly asserted prior to the enactment of the PLRA. Therefore, Fatir was not required to exhaust his remedies on this claim.

#### b. Count Two

Count Two states a claim for interference with legal mail. Again, in the 1995 complaint, Fatir stated that his "mail had been tampered with by mailroom officers." (*Id.* at 10.) There is no explicit mention of legal mail. The claims for legal mail were first explicitly asserted in the 1996 letter to Judge McKelvie. Nevertheless, the claims asserted in Count

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 2018824 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Two can be said to be an amendment or supplement that "relates back" to the 1995 complaint. Relation back is appropriate where a newly asserted claim arises out of the same conduct, transaction, or occurrence that was alleged in the original pleading. *See* Fed. R. Civ. P. 15(c). In this case, the legal mail claim arises out of the same conduct as the civilian mail claim. Judge McKelvie held as much in his May 1996 order when he stated, "[T]he plaintiff asserts *as he did in his original complaint* that defendant Dowdy is interfering with his personal *and* legal mail." (D.I. 20 at 1) (emphasis added). Judge McKelvie further stated, "In addition, [Fatir] appears to claim that their seizure of his legal materials and Dowdy's *continued* interference with legal mail violates his First Amendment right of access to the courts." (*Id.*)(emphasis added). These statements clearly indicate the court's belief that the legal mail claim was either implicitly asserted in the 1995 complaint or was a continuation of the mail tampering conduct contained in that complaint. This court, therefore, finds that the claims contained in Count Two relate back to the 1995 complaint and are thus not subject to the PLRA.

c. Count Four

Count Four as currently written alleges that the defendants violated Fatir's Fourth and Fourteenth Amendment rights to be free of unreasonable searches and seizures. Specifically, the plaintiff alleges that his rights were violated when materials were seized from his cell, including his personal computer, legal files, books including "The Prisoner's Self-Help Litigation Manual" and computer disks. These facts are not mentioned in the 1995 complaint. Rather, this claim was first asserted in Fatir's May 1996 letter to Judge McKelvie, wherein he stated, "On May 14, 1996, Major Barry Hawlk and Lawrence McGwiggen [sic] seized my personal computer, my file on this case, books I own including "The Prisoner's Self-Help Litigation Manual" and computer disks." (D.I.19.) Since this claim was first asserted in May 1996, and the PLRA was enacted in April 26, 1996, it is subject to the PLRA's exhaustion requirement.

The court considered that the claims in Count Four might relate back to the 1995 complaint. Indeed, the 1995 complaint does state a claim for search and seizure based on a search of Fatir's personal computer. However, the court concludes that the claims currently asserted in this action do not relate back to the 1995 complaint. First, by Fatir's own

admission in his complaint, the facts upon which Count Four relies did not occur until May 1996. Additionally, unlike the mail tampering claim, it cannot be argued that the seizure of his property was a continuing wrong related to the wrong alleged in the 1995 complaint. Rather, it appears that the search alleged in the 1995 complaint and the May 1996 allegation are two separate and unrelated incidents. Judge McKelvie acknowledged as much in his order. Although he stated that the legal mail tampering was a continuation of actions alleged in the 1995 complaint, he did not state that the May 1996 search and seizure allegations were in any way related to the 1995 complaint. Indeed, he referred to the May 1996 allegations as "new" claims. (D.I.20.) Moreover, since the 1995 and 1996 incidents were completely separate, they cannot be part of the same transaction or occurrence. The claims in Count Four do not relate back to the 1995 complaint. They are, therefore, subject to the PLRA.

d. Counts Five, Six, and Eight

**\*11** Counts Five, Six, and Eight each assert claims arising from Fatir's July 1996 transfer to Arizona. Each of these claims appeared in this litigation for the first time in Fatir's January 1997 amended complaint. The PLRA was in effect at that time, and each of these claims is therefore subject to its exhaustion requirements. Moreover, since the events alleged in the 1997 complaint did not occur until 1996, there is no way they can be reasonably related to any claim asserted in the 1995 complaint. Therefore, Fatir was required to exhaust the claims asserted in Counts Five, Six, and Eight.

The court observes that the PLRA applies only to "prison conditions." Counts Five, Six, and Eight all state constitutional claims. Thus, it could be argued that because they are not prison conditions claims, no exhaustion is required. The court disagrees with this view. In *Booth v. Churner*, 206 F.3d 289 (3d Cir.2000), *aff'd*, 532 U.S. 731 (2001), the Third Circuit held that an excessive force claim, which is a constitutional claim, was a "prison condition" and had to be exhausted under the PLRA. *See id.* at 296. ("[E]xcessive force actions are 'prison conditions' actions and subject to the exhaustion requirements set forth in [the PLRA].") The Third Circuit further stated that "Congress, in the PLRA, made its intent to subject all prisoner actions (save for habeas petitions) to § 1997e(a)'s exhaustion requirements ... clear." *Id.* at 295. Thus, it appears that given the Third Circuit's holding in *Booth,* even constitutional claims such as

Not Reported in F.Supp.2d                                                                                          Page 9
Not Reported in F.Supp.2d, 2002 WL 2018824 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

those raised in Counts Five, Six, and Eight are subject to the exhaustion requirements of the PLRA.

The Supreme affirmed the Third Circuit in *Booth,* and has also hinted that even constitutional claims might be subject to the PLRA's requirements. Indeed, in reaching its conclusion in *Booth,* the Third Circuit relied on the Supreme Court's decision in *McCarthy v. Bronson,* 500 U.S. 136 (1991). In *McCarthy,* the Supreme Court was asked to construe another section of the PLRA, 18 U.S.C. § 3626, which concerns prison conditions and is interpreted in the same manner as § 1997e(a). *See Booth,* 206 F.3d at 294 ("Because the two sections of the PLRA are directed toward similar ends and are thus substantially related, it follows that ... the identical terms used in the two sections should be read as conveying the same meaning."). The *McCarthy* Court held that the term "prison conditions" included not only continuous claims of prison conditions, but also "isolated episodes of unconstitutional conduct." *See McCarthy,* 500 U.S. at 139. Thus, *McCarthy* lends further support to the argument that even constitutional claims must be exhausted.

Finally, most recently, in *Porter v. Nussle,* 534 U.S. 516 (2002), the Supreme Court was asked to address whether an excessive force claim was a "prison condition" requiring exhaustion under the PLRA. In reversing the Second Circuit, which had held that the excessive force claim did not require exhaustion, the Supreme Court read § 1997e(a) very broadly, stating, "We hold that the PLRA's exhaustion requirement applies to all suits about prison life ... whether they allege excessive force or *some other wrong." Id.* at 992. The Supreme Court therefore did not specifically exclude constitutional claims from the purview of the PLRA.

**\*12** In light of *Booth, McCarthy,* and *Porter,* the court finds that although the plaintiff's First Amendment constitutional claims do not appear to assert claims for prison conditions, they must be exhausted under the PLRA. *See Ghana,* 226 F.3d at 177, 179 (requiring inmate plaintiff to exhaust First Amendment claim prior to filing suit). *See also Walker v. Maschner,* 270 F.3d 573, 574 (8th Cir.2001) (same).

### e. Count Nine

Count Nine is very similar to Count Two. Fatir never expressly stated a claim for denial of access to the courts in the 1995 complaint. However, in his May

1996 order, Judge McKelvie stated, "In addition, [Fatir] appears to claim that their seizure of his legal materials and Dowdy's *continued* interference with legal mail violates his First Amendment right of access to the courts." (D.I. 20 at 2.) The denial of access to courts claim, as worded by Judge McKelvie, is directly dependent upon the mail tampering claim. As previously noted, the mail tampering conduct was properly alleged in the 1995 complaint. Therefore, the claim alleged in Count Nine arises out of conduct, transactions, or occurrences that were plead in the original 1995 complaint. Thus, the claim in Count Nine relates back to the claim in the 1995 complaint and does not require exhaustion.

### f. Conclusion

The court concludes that no exhaustion is required for Counts One, Two, and Nine. Nevertheless, exhaustion is required for Counts Four, Eight, Five, and Six. The court will now consider whether Fatir has satisfied the PLRA's exhaustion requirements with respect to these claims.

### 3. Whether Fatir Properly Exhausted the Claims

As previously stated, the PLRA requires a prisoner to exhaust all available administrative remedies before bringing an action regarding prison conditions. *See Booth,* 206 F.3d at 291; *Nyhuis v. Reno,* 204 F.3d 65, 67 (3d Cir.2000). In the Third Circuit, exhaustion of remedies is an affirmative defense to be asserted by the defendant. *See Ray v. Kertes,* 285 F.3d 287, 295 (3d Cir.2002). Thus, the burden is on the defendant to prove the facts that support its exhaustion defense. Where a prisoner has failed to exhaust, the court is required to dismiss the unexhausted claims without prejudice. *See Nyhuis,* 204 F.3d at 68 n. 2.

The exhaustion requirement is mandatory. Thus, the court cannot excuse a prisoner's failure to exhaust. *See id.* at 66. Additionally, the Third Circuit has refused to recognize a futility exception to the PLRA's exhaustion requirements. *See id.* at 71. In other words, the PLRA requires an inmate to exhaust all administrative remedies prior to bringing a federal action challenging prison conditions, whether or not they provide the inmate with the relief the inmate says he or she desires in the federal action. *See id.* at 71 n. 6 (noting that even where prison cannot grant requested relief, exhaustion may still be helpful) (citations omitted). Nevertheless, if there is no

administrative remedy available for the plaintiff's claim, the court can find that exhaustion is not required. *See Freeman v. Snyder, No. No. 98-636, 2001 WL 515258, at \*5 (D.Del.2001)*, citing *Camp v. Brennan, 219 F.3d 279, 281 (3d Cir.2000)*. Moreover, where the prisoner's compliance with the administrative scheme has been substantial, even if not complete, the court might find exhaustion. *See Nyhuis, 204 F.3d at 77-78*. The court will now consider whether Fatir had administrative remedies available to him, and if so, whether he had properly exhausted those remedies for Counts Four, Eight, Five, and Six.

a. Was there an administrative remedy available?

**\*13** An administrative remedy is "an administrative scheme adopted by the state department of corrections." *See Freeman, 2001 WL 515258 at \*7*. At minimum, it appears that an administrative remedy must be ascertainable by examination of statutes or regulations. *See id.* at \*7 n. 9 (citing *Conception v. Morton, 125 F.Supp.2d 111, 117 (D.N.J.2000)*). Conversely, a vague, informal grievance process is "hardly a grievance procedure." *See id.* at \*7. Thus, an individual administrator's decision would not qualify as a grievance procedure. *See id.* The court will now consider whether there was an administrative remedy available for Fatir for any of his claims.

1). Counts Four and Eight

The court finds Fatir's deposition testimony and other evidence of record clearly establishes that there was a grievance procedure at the DCC for certain claims. The inmate was required to file a grievance with the grievance board, which could then be appealed. There was nothing vague, informal or discretionary about this procedure.

Fatir does not even attempt to argue that the claims asserted in Counts Four and Eight were not redressable through the prison grievance system. Indeed, the prison grievance procedure dictated that claims concerning actions by employees could be grievable, and further states that one of the remedies for a properly filed grievance might be "restitution of property." (D.I. 135 at B199.) It is clear that the claims in Counts Four and Eight concern employees seizing and depriving Fatir of his property in various ways. By its plain language, then, the DCC grievance system appears to be equipped to handle those

allegations and provide Fatir relief by returning his property. Thus, the court finds that these claims were redressable under the DCC's grievance system, and therefore there was an administrative remedy available to Fatir for these claims.

2). Counts Five and Six

With respect to Counts Five and Six, Fatir argues that the available grievance process was too vague and informal to be considered an administrative remedy. The court agrees.

Although the administrative remedies for the other claims are clearly spelled out in the DCC's grievance process, at no point did any DCC official testify that the established DCC grievance procedures were applicable to Fatir's claims regarding his interstate transfer. The court must therefore ask how an inmate might have challenged the transfer. The defendants do not argue that Fatir should have used the normal DCC grievance process. Rather, they argue that Fatir was told that he should "contact the Interstate Compact Coordinator for any legal issues" concerning his transfer. It is clear that the Interstate Compact Coordinator, Colleen Shotzberger, is an individual. This is exactly the type of "administrative remedy" that courts frown upon. *See Freeman, 2001 WL 515258, at \*7*. Additionally, although the defendants assert that Fatir was told to contact Shotzberger, there is absolutely no evidence of record to support his contention. There is no testimony that Fatir was ever notified that he could contact Shotzberger regarding grievances stemming from his transfer. Since the inmate must be aware of the grievance procedure, this failure of proof was significant. For all of these reasons, the court finds this purported administrative remedy to be inadequate.

**\*14** Similarly, although Taylor's testimony establishes that Fatir could have "written a letter" or "written a grievance" his testimony does not establish where or to whom the grievance should be addressed. More important, it definitely does not establish that there was an administrative scheme established by the State of Delaware regarding inmates grievances of interstate transfers. Although it is quite possible that the DCC (or the applicable Interstate Compact authority) has such a grievance procedure, the defendants' evidence is woefully inadequate to demonstrate that such a procedure exists. Since exhaustion is an affirmative defense, the defendants must present evidence sufficient to prove that there

Not Reported in F.Supp.2d                                                                                         Page 11
Not Reported in F.Supp.2d, 2002 WL 2018824 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

was an available administrative procedure. Their failure to present any evidence on this point therefore precludes the entry of summary judgment in their favor on the exhaustion issue for these claims. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986) (noting that summary judgment is appropriate against a party who fails to present evidence on an issue on which it has the burden of proof at trial).

For these reasons, the court finds that there was no administrative remedy for Fatir to exhaust regarding the claims in Counts Five and Six. Therefore, Fatir need not comply with the PLRA's exhaustion requirements on these claims.

b. Did Fatir Substantially Comply with the Available Remedies?

The Court has determined that there was an administrative remedy available to Fatir for Counts Four and Eight. The next question is whether Fatir substantially complied with the available remedies. The court finds that he did not.

Generally, a court may find that an inmate has substantially complied with the available administrative remedies when the inmate has taken the grievance as far as he or she possibly can in the prison appeals process. *See Camp,* 219 F.3d at 281 (finding substantial compliance where inmate took grievance to "ultimate administrative authority"). In this case, Fatir's deposition testimony clearly establishes that he never filed a grievance with regard to the claims in Counts Four and Eight. Fatir's failure to file any grievance stands in stark contrast to taking a grievance as far as the grievance process will permit. Thus, the court is not inclined to find that he substantially complied with the available process.

The only argument Fatir might advance to excuse his lack of exhaustion is that he was told that he could not file a grievance regarding the seizure of his property. The court is not persuaded for two reasons. First, the terms of the grievance manual-which specially state that the prison can return property-contradict and would prevent any such "understanding." Moreover, although some courts have found substantial compliance where an inmate was told a claim was not grievable, *see Freeman, 2001 WL 515258, at *8,* this has generally only occurred where the prisoner actually files a grievance or some informal complaint and is subsequently told by the grievance board or some prison official that the claims are not grievable. *See id.* at *3 (noting that

inmate had made repeated requests for redress before being told that claim was not grievable). Indeed, as a matter of policy, it makes little sense to find substantial compliance where an inmate simply assumes that a claim is not redressable through the grievance procedure, without waiting for the grievance board or other prison officials to inform him or her that the complaint is indeed not redressable. To hold otherwise would permit inmates to satisfy exhaustion requirements based solely upon their own beliefs regarding prison procedures. Obviously, that is an unworkable solution, both for the prisons and the courts.

**\*15** For these reasons, the court finds that Fatir failed to substantially comply with, or exhaust, any of the available administrative remedies for Counts Four and Eight. Therefore, the court will dismiss these claims without prejudice until such time as Fatir has exhausted these claims.

IV. CONCLUSION

For all of the foregoing reasons, the court concludes that the motion to amend will be denied based on the plaintiff's undue delay and the resulting prejudice. Additionally, the defendants' motion for summary judgment is granted on the exhaustion issue as to Claims Four and Eight. It is, however, denied as to the exhaustion issue for all other claims. The motion is denied without prejudice in all other respects. This action will be stayed pending the plaintiff's exhaustion of his administrative remedies.

NOW, THEREFORE, IT IS HEREBY ORDERED that:
1. The Plaintiff's Motion for Leave to Amend (D.I.139) is DENIED.
2. The Defendants' Motion for Summary Judgment (D.I.128) is GRANTED with respect to the plaintiff's failure to exhaust his administrative remedies regarding Counts Four and Eight. These claims shall be DISMISSED without prejudice until such time as the plaintiff has exhausted his administrative remedies regarding these claims.
3. The summary judgment motion is DENIED in all other respects. This denial is without prejudice to the defendants' ability to refile this motion after the plaintiff has exhausted his remedies. However, the defendants may not reassert exhaustion as an affirmative defense as the court's decision today is *res judicata* on the exhaustion issue.
4. This action shall be STAYED until such time as the plaintiff has exhausted his administrative

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 2018824 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 12

remedies with respect to Counts Four and Eight.

D.Del.,2002.
Fatir v. Dowdy
Not Reported in F.Supp.2d, 2002 WL 2018824
(D.Del.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Page 1

Boudin v. Residential Essentials, LLC
S.D.Ala.,2007.
Only the Westlaw citation is currently available.
United States District Court,S.D. Alabama,Southern
Division.
Arthur Brian BOUDIN, etc., Plaintiff,
v.
RESIDENTIAL ESSENTIALS, LLC, etc., et al.,
Defendants.
Civil Action No. 07-0018-WS-C.

July 10, 2007.

George R. Irvine, III, Stone, Granade & Crosby, P.C.,
Daphne, AL, Earl P. Underwood, James Donnie
Patterson, Fairhope, AL, Kenneth J. Riemer, Mobile,
AL, for Plaintiff.
Gregory C. Cook, Balch & Bingham, Stephen James
Bumgarner, Burr & Forman LLP, Birmingham, AL,
for Defendants.

**ORDER**

WILLIAM H. STEELE, United States District Judge.
**\*1** This matter is before the Court on a motion to
dismiss and renewed motion to dismiss filed by
defendant Residential Essentials, LLC ("ATM").
(Docs.10, 27). The parties have filed briefs in support
of their respective positions, (Docs.10, 17, 18, 27, 33,
39), and the motions are ripe for resolution. After
carefully considering the foregoing and other relevant
materials in the file, the Court concludes that the
motions to dismiss are due to be granted in part and
denied in part.

**BACKGROUND**

The plaintiff originally sued only ATM. After ATM's
motion to dismiss was fully briefed, the plaintiff
amended his complaint as of right, modifying some
of his allegations against ATM and adding
Ameriquest Mortgage Company ("Ameriquest") as a
defendant. In response to the amended complaint,
ATM filed a renewed motion to dismiss.

According to the amended complaint, (Doc. 22), the
plaintiff obtained a residential mortgage from
Ameriquest, with ATM acting as closing agent. The
HUD-1 settlement statement ("HUD-1") reflects a

charge of $120 for "recording fees: mortgage," but
the actual recording fee charged by the Probate Court
of Baldwin County was $48, with ATM retaining the
difference. The amended complaint alleges that
ATM's conduct violated Section 8(b) of the Real
Estate Settlement Procedures Act ("RESPA"), 12
U.S.C. § 2607(b).[FN1]

> FN1. The amended complaint omits, and
> thus abandons, a claim under 12 U.S.C. §
> 2607(a) that was asserted in the original
> complaint. (Doc. 1 at 12).
> The amended complaint includes a class
> claim under Section 8(b). (Doc. 22 at 14-
> 15). Because ATM does not separately
> challenge the class claim, it is not addressed
> herein.

ATM argues that the plaintiff has failed to state a
claim under RESPA and that, in any event, his claim
is barred by the statute of limitations and not rescued
by equitable tolling.

**DISCUSSION**

"When considering a motion to dismiss, all facts set
forth in the plaintiff's complaint are to be accepted as
true and the court limits its consideration to the
pleadings and the exhibits attached thereto."
Grossman v. Nationsbank, N.A., 225 F.3d 1228, 1231
(11th Cir.2000) (internal quotes omitted).

**I. Section 8(b)-Recording Charge.**

Section 8(b) provides as follows:
(b) *Splitting Charges.* No person shall give and *no
person shall accept any portion,* split, or percentage
*of any charge* made or received for the rendering of a
real estate settlement service in connection with a
transaction involving a federally related mortgage
loan *other than for services actually performed.*

12 U.S.C. § 2607(b) (emphasis added).

Among the requirements for pleading a claim under
Section 8(b) is "an allegation that the portion of the
charge that [the defendant] retained was accepted
'other than for services actually performed,' i.e., that

[the defendant] performed no services that would justify its retention of a portion of the fee." *Sosa v. Chase Manhattan Mortgage Corp., 348 F.3d 979, 983 (11th Cir.2003).* ATM argues that the plaintiff has made no such allegation. (Doc. 10 at 3-4). The amended complaint, however, expressly alleges that "[n]o additional compensable work was performed by ATM ... in exchange for the fees charged in addition to the actual cost of the recording fee...." (Doc. 22, ¶ 18). This allegation-that ATM performed no services to justify its receipt of more than the $48 paid to the probate court-comfortably satisfies *Sosa.*

**\*2** ATM appears to argue that *Sosa* precludes the plaintiff from properly alleging that it provided no services justifying its retention of a portion of the fee. (Doc. 10 at 2-6). In *Sosa,* the defendant charged the plaintiff $50 for courier/messenger services, paid the delivery service a portion of the charge, and retained the remainder. 348 F.3d at 981. The Court found it "impossible to say that [the defendant] performed no services for which its retention of a portion of the fees at issue was justified," because it was "undisputed ... that [the defendant] arranged to have items delivered to complete the closing," and the defendant "benefitted the borrowers by arranging for third party contractors to perform the deliveries." *Id.* at 983-84.

Assuming without deciding that this portion of *Sosa* represents an alternate holding rather than dicta, it does not apply here. An essential predicate for the *Sosa* ruling was that the defendant's act of arranging for services to be performed by others was "undisputed." ATM alleges in brief that it arranged for recording the mortgage and so performed a service within the contemplation of *Sosa* and Section 8(b). (Doc. 10 at 5). That assertion is not, as ATM apparently believes, (Doc. 18 at 3), "undisputed" simply because not contradicted by the plaintiff in his briefs; since this matter is before the Court on motion to dismiss for failure to state a claim, the plaintiff was not required to challenge ATM's assertion on pain of dismissal.

The *Sosa* Court's conclusion that the defendant's arrangement for courier services was undisputed is unexplained but presumably based on an express admission by the plaintiff. ATM suggests that the original complaint contains just such an express admission. (Doc. 10 at 4-5). It bases this argument on the following snippets:
• ATM "is in the business of providing settlement services";
• As part of the closing process, ATM "is requested

by the lenders as a matter of course to perform certain settlement services with respect to each borrower";
• ATM "as a matter of course obtains settlement services from third party providers";
• ATM claims to "provide clients with a single-point outsource management company for all settlement services needs."

(Doc. 1, ¶¶ 1, 15-16). Without any analysis, ATM concludes that the plaintiff through these quotes admits that ATM arranged for the recording of the plaintiff's mortgage. All the quoted material alleges, however, is that ATM is in the business of providing settlement services and that it ordinarily provides such services through third parties. It cannot reasonably be read as an admission that ATM provided services specifically with respect to recording the plaintiff's mortgage.

Even could the quoted language support the construction ATM places on it, the plaintiff has filed an amended complaint, thereby superseding the original. *Dresdner Bank AG v. M/V Olympia Voyager,* 463 F.3d 1210, 1215 (11th Cir.2006).[FN2] "A superseded pleading is of course not a conclusive admission of the statements made therein...." *Borel v. United States Casualty Co.,* 233 F.2d 385, 387 (5th Cir.1956). While a superseded pleading can still be considered along with other evidence, *id.* at 387-88, the other evidence in this case includes the amended complaint, which both deletes the quoted language and explicitly alleges that ATM provided no services in connection with recording the mortgage. These modifications negate the possibility of an admission favorable to ATM.[FN3]

FN2. While the original pleading remains in play if the amended pleading "refers to or adopts" it, *Varnes v. Local 91, Glass Bottle Blowers Association,* 674 F.2d 1365, 1370 n. 6 (11th Cir.1982), the amended complaint here does not do so.

FN3. The only language in the amended complaint that ATM identifies as forming an admission that it arranged for the recording of the mortgage is the allegation that ATM "acted as the closing agent." (Doc. 27 at 6; Doc. 22, ¶ 6). This bland assertion merely identifies ATM's status in relation to the closing; it scarcely admits that ATM performed services with respect to recording the mortgage, and any such tendency would

Slip Copy                                                                                                          Page 3
Slip Copy, 2007 WL 2023466 (S.D.Ala.)
**(Cite as: Slip Copy)**

be overwhelmed by the explicit allegation that ATM did not do so.

**\*3** ATM next attempts to cast the plaintiff's claim as one for an "overcharge," of the sort recently rejected by this Court in *Morrisette v. Novastar Home Mortgage, Inc.,* 484 F.Supp.2d 1227 (S.D.Ala.2007). (Doc. 27 at 4-5). The plaintiff counters that he is complaining of a "markup." (Doc. 17 at 9).

In *Morrisette,* on which ATM relies, the Court defined a "markup" as occurring " 'when the provider outsources the task of providing the service to a third-party vendor, pays the vendor a fee for the service, and then, *without providing an additional service,* charges homeowners seeking mortgages a higher fee for the settlement service than that which the provider paid to the third-party vendor.' " 484 F.Supp.2d at 1229 (quoting *Kruse v. Wells Fargo Home Mortgage, Inc.,* 383 F.3d 49, 53 (2nd Cir.2004) (emphasis added). An "overcharge" was defined as " 'aris[ing] out of settlement services provided by the lender itself but charged to consumers seeking home mortgages for substantially more than the provider's cost.' " *Id.* (quoting *Kruse,* 383 F.3d at 53).

As noted, the amended complaint expressly alleges that "[n]o additional compensable work was performed by ATM ... in exchange for the fees charged in addition to the actual cost of the recording fee...." (Doc. 22, ¶ 18). On its face, this language alleges a markup: ATM paid the probate court $48 to record the mortgage but charged the plaintiff $120 "without providing an additional service ." [FN4]

> **FN4.** ATM believes that the amended complaint's usage of the adjective "additional" represents a concession that ATM did provide some service in connection with recording the mortgage. (Doc. 27 at 5). It plainly does not; both *Morrisette* and the amended complaint make clear that the failure to provide additional service is a failure to provide service in addition to services provided by the third party, not in addition to previous services provided by the defendant.
>
> ATM's throwaway suggestion that there can be no markup when the third party providing a service is a governmental entity rather than a private concern, (Doc. 27 at n. 3), slices too finely; in either case, the defendant pads another's bill without providing additional

services.

In sum, the plaintiff's Section 8(b) claim with respect to the mortgage recording fee states a claim upon which relief can be granted. The apparent unlikelihood that the plaintiff can actually establish that ATM performed "no services that would justify its retention of a portion of the fee" cannot change this conclusion. *Bell Atlantic Corp. v. Twombly,* 127 S.Ct. 1955, 1965 (2007) ("[A] well-pleaded complaint may proceed even if it appears that a recovery is very remote and unlikely.") (internal quotes omitted).

**II. Section 8(b)-Other Charges.**

The mortgage recording fee is plainly the focus of the amended complaint with respect to ATM, being mentioned at least eleven times and being made expressly part of the RESPA count. (Doc. 22, ¶ ¶ 1, 7, 16, 18, 20, 21, 24, 48, 51, 55, 59). There are, however, fleeting references to other charges as well, specific and generic. These culminate in the following allegation contained within the RESPA count: "Many of the fees listed above were marked up in violation of 12 U.S.C. § 2607(b), therefore, the charges, or a portion thereof, constituted charges for 'other than services actually performed' within the meaning of 12 U.S.C. § 2607(b)." (*Id.,* ¶ 47). ATM argues that the plaintiff has not adequately pleaded a cause of action with respect to any charge other than the mortgage recording fee, (Doc. 27 at 6-8), and the plaintiff offers no response.

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, [citations omitted], a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do [citations omitted]. Factual allegations must be enough to raise a right to relief above the speculative level...." *Twombly,* 127 S.Ct. at 1964-65. Paragraph 47 does not satisfy Rule 8(a)(2) or *Twombly* because it includes no factual material but merely attempts a formulaic recitation of elements. The question becomes whether earlier allegations supply the deficiency.[FN5]

> **FN5.** Following the RESPA count, the amended complaint includes certain nebulous allegations concerning charges by ATM for purposes of a class claim. (Doc. 22

at 11-15). These allegations are irrelevant to the plaintiff's individual claim, because the individual claim does not purport to incorporate them. At any rate, they are too vague to rescue the individual claim even were they incorporated therein.

**\*4** The HUD-1 includes over a dozen entries concerning ATM. The threshold problem with paragraph 47 is its failure to identify which of these are included in the phrase, "[m]any of the fees listed above." As it turns out, the only such fee "listed above" with respect to ATM is "abstracts [sic] title searches," (Doc. 22, ¶ 20),[FN6] for which ATM charged $265. (*Id.,* Exhibit 1).[FN7] Thus, only that charge is put in play by paragraph 47. The only allegation about the abstract/title search, however, is that the defendants misled the plaintiff by disseminating a fraudulent HUD-1 that was calculated to deceive him concerning who was providing the service and how the fee for it was being allocated. (*Id.*). What remains missing are allegations that the abstract/title search was performed by a third party, that the third party charged ATM (and ATM paid) less than $265, and that ATM provided no additional services justifying its retention of the difference.[FN8]

> **FN6.** The amended complaint mentions an "appraisal fee," (*id.,* ¶ 18), but this was a charge by Ameriquest. (*Id.,* Exhibit 1). The amended complaint mentions a "settlement or closing fee," "title search," "document preparation," "notary fees," "subordination rec. fees," and "deed recording fees," but they are listed for the purpose of showing that Ameriquest violated the Truth in Lending Act. (*Id.,* ¶¶ 8-10).

> **FN7.** The amended complaint also mentions a fee for "title examination," (Doc. 22, ¶ 24), but the HUD-1 shows that the plaintiff was not charged for a title examination. Moreover, and as with abstract/title searches, the amended complaint fails to make the necessary allegations to support a Section 8(b) claim concerning title examination fees.

> **FN8.** Paragraph 47's use of the phrase "marked up" cannot substitute for these allegations, given that the plaintiff used the term in the generic sense of "[a]n amount originally added to cost [or] an increase

above an originally established retail price." (Doc. 17 at 2 n. 1).

In sum, to the extent the plaintiff attempts to challenge charges other than the mortgage recording fee, his inadequate pleading shows that he has failed to state a claim upon which relief can be granted.

### III. Equitable Tolling.

"Any action pursuant to the provisions of section ... 2607 ... of this title may be brought ... within ... 1 year ... from the date of the occurrence of the violation...." 12 U.S.C. § 2614. The parties agree that the statute begins to run on the date of closing. (Doc 10 at 7; Doc. 17 at 9).[FN9] Closing occurred on or about October 6, 2005, (Doc. 22, ¶ 5), more than a year before the plaintiff filed suit on January 6, 2007. (Doc. 1). To avoid the statutory bar, the plaintiff invokes equitable tolling.

> **FN9.** This is in accord with the conclusion of the Fifth Circuit in *Snow v. First American Title Insurance Co.,* 332 F.3d 356, 359 (5th Cir.2003).

ATM first argues that equitable tolling is unavailable under Section 2614. (Doc. 10 at 8-9). The weight of authority appears to the contrary[FN10] but, absent a controlling case, the Court looks to more general principles. "Unless Congress states otherwise, equitable tolling should be read into every federal statute of limitations." *Ellis v. General Motors Acceptance Corp.,* 160 F.3d 703, 706 (11th Cir.1998); *accord Young v. United States,* 535 U.S. 43, 49 (2002). In *Ellis,* the Court held that the statute of limitations governing actions under the Truth in Lending Act ("TILA"), 15 U.S.C. § 1640(e), is subject to equitable tolling, given that TILA is a remedial statute designed to protect consumers against fraud and that it would be anomalous to reward defendants who disguise their fraud for a year. 160 F.3d at 707-08.

> **FN10.** *Compare Lawyers Title Insurance Corp. v. Dearborn Title Corp .,* 118 F.3d 1157, 1166 (7th Cir.1997) (equitable tolling applies); *Mullinax v. Radian Guaranty, Inc.,* 199 F.Supp.2d 311, 328 (M.D . N.C.2002) (same); *Pedraza v. United Guaranty Corp.,* 114 F.Supp.2d 1347, 1353 (N.D.Ga.2000) (same); *Kerby v. Mortgage Funding Corp .,*

Slip Copy                                                                                        Page 5
Slip Copy, 2007 WL 2023466 (S.D.Ala.)
**(Cite as: Slip Copy)**

992 F.Supp. 787, 793-96 (D.Md.1998)
(same); *Moll v. United States Life Title
Insurance Co.,* 700 F.Supp. 1284, 1286-89
(S.D.N .Y.1988) (same) *with Hardin v. City
Title & Escrow Co.,* 797 F.2d 1037, 1038
(D.C.Cir.1986) (equitable tolling does not
apply).

The reasoning of *Ellis* compels a similar result here.
First, both RESPA and TILA are "consumer
protection statute[s]." *Hardy v. Regions Mortgage,
Inc.,* 449 F.3d 1357, 1359 (11th Cir.2006); *Ellis,* 160
F.3d at 707. Second, the remedial purpose of RESPA
is at least as clear as under TILA. *Compare* 12 U.S.C.
§ 2601(a) ("[S]ignificant reforms in the real estate
settlement process are needed to insure that
consumers ... are provided with greater and more
timely information ... and are protected from
unnecessarily high settlement charges caused by
certain abusive practices ....") *with* 15 U.S.C. §
1601(a) ("It is the purpose of this subchapter to
assure a meaningful disclosure of credit terms so that
the consumer will be able to compare more readily
the various credit terms available to him and avoid
the uninformed use of credit, and to protect the
consumer against inaccurate and unfair credit billing
and credit card practices."), *quoted in Ellis,* 160 F.3d
at 708. Thus, under TILA, excluding equitable
tolling under RESPA "would lead to the anomalous
result that a statute designed to remediate the effects
of fraud would instead reward those perpetrators who
concealed their fraud long enough to time-bar their
victims' remedy." *Id.* Accordingly, the Court
concludes that equitable tolling is available under
RESPA.[FN11]

> **FN11.** The only court known to have held
> that Section 2614 is jurisdictional and thus
> not amenable to equitable tolling relied on
> the language of the provision, noting that it
> is "identical in all material respects" to
> TILA's limitations provision, including the
> heading of "jurisdiction of courts;
> limitations [on actions]." *Hardin,* 797 F.2d
> at 1039. Because the Eleventh Circuit has
> held that TILA's provision *is* subject to
> equitable tolling, the substantive identity of
> RESPA's provision weighs in favor of, not
> against, equitable tolling.

**\*5** ATM next argues that the conduct underlying
equitable tolling is a species of fraud that must be
pleaded with the particularity required by Rule 9(b).
(Doc. 10 at 9). Assuming for present purposes that

this a correct statement of law (ATM cites a single
district court for the proposition), the amended
complaint meets the standard.

ATM urges the Court to apply the test articulated in
*United States ex rel. Atkins v. McInteer,* 470 F.3d
1350 (11th Cir.2006), in which the Court stated that
"[p]articularity means that a plaintiff must plead facts
as to time, place, and substance of the defendant's
alleged fraud, specifically the details of the
defendant['s] allegedly fraudulent acts, when they
occurred, and who engaged in them." *Id.* at 1357
(internal quotes omitted). The amended complaint
alleges that ATM misled the plaintiff by
disseminating a HUD-1 that misrepresented that the
probate court's cost to record the mortgage was the
full $120 charge, when in fact it charged only $48,
with ATM pocketing the remainder. (Doc. 22, ¶¶ 7,
16, 20). The HUD-1 is distributed as part of closing,
which satisfies the temporal and locational
requirements.

ATM next argues that the plaintiff must also satisfy a
more pointed Rule 9(b) inquiry specific to claims of
equitable tolling, including facts supporting
allegations "that (1) the defendant engaged in a
course of conduct designed to conceal evidence of his
alleged wrongdoing; (2) the plaintiff was not on
actual or constructive notice of that evidence; and (3)
the plaintiff exercised due diligence; viz., the plaintiff
did not 'sleep on her rights.' " (Doc. 18 at 7 (quoting
*Pedraza v. United Guaranty Corp.,* 114 F.Supp.2d
1347, 1358 (S.D.Ga.2000))). Once again, the
amended complaint meets this mark, assuming for
the moment that it correctly captures controlling law.

The key is the HUD-1, which is made a part of the
amended complaint, and which the plaintiff alleges
was "calculated to deceive" him concerning the
distribution of the $120 mortgage recording fee.
(Doc. 22, ¶ 20). On eleven different lines, the title
charge is listed, followed by the words, "to ATM
Corporation of America." Thus, for example, line
1113 reads, "Courier Fee to ATM Corporation of
America-30.00." Line 1201, in contrast, reads,
"Recording Fees: Mortgage $120.00," with no
mention of ATM. A reasonable construction of the
HUD-1 is that ATM designed its selective use of the
"to ATM Corporation of America" language to
conceal evidence of its alleged improper retention of
$72 of the mortgage recording fee. The amended
complaint alleges that the plaintiff was not on notice
of ATM's wrongdoing, and it asserts that he exercised
due diligence in that he reviewed the HUD-1 and
other relevant loan documents and actively

Slip Copy, 2007 WL 2023466 (S.D.Ala.)
**(Cite as: Slip Copy)**

participated in all aspects of the loan transaction. (Doc. 22, ¶¶ 19, 23-24).

ATM insists that these plain, factually supported allegations are nevertheless inadequate because the probate court's recording charge is a matter of public record, thereby placing on the plaintiff the burden of pleading facts explaining how ATM concealed a public record, how he exercised due diligence to discover the public record, and how he can avoid being charged with constructive knowledge of its contents. (Doc. 18 at 7; Doc. 27 at 10). The threshold problem with this argument is its assumption that the public availability of recording fees is "undisputed." (Doc. 10 at 10). The point is not alleged in the amended complaint, and ATM has not invoked, much less established, the applicability of judicial notice. Thus, on this motion to dismiss the plaintiff has not been put to the test of disputing ATM's assertion. At any rate, the factual allegations already discussed dispose of ATM's argument; the HUD-1 was not merely silent as to the allocation of the $120, it was affirmatively misleading that the entire $120 represented the probate court's charge. Without argument or authority to the contrary-and ATM offers none-these allegations satisfactorily plead around the public availability of the probate court's recording fee.

**\*6** ATM's present "public record" argument is the successor to one made in its first brief but in none of the three filed since: that, as a matter of law, the public availability of probate court recording charges defeats equitable tolling. (Doc. 10 at 10). The fatal defects in this argument mirror those above. First, it is not undisputed for purposes of this motion that the recording charges are publicly available. Second, ATM offers no argument or authority for the proposition that such availability necessarily dooms the plaintiff's claim.

## CONCLUSION

For the reasons set forth above, ATM's motion to dismiss and renewed motion to dismiss are **granted** to the extent that the amended complaint attempts to challenge charges other than the mortgage recording fee. All such claims are **dismissed.** In all other respects, the motion to dismiss and renewed motion to dismiss are **denied.**

DONE and ORDERED.

S.D.Ala.,2007.

Boudin v. Residential Essentials, LLC
Slip Copy, 2007 WL 2023466 (S.D.Ala.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Bullock v. Rehrig Intern., Inc.
E.D.Va.,2006.
Only the Westlaw citation is currently available.
United States District Court, E.D. Virginia,
Richmond Division.
Cassandra BULLOCK, Plaintiff,
v.
REHRIG INTERNATIONAL, INC., Defendant.
**Civil Action Number 3:05CV697.**

May 10, 2006.

Henry W. McLaughlin, III, Marilynn Cole Goss, Central Virginia Legal Aid Society, Inc., Richmond, VA, for Plaintiff.

James Patrick McElligott, Jr., Mildred Alesia Bennett, McGuireWoods LLP, Richmond, VA, for Defendant.

### MEMORANDUM OPINION

JAMES R. SPENCER, Chief District Judge.

**\*1** THIS MATTER comes before the Court on Defendant Rehrig International, Inc.'s ("Rehrig") Motion for Summary Judgment. For the reasons to follow, Defendant's Motion for Summary Judgment is hereby GRANTED.

### I. Background

Rehrig manufactures shopping carts and material handling equipment at its Richmond, Virginia plant. Pl. Dep. at 27. Plaintiff, Cassandra Bullock worked in various departments at Rehrig, including a supervisory position in the material handling department. *Id.* at 27-28.

During the work day, Plaintiff interacted with many co-workers, including Linwood Alston, who delivered parts to the assembly departments by forklift. *Id.* at 28-29, 101. Plaintiff claims she had been having problems with Alston since August 2004. Alston had been picking on Plaintiff and calling her names. On one occasion, Alston drove by Plaintiff's work area singing a song using words such as: b----h and n-rs.FN1 Pl.Ex. 6. On another occasion, Plaintiff had placed some chassis in the middle of an entrance, because she wanted to find out where to put them. Alston allegedly stated "move that s-t out of the way." Pl.Ex. 6.

FN1. Specifically, Alston sang lyrics from a popular rap song, "b----hes ain't s-t, but wh-s, tricks, and n----rs."

On December 23, 2004, Plaintiff was working as a quality control inspector, inspecting products for material or manufacturing defects. Pl. Dep. at 28, 100. Plaintiff's co-worker, Henry Thomas was helping her move some heavy items. Alston was in the area, when Thomas asked him to use his forklift, he responded, "hell, no, you can't use my forklift to help that b-h" *Id.* at 61, Pl.Ex. 6. Plaintiff approached Alston and exclaimed "you ain't going to keep calling me out of my name." *Pl. Dep.* at 61. Alston invited Plaintiff to accompany her outside. *Id.* at 61-62. When Alston turned to walk outside with Plaintiff, Plaintiff grabbed Alston around the neck and scratched him with her fingernails. *Id.* at 62, 65-66.

Plaintiff received a copy of Rehrig's Employee Manual. Pl. Dep. 16. Rehrig's policy states:
Examples of harassment prohibited by this policy include but are not limited to:
• Unwelcome sexual flirtation, advances or proposition
• Sexually offensive remarks, as well as offensive remarks related to an individual's age, race, gender, color, religion, national origin, or disability

...

If you believe that you are being subjected to harassment, you must:
• Promptly report the incident to your manager, facilitator, or a member of Human Resources. If you are uncomfortable reporting to your manager, facilitator, or a member of Human Resources, report the conduct to another manager, President, or Vice President you feel comfortable with.
• If additional incidents occur, immediately report them to one of the above resources.
Any reported incident will be promptly investigated. Actions taken to resolve complaints will be handled as confidentially as possible, given Rehrig International's obligation to investigate and act upon reports of such harassment. If an incident is not

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                                                   Page 2
Slip Copy, 2006 WL 1303124 (E.D.Va.)
**(Cite as: Slip Copy)**

reported, Rehrig International has no way to know that you believe you are the subject of harassment and cannot reasonably be expected to take action.
**\*2** Retaliation of any kind against an employee who reports a suspected incident of harassment is prohibited. An employee who violates the policy or retaliates against an employee in any way will be subjected to disciplinary action up to and including termination.

Rehrig Int'l, Inc. Employee Manual. Pl.Ex. 3 at 12.

After the incident, Plaintiff's manager, Heather Stolper suspended Plaintiff from work while Senior Human Resources Generalist, Monica Patsel conducted an investigation into the incident. Patsel Dep. 8.

Patsel interviewed Scott Smith, a floor supervisor to whom Plaintiff complained about Alston. Patsel Dep. 16. Smith claimed that Plaintiff complained to him about Alston around October 2004. Plaintiff did not specify the nature of Alston's behavior. She told Smith, "[Alston was] working her nerves, he needed to stop playing with her." Def. Mot. Summ. J. Ex. A. at 10. Smith allegedly had not heard of any additional complaints regarding Alston's treatment of Plaintiff. In the investigation after the incident, Smith reported to Patsel, he "thought that the behavior had stopped." *Id.* Smith was not a manager at Rehrig. Plaintiff admits that she did not tell any other supervisor or manager at Rehrig that she was having any problem with Alston until after the December 23, 2004 altercation. Pl. Dep. 42, 46, 48-50.

Rehrig advised Plaintiff on December 28, 2004 of her termination for violating Rehrig's company policy banning physical altercations with other employees. Pl. Dep. 21-22. After the investigation, Defendant suspended Alston for several days for his actions toward Plaintiff.

Bullock timely filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). Within ninety (90) days of receiving a right to sue letter from the EEOC, on October 6, 2005, Bullock filed this suit against Rehrig alleging: (1) gender discrimination under Title VII of the Civil Rights Act of 1964 42 U.S.C. § 2000(e) et seq.; (2) sexual harassment creating a hostile work environment; and (3) retaliation against her because of her complaint of discrimination. Plaintiff has since abandoned her retaliation claim. On April 5, 2006, Rehrig filed a motion for summary judgment on all counts.

## II. Standard of Review

Under Rule 56(c), a motion for summary judgment may be granted "only if the pleadings, depositions, interrogatory answers, admissions, and affidavits show 'that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' " *Magill v. Gulf & W. Indus., Inc.,* 736 F.2d 976, 979 (4th Cir.1984) (quoting Fed.R.Civ.P. 56(c)); accord *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *E.E.O.C. v. Clay Printing Co.,* 955 F.2d 936, 940 (4th Cir.1992). "Where ... the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, disposition by summary judgment is appropriate." *United States v.. Lee,* 943 F.2d 366, 369 (4th Cir.1991) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)).

**\*3** The party moving for summary judgment always bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 323. Once a motion for summary judgment is properly made and supported, the opposing party then has the burden of showing that a genuine dispute as to any material fact does exist. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986). The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.

## III. Analysis

### A. Plaintiff's gender discrimination allegation

As amended by the Civil Rights Act of 1991, Title VII of the Civil Rights Act of 1964 provides, it is "an unlawful employment practice for an employer ... to discharge ... or otherwise discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's ... sex...." 42 U.S.C § 2000e-2(a)(1). To establish a prima facie case of gender discrimination under Title VII, Plaintiff must show: (1) that she is a member of a protected class; (2) that the prohibited conduct in which she engaged was comparable in seriousness to misconduct of employees outside the protected class; and (3) that the disciplinary measures enforced against her were

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                          Page 3
Slip Copy, 2006 WL 1303124 (E.D.Va.)
**(Cite as: Slip Copy)**

more severe than those enforced against those other employees. *Cook v. CSX Transp. Corp.,* 988 F.2d 507, 511 (4th Cir.1993). Plaintiff "may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *See Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 256 (1981) (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 804-05 (1973)). However, "the ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination." *Hill v. Lockheed Martin Logistics Mgmt.,* 354 F .3d 277, 286 (4th Cir.2004) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 153 (2000)). Plaintiff must produce sufficient evidence upon which a fact finder could conclude that the protected trait "actually played a role in the employer's decision making process and had a determinative influence on the outcome." *Hill,* 354 F.3d at 286 (quoting *Reeves,* 530 U.S. at 141).

Plaintiff is unable to establish a direct prima facie case for gender discrimination. She admits to physically assaulting Alston in violation of Rehrig's employee policy. Plaintiff admits that Alston did not retaliate. The facts are undisputed that Plaintiff's manager, Heather Stolper decided to terminate Plaintiff's employment due to her physical attack on Alston. It is also undisputed that other employees, including male employees were discharged from employment after engaging in physical altercations. Plaintiff herself stated that she was aware of others who had engaged in physical altercations, and were fired. Plaintiff does not prove that the disciplinary action taken against her was any more severe than that taken against similarly situated employees.

**\*4** Plaintiff is also unable to make an indirect prima facie case of gender discrimination. She does not dispute Rehrig's legitimate nondiscriminatory reason for her termination. Plaintiff admits to receiving Rehrig's company handbook, and to knowledge that violence in the workplace is grounds for termination. She does not rebut Rehrig's reason for her termination by showing it is unworthy of credence, and her prima facie case of gender discrimination fails as a matter of law.

**B. Plaintiff's hostile work environment claim**

Title VII prohibits sexual harassment that is

"sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 64 (1986) (internal citation omitted). To establish sexual harassment amounting to a hostile work environment, a plaintiff must prove: "(1) unwelcome conduct; (2) that is based on the plaintiff's sex; (3) which is sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive working environment; and (4) which is imputable to the employer." *Conner v. Schrod-Bridgeport Int'l, Inc.,* 227 F.3d 179, 192 (4th Cir.2000). Plaintiff is unable to satisfy each of the requirements to make a prima facie claim for a hostile work environment. In particular, Plaintiff's claim fails on the fourth prong, since she is unable to impute any knowledge to Defendant.

**1. Unwelcome conduct**

It is undisputed that Alston's conduct toward Plaintiff was unkind and unwelcome. She had complained that Alston would call her names, refer to her as a "b----h" when talking to other people, and sing lyrics with profane words in her presence. Plaintiff testified during her deposition that she believed some of Alston's behavior was in reaction to her turning him down for a date. Alston's alleged behavior was inappropriate, and unwelcome but may not have been sufficient to make a prima facie case of gender-based hostile work environment.

**2. Harassment based on gender**

Under the second prong, Defendant contends that Plaintiff has not established proof that Alston's harassment was based on her gender. "A trier of fact may reasonably find discrimination ... when a female victim is harassed in such sex-specific and derogatory terms ... as to make it clear that the harasser is motivated by general hostility to the presence of women in the workplace." *Ocheltree v. Scollon Prods., Inc.,* 335 F.3d 325, 331-32 (4th Cir.2003) (en banc) (internal citation omitted). In recounting her interaction with Alston to Defendant, Plaintiff alleged Alston referred to her as a "b-h," and on another occasion, sang a song with explicit lyrics degrading women in her presence. There is no evidence that Alston sang the song with the intent to harass Plaintiff *because of her sex.* The Plaintiff must demonstrate that the harassing conduct was not merely 'tinged with offensive sexual connotations,'

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                      Page 4
Slip Copy, 2006 WL 1303124 (E.D.Va.)
**(Cite as: Slip Copy)**

but actually constituted discrimination because of her sex. *Oncale v. Sundowner Offshore Svcs., Inc.,* 523 U.S. 75, 79, 80 (1980) (citation omitted). The critical issue is "whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Id.* at 80. Plaintiff testified that Alston tended to make inappropriate remarks to co-workers of both genders. She said that he tended to "lash out, cuss all over the place," and "call people out of their names" and that he did that to "[e]verybody, including male co-workers Henry Thomas and his own brother." Whether Alston's conduct constitutes sexual harassment based on gender to support a claim under Title VII is a fact specific inquiry that the Court need not resolve, as the Plaintiff's claim fails for other reasons.

### 3. Harassment sufficiently severe or pervasive

**\*5** Assuming the incidents about which Plaintiff complains do amount to gender-motivated discrimination, Plaintiff must prove that the harassment is sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment. *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 67 (1986). Plaintiff has identified a few isolated incidents that actually occurred. Plaintiff must perceive her environment to be hostile, and in addition, a "reasonable person" in her position must also find that the work environment was objectively abusive. *Cox v. Rumsfeld,* 369 F.Supp.2d 748, 758 (E.D.Va.2005). Alston's conduct was certainly childish and offensive. Regardless of the nature and extent of any harassment, Plaintiff fails to meet the fourth prong of the prima facie claim.

### 4. Whether Alston's harassment was imputable to Rehrig

Alston's harassment of Plaintiff cannot be imputed to Rehrig since Plaintiff did not follow Rehrig's complaint procedures and her Complaint to a floor supervisor did not make specific allegations about Alston's conduct. An "employer cannot be held liable for isolated remarks for its employees unless the employer 'knew or should have known of the harassment, and took no effectual action to correct the situation.' " *Spicer v. Virginia,* 66 F.3d 705, 710 (4th Cir.1995) (quoting *Katz v. Doyle,* 709 F.2d 251, 256 (4th Cir.1983)). Plaintiff admits to being aware of Rehrig's harassment policy and complaint

procedures. The policy provided that employees should report conduct to their own facilitator, manager, or Human Resources representative. Although Plaintiff admits in her deposition that Plaintiff's Manager, Heather Stolper and Senior Human Resources Generalist, Monica Patsel would have taken prompt action on Alston's conduct, she stated she did not request their help because she "did not want to get [Alston] in trouble." Unfortunately, Plaintiff's good nature has cost her. It is clear that had Plaintiff made a clear, formal complaint, and the company took no action, the knowledge would be imputed to the company. Plaintiff understood the system that was in place, but chose not to use it. Since Plaintiff failed to follow Rehrig's complaint procedure, Rehrig cannot be liable for Alston's behavior. *See Dowdy v. North Carolina,* 23 Fed. Appx. 121, 124 (4th Cir.2001) (holding where Plaintiff told a supervisor outside of her and aggressor's chain of command in spite of the directive of the policy manual, Defendant was not liable for the aggressor's actions). After the incident, once Defendant learned of Alston's behavior, it took prompt action against him.

Although Plaintiff did not tell her supervisor or Alston's supervisor, of Alston's actions pursuant to Rehrig's policy. Instead, she told Scott Smith, a floor supervisor, that Alston was "calling her out of name." It is undisputed that Smith was a supervisor at Rehrig, however since Smith was not a supervisor to either Plaintiff or Alston, Plaintiff's complaint to Smith does not fall within Rehrig's policy. Even if Smith was a direct supervisor in accordance with Rehrig's policy, Plaintiff's vague complaint to Smith that Alston was "calling her out of name" is not enough to put the Defendant on notice that Plaintiff believed she was subject to sexual harassment. Plaintiff's claims of misconduct to Smith raised issues of what appeared to be a personal conflict, rather than sexual harassment. Plaintiff is unable to prove the fourth prong of a prima facie case of a hostile work environment, and any alleged harassment cannot be imputed to the Defendant.

### C. Plaintiff's Retaliation Claim

**\*6** Although Plaintiff alleged a claim for retaliation in her Complaint, she has voluntarily abandoned her claim of retaliation. Summary Judgment is hereby entered against Plaintiff on this issue.

### IV. Conclusion

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                    Page 5
Slip Copy, 2006 WL 1303124 (E.D.Va.)
**(Cite as: Slip Copy)**


Plaintiff's claims of sexual discrimination, hostile work environment, and retaliation under Title VII fail as a matter of law. Accordingly, Rehrig's Motion for Summary Judgment is hereby GRANTED. An Appropriate Order shall issue.

E.D.Va.,2006.
Bullock v. Rehrig Intern., Inc.
Slip Copy, 2006 WL 1303124 (E.D.Va.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Shotzberger v. State of Delaware Dept. of Correction
D.Del.,2004.
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
Colleen SHOTZBERGER, Plaintiff,
v.
STATE OF DELAWARE DEPARTMENT OF
CORRECTION, an agency of the State of Delaware,
Paul Howard, individually and in his official capacity
and Stan Taylor, in his official capacity, Defendants.
**No. Civ.A. 03-151 JJF.**

Jan. 30, 2004.

Thomas S. Neuberger, of Thomas S. Neuberger,
P.A., Wilmington, Delaware. Martin Duane Haverly,
of Martin D. Haverly, Attorney at Law, Wilmington,
Delaware, for Plaintiff.
Gregg E. Wilson, C. Cullen Rooney, of State of
Delaware Department of Justice, Wilmington,
Delaware, for Defendants.

*MEMORANDUM OPINION*
FARNAN, J.
**\*1** Presently before the Court is the Motion For
Summary Judgment filed by Defendants. (D.I.31.)
For the reasons discussed below, the Court will grant
in part and deny in part Defendants' Motion.


BACKGROUND

I. Facts


Plaintiff initiated the instant lawsuit alleging the
Defendants discriminated against her based upon her
gender in violation of the Civil Rights Act of 1964,
1991, and the Fourteenth Amendment of the United
States Constitution. Specifically, Plaintiff alleges that
the Defendants made the decision not to promote her
to the position of Inmate Classification Administrator
("Classification Administrator") based on her gender,
and promoted a less qualified male employee,
Anthony Redina. Plaintiff alleges that the direct and
circumstantial evidence surrounding her denial of
promotion reveals that the only credible rationale for
the Defendants' action is that they denied her the
promotion to Classification Administrator for illegal

discriminatory reasons.


II. Parties' Contentions


Defendants contend that Plaintiff cannot satisfy,
under a pretext theory of discrimination, her prima
facie burden of discrimination. Specifically,
Defendants contend that Plaintiff cannot provide
evidence that similarly situated males were treated
more favorably than her because two male applicants
that applied for the position Plaintiff sought were
ranked less favorably than Plaintiff. Addressing
Plaintiff's mixed motive claim, Defendants contend
Plaintiff cannot provide direct evidence of
discrimination. Defendants contend that comments
made by Defendant Howard about Plaintiff's
appearance are not direct evidence of discrimination.
Further, Defendants contend that Plaintiff cannot
establish a pattern or practice of discrimination
because a similarly situated male, William Post, was
not promoted to the position Plaintiff sought. In other
words, Defendants contend that advancement at the
Delaware Department of Corrections (the "DOC")
was equally difficult for both males and females.
Defendants also contend that Plaintiff's Fourteenth
Amendment claim should be dismissed because
Plaintiff cannot establish that she was denied
substantive or procedural due process, the existence
of a suspect classification, nor provide any evidence
that Defendants' promotion decision was motivated
by discrimination or that it evidences discriminatory
results. Defendants Taylor and Howard, citing
*Sheridan v. EI Dupont de Numours & Co.,* 100 F.3d
1061, 1078 (3d Cir.1996), contend that Plaintiff's
Title VII claims against them, in their individual
capacities, must fail because Congress did not intend
for individual liability under Title VII. In addition,
Defendants contend that Plaintiff's Section 1983
claims against the state and its officials are barred by
the Eleventh Amendment and that Defendant Howard
is protected by qualified immunity.

In response, Plaintiff contends that under the
standards provided by *Fuentes v. Penskie,* 32 F.3d
759 (3d Cir.1994), she has established a prima facie
case of discrimination. Plaintiff contends that the
evidence establishes that she is a member of a
protected class, that she was qualified for the position
she sought, and that a male was treated more
favorably than her because a male was promoted to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 2
Not Reported in F.Supp.2d, 2004 WL 758354 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

the position she was denied. Further, Plaintiff contends that disputes over the elements of the prima facie case are properly deferred to the pretext stage of the *McDonnell Douglas* burden shifting analysis. Plaintiff concedes that Defendants have proffered several legitimate non-discriminatory reasons for their promotion decision; however, Plaintiff contends that evidence she has adduced demonstrates that each of the Defendants' non-discriminatory reasons for their decisions are pretextual. Plaintiff also contends that Defendants mischaracterize various aspects of her complaint. She contends that her complaint does not allege that any individual is liable under Title VII and that she only named the state as a defendant for the purpose of recovering attorneys' fees and costs. Finally, Plaintiff contends that Defendant Howard is not entitled to qualified immunity because it was not reasonable for him to believe that it was lawful to discriminate against an individual based upon her gender.

STANDARD OF REVIEW

**\*2** Rule 56(c) of the Federal Rules of Civil Procedure provides that a party is entitled to summary judgment if a court determines from its examination of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," that there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In determining whether there is a triable dispute of material fact, a court must review all of the evidence and construe all inferences in the light most favorable to the non-moving party. *Goodman v. Mead Johnson & Co., 534 F.2d 566, 573 (3d Cir.1976).* However, a court should not make credibility determinations or weigh the evidence. *Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000).* Thus, to properly consider all of the evidence without making credibility determinations or weighing the evidence the "court should give credence to the evidence favoring the [non-movant] as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.' " *Id.*

To defeat a motion for summary judgment, Rule 56(c) requires the non-moving party to:
do more than simply show that there is some metaphysical doubt as to the material facts.... In the language of the Rule, the non-moving party must come forward with "specific facts showing that there is a genuine issue for trial." ... Where the record

taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is "no genuine issue for trial."

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U .S. 574, 586-87 (1986).* Accordingly, a mere scintilla of evidence in support of the non-moving party is insufficient for a court to deny summary judgment. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).*

DISCUSSION

By their Motion (D.I.31), Defendants ask the Court to grant summary judgment on 1) Plaintiff's pretext and mixed motive discrimination claims; 2) Plaintiff's Title VII claims against individual defendants; and 3) Plaintiff's Section 1983 claims against the State of Delaware and its employees in their official capacities. Defendants also request the Court to conclude, as a matter of law, that Defendant Howard is entitled to qualified immunity.

I. Whether Defendants Are Entitled To Summary Judgment On Plaintiff's Prexext Discrimination Claim

When addressing pretext discrimination claims, courts utilize the *McDonnell Douglas* burden shifting analysis. This burden shifting involves three steps: 1) the plaintiff has the initial burden of establishing a prima facie case of discrimination; 2) if the plaintiff meets his or her burden, the burden shifts to the defendant to articulate some legitimate non-discriminatory rationale for his or her action; and 3) if a defendant proffers a non-discriminatory reason, the burden shifts again to the plaintiff to prove by a preponderance of the evidence that the reasons proffered by the defendant are merely a pretext for illegal discrimination. See *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 801-05 (1973); Chandler v. City of Newark, 2001 WL 902209 at \*2 (D.Del. July 31, 2001)* (quoting *Texas Dep't of Comm. Affairs v. Burdine, 450 U.S. 248, 252-53 (1973)*). Defendants contend that Plaintiff has not established her prima facie case of gender discrimination and that she has failed to adduce evidence sufficient to demonstrate that their employment decision was not based on legitimate non-discriminatory reasons.

A. *Whether Plaintiff Has Established Her Prima*

Not Reported in F.Supp.2d                                                                                    Page 3
Not Reported in F.Supp.2d, 2004 WL 758354 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

*Facie Case Of Gender Discrimination*

**\*3** "The burden of establishing a prima facie case of [discrimination] is not onerous." *Texas Dep't of Comm. Affairs v. Burdine,* 450 U.S. 248, 253 (1981). The facts necessary to establish the elements of a prima facie case of discrimination will necessarily vary from case to case because of differing factual scenarios. *McDonnell Douglas,* 411 U.S. at 802 n. 13. In the facts of the instant case, in order to establish her prima facie case of gender discrimination, Plaintiff must provide evidence that 1) she is a member of a protected class; 2) she applied for a position for which she was qualified; and 3) she was treated less favorably than an individual outside of her protected class. *See EEOC v. L.B. Foster Co.,* 123 F.3d 746 (3d Cir.1997) (citing *McDonnell Douglas,* 411 U.S. at 802)).

Defendants contend that Plaintiff has failed to establish the third prong of her prima facie case of discrimination because other males applying for the same position as Plaintiff were ranked less favorably than Plaintiff. Applying the quantum of proof provided by *McDonnell Douglas* and in construing all inferences in favor of the non-moving party, the Court disagrees.

As noted above, the burden of establishing a prima facie case of discrimination is not "onerous." *Burdine,* 450 U.S. at 253. A plaintiff must merely present evidence sufficient to allow a reasonable factfinder to conclude that she or he was treated less favorably than others because of their gender. *Idimarco v. Runyon,* 190 F.3d 151, 163 (3d Cir.1999). The Court concludes that Plaintiff met this burden by producing evidence of her qualifications for the Class Administrator position compared to those of Mr. Redina, and, that despite her purported superior qualifications, she was denied the promotion. In addition, the Court notes that it is not persuaded by Defendants' contention that evidence of other male employees who the Defendants ranked less favorably than Plaintiff for the Classification Administrator position defeats Plaintiff's prima facie case because Plaintiff is alleging only that she was more qualified than Mr. Redina, who according to Warden Williams (A-109) was the only comparable male employee. For these reasons, the Court concludes that Plaintiff has met her burden of establishing a prima facie case of discrimination.

*B. Whether Plaintiff Has Provided Evidence To Rebut Defendants' Legitimate Non-Discriminatory*

*Reason For Its Employment Decision*

As indicated above, once a plaintiff establishes a prima facie case of discrimination, the burden shifts to the employer to proffer a legitimate non-discriminatory rationale for its employment decision. Defendants put forth various reasons for their decision to promote Mr. Redina and not Plaintiff, including: 1) Mr. Redina served more recently as Acting Classifications Administrator; 2) Mr. Redina has more extensive field and institutional experience; and 3) Mr. Redina's greater experience and success with the Point Base Classification System ("PBCS") and the Delaware Automated Computer System ("DACS"). Therefore, for Plaintiff to survive summary judgment, she must point to some evidence that would allow a reasonable factfinder to infer that Defendants' non-discriminatory reasons were "either ... post hoc fabrication[s] or otherwise did not actually motivate the employment action." *Fuentes v. Perskie,* 32 F.3d 759, 764 (3d Cir.1994) (citations omitted). In other words, a plaintiff must do more than demonstrate that the employer's promotion decision was "wrong or mistaken," *id.* at 765, but offer evidence sufficient to persuade reasonable minds that his or her evidence of pretext is more credible than the employer's justifications. *Iadimarco v. Runyon,* 190 F.3d at 166 (citing *White v. Westinghouse Elec. Co.,* 862 F.2d 56, 62 (3d Cir.1989), *abrogated on other grounds, Hazen Paper Co. v. Biggins,* 507 U.S. 604 (1993)). After reviewing the record evidence offered by Plaintiff in light of the summary judgment standard of review, the Court concludes that Plaintiff has produced evidence sufficient to raise a genuine issue of material fact as to whether Defendants' proffered justifications are pretextual and not the actual reason for their promotion decision. *Sheridan v. E.I. DuPont de Nemours & Company,* 100 F.3d 1061, 1067 (3d Cir.1996).

**\*4** Plaintiff directs the Court to evidentiary exhibits to rebut Defendants' justification for their promotion decision. The Court will not recite the evidence Plaintiff contends establishes pretext, but does note that if the factfinder were to accept Plaintiff's version of the facts he or she could reasonably conclude that Defendants' decision was not based on the non-discriminatory reasons they identified. Some of the evidence Plaintiff points to includes her superior qualifications, particularly her educational achievements [FN1] and more than ten years of seniority over Mr. Redina, evidence that no other female employees have been promoted at DOC to positions with a pay grade of nineteen or higher, testimony that

Not Reported in F.Supp.2d                                                                                                                     Page 4
Not Reported in F.Supp.2d, 2004 WL 758354 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

it was "difficult for a female to get a fair shake" with promotions at DOC (D.I. 35 at B-286), testimony that Defendant Howard made a sexual comment toward her during her interview and allegedly referred to female employees as "honey" and "sweetheart," and evidence potentially demonstrating inconsistencies, implausibilities, and contradictions with Defendants' justifications for their promotion decision. The Court concludes that this evidence, viewed under the summary judgment standard of review, creates a genuine issue of disputed material fact as to whether Defendants' proffered reasons were the actual reasons for their employment action. *See Sheridan,* 100 F.3d at 1067. Accordingly, the Court will deny Defendants' motion for summary judgment on Plaintiff's pretext discrimination theory.

FN1. Plaintiff has a master's degree while Mr. Redina has a bachelor's degree.

## II. Whether Defendants Are Entitled To Summary Judgment On Plaintiff's Mixed Motive Discrimination Claim

In their opening brief, Defendants contend that they are entitled to summary judgment on Plaintiff's mixed motive discrimination claim because Plaintiff has failed to produce evidence that " 'directly reflects a discriminatory attitude.' " (D.I. 32 at 19) (quoting *Starceski v. Westinghouse Elec. Corp.,* 54 F.3d 1089, 1096 (3d Cir.1995). In her opposition brief (D.I.34), Plaintiff does not oppose Defendants' contention that they are entitled to judgment on her mixed motive claim. This lack of response prompts the Defendants to conclude that Plaintiff has abandoned her mixed motive claim and that summary judgment should be granted.

The Court is unclear as to whether Plaintiff has abandoned her mixed motive claim, so the Court will grant Defendants' motion. However, if the Court has misunderstood Plaintiff's position, the Court will permit Plaintiff to provide a detailed response to Defendants' papers.

## III. Whether Plaintiff's Claims Against The State Of Delaware and State Officials Are Barred By The Eleventh Amendment

Defendants contend that the State of Delaware and its employees in their official capacities are entitled to summary judgment on Plaintiff's Section 1983 claim because the Eleventh Amendment provides them

immunity in such actions. However, after reviewing Plaintiff's amended complaint (D.I.9) and the applicable law, the Court finds that Plaintiff's joinder of the State of Delaware and its employees acting in their official capacities is permitted for the limited purpose of seeking attorneys' fees and costs. As Plaintiff contends, this approach is permissible under the principles of *Hutto v. Finney,* 437 U.S. 678 (1978), and *Missouri v. Jenkins by Agyie,* 491 U.S. 274 (1989).[FN2]

FN2. Defendants also contend that Plaintiff is impermissibly attempting to sue various Defendants individually under Title VII. However, a review of Plaintiff's amended complaint (D.I.9) reveals that Plaintiff has not sued any individuals under Title VII.

## IV. Whether Defendant Howard Is Entitled To Qualified Immunity

**\*5** A public official is entitled to qualified immunity if the official's conduct does not violate clearly established statutory or constitutional rights that a reasonable person would have known. *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982); *Good v. Dauphin County Social Servs. for Children & Youth,* 891 F.2d 1087, 1092 (3d Cir.1989). In order for a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640 (1987).

In the instant case, the parties do not contest that if Defendant Howard made the decision not to promote Plaintiff because of a discriminatory animus toward women that he would not be entitled to qualified immunity. However, the parties dispute whether Defendant Howard discriminated against Plaintiff in making his decision not to promote her. Defendants contend that Defendant Howard followed the appropriate guidelines and procedures in concluding that Mr. Redina was the better choice for promotion. Defendants also contend that the absence of a discriminatory attitude toward women is demonstrated by Defendant Howard's past endorsement of Plaintiff in her petition for a pay increase in 1997. In response, Plaintiff contends that Defendant Howard's credibility on this issue is questionable because of his alleged sexist comments about women and because his purported rationale for selecting Mr. Redina over Plaintiff is inconsistent with the duties of a Classification Administrator. The

Not Reported in F.Supp.2d, 2004 WL 758354 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

disagreements about Defendant Howard's credibility and conduct are disputes concerning material issues of fact, and therefore, the Court must deny summary judgment because a determination regarding qualified immunity "depends upon the factfinder's evaluation of [Defendant Howard's] conduct." *Clarke v. City of Philadelphia,* 1994 WL 388559 at *6 (E.D.Pa. July 27, 1994) (citation omitted); *see also Cruz v. Pennridge Reg'l Police Dep't,* 2003 WL 21742015 at *10 (E.D.Pa. July 29, 2003).

CONCLUSION

For the reasons discussed, Defendants' Motion For Summary Judgment (D.I.31) will granted in part and denied in part. An appropriate Order will be entered.

*ORDER*

At Wilmington, this 30th day of January, 2004, for the reasons discussed in the Memorandum Opinion issued this date;

IT IS HEREBY ORDERED that:
1) Defendants' Motion For Summary Judgment (D.I.31) is *GRANTED* on Plaintiff's Mixed Motive Claim (Count II);
2) Defendants' Motion For Summary Judgment (D.I.31) is *DENIED* in all other respects.

D.Del.,2004.
Shotzberger v. State of Delaware Dept. of Correction
Not Reported in F.Supp.2d, 2004 WL 758354 (D.Del.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.