# UNREPORTED CASES

Westlaw.

Slip Copy                                                                                                    Page 1
Slip Copy, 2007 WL 119987 (E.D.Pa.)
**(Cite as: Slip Copy)**

Agrizap, Inc. v. Woodstream Corp.
E.D.Pa.,2007.
Only the Westlaw citation is currently available.
United States District Court,E.D. Pennsylvania.
AGRIZAP, INC.
v.
WOODSTREAM CORP., et al.
**Civil Action No. 04-3925.**

Jan. 9, 2007.

Kate M. Neiswender, K M Neiswender Law Office,
Ventura, CA, David J. Kessler, Drinker Biddle &
Reath LLP, Thomas S. Farnish, Larrimore & Farnish,
LLP, Philadelphia, PA, for Agrizap, Inc.
Abraham C. Reich, Theodore H. Jobes, David H.
Colvin, Fox Rothschild O'Brien & Frankel LLP,
Philadelphia, PA, Harvey B. Jacobson, Jr., Michael
R. Slobasky, Philip L. O'Neill, Jacobson Holman
PLLC, Washington, DC, for Woodstream Corp., et
al.

*MEMORANDUM*
ROBERT F. KELLY, Sr. J.
**\*1** On December 6, 2006, Plaintiff filed a motion to
allow the late designation of an expert on damages.
The Defendant opposes this request and the matter is
now before the Court for decision.

On February 14, 2005, this Court adopted the
scheduling order submitted by the parties. Among
many other things, the order required the parties to:
designate all expert witnesses by July 29, 2005; serve
reports from retained experts by September 16, 2005;
and closed expert discovery by December 19, 2005.
Therefore, the pending request by the Plaintiff comes
approximately 17 months after expert designations
were due; 15 months after expert reports were due;
and 12 months after the close of expert discovery.

Plaintiff had, in a timely fashion, identified a damage
expert, Wayne Lorch and served his expert report on
September 15, 2005. His deposition was taken on
November 17, 2005. The following are excerpts from
that deposition.
Q. Okay. What were you engaged to do on or about
August 17?
A. To provide an opinion as to the damages of
Woodstream allegedly not honoring a licensing or

distribution agreement with AgriZap to distribute its
product.

Lorch Dep. p. 10.Q. And isn't it true that your report
purports to estimate a damages-estimate damages for
breach of contract?
A. Yes.

Lorch Dep. p. 62.Q. Okay. Now, do you know what
damages are allowable for patent infringement?
A. I'm somewhat familiar with it.
Q. You're somewhat. Were you when you made this
report?
A. Yes.
Q. Okay. What damages are allowable?
A. Are you implying that this report has damages
related to the patent infringement?
Q. I'm asking you. Does it?
A. No.
Q. Okay. It only relates to the breach of contract,
right?
A. Correct.

Lorch Dep. pgs. 67 & 68.A. My understanding of
patent losses are that they have to be actual economic
damages.
Q. Once a court enters an injunction, there are no
future losses, are there?
A. If the injunction says don't sell them anymore,
correct.
Q. Right. And that's why your report can't relate to
patent damages, right, because it goes out to 2010?
A. It-that would seem fair. That wasn't-that was
beyond the scope of my involvement in the case, but-
Q. Why did you decide to limit your report to
contract damages?
A. Based on the information that was-that we had at
the time the report was drafted, I wasn't asked to do
any other sort of damage assessment.
Q. Okay, so you weren't asked to do a damage
assessment with respect to the alleged trade
disparagement, were you?
A. Not for the purposes of this report.
Q. Nor the alleged fraudulent misrepresentations,
right?
A. Same answer.
Q. Nor the alleged statutory unfair competition right?
A. Same answer.
Q. Okay. And you don't intend to, do you?
A. That's actually a question that would be more
properly stated to Counsel, based on what the status

Slip Copy                                                                                                    Page 2
Slip Copy, 2007 WL 119987 (E.D.Pa.)
**(Cite as: Slip Copy)**

of the discovery is currently.
**\*2** Q. Okay. Do you know what the status of discovery is?
A. No, I do not.
Q. You haven't been asked to render opinions as to damages on patent infringement, trade disparagement, statutory unfair competition, or fraudulent misrepresentation, right?
A. Not at this time.
Q. Okay. So the answer is "yes," not at this time, correct?
A. Could you read back the question.
Q. I'll recite it.
You haven't been asked to opine with respect to damages on any cause of action other than breach of contract, right?
A. At this time, that's correct.

Lorch Dep. pgs. 70 to 72.

How could anyone attending the above deposition think that Mr. Lorch was a damage expert as to patent damages? How could the plaintiff think it had designated a patent damage expert after hearing that testimony? If the defense had not filed the motion to exclude the damage report and testimony of Wayne D. Lorch (Doc. No. 59), and Mr. Lorch had been called as a witness at trial, what could he have said with reference to patent damages in view of the above deposition testimony?

The point I make is, it was not this Court's decision on May 20, 2006 granting Defendants' motion to exclude Lorch which first told the Plaintiff it did not have an expert as to patent damages, it was Mr. Lorch in his deposition of November 17, 2005 who told the Plaintiff it did not have an expert on patent damages.

Under Rule 16(b) the moving party must show that despite its diligence, it could not reasonably have met the scheduling order deadline. *Wyeth v. Teva Pharmaceuticals USA, Inc.,* 2005 U.S. Dist. LEXIS 40055 at \* 9 (D.N.J.) (citation omitted); *see* 6A Wright, Miller, & Kane, *Federal Practice and Procedure:* Civil 2d § 1522.1, at p. 231 (1990). Rule 16(b)'s " 'good cause' standard primarily considers the diligence of the party seeking the amendment .... The focus of the inquiry is upon the moving party's reasons for seeking modification .... If that party was not diligent, the inquiry should end." *Johnson v. Mammoth Recreations, Inc.,* 975 F.2d 604, 609 (9th Cir.1992) (citations omitted).

Agrizap has not made the required showing.

Agrizap's failure to act until now is due to a lack of diligence which precludes relief. *See Johnson v. Mammoth Recreations, Inc., supra,* 975 F.2d at 609 (carelessness is not compatible with a finding of diligence and offers no reason for a grant of relief).

It cannot be said that this failure is harmless because the designation of a new expert would trigger a time consuming pretrial process. A new expert report would have to be prepared and served. This would have to be reviewed by the Defendants' expert and the possible deposition of the new expert.

For the foregoing reasons we enter the following Order.

*ORDER*

**AND NOW,** this 9th day of January, 2007, upon consideration of the motion of Plaintiff Agrizap, Inc. to allow late designation of an expert on damages, (Doc. No. 107) and the opposition of Defendant Woodstream Corp. thereto, and all other pertinent matters of record, it is hereby **ORDERED** that the motion is **DENIED.** It is further **ORDERED** that Agrizap is precluded from offering the testimony of Glenn Newman at the trial in this cause.

E.D.Pa.,2007.
Agrizap, Inc. v. Woodstream Corp.
Slip Copy, 2007 WL 119987 (E.D.Pa.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                                                                    Page 1
Slip Copy, 2006 WL 1286186 (M.D.N.C.)
**(Cite as: Slip Copy)**

H

Alpha Iota Omega Christian Fraternity v. Moeser
M.D.N.C.,2006.
Only the Westlaw citation is currently available.
United States District Court,M.D. North Carolina.
ALPHA IOTA OMEGA CHRISTIAN
FRATERNITY, an unincorporated association;
Trevor J. Hamm, an individual; and Carlon D.
Myrick, an individual, Plaintiffs,
v.
James MOESER, Chancellor of the University of
North Carolina at Chapel Hill; Richard T. Williams,
Chairman and member, Board of Trustees of the
University of North Carolina at Chapel Hill; Nelson
Schwab III, Vice Chairman and member, Board of
Trustees of the University of North Carolina at
Chapel Hill; Jean Almand Kitchin, Secretary and
member, Board of Trustees of the University of
North Carolina at Chapel Hill; Timothy B. Burnett;
Philip G. Carson; Russell M. Carter; John G.B.
Ellison, Jr.; Paul Fulton, Jr.; Karol V. Mason; Roger
L. Perry, Sr.; A. Donald Stallings; Robert W.
Winston III; members, Board of Trustees of the
University of North Carolina at Chapel Hill; Jonathan
Curtis, Assistant Director of Student Affairs and
Organizations, University of North Carolina at
Chapel Hill; Molly Corbett Broad, President,
University of North Carolina; J. Bradley Wilson,
Chair and member, Board of Governors of the
University of North Carolina; J. Craig Souza, Vice
Chairman and member, Board of Governors of the
University of North Carolina; Patsy B. Perry,
Secretary and member, Board of Governors of the
University of North Carolina; Bradley T. Adcock; G.
Irvin Aldridge; James G. Babb; Brent D. Barringer; J.
Addison Bell; R. Steve Bowden; F. Edward
Broadwell, Jr.; William L. Burns, Jr.; Anne W. Cates;
John F.A.V. Cecil; Bert Collins; John W. Davis III;
Ray S. Farris; Dudley E. Flood; Hannah D. Gage;
Willie J. Gilchrist; H. Frank Grainger; Peter D. Hans;
Peter Keber; Adelaide Daniels Key; G. Leroy Lail;
Charles H. Mercer, Jr.; Charles S. Norwood; Cary C.
Owen; Jim W. Phillips, Jr.; Gladys Ashe Robinson;
Estelle "Bunny" Sanders; Priscilla P. Taylor; Robert
F. Warwick, members, Board of Governors of the
University of North Carolina; each in their official
capacities, Defendants.
**No. 1:04CV00765.**

May 4, 2006.

Benjamin W. Bull, Jordan W. Lorence, Alliance
Defense Fund Law Center, Scottsdale, AZ, David A.
French, Columbia, TN, Jeffrey A. Shafer, Alliance
Defense Fund, Washington, DC, Robert Michael
Schmidt, Laurinburg, NC, for Plaintiffs.
John P. Scherer, II, Thomas J. Ziko, N.C. Department
of Justice, Raleigh, NC, for Defendants.

*MEMORANDUM OPINION*
BULLOCK, District Judge
**\*1** This matter is before the court on Defendants'
Second Motion to Dismiss Complaint and Suggestion
of Mootness (filed May 25, 2005) and Plaintiffs'
Motion for Leave to File Amended Complaint (filed
June 20, 2005). For the reasons set forth below,
Defendants' motion will be granted and Plaintiffs'
motion will be denied.

FACTS

Plaintiff Alpha Iota Omega Christian Fraternity
("AIO") is an unincorporated student organization at
the University of North Carolina at Chapel Hill
("UNC-CH"), which is one of several universities in
the publicly-funded University of North Carolina
system. The individual Plaintiffs, Trevor J. Hamm
and Carlon D. Myrick, are [FN1] UNC-CH students and
members or officers of AIO. Plaintiffs' goal is to
"uphold the Great Commission of Jesus Christ by
serving members of Greek letter organizations
through evangelism and mentorship." (Compl.¶ 64.)
AIO is governed by a constitution, by-laws, and a
statement of faith.

> FN1. The individual Plaintiffs' status as full-
> time undergraduate students may have
> changed since the complaint was filed. *See*
> n. 21, *infra.*

Defendant James Moeser is the Chancellor of UNC-
CH. The other Defendants are the Assistant Director
of Student Affairs and Organizations at UNC-CH,
members of UNC-CH's Board of Trustees, and
officers and members of the Board of Governors of
the University of North Carolina. Each of the
Defendants is sued in his or her official capacity
only. (Compl.¶ 59.)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                        Page 2
Slip Copy, 2006 WL 1286186 (M.D.N.C.)
**(Cite as: Slip Copy)**

UNC-CH requires student organizations to apply for official recognition on an annual basis in order to receive certain benefits such as funding, inclusion in university publications, use of the UNC-CH name, and the right to reserve campus facilities and equipment. (Compl.¶ 81.) Until recent changes, which will be addressed below, UNC-CH required all officially recognized student organizations to agree that membership "be open without regard to age, race, color, national origin, religion, disability, veteran status, or sexual orientation." (Compl.¶ 85.) Student organizations that did not agree to the non-discrimination policy would be permitted to exist on campus, but would not be officially recognized by the university.

AIO was an officially recognized student organization for "a number of years" (and had agreed to the non-discrimination policy) prior to September 2003. (Compl.¶ 96.) In September 2003, AIO notified UNC-CH that it would no longer agree to the non-discrimination policy "to the extent those policies conflicted with the requirement that all AIO members and officers adhere to a Christian statement of faith, adhere to tenets of belief, and conform to certain standards of conduct." (Compl.¶ 99.) Plaintiffs objected to the portions of the non-discrimination policy concerning religion and sexual orientation.[FN2] They argued that they should not have to agree to admit all applicants, regardless of their religion or sexual orientation, because persons of certain religions and certain sexual orientations hold beliefs, pursue goals, and maintain standards of conduct that necessarily conflict with AIO's beliefs, goals, and standards of conduct.[FN3] Plaintiffs say that if they were required to admit persons of all religions and sexual orientations "[i]t would contradict AIO's expressive and associational purpose" of "promoting the Christian faith to men belonging to fraternities at UNC-CH." (Compl.¶¶ 68, 72.)

FN2. Plaintiffs do not object to the provisions forbidding discrimination on the basis of age, race, color, national origin, disability, or veteran status. (Compl. ¶ 108 & Ex. 2, Sec. 1(a).)

FN3. The standards contained in AIO's governing documents cannot be set forth here in their entirety. Among them are: "Individuals that aspire to be members of AIO must swear to live their lives in a way that is holy and acceptable to GOD by the grace and empowerment of our Lord Jesus Christ and His Holy Spirit." (Compl.Ex. 3, p. 5.) "Among AIO's Christian standards of conduct is the belief that Christian standards of conduct limit sexual conduct to that which takes place in a marriage between one man and one woman." (Compl.¶ 73.) "Accordingly, individuals who engage in sexual conduct outside of marriage, whether heterosexual or homosexual, are not permitted to be members or officers of AIO." (Compl.¶ 75.)

**\*2** According to Plaintiffs, after their refusal to agree to the non-discrimination policy, UNC-CH withdrew AIO's official recognition,[FN4] removed AIO's information from the university website, and froze AIO's student activities fund account.[FN5] (Compl.¶ 101-04.) Despite lack of official recognition, AIO was still included in the UNC-CH 2004 Greek Life recruitment book and on the UNC-CH Greek affairs website. Plaintiffs continued to pursue their goals on campus, maintain AIO's website (which was advertised by UNC-CH in its publications and on its website), reserve meeting space at the university, and access AIO's student activities fund account. (Donald E. Luse Aff. ¶¶ 3-5, 15-17; Deborah Horne Aff. ¶¶ 2-6; Jonathan Curtis Aff. ¶¶ 12-16, Nov. 15, 2004.) AIO never requested student activity fee funding, even when it was an officially recognized organization. (Horne Aff. ¶ 7.)

FN4. More accurately, AIO was denied official recognition for the 2003-04 academic year, per the annual application process. (Donald E. Luse Aff. ¶¶ 9, 10, 12.) Plaintiffs did not apply for official recognition for 2004-05.

FN5. Defendants deny that AIO's account was ever "frozen" and assert that, even when AIO was not officially recognized, it was free to withdraw its funds at any time and that AIO did in fact use the account in the spring of 2004. (Deborah Horne Aff. ¶¶ 2-6.)

In their lawsuit, filed August 25, 2004, Plaintiffs seek official recognition at UNC-CH, free from those provisions of the non-discrimination policy which require AIO to be open to all interested students regardless of religion or sexual orientation. (Compl.¶ 106.) Plaintiffs invoke their constitutional rights to form a group with persons who share their beliefs and to practice and evangelize their religion on campus as

"secured by the First and Fourteenth Amendments to the Constitution." (Compl.¶¶ 114, 120, 125.) They allege that their religious beliefs, goals and purpose fundamentally conflict with those held by persons of certain religions and sexual orientations. Thus, Plaintiffs conclude that the provisions of the non-discrimination policy that require AIO to be open to all religions and sexual orientations violate their constitutional rights to "freedom of association for expressive purposes," "freedom of speech," and "free exercise of their religion." (*Id.*)

Plaintiffs pray for a preliminary and permanent injunction forbidding Defendants from applying the non-discrimination policy to AIO and a declaratory judgment that the non-discrimination policy is either facially unconstitutional or unconstitutional as applied. (Compl.21.) Other than this equitable relief, the complaint seeks only attorneys' fees and costs. No compensatory or nominal damages are sought.[FN6]

> **FN6.** Although the title of the pleading is "Verified Complaint for Injunctive and Declaratory Relief and Nominal Damages," the complaint does *not* state a claim for nominal damages.

When Plaintiffs pursued their motion for a preliminary injunction (briefed in November 2004 and heard in February 2005) they argued, and this court agreed, that there is a significant difference between discriminating on the basis of one's *beliefs* (which is permitted) and one's *status* (which is not permitted). (Pls.' Reply Br. in Supp. Mot. for Prelim. Inj. 3-5.[FN7]) Because the non-discrimination policy, on its face, may have prohibited the exclusion of potential members on *either* basis, the court was satisfied that application of the policy (as written, although perhaps not as interpreted by the university) to Plaintiffs would violate their rights as guaranteed by the First and Fourteenth Amendments. In order to protect Plaintiffs' constitutional rights and to allow Defendants time to revise or clarify the policy, this court entered an Order and Preliminary Injunction on March 2, 2005. That Order enjoined Defendants from applying the non-discrimination policy "to prohibit Plaintiffs from limiting membership and participation in their organization to students who, upon individual inquiry, affirm that they support Plaintiffs' goals, agree with Plaintiffs' beliefs, and agree to conform their behavior to Plaintiffs' tenets and standards of conduct." The Order ensured that AIO would be treated like non-religious student organizations at UNC-CH, in that they too could limit membership to

those who shared their beliefs and would support their goals.

> **FN7.** In briefs and during oral argument on the pending motions, Plaintiffs' new counsel attempted to discredit the distinction made by Plaintiffs' original counsel and called it "incoherent." New counsel claimed that one "cannot separate status from belief." (*See also* Pls.'s Mem. in Reply to Defs.' Opp'n to Leave to File Am. Complaint 17.) The court disagrees and maintains that Plaintiffs' earlier argument was correct; although beliefs and status often overlap, they are "two distinct concepts-religion as a set of beliefs and religion as a status." (Pls.' Reply Br. in Supp. of Mot. for Prelim. Inj. 3.)

**\*3** There have been two important developments since the March 2, 2005 Order: (1) on May 23, 2005, UNC-CH published a statement entitled "Official Recognition of Student Organizations-Non-Discrimination Policy," which offered official recognition to "student organizations that select their members on the basis of commitment to a set of beliefs,"[FN8] and (2) in September 2005, Plaintiffs applied for and received official recognition, entitling them to full and equal privileges at UNC-CH for the 2005-06 academic year. (James Moeser Aff. ¶¶ 6 & 7, May 25, 2005; Jonathan E. Curtis Aff. ¶ 3, March 7, 2006 ("Second Curtis Aff.").) Thus, AIO is currently enjoying the benefits of official recognition, including having money in a student activities fund account, reserving meeting space in the student union, and being listed on the university's website. (Second Curtis Aff. ¶¶ 4-6.)

> **FN8.** The May 2005 statement reads, in pertinent part:
> To be eligible for official recognition from the University-and the privileges that accompany official recognition-a student co-curricular organization must abide by the following:
> 1. Membership and participation in the organization must be open to all students without regard to age, race, color, national origin, disability, religious status or historic religious affiliation, veteran status, or sexual orientation. Membership and participation in the organization must also be open without regard to gender, unless exempt under Title IX.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                                    Page 4
Slip Copy, 2006 WL 1286186 (M.D.N.C.)
(Cite as: Slip Copy)

2. Student organizations that select their members on the basis of commitment to a set of beliefs (e.g., religious or political beliefs) may limit membership and participation in the organization to students who, upon individual inquiry, affirm that they support the organization's goals and agree with its beliefs, so long as no student is excluded from membership or participation on the basis of his or her age, race, color, national origin, disability, religious status or historic religious affiliation, veteran status, sexual orientation, or, unless exempt under Title IX, gender.

Defendants do not agree that this statement is new or different from the policy it published and/or applied to student organizations in 2003. They refer to it as a clarification or an interpretation of the prior policy. (Defs.' Mem. 1.) The court declines to characterize the May 2005 statement and will instead refer to it as "the 2005 Policy" and will refer to the policy as it was written at the commencement of this suit as "the 2003 Policy."

On May 25, 2005, Defendants filed their Second Motion to Dismiss Complaint and Suggestion of Mootness, arguing that the recent developments resolved Plaintiffs' claims and mooted the case. Plaintiffs opposed Defendants' motion and, after the deadline to file such motions, filed a Motion for Leave to File Amended Complaint.[FN9] For the reasons set forth below, Defendants' motion will be granted and Plaintiffs' motion will be denied.

FN9. Plaintiffs' motion to amend was filed on June 20, 2005, after the June 9, 2005 deadline set in the parties' Joint Rule 26(f) Report. (*See* Report ¶ 5(b); Order Approving Joint Rule 26(f) Report, May 5, 2005.)

DISCUSSION

I. *Motion to Dismiss Will Be Granted*

This court has jurisdiction to adjudicate actual cases and controversies only. U.S. Const. art. III, § 1 *et seq.; Powell v. McCormack,* 395 U.S. 486, 496-97, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969). In order to maintain jurisdiction, "an actual controversy must be extant at all stages of review, not merely at the time

the complaint is filed." *Arizonans for Official English v. Ariz.,* 520 U.S. 43, 67, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997). A case becomes moot when the issues presented are no longer "live" or when the parties no longer hold a personal stake or cognizable interest in the outcome. *Powell,* 395 U.S. at 496-97. When a case becomes moot, the court must dismiss for lack of subject matter jurisdiction. *U.S. Parole Comm'n v. Geraghty,* 445 U.S. 388, 397, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980).

Despite the resolution of all issues between the parties in this case and the relative success for Plaintiffs, Plaintiffs are not satisfied. They oppose Defendants' Second Motion to Dismiss and Suggestion of Mootness and do not accept Defendants' voluntary change in policy and grant of official recognition to AIO as a resolution of the case. In order to avoid mootness, Plaintiffs first argue that Defendants' "litigation-provoked change" in policy does not moot the case because the university could easily revert to the old policy. Second, Plaintiffs contend that the case is not moot because they have filed a motion for leave to amend the complaint, which will be addressed in part II of this opinion.

A. *The Defendants' Voluntary Actions Moot the Case*

In *Friends of the Earth, Inc. v. Laidlaw Env'tl Servs., Inc.,* 528 U.S. 167, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000), the Supreme Court held " '[a] case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.' The 'heavy burden of persua[ding]' the court that the challenged conduct cannot reasonably be expected to start up again lies with the party asserting mootness." *Id.* at 189 (citations omitted). Thus, before finding that this case is mooted by Defendants' voluntary issuance of the 2005 Policy and granting of official recognition to AIO, it is the court's obligation to be sure that Defendants cannot reasonably be expected to revert to the 2003 Policy.

**\*4** It is true that, although the 2005 Policy was posted on the main university website as soon as it was announced in May 2005, UNC-CH did *not* immediately update all of its web-pages, links and templates to reflect the 2005 Policy.[FN10] It was during this time of flux when some pages were updated, but others were not (the summer of 2005), when Plaintiffs filed their Opposition to Defendants' Second Motion to Dismiss and Suggestion of Mootness ("Pls.' Opp'n"). Plaintiffs argued then that

the inconsistencies, in conjunction with UNC-CH's habit of changing its interpretation of the 2003 Policy, showed that "[i]t is not 'absolutely clear' that the University would stick with its updated policy, nor is there anything therein that would preclude it from abandoning its latest terminology once this case would be dismissed." (Pls.' Opp'n 5.) Plaintiffs urged the court to retain jurisdiction in order to rule on the unconstitutionality of the 2003 Policy and to enjoin Defendants from applying it to Plaintiffs.

> FN10. UNC-CH maintains two main websites that are relevant here, www.unc.edu and www.carolinaunion.com, each containing several statements of and/or links to the university's non-discrimination policy.

However, even if Plaintiffs' concerns were valid as of the summer of 2005 (which the court does not decide), the current situation is very different. The court takes judicial notice that all relevant UNC-CH websites, links, applications and templates for student organizations now contain the 2005 Policy only. Fed.R.Evid. 201(b)(2) & 201(f). The 2003 non-discrimination policy, about which Plaintiffs brought suit, is now gone. Defendants have made the 2005 Policy as public and as permanent as possible and Plaintiffs are officially recognized for the 2005-06 academic year. Defendants have done much more than merely "promise not to commit similar violations in the future." *United States v. W.T. Grant Co.*, 345 U.S. 629, 634, 73 S.Ct. 894, 97 L.Ed. 1303 (1953). They have changed the policy and have granted AIO official recognition under the 2005 Policy. There is no "reasonable expectation that the same complaining party would be subjected to the same action again," *Murphy v. Hunt*, 455 U.S. 478, 482, 102 S.Ct. 1181, 71 L.Ed.2d 353 (1982), and the possibility that another person may suffer harm in the future is insufficient to avoid mootness. *Weinstein v. Bradford*, 423 U.S. 147, 149, 96 S.Ct. 347, 46 L.Ed.2d 350 (1975). "The purpose of an injunction is to prevent future violations." *W.T. Grant*, 345 U.S. at 633. To be entitled to an injunction Plaintiffs would have to show that such relief is still needed by showing "some cognizable danger of recurrent violation, something more than the mere possibility." *Id.*

Although there is a remote possibility that Defendants could be acting in bad faith and could, as soon as the lawsuit is ended, change all of the forms and websites back to the 2003 Policy and revoke

AIO's official recognition, the court believes that such a development is unlikely and that Defendants can and should be trusted to abide by the 2005 Policy.[FN11] Defendants have met their burden of persuasion and this case must be dismissed. *See Princeton Univ. v. Schmid*, 455 U.S. 100, 103, 102 S.Ct. 867, 70 L.Ed.2d 855 (1982) (per curiam) (when university substantially amended the regulation which plaintiff claimed violated his constitutional rights, "the issue of the validity of the old regulation is moot, for this case has 'lost its character as a present, live controversy of the kind that must exist if we are to avoid advisory opinions on abstract questions of law.' ") (*quoting Hall v. Beals*, 396 U.S. 45, 48, 90 S.Ct. 200, 24 L.Ed.2d 214 (1969)); *Murphy*, 455 U.S. at 484; *Weinstein*, 423 U.S. at 149; *W.T. Grant*, 345 U.S. at 635.

> FN11. *See, e.g., United States v. Or. State Med. Soc'y*, 343 U.S. 326, 334, 72 S.Ct. 690, 96 L.Ed. 978 (1952) (finding "not the slightest reason to doubt the genuineness, good faith or permanence of the changed attitude and strategy of these defendant-appellees," as evidenced by "an overt and visible reversal of policy, carried out by extensive operations which have every appearance of being permanent").

B. *The 2005 Policy Protects the Rights of the Parties*

**\*5** There is no merit to Plaintiffs' contention that "the policy has not been changed in a manner that rescues it from unconstitutionality." (Pls.' Opp'n 2.) On the contrary, the court finds that the 2005 Policy (quoted in footnote 8, *supra* ) is an acceptable and thoughtful balance of the interests of the Defendants to foster diversity, safeguard academic freedom, encourage intellectual discourse, and discourage discrimination and disruption at UNC-CH, on the one hand, with the interests of Plaintiffs to organize with like-minded students to participate in an evangelical Christian student organization on campus, on the other hand.

The 2005 Policy incorporates Plaintiffs' own request that a distinction be made between a prospective member's religious *beliefs* (which is a permissible grounds on which to grant or deny membership) and a prospective member's religious *status* (which is not a permissible ground on which to grant or deny membership).[FN12] The 2005 Policy makes clear that AIO (and all other student organizations at UNC-CH) may exclude persons who do not agree with the goals and beliefs of the organization. That is the right

Plaintiffs sought in their lawsuit and they have it now.[FN13] The 2005 Policy also makes clear, as it should, that student organizations that select their members on the basis of commitment to a set of beliefs, must ask prospective members individually about their commitment to the organization's beliefs and goals, must honor a person's honest responses to such questions, and may not pre-judge any applicant based on his reputation, status, appearance, or heritage.[FN14] To the extent Plaintiffs would suggest that they have a constitutional right to pre-judge prospective members based on any of these "status" indicators, they are wrong and the court rejects that position.[FN15] *Boy Scouts of Am. v. Dale,* 530 U.S. 640, 653, 120 S.Ct. 2446, 147 L.Ed.2d 554 (2000) (organization may not "erect a shield against anti-discrimination laws simply by asserting that mere acceptance of a member from a particular group would impair its message").

FN12. *See* Pls.' Reply Br. in Supp. Mot. for Prelim. Inj. 3; *see also Healy v. James,* 408 U.S. 169, 181, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972) ("Among the rights protected by the First Amendment is the right of individuals to associate to further their personal beliefs."); *Gay Alliance of Students v. Matthews,* 544 F.2d 162, 165 (4th Cir.1976) (the First Amendment right of individuals to "associate to further their personal beliefs" "is furthered if those who may wish to join GAS are encouraged by the fact of [official recognition] to take that step"); *Seaborn v. Coronado Area Council, Boy Scouts of Am.,* 257 Kan. 178, 891 P.2d 385 (Kan.1995) (scouts may exclude from position of leadership an atheist who was unwilling to profess a belief in a supreme being), *cited with approval in Boy Scouts of Am. v. Dale,* 530 U.S. 640, 653-54, 657 n. 3, 120 S.Ct. 2446, 147 L.Ed.2d 554 (2000) (an "expressive organization" has a First Amendment right to exclude persons whose message and conduct would "propound a point of view contrary to its beliefs," but may not "erect a shield against antidiscrimination laws simply by asserting that mere acceptance of a member from a particular group would impair its message").

FN13. "AIO desires official recognition" and seeks permission to enforce its by-laws which provide that "due to the explicit Christian purposes and tenets on which this organization is founded, members shall be selected according to standards set by the organization, in accordance with the statement of faith." (Compl.¶ ¶ 67, 105.)

FN14. The court offered this theoretical example at oral argument: A student who Plaintiffs have known to be a member of the Jewish community applies for membership in AIO. Plaintiffs are not permitted to exclude that person indiscriminately, based on assumptions about his beliefs and behaviors. Instead, the 2005 Policy requires Plaintiffs to ask that student whether he can affirm that he "supports the organization's goals" and "agrees with its beliefs." If he answers "yes" (assuming the answer is given honestly), that person cannot be excluded because of his "religious status or historic religious affiliation," *i.e.,* he cannot be excluded simply because he may be Jewish. Once admitted, he may thereafter be held to AIO's standards of conduct and internal rules. If he answers "no," Plaintiffs may exclude him on *that* basis. Exclusion in that case is permitted under the 2005 Policy because it is not "on the basis of his religious status or historic religious affiliation," but on the basis of his inability or unwillingness to support AIO's goals and agree with its beliefs.

FN15. The prayer for judgment states that Plaintiffs seek the right to "discriminate on the basis of religion or sexual orientation." (Compl.21.) Plaintiffs have made it clear during briefing and oral arguments that what they mean by that is that they seek the right to limit membership to those persons who agree with Plaintiffs' beliefs and will support AIO's goals. Plaintiffs do not wish to summarily refuse someone whose beliefs and commitments align with theirs, regardless of that person's label.

In addition to what the 2005 Policy says about Plaintiffs' rights and responsibilities, it also properly sets forth the rights and responsibilities of Defendants. UNC-CH must grant official recognition to students who wish to organize with others who share their beliefs in pursuit of common goals, even if the university disagrees with those beliefs and goals. *Healy v. James,* 408 U.S. 169, 187, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972) (under the First Amendment, "mere disagreement of the [college]

President with the group's philosophy affords no reason to deny it recognition"). UNC-CH may not force its student groups to espouse the same anti-discrimination message that the university has adopted for itself. *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.,* 515 U.S. 557, 579, 115 S.Ct. 2338, 132 L.Ed.2d 487 (1995) ("While the law is free to promote all sorts of conduct in place of harmful behavior, it is not free to interfere with speech for no better reason than promoting an approved message or discouraging a disfavored one, however enlightened either purpose may strike the government.").[FN16] The university may still pursue its goals of discouraging discrimination, encouraging diversity, and fostering the free exchange of ideas by recognizing student groups that support various religious beliefs and contrasting views concerning homosexuality. *Bd. of Regents of Univ. of Wis. Sys. v. Southworth,* 529 U.S. 217, 233, 120 S.Ct. 1346, 146 L.Ed.2d 193 (2000) ("The University may determine that its mission is well served if students have the means to engage in dynamic discussions of philosophical, religious, scientific, social, and political subjects in their extracurricular campus life outside of the lecture hall.") The key is that the university must protect all students' First Amendment rights by maintaining "viewpoint neutrality in the allocation of funding support" and "may not prefer some viewpoints to others." *Id.; see also Rosenberger v. Rector and Visitors of Univ. of Va.,* 515 U.S. 819, 828-29, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995). In other words, UNC-CH must allow all student organizations to limit membership according to shared beliefs and common goals, regardless of whether they are social, religious or political, and regardless of whether they are in line with the university's beliefs and goals.[FN17]

FN16. However, UNC-CH is not required to recognize all applicants. It could refuse to recognize a student group that acted unlawfully and posed a threat of material disruption to the campus, or a group that refused to adhere to reasonable regulations concerning the time, place and manner in which student groups must exercise their free speech rights. *Healy,* 408 U.S. at 189, 192-93. Those factors are not present here.

FN17. This is subject, of course, to reasonable restrictions, as discussed in footnote 16, *supra. See also United States v. Albertini,* 472 U.S. 675, 687-88, 105 S.Ct. 2897, 86 L.Ed.2d 536 (1985) ("Application

of a facially neutral regulation that incidentally burdens speech satisfies the First Amendment if it 'furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.' ") (quoting *United States v. O'Brien,* 391 U.S. 367, 377, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968)).

**\*6** Thus, because the 2005 Policy strikes the right balance between the competing rights and responsibilities of the parties, it is consistent with the Supreme Court's directive that:
First Amendment rights must always be applied "in light of the special characteristics of the ... environment" in the particular case. And, where state-operated educational institutions are involved, this Court has long recognized "the need for affirming the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools." Yet, the precedents of this Court leave no room for the view that, because of the acknowledged need for order, First Amendment protections should apply with less force on college campuses than in the community at large. Quite to the contrary, "[t]he vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." The college classroom with its surrounding environs is peculiarly the "marketplace of ideas," and we break no new constitutional ground in reaffirming this Nation's dedication to safeguarding academic freedom.

*Healy,* 408 U.S. at 180-81 (citations omitted). Plaintiffs' inexplicable inability or refusal to understand the 2005 Policy does not require the continuation of a moot case.[FN18]

FN18. Plaintiffs call the 2005 Policy "utterly confounding," "circular and inexplicable." (Pls.' Mem. in Reply to Defs.' Opp'n to Leave to File Am. Compl. 16-17.) However, Plaintiffs argued in favor of the distinction between belief and status, before they argued against it. *See* n. 7, *supra.*

The court must consider the claims that were asserted (not what might have been asserted) when deciding whether a live case or controversy exists. In this case,

Slip Copy                                                                                                 Page 8
Slip Copy, 2006 WL 1286186 (M.D.N.C.)
**(Cite as: Slip Copy)**

Plaintiffs asked for equitable relief which has either been voluntarily granted by Defendants (freedom from application of the 2003 Policy) or rendered moot by the changed circumstances (a declaratory judgment that the 2003 Policy is unconstitutional). The 2003 Policy is no longer the policy of UNC-CH. It cannot threaten or harm Plaintiffs and this court would be engaging in purely advisory, theoretical analysis if it were to enter a declaratory judgment on the constitutionality of a non-existent policy. *Lewis v. Continental Bank Corp., 494 U.S. 472, 479, 110 S.Ct. 1249, 108 L.Ed.2d 400 (1990)* ("Even in order to pursue the declaratory and injunctive claims ... Continental must establish that it has a 'specific live grievance' against the application of the statutes ... and not just an 'abstract disagreemen[t]' over the constitutionality of such application.") (citations omitted).

Given AIO's current status as an officially recognized student organization and Defendants' adoption of the 2005 Policy, the court is unable to find a current case or controversy between the parties.[FN19] In the words of the Supreme Court:

> [FN19.] Plaintiffs made no claim for monetary damages for any alleged past injury. Although Plaintiffs sought recovery of their costs, expenses, and attorneys' fees under 42 U.S.C. § 1988(b), that claim fails for the reasons set forth in Part III, *infra*. Even if Plaintiffs had a valid claim for attorneys' fees, it would be insufficient to create an Article III case or controversy and dismissal would still be appropriate. *Lewis, 494 U.S. at 480* ("Where on the face of the record it appears that the only concrete interest in the controversy has terminated, reasonable caution is needed to be sure that mooted litigation is not pressed forward, and unnecessary judicial pronouncements on even constitutional issues obtained, solely in order to obtain reimbursement of sunk costs."); *Diamond v. Charles, 476 U.S. 54, 70-71, 106 S.Ct. 1697, 90 L.Ed.2d 48 (1986)* (appellate court lacked jurisdiction and suit challenging constitutionality of state statute must be dismissed when only remaining issue concerned attorney's fees because the "fee award is wholly unrelated to the subject matter of the litigation, and bears no relation to the statute whose constitutionality is at issue here. It is true that, were the Court to resolve the case on the merits against

appellees, appellees would no longer be 'prevailing parties' entitled to an award of fees under 42 U.S.C. § 1988. But the mere fact that continued adjudication would provide a remedy for an injury that is only a byproduct of the suit itself does not mean that the injury is cognizable under Art. III.").

Under Article III of the Constitution, federal courts may adjudicate only actual, ongoing cases or controversies. To invoke the jurisdiction of a federal court, a litigant must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision. Article III denies federal courts the power "to decide questions that cannot affect the rights of litigants in the case before them," and confines them to resolving "real and substantial controvers[ies] admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts."
**\*7** *Lewis, 494 U.S. at 477* (citations omitted). Accordingly, Defendants' Second Motion to Dismiss and Suggestion of Mootness will be granted and Plaintiffs' claims will be dismissed.

## II. *Motion for Leave to File Amended Complaint Will Be Denied*

In an effort to avoid mootness, Plaintiffs request leave to amend the complaint pursuant to Rule 15(a), Fed.R.Civ.P. Plaintiffs' position is that they should be allowed to amend their complaint, almost as a matter of course,[FN20] and thereby avoid mootness by raising new issues and damages claims.

> [FN20.] In response to Defendants' Second Motion to Dismiss and Suggestion of Mootness, Plaintiffs assert "[b]ecause an amended complaint has been filed by Plaintiffs, little else need be considered in this matter." (Pls.' Opp'n 2.)

Plaintiffs' proposed amendments fall into four main topics: (1) the pre-litigation actions of university officials who allegedly enforced the 2003 non-discrimination policy inconsistently, without changing the text of the policy (Proposed Am. Compl. ¶ ¶ 42-85), (2) Defendants' failure to completely replace the 2003 Policy with the 2005 Policy in its guidelines, template forms and websites (*id.* at ¶¶ 33-41, 90), (3) the alleged vagueness of the

2005 Policy (*id.* at ¶ 89), and (4) a claim for nominal damages (*id.* at ¶ 121.).[FN21]

> **FN21.** In addition to these amendments, Plaintiffs also seek to make changes to their names and status at UNC-CH. The proposed amended complaint changes the entity bringing this suit from "Alpha Iota Omega Christian Fraternity, an unincorporated association" and "student organization of the University of North Carolina at Chapel Hill" (Compl.¶ 9), to "Alpha Iota Omega Christian Fraternity, *Inc.,*" a "*national* men's fraternity organization," having its own "constitution, bylaws and statement of faith" which bind and govern its "local chapters," such as the AIO chapter at UNC-CH, which is known as the "Alpha Chapter." (Proposed Am. Compl. ¶ 3) (emphasis added). The proposed amended complaint omits the allegation that the individual Plaintiffs are "all full-time, registered students at the UNC-CH." *Compare* Compl. ¶ ¶ 61-63 *with* Proposed Am. Compl. ¶ ¶ 4, 5, & 12. UNC-CH requires that all officers and the majority of the members of student organizations are registered, full-time students. (Compl.Ex. 4.) In addition, the proposed amended complaint was filed before, and therefore does not address the fact that, AIO applied for and was granted official recognition for the 2005-06 academic year. Instead, it alleges that the denial of Plaintiffs' rights is ongoing. (Proposed Am. Compl. ¶ ¶ 99, 104, 111.) For these reasons, all or some of the Plaintiffs may no longer be proper parties to bring the claims. *See DeFunis v. Odegaard,* 416 U.S. 312, 316-17, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974) (non-class-action challenge to constitutionality of school admissions process mooted when plaintiff, admitted pursuant to preliminary injunction, neared graduation and defendant conceded that plaintiff would be allowed to finish); *Steele v. Van Buren Pub. Sch. Dist.,* 845 F.2d 1492, 1495 (8th Cir.1988) (student's claim against school district mooted by her graduation); *Case v. Unified Sch. Dist. No. 233,* 908 F.Supp. 864, 873 (D.Kan.1995) (former students no longer had cognizable interest in claim seeking injunction to compel school to reinstate books removed from library).

"A party who requests leave to amend after the date specified in the initial scheduling order must satisfy two prerequisites. The party must first demonstrate that there is some 'good cause' why the court should not adhere to the dates specified in the scheduling order. If the party shows 'good cause' to the court's satisfaction, the party must then demonstrate that leave to amend is proper under Federal Rule of Civil Procedure 15." *Forstmann v. Culp,* 114 F.R.D. 83, 85 (M.D.N.C.1987). Thus, Plaintiffs are faced with two hurdles in this case.

First, Rule 16(b) requires that parties abide by the filing deadlines set forth in the scheduling order, which "shall not be modified except upon a showing of good cause and by leave" of court. Fed.R.Civ.P. 16(b). Plaintiffs do not address the fact that their motion to amend was filed beyond the deadline, in violation of Rule 16(b), and do not even attempt to show "good cause" to revise the scheduling order.

Second, Plaintiffs must also demonstrate that leave to amend is proper under the more-lenient, general Rule 15(a), which provides that leave to amend pleadings "shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). Even under the more-lenient rule, however, amendments are not always allowed. *Lewis v. Microsoft Corp.,* 410 F.Supp.2d 432, 438 (E.D.N.C.2006) (*citing Glick v. Koenig,* 766 F.2d 265, 268-69 (7th Cir.1985) ("The liberal amendment rules under Rule 15(a) do not require the courts to indulge in futile gestures.")); *Forstmann,* 114 F.R.D. at 86 ("[T]he text of Rule 15 makes it clear that a court is not to grant permission to amend automatically."). Valid reasons to deny leave to amend include futility, waste of judicial resources, undue delay, and unfair prejudice to the non-moving party. *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); *Davis v. Piper Aircraft Corp.,* 615 F.2d 606, 613 (4th Cir.1980).

**\*8** In this case, the tardiness of the proposed amendment, its futility, and the unfair prejudice to Defendants and overall inefficiency which would result from its allowance, require that leave to amend be denied.

### A. *Motion Does Not Satisfy Requirements of Rule 16(b)*

Plaintiffs' Motion for Leave to File Amended Compliant was filed after the deadline set by the parties' Joint Rule 26(f) Report and the court's

Slip Copy, 2006 WL 1286186 (M.D.N.C.)
**(Cite as: Slip Copy)**

scheduling order. Accordingly, Plaintiffs must first meet the higher standard of "good cause" necessary to revise a scheduling order deadline under Rule 16(b), before the court should even consider the more-lenient standard of Rule 15, which applies to *timely* motions. Fed.R.Civ.P. 16(b); *Interstate Narrow Fabrics, Inc. v. Century USA, Inc.,* 218 F.R.D. 455, 460 (M.D.N.C.2003); *Forstmann,* 114 F.R.D. at 85.

Plaintiffs completely ignore the scheduling order and do not attempt to justify their tardiness. Instead, they assume that grounds sufficient under Rule 15 satisfy Rule 16 as well. Plaintiffs are wrong. "[T]he scheduling order 'is not a frivolous piece of paper, idly entered, which can be cavalierly disregarded by counsel without peril.' " *Forstmann,* 114 F.R.D. at 85 (citation omitted).

Defendants announced the 2005 Policy on May 23, 2005, and filed the Second Motion to Dismiss and Suggestion of Mootness on May 25, 2005. Plaintiffs could and should have filed their motion to amend on time-by June 9, 2005.[FN22] Their delay, absent a showing of "good cause" as required by Rule 16(b), constitutes sufficient grounds on which to disallow the motion, even without reaching the arguments raised in Plaintiffs' briefs. *See Intown Props. Mgmt., Inc. v. Wheaton Van Lines, Inc.,* 271 F.3d 164, 166-67 (4th Cir.2001) ("district court clearly did not abuse its discretion in denying Intown's late-filed motion to amend"); *Wildauer v. Frederick County,* 993 F.2d 369, 372 (4th Cir.1993) (district court did not abuse its discretion in denying motion to amend filed after scheduling order deadline); *Blundell v. Wake Forest Univ. Baptist Med. Ctr.,* 2006 WL 694630, *2 (M.D.N.C. Mar.15, 2006)* (failure to comply with scheduling order sufficient grounds on which to deny leave to file amended complaint); *DeWitt v. Hutchins,* 309 F.Supp.2d 743, 748 (M.D.N.C.2004) ("good cause is not shown if the amendment could have been timely made"); *Forstmann,* 114 F.R.D. at 85 (plaintiff's failure to show good cause for untimely motion to amend "clearly fails to satisfy the first prerequisite").

FN22. Plaintiffs filed their motion on June 20, 2005.

B. *Futility*

Even a timely-filed motion to amend should be denied if it is futile. *Foman,* 371 U.S. at 182. An amendment is futile when it could not withstand a motion to dismiss or is legally insufficient. *HealthSouth Rehab. Hosp. v. Am. Nat'l Red Cross,* 101 F.3d 1005, 1011-12 (4th Cir.1996) (proposed amendment was futile because allowing it would have "at most, delayed the inevitable dismissal" of the plaintiff's claims); *Perkins v. U.S.,* 55 F.3d 910, 917 (4th Cir.1995). Plaintiffs' motion for leave to file the proposed amended complaint is futile because even if it were allowed, the case would still be moot and because it is based on an outdated, and therefore false, state of affairs.

**\*9** The court finds that all four categories of allegations Plaintiffs wish to add are futile and should not be allowed. First, the allegations concerning the application of the 2003 non-discrimination policy to AIO and other student organizations prior to the inception of this lawsuit do not change the current situation between these parties,[FN23] which was fundamentally altered by the announcement and application of the 2005 Policy. Second, the allegations concerning Defendants' failure to commit fully to the 2005 Policy are simply no longer true and are, therefore, irrelevant and insufficient to save the case from mootness.[FN24] Third, Plaintiffs' single allegation that the 2005 Policy is "vague" is rejected by the court, as addressed in Part I(B) of this opinion, *supra.*[FN25] Finally, the court in its discretion will not allow the continuation of a lawsuit merely to allow Plaintiffs to seek nominal damages, which, even if proven, would be limited to one dollar. *Carey v. Piphus,* 435 U.S. 247, 267, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978).[FN26]

FN23. No other student organizations are parties to this lawsuit.

FN24. The proposed amended complaint was filed at a time of flux, before UNC-CH had updated all of the relevant websites, links and templates with the 2005 Policy and before Plaintiffs had applied for and received official recognition. The situation then, as reflected in Plaintiffs' proposed amended complaint, is not the situation now. If this court were to allow an amendment stating allegations all parties now know to be false, it would not serve the interests of justice or efficiency. *See also* Part I(A) of this opinion, *supra.*

FN25. Plaintiffs' proposed amended complaint says almost nothing about the 2005 Policy, but does make one allegation

that the policy is "vague in its terms," when viewed as "supplementing the university nondiscrimination policy regime." (Proposed Am. Compl. ¶ 89.) Plaintiffs' vagueness argument assumes that the 2003 Policy is also still published and that the two contradictory policies must somehow be reconciled. This is no longer the case, as UNC-CH has now completely removed the 2003 Policy, in favor of the 2005 Policy.

FN26. In order to recover nominal damages, Plaintiffs would have to prevail on the merits of their case. *Farrar v. Hobby,* 506 U.S. 103, 112, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992) (nominal damages are appropriate when civil rights plaintiff establishes violation of his due process rights, but is unable to prove actual injury); *Brister v. Faulkner,* 214 F.3d 675, 685-86 (5th Cir.2000) (civil rights plaintiffs not entitled to nominal damages where court found that their constitutional rights had not been violated). Here, Plaintiffs have not proven a constitutional violation and the case is dismissed as moot, so that possibility is foreclosed.

### C. *Relative Prejudice to Parties*

In deciding whether to allow amendments under Rule 15, courts must weigh the prejudice which would be suffered by the non-moving party if leave were granted against any harm which would be suffered by the moving party if leave were denied. *Foman,* 371 U.S. at 182 (leave to amend may be denied when the prejudice to the non-moving party outweighs any harm to the moving party if leave is denied); *Forstmann,* 114 F.R.D. at 87. "[P]rejudice resulting to the opponent by a grant of leave to amend is reason sufficient to deny amendment." *Davis v. Piper Aircraft Corp.,* 615 F.2d 606, 613 (4th Cir.1980) (citing *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971)).

In this case, Plaintiffs suffer no harm from the denial of their motion to amend. There are no concerns about the statute of limitations or a need to "relate back" pursuant to Fed.R.Civ.P. 15(c). Plaintiffs are not currently suffering injury. They have what they sought-official university recognition-and the status quo is to their benefit. If Plaintiffs, future members of AIO, or members of other student organizations are injured in the future, under the 2005 Policy or

otherwise, they are free to bring a lawsuit and seek redress at that time.

In contrast, Defendants would be prejudiced if leave to amend were granted and the lawsuit were permitted to continue. Defendants voluntarily met the demands of Plaintiffs by issuing the 2005 Policy and granting AIO official recognition. Plaintiffs have been enjoying the benefits of that status and Defendants are justified in expecting the lawsuit to reach its end. Thus, the balance of harm weighs against granting leave to amend.

### D. *Judicial Economy*

The motion to amend should also be denied in the interest of preserving judicial resources and serving efficient case management. *Perrian v. O'Grady,* 958 F.2d 192, 195 (7th Cir.1992) ("The burden to the judicial system can justify a denial of a motion to amend 'even if the amendment would cause no hardship at all to the opposing party.' ") (citation omitted); *Chitimacha Tribe of La. v. Harry L. Laws Co., Inc.,* 690 F.2d 1157, 1163 (5th Cir.1982) (court should consider judicial economy and whether amendment would lead to expeditious disposition of litigation on merits). Without a current controversy or injury for which the court can offer redress, it would be a waste of judicial resources to allow the proposed amendments and continue the court's involvement.

**\*10** Among the proposed amended complaint's most prominent flaws are the allegations that Plaintiffs are currently suffering denial of official recognition and that UNC-CH has not officially, clearly and completely replaced its 2003 non-discrimination policy with the 2005 Policy. As discussed *supra,* those allegations are both false and pivotal. If the court were to allow the proposed amended complaint, it would be forcing the litigation of issues mooted by the progress and compromise made by the parties since the March 2, 2005 Order.

It is manifestly more efficient for the parties to continue their mutually-satisfactory relationship, without interference from the court. The 2005 Policy is the policy of UNC-CH now. So far, the parties have been able, in the spirit of compromise and good faith, to coexist under that policy. The courts are open to address any actual controversy which may arise concerning the 2005 Policy in the future, but this court should not retain jurisdiction over the parties indefinitely, in anticipation of a new injury.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                            Page 12
Slip Copy, 2006 WL 1286186 (M.D.N.C.)
**(Cite as: Slip Copy)**

For these reasons, the Motion for Leave to File Amended Complaint will be denied.

### III. *Plaintiffs Not Entitled to Recover Costs and Attorneys' Fees*

Plaintiffs seek recovery of their costs and expenses, including reasonable attorneys' fees, under 42 U.S.C. § 1988 and "other applicable law." FN27 (Compl.21.) In order to recover costs and attorneys' fees, Plaintiffs must qualify as "prevailing parties." Fed.R.Civ.P. 54(d)(1); 42 U.S.C. § 1988(b). Even then, it is in the court's discretion whether to award attorneys' fees.

> FN27. Plaintiffs presumably mean to invoke the cost-shifting provisions of Fed.R.Civ.P. 54(d)(1), which require an award of costs to the "prevailing party."

The court recognizes that Plaintiffs' lawsuit and this court's March 2, 2005 Order were likely catalysts toward UNC-CH's decision to announce the 2005 Policy and grant AIO official recognition. Nevertheless, the United States Supreme Court and the Fourth Circuit have rejected the "catalyst theory," "which posits that a plaintiff is a 'prevailing party' if it achieves the desired result because the lawsuit brought about a voluntary change in the defendant's conduct." *Buckhannon Bd. & Care Home, Inc. v. W. Va. Dept. of Health and Human Res.,* 532 U.S. 598, 601, 121 S.Ct. 1835, 149 L.Ed.2d 855 (2001). The Supreme Court said the following:
Petitioners ... assert that the "catalyst theory" is necessary to prevent defendants from unilaterally mooting an action before judgment in an effort to avoid an award of attorney's fees. They also claim that the rejection of the "catalyst theory" will deter plaintiffs with meritorious but expensive cases from bringing suit. We are skeptical of these assertions, which are entirely speculative and unsupported by any empirical evidence.... Petitioners discount the disincentive that the "catalyst theory" may have upon a defendant's decision to voluntarily change its conduct, conduct that may not be illegal.

*Id.* at 608. *Accord Smyth ex rel. Smyth v. Rivero,* 282 F.3d 268, 275, 278 (4th Cir.2002) (noting *Buckhannon's* rejection of the catalyst theory and holding that a voluntary, unilateral act is not enough for the opposing party to be said to have prevailed for purposes of Section 1988(b)); *S-1 and S-2 v. State Bd. of Ed. of N.C.,* 21 F.3d 49, 51 (4th Cir.1994) (en banc) ("A person may not be a 'prevailing party' ...

except by virtue of having obtained an enforceable judgment, consent decree, or settlement giving some of the legal relief sought").

**\*11** In rejecting the "catalyst theory," the *Buckhannon* court defined "prevailing party" as a "party in whose favor a judgment is rendered, regardless of the amount of damages awarded.... Also termed *successful party.*" 532 U.S. at 603. In other words, " '[L]iability on the merits and responsibility for fees go hand in hand; where a defendant has not been prevailed against, either because of legal immunity or on the merits, § 1988 does not authorize a fee award against that defendant." ' *Farrar v. Hobby,* 506 U.S. 103, 109, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992) (*quoting Kentucky v. Graham,* 473 U.S. 159, 165, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985)).

Here, there was no winner and no loser. The parties have reached common ground, due to Defendants' voluntary issuance of the 2005 Policy (albeit with prodding from the court), Plaintiffs' willingness to apply for official recognition under that policy, and Defendants' granting of official recognition to AIO. The only court-sanctioned relief Plaintiffs recovered was a preliminary injunction, which is insufficient to qualify Plaintiffs as "prevailing parties" for purposes of Section 1988(b). *Smyth,* 282 F.3d at 277.FN28 Plaintiffs neither sought nor were granted damages, not even nominal damages.FN29 Plaintiffs did not even secure a settlement agreement enforceable by a consent decree, since Defendants did not condition their actions on Plaintiffs' agreement to dismiss their claims.FN30 Defendants did not force Plaintiffs to go to trial and win a verdict in their favor and there was no decision on the merits of the case.FN31

> FN28. The *Smyth* opinion explains that the frame-work used to decide whether to grant interim relief turns on the relative harm the parties "would be likely to suffer absent an injunction" and a decision to grant a preliminary injunction "by no means represents a determination that the claim in question will or ought to succeed ultimately." *Id.* at 276-77. Thus, the issuance of interim relief is "an unhelpful guide to the legal determination of whether a party has prevailed" under Section 1988(b). *Id.* at 277.

> FN29. In some circumstances, an award of nominal damages on the merits can be sufficient to qualify the recipient as a

"prevailing party" for an award of costs under Rule 54(d)(1) and attorney's fees under Section 1988(b). *Buckhannon, 532 U.S. at 603-04; Zeuner v. Rare Hospitality Int'l, Inc.,* 386 F.Supp.2d 635, 639-40 (M.D.N.C.2005). However, Plaintiffs did not prevail on the merits of any of their claims and Plaintiffs' claim for attorneys' fees is insufficient to keep this case alive. *See* discussion in footnote 19, *supra.*

FN30. *Contrast Buckhannon,* 532 U.S. at 604 ("we have held that settlement agreements enforced through a consent decree may serve as the basis for an award of attorney's fees").

FN31. *Contrast Belk v. Charlotte-Mecklenburg Bd. of Educ.,* 269 F.3d 305, 352 (4th Cir.2001) ("In this case, there was no voluntary change in CMS's conduct. CMS clung to the desegregation orders and put up a vigorous defense in the course of a two-month trial. A final judgment was handed down, and any change in CMS's behavior will be due to the district court's decree, not a voluntary act.").

Instead, Defendants voluntarily gave Plaintiffs what they asked for and are now in the unusual position of having to convince Plaintiffs to accept victory. Defendants have a right to bring this case to an end by changing or clarifying the policy in order to avoid further alleged injury to or controversy with Plaintiffs. This should be encouraged, not discouraged.

For the foregoing reasons, Plaintiffs are not "prevailing parties" under Rule 54(d)(1) or Section 1988(b) and are not entitled to an award of costs or attorneys' fees thereunder. In the absence of a statutory basis for the recovery of Plaintiffs' costs and fees, the "American Rule" applies and the parties must bear their own costs and expenses. *Buckhannon,* 532 U.S. at 602.

CONCLUSION

Plaintiffs filed this lawsuit as outsiders, challenging the university system, and end this lawsuit as insiders, fully participating in the university system. The claims of the original complaint are moot and the court will not allow Plaintiffs to morph it into a new case, via belated amended allegations about harm that

Plaintiffs or other student groups might suffer in the future.

For the reasons set forth above, the court will grant Defendants' Second Motion to Dismiss and Suggestion of Mootness and will deny Plaintiffs' Motion for Leave to File Amended Complaint. The parties will bear their own costs.

An order in accordance with this memorandum opinion shall be entered contemporaneously herewith.

*ORDER*

**\*12** For the reasons set forth in the memorandum opinion filed contenporaneously herewith

IT IS ORDERED that Plaintiffs' Motion for Leave to File Amended Complaint [Doc. # 44] is DENIED.

IT IS FURTHER ORDERED that Defendants' Second Motion to Dismiss and Suggestion of Mootness [Doc. # 39] is GRANTED, and this action is DISMISSED. The parties shall bear their own costs.

M.D.N.C.,2006.
Alpha Iota Omega Christian Fraternity v. Moeser
Slip Copy, 2006 WL 1286186 (M.D.N.C.)

END OF DOCUMENT




Fatir v. Dowdy
D.Del.,2002.
Only the Westlaw citation is currently available.
United States District Court, D. Delaware.
Amir FATIR, Plaintiff,
v.
David DOWDY, Patrick Ryan, Barry Hawlk,
Lawrence McGuigan, Robert Snyder, Carl Danberg,
Stanley Taylor, and Colleen T. Schotzberger,
Defendants.
**No. Civ.A. 95-677-GMS.**

Sept. 4, 2002.

*MEMORANDUM AND ORDER*
SLEET, J.

### I. INTRODUCTION

**\*1** On April 6, 1995, Amir Fatir, a prisoner, filed a complaint against the defendants pursuant to 42 U.S.C. § 1983. His allegations stem from various actions taken by the defendants, all employees of the Delaware Correctional Center ("DCC") in Smyrna, Delaware. At the time he filed his complaint, Fatir was proceeding *pro se*. Among other things, Fatir's original complaint ("the 1995 complaint") alleged that certain of the defendants had tampered with his mail and had taken property belonging to him from his work area.

In May 1996, Fatir wrote the court expressing his concern that the defendants had begun to retaliate against him for filing this lawsuit. This letter added further facts supporting the claims previously filed in the original complaint. Although Fatir stated that the letter was a motion for a preliminary injunction and did not attach an amended complaint, The Honorable Roderick R. McKelvie *sua sponte* decided to treat the letter as a motion to amend. Judge McKelvie granted the motion.

In the summer of 1996, Fatir was transferred to an Arizona prison. In January 1997, he sought to amend his complaint to add claims of retaliatory transfer and retaliation for speech protected under the First Amendment. Apparently, Fatir did not file any grievances with prison authorities regarding these claims prior to amending his complaint.

The case was eventually reassigned to this court. After the case was reassigned, Fatir filed a second motion for appointment of counsel. Although Fatir demonstrated that he was quite capable of prosecuting his lawsuit *pro se*, given the problems he encountered during the discovery period and the practical difficulties presented by his transfer to Arizona, the court appointed counsel on June 20, 2000 (D.I.57). In November 2000, Fatir, by and through his counsel, filed a motion to amend his complaint. On January 29, 2001, the court granted this motion with the provision that the defendants would be permitted to retain any and all applicable defenses. After the third motion to amend was granted, the court entered a scheduling order which set the dispositive motion deadline at November 16, 2001.

Presently before the court are two motions. The first is the defendants' motion for summary judgment filed on November 16, 2001. In this motion, the defendants raise several defenses to the plaintiff's claims, including the plaintiff's failure to exhaust administrative remedies as required by the Prison Litigation Reform Act of 1996 ("PLRA"), 42 U.S.C. § 1997e. In the plaintiff's response to that motion, filed on February 15, 2002, he asserts that since his complaint was filed after the PLRA was enacted, his claims are not subject to any exhaustion requirements. The defendants respond that although this is true for the claims contained in the 1995 complaint, the new claims presented in Fatir's first, second, and third amended complaints were filed after the PLRA's enactment and are therefore subject to its exhaustion requirements.

**\*2** The second motion before the court is the plaintiff's motion for leave to file a fourth amended complaint. This motion was filed on February 19, 2002, four days after the plaintiff's response to the defendants' motion for summary judgment. The proposed fourth amended complaint will amend Count Eight of the third amended complaint-which currently states a claim for deprivation of property-to state a claim for conversion. The defendants allege that this motion is the product of undue delay and will result in prejudice to their ability to defend this case. Additionally, the defendants allege that the proposed conversion claim is futile. The plaintiff responds that the amendment is not futile, and that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 2
Not Reported in F.Supp.2d, 2002 WL 2018824 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

the motion is not the result of undue delay.

Upon review of the lengthy record, the submissions of the parties, and the applicable law, the court reaches the following conclusions. First, the motion to amend will be denied. The court finds the fact that the motion was filed four days after the plaintiff's response to the motion for summary judgment supports a finding that the motion is the product of undue delay. For this reason, the court also finds that granting the motion will unreasonably prejudice the defendants and the court. Second, with regard to summary judgment, the court finds that certain of the plaintiff's claims either did not require exhaustion or were properly exhausted. The court finds, however, that there is scant evidence of exhaustion of the claims in Counts Four and Eight. Therefore, the court will order that those particular claims must be dismissed without prejudice until such time as the plaintiff has exhausted his administrative remedies regarding these claims. While the plaintiff is exhausting his remedies pertaining to these claims, this case will be stayed with respect to all other claims. Since the court is staying the case, the court will not decide the other legal issues in this case until the plaintiff has exhausted his remedies. The court will now more fully explain the reasons for is ruling.

## II. FACTS [FN1]

> **FN1.** As indicated above, the court will not address the legal merits of the plaintiff's claims at this time. Thus, the court will only provide those facts that are pertinent to the motion to amend and the exhaustion issue raised in the motion for summary judgment.

In 1975, Amir Fatir was arrested and charged with crimes stemming from an armed robbery and murder which occurred earlier that year. In March 1976, the plaintiff was found guilty of the charges and was sentenced to life in prison. [FN2] Fatir was classified to serve his imprisonment at the Delaware Correctional Center ("DCC") in Smyrna, Delaware. Although the plaintiff presented a serious disciplinary problem at the beginning of his incarceration, by 1987, he had become a model prisoner. He became an active participant in positive aspects of prison life. He even began new programs designed to help prisoners cope with life behind bars. Fatir also became an author and sought after lecturer on prison life. Most important for the purposes of the present motion, after his initial infractions, Fatir was deemed to be a low security

risk and was permitted to work in the prison's Central Supply as a clerk and computer programmer. [FN3]

> **FN2.** The plaintiff was originally sentenced to death, but due to the constitutional infirmity of the Delaware death penalty statute, this sentence was later reduced to life without parole.

> **FN3.** The Central Supply was technically on the prison grounds, but it was beyond the secure area of the prison fences. Thus, only inmates who presented low security risks were permitted to work in this area.

*3 On April 6, 1995, Fatir filed a complaint against the defendants. [FN4] The complaint asserted several causes of action. First, Fatir claimed, "Defendants violated plaintiff's constitutional protection against unreasonable searches and seizures and free speech by searching his computer and copying files without his permission." (D.I. 2 at 7.) Fatir also alleged, "For the past year, Plaintiff's mail has been tampered with by mailroom officers.... Plaintiff has had incoming mail returned to sender without explanation and in violation of institutional mail regulations which require the mailroom officers to notify the inmates of any mail that they intend to send back to sender." (*Id.* at 10.)

> **FN4.** The defendants Danberg, Taylor, and Schotzberger were not added until 1997. Additionally, Fatir has voluntarily withdrawn certain claims. Therefore, the defendants Boyle, Hosterman, Cunningham, and Gullege are no longer defendants in this action.

On May 16, 1996, Fatir wrote a letter to the court. (D.I.19.) In the letter, Fatir alleged that "On May 14, 1996, Major Barry Halwk and Lawrence McGwiggen [sic] seized my personal computer, my file on this case, books I own including "The Prisoner's Self-Help Litigation Manual" and computer disks." (*Id.*) Fatir also asserted that "Defendant Dowdy has repeatedly mishandled legal mail coming into the institution for me. He has also stopped mail leaving the institution from directly going to the persons to whom the mail is addressed." (*Id.*) Fatir further stated, "I would request that the court please treat this letter as a Motion for a Preliminary Injunction." (Id.) At no point did Fatir refer to his letter as a motion to amend.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                      Page 3
Not Reported in F.Supp.2d, 2002 WL 2018824 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

On May 23, 1996, Judge McKelvie issued an order addressing Fatir's letter-motion. The order stated as follows:

On May 20, 1996, plaintiff sent a letter to the court stating that ... Major Barry Hawk and McGwiggen [sic], had seized his personal computer, his file for this litigation, certain books, including plaintiff's "The Prisoner's Self-Help Litigation Manual," and computer disks. In addition, the plaintiff asserts *as he did in his original complaint* that defendant Dowdy is interfering with his personal and legal mail. Plaintiff seeks a temporary restraining order and preliminary injunction to order the return of his property and to prevent DCC officials from tampering with his mail. The court will construe plaintiff's letter as a proposed amendment to his original complaint and as a motion for injunctive relief.

Plaintiff's proposed amendment to his complaint appears to claim that Hawk and McGwiggen's [sic] seizure of his personal property violates his Fourteenth Amendment right to due process. In addition, he appears to claim that their seizure of his legal materials and Dowdy's *continued* interference with legal mail violates his First Amendment right of access to the courts. As plaintiff still lacks the funds to maintain this action, and as these claims do not appear frivolous, the court will allow plaintiff to proceed *in forma pauperis* on these claims in addition to those identified by the court's October 31, 1995 Order granting plaintiff [sic] to proceed *in forma pauperis* against defendants Dowdy and Ryan.

**\*4** (D.I. 20 at 1)(emphasis added).

On June 22, 1996, approximately three months after Judge McKelvie granted the "motion to amend," Fatir gave a speech which criticized the policies of the warden, the defendant Robert Snyder, as racist. One week later, on June 29, 1996, Fatir was informed that he would be transferred to an Arizona prison pursuant to the Interstate Corrections Compact. Fatir arrived at Santa Rita prison in Arizona on July 5, 1996. On January 10, 1997, Fatir filed a motion to amend with a new complaint attached. (D.I.30.) In that complaint he alleged retaliatory transfer, retaliation for First Amendment violations, and deprivation of due process resulting from the seizure of certain of his personal effects lost during his transfer, including books, a television, a radio, legal materials, a computer, cosmetics, and other assorted items. (*Id.* at 5.) In their response to the motion, the defendants asserted that the retaliation claims should be considered separate causes of action under section 1983. (D.I.41.) Without addressing the defendants'

contention, Judge McKelvie granted Fatir's motion to amend. (D.I. 44 .)

In April 1998, Fatir filed a second motion for appointment of counsel. [FN5] In September 1998, the case was reassigned to this court. The court granted the motion for appointment of counsel on June 20, 2000. Upon securing new counsel, the plaintiff was permitted to file an amended complaint over the objection of the defendants. The amended complaint ("the 2001 complaint") was deemed filed on January 29, 2001. The 2001 Complaint asserted nine causes of action, seven of which remain in this litigation.[FN6] The 2001 complaint did not present new causes of action. Rather, it contained reformulations of Fatir's prior allegations. Count One alleged that the defendants had tampered with Fatir's "personal correspondence and legal mail." (D.I. 80 at 19.) Count Two alleged interference with Fatir's legal mail, specifically. (*Id.* at 20.) Count Four asserted that Hawlk and McGuigan had violated Fatir's Fourth Amendment rights against unreasonable searches and seizures and his Fourteenth Amendment right to due process by seizing his litigation materials and the other items listed in the May 1996 letter. (*Id.* at 21.) Count Five asserts that Fatir was retaliated against for engaging in speech protected by the First Amendment. Count Six contends that the plaintiff was transferred in retaliation for filing this lawsuit. Count Eight asserts that the defendants violated the plaintiff's right to due process and deprived him of his property when they removed certain property, including books, a radio, a television, legal material, a computer, cosmetics, stamps, shoes, clothing, and two photo albums. (*Id.* at 24.) Count Nine alleges that the defendants' interference with his legal mail violated his right to have access to the courts. (*Id.* at 25.)

> FN5. Fatir filed his first motion for appointment of counsel in August 1997. This motion was denied by Judge McKelvie in November 1997. (D.I.44.)

> FN6. The plaintiff has voluntarily withdrawn Count Three, an equal protection claim, and Count Seven, a due process claim based upon the plaintiff's reclassification upon arrival in Arizona. Since these claims are no longer being litigated, the court will not address them.

The court issued a scheduling order in this case on May 10, 2001. That order set the dispositive motion

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 2018824 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

deadline at September 28, 2001. However, by agreement of the parties and the court, the deadline was later changed to November 16, 2001. Thus, dispositive motions were to be filed on November 16, 2001, the answering briefs were due on January 25, 2002, and the reply briefs were due on February 1, 2002.

**\*5** The defendants filed their summary judgment motion on November 16, 2001, as scheduled. The motion argues, *inter alia,* that summary judgment should be granted in the defendants' favor because Fatir had failed to exhaust his administrative remedies before filing his complaint as required by the PLRA. The record indicates that the DCC had a formal grievance procedure for certain claims. The defendants have submitted an inmate grievance handbook and other materials establishing the existence of this grievance procedure. Also, Fatir testified at his deposition that there was a grievance procedure at the DCC. (D.I. 130 at A073.) When asked about his attempts at exhaustion during his deposition, Fatir testified as follows:
Q: Did you ever file a grievance?
A: Yes.
Q: More than one?
A: I can only recall one ...
Q: [T]here's a form they use, correct?
A: There ... was, I think, a letter you had to write to begin the grievance process.
Q: It was a form you had to fill in wasn't it?
A: Maybe. I don't know. I don't recall.
Q: And when you filled in this form, where would it go?
A: When the grievance procedure was functioning as ordered by the court, it would go to the grievance coordinator.
Q: And then from where? Would there be a hearing scheduled for it?
A: There would be a hearing for it.
Q: And after that there would be a decision made?
A: Yes.
Q: And after that you could appeal the decision?
A: Yes.
Q: To who [sic]?
A: To the warden.
....
A: The person who would be the statewide grievance coordinator [left], and the grievance procedure pretty much collapsed.
Q: There are still people that file grievances aren't there?
A: I would imagine so.
...
Q: In any event, in none of the instances that you

complained about in the second amended complaint did you in any way file a grievance form and turn it in, correct?
A: After having been told that my issues were nongrievable ...
Q: My question was did you actually file a written grievance and the answer is no?
A: No, I did not.
Q: Now, what things were you told were not grievable?
A: I was told that the mail tampering was not grievable. I was told that my job issues were not grievable because they were classification, and I was told that classification matters are not grievable. I was told that all the seizure of my materials, my computer itself, was not grievable, and--
Q: Just so we're clear--
A: the grievance board is not going to handle anything else from here.
Q: But you never filed a grievance and had the grievance board say that?
A: Well, the grievance coordinator said--
Q: My question is still the same. You never actually filed a grievance and had them say, "This is not grievable"?
A: That's a two part question ...
Q: Did you ever file a grievance form?
A: No.
Q: Since you never filed a grievance, you never heard back from the grievance board?
**\*6** A: I heard back. They don't have them.

In his answer to the defendant's motion, filed on February 15, 2002, the plaintiff responded that the PLRA was enacted on April 26, 1996. Fatir thus argued that since his original complaint was filed in 1995, and the PLRA was not retroactive, his case was exempt from the exhaustion requirements of the PLRA. He also argued that with regard to the 1997 claims surrounding his transfer to Arizona, there was no available "formal" grievance procedure. The defendants assert that upon his transfer, Fatir was instructed to "contact the Interstate Compact Administrator for any legal issues." (D.I. 143 at 21-22.) The defendants, however, cite no record evidence in support of this claim. A review of the depositions given by those responsible for the transfer (namely the defendants Shotzberger, Ryan, Danberg, Taylor, as well as Mr. Stanley Turner) fails to clearly identify exactly how Fatir could have or would have been able to file a grievance regarding his transfer claims. When asked how an inmate who disagreed with a transfer might challenge this decision, the defendant Taylor testified that "They

Not Reported in F.Supp.2d                                                                                                     Page 5
Not Reported in F.Supp.2d, 2002 WL 2018824 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

write letters all the time. They write grievances all the time." (D.I. 130 at 157 .) However, Taylor offered no testimony as to the exact operation or regulations of the purported grievance system, or to whom the grievance would be sent. Colleen Shotzberger, the Interstate Compact Administrator, testified that she gave Fatir a memo concerning the transfer of his legal materials, but did not testify that this memo or any other document notified Fatir of the appropriate grievance procedure for his transfer. (*Id.* at 299.) The prison hearing officer, Scott Turner, testified that if Fatir had indicated that he had a problem with the transfer, Turner might have been able to intervene. Additionally, Turner stated that there was no appeal from the decision to transfer. However, when Turner gave these responses, he was not specifically being asked about grievance procedures. (*Id.* at 120.) The record thus fails to clearly demonstrate how, or to whom, Fatir might appeal the transfer decision.

In their response to the plaintiff's motion, the defendants replied that although the PLRA might not be retroactive, thus saving the claims in the 1995 complaint, it did not save any claim asserted in an amended complaint after the PLRA was filed.

On February 19, 2002, a mere four days after answering the defendants' motion for summary judgment, the plaintiff filed a motion for leave to amend Count Eight of the 2001 Complaint. At present, Count Eight alleges that the defendants deprived Fatir of certain personal property, thus violating his due process rights. Fatir seeks to amend this count to instead assert a state law claim of conversion. The defendants oppose the amendment on two grounds. First, they assert that the plaintiff's motion is untimely, as it comes after the close of discovery and summary judgment. The defendants argue that this delay will prejudice their ability to defend this action. Second, the defendants assert that the plaintiff's conversion claim is futile under current law. The plaintiff responds that the motion is timely made and will not prejudice the defendants since the facts relating to the due process and conversion claims are nearly identical.

### III. DISCUSSION

**\*7** Since the motions to amend and for summary judgment are subject to different legal standards, the court will address each motion in turn. The court will first discuss its reasons for denying the motion to amend. The court will then discuss the exhaustion

issues raised in the defendants' motion for summary judgment.

#### A. Motion to Amend

##### 1. Legal Standard

Permission to amend a pleading "shall be freely given whenever justice so requires." Fed. R. Civ. P. 15(a). *See also Foman v.. Davis*, 371 U.S. 178, 182 (1962) (same). Nevertheless, a court can deny a motion to amend if the motion is motivated by bad faith or if granting the motion will result in undue delay or prejudice to the opposing party. *See Cureton v. National Collegiate Athletic Ass'n*, 252 F.3d 267, 273 (3d Cir.2001) (citations omitted). Furthermore, the doctrine of futility allows the court to refuse any amendment that fails to state a cause of action. *See id.*

##### 2. The Plaintiff Unduly Delayed in Bringing this Motion to Amend

As noted above, a court may deny a motion to amend where the movant has unduly delayed in bringing the motion. *See id.* However, the Third Circuit has cautioned that delay alone is usually "an insufficient ground to deny leave to amend." *Id.* Nevertheless, "at some point, the delay will become 'undue,' placing an unwarranted burden on the court, or will become 'prejudicial,' placing an unfair burden on the opposing party." *Id.* Although the original complaint was filed in 1995, over seven years ago, the court will not consider the time during which the plaintiff represented himself *pro se.* The court will only consider the time from June 20, 2000-when counsel was appointed-to the present. Counsel first amended the complaint on January 29, 2001. The motion to amend presently before the court was filed on February 19, 2002, more than one year after the first amendment by counsel. This one year delay was both undue and prejudicial for the following reasons.

The plaintiff's delay may become undue after a motion for summary judgment is filed where the movant has had previous opportunities to amend a complaint, but chose not to do so. *See Bethany Pharmacal Co., Inc. v. QVC, Inc.*, 241 F.3d 854, 861-62 (7th Cir.2001) (denying leave to amend where the plaintiff "offered no explanation for waiting until it was faced with a summary judgment motion before attempting to add its promissory estoppel claim"

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 2018824 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

although claim was previously available). In particular, if the requested amendment is based upon facts known to the plaintiff at the time the previous complaint was amended, the amendment is disfavored. *See M/V American Queen v. San Diego Marine Construction Corp., 708 F.2d 1483, 1492 (9th Cir.1983)* (denying leave to amend where summary judgment was pending and amendment was not the product of newly discovery facts, but facts known at the time of the previous complaint). Similarly, if the newly presented claim and the previous claim are similar or identical, giving the plaintiff the ability to assert the new cause earlier, leave to amend is not granted. *See Coleman v. Ramada Hotel Operating Company, 933 F.2d 470, 473 (7th Cir.1991)* (denying leave to amend after filing of summary judgment motion where the new claims "merely reiterate[d]" the claims of the original complaint).

**\*8** In the present case, by the plaintiff's own admission, the earlier alleged deprivation of property claim and newly sought conversion claims are very similar. The plaintiff admits that the new claim stems from the exact same set of factual circumstances as its predecessor.[FN7] Although the plaintiff acknowledges that the new claim is factually similar, implicitly conceding that it could have been asserted previously, he offers no excuse for his failure to raise this claim earlier in this litigation. Since the new conversion claim is so similar to the prior property claim and there was no reason not to present the claim in the prior amended complaint, this delay weighs against granting the plaintiff's request for leave to amend. Moreover, this matter has been in litigation for nearly seven years. Given these facts, the court can not countenance the additional delay that would result were the plaintiff permitted the sought after amendment.

> FN7. The plaintiff stated, "The underlying facts supporting the proposed claim for conversion are exactly the same as those supporting the claim for due process/deprivation of property." (D.I. 146 at 4.-Pls.' Reply Br.)

Additionally, the timing of this motion is prejudicial to the defendants and the court. The court notes that the motion to amend was filed on February 19, 2002, just four days after the plaintiff filed his response to the defendants' motion for summary judgment. Motions to amend which are filed after summary judgment motions have been filed or granted are

highly disfavored. *See Cureton, 252 F.3d at 273* ("When a party delays making a motion to amend until after summary judgment has been granted to the adverse party, other courts have recognized that the interests in judicial economy and finality of litigation may become particularly compelling."); *Eisenmann v. Gould-National Batteries, Inc., 169 F.Supp. 862, 864 (E.D.Pa.1958)* (denying leave to amend where "the plaintiffs waited nearly two years to move to amend the complaint and then made the motion only after a motion for summary judgment had been filed and argued"). These belated attempts at amendment are disfavored with good reason. If parties were allowed to repeatedly amend their complaints, even after summary judgment motions had been filed, not only the opponent, but the courts, would be prejudiced by the never-ending litigation.

The plaintiff notes that since discovery has been conducted regarding the deprivation of property issue, the defendants will be able to use that discovery in their defense of the conversion claim, and therefore will not be prejudiced. The court agrees, but further notes that this is not the only source of prejudice. As previously noted, motions to amend which follow the filing of a motions for summary judgment are heavily disfavored. In the present case, the timing of the motion to amend in response to the defendant's motion raises an inference that the plaintiff is attempting to bolster his legal position-and therefore avoid summary judgment-by amending the complaint. This is an unacceptable reason to amend. *See Kennedy v. Josephthal & Co., 814 F.2d 798, 806 (1st Cir.1987)* (affirming district court's denial of leave to amend where the attempt to amend the complaint appeared to be "an attempt to avoid an adverse ruling on summary judgment"); *Local 472 of the United Association of Journeymen and Apprentices v. Georgia Power Co., 684 F.2d 721, 724-25 (11th Cir.1982)* (same). Permitting such an amendment at this stage would change the focus of that portion of the litigation, thereby prejudicing the defendants. *See Torres-Rios v. LPS Laboratories, Inc., 152 F.3d 11, 16 (1st Cir.1998)* (noting that permitting amendment after discovery had closed and summary judgment motion had been filed would prejudice defendant).

**\*9** For all of the above reasons, the court concludes that the plaintiff's undue and prejudicial delay requires the court to deny the plaintiff's motion to amend.

B. The Exhaustion Issue

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 2018824 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

The court must address two questions. The first question is which claims, if any, must Fatir exhaust before proceeding. Second, the court must address whether any of these remedies were properly exhausted. The court will address the questions in turn. But first, the court will outline the applicable summary judgment standard.

### 1. The Summary Judgment Standard

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to a judgment as a matter of law. *See* Fed. R. Civ. P 56(c). A fact is material if it might affect the outcome of the case, and an issue is genuine if the evidence is such that a reasonable factfinder could return a verdict in favor of the nonmovant. *See In re Headquarters Dodge, Inc.,* 13 F.3d 674, 679 (3d Cir.1993) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). When deciding a motion for summary judgment, the court must evaluate the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *See Pacitti v. Macy's,* 193 F.3d 766, 772 (3d Cir.1999). The nonmoving party, however, must demonstrate the existence of a material fact supplying sufficient evidence-not mere allegations-for a reasonable jury to find for the nonmovant. *See Olson v. General Elec. Aerospace,* 101 F.3d 947, 951 (3d Cir.1996) (citation omitted). To raise a genuine issue of material fact, the nonmovant "need not match, item for item, each piece of evidence proffered by the movant but simply must exceed the 'mere scintilla' [of evidence] standard." *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.,* 998 F .2d 1224, 1230 (3d Cir.1993) (citations omitted). The nonmovant's evidence, however, must be sufficient for a reasonable jury to find in favor of the party, given the applicable burden of proof. *See Anderson,* 477 U.S. at 249-50.

### 2. Whether Exhaustion was Required

The first question is whether exhaustion is required, and if so, for which claims. The PLRA mandates that: no action shall be brought with respect to prison conditions under section 1983 of this title or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997(e)(a)(1996).

The latest version of the PLRA was enacted on April 26, 1996. *See* Pub. Law No. 104-134, 110 Stat. 1321. Congress did not state whether the law should have a retroactive effect. Nevertheless, the Third Circuit has made it clear that it believes the PLRA was not intended to be retroactive. *See Ghana v. Holland,* 226 F.3d 175, 182-83 (3d Cir.2000). Therefore, while the PLRA would apply to claims brought into this case after April 26, 1996, it would not apply to claims asserted prior to that time. Therefore, any claim that was clearly or conceivably asserted in Fatir's 1995 complaint is exempt from any exhaustion requirement.[FN8] However, as the defendants correctly point out, any claims that were asserted through amendment in 1996 or 1997 may need to be exhausted. The court will now consider each of the claims presented in Fatir's 2001 complaint and determine when they were first asserted in this litigation-whether explicitly or through relation back-and whether the PLRA is applicable to them.

> FN8. Although there were methods of determining exhaustion in existence prior to the enactment of the PLRA, the defendants do not assert that Fatir failed to exhaust his remedies under pre-PLRA law. They merely argue that he did not exhaust as required by the PLRA. Since the defendants did not brief the issue of pre-PLRA exhaustion, the court will consider it waived.

#### a. Count One

*10 Count One of the complaint states a claim for interference with mail. In Fatir's 1995 complaint, he clearly states that his "mail had been tampered with by mailroom officers." (D.I. 2 at 10.) Thus, the claims in Count One were clearly asserted prior to the enactment of the PLRA. Therefore, Fatir was not required to exhaust his remedies on this claim.

#### b. Count Two

Count Two states a claim for interference with legal mail. Again, in the 1995 complaint, Fatir stated that his "mail had been tampered with by mailroom officers." (*Id.* at 10.) There is no explicit mention of legal mail. The claims for legal mail were first explicitly asserted in the 1996 letter to Judge McKelvie. Nevertheless, the claims asserted in Count

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 2018824 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Two can be said to be an amendment or supplement that "relates back" to the 1995 complaint. Relation back is appropriate where a newly asserted claim arises out of the same conduct, transaction, or occurrence that was alleged in the original pleading. *See* Fed. R. Civ. P. 15(c). In this case, the legal mail claim arises out of the same conduct as the civilian mail claim. Judge McKelvie held as much in his May 1996 order when he stated, "[T]he plaintiff asserts *as he did in his original complaint* that defendant Dowdy is interfering with his personal *and* legal mail." (D.I. 20 at 1) (emphasis added). Judge McKelvie further stated, "In addition, [Fatir] appears to claim that their seizure of his legal materials and Dowdy's *continued* interference with legal mail violates his First Amendment right of access to the courts." (*Id.*)(emphasis added). These statements clearly indicate the court's belief that the legal mail claim was either implicitly asserted in the 1995 complaint or was a continuation of the mail tampering conduct contained in that complaint. This court, therefore, finds that the claims contained in Count Two relate back to the 1995 complaint and are thus not subject to the PLRA.

c. Count Four

Count Four as currently written alleges that the defendants violated Fatir's Fourth and Fourteenth Amendment rights to be free of unreasonable searches and seizures. Specifically, the plaintiff alleges that his rights were violated when materials were seized from his cell, including his personal computer, legal files, books including "The Prisoner's Self-Help Litigation Manual" and computer disks. These facts are not mentioned in the 1995 complaint. Rather, this claim was first asserted in Fatir's May 1996 letter to Judge McKelvie, wherein he stated, "On May 14, 1996, Major Barry Hawlk and Lawrence McGwiggen [sic] seized my personal computer, my file on this case, books I own including "The Prisoner's Self-Help Litigation Manual" and computer disks." (D.I.19.) Since this claim was first asserted in May 1996, and the PLRA was enacted in April 26, 1996, it is subject to the PLRA's exhaustion requirement.

The court considered that the claims in Count Four might relate back to the 1995 complaint. Indeed, the 1995 complaint does state a claim for search and seizure based on a search of Fatir's personal computer. However, the court concludes that the claims currently asserted in this action do not relate back to the 1995 complaint. First, by Fatir's own

admission in his complaint, the facts upon which Count Four relies did not occur until May 1996. Additionally, unlike the mail tampering claim, it cannot be argued that the seizure of his property was a continuing wrong related to the wrong alleged in the 1995 complaint. Rather, it appears that the search alleged in the 1995 complaint and the May 1996 allegation are two separate and unrelated incidents. Judge McKelvie acknowledged as much in his order. Although he stated that the legal mail tampering was a continuation of actions alleged in the 1995 complaint, he did not state that the May 1996 search and seizure allegations were in any way related to the 1995 complaint. Indeed, he referred to the May 1996 allegations as "new" claims. (D.I.20.) Moreover, since the 1995 and 1996 incidents were completely separate, they cannot be part of the same transaction or occurrence. The claims in Count Four do not relate back to the 1995 complaint. They are, therefore, subject to the PLRA.

d. Counts Five, Six, and Eight

*11 Counts Five, Six, and Eight each assert claims arising from Fatir's July 1996 transfer to Arizona. Each of these claims appeared in this litigation for the first time in Fatir's January 1997 amended complaint. The PLRA was in effect at that time, and each of these claims is therefore subject to its exhaustion requirements. Moreover, since the events alleged in the 1997 complaint did not occur until 1996, there is no way they can be reasonably related to any claim asserted in the 1995 complaint. Therefore, Fatir was required to exhaust the claims asserted in Counts Five, Six, and Eight.

The court observes that the PLRA applies only to "prison conditions." Counts Five, Six, and Eight all state constitutional claims. Thus, it could be argued that because they are not prison conditions claims, no exhaustion is required. The court disagrees with this view. In Booth v. Churner, 206 F.3d 289 (3d Cir.2000), *aff'd*, 532 U.S. 731 (2001), the Third Circuit held that an excessive force claim, which is a constitutional claim, was a "prison condition" and had to be exhausted under the PLRA. *See* id. at 296. ("[E]xcessive force actions are 'prison conditions' actions and subject to the exhaustion requirements set forth in [the PLRA]."). The Third Circuit further stated that "Congress, in the PLRA, made its intent to subject all prisoner actions (save for habeas petitions) to § 1997e(a)'s exhaustion requirements ... clear." *Id.* at 295. Thus, it appears that given the Third Circuit's holding in *Booth,* even constitutional claims such as

those raised in Counts Five, Six, and Eight are subject to the exhaustion requirements of the PLRA.

The Supreme affirmed the Third Circuit in *Booth,* and has also hinted that even constitutional claims might be subject to the PLRA's requirements. Indeed, in reaching its conclusion in *Booth,* the Third Circuit relied on the Supreme Court's decision in *McCarthy v. Bronson,* 500 U.S. 136 (1991). In *McCarthy,* the Supreme Court was asked to construe another section of the PLRA, 18 U.S.C. § 3626, which concerns prison conditions and is interpreted in the same manner as § 1997e(a). *See Booth,* 206 F.3d at 294 ("Because the two sections of the PLRA are directed toward similar ends and are thus substantially related, it follows that ... the identical terms used in the two sections should be read as conveying the same meaning."). The *McCarthy* Court held that the term "prison conditions" included not only continuous claims of prison conditions, but also "isolated episodes of unconstitutional conduct." *See McCarthy,* 500 U.S. at 139. Thus, *McCarthy* lends further support to the argument that even constitutional claims must be exhausted.

Finally, most recently, in *Porter v. Nussle,* 534 U.S. 516 (2002), the Supreme Court was asked to address whether an excessive force claim was a "prison condition" requiring exhaustion under the PLRA. In reversing the Second Circuit, which had held that the excessive force claim did not require exhaustion, the Supreme Court read § 1997e(a) very broadly, stating, "We hold that the PLRA's exhaustion requirement applies to all suits about prison life ... whether they allege excessive force or *some other wrong." Id.* at 992. The Supreme Court therefore did not specifically exclude constitutional claims from the purview of the PLRA.

**\*12** In light of *Booth, McCarthy,* and *Porter,* the court finds that although the plaintiff's First Amendment constitutional claims do not appear to assert claims for prison conditions, they must be exhausted under the PLRA. *See Ghana,* 226 F.3d at 177, 179 (requiring inmate plaintiff to exhaust First Amendment claim prior to filing suit). *See also Walker v. Maschner,* 270 F.3d 573, 574 (8th Cir.2001) (same).

### e. Count Nine

Count Nine is very similar to Count Two. Fatir never expressly stated a claim for denial of access to the courts in the 1995 complaint. However, in his May

1996 order, Judge McKelvie stated, "In addition, [Fatir] appears to claim that their seizure of his legal materials and Dowdy's *continued* interference with legal mail violates his First Amendment right of access to the courts." (D.I. 20 at 2.) The denial of access to courts claim, as worded by Judge McKelvie, is directly dependent upon the mail tampering claim. As previously noted, the mail tampering conduct was properly alleged in the 1995 complaint. Therefore, the claim alleged in Count Nine arises out of conduct, transactions, or occurrences that were plead in the original 1995 complaint. Thus, the claim in Count Nine relates back to the claim in the 1995 complaint and does not require exhaustion.

### f. Conclusion

The court concludes that no exhaustion is required for Counts One, Two, and Nine. Nevertheless, exhaustion is required for Counts Four, Eight, Five, and Six. The court will now consider whether Fatir has satisfied the PLRA's exhaustion requirements with respect to these claims.

### 3. Whether Fatir Properly Exhausted the Claims

As previously stated, the PLRA requires a prisoner to exhaust all available administrative remedies before bringing an action regarding prison conditions. *See Booth,* 206 F.3d at 291; *Nyhuis v. Reno,* 204 F.3d 65, 67 (3d Cir.2000). In the Third Circuit, exhaustion of remedies is an affirmative defense to be asserted by the defendant. *See Ray v. Kertes,* 285 F.3d 287, 295 (3d Cir.2002). Thus, the burden is on the defendant to prove the facts that support its exhaustion defense. Where a prisoner has failed to exhaust, the court is required to dismiss the unexhausted claims without prejudice. *See Nyhuis,* 204 F.3d at 68 n. 2.

The exhaustion requirement is mandatory. Thus, the court cannot excuse a prisoner's failure to exhaust. *See id.* at 66. Additionally, the Third Circuit has refused to recognize a futility exception to the PLRA's exhaustion requirements. *See id.* at 71. In other words, the PLRA requires an inmate to exhaust all administrative remedies prior to bringing a federal action challenging prison conditions, whether or not they provide the inmate with the relief the inmate says he or she desires in the federal action. *See id.* at 71 n. 6 (noting that even where prison cannot grant requested relief, exhaustion may still be helpful) (citations omitted). Nevertheless, if there is no

Not Reported in F.Supp.2d                                                                 Page 10
Not Reported in F.Supp.2d, 2002 WL 2018824 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

administrative remedy available for the plaintiff's claim, the court can find that exhaustion is not required. *See Freeman v. Snyder,* No. No. 98-636, 2001 WL 515258, at *5 (D.Del.2001), citing *Camp v. Brennan,* 219 F.3d 279, 281 (3d Cir.2000). Moreover, where the prisoner's compliance with the administrative scheme has been substantial, even if not complete, the court might find exhaustion. *See Nyhuis,* 204 F.3d at 77-78. The court will now consider whether Fatir had administrative remedies available to him, and if so, whether he had properly exhausted those remedies for Counts Four, Eight, Five, and Six.

### a. Was there an administrative remedy available?

**\*13** An administrative remedy is "an administrative scheme adopted by the state department of corrections." *See Freeman,* 2001 WL 515258 at *7. At minimum, it appears that an administrative remedy must be ascertainable by examination of statutes or regulations. *See id.* at *7 n. 9 (citing *Conception v. Morton,* 125 F.Supp.2d 111, 117 (D.N.J.2000)). Conversely, a vague, informal grievance process is "hardly a grievance procedure." *See id.* at *7. Thus, an individual administrator's decision would not qualify as a grievance procedure. *See id.* The court will now consider whether there was an administrative remedy available for Fatir for any of his claims.

### 1). Counts Four and Eight

The court finds Fatir's deposition testimony and other evidence of record clearly establishes that there was a grievance procedure at the DCC for certain claims. The inmate was required to file a grievance with the grievance board, which could then be appealed. There was nothing vague, informal or discretionary about this procedure.

Fatir does not even attempt to argue that the claims asserted in Counts Four and Eight were not redressable through the prison grievance system. Indeed, the prison grievance procedure dictated that claims concerning actions by employees could be grievable, and further states that one of the remedies for a properly filed grievance might be "restitution of property." (D.I. 135 at B199.) It is clear that the claims in Counts Four and Eight concern employees seizing and depriving Fatir of his property in various ways. By its plain language, then, the DCC grievance system appears to be equipped to handle those

allegations and provide Fatir relief by returning his property. Thus, the court finds that these claims were redressable under the DCC's grievance system, and therefore there was an administrative remedy available to Fatir for these claims.

### 2). Counts Five and Six

With respect to Counts Five and Six, Fatir argues that the available grievance process was too vague and informal to be considered an administrative remedy. The court agrees.

Although the administrative remedies for the other claims are clearly spelled out in the DCC's grievance process, at no point did any DCC official testify that the established DCC grievance procedures were applicable to Fatir's claims regarding his interstate transfer. The court must therefore ask how an inmate might have challenged the transfer. The defendants do not argue that Fatir should have used the normal DCC grievance process. Rather, they argue that Fatir was told that he should "contact the Interstate Compact Coordinator for any legal issues" concerning his transfer. It is clear that the Interstate Compact Coordinator, Colleen Shotzberger, is an individual. This is exactly the type of "administrative remedy" that courts frown upon. *See Freeman,* 2001 WL 515258, at *7. Additionally, although the defendants assert that Fatir was told to contact Shotzberger, there is absolutely no evidence of record to support his contention. There is no testimony that Fatir was ever notified that he could contact Shotzberger regarding grievances stemming from his transfer. Since the inmate must be aware of the grievance procedure, this failure of proof was significant. For all of these reasons, the court finds this purported administrative remedy to be inadequate.

**\*14** Similarly, although Taylor's testimony establishes that Fatir could have "written a letter" or "written a grievance" his testimony does not establish where or to whom the grievance should be addressed. More important, it definitely does not establish that there was an administrative scheme established by the State of Delaware regarding inmates grievances of interstate transfers. Although it is quite possible that the DCC (or the applicable Interstate Compact authority) has such a grievance procedure, the defendants' evidence is woefully inadequate to demonstrate that such a procedure exists. Since exhaustion is an affirmative defense, the defendants must present evidence sufficient to prove that there

was an available administrative procedure. Their failure to present any evidence on this point therefore precludes the entry of summary judgment in their favor on the exhaustion issue for these claims. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986) (noting that summary judgment is appropriate against a party who fails to present evidence on an issue on which it has the burden of proof at trial).

For these reasons, the court finds that there was no administrative remedy for Fatir to exhaust regarding the claims in Counts Five and Six. Therefore, Fatir need not comply with the PLRA's exhaustion requirements on these claims.

### b. Did Fatir Substantially Comply with the Available Remedies?

The Court has determined that there was an administrative remedy available to Fatir for Counts Four and Eight. The next question is whether Fatir substantially complied with the available remedies. The court finds that he did not.

Generally, a court may find that an inmate has substantially complied with the available administrative remedies when the inmate has taken the grievance as far as he or she possibly can in the prison appeals process. *See Camp,* 219 F.3d at 281 (finding substantial compliance where inmate took grievance to "ultimate administrative authority"). In this case, Fatir's deposition testimony clearly establishes that he never filed a grievance with regard to the claims in Counts Four and Eight. Fatir's failure to file any grievance stands in stark contrast to taking a grievance as far as the grievance process will permit. Thus, the court is not inclined to find that he substantially complied with the available process.

The only argument Fatir might advance to excuse his lack of exhaustion is that he was told that he could not file a grievance regarding the seizure of his property. The court is not persuaded for two reasons. First, the terms of the grievance manual-which specially state that the prison can return property-contradict and would prevent any such "understanding." Moreover, although some courts have found substantial compliance where an inmate was told a claim was not grievable, *see Freeman, 2001 WL 515258, at *8,* this has generally only occurred where the prisoner actually files a grievance or some informal complaint and is subsequently told by the grievance board or some prison official that the claims are not grievable. *See id.* at *3 (noting that

inmate had made repeated requests for redress before being told that claim was not grievable). Indeed, as a matter of policy, it makes little sense to find substantial compliance where an inmate simply assumes that a claim is not redressable through the grievance procedure, without waiting for the grievance board or other prison officials to inform him or her that the complaint is indeed not redressable. To hold otherwise would permit inmates to satisfy exhaustion requirements based solely upon their own beliefs regarding prison procedures. Obviously, that is an unworkable solution, both for the prisons and the courts.

**\*15** For these reasons, the court finds that Fatir failed to substantially comply with, or exhaust, any of the available administrative remedies for Counts Four and Eight. Therefore, the court will dismiss these claims without prejudice until such time as Fatir has exhausted these claims.

### IV. CONCLUSION

For all of the foregoing reasons, the court concludes that the motion to amend will be denied based on the plaintiff's undue delay and the resulting prejudice. Additionally, the defendants' motion for summary judgment is granted on the exhaustion issue as to Claims Four and Eight. It is, however, denied as to the exhaustion issue for all other claims. The motion is denied without prejudice in all other respects. This action will be stayed pending the plaintiff's exhaustion of his administrative remedies.

NOW, THEREFORE, IT IS HEREBY ORDERED that:
1. The Plaintiff's Motion for Leave to Amend (D.I.139) is DENIED.
2. The Defendants' Motion for Summary Judgment (D.I.128) is GRANTED with respect to the plaintiff's failure to exhaust his administrative remedies regarding Counts Four and Eight. These claims shall be DISMISSED without prejudice until such time as the plaintiff has exhausted his administrative remedies regarding these claims.
3. The summary judgment motion is DENIED in all other respects. This denial is without prejudice to the defendants' ability to refile this motion after the plaintiff has exhausted his remedies. However, the defendants may not reassert exhaustion as an affirmative defense as the court's decision today is *res judicata* on the exhaustion issue.
4. This action shall be STAYED until such time as the plaintiff has exhausted his administrative

Not Reported in F.Supp.2d                                                    Page 12
Not Reported in F.Supp.2d, 2002 WL 2018824 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

remedies with respect to Counts Four and Eight.

D.Del.,2002.
Fatir v. Dowdy
Not Reported in F.Supp.2d, 2002 WL 2018824
(D.Del.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                 Page 1
Not Reported in F.Supp.2d, 2005 WL 2136946 (M.D.N.C.)
**(Cite as: Not Reported in F.Supp.2d)**

H

Hayes v. Rule
M.D.N.C.,2005.
Only the Westlaw citation is currently available.
United States District Court,M.D. North Carolina.
Terrance HAYES, aka Heruchuti Asar, an individual,
Plaintiff,
v.
Ja RULE (aka Jeffrey Atkins), an individual, Irv
Gotti (aka Irv Lorenzo), an individual, Murder Inc.
Records, LLC, Interscope Geffen A & M, Island Def
Jam Music Group, and UMG Recordings, Inc.,
Defendants.
No. 1:03 CV 1196.

Aug. 19, 2005.

Jeffrey M. Young, Moore & Van Allen, Raleigh, NC,
John E. Slaughter, Moore & Van Allen, Durham, NC,
for Plaintiff.
Joseph M. Beck, Atlanta, GA, Hayden J. Silver, III,
W. Swain Wood, Kilpatrick Stockton, L.L.P.,
Raleigh, NC, for Defendants.

RECOMMENDATION AND ORDER OF UNITED
STATES MAGISTRATE JUDGE
DIXON, Magistrate J.
**\*1** This matter is before the court on motions for
summary judgment filed by Defendants Murder Inc.
Records, LLC, Interscope Geffen A & M, Island Def
Jam Music Group, and UMG Recordings, Inc.
[docket no. 63], and by Defendants Ja Rule and Irv
Gotti [docket no. 83]; on Plaintiff's motion to strike
the summary judgment motion filed by Defendants Ja
Rule and Irv Gotti [docket no. 103]; on Plaintiff's
motion to amend his Second Amended Complaint
[docket no. 90]; and on Plaintiff's third motion to
compel [docket no. 92]. Each party has either
responded to the respective motions or the time to do
so has expired. In this posture, the matter is ripe for
disposition. Furthermore, because the parties have
not consented to the jurisdiction of a magistrate
judge, all dispositive motions must be dealt with by
way of recommendation. For the reasons stated
below, the court will deny Plaintiff's motion to strike
the summary judgment motion filed by Defendants Ja
Rule and Irv Gotti, and the court will deny Plaintiff's
third motion to compel. Furthermore, it will be
recommended that the court grant summary judgment
in favor of all Defendants and that the court deny

Plaintiff's motion to amend his Second Amended
Complaint.

*FACTS*

This case involves claims by Plaintiff Terrance
Hayes, a musical rap artist from Raleigh, North
Carolina, who composed a collection of lyrical
compositions in 1996 and 1997 based on his thoughts
and feelings about the time he spent in prison. *See*
Defs.' Ex. 1, Hayes Dep. at 9-11; Defs.' Ex. 2A.
Plaintiff has no formal musical training, and he
developed rhythms in his head to go along with the
lyrics he was composing. Hayes Dep. at 11-12.
Plaintiff attempted to include in his work a social and
political message of empowerment for young
African-Americans. Hayes Dep. at 12-13. He did this
by expressly addressing such themes in his lyrics and
by including references to historical figures such as
George Jackson, Marcus Garvey, and Nat Turner in
his work. *Id.* Plaintiff's efforts resulted in a work that
he titled "Blood in My Eyes," which refers to a 1970s
book by the radical author George Jackson titled
*Blood in My Eye.*[FN1] Plaintiff alleges that he obtained
copyright registrations for his lyrical work, and he
recorded those lyrics onto a compact disc ("CD")
with musical and rhythmic accompaniment. *See*
Defs.' Ex. 3 (containing a photocopy of the CD).
Plaintiff asserts that he has sold and performed from
"Blood in My Eyes" in many locations in the United
States, particularly in the Southeast, and that his
music is well known by the title "Blood in My Eyes."
*See* Pl.'s Ex. 1, Hayes Decl. ¶¶ 5, 6. Plaintiff further
asserts that he has used the phrase "Blood in My
Eyes" for multiple music works, that he has been the
exclusive user of this phrase for hip-hop CDs since
1996, and that this exclusivity remained intact until
the November 2003 release by Defendants of another
CD titled "Blood in My Eye," which is the subject of
Plaintiff's copyright infringement claim. *See* Pl.'s Ex.
1, Hayes Decl. ¶ 6. Finally, Plaintiff describes his
work "Blood in My Eyes" as "a musical and thematic
composition related to the revolutionary struggle of
minorities, [specifically] African-Americans, against
oppression[ ], poverty and injustice" that is "both
historical in nature, and forward looking in scope,
with references to George Jackson, Jonathan Jackson,
Nat Turner, and Marcus Garvey, among others," and
which is "a work of social conscience, and attempts
to convey an overall message through the use of both

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 2
Not Reported in F.Supp.2d, 2005 WL 2136946 (M.D.N.C.)
**(Cite as: Not Reported in F.Supp.2d)**

words and music." Second Amended Compl. ¶ 25.

> FN1. According to Plaintiff's allegations, Jackson wrote the book *Blood in My Eye* in the 1970s while he was incarcerated in a California prison. Plaintiff alleges that the book *Blood in My Eye* "deals with oppression, racism, and related revolutionary activism in struggling against such social forces, and the phrase 'Blood in My Eye' has come to be known and associated with such matters." Second Amended Compl. ¶ 12.

**\*2** According to the Second Amended Complaint, sometime in 2001 Plaintiff met with Defendant Irv Gotti, who is an employee of Defendant Murder, Inc. Records ("M.I.Records"), after attending a concert in Durham, North Carolina, where Defendant Ja Rule, a well-known hip-hop artist, had performed. Second Amended Compl. ¶ ¶ 16-17. According to Plaintiff, Gotti led him to believe that he might be interested in signing Plaintiff to a record deal with M.I. Records, and Plaintiff gave Gotti a copy of his "Blood in My Eyes" CD. Second Amended Compl. ¶ ¶ 17-19. A short time later, one of Gotti's assistants contacted Plaintiff and told him that Gotti liked Plaintiff's music but wanted to know if Plaintiff could write material that was "more commercial." Plaintiff subsequently submitted "more commercial" music to M.I Records for Gotti to listen to. Second Amended Compl. ¶ ¶ 17-19. Gotti's assistant subsequently contacted Plaintiff again and told him that M.I. Records liked Plaintiff's music but that the company was not interested in signing Plaintiff to a deal at that time. Second Amended Compl. ¶ 19.

In November 2003, Defendants Ja Rule, M.I. Records, Island Def Jam Music Group, Inc., and UMG Recordings released a CD titled "Blood in My Eye," on which Ja Rule is the principal performer. According to Plaintiff, the Ja Rule "Blood in My Eye" CD is substantially similar to Plaintiff's "Blood in My Eyes" CD "in that it copies the title, the themes and the overall expression" of Plaintiff's work. Second Amended Compl. ¶ 19. Plaintiff further alleges that the Ja Rule CD's "packaging is an obvious attempt to copy and use my expression of the words 'Blood in My Eyes' in conjunction with references to black leaders and historical figures ... in order to sell hip/hop music dealing with themes relating to the struggles of minorities in the United States against oppression, injustice, poverty and racism." Second Amended Compl. ¶ 13. Plaintiff

alleges that the release of the Ja Rule CD has destroyed Plaintiff's ability to promote his own work titled "Blood in My Eyes" and has prevented him from signing a deal with other record companies for the release of his "Blood in My Eyes" CD. Hayes Decl ., Ex. 1, ¶ 14. Plaintiff additionally contends that because of the release of the Ja Rule CD, as a regional artist Plaintiff has "been unable to sustain the sales levels he recorded previously for his self-produced works." Hayes Decl. ¶ 15. Based on these allegations, Plaintiff asserts the following claims against Defendants: copyright infringement in violation of the federal Copyright Act, 17 U.S.C. § 501 et seq.; fraud/fraudulent inducement under North Carolina law; unfair competition and false advertising in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); and unfair and deceptive trade practices under N.C. Gen.Stat. § 75-1.1. Defendants have moved for summary judgment on all claims.

*Plaintiff's Motion to Strike the Summary Judgment Motion filed by Defendants Ja Rule and Irv Gotti*

**\*3** Before addressing the merits of Defendants' summary judgment motions, the court must first address Plaintiff's motion to strike the motion for summary judgment filed by the two individual Defendants Ja Rule and Irv Gotti. On April 21, 2005, the record company Defendants (M.I. Records, Interscope Geffen A & M, Island Def Jam Music Group, and UMG Recordings) filed a motion for summary judgment with an accompanying brief. It is undisputed that this motion was timely and otherwise complied with the applicable rules for filing. On June 22, 2005, Defendants Ja Rule and Irv Gotti also filed a motion for summary judgment. Instead of filing their own brief to accompany the motion, however, they stated that they were adopting as their own the brief already filed by the record company Defendants. Plaintiff moves to strike the motion for summary judgment filed by Defendants Ja Rule and Irv Gotti on the grounds that it is, among other things, untimely because it was filed after the deadline for filing dispositive motions, because Defendants Ja Rule and Gotti did not file a notice of intent to file the motion, and because it is not accompanied by a brief as required by this court's local rules. The court will deny the motion to strike. Here, although Defendants Ja Rule and Gotti did not timely file their own motion for summary judgment, a summary judgment ruling in favor of those Defendants who did timely file for summary judgment will effectively also bar Plaintiff's claim

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 3
Not Reported in F.Supp.2d, 2005 WL 2136946 (M.D.N.C.)
(Cite as: Not Reported in F.Supp.2d)

against Defendants Ja Rule and Gotti because the rationale for granting summary judgment is the same for all Defendants. Thus, granting the motion to strike would have no consequence. Furthermore, courts have held that if one defendant is granted a motion for summary judgment, the district court may sua sponte enter summary judgment in favor of nonmoving, additional defendants "if the motion raised by the first defendant is equally effective in barring the claim against the other defendants, and the plaintiff had an adequate opportunity to argue in opposition to the motion." *Colan v. Cutler-Hammer, Inc.,* 812 F.2d 357, 360 n. 2 (7th Cir.1987); *see also Al-Hashimi v. Scott,* 756 F.Supp. 1567, 1569 (S.D.Ga.1991) (stating that "[a]lthough the other defendants ... did not join in the motion for summary judgment, the rationale for granting [the moving defendant's] motion applies equally to them" and, thus, granting summary judgment as to all defendants). Here, even if Defendants Ja Rule and Gotti had not filed a motion for summary judgment at all, a ruling for the record company Defendants on their summary judgment motion would bar Plaintiff's claims against Defendants Ja Rule and Gotti because the rationale for granting summary judgment to the record company Defendants equally applies to Defendants Ja Rule and Gotti. Thus, the motion to strike will be denied.

### *Plaintiff's Motion to Amend His Second Amended Complaint*

The court next addresses Plaintiff's motion to amend his Second Amended Complaint so that he can add Top Dawg Productions and IG Records as additional Defendants. In support of the motion, Plaintiff argues that Defendants' purported delay in responding to Plaintiff's discovery requests delayed his discovery of the alleged involvement of these two entities in the development of the Ja Rule CD "Blood in My Eye." For the following reasons, it will be recommended that the court deny Plaintiff's motion to amend.

**\*4** Rule 15(a) of the Federal Rules of Civil Procedure applies to motions to amend complaints and generally states that leave to amend shall be freely granted when justice requires unless there are valid reasons for denying leave, such as undue delay, bad faith, or futility of the amendment. *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). When a scheduling order has been entered, however, as it has been in this case, Rule 16(b) is also implicated.[FN2] *See Odyssey Travel Ctr., Inc. v. RO Cruises, Inc.,* 262 F.Supp.2d 618, 631 (D.Md.2003).

Rule 16(b) provides that a scheduling order "shall not be modified except upon a showing of good cause and by leave of the district judge or, when authorized by local rule, by a magistrate judge." As a result of Rule 16(b), when a party moves to amend his pleading after the scheduled time for amendments has passed, the party is effectively asking the court both for an amendment to the scheduling order and for leave to amend the pleading. *Interstate Narrow Fabrics, Inc. v. Century USA, Inc.,* 218 F.R.D. 455, 459-60 (M.D.N.C.2003). Thus, in deciding whether Plaintiff should be granted leave to amend his Second Amended Complaint, it is necessary to consider first whether Plaintiff can satisfy the "good cause" standard of Rule 16(b) before addressing the more lenient standard of Rule 15(a). "Good cause" under Rule 16(b) exists when evidence supporting the proposed amendment would not have been discovered in the exercise of reasonable diligence until after the amendment deadline had passed. *See Forstmann v. Culp,* 114 F.R.D. 83, 85 (M.D.N.C.1987). Thus, even if the opposing party would not be prejudiced by the modification of a scheduling order, good cause is not shown if the amendment could have been timely made.

> FN2. On November 1, 2004, the parties filed a Joint Rule 26(f) Report, which the court approved without modification. The Rule 26(f) Report provides that each party would be allowed to request leave to join additional parties or amend pleadings until February 1, 2005. The Rule 26(f) Report further states that after that date the court would consider whether the granting of leave would delay trial or unduly prejudice the parties.

Here, Defendants argue that by exercising reasonable diligence, Plaintiff could have easily discovered Top Dawg's and IG Record's involvement in the production of the Ja Rule CD many months ago. Defendants point out that the written credits for each track on the Ja Rule CD acknowledged that each track was "produced by Irv Gotti for Top Dawg Productions, Inc." and that this same acknowledgment appears fifteen times throughout the liner notes for the CD. Defendants argue that "[e]ven a cursory examination of these notes prior to the filing of the lawsuit would have put Plaintiff on notice of Top Dawg's involvement with the production of the album and should have alerted Plaintiff to the possibility that other corporate entities may be involved as well." Defs.' Br. Opp. Mot. Amend at 5. The court finds Defendants' argument to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                      Page 4
Not Reported in F.Supp.2d, 2005 WL 2136946 (M.D.N.C.)
(Cite as: Not Reported in F.Supp.2d)

be persuasive. Furthermore, Plaintiff has already amended the complaint twice, the discovery period has ended, Defendants' motions for summary judgment are pending, and the trial date for this action, October 3, 2005, is now approximately six weeks away. To allow Plaintiff to amend his complaint yet again to add additional parties at this late date would possibly delay trial, an outcome that this court will not allow given that this lawsuit has been pending since December 2003. Finally, the motion to amend would be futile. Plaintiff does not allege any new conduct by IG Records or Top Dawg, but merely states that these two entities were involved in the production of the Ja Rule CD in the same manner as the existing Defendants. Even if Plaintiff were allowed to add these additional entities as Defendants, the court's reasoning for granting summary judgment will be effective as to these two proposed additional entities. Thus, it will be recommended that the court deny Plaintiff's motion to amend.

*Plaintiff's Third Motion to Compel*

**\*5** Finally, Plaintiff has filed a third motion to compel, which Defendants contend is moot because the parties have by now resolved all of their outstanding discovery issues. Plaintiff replies that he is still awaiting supplementation from Defendants and only after he is satisfied that this supplementation is adequate will he withdraw the motion to compel. After thoroughly reviewing the discovery record, as well as the parties' respective arguments on this issue, the court is satisfied that Defendants have by now adequately responded to Plaintiff's discovery requests. Thus, Plaintiff's third motion to compel is denied.

*Discussion*

The court now addresses the merits of Defendants' motions for summary judgment. Under Rule 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed. R. Civ. P. 56(c)*. A party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*

*Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)*. Once the moving party has met its burden, the non-moving party must then "set forth specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574 586-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)* (quoting *Fed. R. Civ. P. 56(e)*).

In making a determination on a summary judgment motion, the court views the evidence in the light most favorable to the non-moving party, according that party the benefit of all reasonable inferences. *Bailey v. Blue Cross & Blue Shield of Va., 67 F.3d 53, 56* (4th Cir.1995). Mere allegations and denials, however, are insufficient to establish a genuine issue of material fact. *See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)*. Judges are not "required to submit a question to a jury merely because some evidence has been introduced by the party having the burden of proof, unless the evidence be of such a character that it would warrant the jury in finding a verdict in favor of that party." *Id ., at 251* (citations omitted). Thus, the moving party can bear its burden either by presenting affirmative evidence or by demonstrating that the non-moving party's evidence is insufficient to establish its claim. *Celotex, 477 U.S. at 331* (Brennan, J., dissenting). "[A] complete failure of proof concerning an essential element of [a plaintiff's] case necessarily renders all other facts immaterial." *Celotex, 477 U.S. at 323*. Finally, in the copyright context, "a district court may determine noninfringement as a matter of law on a motion for summary judgment either when the similarity concerns only noncopyrightable elements of plaintiff work, or when no reasonable trier of fact could find the works substantially similar." *Walker v. Time-Life Films, Inc., 784 F.2d 44, 48* (2 nd Cir.1986).

*I. Copyright Infringement*

**\*6** The court first addresses Defendants' motion for summary judgment on Plaintiff's claim for copyright infringement. Under the Copyright Act, "[c]opyright protection subsists ... in original works of authorship fixed in any tangible medium of expression." *17 U.S.C. § 102*. To establish a claim for copyright infringement, a plaintiff must prove that he owns a valid copyright and that the defendant copied the original elements of that copyright. *Ale House Mgmt., Inc. v. Raleigh Ale House, Inc., 205 F.3d 137, 143* (4th Cir.2000). Where there is no direct evidence of copying, a plaintiff must prove: (1) that the defendant

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 2136946 (M.D.N.C.)
(Cite as: Not Reported in F.Supp.2d)

had access to the plaintiff's work and (2) that there is a substantial similarity between the alleged copy and the protectable elements of the original. *See Towler v. Sayles,* 76 F.3d 579 (4th Cir.1996). Here, there is no dispute that Defendants had access to Plaintiff's work. The specific issue, then, is whether the two works are substantially similar. In addressing whether works are "substantially similar," a court must consider whether two works are extrinsically and intrinsically similar. *See Lyons P'ship, L.P. v. Morris Costumes, Inc.,* 243 F.3d 789, 801 (4th Cir.2001). Extrinsic similarity focuses on the similarity between the two works' objective elements, such as plot, theme, characters, setting, pace, mood, and dialogue, whereas intrinsic similarity focuses on whether the " 'total concept and feel' of the disputed work resembles that of the plaintiff's." *Eaton v. National Broad. Co.,* 972 F.Supp. 1019, 1026 (E.D.Va.1997). In addressing this second prong, courts separate the protectable expression unique to the allegedly infringed work from the unprotectable expression that is dictated by the idea upon which the work is based. *Aliotti v. R. Dakin & Co.,* 831 F.2d 898, 901 (9th Cir.1987). Courts then look to the entire work, including the unprotectable expression, to determine if the two works are substantially similar in expression. As one court has explained:

[Comparing the two works in their entireties, including both protectable and unprotectable elements] is appropriate because although the plaintiff must ultimately establish infringement by showing that the defendant copied a substantial amount of protectable elements, (i.e., meet the "substantial similarity" standard), the fact that non-protectable elements were copied, although not a basis for liability, can be probative of whether protected elements were copied (i.e., help establish probative similarity).

*Positive Black Talk, Inc. v. Cash Money Records, Inc.,* 394 F.3d 357, 370 n. 9 (5th Cir.2004) (citations omitted) (quoting *O.P. Solutions, Inc. v. Intellectual Prop. Network, Ltd.,* No. 96 Civ. 7952, 1999 WL 47191, at *4 (S.D.N.Y. Feb.2, 1999)). Finally, in analyzing substantial similarity, a court must be "guided by the proposition that the sine qua non of copyright is originality." *Comins v. Discovery Communications, Inc.,* 200 F.Supp.2d 512, 518 (D.Md.2002) (citing *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.,* 499 U.S. 340, 345, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991)). Courts, therefore, will not find substantial similarity "where analytical dissection demonstrates that all similarities in expression arise from the use of common ideas" because protecting the expression when the idea and expression are

inseparable " 'would confer a monopoly of the idea upon the copyright owner.' " *Aliotti v. R. Dakin & Co.,* 831 F.2d 898, 901 (9th Cir.1987) (quoting *Herbert Rosenthal Jewelry Corp. v. Kalpakian,* 446 F.2d 738, 742 (9th Cir.1971)). With these principles in mind, the court turns to the two works at issue in this case.

*Plaintiff's CD Titled "Blood in My Eyes"*

**\*7** The front cover of Plaintiff's CD titled "Blood in My Eyes" features a close-up photograph of Plaintiff's face and part of his chest, tinted in red and set to the right side of the cover, with Plaintiff's alternative name "Herukhuti Ausar" in white lettering, followed by a red, computer-generated circle that resembles an eye. Underneath Plaintiff's name in smaller print are the words "Blood in My Eyes" in red lettering. *See* Pl.'s Ex. 3. The back of the CD again features a photograph of Plaintiff's face, tinted in red, with the red, computer-generated circle resembling an eye. Plaintiff's CD contains 19 songs, with the following titles: Intro / I'm Tired / Interlube (By Blood Shed) / Fat Bitch / If She Was Straight / Falling Comrades / Interlube by Rabbit / Blood On My Shoes / Incarcerated Love / Female Twins / Niggas Dug A Hole For You / Interlube (By Rabbit) / Legendary Projects / Pledge The Legion to a Real Nigga / Interlube By (Blood Shed) / Killer Niggas Get Killed To / This Goes Out To My Homies in The Pen / Interlube (By Blood Shed) / I'm Tired (Remix).

*The Ja Rule CD Titled "Blood in My Eye"*

The front cover art of the Ja Rule CD titled "Blood in My Eye" features a multicolored drawing, depicting Ja Rule walking away from a state prison-with armed guards, prison gates, and barbed wire in the background-into an urban street scene, showing urban buildings, street hustling, liquor stores, and street life. *See* Pl.'s Ex. 2. The image suggests that Ja Rule is leaving prison and returning to the urban streets. Ja Rule is wearing jeans and heavy boots, but no shirt. His chest, abdomen, and arms have several tattoos, and broken, open chains hang from his rear right ankle, suggesting that he has broken free from prison.

The rear jacket cover art depicts a multi-colored drawing of an eyeball, tinted in red, with blood dripping from the right side of the eyeball. Inside the eyeball are numerous drawings of images symbolizing the history of oppression and the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                            Page 6
Not Reported in F.Supp.2d, 2005 WL 2136946 (M.D.N.C.)
(Cite as: Not Reported in F.Supp.2d)

struggle for black civil rights in America. The scenes include a civil rights scene featuring the famous "I Am A Man" sign carried by a black garbage worker during the 1968 sanitation workers' strike in Memphis, Tennessee; signs stating "Segregation" and "Colored"; a black man being lynched; white men in hooded, white robes standing in front of a burning cross, and a depiction of gold medal winners John Carlos and Tommy Smith giving a "black power" fist salute at the 1968 Olympics in Mexico. Inside the packaging for the Ja Rule CD, an insert expresses thanks from Ja Rule to "All the black leaders: Marcus Garvey, Malcolm X, Martin Luther King, Jr, Nelson Mandela, Nat Turner, Harriet Tubman, Roy Wilkins, Muhammed Ali, George Jackson, Louis Farrahkan." Finally, a promotional label on the packaging of the Ja Rule CD states "New Low Price-Murder Inc. Presents Ja Rule's Revolutionary New Album 'Blood in My Eye' featuring the hit single 'Clap Back'." The Ja Rule CD contains 14 songs, with the following titles: Murder Intro / The Life / Clap Back/ The Crown / Kay Slay / Things Gon' Change / Race Against Time II / Bobby Creep / N* * * *s & B* * * * *s / The INC Is Back / Remo / Blood in My Eye / It's Murda / The Wrap.

**8** After closely comparing the two CDS, the court finds that almost all of the alleged similarities between the two works are based on non-protectable elements. First, as for the similarity between Plaintiff's title "Blood in My Eyes" and Ja Rule's title "Blood in My Eye," titles are generally not copyrightable. See *Positive Black Talk*, 394 F.3d at 374 n. 14 (noting the plaintiff's concession that song titles are not copyrightable); 37 C.F.R. § 202.1(a) (stating that "[w]ords and short phrases such as names, titles, and slogans" are "not subject to copyright and applications for registration of such works cannot be entertained"). It has been suggested that a title may be entitled to copyright protection if it is "arbitrary, fictitious, fanciful, artificial, or technical." *Tree Publ'g Co. v. Warner Bros. Records*, 785 F.Supp. 1272, 1274 (M.D.Tenn.1991). For example, a single-word title from a copyrighted song such as "supercalifragilisticexpialidocious" might receive copyright protection. See *Life Music, Inc. v. Wonderland Music Co.*, 241 F.Supp. 653, 656 (S.D.N.Y.1965). Plaintiff's CD title "Blood in My Eyes" is not, however, "arbitrary, fictitious, fanciful, artificial, or technical" such that it should receive copyright protection. Moreover, Plaintiff concedes that the title "Blood in My Eyes" is a direct reference to a book titled *Blood in My Eye* written by George Jackson in the 1970s. Thus, Plaintiff does not even contend that the title "Blood in My Eyes" is original

to him. See 17 U.S.C. § 102(a) (originality required for copyright protection).

As for the melodies, harmonies, rhythms, and accompanying lyrics on Plaintiff's CD, these are certainly protectable elements under copyright law. *Pendelton v. Acuff-Rose Publ'ns, Inc.*, 605 F.Supp. 477, 481 (M.D.Tenn.1984); *Black v. Gosdin*, 740 F.Supp. 1288, 1292 (M.D.Tenn.1990). A comparison of the two CDs shows, however, that the melodies, harmonies, rhythms, and accompanying lyrics on the Ja Rule CD are different from those on Plaintiff's CD, *See* Defs. Exs. 5, 7 (lyrics from the CDs). Indeed, Plaintiff freely admitted in his deposition that Defendants did not copy any of these elements of his CD:

Q: But he didn't copy your lyrics, right?

A: No, he didn't copy no lyrics.

Q: And he didn't copy your music?

A: No, he didn't copy my music.

Defs.' Ex. 1, Hayes Dep. at 33. Furthermore, in comparing the cover art of the two CDs, the CD covers do have certain thematic similarities, including almost identical titles, imagery involving the eye, and references to historical African-American figures and to revolutionary and political imagery and messages. The two CDs are also, however, significantly different from each other in several ways. For instance, Plaintiff's CD features a close-up photograph of Plaintiff's face and chest, tinted in red, whereas the cover art for the Ja Rule CD is a multi-colored drawing depicting Ja Rule in an urban setting walking away from a state prison. Indeed, Plaintiff has admitted that Defendants did not copy his artwork:

**9** Q: Can you describe for us what you believe [the artwork on the Ja Rule CD] copies from [the artwork on Plaintiff's CD]?

A: I feel like they just-they taken-they took the idea and, you know, took it to another level as far as, you know, what they had in mind. I feel like they took the concept from me, you know, but they took it and, you know, and put it in their own, you know, ways; express it in their own ways, their thoughts. But I feel like they took the-"Blood in My Eye," you know, the-the blood everywhere, the struggle movement, and then they-you know, the concept of the name itself, and moved forward with it.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                      Page 7
Not Reported in F.Supp.2d, 2005 WL 2136946 (M.D.N.C.)
**(Cite as: Not Reported in F.Supp.2d)**

Q: But you don't contend that you-that the actual artwork that appears on the cover of the Ja Rule album, the artwork itself, the drawing, was copied from the drawing or photograph that appears on the cover of your album, except at the conceptual level?

A: Yeah, I feel like they just took my idea and took their idea to another level with it. I feel like they stole the concept from me. I feel like they stole the concept of, you know, where I was going, and they took it to different heights.

Defs.' Ex. 1, Hayes Dep. at 34-35.

Finally, Plaintiff has also admitted that the content of the Ja Rule CD is markedly different from the content of Plaintiff's CD. For instance, Plaintiff stated in his deposition that his own work titled "Blood in My Eyes" involves themes such as
fighting ... against injustice and basically fighting for, you know, trying to ... expand the mindset ... of ... younger youth that was experiencing and going through things in their life and, you know. And while I was incarcerated, I communicated with a lot of brothers that was going through, you know, similar situations as I was and ... it was basically about, you know, expanding the mentality and growth.

Defs.' Ex. 1, Hayes Dep. at 12. Plaintiff stated that the Ja Rule CD, by contrast, is focused on Ja Rule's personal life and his petty disputes with other rapper artists and that it lacks the same message of political or social empowerment that is allegedly found on Plaintiff's CD:

Q: What is the-how would describe the music on Ja Rule's CD, "Blood in My Eye"?

A: Basically ... still a party album and a more of a, you know, strike back at [another rapper artist], basically, as far as what they was going through and what that was experiencing. And, you know, he spoke on no conscience issues; spoke on no political figures, and-

Q: Did he have a message that you could discern directed towards younger African American youth?

A: No, sir.

Q: Did he have a political message of any kind that you could discern?

A: No, sir.

Defs.' Ex. 1, Hayes Dep. at 23. The gist of Plaintiff's argument, then, is that Defendants copied essentially the *theme* of Plaintiff's CD "Blood in My Eyes" by packaging the Ja Rule CD as a "work of revolutionary, political, and social nature":

Q: And your position is that they took the idea of having an album entitled "Blood in My Eye," referring to George Jackson, that had some artwork and associated packaging that-that suggested that there would be a political message to it, your position is that they obtained that idea from you.

**\*10** A: Yes, sir.

Defs.' Ex. 1, Hayes Dep. at 28.

Q: So, it's the idea of the album that-the idea of the album as being a work of historical, political and social conscience that in your view is misleading?

A: Yes, sir.

Q: And he took that idea from you in your view?

A: Yes, sir.

Defs.' Ex. 1, Hayes Dep. at 29.

Q: So, is it your position that he copied the idea of a work of social conscience based on some allusions to George Jackson?

A: Yeah.

Defs.' Ex. 1, Hayes. Dep. at 33. Here, based on Plaintiff's own deposition testimony, it is clear that Plaintiff's copyright claims are based primarily on Defendants' copying of nonprotectable elements, such as the title of Plaintiff's CD, along with its theme of racial injustice and as a work of historical, political, and social conscience. Plaintiff even admits that although Defendants packaged the Ja Rule CD in a way that made it appear that its content would contain the same themes as those found in Plaintiff's work, the Ja Rule CD ultimately "don't reflect on [Plaintiff's idea] at all." [FN3] Hayes Dep. at 29. Furthermore, Plaintiff's expert Dr. Tricia Rose, a scholar of African-American culture with a specialty in black music, particularly hip-hop, testified:

[FN3.] Indeed, as Defendants note, in support of his false advertising claim, Plaintiff

asserts that the differences between the two albums are so striking that it is actionable for Defendants to suggest that the Ja Rule CD actually contains the same "revolutionary" ideas as Plaintiff's work. Am. Compl. ¶ 54; Hayes Dep. at 24-25.

[The two works] share the themes of gangster life, but they do so in significantly different ways. And from importantly different points of view. So that they broadly, at the broadest scope, they share some general traits around some gangster themes. But they take up very different identities in that theme, and therefore, the difference in identities changes the political meaning of what it is they are talking about, along with the detailed content. So they share, broadly speaking, some similar themes, but they express them in very different ways.

Defs.' Ex. 8, Rose Dep. at 14. It is well settled that a copyright does not protect its owner from the use by others of the ideas, themes, locale, or characters in his copyrighted work. *Fuld v. Nat'l Broad. Co.,* 390 F.Supp. 877, 881 (S.D.N.Y.1975); *see also* 17 U.S.C. § 102(b) ("In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery."). Furthermore, neither historical facts and events nor interpretations of those events are protected by copyright. *Hoehling v. Universal City Studios, Inc.,* 618 F.2d 972, 978 (2nd Cir.1980); *Gardner v. Nizer,* 391 F.Supp. 940, 942-43 (S.D.N.Y.1975). Additionally, where "common sources exist for the alleged similarities, or the material that is similar is otherwise not original with the plaintiff, there is no infringement." *Alexander v. Haley,* 460 F.Supp. 40, 45 (S.D.N.Y.1978) (in a copyright infringement suit against the author of *Roots,* a book about black slavery, finding no copyright infringement where the two books shared many of the same themes and symbols of black slavery and racial injustice); *see also Fuld,* 390 F.Supp. at 881 ("[O]ne work does not violate the copyright in another simply because there is a similarity between the two, if the similarity results from the fact that both works deal with the same subject or have the same common sources."); *Greenbie v. Noble,* 151 F.Supp. 45, 66 (S.D.N.Y.1957) ("By drawing upon materials and information from sources available to all, an author does not thereby obtain the right to exclude others from using the same materials.").

**\*11** Here, the common sources for the alleged similarities between Plaintiff's CD and the Ja Rule CD were George Jackson's book *Blood in My Eye,* as well as the themes of racial injustice and oppression. Even if Defendants may have drawn from Plaintiff's work similar themes of racial injustice and struggles against oppression and used those themes in packaging the Ja Rule CD, this does not constitute copyright infringement. Furthermore, the themes of racial injustice and oppression, connoted by the phrase "Blood in My Eye," may be considered "stock themes," which are so universal that they cannot be considered original for copyright purposes. *See Walker v. Time Life Films, Inc.,* 784 F.2d 44, 50 (2nd Cir.1986). Here, by Plaintiff's own account, the phrase "Blood in My Eye," which even Plaintiff concedes is originally attributable to George Jackson and not to Plaintiff, has come to be known throughout the cultural landscape as a symbol of the struggle against racial injustice, and Plaintiff has no right under the copyright laws to a monopoly on the *theme* of a politically conscious, hip-hop album in the tradition of George Jackson. Since there is no copyright in the ideas and themes that Plaintiff seeks to protect, and since the court finds that the two works at issue are not substantially similar, Defendants are entitled to summary judgment on Plaintiff's copyright infringement claim.

## II. Fraud/Fraudulent Inducement

The court next addresses Defendants' motion for summary judgment on Plaintiff's claim for fraud/fraudulent inducement. To establish fraud under North Carolina law, a plaintiff must prove (1) false representation or concealment of a material fact; (2) reasonably calculated to deceive; (3) made with intent to deceive; (4) which does in fact deceive; (5) resulting in damage to the injured party. *RD & J Props. v. Lauralea-Dilton Enters.,* 165 N.C.App. 737, 600 S.E.2d 492, 497 (N.C.Ct.App.2004). Here, in support of his fraud claim, Plaintiff contends that Defendants Gotti and M.I. Records defrauded him into giving him a copy of his CD by acting as if they were interested in signing him to a record deal. Second Amended Compl. ¶¶ 16-19, 45. Plaintiff has produced no evidence, however, that Defendants misrepresented or concealed any material facts, that Defendants had any intent to deceive Plaintiff, or that Plaintiff sustained any damages from handing over a copy of his CD. The alleged misrepresentation of material fact appears to be that Defendants told Plaintiff they wanted his CD so they could consider him for a record deal, when in fact they wanted his CD so that they could infringe Plaintiff's copyright. The court has already found, however, that Defendants did not infringe any copyright that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 9
Not Reported in F.Supp.2d, 2005 WL 2136946 (M.D.N.C.)
(Cite as: Not Reported in F.Supp.2d)

Plaintiff had in his CD. At most, Plaintiff has shown that Defendants expressed an interest in listening to Plaintiff's CD so that they might consider it for a future record deal. Defendants' decision not to sign Plaintiff to a record deal after having listened to his CD does not amount to an actionable claim for fraud. Thus, Defendants are entitled to summary judgment on Plaintiff's fraud claim.

### III. Unfair Competition and False Advertising under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)

**\*12** The court next addresses Defendants' motion for summary judgment on Plaintiff's claims against Defendants for unfair competition and false advertising in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). Plaintiff's unfair competition claim is based on Defendants' use of "Blood in My Eye" as the title of the Ja Rule CD. In support of this claim, Plaintiff alleges that "Defendants, in connection with the advertising and sale of the Ja Rule Album, are using in commerce the term 'Blood in My Eye,' which is likely to cause confusion, to cause mistake, or to deceive as to the affiliation, connection, or association of Ja Rule and/or the album with Plaintiff and/or Plaintiff's copyrighted works, and/or as to the origin, sponsorship, or approval of the album by Plaintiff." Second Amended Compl. ¶ 52. To prevail on a claim for unfair competition under section 43(a) of the Lanham Act, Plaintiff must prove that he has a valid, protectable trademark in the title "Blood in My Eye" and that Defendant's use of a colorable imitation of the trademark is likely to cause confusion among consumers. *See* 15 U.S.C. § 1114(1)(a); *U.S. Search, LLC v. U.S. Search.com Inc.,* 300 F.3d 517, 523 (4 th Cir.2002); *Lone Star Steakhouse & Saloon, Inc. v. Alpha of Va., Inc.,* 43 F.3d 922, 930 (4th Cir.1995). In order to enjoy trademark rights in the title of an expressive work such as "Blood in My Eye," a plaintiff must prove that the title has "secondary meaning." *See Heirs of Estate of Jenkins v. Paramount Pictures Corp.,* 90 F.Supp.2d 706, 713 (E.D.Va.2000) (holding that even if the science fiction title "First Contact" was a descriptive phrase it had not acquired secondary meaning and so it was not entitled to trademark protection) (quoting *Rogers v. Grimaldi,* 875 F.2d 994, 998 (2 nd Cir.1989)). Secondary meaning is "the consuming public's understanding that the mark, when used in context, refers not to what the descriptive word ordinarily describes, but to the particular [source] that the mark is meant to identify." *U.S. Search,* 300 F.3d at 525.

Proof of secondary meaning entails a rigorous evidentiary standard, which requires a court to consider numerous factors, such as (1) advertising expenditures; (2) consumer studies linking the mark to a source; (3) sales success; (4) unsolicited media coverage of the product; (5) attempts to plagiarize the mark; and (6) the length and exclusivity of the mark's use. *U.S. Search,* 300 F.3d at 525. Finally, the burden of proving secondary meaning is on the party asserting it. *Id.*

Here, Plaintiff has come forward with no evidence of any of the above-listed factors or any other factors that would establish that members of the public view the title "Blood in My Eye" as a source-identifier for Plaintiff. First, as already noted by the court, "Blood in My Eye" is a title that Plaintiff acknowledges that he copied from an earlier work created by George Jackson. Furthermore, Plaintiff's expert Dr. Rose testified that she has done no analysis and renders no opinion on consumer behavior as it relates to either the Ja Rule CD or Plaintiff's CD. Specifically, Dr. Rose testified that she (1) has not collected any information about the marketing and selling of Plaintiff's CD; (2) has not undertaken any analysis or study of the number, type, or characteristics of consumers, if any, who have purchased Plaintiff's work; (3) has not undertaken any formal analysis or study of how many hip-hop consumers may be familiar with George Jackson's book *Blood in My Eye;* (4) has not attempted to find out what percentage of hip-hop consumers may be familiar with the Jackson book, the Ja Rule CD, or Plaintiff's CD; (5) has not done any study or analysis of the popularity of the Ja Rule CD, the characteristics of consumers who may have purchased the CD, or what factors might have influenced such consumers to purchase the CD; (6) has made no attempt to determine how many (if any) hip-hop consumers bought the Ja Rule CD believing that it contained politically conscious content; and (7) has not undertaken any analysis of how sales of Plaintiff's CD may have been impacted by the sale of the Ja Rule CD. *See* Defs.' Ex. 8, Rose Dep. at 27-28, 32, 49-53. Furthermore, Dr. Rose testified that she has "no idea" of the number of hip-hop consumers who might associate the title "Blood in My Eye" with Plaintiff. *See* Defs.' Ex. 8, Rose Dep. at 50-51. The rest of the evidence, including Plaintiff's Initial Disclosures and his own deposition testimony, also fails to show that Plaintiff has established secondary meaning for himself in the title "Blood in My Eye." The only evidence that Plaintiff has submitted to support his claim that he has established secondary meaning in the title "Blood in My Eye" consists of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                 Page 10
Not Reported in F.Supp.2d, 2005 WL 2136946 (M.D.N.C.)
(Cite as: Not Reported in F.Supp.2d)

some records of sales and radio play for some of Plaintiff's music, but the song titles shown in that documentation do not appear to show any sales or radio play from the "Blood in My Eyes" CD. For instance, the documentation shows sales and radio play for two songs by Plaintiff titled "Thug Angel" and "Black Super Heroes" from an album titled "Money Over Death," but the court finds no references to the "Blood in My Eyes" CD. In any event, it does not even appear that these documents have been properly authenticated and therefore the court doubts their admissibility. In sum, the court finds that as a matter of law Plaintiff has failed to show that the title "Blood In My Eye" has acquired secondary meaning that is attributable to him. It will, therefore, be recommended that the court grant Defendants' motion for summary judgment on Plaintiff's claim for unfair competition.

**\*13** The court next considers Defendants' motion for summary judgment as to Plaintiff's false advertising claim. Section 43(a) of the Lanham Act provides a civil cause of action against a person who misrepresents the "nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities" in "commercial advertising or promotion." 15 U.S.C. § 1125(a)(1)(B). The Fourth Circuit has adopted a five-element test for adjudicating false advertising claims under the Lanham Act. To recover, the plaintiff must establish that (1) the defendant made a false or misleading description of fact or representation of fact in a commercial advertisement about his own or another's product; (2) the misrepresentation is material in that it is likely to influence the purchasing decision; (3) the misrepresentation actually deceives or has the tendency to deceive a substantial segment of its audience; (4) the defendant placed the false or misleading statement in interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the misrepresentation, either by direct diversion of sales or by a lessening of goodwill associated with its products. *Scotts Co. v. United Indus. Corp.,* 315 F.3d 264, 272 (4th Cir.2002). In support of his claim for false advertising, Plaintiff argues that the Ja Rule CD's use of the title "Blood in My Eye," its labeling as "revolutionary," its cover artwork depicting Ja Rule coming out of the prison system, and its references in the album insert to historical figures such as George Jackson, Marcus Garvey, and Nat Turner create the false impression that the Ja Rule CD contains a revolutionary empowerment message in the tradition of those figures. Plaintiff argues that, in reality, the Ja Rule CD does not carry a political theme but is, instead, a

compilation of so-called "gangsta" rap in which Ja Rule mostly sings about petty fights without other rapper artists. The court agrees with Defendants that Plaintiff's claim for false advertising is wholly without merit, and Defendants are entitled to summary judgment on this claim. Here, Plaintiff offers no evidence to show that the packaging of the Ja Rule CD and the description of the CD as "revolutionary" is a "false or misleading statement of fact," that it has deceived or has the tendency to deceive "a substantial segment of potential consumers," that any such deception was material and "likely to influence the purchasing decision," or that Plaintiff has been or is likely to be injured by the alleged misrepresentations. The alleged misrepresentations, including the album title, packaging, cover art, and album insert suggesting "revolutionary" content, are not sufficiently objective and verifiable to constitute false statements of fact of the type required to support a false advertising claim under the Lanham Act. At most, the description of the Ja Rule CD as "revolutionary" is akin to a non-actionable statement of objective opinion, or "puffing." *See, e.g., American Italian Pasta Co. v. New World Pasta Co.,* 371 F.3d 387, 390-91 (8th Cir.2004) (holding that a statement in advertising describing the defendant's product as "America's Favorite Pasta" was subjective and therefore could not give rise to a false advertising claim); *Bologna v. Allstate Ins. Co.,* 138 F.Supp.2d 310, 323 (E.D.N.Y.2001) (stating that the slogan "You're in good hands with Allstate" was general and subjective and was therefore not actionable under the Lanham Act). Even Plaintiff's own expert conceded that the term "revolutionary" can have different meanings in different contexts. Rose Dep. at 56. Although Dr. Rose testified that various features of the Ja Rule CD create a false impression that the CD contains a revolutionary message of political consciousness, she also conceded that her analysis was based on her subjective interpretation of the CD. Rose Dep. at 55-56, 58. In sum, Plaintiff has produced no evidence to raise a genuine issue of fact to support these essential elements of a false advertising claim.

**\*14** Furthermore, Plaintiff has offered no evidence to demonstrate any cognizable injury to himself that was proximately caused by Defendants' alleged false statements. To bring a claim under the false advertising provisions of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), a plaintiff must have sustained or must be likely to sustain a discernibly competitive injury. *See Made in the USA Found. v. Phillips Foods, Inc.,* 365 F.3d 278 (4th Cir.2004); *see also Kournikova v. General Media Communications,*

Case 1:05-cv-00376-GMS    Document 109-3    Filed 07/30/2007    Page 39 of 54

Not Reported in F.Supp.2d                                                                    Page 11
Not Reported in F.Supp.2d, 2005 WL 2136946 (M.D.N.C.)
(Cite as: Not Reported in F.Supp.2d)

*Inc.*, 278 F.Supp.2d 1111, 1118-20 (C.D.Cal.2003). The "competitive injury" requirement flows from the legislative purpose of the Lanham Act, which is "to protect persons engaged in ... commerce from unfair competition." 15 U.S.C. § 1127. Here, Plaintiff has produced no evidence to show that he is engaging in meaningful competition with Defendants, nor has he come forward with any evidence of lost sales or other competitive injury resulting from Defendants' act of advertising the Ja Rule CD as "revolutionary" in nature. Without such evidence, Plaintiff lacks standing to bring a false advertising claim against Defendants. In sum, Plaintiff cannot establish the essential elements required for a false advertising claim under the Lanham Act, and the court should grant summary judgment to Defendants as to this claim.

### IV. Unfair and Deceptive Trade Practices under N.C. Gen.Stat. § 75-1.1

Finally, as for Plaintiff's claim alleging a violation of North Carolina's unfair and deceptive trade practices statute, *see* N.C. Gen.Stat. § 75-1.1, this claim is predicated on the same actions giving rise to some or all of Plaintiff's other claims in the Second Amended Complaint. To establish a prima facie claim for unfair trade practices under N.C. Gen.Stat. § 75-1.1, the plaintiff must show that the defendant committed an unfair or deceptive act that affected commerce and proximately injured the plaintiff. *Pleasant Valley Promenade v. Lechmere, Inc.*, 120 N.C.App. 650, 464 S.E.2d 47 (1995). Here, to the extent Plaintiff relies on the allegations of copyright infringement to support his unfair and deceptive practices claim, the unfair and deceptive practices claim is preempted by Section 301 of the Copyright Act. [FN4] *Nintendo of Am., Inc. v. Aeropower Co., Ltd.*, 34 F.3d 246, 251 (4th Cir.1994) ("[T]he Copyright Act's remedial scheme, of which the statutory damages provision of § 504(c) is an integral part, provides the exclusive remedies for copyright infringement, and it contains no provision for trebling statutory damages, either as an integral feature of the federal remedial scheme or by invoking any trebling provisions of state law.") (citation omitted); *see also Collezione Europa U.S.A., Inc. v. Hillsdale House, Ltd.*, 243 F.Supp.2d 444, 450 (M.D.N.C.2003). To the extent that Plaintiff relies on claims other than copyright infringement-such as fraud, false advertising, and unfair competition-to sustain the unfair trade practices claim, Defendants are entitled to summary judgment for the reasons discussed above as to those claims. In sum, Plaintiff has not presented evidence sufficient to raise a

genuine issue of fact as to whether Defendants engaged in unfair trade practices, and it will therefore be recommended that the court grant Defendants' motion for summary judgment as to this claim.

> FN4. Pursuant to section 301 of the Copyright Act, state law causes of action are preempted when they involve the equivalent of the protections afforded copyrightable subject matter by § 106 of the Act. *See* 17 U.S.C. § § 106, 301(a).

### CONCLUSION

**\*15** For the reasons stated herein, it is ORDERED that Plaintiff's motion to strike [docket no. 103] the summary judgment motion filed by Defendants Irv Gotti and Ja Rule is DENIED and Plaintiff's third motion to compel [docket no. 92] is DENIED. Furthermore, it is RECOMMENDED that the court DENY Plaintiff's motion to amend his Second Amended Complaint [docket no. 90] and that the court GRANT Defendants' motions for summary judgment [docket nos. 63 and 83].

M.D.N.C.,2005.
Hayes v. Rule
Not Reported in F.Supp.2d, 2005 WL 2136946 (M.D.N.C.)

END OF DOCUMENT



Not Reported in F.Supp.2d                                                                                                    Page 1
Not Reported in F.Supp.2d, 2006 WL 2570837 (D.N.J.)
**(Cite as: Not Reported in F.Supp.2d)**

**H** Luna v. Weiner
D.N.J.,2006.
Only the Westlaw citation is currently available.NOT
FOR PUBLICATION
United States District Court,D. New Jersey.
Victor M. LUNA, Plaintiff,
v.
A. Kenneth WEINER, Esq., Diana Farrell, and Judith
Rosenstein, Defendants.
**Civil Action No. 05-2298.**

Sept. 5, 2006.

Victor M. Luna, New Brunswick, NJ, pro se.
Christopher C. Josephson, Office of the New Jersey
Attorney General, Trenton, NJ, for Defendant.

**OPINION**
KATHARINE S. HAYDEN, U.S.D.J.
**\*1** Currently before the Court is a motion for a
judgment on the pleadings pursuant to Fed.R.Civ.P.
12(c) that Diana Farrell ("Farrell") filed after this
Court granted summary judgment to the other
defendants in this case (*see* written opinion dated
May 23, 2006) and directed her to file for summary
judgment within 30 days. Plaintiff has not filed
opposition to the motion.

As a preliminary procedural matter requiring the
Court's attention, on August 18, 2006, plaintiff filed
an amended complaint, in which he adds James
Perdoni, the parole officer who succeeded Farrell, as
a defendant, alleging Perdoni harassed him. (See
Amended Complaint, ¶ 2; ¶ 7). Then, on August 29,
2006, he filed a motion seeking to leave to amend his
complaint.

Fed.R.Civ.P. 15 governs the circumstances
surrounding amending a pleading, and provides, in
pertinent part:
(a) Amendments. A party may amend the party's
pleading once as a matter of course *before a
responsive pleading is served,* or, if the pleading is
one to which no responsive pleading is permitted and
the action has not been placed upon the trial calendar,
the party may so amend it at any time within 20 days
after it is served. *Otherwise a party may amend his
pleading only by leave of court or by written consent
of the adverse party;* and leave shall be freely given

when justice so requires.

Fed.R.Civ.P. 15(a) (emphasis added).

Here, responsive pleadings were served, so plaintiff
needed leave of court to amend the complaint prior to
filing. Plaintiff failed to seek leave until after he filed
the pleading. Even had plaintiff requested leave in
advance, such an application would be too late and
deemed prejudicial, as motions for dismissal and
summary judgment were filed and ruled upon. *See,
e.g., Foman v. Davis,* 371 U.S. 178, 182 (1962); *Heyl
and Patterson Int'l, Inc. v. F.D. Rich Housing of the
Virgin Islands, Inc.,* 663 F.2d 419, 425 (3rd
Cir.1981); *Harrison Beverage Co. v. Dribeck
Importers, Inc.,* 133 F.R.D. 463, 468 (D.N.J.1990)
(stating that leave to amend may be denied where
there is undue delay or undue prejudice to the
opposing party). Reviewing the long list of
complaints about the proposed defendant Perdoni, it
is evident to the Court that plaintiff is attempting to
shoal up his lawsuit, substantively dismissed as to all
defendants except the movant, by finding another
target for his discontent. This is not proper under the
most benign reading of the Rules of Court. Under
Rule 15, and because amending as a form of
opposing a substantive motion is not proper,
plaintiff's untimely motion to amend is denied and the
amended complaint dismissed.

Addressing Farrell's motion: Luna pleaded guilty in
June, 1998, to sexually assaulting two minor
children. After he served his sentence for sexual
assault, he was designated a sex offender; as a
consequence, he is subject to the registration and
reporting requirements of Megan's Law, *N.J.S.A.
2C:7-1* to 11. As such, he is supervised by the New
Jersey Parole Board, and the claims he asserts against
this remaining defendant in his lawsuit are brought in
connection with his parole supervision.

**\*2** Farrell moves for judgment on the pleadings
pursuant to Fed.R.Civ .P. 12(c) on the basis of
plaintiff's failure to state a claim upon which relief
can be granted. She argues first, that Luna cannot
establish an Eighth Amendment denial of medical
care claim because he cannot demonstrate that he is
in the physical custody of the government; and
second, that he cannot establish that she acted with
"deliberate indifference" or that he suffered from a
"serious medical need." (Farrell Br. at 1-2.) For the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

reasons set forth below, the Court grants the motion and dismisses all claims against Farrell. This ruling closes the case.

## I. BACKGROUND

Plaintiff was arrested and charged with sexual assault of two minor children on or about June 20, 1997. (Compl. at ¶ 3). His complaint asserts that on June 15, 1998, he accepted a plea bargain upon the advice of his attorney, A. Kenneth Weiner. (Compl. at ¶ 8 .) He served 34 months and was released on or about March 1, 2000. (Compl. at ¶ 10.) Upon his release, he became subject to the reporting requirements under Megan's Law, *N.J.S.A.* 2C:7-1 to 11, whereby he must be monitored by the Parole Board for at least 15 years from either the date of conviction or release from incarceration, whichever is later. *N.J.S.A.* 2C:43-6.4(c). (Compl. at ¶ 11; Farrell Br. at Statement of Facts at 3.) Under this Community Supervision for Life ("CSL") monitoring, Luna is "subject to conditions appropriate to protect the public and foster rehabilitation." *N.J.S.A.* 2C:43-6.4(b). (Farrell Br. at 3.)

As a condition of CSL, the Parole Board assigned plaintiff to group and individual therapy sessions for convicted sex offenders conducted by Rosenstein, a licensed clinical social worker and therapist. (Compl. at ¶ 41; Farrell Br. at Statement of Facts at 3 .) Plaintiff's parole officer, defendant Diana Farrell, directed that Rosenstein provide these therapy sessions, which began in June, 2004, and continued for about one year. (Compl. at ¶ 12; Farrell Br. at Statement of Facts at 3-4.)

As to Farrell, specifically, the complaint alleges that she demonstrated "deliberate indifference to a serious medical condition," which violated plaintiff's Eighth Amendment rights. (Compl. at ¶ 12; ¶ 46.) He claims that this was accomplished by forcing him to attend sex therapy, which he claims was not beneficial, and for "interrupt[ing] [plaintiff] for on or about [sic] 7 months without medications for his psychiatric conditions." (Compl. at ¶ 12.) The complaint avers that "[o]n or about March 2004, officer Ferrell, forced Plaintiff to go to attend sex therapy in which he does not benefits [sic], and he does not receives from this therapy any medications for Plaintiff [sic] psychiatric conditions...." (Compl. at ¶ 12.) Plaintiff also brings state claims of negligence against all defendants, including Farrell. (Compl. at ¶ ¶ 60-63.)

## II. STANDARD OF REVIEW

***3** Federal Rule of Civil Procedure 12(c) states, in pertinent part: "[a]fter the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings." *Fed.R.Civ.P.* 12(c). The standard of review used for a motion for judgment on the pleadings is substantively identical to that of a motion to dismiss; the difference between the two is procedural-a motion for judgment on the pleadings is filed after the pleadings are closed, and a motion to dismiss is filed in lieu of an answer. *See Woolley v. Commonwealth of Pa.,* 2006 WL 485850, *1 (M.D.Pa.2006) (citing *Rose v. Bartle,* 871 F.2d 331, 342 (3d Cir.1989); *Regalbuto v. City of Philadelphia,* 937 F.Supp. 374, 376-77 (E.D.Pa.1995) and stating that "[c]ourts have applied the same standard of review for a motion for judgment on the pleadings under Rule 12(c) as they do for a motion to dismiss under Rule 12(b)).

A motion for judgment on the pleadings is not granted "unless the movant clearly establishes that no material issue of fact remains to be resolved." *Jablonski v. Pan American World Airways, Inc.,* 863 F.2d 289, 290-91 (3d Cir.1988) (citing *Society Hill Civic Association v. Harris,* 632 F.2d 1045, 1054 (3d Cir.1980)). In reviewing the grant of a Rule 12(c) motion, the Court must "view the facts presented in the pleadings and the inferences to be drawn therefrom in the light most favorable to the nonmoving party." *Id.* The Court must accept the complaint's well-pleaded allegations as true, and construe the complaint in the light most favorable to the non-moving party, but will not accept unsupported conclusory statements. *Allah v. Brown,* 351 F.Supp.2d 278, 280 (D.N.J.2004). If, after this review, the Court is satisfied that no material issue of fact remains, it will determine that on the basis of the pleadings, the movant is entitled to judgment as a matter of law, and will therefore grant the motion pursuant to *Fed.R.Civ.P.* 12(c) *Id.*

The Court will take into account that this plaintiff is proceeding *pro se*, and will liberally construe the pleadings and will apply the applicable law, "irrespective of whether the pro se litigant has mentioned it by name." *Higgins v. Beyer,* 293 F.3d 683, 688 (3d Cir.2002) (citing *Holley v. Dep't of Veteran Affairs,* 165 F.3d 244, 247-48 (3d Cir.1999)).

## III. DISCUSSION

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2570837 (D.N.J.)
(Cite as: Not Reported in F.Supp.2d)

Plaintiff alleges that Farrell violated his Eighth Amendment rights by forcing him to undergo therapy that was unnecessary and ineffective. (Compl. at ¶ 12; ¶ 46.) Title 42 U.S.C. § 1983 provides a private cause of action against State actors for a deprivation of rights protected by a federal statute or the United States Constitution. To bring such a claim, a plaintiff must demonstrate: (1) a violation of a right secured by the Constitution or the laws of the United States; and (2) that the deprivation was committed by a person acting under the color of State law. *Abraham v. Raso,* 183 F.3d 279, 287 (3d Cir.1999).

**\*4** The Eighth Amendment of the United States Constitution reads:
Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.

U.S. Const. amend. VIII. Plaintiff claims that he was forced to undergo supervision by Farrell and other parole officers, and to attend several therapy sessions. He complains about the quality of therapy he received, stating that it was not beneficial, and asserts that this constitutes "deliberate indifference" to his medical needs. His claim fails.

To begin with, in order to demonstrate an Eighth Amendment claim alleging deliberate indifference to a serious medical need, a plaintiff must demonstrate that he was in the physical custody of the government. *Estelle v. Gamble,* 429 U.S. 97, 106. This is because "when the State takes a person into custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being" because it is restraining the person's liberty to care for himself. *DeShaney v. Winnebago County Dept. of Social Servs.,* 489 U.S. 189, 199-200 (1989); *County of Sacramento v. Lewis,* 523 U.S. 833, 851 (1998) (stating that "in the custodial situation of a prison, forethought about an inmate's welfare is not only feasible but obligatory under a regime that incapacitates a prisoner to exercise ordinary responsibility for his own welfare."). Here, Luna was on parole, and had the liberty to care for himself and exercise choice over medical attention. *See County of Sacramento,* 523 U.S. at 851 (stating that the term "deliberate indifference" "is sensibly employed only when actual deliberation is practical, and in the custodial situation of a prison, forethought about an inmate's welfare is not only feasible but obligatory under a regime that incapacitates a prisoner to exercise ordinary responsibility for his

own welfare." (citations omitted)).

Even had Luna been incarcerated, his claim would still fail. In *Farmer v. Brennan,* 511 U.S. 825 (1994), the Supreme Court held that a prison official can be held liable for deliberate indifference only "if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer,* 511 U.S. at 847. In *Montgomery v. Pinchak,* 294 F.3d 492 (3d Cir.2002), the court ruled that a plaintiff must demonstrate two elements in order to set forth a *prima facie* case for cruel and unusual punishment based on the denial of medical care amounting to deliberate indifference. First there must be "an 'objective' showing that the deprivation was 'sufficiently serious,' or that the result of defendant's denial was sufficiently serious." *Id.* at 499 (internal quotation marks and citations omitted). Second, there must be "a 'subjective' showing that defendant acted with 'a sufficiently culpable state of mind.' " *Id.* Luna does not satisfy either element.

**\*5** First, his alleged "deprivation" is that the therapy he received was "therapy in which he does not benefits [sic], and he does not receives [sic] from this therapy any medications for Plaintiff [sic] psychiatric conditions...." (Compl. at ¶ 12.) Giving plaintiff's vague, conclusory assertions of inadequate therapy as much force as possible, at best the claims could characterized as alleging malpractice. "It is well-settled that claims of negligence or medical malpractice, without some more culpable state of mind, do not constitute 'deliberate indifference.' " *Rouse v. Plantier,* 182 F.3d 192, 197 (3rd Cir.1999). A defendant must have known of and disregarded "an excessive risk to inmate health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan,* 511 U.S. 825, 825 (1994). Deliberate indifference, the prerequisite conduct to a constitutional claim, requires "obduracy and wantonness," which has been likened to conduct that includes recklessness or a conscious disregard of a serious risk. *Id.* (citing *Whitley v. Albers,* 475 U.S. 312, 319 (1986)). Where alleged negligence or malpractice was deemed sufficiently intentional to pass constitutional muster, courts have required additional instances of conduct to be show to demonstrate "deliberate indifference," such as the infliction of harm by a willful refusal to provide needed care, or persistent use of flawed medical treatment. *See Montgomery,* 294 F.3d 492. All that Luna asserts is that the treatment he received did not

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2570837 (D.N.J.)
**(Cite as: Not Reported in F.Supp.2d)**

"benefits [sic]" him. (Compl. at ¶ 12.)

In addition, plaintiff has failed to demonstrate that he was placed into therapy as a result of a "serious" medical need. Rather, he was assigned to therapy as a part of his parole terms. A "serious medical need" has been defined as one that has been "diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention." *Monmouth County Correctional Inst. Inmates v. Lanzaro,* 834 F.2d 326, 346 (3d Cir.1987). Plaintiff provides no factual predicate for a finding of serious medical need, a basic requirement for this Eight Amendment claim.

Further distancing plaintiff from establishing a viable constitutional claim, when a non-detained person brings an Eighth Amendment claim, the higher standard of "shocks the conscience" is used, rather than "deliberate indifference." *See Koulta ex rel. Estate of Koulta v. City of Centerline,* 2006 WL 1000770, *5 (E.D.Mich.2006). As the Sixth Circuit has stated:
where a plaintiff claims that a non-custodial substantive due process violation has occurred because of the government's deliberate indifference, something more must be shown-a something that we have variously described as callous disregard for the risk of injury or action in an arbitrary manner that shocks the conscience or that indicates an intent to injure.... [O]nly the most egregious official conduct can be said to be 'arbitrary in the constitutional sense.'

**\*6** *Schroder v. City of Fort Thomas,* 412 F.3d 724, 730 (6th Cir.2005). *See also County of Sacramento v. Lewis,* 523 U.S. 833, 846; 851-52 (1998) (stating that deliberate indifference is insufficient for liability in non-custodial situations). Plaintiff's allegations of negligence and his basic disappointment about the benefits of his therapy do not come close to meeting this high standard.

The Court concludes that plaintiff fails to state a constitutional violation on Farrell's part and dismisses the federal claims in his complaint. When a court dismisses a federal claim, it may, in its discretion, exercise supplemental jurisdiction over the pendent state-law claims. *See Arbaugh v. Y & H Corp.,* 126 S.Ct. 1235, 1244-45 (2006). When "all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine-judicial economy, convenience, fairness, and comity-... points toward declining to exercise jurisdiction over the remaining state-law

claims." *Carnegie-Mellon Univ. v. Cohill,* 484 U.S. 343, 350 n. 7 (1988). In its discretion, this Court declines to exercise supplemental jurisdiction over the state claim of negligence.

## IV. CONCLUSION

Plaintiff's claims against Farrell, which arise out of her professional services as parole officer, appear to reflect his frustration with remaining in the Parole Board's control, exemplified in his statement that "[u]nder Megan's Law, Plaintiff can not [sic] move without reporting it to the police, parole, and the Prosecutors Office [sic] ..." (Compl. at ¶ 14.) This point of view cannot substitute for, or rise to the level of, cognizable constitutional claims. As a consequence, plaintiff's complaint is dismissed against Farrell, the remaining defendant. An appropriate order accompanies this decision.

D.N.J.,2006.
Luna v. Weiner
Not Reported in F.Supp.2d, 2006 WL 2570837 (D.N.J.)

END OF DOCUMENT

Westlaw

Slip Copy                                                                                                          Page 1
Slip Copy, 2007 WL 203943 (D.N.J.)
(Cite as: Slip Copy)

Thoman v. Philips Medical Systems
D.N.J.,2007.
Only the Westlaw citation is currently available.NOT
FOR PUBLICATION
United States District Court,D. New Jersey.
Charles THOMAN, Plaintiff,
v.
PHILIPS MEDICAL SYSTEMS, Defendant.
Civ. No. 04-3698 (GEB).

Jan. 24, 2007.

George Wright Fisher, Jr., Zuckerman & Fisher,
LLC, Princeton, NJ, for Plaintiff.
Jeffrey L. Reiner, Morristown, NJ, for Defendant.

**MEMORANDUM OPINION**
BROWN, Chief Judge.
**\*1** This matter comes before the Court upon the
motion of defendant Philips Medical Systems
("Defendant") for partial summary judgment of the
Complaint of plaintiff Charles Thoman ("Plaintiff").
The motion for partial summary judgment was filed
on behalf of Defendant on April 21, 2006. This
matter was reassigned to the undersigned on
November 16, 2006. The Court has read and
considered all documents filed and submitted and has
decided the motion based upon the parties'
submissions and without oral argument, pursuant to
Federal Rule of Civil Procedure 78. For the reasons
set forth below, Defendants' motion for summary
judgment is granted as to Counts One, Two, Three
and Four.

**I. BACKGROUND**

Plaintiff was a service sales specialist in the field of
medical equipment and was employed by Picker
Marconi for ten years, voluntarily resigned in 2000
and sought to return there in mid-2001. Thoman
Certif. ¶ 1; Certification of Joseph Graham, ¶ 4;
Thoman Vol. I, T7-13 to 18; T9-18 to 19; T27-15 to
19. During the time Plaintiff wished to return to
Picker Marconi, Defendant Philips was in the process
of acquiring the company. Thoman Vol. I, T8-5 to 8.
On May 10, 2002, Plaintiff received an offer of
employment and commenced working shortly
thereafter. Graham Certif., ¶ 4; Certification of

Eugene Prendergast, Exh. R. Plaintiff was born in
1944 and was fifty-seven years old at the time he was
hired by Defendant. Certification of Charles Thoman,
¶ 1; Certification of Jeffrey L. Reiner, Exh. A, 15:21
to 17:5.

According to Plaintiff, during the acquisition,
Defendant's organization was disorganized as it
integrated additional business, sales methods,
documentation and payments into Defendant's
system. Graham Certif., ¶ 5. Plaintiff claims that
with respect to service sales, the filing, record
keeping and determination and payment of
commissions was in a constant state of disarray.
Graham Certif., ¶ 5; Thoman Vol. I, T50-23 to T51-
3; T109-11 to 13. Around the time Plaintiff was
hired, the Senior Vice President of Service Sales
issued a memorandum to the service sales specialists
regarding certain contracts for which no records
existed. Graham Certif., ¶ 5.

Eugene Prendergast, the Zone Manager for
Defendant, was Plaintiff's supervisor and responsible
for administering his annual performance appraisal.
Defendant's Statement of Facts ("SOF"), ¶ 7. Mr.
Prendergast gave Plaintiff a "very good" rating
during his 2002 review, which encompassed the
period from May 2002 until December 31, 2002. Id.
Within forty-five days of being hired, Defendant and
Mr. Prendergast realigned the territories and accounts
of the sales staff. Graham Certif., ¶ 14; Certification
of Dennis O'Toole, ¶ 6; Thoman Vol. II, T210-7 to
T217-22. Plaintiff claims that during that alignment
he acquired some of Mr. O'Toole's accounts,
including one in dispute, the Lenox Hill Hospital.
Graham Certif., ¶ 14; O'Toole Certif., ¶ 6; Thoman
Vol. II, T210-7 to T217-22. Plaintiff claims that he
worked on the Lenox Hill account by establishing
personal relationships and attending meetings
regarding the multi-vendor proposal. O'Toole Certif.,
¶ 9; Thoman Vol. II, T210-7 to T217-22. Mr.
Prendergast maintains that the Lenox Hill account
was not Plaintiff's account. Prendergast Certif., ¶¶
37-44.

**\*2** According to Plaintiff, Mr. Prendergast gave him
old copies of Defendant's databases which included
whether existing customers would be in need of
service contracts for medical equipment. Thoman
Vol. I, T53-4 to T54-22. Plaintiff developed
prospects to pursue from these lists, including

Slip Copy                                                                                                          Page 2
Slip Copy, 2007 WL 203943 (D.N.J.)
(Cite as: Slip Copy)

University Radiology, Sparta Imaging, Sussex County Imaging and Greene Medical Imaging. Thoman Vol. I, T-48-4 to 9. Plaintiff claims that according to the documents, these accounts did not have service agreements in place once the warranties ended, and so Plaintiff contacted each customer by telephone to solicit service agreements. Thoman Vol. I, T50-12 to 18; Thoman Vol. II, T222-20 to T225-5. Plaintiff admits that he did not confirm the accuracy of the documents prior to contacting the customers. Thoman Certif., ¶ 8. For all four accounts, Plaintiff secured a signed quotation, and the time between first contact with the customer and securing a signed quotation was less than thirty days. Thoman Vol. I, T73-14 to T78-23; T84-15 to T95-24; T99-14 to T103-18. Plaintiff delivered the signed quotations to Mr. Prendergast for review and then forwarded them to booking. Plaintiff did not retain copies of the signed quotations. Thoman Vol. I, T57-21 to T58-5; T97-21 to 24. A quotation is considered "booked" once it has been reviewed by a contract administrator, approved by a manager and entered into the computer system. Thoman Vol. II, T242-18 to 19.

Between August and December 2002, Plaintiff learned that in each of the four accounts he submitted for booking, a service agreement had already been sold to the customer before Plaintiff was employed by Defendant. Thoman Vol. I, T60-19 to 22. Plaintiff claims that he advised the booking department that the appropriate course of action was to process the pre-existing contracts, not the ones he had recently prepared for those four accounts. Thoman Vol. I, T61-25 to T62-4; T69-19 to 22; T70-2 to 5; T114-1 to 15. Plaintiff contends that he informed Mr. Prendergast about the situation-that Plaintiff had put in a lot of work on these four accounts and secured service agreements only to find out later that the customers already had service agreements-and they discussed the commissions for the accounts. Thoman Vol. I, t63-15 to 22; T72-17 to T73-13; Thoman Vol. II, T236-16 to T240-8. Plaintiff claims that Mr. Prendergast assured him that his receiving a commission was not a problem, and that Plaintiff should enter the old contracts on booking sheets and forward them to the central office. *Id.* Mr. Prendergast denies that such a meeting took place.

Between February and April 2003, these four accounts were addressed by Defendant as part of a validation process which reviewed many of the sales from 2002 and their commissionability. Thoman Certif., ¶ 13. All sales specialists were given an Issues to Resolve list, and were instructed to respond to the items on their list and submit them to an Audit Committee for review, further discussion or final decision. *Id.* Plaintiff's list included the four accounts at issue-University Radiology, Sparta, Sussex and Greene. Thoman Certif., ¶ 14. The committee indicated that the commissions were denied for these accounts because the contracts were sold in 2001, prior to Plaintiff's employment with the company. *Id.* Plaintiff responded to the four rejections as follows:

**\*3** Presented proposals to Customer at Customer's request. After signing and submission it was discovered that this customer had signed a POS agreement. It was buried in some file and forgotten. My inquiry caused the issue to surface. However, the ethical approach was to submit the original document.

Plaintiff claims that with all four accounts he did not know that there were service contracts in place before he started working on the accounts. *Id.* Plaintiff also claims that with all four accounts a POS service contract had been sold to the customer in 2001 when the equipment sale was made, however, those contracts had not been booked. *Id.* According to Plaintiff, until May 2003 there was no activity regarding the four contracts and no one discussed the matter with him or suggested that he withdraw any claim for commissions. Thoman Certif., ¶ 16. In May 2003, he received a response from the Audit Committee regarding the four accounts, which stated: "Rejected need copy of new agreement." Thoman Certif., ¶ 17. The response was issued by Larry Simanek, the Director of Sales Service Administration. Def.'s SOF, ¶ 14.

Plaintiff claims that the company never informed him that they were seeking copies of the newly signed quotations obtained by Plaintiff that past year. *Id.* Plaintiff understood the request for the new agreements to be the 2001 agreements that had been newly booked. *Id.* Plaintiff claims that because the new quotations he received never achieved agreement status and had not been booked, that he believed Defendant was requesting the 2001 signed agreements. *Id.* Plaintiff did not have the more recent, signed quotations in his possession, as he did not retain copies. Defendant contends that after Mr. Simanek's request for more information on the four accounts, Mr. Prendergast sent an email to Plaintiff on May 7, 2003 directing Plaintiff to "[h]ave copies of the signed contracts and PO's that you sold in 02 for items 2 [Greene], 4 [Sparta], 5 [Sussex], 6 [University], 24, 25. We are going to need them faxed." Def.'s SOF ¶ 15.

Slip Copy                                                                                    Page 3
Slip Copy, 2007 WL 203943 (D.N.J.)
(Cite as: Slip Copy)

During discovery, Plaintiff did not produce copies of any of the 2002 contract or purchase orders for the service contracts for the four accounts. Def.'s SOF, ¶ ¶ 16, 17. The four accounts, Greene, Sparta, Sussex and University, also did not produce any signed service agreements or purchase orders from Defendant during the period of May through December 2002. Def.'s SOF, ¶ 18. While Plaintiff explains that his booking requests for these four accounts brought to the light the fact that the previous contracts were not booked and were lost, Defendant puts forth the testimony of Sharon Lucas, who testified that she entered the 2001 University contract into the computer on July 27, 2001 and it was never lost or misplaced. Def.'s SOF, ¶ 33. Defendant also offers the testimony of Josette Viik that the Sussex and Sparta agreements were not buried in a file, but were entered into the computer system in 2002 and 2003, and that the Greene agreement was not lost or misplaced, rather she performed some necessary computer functions for this account in September 2002. Def.'s SOF, ¶ 34.

**\*4** During 2002 and 2003, all service sales specialists reporting to Mr. Prendergast submitted monthly forecasts with respect to their sales activity, including information on all of the service agreements booked during that month, current sales activities, transactions the specialist anticipated closing within thirty, sixty and ninety days, and prospects the specialist was pursuing. Def.'s SOF, ¶ 23. Defendant contends that Plaintiff's monthly forecasts do not accurately reflect the claimed activity regarding the four accounts at issue. Def.'s SOF, ¶ ¶ 24, 25, 26. Plaintiff explains the discrepancies in his monthly forecasts by stating that he learned about the accounts after he turned in the prior monthly forecast, and obtained signed agreements on the day of his presentations to these companies. Def.'s SOF, ¶ 29.

Defendant contends that Mr. Prendergast brought the problem with the four accounts to the attention of Amy Giustino, Defendant's Human Relations department representative, who directed him to prepare a synopsis of the facts for Paul Murdoch, the Senior Vice President of Customer Services. Def.'s SOF, ¶ 39. Defendant claims that Plaintiff's performance had deteriorated during 2003. Def.'s SOF, ¶ 41. Defendant hired Steve Kellett to replace Mr. Murdoch, and Mr. Kellett was charged with determining what to do about Plaintiff's employment. Def.'s SOF, ¶ 42. On June 17, 2003, Plaintiff was terminated on the basis of unethical conduct regarding the aforementioned four accounts. Thoman Certif., ¶ 18; Def.'s SOF, ¶ 11. Following Plaintiff's termination, his sales territory was covered by an existing employee, Bob Antonishak, age fifty-four, and Marylou Graham, age forty-five. Def.'s SOF, ¶ 51. On December 15, 2003, Mr. Prendergast hired Beth Gilchriest as a service specialist. *Id.* Ms. Gilchriest assumed the majority of Plaintiff's prior job duties. *Id.* At the time of her hire, Ms. Gilchriest was fifty years old. *Id.*

## II. DISCUSSION

### A. *Standard Summary Judgment*

A party seeking summary judgment must "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Orson, Inc. v. Miramax Film Corp.,* 79 F.3d 1358, 1366 (3d Cir.1996); *Healy v. New York Life Ins. Co.,* 860 F.2d 1209, 1219, n. 3 (3d Cir.1988), cert. *denied,* 490 U.S. 1098 (1989); *Hersh v. Allen Prods. Co.,* 789 F.2d 230, 232 (3d Cir.1986). The threshold inquiry is whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986)(noting that no issue for trial exists unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict in its favor). In deciding whether triable issues of fact exist, the Court must view the underlying facts and draw all reasonable inferences in favor of the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986); *Pennsylvania Coal Ass'n v. Babbitt,* 63 F.3d 231, 236 (3d Cir.1995); *Hancock Indus. v. Schaeffer,* 811 F.2d 225, 231 (3d Cir.1987).

**\*5** Rule 56(e) of the Federal Rules of Civil Procedure provides, in relevant part:
When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 4
Slip Copy, 2007 WL 203943 (D.N.J.)
**(Cite as: Slip Copy)**

Fed.R.Civ.P. 56(e). The rule does not increase or decrease a party's ultimate burden of proof on a claim. Rather, "the determination of whether a given factual dispute requires submission to a jury must be guided by the substantive evidentiary standards that apply to the case." Anderson, 477 U.S. at 255.

Under the Rule, a movant must be awarded summary judgment on all properly supported issues identified in its motion, except those for which the nonmoving party has provided evidence to show that a question of material fact remains. See Celotex, 477 U.S. at 324. Put another way, once the moving party has properly supported its showing of no triable issue of fact and of an entitlement to judgment as a matter of law, for example, with affidavits, which may be "supplemented ... by depositions, answers to interrogatories, or further affidavits," id. at 322 n. 3, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586 (citations omitted); see also Anderson, 477 U.S. at 247-48 (stating that "[b]y its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.").

What the nonmoving party must do is "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " Celotex, 477 U.S. at 324; see also Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888 (1990)(stating that "[t]he object of [Rule 56(e) ] is not to replace conclusory allegations of the complaint ... with conclusory allegations of an affidavit."); Anderson, 477 U.S. at 249; Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir.1992), cert. denied, 507 U.S. 912 (1993)(stating that "[t]o raise a genuine issue of material fact, ... the opponent need not match, item for item, each piece of evidence proffered by the movant," but must "exceed[ ] the 'mere scintilla' threshold and ... offer[ ] a genuine issue of material fact.").

The Local Civil Rules supplement the Federal Rules of Civil Procedure and provide that "each side shall furnish a statement which sets forth material facts as to which there exists or does not exist a genuine issue." L. Civ. R. 56.1. "Where possible, a single joint Rule 56.1 statement is favored." Allyn Z. Lite, New Jersey Federal Practice Rules 192 (2006 ed.)

(citations omitted). "Where a joint statement is not prepared, then, under the rule, 'facts submitted in the statement of material facts which remain uncontested by the opposing party are deemed admitted.' " Id. at 193 (citations omitted). [FN1] However, "the parties' statements pursuant to Local Rule 56.1 "cannot bind the Court if other evidence establishes that the stipulated facts are in error." Id. (citation omitted).

> FN1. The Court notes that while Plaintiff submitted a statement of material facts pursuant to L. Civ. R. 56. 1, the statements were not supported by affidavits, deposition testimony or documents. The Plaintiff also did not properly respond to Defendant's statement of undisputed facts, and therefore this Court was unable to determine what facts Plaintiff disputes. The Court will look to Plaintiff's counter-statement of facts contained in his brief in opposition to the motion for partial summary judgment which provides citations to the record pursuant to L. Civ. R. 56.1.

### B. *Plaintiff Fails to Satisfy his Burden on his Age Discrimination Claims*

**\*6** Plaintiff's Complaint alleges discrimination on the basis of age pursuant to the New Jersey Law Against Discrimination, N.J. Stat. Ann. § 10:5-1 to -49 ("NJLAD") and the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq. ("ADEA"). The Third Circuit has recognized that the New Jersey Supreme Court, "[i]n the absence of divergent language between the NJLAD and federal discrimination laws, ... has applied federal standards in NJLAD cases 'in the interest of achieving a degree of uniformity in the discrimination laws.' " Monaco v. Am. Gen. Assurance Co., 359 F.3d 296, 305 (3d Cir.) (citations omitted), cert. denied, 543 U .S. 814 (2004). Consequently, the Court will apply the *McDonnell Douglas* burden shifting analysis to Plaintiff's claims. See Sarullo v. U.S. Postal Serv., 352 F.3d 789, 797 (3d Cir.2003) (citations omitted), cert. denied sub nom. Sarullo v. Potter, 541 U.S. 1064 (2004).

Plaintiff must first prove a *prima facie* case of discrimination by a preponderance of evidence. See Texas Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53 (1981)(quoting McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)). To make a prima facie case here, Plaintiff must prove 1) that he belongs to a protected class; 2) that he was

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

qualified for the position; 3) that despite his qualifications he was terminated; and 4) that under circumstances raising an inference of discrimination, the employer continued to seek out individuals with qualifications similar to Plaintiff's to fill the position. *See Sarullo, 352 F .3d at 797* (citing *McDonnell Douglas,* 411 U.S. at 802 and *Pivirotto v. Innovative Sys., Inc.,* 191 F.3d 344, 348 n. 1 (3d Cir.1999)); *see also Abramson v. William Patterson College of New Jersey,* 260 F.3d 265, 281-82 (3d Cir.2001); *Warner v. Federal Express Corp.,* 174 F.Supp.2d 215, 219 (D.N.J.2001)(stating that the fourth prong is satisfied by presenting evidence "that Plaintiff was replaced by persons sufficiently younger to create the inference of age discrimination").

Once established, Plaintiff's *prima facie* case creates a rebuttable presumption of discriminatory intent. *See St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 506 (1993); *Burdine,* 450 U.S. at 254. While the ultimate burden of proof always remains with Plaintiff, the burden of production now shifts to Defendants, who must articulate a legitimate, nondiscriminatory reason for their actions. *See Hicks,* 509 U.S. at 507; *Burdine,* 450 U.S. at 253. To satisfy their burden, defendants must come forward with admissible evidence supporting the nondiscriminatory reason or reasons for their actions. *See Burdine,* 450 U.S. at 255. "The McDonnell Douglas formula is grounded in the presumption that if a rational reason for disparate treatment is not forthcoming, it is more likely than not that illegal discrimination played a role in the [adverse] decision." *Chauhan v. M. Alfieri Co.,* 897 F.2d 123, 127 (3d Cir.1990) (citations omitted). Once defendants satisfy their burden, the presumption of discriminatory intent is rebutted and drops from the case. *See id.*

**\*7** The burden of production then shifts back to plaintiff, who must come forward with admissible evidence showing that the articulated nondiscriminatory reasons were not the true reasons for the adverse action, but merely a "pretext for discrimination." *McDonnell Douglas,* 411 U.S. at 804; *Hicks,* 509 U.S. at 507-08; *Burdine,* 450 U.S. at 253. "[A] plaintiff does not need direct evidence of pretext in order to survive summary judgment." *Chauhan,* 897 F.2d at 127 (citing *Chipollini v. Spencer Gifts, Inc.,* 814 F.2d 893 (3d Cir.), cert. dismissed, 483 U.S. 1052 (1987)). "Instead, a plaintiff needs to be able to 'point[ ] to evidence which calls into question the defendant's intent.' " *Id .* (quoting *Chipollini,* 814 F.2d at 899). "In sum, the plaintiff cannot rely solely on a potential finding that the defendant's explanation is implausible. The fact

that a judge or a jury might disbelieve the defendant's asserted nondiscriminatory reason is not enough, by itself, to preclude summary judgment. Rather, the plaintiff must be able to adduce evidence, whether direct or circumstantial, from which a reasonable jury could conclude that the defendant's explanation is incredible." *Id.* at 128 (citation omitted).

Plaintiff claims that he was terminated from his employment with Defendant based on his age. Plaintiff was fifty-nine years old at the time he was discharged, thus placing him in the protected age group for both the NJLAD and the ADEA. Under *McDonnell Douglas,* Plaintiff must demonstrate that his employer replaced him with a younger individual, giving rise to an inference of age discrimination. Defendant argues that Plaintiff cannot establish a *prima facie* case of age discrimination because he was not replaced by a new hire until six months after he left the company and that initially his position was covered by two existing employees, aged fifty-four and forty-five. Further, upon hiring a replacement for Plaintiff, Defendant hired a fifty-year-old woman to cover the bulk of his former territory.

Defendant contends that the age difference-Plaintiff was fifty-eight when terminated and his replacement was fifty-does not constitute an inference of age discrimination. "[I]n order to satisfy the sufficiently younger standard, 'there is no particular age difference that must be shown, but while different courts have held ... that a five year difference can be sufficient, ... a one year difference cannot.' " *Monaco v. American General Assurance Co.,* 359 F.3d 296, 307 (3d Cir.2004) (quoting *Showalter v. Univ. of Pittsburg Med. Ctr.,* 190 F.3d 231, 236 (3d Cir.1999)). Defendant claims that Plaintiff's territory was handled by two existing employees-aged fifty-four and forty-five-until his replacement was hired six months later. The Court follows the standard set forth above and finds that Plaintiff has satisfied the fourth prong by demonstrating that the immediate, temporary replacements and the permanent replacement hired six months after his termination were younger than Plaintiff.

**\*8** Having found that Plaintiff has presented a *prima facie* case of age discrimination, and with the ultimate burden of proof still remaining with Plaintiff, the burden of production now shifts to Defendant to articulate a legitimate, non-discriminatory reason for Plaintiff's termination. To that end, Defendant has asserted that Plaintiff was terminated due to "unethical conduct," which involved his claims for commissions on the four

accounts in controversy. As documented in detail, Plaintiff was questioned about the four accounts and was given the opportunity to provide his employer with documents to substantiate his claims to these service contracts. Defendant determined these contracts were actually sold prior to Plaintiff's employment with the company. Plaintiff failed to provide any documents or evidence to validate his contention that he was entitled to the commissions, and Defendant terminated him based on what it found to be unethical conduct. This legitimate, non-discriminatory reason for terminating Plaintiff is supported by Defendant's affidavits, testimony and documents.

Consequently, it is Plaintiff's burden to show that this reason was merely pretext for discrimination. However, the Court concludes that Plaintiff's claim fails here. Plaintiff has not presented evidence demonstrating that Defendant's stated reason for his termination was merely pretext for discrimination or based upon anything other than his conduct. Plaintiff must point to evidence which calls into question the Defendant's intent. In this case, Plaintiff asserts that the purported unethical conduct is not credible, however, he does not cite to specific evidence to support this claim. Rather, Plaintiff makes broad allegations, for instance, that Mr. Prendergast's credibility is questionable, and since the termination for unethical conduct was initiated by Mr. Prendergast as Plaintiff's supervisor, the credibility of the legitimate reason must also be questioned.

Plaintiff also claims that Mr. Prendergast made a comment to him that a fellow employee, three years younger than Plaintiff, should leave the company because "[h]e's too old for this job." Thoman Vol. II, T283-23 to T284-8. Plaintiff claims that certain service sales specialists were given new assignments, and Plaintiff received a less profitable assignment than a younger specialist. Reiner Certif., Exh. F. In his deposition, Plaintiff claims that the older employees were treated differently than the younger employees by Mr. Prendergast, specifically, that he treated them "[g]enerally rude, not respectful of their feelings ... very aloof." Thoman Vol. II, T285-19 to 25. Plaintiff cited to a specific example where Mr. Prendergast questioned whether he should have been working at a certain office, and Plaintiff claims this demonstrated the way Mr. Prendergast treated Plaintiff differently than younger employees. Thoman Vol II, T283-13 to 24. Plaintiff, however, could not explain a similar situation where one of the younger employees was actually treated differently. Thoman Vol. II, T286-1 to 20.

**\*9** Even viewing the facts in a light more favorable to Plaintiff, he has failed to put forth evidence that demonstrates the legitimate, non-discriminatory reason for his termination was merely a pretext for age discrimination. Plaintiff makes generalizations regarding the different manner in which his supervisor, Mr. Prendergast, treated the older and younger sales specialists, however, does not cite to any specific examples or conversations that would question the legitimacy of Defendant's reason for terminating him. Plaintiff has not carried his burden to show that Defendant's reason, unethical conduct, is not credible. In order to survive a motion for summary judgment, Plaintiff must go beyond mere allegations and point to specific instances and evidence which support his claims. The Court concludes that there are no genuine issues of material fact and that the evidence demonstrates that Defendant terminated Plaintiff based upon his conduct and not in a discriminatory manner prohibited by NJLAD or the ADEA. Consequently, Defendants' motion for summary judgment is granted with respect to Plaintiff's claims under NJLAD and the ADEA (Counts One and Two).

### C. *Plaintiff is not Permitted to Amend his Claim of a Violation of Good Faith and Fair Dealing*

Count Four of the Complaint, "Violation of Covenant of Good Faith and Fair Dealing" alleges that "[t]he termination of Plaintiff by Defendant was so egregious and so contrary to the heart and essence of his employment agreement with Defendant as to violate the covenant of good faith and fair dealing implied in every employment agreement ... [a]s a direct [result] of his unlawful termination, Plaintiff has been caused to sustain serious economic loss and emotion distress and humiliation." Absent an express or implied employment contract, "there is no implied covenant of good faith and fair dealing." *Wade v. Kessler Inst., 172 N.J. 327, 345 (2002)*; *DeJoy v. Comcast Cable Communs., 968 F.Supp. 963, 989 (D.N.J.1995)*. Defendant contends that the covenant of good faith and fair dealing does not exist with at-will employment. *Citizens Bank of New Jersey v. Libertelli, 215 N.J.Super. 190, 194 (App.Div.1987)*; *McDermott v. Chilton Co., 938 F.Supp. 240, 246 (D.N.J.1995)*. In Plaintiff's opposition, he acknowledges that Count Four is "not well-crafted both in allegations an relief sought and thereby suggests a wrongful termination ... claim." Pl.'s Br. at 41. Plaintiff concedes that as stated, Count Four is subject to dismissal, however, Plaintiff intended this

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

claim to sound in contract, and to pursue recovery for commissions Plaintiff allegedly earned during the first half of 2003 but was not paid due to his termination. *Id.* Regardless of whether employment is "at will," an implied obligation of good faith and fair dealing attaches to any contractual aspect of an employment relationship. *Nolan v. Control Data Corp.,* 243 N.J.Super. 420, 429 (App.Div.1990).

**\*10** Plaintiff requests that this Court regard the Complaint as amended as discussed above or permit Plaintiff to amend the Complaint and consider this motion in light of such an amendment. In this case, the Court entered a Scheduling Order on February 7, 2005, which delineates March 1, 2005 as the deadline for filing a motion to amend the pleadings. Given the untimeliness of Plaintiff's request to amend, Fed.R.Civ.P. 16(b) governs whether Plaintiff will be allowed to file an Amended Complaint. Under Fed.R.Civ.P. 16(b), Plaintiff is required to establish good cause before he will be allowed to amend. The Court has great discretion in determining what kind of showing the moving party must make in order to satisfy the good cause requirement of Fed.R.Civ.P. 16(b). 3 James Wm. Moore et al., Moore's Federal Practice, § 16.14[1][b] (Matthew Bender 3d ed.1997). Whether good cause exists depends upon the diligence of the moving party. Fed.R.Civ.P. 16(b) advisory committee's note; *Harrison Beverage Co. v. Dribeck Importers, Inc.,* 133 F.R.D. 463, 469 (D.N.J.1990)). Good cause may be satisfied if the movant shows that his delay in filing the motion to amend stemmed from "any mistake, excusable neglect or any other factor which might understandably account for failure of counsel to undertake to comply with the Scheduling Order." *Newton v. Dana Corp. Parish Division,* 1995 WL 368172, at \* 1 (E.D.P.A.1995) (quoting *Gestener Corp. v. Case Equipment Co.,* 108 F.R.D. 138, 141 (D.Me.1985)). The good cause requirement must be read in conjunction with the directive of Fed.R.Civ.P. 15(a), that leave to amend be "freely given" such that both standards are met before amendment is allowed. *Reynolds v. Borough of Avalon,* 799 F.Supp. 442, 450 (D.N.J.1992).

Here, Plaintiff merely states that he intended to pursue a breach of the covenant of good faith and fair dealing based on a service contract, however, the claim as stated was not so drafted and instead asserts a breach based on wrongful termination. The Court finds that Plaintiff has not satisfied the good cause standard necessary to amend the Complaint at this late date. Discovery concluded in this case on March 15, 2006. Defendants would be prejudiced if Plaintiff

were permitted to revise a claim which was filed in 2004. Plaintiff has not put forth good cause for amending this claim, or explained how mistake or excusable neglect is present. Accordingly, the Court will grant summary judgment as to Count Four, as currently stated and will not permit Plaintiff to amend his Complaint to revise Count Four.

### D. *Remaining Counts (Three and Five)*

In Plaintiff's opposition brief, he does not oppose that Count Three, alleging that the termination of Plaintiff was in violation of state whistle blower laws of New Jersey (N.J.S.A. 34:19-1 et seq.), New York, Pennsylvania and Washington, should be dismissed. Therefore, Count Three of the Complaint is dismissed.

Further, in Defendant's reply brief, it withdraws its motion for summary judgment as to Count Five, regarding breach of contract as to the Lenox Hill Hospital account. Therefore, Count Five remains.

### III. CONCLUSION

**\*11** For the foregoing reasons, Defendant's motion for partial summary judgment is granted as to Counts One, Two, Three and Four. An appropriate form of order accompanies this Memorandum Opinion.

D.N.J.,2007.
Thoman v. Philips Medical Systems
Slip Copy, 2007 WL 203943 (D.N.J.)

END OF DOCUMENT

Westlaw.

Not Reported in F.Supp.2d                                                                                                      Page 1
Not Reported in F.Supp.2d, 1998 WL 966026 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d)

H

Vosgerichian v. Commodore Intern. Ltd.
E.D.Pa.,1998.
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.
Glen VOSGERICHIAN, on behalf of himself and
others similarly situated, Plaintiffs,
v.
COMMODORE INTERNATIONAL LIMITED,
Irving Gould, Medhi R. Ali, and Ronald B.
Alexander, Defendants.
No. CIV.A. 92-CV-4867.

Nov. 6, 1998.

Stephen H. Goldstein, Rudolph, Salmon, Goldstein,
Rochestie & Dorian, P.C., J. Dennis Faucher, Miller,
Faucher, Chertow, Cafferty and Wexler, John F.
Innelli, Innelli and Molder, Lindsey S. Forshay,
Miller, Faucher, Cafferty and Wexler, LLP, Phila, for
Glen Vosgerichian, on behalf of himself and all
others similarly situated, Plaintiffs.
Phillip A. Geraci, Andrew J. Melnick, Kaye, Scholer,
Fierman, Hays & Handler, Fredric W. Yerman, Kaye,
Scholer, Fierman, Hays & Handler, Jonathan Thier,
Richard Schoenstein, Cahill, Gordon & Reindel, New
York, NY, for Commodore International, Medhi R.
Ali, Ronald B. Alexander, Defendants.

MEMORANDUM OPINION
KAUFFMAN, J.
*1 In this six year old securities fraud action, the
individual Defendants ("Defendants")-former
directors and officers of Commodore International
Limited ("Commodore")-have moved for summary
judgment. In response, Plaintiff Glen Vosgerichian
("Plaintiff"), has moved to amend the Complaint
pursuant to Rule 15(b) of the Federal Rules of Civil
Procedure. For the following reasons, Plaintiff's
Motion to Amend the Complaint will be DENIED
and Defendants' Motion for Summary Judgment will
be GRANTED.

I. BACKGROUND

The following undisputed facts in this case are stated
by Judge Ditter in a Memorandum Opinion, issued on
August 26, 1993. See Vosgerichian v. Commodore
Int'l, 832 F.Supp. 909, 911 (E.D.Pa.1993), vacated on

reconsideration, 862 F.Supp. 1371 (E.D.Pa.1994).
Commodore is an American manufacturer of
personal computers and other technological products.
It does the majority of its business in Europe.
Commodore prospered in the 1980's, but in 1989,
sales dwindled and net income decreased sharply,
particularly in Europe. A five percent drop in the
growth rate of the European computer market
between December 1989 and June 1990 contributed
to this loss. In April, 1991, Commodore launched
CDTV, a new interactive compact disc home
television system. CDTV sold slowly. Thereafter,
Commodore's success continued to decline.

Plaintiff contends that Commodore and Defendants
(collectively, the "Commodore Defendants")
intentionally deceived shareholders about the
company's financial situation. After relying on these
misrepresentations, Plaintiff asserts that he and other
shareholders who purchased Commodore stock
between July 1, 1990 and August 19, 1992 were
damaged. Plaintiff claims that these
misrepresentations constituted a "continuing course"
of fraudulent conduct, which aimed to inflate the
price of Commodore stock artificially and entice a
willing buyer.

In his original Complaint, Plaintiff alleged four
instances of securities fraud. First, Plaintiff claimed
that the Commodore Defendants and Commodore's
independent auditor, Arthur Andersen,
mischaracterized a $9.2 million litigation settlement,
paid by Commodore in 1991, on Commodore's third-
quarter 1991 financial statement as an "extraordinary
item," violating generally accepted accounting
principles ("GAAP") and fraudulently
misrepresenting the company's income. Second,
Plaintiff claimed that the Commodore Defendants
failed to disclose an obligation, allegedly incurred in
1987, to buy back warrants for its stock from
Prudential Insurance Company, to whom
Commodore had issued the warrants in connection
with a $60 million loan. Third, Plaintiff charged that
the Commodore Defendants misrepresented their true
expectations for CDTV. Finally, Plaintiff alleged that
the Commodore Defendants failed to disclose the
extent of the company's reliance on the European
market and the true effect of the European recession
on Commodore's fortunes. Plaintiff also brought a
negligent misrepresentation claim against the
Commodore Defendants.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                Page 2
Not Reported in F.Supp.2d, 1998 WL 966026 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

**\*2** This action was originally before Judge William Ditter, Jr. Ruling on the separate Defendants' Motions to Dismiss under Rule 12(b)(6), Judge Ditter converted them into motions for summary judgment and found all but one of Plaintiff's allegations of fraud groundless. Accordingly, Judge Ditter granted summary judgment for Arthur Andersen entirely, and he granted the Commodore Defendants' motion "except as it concerns their failure to disclose a warrant re-purchase agreement they allegedly entered into with Prudential Insurance in 1987." 832 F.Supp. at 911. Judge Ditter allowed a sixty-day discovery period on this remaining claim, and he also allowed Plaintiff's negligent misrepresentation claim to proceed to the extent that this one remaining allegation of fraud existed. *Id* . Upon Plaintiff's Motion to Reconsider, Judge Ditter vacated his earlier order, finding that he had not given Plaintiff proper notice prior to converting the motions to dismiss into summary judgment motions. *Vosgerichian v. Commodore Int'l, 862 F.Supp. 1371, 1375, 1378 (E.D.Pa.1994)*. Nonetheless, Judge Ditter found that Plaintiff's claims which he had dismissed under the summary judgment standard would still be dismissed under the 12(b)(6) standard, for they failed to state a claim upon which relief could be granted. *Id. at 1375-78.*

The individual defendants have moved for summary judgment, claiming that Plaintiff has failed to produce any evidence of the secret repurchase agreement. In response, Plaintiff declines to present any evidence, moving instead to amend the Complaint pursuant to Rule 15(b). Arguing that discovery has turned up evidence that supports the claims already dismissed by Judge Ditter, Plaintiff urges this Court to allow leave to amend the Complaint to conform to this new evidence. Plaintiff further contends that Judge Ditter did not narrowly tailor the remaining claim to the question of whether a re-purchase agreement existed between Commodore and Prudential, but he also left intact the issue of whether Commodore mischaracterized the re-purchase on its financial statements to the detriment of the class members. While discovery revealed no evidence of a re-purchase agreement, argues Plaintiff, it did unearth evidence showing that the actual re-purchase payment was not properly accounted for on Commodore's financial statements, resulting in an overstatement of income for the fourth quarter of the 1991 fiscal year.

Without amendment to the Complaint, Plaintiff cannot hope to avoid summary judgment. At oral argument, Plaintiff's counsel conceded that no evidence had been found of an agreement between Commodore and Prudential, (Tr. July 16, 1998, at 48), and Plaintiff's arguments against summary judgment focus entirely on the accounting issue relating to the repurchase payment. Plaintiff argues that the evidence that the warrant repurchase was given improper accounting treatment is relevant under the Complaint as left intact by Judge Ditter, even without the amendment he seeks. Plaintiff claims that "[d]iscovery was permitted to go forward [by Judge Ditter] on the issue of defendants' misrepresentation of reported income from operations stemming from incorrect accounting treatment of the warrants ...." (Pl.'s Mem. Law Opp. Defs.' Mot. Dismiss.) This constitutes a misstatement of the law of the case; Judge Ditter's holding is clear: he granted the Commodore Defendants' Motion to Dismiss "except as it concerns their failure to disclose a warrant re-purchase agreement they allegedly entered into with Prudential Insurance in 1987." 832 F.Supp. at 911. Thus, without amendment, the evidence to which Plaintiff points cannot aid him in eluding summary judgment on his remaining claim.

**\*3** Plaintiff has filed his Motion to Amend the Complaint under Rule 15(b) of the Federal Rules of Civil Procedure. He claims that he has uncovered facts which support "the claims included in his complaint which were dismissed by Judge Ditter." (Pl.'s Mem. Law Supp. Mot. Amend at 6.) Rule 15(b), however, is inapplicable to the instant case. Rule 15(b) allows for amendment to conform to the evidence when issues arise that are not addressed in the pleadings, but only when these issues "are tried by express or implied consent of the parties." Fed.R.Civ.P. 15(b). The rule contemplates amendments made during or after trial, due to the emergence of novel issues not covered in the operative pleadings. "The rule is applicable only where it clearly appears from the record that an issue not raised in the pleadings and not preserved in the pretrial order *has in fact been tried* and that this procedure has been authorized by express or implied consent of the parties." *Systems Inc. v. Bridge Elec. Co., 335 F.2d 465, 466-67 (3d Cir.1964)* (emphasis added). "Rule 15(b), however, is limited to situations where the issue has been tried. [Where] no trial has occurred, [plaintiff] can find no solace in Rule 15(b)." *Albanese v. Bergen County, New Jersey, 991 F.Supp. 410, 421 (D.N.J.1998)*. Plaintiff has made his motion in response to a motion for summary judgment; no trial has even begun.

Although Plaintiff has not taken advantage of it, Rule

15(a) allows for amendment to a complaint by leave of court, and such "leave shall be freely given when justice so requires." Fed.R.Civ.P. 15(a).[FN1] While a liberal philosophy guides a district court's decision on a Rule 15(a) motion to amend, the trial court may consider various factors in deciding such a motion, including undue delay, undue prejudice to the opposing party, and futility of amendment. *Averbach v. Rival Mfg. Co.,* 879 F.2d 1196, 1203 (3d Cir.1989) (citing *Foman v. Davis,* 371 U.S. 178 (1962)). "For example, if the amendment substantially changes the theory on which the case has been proceeding and is proposed late enough so that the opponent would be required to engage in significant new preparation, the court may deem it prejudicial. Likewise, if the proposed change clearly is frivolous or advances a claim or defense that is legally insufficient on its face, the court may deny leave to amend." *Ross v. Jolly,* 151 F.R.D. 562, 565 (E.D.Pa.1993) (Joyner, J.). The trial court *must* take into account any prejudice to the defendant that would result from the proposed amendment. *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 330-31 (1971). Plaintiff has not moved under Rule 15(a). Even if he had, however, no modicum of justice would be served by an amendment at this late stage of these proceedings.

> FN1. In the interest of comprehensiveness and clarity, the Court will address issues that would have been raised had Plaintiff moved under Rule 15(a).

Plaintiff's intent in his motion to amend is to conform his Complaint to "facts not previously known," which were unearthed during discovery. (Pl.'s Mem. Law Supp. Mot. Amend at 5.) Discovery, as allowed under the Federal Rules of Civil Procedure, must not serve as a fishing expedition for Plaintiffs. *See Rector v. Johnson,* 120 F.3d 551, 563 (5th Cir.1997). This action is six years old, and discovery proceeded for years. Plaintiff has been inexplicably dilatory in moving for this amendment, and he appears to have done so only in response to Defendants' Motion for Summary Judgment. Amendment at this stage of these proceedings would also cause substantial prejudice to Defendants. Plaintiff's proposed amendments would constitute his Third Amended Complaint, and again, this action was filed in 1992. Defendants proceeded through discovery while laboring under the impression that Plaintiff was pursuing the claim left intact by Judge Ditter. Discovery has now closed, and Defendants have moved for summary judgment. Forcing Defendants at

this stage of the proceedings to defend against new claims would be clearly prejudicial. *See Ansam Assocs., Inc. v. Cola Petroleum, Ltd.,* 760 F.2d 442, 446 (2d Cir.1985). For these reasons alone, Plaintiff's motion should be denied.

**\*4** In addition, however, most of Plaintiff's proposed amendments would be futile. Much of their substance merely restates claims already dismissed by Judge Ditter. Included in the amendments are allegations that Defendants used improper accounting methods when reporting the warrant re-purchase and the litigation settlement, and that Defendants issued encouraging economic statements regarding CD-TV that did not comport with the prevailing economic reality, all events declared by Judge Ditter to be immaterial in the context of securities fraud. 862 F.Supp. at 1376-77.

Plaintiff argues that, upon the emergence of new evidence not known at the time of the dismissal, this Court possesses the authority to allow an amendment to the Complaint that would reflect claims dismissed by Judge Ditter. He urges that despite the weight of Judge Ditter's holdings as the law of the case, this Court may take steps to correct these holdings upon presentation of the new evidence. Indeed, the doctrine of "law of the case," which posits that a court's legal decisions should continue to govern the same issues in subsequent stages in the same case, guides a court's discretion, but it does not limit the tribunal's power. *Arizona v. California,* 460 U.S. 605, 618 (1983). The Third Circuit recognizes, for example, the following exceptions to the law of the case doctrine: (1) when a timely motion for reconsideration is made before a second judge, if the first judge is not available; (2) when evidence not considered by the first judge becomes available for consideration by the second judge; (3) when a supervening rule of law renders invalid the decision rendered by the first judge; and (4) when the first judge's decision was clearly erroneous and would work a manifest injustice. *Schultz v. Onan Corp.,* 737 F.2d 339, 345 (3d Cir.1984).

Only the second and fourth of these exceptions are even arguably available here: (2) The new evidence produced by Plaintiff goes mostly to issues deemed immaterial by Judge Ditter, such as the accounting treatment of the settlement, the sales puffery over CD-TV, and the accounting treatment of the warrant re-purchase. (4) Considering the present record, Judge Ditter's holdings were not clearly erroneous and would not result in manifest injustice.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 4
Not Reported in F.Supp.2d, 1998 WL 966026 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

The Third Circuit has held in the clearest of terms that "judges of co-ordinate jurisdiction sitting in the same court and in the same case should not overrule the decisions of each other." *TCF Film Corp. v. Gourley,* 240 F.2d 711, 713 (3d Cir.1957) (citing *Price v. Greenway,* 167 F.2d 196, 199-200 (3d Cir.1948)); *see also Jurgenson v. National Oil & Supply Co.,* 63 F.2d 727, 729 (3d Cir.1933). The purpose of this rule is "to preserve the orderly functioning of the judicial process." *TCF,* 240 F.2d at 714; *see also Hayman Cash Register Co. v. Sarokin,* 669 F.2d 162, 168 (3d Cir.1982). This guidance, combined with the undue delay, undue prejudice, and contradiction of the law of the case implicated by Plaintiff's Motion, compel this Court to deny the Motion.

**\*5** The Court now turns to Defendants' Motion for Summary Judgment on the only remaining claim of securities fraud, the failure to disclose an alleged agreement between Commodore and Prudential concerning the re-purchase of the warrants and the negligent misrepresentation claim. Under Federal Rule of Civil Procedure 56(c), summary judgment shall be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Defendants claim that no such re-purchase agreement ever existed and that Plaintiff has failed to discover or produce any evidence in support of its existing claim. Plaintiff's response consists of his Motion to Amend and an argument that the accounting treatment of the re-purchase payment is still an issue in this case, despite Judge Ditter's clear holding to the contrary. *See* 832 F.Supp. at 915 ("[N]o reasonable investor could have considered the accounting treatment of the [warrant] purchases significant ....").

At oral argument, Plaintiff's counsel conceded that he discovered no evidence of a re-purchase agreement, and he has produced no such evidence in response to Defendants' motion. Thus, no genuine issue of material fact exists on the issue of the alleged re-purchase agreement. Judge Ditter allowed the negligent misrepresentation claim to proceed only to the extent that the alleged re-purchase agreement question remained unanswered. Summary Judgment will be entered for Defendants on the remaining securities fraud claim and on the negligent misrepresentation claim.

An Appropriate Order follows.

ORDER

AND NOW, this 4th day of November, 1998, upon consideration of Plaintiff's Motion to Amend the Complaint, Defendants' Motion for Summary Judgment, the memoranda of law submitted in support thereof, the responses thereto, and oral argument, it is ORDERED that Plaintiff's Motion to Amend the Complaint is DENIED and Defendants' Motion for Summary Judgment is GRANTED.

E.D.Pa.,1998.
Vosgerichian v. Commodore Intern. Ltd.
Not Reported in F.Supp.2d, 1998 WL 966026 (E.D.Pa.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.